# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

FN Herstal, S.A.,                             )
                                              )
        Plaintiff,                   )
                                              )    Civil Action No. 3:12-cv-102-CAR
v.                                            )
                                              )
Clyde Armory, Inc.,                           )
                                              )
        Defendant.                   )


## DEFENDANT CLYDE ARMORY INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PRIORITY OF USE

### PUBLIC VERSION

Glenn D. Bellamy, Esq.
Paul J. Linden, Esq.
WOOD, HERRON & EVANS, LLP
2700 Carew Tower, 441 Vine Street
Cincinnati, Ohio 45202

Michael C. Daniel, Esq.
PRIOR, DANIEL & WILTSHIRE, LLC
490 North Milledge Avenue
Athens, Georgia 30601

*Attorneys for Defendant, Clyde Armory, Inc.*

June 19, 2014

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   BACKGROUND ................................................................................ 3

    A.    Sage Develops the Enhanced Battle Rifle (EBR) Chassis Stock System ............ 4

    B.    Clyde Armory Develops the SCAR-Stock Replacement Stock ......................... 4
        with Sage

    C.    The U.S. Military Initiates the Special Operations Forces ("SOF")
        Combat Assault Rifle (SCAR) Program ................................................ 5

    D.    FN's Erroneous Trademark Right Claims ............................................. 7

        1.    FN's Trademark Registrations and Applications ................................. 7

        2.    Relation of FN's Patent Rights to its Alleged Trademark Rights ............. 9

    E.    Background of the Current Dispute .................................................. 10

III.  LEGAL PRINCIPLES ...................................................................... 12

    A.    Legal Principles of Summary Judgment .............................................. 12

    B.    Substantive Trademark Law .......................................................... 12

        1.    Establishing a Protectable Trademark ........................................ 13

        2.    Priority of Use .............................................................. 15

        3.    Unlawful Use ................................................................. 16

IV.   DISCUSSION .............................................................................. 17

    A.    Clyde Armory Established Priority in SCAR-Stock Through its
        Lawful Use of the Mark in Commerce as Early as September 2006 ................. 17

    B.    As Used with the U.S. Military, SCAR is Descriptive
        and Establishes No Trademark Right ................................................ 20

    C.    FN Cannot Show that SCAR Acquired Distinctiveness
        Before September 2006…………………………………………………………20

D.     FN's Advertisement of an Association with SOCOM and
the SCAR Program Violates Federal Acquisition Regulations
and was Therefore Unlawful.............................................................. 23

V.     CONCLUSION........................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

*Cases*

*Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988) ...................................................................... 10

*Am. Express Co. v. Goetz*, 515 F.3d 156 (2d Cir. 2008) ............................................................. 3

*American Foods v. Golden Flake*, 312 F.2d 619 (5th Cir. 1963) ................................................ 21

*Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) ...................................................................... 12

*Astroworks, Inc. v. Astroexhibit, Inc.,* 257 F. Supp. 2d 609 (S.D.N.Y. 2003) ........................... 10

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523 (2d Cir. 1985) ................................ 10

*Carolina Exports Int'l v. Bulgari, S.p.A.*, 1997 U.S. App. LEXIS 4701 (Fed. Cir. 1987) ... 16, 23

*Clark v. Coats & Clark*, 929 F.2d 604 (11th Cir. 1991) ............................................................. 12

*Clorox Co. v. Armour-Dial, Inc.,* 214 U.S.P.Q. 850 (TTAB 1982) ............................................. 23

*Colt Defense LLC v. Bushmaster Firearms, Inc.,* 486 F.3d 701 (1st Cir. 2007) ....................... 13

*Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir. 1984) ...................................... 15, 21

*CreAgri, Inc. v. USANA Health Sciences, Inc.,* 474 F.3d 626 (9th Cir. 2007) ........... 1, 16, 17, 23

*Dessert Beauty, Inc. v. Mara Fox*, 617 F. Supp. 2d 185 (S.D.N.Y. 2007) ....................... 2, 16, 24

*Erva Pharm., Inc. v. American Cyanamid Co.*, 755 F. Supp. 36 (D. P.R. 1991) ................ 16, 24

*G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 873 F.2d 985 (7th Cir. 1989).............. 15, 23

*General Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270 (TTAB 1992)............ 17, 27, 28

*Harod v. Sage Products, Inc.*, 188 F. Supp. 2d 1369 (S.D. Ga. 2002) ......................................... 3

*In re MBNA America Bank, N.A.*, 340 F.3d 1328 (Fed. Cir. 2003) ............................................ 14

*In re Midwest Tennis & Track Co.,* 29 U.S.P.Q.2d 1386 (1993).................................................. 23

*In re Pepcom Indus., Inc.,* 192 U.S.P.Q. 400 (TTAB 1976)......................................................... 23

*Int'l Stamp Art, Inc. v. U.S. Postal Serv.,* 456 F.3d 1270 (11th Cir.2006).................................. 13

*In re Stellar Int'l, Inc.,* 159 U.S.P.Q. 48 (TTAB 1968) ............................................................... 23

*Intrawest Financial Corp. v. Western National Bank of Denver,*
    610 F. Supp. 950 (D. Co. 1985)........................................................................ 16, 24

*Investacorp, Inc. v. Arabian Inv. Banking Corp.,* 931 F.2d 1519 (11th Cir. 1991).......... 1, 13, 15

*Johnny Blastoff, Inc. v. L.A. Rams Football Co.,* 188 F.3d 427 (7th Cir. 1999) ........................ 21

*Kellogg Co. v. New Generation Foods, Inc.,* 6 U.S.P.Q.2d 2045 (TTAB 1988)........................ 17

*Kratom Lab, Inc. v. Mancini,* 2013 U.S. Dist. LEXIS 105852 (S.D. FL. 2013) ................. 15, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)................................. 12

*Menper Distributors, Inc. v. Germa Products, Inc.,*
    2011 U.S. Dist. LEXIS 80192 (S.D. FL. 2011) ................................................ 16, 24

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189 (1985) ................................. 13 (fn. 5)

*Satine Societa in Nome Collettivo v. P.A.B. Produits,*
    209 U.S.P.Q. 958 (TTAB 1981) ........................................................................ 17, 27

*Tally-Ho, Inc. v. Coast Community College District,* 889 F.2d 1018 (11th Cir. 1989)............... 1

*Taylor v. Espy,* 816 F. Supp. 1553 (N.D. Ga. 1993)................................................................... 12

*Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763 (1992)................................................. 1, 13

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219 (10th Cir. 2000) ........ 16, 23

*Wal-Mart Stores v. Samara Bros.,* 529 U.S. 205 (2000) ........................................................ 1, 14

*Welch v. Celotex Corp.,* 951 F.2d 1235 (11th Cir. 1992) ........................................................... 12

*Welding Services, Inc. v. Forman,* 509 F.3d 1351 (11th Cir. 2007)........................ 13, 15, 21, 23

## Statutes, Regulations, & Rules

FED. R. CIV. P. 56...................................................................................................................... 12

48 C.F.R. §5652.204-9003.................................................................................................... 3, 24

10 U.S.C. 130b........................................................................................................................... 24

15 U.S.C. §1125(a) ................................................................................................................... 13

15 U.S.C. §1141(g) .................................................................................................... 8 (fn. 2)

35 U.S.C. §102(b) .................................................................................................................. 9

**_Other Authorities_**

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed. 2013)...................... 13, 14, 15

# I.  PRELIMINARY STATEMENT

This case turns on the question of whether Defendant Clyde Armory, Inc. established trademark rights in the mark SCAR-Stock before Plaintiff FN Herstal S.A. established any trademark rights in the name SCAR. In light of the law and facts discussed below, Clyde Armory submits that the Court must answer this question in the affirmative.

Under U.S. trademark law, protectable common law trademark rights are established by using in commerce a mark that establishes in the minds of consumers the source of the goods on which the mark is used. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992). When two marks are so similar that they are likely to cause confusion for consumers as to the source of the goods, the senior party owns rights to the mark based on its priority of use, and may enjoin a junior party from using a competing mark on the same or related goods. *Tally-Ho, Inc. v. Coast Community College District,* 889 F.2d 1018 (11th Cir. 1989). In other words, the party that establishes it had a protectable trademark interest first wins the race.

But not every "use" of a mark in commerce is sufficient to establish priority. To make a claim to priority, the mark used must be "inherently distinctive" or have "acquired distinctiveness." *Investacorp, Inc. v. Arabian Inv. Banking Corp*., 931 F.2d 1519, 1522 (11th Cir. 1991). A mark is inherently distinctive if, by its very nature, it identifies the source of the product. *Wal-Mart Stores v. Samara Bros*., 529 U.S. 205, 210 (2000). A mark acquires distinctiveness if it develops "secondary meaning," i.e., recognition by consumers in the general public that the mark identifies the source of the product rather than the product itself. *Id.*

Moreover, to claim priority, the use of the mark in commerce must be lawful. *See CreAgri, Inc. v. USANA Health Sciences, Inc.,* 474 F.3d 626 (9th Cir. 2007). Unlawful use of a mark creates no trademark right, and negates the user's claim to priority of use in commerce where: (1) a court or government agency has determined that the mark-user has failed to comply

1

with the law when using its mark; or (2) the user engaged in a *per se* violation of a law regulating the sale of the user's goods. *See Dessert Beauty, Inc. v. Mara Fox*, 617 F. Supp. 2d 185, 190 (S.D. N.Y. 2007).

In this case, Clyde Armory established a protectable trademark right in SCAR-Stock *before* FN established lawful trademark use of its SCAR product name. Clyde Armory began selling products under its distinctive mark SCAR-Stock, a coined acronym reflecting the product name S̲age C̲lyde A̲rmory R̲ifle S̲tock, in commerce no later than September 2006. By its own admission, on the other hand, FN first used its product name, a descriptive designation provided by the U.S. Military for S̲pecial Operation Forces C̲ombat A̲ssault R̲ifle, in commerce no earlier than late November 2008.

FN may attempt to rebut this basic fact in two ways, neither of which the Court should find persuasive. First, FN may say that it established a trademark right to SCAR in 2005 when it began selling firearms to the U.S. Military under that product name. But at that time, FN only used SCAR in connection with products it provided to the U.S. Military, not the general consuming public. Any such use of SCAR by FN was merely as a descriptive term provided by the U.S. Military itself. In other words, FN called its products SCAR because that was the name the U.S. Military gave a project to develop a Special Operation Forces Combat Assault Rifle (SCAR). As used in connection with products FN provided to the U.S. Military, SCAR was merely descriptive, and could not have acquired distinctiveness through secondary meaning because it was not used on products that were commercially available or marketed to non-military customers at that time. Thus, FN's sale of goods to the U.S. Military under the designation SCAR establishes no trademark right.

Second, FN may claim that it developed a protectable trademark right through "analogous use" of the SCAR mark beginning in early 2006. Analogous use may establish a

trademark right if the mark becomes "popularized in the public mind" even before a product bearing the mark is commercially available. *See Am. Express Co. v. Goetz*, 515 F.3d 156, 161 (2d Cir. 2008); *Harod v. Sage Products, Inc.*, 188 F. Supp. 2d 1369, 1376-77 (S.D. Ga. 2002). But FN's analogous use argument is undercut by its own actions in advertising an association between itself and the SCAR program without authorization by the U.S. Military in violation of Federal Acquisition Regulations. *See* 48 C.F.R. § 5652.204-9003. FN's advertisements and promotions constitute a *per se* violation of federal law and, under the doctrine of unlawful use, negate FN's attempt to establish a protectable trademark right through those advertisements.

The Court should conclude that Clyde Armory has established priority of use over FN. SCAR-Stock is a distinctive mark first used in commerce by Clyde Armory in September 2006. The descriptive term SCAR could not have acquired distinctiveness any earlier than November 2008. FN's use of SCAR in connection with products it sold to the U.S. Military was merely descriptive and any alleged analogous use violated U.S. law and was therefore unlawful. Clyde Armory respectfully requests that the Court rule in Clyde Armory's favor on the issue of priority of use and grant this motion for partial summary judgment. This issue would be dispositive of all claims in the case.

## II.  BACKGROUND

This lawsuit arose from two separate stories that crossed paths in 2009. The following background explains these stories, providing both relevant background to the current dispute and an account of the undisputed material facts needed to resolve the current motion. As required by Local Rule 56, a separate and concise statement of material facts for which there is no genuine issue to be tried is attached to this memorandum. *See* Exhibit A [Statement of Undisputed Material Facts].

**A.    Sage Develops the Enhanced Battle Rifle (EBR) Chassis Stock System.**

Beginning in 2000, at the request of the U.S. Navy SEALs, a replacement chassis stock system was sought for the M14 rifle, and close variations thereof, such as the Springfield Armory M1A™. By 2003, Sage International, Ltd. ("Sage") began producing the replacement chassis stock system for the U.S. Military. Sage called this replacement chassis product the Enhanced Battle Rifle (EBR) Chassis Stock System ("Sage EBR Stock"). Exhibit B [CA0065-68]. The Sage EBR Stock allowed pre-Vietnam War era M14 rifles to be updated with modern tactical features. In contrast to the more traditional stocks, Sage EBR Stocks provided accessory mounting rails, a pistol grip and a telescoping buttstock—which allows the length and height of the buttstock to be adjusted—and other modern accessories, such as single-point slings, night vision optics, or bipods. This conversion chassis also allowed for a larger caliber rifle, i.e., larger than the M4 or M16, to be used as either a close quarters battle ("CQB") rifle or a designated marksman ("DM") rifle in the modern era.

**B.    Clyde Armory Develops the SCAR-Stock Replacement Stock with Sage.**

In the mid-2000s, Clyde Armory recognized that the Mini-14, Mini Thirty, and AC-556 made by Sturm Ruger & Co., Inc., were, and continue to be, popular with both civilian law enforcement agencies and sport shooters. Exhibit C [Clyde Dep. Tr. 33:-9-34:7; 176:24-178:23]. In 2005, Clyde Armory approached Sage about making a stock with features similar to the Sage EBR Stock for the rifles made by Ruger. Ex. C [Clyde Dep. Tr. 32:21-35:2]. In 2006, Sage and Clyde Armory collaborated to produce a new replacement rifle stock. Ex. C [CA0002-03; CA0010-12; SAGE158-162; Clyde Dep. Tr. 49:3-57:18]. To reflect the collaborative origin of the newly developed replacement stock design, Clyde Armory referred to it as the Sage Clyde Armory Replacement Stock, and coined the acronym SCAR-Stock to be used commercially in association with the new product. Ex. C [Clyde Dep. Tr. 80:24-85:9; Klein Dep. Tr. 34:19-24].

Similar to the Sage EBR Stock, the SCAR-Stock replaced the traditional wood or synthetic stock that had been used with a number of different Ruger rifles. Significantly, SCAR-Stock replacement stocks are not used with SCAR assault weapons, discussed below. As early as September 2006, Clyde Armory began selling and shipping the replacement stocks that it had designed with Sage under the SCAR-Stock trademark and/or similar variations thereof. Ex. C [CA03750]. Through Clyde Armory's significant and continuous use of the SCAR-Stock mark and/or similar variations thereof, it developed strong common law rights in this mark throughout the United States for use in connection with rifle stocks. Ex. C [CA-03525-28; CA-03641-42].

On February 18, 2009, Clyde Armory filed U.S. Trademark Application No. 77/673,128 ("Clyde Armory's trademark application") with the United States Patent and Trademark Office ("USPTO"). Exhibit D [Clyde Armory's Trademark Application]. Clyde Armory's trademark application sought federal trademark registration for the mark SCAR-Stock. *Id.* The USPTO initially issued an Office Action refusing registration of the mark on the ground that it is merely descriptive of a type of rifle on which the stocks are used. Ex. D [First Office Action]. However, Clyde Armory overcame that ground for refusal by explaining that SCAR-Stock is not used on a "scar assault rifle." Ex. D [Response to Office Action]. Thereafter, the USPTO withdrew its merely descriptive refusal to registration and issued a new ground for refusal based on a purported likelihood of confusion between SCAR-Stock and FN's pending applications to register SCAR. Ex. D [Second Office Action].

C.    **The U.S. Military Initiates the Special Operations Forces ("SOF")**
      **Combat Assault Rifle (SCAR) Program.**

In 2002-03, the United States Special Operation Command ("SOCOM") initiated the Special Operations Forces ("SOF") Combat Assault Rifle Program, which was abbreviated by SOCOM as the "SCAR" Program. Exhibit E [CA00133-35; CA02726-33; Spaniel Dep. Tr. 13:8-

14:2; Spaniel Dep. Tr. 55:12-14 ("In the context of the SOCOM Program, [SCAR] was an abbreviation for what you said, Special Operations Forces Combat Assault Rifle.")]; Ex. C [Klein Dep. Tr. 26:12-18]. The SCAR program was implemented as an effort to develop the first assault rifle procured through an open competition since the M4/M16. Ex. E [CA00133-35]. The program requirements specified that the rifle, designated SCAR, would be a modular system in two threshold configurations, a "SCAR-Light (SCAR-L)" in 5.56 mm caliber and a "SCAR-Heavy (SCAR-H)" in 7.62 mm caliber. *Id.*

SOCOM officially released the SCAR Solicitation in January 2003. Four vendors, including FN, Colt Defense LLC and Cobb Manufacturing Inc., submitted SCAR prototypes for testing in the program. Each vendor that delivered rifles to the U.S. Military for testing submitted their prototype under the U.S. Military's designation SCAR. In November 2004, SOCOM awarded FN the initial contract to develop the SOF Combat Assault Rifle, or SCAR weapon. Ex. F [Hochstrate Dep. Tr. 19:11-20:18; CA00133-38; CA00139-41; CA03689-03696; CA03529; CA03585; CA03684-3688].

In February 2006, FN "unveiled" its SCAR-Light and SCAR-Heavy prototypes at a firearms industry trade show in Las Vegas, Nevada. Exhibit G [CA01398]. These prototypes were select-fire weapons, meaning that they were fully automatic machine guns, the sale of which in the U.S. is restricted to military and law enforcement agencies only. *Id.* FN's internal documents summarizing sales of the SCAR-L and SCAR-H products demonstrate that FN's sales of SCAR products during 2005-2006 went solely to U.S. Military institutions, e.g., SOCOM, Naval Air Systems Command ("NAVAIR") and Naval Surface Warfare Center ("NSWC"). Ex. G [FN102493-94].

FN did not release publicly available commercial versions of FN's SCAR-Light and SCAR-Heavy prototypes at the time of the Las Vegas trade show. In fact, a press release dated

6

March 2, 2006 shows that FN's release of commercial SCAR rifles was still a long way off:

> Production of a semi-automatic only version of the innovative modular rifle system with a target launch to LE [law enforcement] and commercial markets will potentially be available in the next two years.

Ex. G [CA00133] (emphasis added). As it turned out, FN did not make commercially available a semi-automatic version of its SCAR-Light and SCAR-Heavy products, which under U.S. law may be sold to non-law enforcement civilians, until late 2008. Ex. G [CA01450].

**D.    FN's Erroneous Trademark Right Claims**

**1.    FN's Trademark Registrations and Applications**

FN asserts ownership of several U.S. trademark registrations and applications for registration. Among the registrations and applications relevant to this motion is FN's U.S. Trademark Registration No. 3,801,448 ("FN's '448 Registration"), registered on June 15, 2010, for the mark SCAR (and Design) for use in connection with the following goods:

> Firearms; firing platforms; firearm slings; gun mounts; grips for small arms; pistol grips; rifle hand grips; bipods and stands for firearms; gun cases; magazines for weapons; cleaning implements for firearms, namely, pull-throughs; clothing, namely, shirts and hats.

Dkt. 73-1 at 2. The application that matured into the '448 Registration was filed on January 13, 2009 and claims first use of the mark in commerce on November 1, 2008. *Id*. Although these applications were filed before Clyde Armory's trademark application, none have an effective priority date *before* Clyde Armory's date of first actual use in September 2006. Also relevant here is FN's *intent-to-use* U.S. Trademark Application No. 79/053,575 ("FN's '575 Application") for the mark SCAR (word-mark), which was filed on April 22, 2008, and claims priority to a Benelux[1] Trademark Application that was filed on November 12, 2007.[2] Dkt. 73-1 at

---

[1]    Benelux refers to a combined trademark registration system for Belgium, The Netherlands, and Luxembourg.

6. Even if valid, this priority date is more than a year *after* Clyde Armory's September 2006 date of first actual use of the SCAR-Stock mark in commerce. Ex. C [CA03750].

FN must rely on certain advertisements in an attempt to predate Clyde Armory's September 2006 date of first use of SCAR-Stock. In virtually all of FN's early advertisements and literature, the term SCAR appears in close proximity to the text: "S.O.F. Combat Assault Rifle." Ex. H [FN102637; FN100412; FN100413; FN100414; FN100415; FN100416; FN100389].[3] The close proximity of the term SCAR with its origins establishes two concepts. The first concept is that SCAR is an acronym for S.O.F. Combat Assault Rifle.

The second concept is that FN repeatedly attempted to associate itself with the SCAR Program. The advertisements cited above also demonstrate this concept. FN's prominent and repeated use of the terms "SCAR", "SOCOM," "Special Operations Command" throughout its advertisements is clearly meant to establish an association between FN and these U.S. Military operations. This concept is strengthened by the text in the remainder of the advertisement stating:

> CHOSEN BY THE US SPECIAL OPERATIONS COMMAND'S [sic] TO BE THE NEXT GENERATION MODULAR RIFLE SYSTEM, THE FN SCAR IS A 21ST CENTURY ASSAULT RIFLE BUILT FROM THE GROUND UP FOR THE FINEST FIGHTING FORCES IN THE WORLD.

As will become more clear from the discussion below, it is especially significant that the official emblem of the U.S. Special Operation Forces for the U.S. Military also appears in these FN advertisements. *See e.g.*, Ex. H [CA02764; FN102638; FN100412].

---

[2]   Under an international agreement, an application validly claiming priority is treated as if filed in the U.S. on the claimed priority date. *See* 15 U.S.C. § 1141(g).

[3]   In one advertisement, FN changed the "C" in SCAR to stand for "Capable," *see* Ex. H. [CA02764], but at all other times used it to stand for "Combat," *see* Ex. H [FN100409-416]. Regarding this inconsistency, FN has offered no explanation for why "capable" was used in this lone example that is inconsistent with all other uses of "SCAR - SOF Combat Assault Rifle."

### 2.    Relation of FNs Patent Rights to its Alleged Trademark Rights

On June 9, 2010, FN filed with the USPTO a U.S. Design Patent Application, Serial No. 29/363,427 ("'427 patent application"), entitled "Assault Rifle." Exhibit I [CA00153-163] The 427 patent application issued on July 9, 2011 as U.S. Design Patent No. D641,824 ("the '824 patent"), which claimed priority to an earlier-filed European Market design registration filed on March 24, 2010. Ex. I [CA00153].

Under U.S. patent law, 35 U.S.C. §102(b), in order for the '824 patent to be valid, the ornamental appearance of the rifle shown and described in it cannot have been shown by the inventor in a printed publication anywhere in the world, or in public use or on sale in the U.S. by the inventor, more than one year prior to the effective filing date of the application, i.e., prior to March 24, 2009.[4]

On January 10, 2012, FN filed an action for patent infringement of the 824 patent in the U.S. District Court for the Northern District of Texas, styled *FN Herstal, S.A., et al. v. JAG Precision*, Case No. 3:12-cv-87, wherein FN asserted that the accused infringers were manufacturing firearms that imitated the design patented in the '824 patent. Ex. I [Complaint]. FN also alleged claims for trademark infringement related to the SCAR trademark.  In paragraph 12 of its Complaint, FN alleged:

> In 2009, FNH introduced the FNH SCAR (Special Combat Assault Rifle) assault rifle, today known by two different models including the FN SCAR 16 and FN SCAR 17.

---

[4]    Prior to the recent changes to the Patent Act put into place by the America Invents Act, Section 102(b) prohibited inventors from obtaining a patent if they had publicly disclosed their invention more than 1 year before filing a patent application with the USPTO. *See* 35 U.S.C. §102(b)("A person shall be entitled to a patent unless - (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States").

*Id.* (emphasis added). This factual allegation, made by FN in another lawsuit, constitutes an admission that FN's first use of the SCAR name in commerce occurred in 2009. *See Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 n.10 (S.D.N.Y. 2003) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) and *Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (en banc)). As such, FN could not have established its use of SCAR as a trademark until much later than Clyde Armory's first use of the SCAR-Stock trademark in September 2006. Of course, if FN's factual allegation were not true and SCAR rifles were offered for sale before March 24, 2009, i.e., more than one year before the date of application for the patent, then FN would have been asserting patent infringement of a design patent it knew was invalid under Section 102(b) of the Patent Act.

E.    **Background of the Current Dispute**

On February 6, 2009, Louis Dillais, President and CEO of FNH USA, LLC, a subsidiary of the Plaintiff, sent Clyde Armory a letter asserting senior rights in the mark SCAR and demanding that Clyde Armory halt use of its SCAR-Stock mark and desist from any future use of the mark. Exhibit J [CA00021]. Andrew Clyde, CEO and Owner of Clyde Armory, responded to Mr. Dillais's demand letter on February 17, 2009. Ex. J [FN101158]. In reply, Mr. Dillais responded by letter postmarked March 3, 2009 admitting that "the acronym SCAR in US Government jargon does refer to the USSOCOM Program." Ex. J [CA0022]. He went on to assert "[h]owever, in Commercial firearms use of the term SCAR has been registered by FN Herstal S.A., our parent company, as a Trademark on the International Trademark Registry on 04.22.2008 under International Trademark Registration Number 0963568 and protocols including the United States of America." *Id.* He repeated the request that Clyde Armory "discontinue the use of the SCAR name to avoid any further confusion in the marketplace." *Id.*

By letter dated October 21, 2009, counsel for Clyde Armory responded to Mr. Dillais

pointing out that both the international priority date of November 12, 2007 and FN's declaration that its first actual commercial use of SCAR as a trademark was November 1, 2008, both dates being after Clyde Armory's date of first actual use in 2006. Ex. J [CA0023-0024]. FN did not respond to this letter from Clyde Armory's counsel.

After repeated efforts to resolve the parties' broiling dispute, Ex. J. [CA 0025-028], Clyde Armory filed a Petition for Cancellation (Proceeding No. 92053562) at the USPTO directed to FN's issued '448 Registration for SCAR (and Design) and an Opposition (Proceeding No. 91198401) relating to FN's '575 Application for SCAR. Both of these proceedings were filed on January 27, 2011. Ex. J [Notice of Opposition; Petition for Cancellation]. The USPTO suspended those proceedings pending this case. Ex. J [Suspension Pending Civil Action].

FN then filed its Complaint in the present case on March 12, 2012 in the Eastern District of Virginia. Dkt. 1. On motion from Clyde Armory, the case was first transferred to the Northern District of Georgia, Dkt. 34, and then to this Court, Dkt. 50. The parties have alleged competing claims for trademark infringement. Dkt. 73 [FN's Amended Complaint]; Dkt. 78 [Clyde Armory's Amended Answer]. Among other state and federal claims related to trademark infringement, FN also alleged Dilution under Federal Law. FN has agreed to withdraw its federal trademark dilution claim. Exhibit K [June 2, 2014 Email from FN's counsel to Clyde Armory's counsel]. For its part, in addition to its infringement claims, Clyde Armory also seeks cancellation of FN's issued '448 Registration and refusal of FN's pending '575 Application due to Clyde Armory's superior right to the mark at-issue. A determination from this Court that Clyde Armory is entitled to priority as a matter of law would resolve this additional claim, and, accordingly, all claims in this action.

### III.  <u>LEGAL PRINCIPLES</u>

**A.**     <u>Legal Principles Of Summary Judgment</u>

The Federal Rules of Civil Procedure require that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Substantive law governs which facts are to be considered material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). Genuine disputes are only those in which the evidence is such that a reasonable jury could return a verdict for the non-movant, *id.*, and must have a real basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (an opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

As the party seeking summary judgment, Clyde Armory bears the initial burden to show to the Court the basis for its summary judgment motion and to identify those portions of the record which indicate an absence of a genuine dispute of material fact. *Taylor v. Espy,* 816 F. Supp. 1553, 1556 (N.D. Ga. 1993). In assessing whether Clyde Armory has met this burden, the Court must review the evidence and draw all reasonable factual inferences therefrom in a light most favorable to FN. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992). If Clyde Armory meets it burden, the burden then shifts to FN, which must rely on information beyond its pleadings to establish the existence of a genuine dispute of material fact. *Matsushita,* 475 U.S. at 586-87; *Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir. 1991).

**B.**     <u>Substantive Trademark Law</u>

The substantive law governing this case is provided by federal statute under the Lanham Act, codified at Title 15 of the United States Code, and federal common law provided by judicial rulings related to trademark principles. To prevail on a claim of trademark infringement, a party

must demonstrate that (1) it has a valid, protectable trademark right, and (2) that defendant's use of the mark is likely to cause confusion, or to cause mistake, or to deceive. *See* 15 U.S.C. § 1125(a); *Int'l Stamp Art, Inc. v. U.S. Postal Serv.,* 456 F.3d 1270, 1274 (11th Cir.2006) (per curiam).

### 1.    <u>Establishing a Protectable Trademark</u>

Trademark protection is only available to "distinctive" marks, *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768-69 (1992), that is, marks that serve the purpose of identifying the source (rather than the type) of the goods or services in the minds of the consuming public, *Colt Defense LLC v. Bushmaster Firearms, Inc.,* 486 F.3d 701, 705 (1st Cir. 2007). Distinctiveness is a question of fact. *Investacorp,* 931 F.2d at 1523. In the absence of a registration with an effective date prior to when the alleged infringement began, the plaintiff bears the burden of proving distinctiveness. *Welding Services, Inc. v. Forman,* 509 F.3d 1351, 1356-57 (11th Cir. 2007).

Trademark law designates four categories of distinctiveness for marks. In descending order of strength, those categories are: fanciful, arbitrary, suggestive, and descriptive.[5] A fanciful mark is a coined, or made up, term and has no meaning other than as a trademark. *See* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:4 (4th ed. 2013). EXXON for gas and POLAROID for cameras are examples of fanciful marks. *Id*. at § 11:8. An arbitrary mark has an understood meaning, but that meaning bears no logical relationship to the product or service it is used to represent. *Id.* at § 11:11. GAP for clothing, and POLO for men's fragrances are examples of arbitrary marks. *Id*. at § 11:13.

---

[5]    A generic use of a word may not be protected as a trademark. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194 (1985). ASPRIN and ESCALATOR are examples of trademarks that have become generic through their popular use. *See* MCCARTHY, *supra*, at § 11:9.

A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product. *Id*. at § 11:67. COPPERTONE for sun tan oil, and WRANGLER for western boots and jeans are examples of suggestive marks. *Id*. at § 11:72.

A descriptive mark identifies a characteristic or quality of the service or product. *Id*. at § 11:51; *see also In re MBNA America Bank, N.A.*, 340 F.3d 1328, 1332 (Fed. Cir. 2003) ("A mark is descriptive if it immediately conveys information concerning a quality or characteristic of the product or service."). QUICK-PRINT for printing and duplication service and WORKMASK for a self contained breathing apparatus are examples of descriptive names.

Classifying a purported mark is important because fanciful, arbitrary, and suggestive names are "inherently distinctive," and therefore, garner immediate protection as trademarks. Descriptive names, on the other hand, may only serve as trademarks if they have acquired distinctiveness through secondary meaning. In *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205 (2000), the Supreme Court summarized these principles as follows:

> In evaluating the distinctiveness of a mark under § 2 (and therefore, by analogy, under § 43(a) [of the Lanham Act]), courts have held that a mark can be distinctive in one of two ways. First, a mark is inherently distinctive if "[its] intrinsic nature serves to identify a particular source." [*Two Pesos*, 505 U.S. at 768]. In the context of word marks, courts have applied the now-classic test originally formulated by Judge Friendly, in which word marks that are "arbitrary" ("Camel" cigarettes), "fanciful" ("Kodak" film), or "suggestive" ("Tide" laundry detergent) are held to be inherently distinctive. *See Abercrombie & Fitch Co.* v. *Hunting World, Inc.*, 537 F.2d 4, 10-11 (CA2 1976). Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982).

*Id*. at 210 (footnote omitted). Abbreviations and acronyms of merely descriptive words may become protectable if the party claiming protection for such a term shows that the abbreviation

or acronym itself has acquired a meaning distinct from the underlying words in the mind of the public. *Welding Services,* 509 F.3d at 1389 (citing *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 993-94 (7th Cir. 1989) (noting the "heavy burden" on a trademark claimant seeking to show an independent meaning for initials of descriptive words apart from the fact that they are abbreviations for the descriptive words)); *see also* 2 MCCARTHY, *supra,* § 12:37 (distinguishing between abbreviations "which still convey[] to the buyer the original generic connotation of the abbreviated name" and those which are "not recognizable as the original generic term").

Whether a name, or abbreviation of a name, can be said to have acquired distinctiveness by establishing secondary meaning depends on the length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir. 1984).

### 2.    <u>Priority of Use</u>

Clyde Armory began actual use of its inherently distinctive mark SCAR-Stock no later than September 2006. FN cannot prove infringement unless it can demonstrate that the SCAR name acquired secondary meaning before Clyde Armory began to use its SCAR-Stock trademark no later than September 2006. *See* MCCARTHY, *supra* § 16:34 ("[T]he senior user must prove the existence of secondary meaning in its mark at the time and place the junior user first began use of that mark."). The Eleventh Circuit has held that a plaintiff has the burden of sustaining a high degree of proof establishing secondary meaning for a descriptive term. *Investacorp,* 931 F.2d at 1525.

3.    **Unlawful Use**

Use in commerce only creates trademark rights when the use is lawful. Having been applied by the USPTO for decades, the unlawful use doctrine has been expressly adopted by at least three Circuit Courts of Appeal. *See CreAgri, Inc. v. USANA Health Sciences, Inc.*, 474 F.3d 626, 630-33 (9th Cir. 2007); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1225 (10th Cir. 2000); *Carolina Exports Int'l v. Bulgari, S.p.A.*, 1997 U.S. App. LEXIS 4701 (Fed. Cir. 1987) (upholding USPTO's refusal to register a proposed mark due to unlawful use).

While the Eleventh Circuit has not yet had occasion to address the question, district courts within the Eleventh Circuit (and elsewhere) have applied the principles of unlawful use. *See Menper Distributors, Inc. v. Germa Products, Inc.*, 2011 U.S. Dist. LEXIS 80192, *10-11 (S.D. Fla. 2011); *Kratom Lab, Inc. v. Mancini*, 2013 U.S. Dist. LEXIS 105852, *14-15 (S.D. Fla. 2013); *Intrawest Financial Corp. v. Western National Bank of Denver*, 610 F. Supp. 950 (D. Co. 1985); *Erva Pharm., Inc. v. American Cyanamid Co.*, 755 F. Supp. 36 (D. P.R. 1991); *Dessert Beauty,* 617 F. Supp. 2d at 190.

Unlawful use will be found where: (1) noncompliance has previously been determined by a court or government agency having competent jurisdiction under the statute involved, or (2) where there has been a *per se* violation of a statute regulating the sale of a party's goods. *See Dessert Beauty*, 617 F. Supp. 2d at 190. In this case, there has not been a previous determination of non-compliance by a court or government agency. Thus, the Court need only determine whether a *per se* violation is present.

The unlawful use doctrine is well-supported as a matter of logic and policy. First, as a logical matter, to fail to recognize the unlawful use doctrine would be to place the government, which endorses trademark use through registration, in the precarious position of allowing trademark protection based upon actions that violate the government's own laws. *See CreAgri,*

*Inc.*, 474 F.3d at 630. Second, as a policy matter, to give trademark priority to a party who rushes to market without taking care to carefully comply with the relevant regulations would be "to reward the hasty at the expense of the diligent." *Id.*

Not all violations of law or regulation are sufficient to deem use of a trademark "unlawful" and to nullify the effect of such use for establishing priority. There must be a nexus between the use of the mark and the violation, and the violation must be material (i.e., more than *de minimus*). *See General Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1274 (TTAB 1992) (citing *Santinine Societa v. P.A.B. Produits*, 209 U.S.P.Q. 958 (TTAB 1981) and *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q.2d 2045 (TTAB 1988)). Ultimately, use that is unlawful cannot serve as the basis for a claim to priority of rights under the trademark law. *CreAgri*, 474 F.3d at 630.

## IV.  DISCUSSION

In light of the facts and law set forth above, the Court should conclude that Clyde Armory is rightfully entitled to priority of use of its SCAR-Stock mark. Clyde Armory established a protectable trademark interest in the mark SCAR-Stock mark through its lawful use in commerce at least as early as September 2006. FN cannot establish any earlier, lawful, use of the name SCAR as a trademark. Accordingly, summary judgment on this issue is warranted.

**A.     Clyde Armory Established Priority in SCAR-Stock Through its
         Lawful Use of the Mark in Commerce as Early as September 2006.**

The evidence of record clearly shows that Clyde Armory is entitled to trademark protection for SCAR-Stock from as early as September 2006.[6] By virtue of its sales of products bearing the SCAR-Stock mark, or similar variations thereof, to U.S. customers, Clyde Armory

---

[6]     Additional undisputed evidence indicates that Clyde Armory's mark may have been recognized by consumers or in actual use even earlier in 2006. *See* Ex. C. [CA0001-03; CA0019-20; CA0981-1027; CA03484-87; CA3749; CA4119; Clyde Dep. Tr. 19:21-23-1].

established use of the mark in commerce as required by U.S. trademark law. Moreover, unlike FN's advertisement of SCAR, Clyde Armory's use of its mark was lawful and in full compliance with all regulations for such use. FN can point to no evidence otherwise, and thus, there is no genuine dispute of material fact on these points.

It is equally clear that SCAR-Stock is inherently distinctive as it is used on the replacement stock products collaboratively developed by Sage and Clyde Armory. The rifles with which the SCAR-Stock products are used are the Ruger Mini-14, Mini Thirty and AC-556. They are not SOF Combat Assault Rifles like the rifles requested by and developed for the U.S. Military through the SCAR Program. Thus, SCAR-Stock is not a descriptive mark.[7]

The prosecution history of Clyde Armory's trademark application is informative on this point. In May 2009, the Trademark Examining Attorney at the USPTO initially refused Clyde Armory's trademark application for SCAR-Stock on the ground that the mark was merely descriptive. Exhibit D [First Office Action]. The Trademark Examining Attorney asserted that "stock" described "a part of a rifle" and that a "'scar rifle' is a modular rifle made by Fabrique Nationale de Herstal (FNH) for the U.S. Special Operations Command (SOCOM) to satisfy the requirements of the SCAR competition," citing to references obtained from the Internet. *Id*. The Trademark Examining Attorney further asserted that "[a] 'scar stock' is a gun stock that is made specifically for a 'scar assault rifle.'" *Id*.

Clyde Armory overcame this ground for refusal. In a Response to Office Action, dated October 20, 2009, Clyde Armory explained that the products on which its stocks used are not scar assault rifles. Specifically, Clyde Armory, i.e., "Applicant" below, noted:

---

[7]    It is at least suggestive because it requires a leap of imagination to associate SCAR-Stock products with the collaborative efforts of two companies for which the products are named, i.e., Sage Clyde Armory Rifle Stock. Ex. C [Clyde Dep. Tr. 100:6-18].

…Applicant notes that the Examining Attorney's rationale for finding Applicant's mark to be merely descriptive is belied by the dates of first use claimed by each party. The Examining Attorney has expressly stated that Applicant's SCAR-Stock mark informs consumers that the guns stocks offered under the mark are specifically made for the FN Herstal "scar assault rifle." However, Applicant's date of first use for its SCAR-Stock mark is in late 2006. According to FN Herstal's applications, the first use of the SCAR mark on its products, including its assault rifles, was in late 2008. (Applicant's date of first use is also earlier than the priority filing date for the cited FN Herstal applications.) It is difficult to imagine how Applicant might have been making and selling a gun stock for a particular type or brand of rifle for a period of two years when that rifle was apparently not on the market during that time. And, in fact, <u>Applicant was not making or selling such products. Applicant's SCAR-Stock products were not and are not specifically made for the FN Herstal assault rifle, nor can they be used with the FN Herstal assault rifle.</u>

Ex. D [Response to Office Action] (emphasis added). Clyde Armory's response on this point was accepted by the Trademark Examining Attorney. In a subsequent Office Action, the merely descriptive refusal was withdrawn, with the implicit acknowledgement that Clyde Armory's SCAR-Stock mark was not merely descriptive and was a protectable trademark, but-for a purported likelihood of confusion with FN's '448 Registration and '575 Application, both for the mark SCAR and having filing dates earlier than Clyde Armory's application date. Ex. D. [Second Office Action]. The Trademark Examining Attorney made no findings on priority of use between Clyde Armory and FN. Ultimately, Clyde Armory requested that its trademark application be suspended until the priority issue was determined through opposition/cancellation proceedings, which have been stayed pending the outcome of this lawsuit.

There is no genuine dispute that Clyde Armory's SCAR-Stock mark is inherently distinctive and that Clyde Armory's lawful use of the mark in commerce created priority rights at least as early as September 2006.

**B.     As Used with the U.S. Military, SCAR is Descriptive
and Establishes No Trademark Right.**

The evidence of record clearly establishes that FN is not entitled to trademark protection for its use of the designation SCAR on assault rifles supplied to the U.S. Military under SOCOM's SCAR program. As discussed above, trademark rights are only created for inherently distinctive marks or marks that have acquired distinctiveness through secondary meaning. FN's use of the SCAR designation under such circumstances satisfies neither of these threshold inquiries.

There is no genuine dispute of material fact that FN designated the assault rifles that it provided to SOCOM as SCAR rifles because that was what was requested by SOCOM in the SCAR program. As discussed above, SCAR is an acronym for <u>S</u>pecial Operations Forces <u>C</u>ombat <u>A</u>ssault <u>R</u>ifle, and therefore, the use of the descriptive SCAR designation for assault rifles provided to SOCOM's Special Operations Forces was done at the direction of SOCOM. This direction was followed by each of the vendors that submitted prototypes for the SCAR contract competition, who also described their submissions using the SCAR name. As an acronym for and descriptor of the program under which SOCOM requested submission, SCAR is a purely descriptive term. Any argument by FN that it independently conjured the SCAR name is not reasonable, and should not be credited by the Court.[8]

**C.     FN Cannot Show that SCAR Acquired Distinctiveness Before September 2006.**

FN may obtain a protectable trademark right in SCAR if its use of the term had acquired distinctiveness through secondary meaning. However, FN cannot establish that SCAR acquired secondary meaning with the consuming public by September 2006 when Clyde Armory began

---

[8]     No reasonable jury could conclude that FN independently created SCAR as a designation for its production. SCAR unquestionably originated with SOCOM's initiation of the SCAR Program. But even in the face of overwhelming evidence of that fact, FN has before tried to argue that SCAR has no meaning in the industry. *See* Ex. H [FN101044-47; FN101118-19; FN101107-11; FN101065-67].

actual use of its SCAR-Stock mark. Secondary meaning is the connection in the consumer's mind between the mark and the provider of the product, not just the product itself. *See Welding Services,* 509 F.3d at 1358. The Eleventh Circuit's predecessor court acknowledged the importance of a mark's recognition in the minds of the consuming public in *American Foods v. Golden Flake*, 312 F.2d 619 (5th Cir. 1963), where the court stated:

> [A] trademark is not a right in gross or at large, nor is there property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.  The right to a particular mark grows out of its use and not its mere adoption.

> \*        \*        \*

> "Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question. … But the reason is that purchasers have come to understand the mark as indicating the origin of the wares, so that its use by a second producer amounts to an attempt to sell his goods as those, of his competitor." (*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918) ) *supra* at 625.

*Id*. at 625.

Absent consumer survey evidence, which FN has not produced in this case, courts consider four factors to determine whether a particular mark has acquired a secondary meaning. These factors include: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the purported mark owner to promote a conscious connection in the public's mind between the name and the mark owner's business; and (4) the extent to which the public actually identifies the name with the plaintiff's product. *Welding Services*, 509 F.3d at 1358; *Conagra*, 743 F.2d at 1513; *see also Johnny Blastoff, Inc. v. L.A. Rams Football Co.,* 188 F.3d 427, 433 (7th Cir. 1999) ("The determination of whether a party has established protectable rights in a trademark is made on a case by case basis, considering the totality of the circumstances.").

Consideration of these factors in light of the totality of the circumstances leads to the

conclusion that FN could not have established secondary meaning in the SCAR name before Clyde Armory began its lawful use of the SCAR-Stock mark. First, prior to September 2006, FN had not actually used SCAR on goods sold in commerce other than to SOCOM. FN has admitted this fact on several occasions. For example, FN's '448 Registration claims a first use of the SCAR mark as November 1, 2008. Dkt. 73-1 at 2. FN's '575 Application claims no actual date of first use, but merely claims priority to a Benelux Trademark Application dated November 12, 2007. Dkt. 73-1 at 6. And, in its lawsuit against JAG Precision in the Northern District of Texas, FN stated in its complaint that it "introduced" its commercial SCAR product in 2009. *See* Ex. I. Regardless of which of these admissions is accurate, under no circumstance should FN now be heard to represent to this Court that it sold SCAR products in commerce prior to September 2006.

Second, the nature and extent of any advertising by FN cannot be found to establish secondary meaning. FN may assert that it displayed its new rifle to non-military consumers at a trade show in Las Vegas in February 2006. But the SCAR rifles that FN presented at that trade show were military prototypes, not available for public purchase. The products shown at the 2006 trade show were models of the FN-produced assault rifles that FN actually supplied to the U.S. Military for the SCAR program. Non-military consumers would not have associated the term SCAR exclusively with FN at that point. Rather SCAR was simply a designation for the type of assault rifle FN had provided for the SCAR Program.

Third, FN's effort to create a conscious connection between SCAR and its commercial products is unavailing. FN's own contemporaneous publications indicated that commercial versions of its SCAR assault rifle would "potentially be available in the next two years." Ex. G [CA00133]. Even if we were to assume that FN's prediction of forthcoming commercial products and appearance at a trade show held any traction with the consuming public, it cannot

be said to meet FN's "heavy burden" to establish in the minds of the consuming public that the acronym SCAR represented anything other than the merely descriptive name given to the Special Operations Forces Combat Assault Rifle by the U.S. Military. *See*, *supra*, *Welding Services*, 509 F.3d at 1358; *G. Heileman Brewing Co..,* 873 F.2d at 993-94. FN simply cannot establish that the public recognized SCAR as anything other than a designation supplied by the U.S. Military.  FN also cannot establish that the public recognized SCAR as an indicator of a particular source of the product. Nor can FN point to any evidence that establishes that the public actually identified the term SCAR exclusively with the *FN's* product.

### D.     FN's Advertisement of an Association with SOCOM and the SCAR Program Violates Federal Acquisition Regulations and was Therefore Unlawful.

The evidence of record further establishes that FN's advertisement of the SCAR name in commercial markets was a *per se* violation of federal law. As such, FN's advertisements of its commercially available assault rifles under the name SCAR that may pre-date September 2006 constitute unlawful use. Thus, the Court cannot allow FN to base any claim to priority on its unlawful use of the mark.

It has long been the policy of the USPTO to require that use in commerce sufficient to create trademark rights must be *lawful. See e.g.*, *In re Midwest Tennis & Track Co.,* 29 U.S.P.Q.2d 1386, 1386 n.2 (TTAB 1993); *Clorox Co. v. Armour-Dial, Inc.,* 214 U.S.P.Q. 850, 851 (TTAB 1982); *In re Pepcom Indus., Inc.,* 192 U.S.P.Q. 400, 401 (TTAB 1976); *In re Stellar Int'l, Inc.,* 159 U.S.P.Q. 48, 51 (TTAB 1968). The Ninth and Tenth Circuits have expressly adopted and applied this rule in litigation of priority disputes. *CreAgri*, 474 F.3d 626 (9th Cir. 2007); *United Phosphorus,* 205 F.3d 1219, 1225 (10th Cir. 2000). The Federal Circuit has upheld the application of the unlawful use doctrine as well. *Carolina Exports Int'l*, 1997 U.S. App. LEXIS 4701 (upholding USPTO's refusal to register a proposed mark due to unlawful use).

The unlawful use rule has been recognized at least twice by a district court in the Eleventh Circuit. *See Menper Distributors,* 2011 U.S. Dist. LEXIS 80192, *10-11 (S.D. Fla. 2011); *Kratom Lab,* 2013 U.S. Dist. LEXIS 105852, *14-15 (S.D. Fla. 2013). And, it has also been recognized by district courts in other circuits. *See e.g.*, *Dessert Beauty,* 617 F. Supp. 2d 185; *Intrawest Financial Corp.*, 610 F. Supp. 950; *Erva Pharm.,* 755 F. Supp. 36.

This Court should also recognize the unlawful use doctrine and follow it in this case. Here, the facts implicate the Federal Acquisition Regulations. The FAR are the principal set of rules in the Federal Acquisition Regulation System ("FARS"). The FARS is codified at Title 48 of the United States Code of Federal Regulations; the FAR is set forth in Chapter 1. The remainder of the FAR System consists mostly of sets of regulations issued by agencies of the federal government to supplement the FAR. Chapter 2 is the Defense Federal Acquisition Regulation Supplement ("DFARS"). Chapter 56 is the USSOCOM FAR Supplement ("SOFARS"). Subpart 5652 includes solicitation provisions and mandatory contract clauses used to implement contract bids and performance with SOCOM. Among other provisions, SOFARS includes restrictions on the disclosure of information relating to Special Operations Forces contracts. These restrictions are not limited to "classified" information, but also restrict the public disclosure of non-classified information. Specifically, Section 5652.204-9003 addresses the disclosure of *unclassified information*. It states:

> (a) On September 21, 2001, the Department of Defense designated Headquarters US Special Operations Command (USSOCOM) a sensitive unit, as defined by Title 10 United States Code (USC) Section 130b (10 USC 130b). In keeping with this designation, unclassified information related to USSOCOM military technology acquisitions managed by USSOCOM or any of its component commands, will be designated Controlled Unclassified Information (CUI). As such, the contractor hereby unequivocally agrees that it shall not release to anyone outside the Contractor's organization any unclassified information, regardless of medium (e.g., film, tape, document, contractor's external website, newspaper, magazine, journal, corporate annual report, etc.), pertaining to any part of this

24

contract or any program related to this contract, unless the Contracting Officer has given prior written approval.  Furthermore, any release of information which associates USSOCOM, Special Operation Forces (SOF), or any component command with an acquisition program, contractor, or this contract is prohibited unless specifically authorized by USSOCOM.

(b) Request for approval shall identify the specific information to be released, the medium to be used, and the purpose for the release. The contractor shall submit the request to the Contracting Officer at least 45 days before the propose date for release for approval. No release of any restricted information shall be made without specific written authorization by the Contracting Office.

(c) The Contractor shall include a similar requirement in each subcontract under this contract. Subcontractors shall submit request for authorization to release through the prime contractor to the Contracting Officer.

(d) The Contractor further understands that Title 18 USC Section 701 specifically prohibits the use of the USSOCOM emblem or logo in any medium (e.g., corporate website, marketing brochure, news paper, magazine, etc.) unless authorized in writing by USSOCOM. Forward any request to use the USSOCOM emblem or logo through the Contracting Officer.

(emphasis added). Thus, FN's production of the SCAR rifle, under Federal Acquisition Regulations, was governed by express contract terms incorporating 48 C.F.R. § 5652.204-9003. This regulation "unequivocally" prohibits the release of information "pertaining to any part of this contract or any program related to this contract" or "which associates USSOCOM, Special Operation Forces (SOF), or any component command with an acquisition program, contractor, or the contract, … unless specifically authorized by USSOCOM." 48 C.F.R. § 5652.204-9003(a).

This regulation, which was required to be expressly incorporated as a contract term, also prohibits use of the USSOCOM emblem or logo unless specifically authorized by USSOCOM. 48 C.F.R. § 5652.204-9003(d).  The regulation provides that a:

[r]equest for approval shall identify the specific information to be released, the medium to be used, and the purpose for the release. The contractor shall submit the request to the Contracting Officer at least 45 days before the propose date for release for approval. No release of any restricted information shall be made

without specific written authorization by the Contracting Office.

48 C.F.R. § 5652.204-9003(b). FN has expressly relied on the terms of these regulations to withhold certain documents and information requested by Clyde Armory during discovery in this matter. Ex. L [FN Discovery Responses].

FN's early promotion and advertisements, where FN consistently associated itself with SOCOM and its SOF Combat Assault Rifle (SCAR) Program, was a *per se* violation of the express terms of the regulations above. As discussed above, in FN's advertisements, the mark SCAR appears at the top under which is displayed the text: "[S.O.F. Capable Assault Rifle]." The close proximity of the mark with its origins establishes two concepts. First, SCAR is an acronym for S.O.F. Capable Assault Rifle. Ex. H [CA02764]. In fact, most all of FN's advertisements of record clearly indicates that SCAR is associated with, and an abbreviation for, "[S.O.F. Capable Assault Rifle]." Ex. H [CA02764; FN102637; FN100412; FN100413; FN100414; FN100415; FN100416; FN100389].

FN's advertisements also show FN's prominent and repeated use of the terms "SCAR", "SOCOM," "Special Operations Command" throughout its advertisements is clearly meant to establish an association between FN and these U.S. Military operations. They state:

> CHOSEN BY THE US SPECIAL OPERATIONS COMMAND'S [sic] TO BE THE NEXT GENERATION MODULAR RIFLE SYSTEM, THE FN SCAR IS A 21ST CENTURY ASSAULT RIFLE BUILT FROM THE GROUND UP FOR THE FINEST FIGHTING FORCES IN THE WORLD.

This language, included in FN's many advertisements, cements the conclusion that FN repeatedly attempted to associate itself with SOCOM and the SCAR program in violation of federal regulations, and blurred any distinction between the abbreviation SCAR and the descriptive term it stood for. Moreover, it is clear that FN improperly used the official emblem of the U.S. Special Operation Forces for the U.S. Military in many of its advertisements. Ex. H

[CA02764; FN102638; FN100412]. Accordingly, FN's promotions and advertisements discussed above are a *per se* violation of the FARS regulations.

In addition to being *per se* violations of the FARS, FN's promotion and advertisements also meet the nexus and materiality requirements of the unlawful use defense. The nexus requirement springs from decisions of the Trademark Trial and Appeal Board: "There must be some nexus between . . . use of [a] mark and [an] alleged violation before it can be said that the unlawfulness of [a] sale or shipment has resulted in [a trademark's] invalidity…" *Santinine,* 209 U.S.P.Q. at 967; *General Mills,* 24 U.S.P.Q.2d at 1274 (adopting this rule).

FN cannot reasonably argue that no nexus exists between its FARS violations and its use of SCAR and SOF Combat Assault Rifle designation. FN's use of SCAR demonstrates an inextricable nexus based on the recognition of the SCAR Program being associated with SOCOM.  FN's early promotions include such self-laudatory statements as: "SCAR" rifle was "Operated Envisioned, Tested, Chosen," "Chosen by the U.S. Special Operations Command to be the next generation modular assault rifle system," "SOCOM's SCAR was developed to provide . . ." and further demonstrate a blatant unauthorized use of the USSOCOM logo. These actions clearly show a nexus between the violations of the FARS regulations at-issue, which prohibit this very type of attempt at association, and FN's purported use of SCAR as a trademark. There is a direct and undeniable connection between FN's marketing to associate itself and the rifle with SOCOM and the SOF Combat Assault Rifle (SCAR) Program and what it claims as its trademark.

Designating the rifles it made for and sold to the U.S. Military as SCAR, SCAR-L or SCAR-H was a proper, descriptive designation—but it is not use as a trademark. The unlawful association was reinforced by its additional unauthorized use of the SOCOM logo in the product literature on which FN must rely as the only documentary evidence of "use" in commerce prior

27

to Clyde Armory's. To the extent FN claims it created distinctiveness of SCAR as a brand indicator by its promotions prior to September 2006, those promotions were *per se* violations of government regulations that went directly to the use of the term "SCAR" and unauthorized association with SOCOM, its SCAR Program, and FN's award of the SCAR contract. This is far more than "some purely collateral defect." *See General Mills,* 24 U.S.P.Q.2d at 1274.

FN also cannot reasonably argue that its promotion of the SCAR rifle to customers outside the U.S. Military was so harmless or *de minimis* that it should be excused as "immaterial" *General Mills,* 24 U.S.P.Q.2d at 1274 (holding that a labeling defect is "material" only when it is "of such gravity and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it [can] create no trademark rights"). It is the term SCAR itself that implicates an unlawful connection between FN and the U.S. Military. Promotion of this type by FN was clearly designed to indicate FN's involvement with SOCOM and the SCAR Program.

Under the unlawful use doctrine, the Court must conclude that there is not a single instance of "lawful use in commerce" prior to September 2006 upon which FN can base a claim of priority. FN's violation of FARS regulations, i.e., its use of the designation SCAR and SOF Combat Assault Rifle, existed in *every* advertisement on which FN must rely to show acquired distinctiveness prior to Clyde Armory's priority date. These violations were material and sufficiently connected to the issues now in dispute. It was the very use of the term SCAR to which FN now claims to have acquired trademark rights that was unlawful. The Court should not permit FN's unlawful use of SCAR to serve as the basis for its claim to a trademark right.

## V.  CONCLUSION

FN cannot show that, before Clyde Armory's first use in commerce of the mark SCAR-Stock in September 2006, the abbreviation SCAR had a recognized meaning distinct from the words "SOF Combat Assault Rifle." Nor can FN show that, before September 2006, SCAR had

28

acquired distinctiveness as a brand apart from the descriptive designation used by the U.S. Military. But, even if the Court assumes for purposes of this motion, that SCAR had acquired distinctiveness, FN cannot establish priority through use of the term SCAR that was unlawful. Any use of the term SCAR prior to Clyde Armory's first use of SCAR-Stock was unlawful. Accordingly, the Court should enter summary judgment in favor of Clyde Armory regarding priority of use of the marks at-issue.

Respectfully submitted this 19th day of June, 2014.

CLYDE ARMORY, INC.

By:     ___/Glenn D. Bellamy/_____
        WOOD, HERRON & EVANS, LLP
        Glenn D. Bellamy (admitted *pro hac vice*)
        Paul J. Linden (admitted *pro hac vice*)
        2700 Carew Tower, 441 Vine Street
        Cincinnati, Ohio 45202
        (513) 241-2324
        gbellamy@whe-law.com
        plinden@whe-law.com

        and

        PRIOR, DANIEL & WILTSHIRE, LLC
        Michael C. Daniel
        Georgia State Bar No. 204237
        490 North Milledge Avenue
        Athens, Georgia 30601
        (706) 543-0002
        mdaniel@pdwlawfirm.com

        *Attorneys for Defendant, Clyde Armory, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 19, 2014, I electronically filed the foregoing memorandum and exhibits with the Clerk of the Court using the CM/ECF system which will electronically send notice of such filing to all counsel of record.


*s/ Glenn D. Bellamy*
Glenn D. Bellamy
WOOD HERRON & EVANS, LLP
2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202-2917

*Attorneys for Defendant Clyde Armory, Inc.*

30