# EXHIBIT E



*For Immediate Release:*
March 2, 2006

Contacts:
Barbara Sadowy
703.288.3500, Ext.106
barbaras@fnhusa.com

David A. Golladay, Jr.
864.414.2405
dagolladay@bellsouth.net

## The Making of the 21st Century Assault Rifle: SCAR SOF Combat Assault Rifle

McLEAN, Va. - FN Herstal is now entering the final phase of the development of the SCAR SOF Combat Assault Rifle, the first assault rifle procured through an open competition since the M4/M16. After more than a year of product review and testing with United States Special Operation Command (USSOCOM) and Naval Surface Warfare Center (NSWC Crane) the SCAR represents the leading edge of current assault rifle design.

The development process demands a close interaction between USSOCOM, Special Operations Forces (SOF) operators and its chosen manufacturer partner, FN Herstal, to ensure that the new SCAR is the most reliable, accurate, rugged, safe and ergonomic weapon possible.

**Project Timeline:**

**2002-2003:** The search begins for a new SOF assault rifle.
In an effort to acquire a "Weapon Designed for SOF by SOF", USSOCOM initiated the SCAR program with an approved Joint Operational Requirements Document (JORD).

In order to meet the JORD, the SCAR program recognized the tremendous benefits that the SOF operator possesses, and therefore adopted a theme: "Operator Envisioned, Tested and Chosen." This theme encompasses the involvement of the SOF operator in the requirements initiation, generation, and testing prior to and after source selection.



SCAR Requirements:

Reliability, Availability, and Maintainability (RAM) requirements include MRBS (Mean Rounds between Stoppage) - 2000 Threshold (T) and 8000 Objective (O); MRBF (Mean Rounds between Failure) – 15,000 (T) and 50,000 (O); Service Life (Weapon): 15,000 (T) and 90,000 (O); and Service Life (Barrel): 15,000 (T) and 35,000 (O). Modular System: SCAR-Light 5.56mm (T) and SCAR-Heavy 7.62mm (T). Additional barrel for each variant will allow current and future ammunition (O). Accuracy: SCAR-L: 70% hit ratio on 500 meter point target – 600 meter area target (T) and 600 meter point target – 800 meter area target (O) SCAR-H: 70% hit ratio on 600 meter point target – 800 meter area target (T) and 800 meter point target – 1000 meter area target (O). The SCAR-L and SCAR-H will not add more than 1 MOA (minute of angle) at 300 meters (T) and not more than .25 MOA at 300 meters (O).

The SCAR is developed in two threshold configurations, a SCAR-Light in 5.56x45mm NATO and a SCAR-Heavy in 7.62x51mm NATO, with the SCAR-L being the priority. Both the SCAR-L and SCAR-H possess the capability for barrel modularity and thus are available in the following variants: Standard (S), Close Quarter Combat (CQC) and Sniper Variant (SV). The SV can be either a modular enhancement or a separate weapon. The barrel modularity can be accomplished via changing the complete upper receiver changes or just the barrel. The SCAR-L will be optimized for 5.56x45mm NATO and thus will use an enhanced 5.56mm magazine. The SCAR-H provides an open architecture design to accommodate changing calibers from the standard 7.62x51mm NATO. The initial caliber change is projected as the 7.62x39mm. The ergonomic and parts commonality between the SCAR-L and SCAR-H will be maximized to create a family of SCAR weapons. This commonality is essential for training time reduction, enhancing mission effectiveness, and improving the SOF operators ingrained operational and emergency procedure autonomic responses that are critical during high stress situations.

The SCAR system is rugged, highly reliable, controllable in full automatic fire, has no unsafe failure modes, is highly ergonomic, corrosion resistant, capable of lube-less firing, and is capable of being operated and maintained by a single operator.

The SCAR-L with stock collapsed or folded does not exceed lengths of 29.9 in. / 33.6 in. extended, with standard barrel. The SCAR-L weighs no more than 6.97 lbs. unloaded. The SCAR-H is collapsible or foldable to lengths not greater than similar configurations of currently available 7.62 battle rifles (30.3 in. folded / 40.2 in. extended, with standard barrel). The SCAR-H will weigh no more than 8 lbs.

The following are the Key Performance Parameters for the SCAR: Adaptability, Modular/Family of Weapons, Reliability and Accuracy. The SCAR barrels/caliber are readily exchanged at the operator level, without headspace or timing adjustments, within 5 minutes.

The SCAR-L and SCAR-H, in threshold caliber configurations (5.56x45mm NATO and 7.62x51mm NATO) with M855 and M80 ball ammunition respectively (T), spirally developed/alternate caliber configurations (O), have a Mean Round Between Stoppages (MRBS) of 2,000 rounds (T), 8,000 rounds (O).



The SCAR-L and SCAR-H, in threshold caliber configurations (T), spirally developed/ alternate caliber configurations (O), have a Mean Round Between Failure (MRBF) of 15,000 rounds (T), 35,000 rounds (O).

The SCAR-L and SCAR-H, in threshold caliber configuration/ball ammunition (T), spirally developed/alternate caliber configurations (O), have a fully functional service life without overhaul for a minimum of 15,000 rounds (T), 90,000 rounds (O) for the weapon and 15,000 rounds (T), 35,000 rounds (O) for the barrel.

The SCAR, in threshold configuration (T) and all caliber/barrel configurations (O), does not add more than 1.0 MOA at 300 meters (T), .25 MOA at 300 meters (O) to baseline (M855, MK262, M80, M118) ammunition performance.

The SCAR is also compatible with nearly all the SOPMOD Accessory Kit components via MIL-STD 1913 rails. The SCAR weapons are available with a sling, bipod, forward handgrip, blank firing capability and an operator's manual. The SCAR has a rigid MIL-STD 1913 rail at the 12 o'clock position running continuously from the rear sight to the front sight, which may be mounted to the upper receiver or integral to the weapon (T). The 12 o'clock rail has numbered the slots in alternate even numbers running the extent of the rail from back sight to front (T). The SCAR has additional MIL-STD 1913 rails at 3 o'clock, 6 o'clock, and 9 o'clock in the fore-arm/hand guard area (T). All rails are capable of maintaining the bore sight alignment (T). The MIL-STD 1913 rails were to be mounted to the weapon to maximize; rigidity (no loss of zero due to rough handling), independent from the barrel (no interference with the natural harmonic vibrations of the barrel during firing), and provision for mounting future 6 o'clock subsystems more closely to the gun barrel (decrease in offset between the 6 o'clock subsystems and the axis of the bore) (T). SOPMOD/MWS items mounted on rail system are not be blocked or interfered with by other SCAR components/features (T). The SCAR-L has to be compatible with the EGLM Enhanced Grenade Launcher Module (T). SCAR in any barrel length configuration mounts the EGLM 40mm grenade launcher on the 6 o'clock position (T). The rail interface is capable of withstanding the recoil forces generated by firing the 40mm grenade launcher with a cartridge producing a pressure of 230 bar (T). The SCAR rails are to exhibit no detectable shift in zero, when the EGLM 40mm weapon is fitted to the SCAR-L, and during firing of the EGLM (T).



SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)



COL Tom Spellissy — PEO-Special Programs

## National Defense Industrial Association

### 2003 Joint Services Small Arms Systems Section and Firing Demonstration

PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS

13 May 2003

CA02726



SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)

## SOF Guidance to Industry:

Users are why we are employed. We support the user- not vice versa.

Technology moves faster than the Acquisition process and we have to continually find creative ways to get the required/desired gear to the troops.

COTS items are the fastest, most timely acquisitions. Limited modifications are acceptable.

Being able to procure the 80% solution is better than to wait for 100%.

PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS

13 May 2003

CA02727



SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)

## Lessons Learned From Recent Operations:

- MICH (Modular Integrated Communications Helmet)
- BALCS (Body Armor and Load Carriage System)
- 77 Grain 5.56mm Sierra Match King
- Optics / Night Vision
- MK 46 5.56mm Lightweight Machinegun
- Industry is responsive to our requirements

PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS

13 May 2003

CA02728



SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)

## Emerging requirements:

Faster, smaller, lighter are the requirements for equipment in the future.

Composites, modularity, adaptability are the key ingredients to all current and future acquisitions. We need to be able to enhance current capabilities.

### Examples:

- SOF Combat Rifle (SCAR)
  - Small Arms Ammunition (5.56mm, 7.62mm, (6.8mm ??) and beyond)
- Enhanced Grenade Launcher Module (EGLM)
- Mini Day/Night Sight Effort (MDNS)
- Coatings / Lubrication
- Shoulder Fired Weapons
- 40mm Ammunition

PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS

13 May 2003

CA02729



SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)

## Upcoming opportunities for Industry:

The vendor that can take an existing capability and enhance it economically will find lots of work. Same goes for creating a new capability in such a way that it can be technologically advanced as faster, lighter, smaller becomes a reality. **APBI: 19-23 May in Tampa, Florida**

- Precision Target Laser Designator (PTLD)
- Precision Laser Target Device (PLTD)
- Multi-target Warhead
- 40mm Airburst technology
- Advanced Carl Gustav
- Nanotechnology
- SOF Combat Assault Rifle

**PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS**

13 May 2003

CA02730



SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)

## SOF Combat Assault Rifle Requirement Summary

**SCAR ORD Summary:** The Special Operations Combat Assault Rifle will improve mission performance of SOF by providing them with a **reliable** and **accurate** rifle. This will be a weapon of maximized lethality, superior to the M4A1 through versatility, fire control and target acquisition both day and night during CQB and to ranges of 800M.
- Reliable and accurate
- Variety of calibers, interchangeable components: threshold is 5.56mm NATO standard.
- Initially 2 configurations – SCAR-L and SCAR-H with evolutionary variants (Sniper) and (CQB)

**SCAR replaces the MK11 (SR-25 7.62 sniper rifle), the MK12 (SPR), the CQBR (10inch upper from SOPMOD), the M4A1 Carbine and the M14 (in use at WARCOM)**

PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS

13 May 2003

CA02731



SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)

## SCAR KPPs

**Reliability, Availability, and Maintainability (RAM)**
    **Reliability:** MRBS (Mean Rounds between Stoppage) - 2000(T) and 8000(O)
        MRBF (Mean Rounds between Failure) – 15,000(T) and 50,000(O)
        Service Life (Weapon): 15,000 (T) and 90,000 (O)
        Service Life (Barrel): 10,000 (T) and 50,000 (O)
    **Modular System:** SCAR-L 5.56mm (T) and SCAR-H 7.62mm (T)
        Additional barrel for each variant will allow current and future ammunition (O)
    **Accuracy:** SCAR-L: 70% hit ratio on 500m point target – 600m area target (T) and 600m point target - 800m area target (O)
        SCAR-H: 70% hit ratio on 600m point target – 800m area target (T) and 800m point target – 1000m area target (O)

**The SCAR-L and SCAR-H will not add more than 1 MOA (minute of angle) @ 300m (T) and not more than .25 MOA @ 300m (O)**

PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS

13 May 2003

CA02732



**SPECIAL OPERATIONS ACQUISITION AND LOGISTICS CENTER**

# JOINT SERVICE SMALL ARMS PROGRAM (JSSAP)

## SCAR-(L) BOIP

| | |
|---|---:|
| USASOC (includes 160th SOAR, 75th Ranger Regiment, USAJFKSWCS, and SFC) | 8,692 |
| USACAPOC | 228 |
| NAVSPECWARCOM (includes SEAL Teams, SDV teams, DEVGRU, NAVSPECWARCEN, NSWUs, SBU) | 2,716 |
| AFSOC | 483 |
| Floats and Spares | 1,164 |
| Joint Operational Stocks | 1,397 |
| | 14,670 |

## SCAR-(H) BOIP – TBD
## FUNDING:

| FY | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | TOTAL |
|---|---|---|---|---|---|---|---|
| RDTE | 886K | 1,500K | | | | | 2,386K |
| PROC | 996K | 719K | 2,268K | 4,028K | 10,826K | 9,639K | 28,476K |
| O&M | TBD | TBD | 500K | 500K | 500K | 500K | 2,000K |

**PROGRAM EXECUTIVE OFFICE, SPECIAL PROGRAMS**

13 May 2003

CA02733

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE MIDDLE DISTRICT OF GEORGIA
 3                         ATHENS DIVISION
 4              Civil Action No. 1:12-CV-275 (CAR)
 5
 6   FN HERSTAL, S.A.,
 7        Plaintiff,
 8   VS.
 9   CLYDE ARMORY, INC.,
10        Defendant.
11
12                   30(B)(6) DEPOSITION OF:
13                        FRANK SPANIEL
14
15                  Tuesday, August 13, 2013
16                  10:30 a.m. to 12:58 p.m.
17
18                       FN Manufacturing
19                    Columbia, South Carolina
20
21
22
23
24
25
```

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Frank Spaniel on 08/13/2013
30(b)(6) — Pages 2..5

## Page 2

APPEARANCES:

FOR THE PLAINTIFF:

    FN HERSTAL, S.A.
    BY: BURTON S. EHRLICH
    LADAS & PARRY, LLP
    224 South Michigan Avenue
    Suite 1600
    Chicago, IL  60604
    312-427-1300 - telephone
    Burt@LADAS.NET

FOR THE DEFENDANT:

    CLYDE ARMORY, INC.
    BY: GLENN D. BELLAMY
    WOOD HERRON & EVANS, LLP
    2700 Carew Tower
    441 Vine Street
    Cincinnati, OH  45202-2917
    513-241-2324 - telephone
    gbellamy@whe-law.com

## Page 3

EXHIBIT INDEX

EXHIBIT 1 - NOTICE OF DEPOSITION ........... 13
EXHIBIT 2 - NOTICE OF AWARD ................ 26
EXHIBIT 3 - SOLICITATION FOR THE SCAR
            PROGRAM ........................ 27
EXHIBIT 4 - FNH PRESS RELEASE .............. 29
EXHIBIT 5 - FN HERSTAL'S SUPPLEMENTAL
            ANSWERS AND RESPONSES TO CLYDE ARMORY'S
            FIRST SET OF INTERROGATORIES AND
            REQUESTS FOR PRODUCTION OF DOCUMENTS ... 46
EXHIBIT 6 - THREE-PAGE DOCUMENT PRODUCED
            BY FN .......................... 52
EXHIBIT 7 - DISTRIBUTION STATEMENT A.
            APPROVED FOR PUBLIC RELEASE DISTRIBUTION
            UNLIMITED ...................... 55
EXHIBIT 8 - COLLECTION OF IMAGES, MR.
            TROY SMITH, 19 MAY 2005 ........ 59
EXHIBIT 9 - COVER AND MASTHEAD AND TABLE
            OF CONTENTS PAGE AND ARTICLE FROM SMALL
            ARMS REVIEW, SEPTEMBER, 2006 ... 62
EXHIBIT 10 - COVER AND CERTAIN PAGES OF
             SMALL ARMS REVIEW, OCTOBER, 2006 ... 63
EXHIBIT 11 - TWO-PAGE DOCUMENT PRODUCED
             BY FN .......................... 66

    (All exhibits were retained by counsel,
Mr. Bellamy, by agreement.)

## Page 4

WITNESS INDEX:

FRANK SPANIEL:

    Examination by Mr. Bellamy ......... 7
    Examination by Mr. Ehrlich ......... 67
    Examination by Mr. Bellamy ......... 67

## Page 5

    MR. BELLAMY: This is the deposition of
Frank Spaniel, FN Manufacturing in Columbia, South
Carolina.
    My name is Glenn Bellamy, with Wood Herron
and Evans. I represent Clyde Armory in this matter of
FN Herstal Steel -versus- Clyde Armory. That's an
abbreviated version of the caption. And Mr. Ehrlich,
who represents FN, needs to put some statements on the
record regarding confidentiality and so forth pursuant
to the protective order and other issues.
    MR. EHRLICH: A couple of comments. This
is Burt Ehrlich, and I'm with Abla Fahim, who is
in-house counsel for the plaintiff in this litigation.
    The first thing I would like to put on the
record is, we have talked about the protective
order -- and just to keep things as simple and
expeditious as possible for all of us, we have
agreed -- and this is mutual for all the
depositions -- that we are not going to start -- we
are not going to be objecting or saying something is
confidential or highly confidential or designate it
during the course of the deposition.
    But after a transcript is available within,
you know, a reasonable time period, we can notify each
other -- if something needs to be done sooner or

**Page 10**

1  A.  Engineer.
2  Q.  And before that?
3  A.  That's it.
4  Q.  That's what you started, as an Engineer?
5  A.  Yes.
6  Q.  Prior to being employed by FN
7  Manufacturing, were you previously employed?
8  A.  Yes.
9  Q.  And by whom were you previously employed?
10 A.  AEA Technology.
11 Q.  And what years were you employed by AEA
12 Technology?
13 A.  1979 through 1997.
14 Q.  And prior to AEA Technology, were you
15 employed?
16 A.  No.
17 Q.  Were you in school prior to that?
18 A.  Yes.
19 Q.  Let's talk about your educational
20 background. After high school, do you have any other
21 higher education?
22 A.  Yes.
23 Q.  And beginning with the first degree after
24 high school, what was the first degree you obtained?
25 A.  Bachelor of Science in Mechanical

**Page 11**

1  Engineering.
2  Q.  And from what institution was that?
3  A.  Carnegie-Mellon University.
4  Q.  And when did you receive your Bachelor's
5  Degree?
6  A.  1979.
7  Q.  Do you have any graduate, post-graduate
8  degrees?
9  A.  Yes.
10 Q.  And what are those?
11 A.  Master's in Mechanical Engineering.
12 Q.  And from what institution did you receive
13 that?
14 A.  Carnegie-Mellon University.
15 Q.  And what year?
16 A.  I believe I finished in 1985.
17 Q.  Anything after your Master's?
18 A.  No.
19 Q.  What did you do at AEA Technology?
20 A.  Engineering Consultant.
21 Q.  In what field?
22 A.  Mechanical engineering.
23 Q.  Where is AEA Technology located?
24 A.  Pittsburgh, Pennsylvania.
25    MR. BELLAMY: Mark that as number one.

**Page 12**

1  (EXHIBIT 1 MARKED.)
2     MR. EHRLICH: Thank you.
3     COURT REPORTER: Hand it to the witness?
4     MR. BELLAMY: Yes.
5     COURT REPORTER: There you go.
6  Q.  Mr. Spaniel, you have been handed what's
7  been marked as Exhibit 1. This is a Notice of
8  Deposition under Federal Rules of Civil Procedure
9  30(b)(6) that is to the plaintiff, FN Herstal Steel.
10    It's my understanding that you have been
11 designated as the person or a person who can speak on
12 behalf of the company as to certain of the topics that
13 are identified here. Have you seen this document
14 before?
15 A.  Yes, I have seen the document with this
16 title.
17 Q.  If you would look on Page 2, at
18 paragraph -- it's numbered two, that reads: FN's
19 participation in the US SOCOM SOF Combat Assault Rifle
20 program.
21    It's my understanding that you have been
22 designated as a witness to speak on that topic; is
23 that correct?
24 A.  Yes.
25 Q.  If you will turn to the next page, No. 14,

**Page 13**

1  it reads: The nature and circumstances of FN's first
2  use of the term SCAR as a trademark in the United
3  States.
4     It's my understanding you have been
5  designated to speak with respect to that topic; is
6  that correct?
7  A.  Yes.
8  Q.  And finally, Paragraph 15: The
9  identification, selection and use by FN of the SCAR
10 brand in 2002 to 2003 is referenced in Plaintiff's
11 Supplemental Answer to Interrogatory No. 2, dated
12 March 28th, 2013.
13    It's my understanding that you have been
14 designated to speak with respect to that topic, as
15 well; is that correct?
16 A.  Yes.
17 Q.  Did FN participate in the US SOCOM SOF
18 Combat Assault Rifle program?
19 A.  Yes.
20 Q.  All right. And when was FN's first
21 involvement with that program?
22 A.  It would have been 2003.
23 Q.  And what was that first involvement?
24 A.  A government notice called a Sources
25 Sought.

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)                      Frank Spaniel on 08/13/2013                      Pages 14..17

**Page 14**

1  Q.  And was that a notice that was published?
2  A.  Yes.
3  Q.  And so how would FN have learned of that
4  notice of Sources Sought?
5  A.  It's a, you know, folks in the company are
6  designated to monitor business opportunities, and they
7  are made public. And we pick up on them.
8  Q.  In 2003, what was your position at FN?
9  A.  Engineer.
10 Q.  And did you, as an individual, become
11 involved with the SOCOM SCAR program?
12 A.  Yes.
13 Q.  And when was your first involvement?
14 A.  Heavy involvement in 2005, early 2005.
15 Q.  Did you have some lighter involvement
16 before that?
17 A.  Yes.
18 Q.  What was the nature of that lighter
19 involvement?
20 A.  I was aware of the program, and, you know,
21 certain management involvement in the program. There
22 were discussions about the program.
23 Q.  In -- during that time period of your less-
24 than-heavy involvement --
25 A.  Uh-huh.

**Page 15**

1  Q.  -- what were your duties as an engineer?
2  And what did that involve?
3  A.  Particular product support for weapons we
4  manufacture.
5  Q.  Were you assigned particular weapons? Or
6  would it vary?
7  A.  It would vary from time to time, but a
8  duration of working on a particular weapon.
9  Q.  Did you usually work on one at a time? Or
10 were there more than one at a time?
11 A.  It could be multiple.
12 Q.  During this less-than-heavy involvement
13 time when you were aware of the program, what, if any,
14 input did you have with respect to FN's involvement?
15 A.  It was so minimal that I just don't recall
16 specifics.
17 Q.  So when you had a more heavy involvement
18 starting in 2005, what did that involve?
19 A.  I became the project engineer for the
20 support effort that went on at FN Manufacturing in
21 support of FN Herstal.
22 Q.  All right. Did you work closely with
23 people at -- from FN Herstal?
24 A.  Very.
25 Q.  And who did you work with from FN Herstal?

**Page 16**

1  A.  Quite a number of people. Their side of
2  the program.
3  Q.  Limiting it just to the SCAR-program, can
4  you give me whatever names you remember?
5  A.  Benoit Gridelet, Tony Macaluso, Charles
6  Demuit, George Chauveheid and Henry Groven.
7  Q.  Any others?
8  A.  I'm sure there were. Those were main --
9  main involvement.
10 Q.  And where are those people located?
11 A.  Herstal, Belgium.
12 Q.  None of them reside here with FN
13 Manufacturing?
14 A.  No.
15 Q.  And how did you communicate with them?
16 A.  Phone, e-mail, meetings, here or there.
17 Q.  Was anyone -- was anyone else at FN
18 Manufacturing involved with you in that project?
19 A.  Yes.
20 Q.  And who was that?
21 A.  Initially Eric Brisbon, Mike Gardner,
22 Marvin Memmert. That's it.
23 Q.  What is Eric Brisbon's title? Or what was
24 it at that time?
25 A.  At that time, Director of Research and

**Page 17**

1  Development.
2  Q.  What is his position now?
3  A.  He's no longer with FN Manufacturing.
4  Q.  Oh, okay. And Mike Gardner, what was his
5  position at the time?
6  A.  Purchasing and Planning.
7  Q.  Is he still with the company?
8  A.  Yes.
9  Q.  What is his position now?
10 A.  I believe it's the same.
11 Q.  Marvin Memmert, what was his position at
12 the time?
13 A.  Business Unit Manager.
14 Q.  Is he still with the company?
15 A.  Yes.
16 Q.  And what is his position now?
17 A.  I don't -- I don't recall exactly. He's
18 still a manager, but they have changed the
19 description. I don't recall exactly what it is today.
20 Q.  Okay.
21 A.  I don't recall exactly what it is today.
22 Q.  So what was your -- what was the nature of
23 your first involvement in 2005 with the SCAR program?
24     MR. EHRLICH: Well, I think I have an
25 objection. I think it mischaracterizes his testimony.

Case 3:12-cv-00102-CAR   Document 90-5   Filed 06/19/14   Page 17 of 20

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)　　　　　　　　　　Frank Spaniel on 08/13/2013　　　　　　　　　Pages 14..17

### Page 14

1  Q.  And was that a notice that was published?
2  A.  Yes.
3  Q.  And so how would FN have learned of that
4  notice of Sources Sought?
5  A.  It's a, you know, folks in the company are
6  designated to monitor business opportunities, and they
7  are made public. And we pick up on them.
8  Q.  In 2003, what was your position at FN?
9  A.  Engineer.
10 Q.  And did you, as an individual, become
11 involved with the SOCOM SCAR program?
12 A.  Yes.
13 Q.  And when was your first involvement?
14 A.  Heavy involvement in 2005, early 2005.
15 Q.  Did you have some lighter involvement
16 before that?
17 A.  Yes.
18 Q.  What was the nature of that lighter
19 involvement?
20 A.  I was aware of the program, and, you know,
21 certain management involvement in the program. There
22 were discussions about the program.
23 Q.  In -- during that time period of your less-
24 than-heavy involvement --
25 A.  Uh-huh.

### Page 15

1  Q.  -- what were your duties as an engineer?
2  And what did that involve?
3  A.  Particular product support for weapons we
4  manufacture.
5  Q.  Were you assigned particular weapons? Or
6  would it vary?
7  A.  It would vary from time to time, but a
8  duration of working on a particular weapon.
9  Q.  Did you usually work on one at a time? Or
10 were there more than one at a time?
11 A.  It could be multiple.
12 Q.  During this less-than-heavy involvement
13 time when you were aware of the program, what, if any,
14 input did you have with respect to FN's involvement?
15 A.  It was so minimal that I just don't recall
16 specifics.
17 Q.  So when you had a more heavy involvement
18 starting in 2005, what did that involve?
19 A.  I became the project engineer for the
20 support effort that went on at FN Manufacturing in
21 support of FN Herstal.
22 Q.  All right. Did you work closely with
23 people at -- from FN Herstal?
24 A.  Very.
25 Q.  And who did you work with from FN Herstal?

### Page 16

1  A.  Quite a number of people. Their side of
2  the program.
3  Q.  Limiting it just to the SCAR program, can
4  you give me whatever names you remember?
5  A.  Benoit Gridelet, Tony Macaluso, Charles
6  Denuit, George Chauveheid and Henry Groven.
7  Q.  Any others?
8  A.  I'm sure there were. Those were main --
9  main involvement.
10 Q.  And where are those people located?
11 A.  Herstal, Belgium.
12 Q.  None of them reside here with FN
13 Manufacturing?
14 A.  No.
15 Q.  And how did you communicate with them?
16 A.  Phone, e-mail, meetings, here or there.
17 Q.  Was anyone -- was anyone else at FN
18 Manufacturing involved with you in that project?
19 A.  Yes.
20 Q.  And who was that?
21 A.  Initially Eric Brisbon, Mike Gardner,
22 Marvin Memmert. That's it.
23 Q.  What is Eric Brisbon's title? Or what was
24 it at that time?
25 A.  At that time, Director of Research and

### Page 17

1  Development.
2  Q.  What is his position now?
3  A.  He's no longer with FN Manufacturing.
4  Q.  Oh, okay. And Mike Gardner, what was his
5  position at the time?
6  A.  Purchasing and Planning.
7  Q.  Is he still with the company?
8  A.  Yes.
9  Q.  What is his position now?
10 A.  I believe it's the same.
11 Q.  Marvin Memmert, what was his position at
12 the time?
13 A.  Business Unit Manager.
14 Q.  Is he still with the company?
15 A.  Yes.
16 Q.  And what is his position now?
17 A.  I don't -- I don't recall exactly. He's
18 still a manager, but they have changed the
19 description. I don't recall exactly what it is today.
20 Q.  Okay.
21 A.  I don't recall exactly what it is today.
22 Q.  So what was your -- what was the nature of
23 your first involvement in 2005 with the SCAR program?
24      MR. EHRLICH: Well, I think I have an
25 objection. I think it mischaracterizes his testimony.

Page 18

1  I think you are saying -- you're asking --
2  and if you are -- that question is fine. If you're
3  asking what was the nature of his involvement in 2005
4  when he became directly involved or more heavily
5  involved, that's fine.
6     MR. BELLAMY: That's what I meant.
7     MR. EHRLICH: Yeah.
8  Q. (BY MR. BELLAMY:) At the time that you
9  became more heavily involved, what was the nature of
10 your involvement?
11 A. Product development.
12 Q. And what does that really mean?
13 A. Oh.
14 Q. What does --
15 A. Initially, we were responsible for
16 development of a particular barrel that went on that
17 weapon.
18 Q. And were you part of a team?
19 A. With the few folks I gave you the names of.
20 Q. Uh-huh.
21 A. Yes.
22 Q. And were those assigned to other aspects of
23 that weapon system?
24 A. No.
25 Q. Okay.

Page 19

1  A. Not here.
2  Q. So the involvement from the side of FN
3  Manufacturing, it focused on the barrel; is that
4  correct?
5  A. Yeah. Like I said, the initial involvement
6  was the barrel.
7  Q. Was there anyone else here in the United
8  States working on other aspects of the weapon system,
9  other than the barrel?
10 A. Yes. And on the barrel.
11 Q. Were any of those other people somebody
12 other than who you've already listed?
13 A. Yes.
14 Q. And what aspects did those other people
15 work on, other than the barrel?
16 A. There is a Sales and Marketing arm of FN
17 Herstal --
18 Q. Uh-Huh.
19 A. -- in the United States. And those folks
20 worked with FN Herstal both on technical development
21 and, you know, other aspects of the program.
22    I really couldn't speak to exactly all the
23 details of what they did and did not do --
24 Q. Okay.
25 A. -- at that facility.

Page 20

1  Q. Is that FN USA?
2  A. Correct.
3  Q. And was one of those people Bucky Mills?
4  A. Yes.
5     MR. BELLAMY: We will talk to him tomorrow.
6  Q. At the time that you became more heavily
7  involved with the SCAR -- is it correct to say
8  program? Project? What would be an appropriate term
9  internally at FN?
10 A. Project, at that point.
11 Q. So when you became more heavily involved in
12 the SCAR project, did you have any kind of starting
13 point from an existing weapon system or barrel that
14 you were working to adapt? Or how did you begin?
15 A. Yes.
16 Q. Yes, you had a starting point?
17 A. Yes, we had a starting point for the weapon
18 and the barrel system.
19 Q. What weapon or barrel system was your
20 starting point?
21 A. The SCAR-Light.
22 Q. So is it correct that at the time you
23 became more heavily involved, there was already a
24 weapon system that was being called the SCAR-Light?
25 A. Yes.

Page 21

1  Q. Do you know whether there was some
2  predecessor weapon system or starting point that was
3  the -- that was the starting point for the SCAR-Light?
4  A. No, I don't know that.
5  Q. Do you know who would know?
6     MR. EHRLICH: Objection; speculation. If
7  he knows -- if he knows.
8     MR. BELLAMY: Yeah.
9     MR. EHRLICH: If you know or want to give
10 some names, go ahead. If you think people might know,
11 go ahead.
12 A. The folks at FN Herstal R&D that I named,
13 developed the weapon.
14 Q. In your role in -- when you became more
15 heavily involved, were you working from any sort of
16 list of requirements or objectives that had been --
17    Well, let's leave it at that, requirements
18 or objectives?
19 A. Yes.
20 Q. And what were those?
21 A. Performance specifications.
22 Q. Do you know whether those were created by
23 FN? Or whether those came from SOCOM?
24 A. SOCOM.
25 Q. Were those set forth in a solicitation that

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)                Frank Spaniel on 08/13/2013                Pages 54..57

Page 54

1  on the rifle.
2    Q.   And by "SCAR brand," what do you mean by
3  "brand"?
4         MR. EHRLICH: Well, just so you know -- an
5  objection that he's not an attorney. But go ahead.
6  You know you are not an expert witness, but go ahead.
7    A.   It was the name adopted for that rifle,
8  that design, that product.
9    Q.   And that name was adopted by FN?
10   A.   Yes.
11   Q.   Why did SCAR -- excuse me -- why did FN
12 choose that name for the rifle?
13   A.   I don't think I could say the reasons why.
14 I could speculate, but I couldn't definitively say why.
15   Q.   I don't want to ask you to speculate.
16        In the cover text of SOCOM's SCAR program
17 --
18   A.   Uh-huh.
19   Q.   -- did the term -- was the term "SCAR" in
20 that context, a brand name for a particular
21 manufacturer's rifle?
22        MR. EHRLICH: Objection. Again, I don't
23 think that the question makes sense. But also, it's
24 compound, and it's -- also, this guy is not an expert
25 or legal expert.

Page 55

1    Q.   Do you understand my question?
2    A.   Would you repeat it?
3         MR. BELLAMY: I'll try.
4    Q.   In the context of SOCOM's SOF Combat
5  Assault Rifle program, the term "SCAR," did that
6  designate a particular manufacturer's rifle in the
7  context of that competition?
8         MR. EHRLICH: Objection. Speculation,
9  foundation.
10   Q.   You can answer if you know. If you
11 understand, go ahead.
12   A.   In the context of the SOCOM program, it was
13 an abbreviation for what you said, Special Operations
14 Forces Combat Assault Rifle.
15   Q.   In the context of FN displaying this rifle
16 at Shot Show 2006, did SCAR indicate that it had --
17 was the winner of the SOCOM SCAR competition?
18   A.   I'm not sure I understand what you mean.
19        MR. BELLAMY: Well, let me move on. I'll
20 ask Mr. Mills about that tomorrow.
21        (EXHIBIT 7 MARKED.)
22   Q.   You have been handed what's been marked as
23 Exhibit 7. And I will represent to you that this is a
24 document that was obtained publicly.
25        It says, at the bottom of the first page:

Page 56

1  Distribution Statement A approved for public release
2  distribution unlimited.
3         And then as you look at it, I'm going to
4  ask you whether you recognize what this is.
5         MR. EHRLICH: You mean whether he has seen
6  this document before?
7         MR. BELLAMY: Yes, or whether he recognizes
8  what this --
9    Q.   Whether you have seen the content of this
10 document before?
11        MR. EHRLICH: Wait. Go through it for a
12 second. Rather than jump in the middle, take a look,
13 thumb through it for a second.
14   A.   I have seen a number of documents that
15 contain this type of information and some of this
16 specific information.
17   Q.   Have you seen this particular collection of
18 these images and texts and so forth? Have you seen
19 this presentation of that information before?
20   A.   Most likely. But like I said, I have seen
21 this information in multiple places throughout the
22 program.
23        So to say: Yeah, I have seen everything in
24 this specific document, you know, beginning to end --
25 it's hard for me to say.

Page 57

1    Q.   Okay.
2    A.   I mean, there's been so many documents.
3    Q.   Let me ask you this: In the course of your
4  work for FN on the SCAR project, did you ever attend a
5  presentation given by someone from SOCOM where they
6  did a PowerPoint presentation along with their
7  information that they were speaking on relating to the
8  SCAR program?
9    A.   Yes, many of those.
10   Q.   Were any of those given by Mr. ▮▮▮▮
11   A.   Yes.
12   Q.   What about by MAJ ▮▮▮▮
13   A.   Yes.
14   Q.   And where would those have occurred?
15   A.   They could have occurred at any of their
16 facilities.
17        I have been to a number of them, you know,
18 in different parts of the country.
19   Q.   Did you attend any of those at -- while at
20 an AUSA show?
21   A.   No.
22   Q.   Did you attend any of those while at the
23 NDIA Symposium, the National Defense Industrial
24 Association?
25   A.   Yes, NDIA is presentations.

REDACTED

Case 3:12-cv-00102-CAR   Document 90-5   Filed 06/19/14   Page 20 of 20

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Frank Spaniel on 08/13/2013

30(b)(6)                                            Pages 70..71

Page 70

```
 1    CERTIFICATE OF DEPONENT
 2
 3        I, Frank Spaniel, hereby certify that I
 4    have read the foregoing pages of my deposition of
 5    testimony taken in these proceedings on August 13,
 6    2013, and with the exception of the changes listed on
 7    the next page and/or corrections, if any, find them to
 8    be a true and accurate transcription thereof.
 9
10
11
12
13
14
15
16    Signed:_____
17    Name:_____
18    Date:_____
19
20    Sworn to and Subscribed before me
21    _____, Notary Public
22    This_____day of _____, 20____.
23    My Commission Expires:
24
25
```

Page 71

```
 1    REPORTER'S CERTIFICATION
 2
 3        I, Jane G. Dropnick LaPorte, court
 4    reporter and notary public do hereby certify that the
 5    above and foregoing transcript is true and correct.
 6        Dated this 23rd day of August, 2013.
 7
 ...
22    [signature: Jane G. LaPorte]
23
24    _____
25        Jane G. LaPorte
```