IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| FN HERSTAL, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE NO.: |
| v. | ) | 3:12-cv-00102-CAR |
| | ) | |
| CLYDE ARMORY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED
MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Plaintiff, FN Herstal, S.A., pursuant to F.R.C.P. § 56 and L.R. 56 and in

opposition to Defendant's Motion for Partial Summary Judgment, hereby submits the

following statement of disputed facts and further submits additional undisputed material

facts:

1-2.    Regarding Paragraphs 1 and 2, Defendant's sole shareholder and owner,

Andrew Clyde, testified that the "initial meeting" between the principals of Defendant

and Sage International, Ltd. occurred at the February 2006 SHOT Show held in Las

Vegas, Nevada.  No documents have ever been produced of any communications

occurring in 2005.  It should further be distinguished that the collaboration being

referenced in 2005 and 2006 is on the manufacture of the rifles and not on the mark

SCAR-Stock.  As John Klein the President of Sage International, Ltd., the manufacturer

of the product, would testify in 2013, █████████████████████████████████

██████████████████████████████████████████████████████████████

████████. Furthermore, neither Defendant nor Sage International has provided any documentation of ever searching the mark SCAR-Stock. Moreover, the mark for Defendant's firearms product had not yet been considered during the supposed undocumented collaboration in 2005 or at the SHOT Show in February 2006, and apparently was only later selected by Andrew Clyde. (Dkt. 92-3, Exhibit B – Selected Portions of Deposition of Andrew Clyde, pgs. 25:23-26:11 and 32:18-35:19; Exhibit 1 hereto, Klein Dep., p. 37:3-38:3).

3.      Regarding Paragraph 3, Defendant cites to only the deposition testimony of its sole shareholder and owner Andrew Clyde and Sage International's President and founder John Klein for the proposition that Defendant's mark SCAR-Stock was a term coined by Defendant as a reference to Sage Clyde Armory Replacement Stock (or perhaps more properly Sage International, Ltd. and Clyde Armory, Inc.) to "reflect the collaborative origin of the newly developed replacement stock design." Yet the portion of Mr. Klein's deposition transcript referenced in and attached as an exhibit to Defendant's Brief (Klein Dep. Tr. 34:19-24), which Defendant claims supposedly confirms this understanding of SCAR-Stock, is an incomplete and distorted excerpt of Mr. Klein's entire testimony on the subject. Immediately after the deposition testimony cited by Defendant, Mr. Klein, the individual who personally dealt with Mr. Clyde about designing and manufacturing the product for Defendant, and who is the President of Sage International, Ltd., the manufacturer for the underlying product, further testified that █

████████████████████████████████████████

████████████████████████████████████████

 In particular, Mr. Klein testified as follows:

(Exhibit 1 hereto, Klein Dep. pgs. 36:21-37:22, 39:7-40:7).

In fact, as explained by Mr. Joshua Smith, Defendant's former Chief Operating Officer, the real reason Defendant adopted the mark SCAR-Stock for use with Defendant's firearms products was to take commercial advantage of the prior use of the trademark SCAR by Plaintiff and the considerable media and industry attention surrounding such use. Indeed, Defendant admits that most prospective purchasers would not even be aware of Defendant's use of SCAR-Stock as purportedly being some sort of reference to Sage Clyde Armory Rifle Stock or Sage Clyde Armory Replacement Stock.

(Dkt. 92-1, Plaintiff's Material Facts ¶¶26 and 36 and Dkt. 92-13, Exhibit H – Smith Dep., pgs. 46:19-49:9 and 56:21-57:13).

4.      Regarding Paragraph 4, Defendant's assertion of "significant and continuous use of the SCAR-Stock mark and/or similar variations thereof" and "trademark rights in this mark throughout the United States" is disingenuous and not supported by the record.  The documents upon which Defendant relies to support this claim (Defendant's Brief, Ex. C – CA-03525-28 and CA-03641-42) demonstrate that Defendant's sales of the rifle stocks bearing the mark SCAR-Stock for a product available nationally on the Internet and supposedly available to law enforcement, gun dealers and distributors, as well as to civilian purchasers of firearms were sporadic at best, not of some high level considering the national market for firearms, and certainly not "significant" in that context by any definition of that word.  For example, Defendant's documents labeled CA-03525-28 show that in the roughly eight years from the very first sale in 2006 through early 2014, Defendant allegedly sold a total of only about ███ units for a total amount of dollar sales of about ██████.  As explained in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (Dkt. 92, "Plaintiff's Brief"), the total number of Defendant's customers during this time span was lower than the total number of units sold.  (Dkt. 92-1, Plaintiff's Material Facts ¶¶52-53).  Defendant's documents labeled CA-03525-28 also show that during many months Defendant's sales ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

4

████████████████████████ (Dkt. 92-1, Plaintiff's Material Facts ¶49). Defendant's documents labeled CA-03641-42 similarly show that, contrary to Defendant's allegation, it has **not** "established common law trademark rights in [the mark SCAR-Stock] throughout the United States." Documents CA-03641-42 show that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████. Further, Plaintiff states that under Local Rule 56 no response is necessary to this statement, which is vague and ambiguous as to what is considered "significant" or which calls for legal conclusions or statements on issues in the case, rather than relying on specific cited facts that could support such legal contentions.

6.     Regarding Paragraph 6, Plaintiff notes that the USPTO's initial Office Action referencing a merely descriptive objection also included an advisory statement concerning Plaintiff's two earlier-filed pending trademark applications, Serial Nos. 79/053,575 and 76/695,285 for the marks SCAR and SCAR And Design, respectively. In particular, the USPTO Trademark Attorney Examiner indicated that "[i]f one or more of the referenced applications registers, registration [of Defendant's SCAR-Stock application] may be refused in this case under Section 2(d)." (Dkt. 91-4, Ex. D – First Office Action, attached to Defendant's Brief). Section 2(d) refers to refusal of registration on the grounds of a likelihood of confusion (15 U.S.C. § 1052(d)), and that statement by the Trademark Attorney Examiner pertained to a likelihood of confusion with Plaintiff's marks SCAR and SCAR And Design, shown in Plaintiff's prior-filed pending Federal trademark applications.

7-8.    Regarding Paragraphs 7 and 8, Defendant's claims that it "overcame the merely descriptive ground for refusal by explaining that SCAR-Stock is not used on a 'scar assault rifle'" and that "the USPTO withdrew its merely descriptive refusal to registration" are false.  First, the USPTO did not withdraw the descriptiveness refusal, but rather maintained and continued that refusal.  (Dkt. 91-4, Ex. D – Second Office Action, p. 3, attached to Defendant's Brief).[1]  Second, the Defendant's claim that it explained to the Trademark Attorney Examiner that SCAR-Stock was not used in connection with Plaintiff's rifles bearing the SCAR mark does not accurately and completely reflect Defendant's arguments as actually made within Defendant's USPTO submission.  In response to the USPTO's initial refusal on the ground that Defendant's applied-for mark SCAR-Stock was merely descriptive of a gun stock used on a certain type of rifle, Defendant argued that the mark SCAR-Stock could not be descriptive because the Trademark Attorney Examiner also cited two of Plaintiff's earlier-filed Federal trademark applications for the mark SCAR and SCAR And Design as potentially obstructing references under a likelihood of confusion scenario.  (Dkt. 91-4, Ex. D – Response to Office Action, attached to Defendant's Brief).  Defendant was essentially arguing that Plaintiff's trademark SCAR was a trademark as a source indicator for Plaintiff's firearms and rifles and Defendant's trademark SCAR-Stock was a source indicator for Defendant's firearms products, i.e. gun stocks.

9.    Regarding Paragraph 9, while the U.S. government and military may have early-on during the solicitation and review process used various abbreviations, including

---

[1] The subject Office Action states, in relevant part, "The refusal under Trademark Act Section 2(e)(1) is continued."  Section 2(e)(1) refers to 15 U.S.C. § 1052(e)(1) - the section of the Trademark Act relating to refusal of registration of a mark on the Principal Register, which, "when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them."

at times the abbreviation SCAR as a reference to Special Operations Forces Combat Assault Rifle, the exhibits produced and relied upon by Defendant indicate that Plaintiff used SCAR as a source identifier and a trademark for Plaintiff's firearms products – e.g. Plaintiff's March 2, 2006 press release, in reference to Plaintiff's product, states, "[T]he SCAR represents the leading edge of current assault rifle design." (Dkt. 91-5, Ex. E – CA-00133-35, attached to Defendant's Brief). Moreover, the record and facts clearly demonstrate that for roughly two years prior to Defendant's alleged first use date of September 2006, Plaintiff was promoting, providing, transporting and selling in commerce firearms products bearing the trademark SCAR and was using the trademark SCAR. With the award of the November 2004 contract, the Plaintiff became the only authorized provider of weapons under the Plaintiff's mark SCAR. (Dkt. 92-1, Plaintiff's Material Facts ¶¶8-15, 17-19; Exhibit 2 hereto, Hochstrate Dep. pgs. 26:3-7, 54:2-15, 57:6-58:16, and 60:1-23).

10.     Regarding Paragraph 10, the same day USSOCOM awarded the contract to Plaintiff on November 5, 2004, Plaintiff sold ███████ worth of firearms to USSOCOM, with shipments of Plaintiff's SCAR branded firearms beginning shortly thereafter. Even prior to that date, in June 2004, Plaintiff shipped prototype firearms sold under Plaintiff's trademark SCAR that later were actually sold. Furthermore, the award of the contract meant Plaintiff was the only authorized provider of firearms under Plaintiff's trademark SCAR. (Dkt. 92-1, Plaintiff's Material Facts ¶¶9, 11, 13).

11-12. Regarding Paragraphs 11 and 12, Plaintiff admits that in February 2006 Plaintiff promoted its firearms products bearing the trademark SCAR at the SHOT Show "firearms industry trade show" held in Las Vegas, Nevada, whose attendees included

persons having an interest in the firearms industry that would include firearms dealers, distributors, gun store owners, members of law enforcement, other manufacturers, and others having an interest in the industry. (Dkt. 92-1, Plaintiff's Material Facts ¶17; Dkt. Dkt. 92-7, Exhibit D – Mills Dep., p. 24:13-25:6). The Plaintiff's SCAR brand rifles displayed during the February 2006 SHOT Show were not intended for use for firing live rounds at the trade show. Moreover, Plaintiff had been over one year earlier (in November 2004) awarded an exclusive contract to supply the U.S. military with Plaintiff's rifles bearing the trademark SCAR, Plaintiff had already sold to the U.S. military ████████████████████ worth of such rifles, and Plaintiff was actively promoting SCAR brand firearms to persons attending the trade show, including those in the law enforcement and the civilian markets. (Dkt. 92-1, Plaintiff's Material Facts ¶¶13-15). The versions of Plaintiff's SCAR brand firearms shown at the trade show were fully automatic versions intended for sale to military and law enforcement agencies, as only a semiautomatic version would be provided to the civilian market due to regulatory requirements, with the exception being Plaintiff's licensed air gun versions. Additionally, as Plaintiff's representative explained to non-military attendees of the February 2006 SHOT Show who inquired as to when the products would be available to them, Plaintiff had to wait until a semiautomatic version of its rifles bearing the trademark SCAR was approved by the government for commercial sales. (Dkt. 92-1, Plaintiff's Material Facts ¶20). Moreover, a number of witnesses, including Plaintiff's representatives, Defendant's representatives, and third parties, have testified to the fact that it is quite normal within the firearms industry for products to first be targeted to military customers prior to the manufacturer making such products available to the

commercial market, especially since military sales tend to generate commercial interest in such products. (Dkt. 92-1, Plaintiff's Material Facts ¶¶21-22). In fact, consumers were already commenting on Plaintiff's promotion of SCAR brand firearms one year earlier, since the 2005 SHOT Show held in January 2005. Certain Internet records indicate that as early as January 2005 potential civilian purchasers of Plaintiff's SCAR brand rifles were already recognizing the trademark SCAR and associating the trademark with Plaintiff and Plaintiff's firearms, and that such consumers were growing excited about the possibility of owning such firearms, even inquiring as to their availability. (Exhibit 3 hereto, Umansky Supplemental Decl., ¶3-7 and exhibits thereto).

13.     Defendant cites no supporting "specific citation to the record" as required by Local Rule 56 and therefore no response is required. Moreover, the statement is vague and incomprehensible as it is unclear what is meant by "did not release publicly available commercial versions." Does that mean sales or information or prototypes or something else entirely? Also unclear is which annual "Las Vegas trade show" is being referenced in this Paragraph.

14.     Defendant cites to a supporting document containing this statement, but the citation is not the correct page. Document "CA00137," which Defendant apparently neglected to attach to Defendant's Brief, is the correct page from a press release containing the statement alleged in Paragraph 14, and that document as it fully reads speaks for itself, but a portion of that document is properly quoted.

15.     Regarding Paragraph 15, Defendant appears to make a distinction between the military market, the law enforcement market, and the non-law enforcement civilian market, although these are all customers for Plaintiff's firearms bearing the trademark

9

SCAR. The document attached as "Ex. G [CA01450]" to Defendant's Brief appears to be a January 7 or 8, 2009 press release from Plaintiff's subsidiary FNH USA published on the Internet site for The Tactical Wire (www.thetacticalwire.com), which indicated that the "FN SCAR™ 16S for the civilian enthusiast was delivered to its dealer base at year end 2008." This document makes no mention of the availability of firearms bearing the trademark SCAR to law enforcement organizations. As Charles Newton Mills, III, Plaintiff's Rule 30(b)(6) witness, testified, Plaintiff promoted and demonstrated its products bearing the trademark SCAR during visits to law enforcement agencies throughout 2006. (Dkt. 92-1, Plaintiff's Material Facts ¶18). Mr. Mills also testified that Plaintiff began taking orders for the product from law enforcement agencies in 2007 or 2008 (Dkt. 92-7, Ex. D – Mills Dep., p. 30:7-11). Moreover, the purported distinctions between Plaintiff's various types of customers as well as fully automatic versus semi-automatic rifles are irrelevant. Plaintiff's first bulk sale of SCAR brand rifles in the approximate amount of ███████ took place on November 5, 2004, and this single early sale ████████████████████████████████████ from Defendant's first use of the mark SCAR-Stock in September 2006 through the present time. (Dkt. 91, Defendant's Brief, pgs, 2-3, 5, 7-8, 10, 15, 17, 19-20, 28; Dkt. 91-3, Ex. C – CA-03525-28, attached to Defendant's Brief; Dkt. 92-1, Plaintiff's Material Facts ¶13).

17.    Regarding Paragraph 17, while the information from the application, which is taken out of context, is accurate, the reference is to a registration showing the mark SCAR in a stylized and design form and which application covers a broad range of goods. Furthermore, it should be commented upon that Plaintiff holds a substantially earlier first use and priority date by virtue of Plaintiff's significant commercial use of the

10

mark SCAR dating back to at least 2004, and at any rate years prior to Defendant's alleged first use date of September 2006.   (Dkt. 92, Plaintiff's Brief, pgs. 10-16; Dkt. 92-1, Plaintiff's Material Facts ¶¶8-11, 13-15, 17-19).

18.     Regarding Paragraph 18, Defendant's labeling of Plaintiff's U.S. Trademark Application No. 79/053,575 for the mark SCAR as one filed on the basis of "*intent-to-use*" is an improper characterization.  This trademark application was not filed on the basis of *intent-to-use* (Section 1(b) of the Trademark Act, 15 U.S.C. §1051(b)), but was rather filed based on Section 66(a) of the Trademark Act, 15 U.S.C. §1141f(a), which provides for a separate filing basis under the Madrid Protocol, an international treaty to which the United States is a signatory.  (Exhibit 4 hereto, FN101031-37; Dkt. 73-1 at 6).  Unlike trademark applications filed under Section 1(b) *intent-to-use*, Madrid Protocol applications, while requiring the applicant to declare that it also has a bona fide intention to use the mark in commerce, do not require specimens for filing or even use in commerce on the covered items prior to registration in the United States.  15 U.S.C. §1141h(a)(3).  Thus, Defendant's labeling of Plaintiff's trademark application as one based only on "*intent-to-use*" is false and inaccurate.

19.     Regarding Paragraph 19, Defendant's statement is argumentative and improperly supported, as well as being internally inconsistent, and as such under Local Rule 56 no response should be necessary.  The characterization of the argumentative word "most" causes the statement to be improperly argumentative and ambiguous, and the statement is not sufficiently supported.  It refers to only eight pages, which by itself is far less than "most" of Plaintiff's advertisements, as Plaintiff will further herein reference far more instances that do not show what Defendant claims.  Moreover, the statement is

11

inconsistent as an abbreviation for S.O.F. Combat Assault Rifle or Special Operations Forces Combat Assault Rifle could just as easily be characterized with the first letter of each word as SOFCAR, with a variety of other potential possible abbreviations. Defendant's use of the word "most" is inaccurate as many of Plaintiff's advertisements, marketing pieces, and promotional items of record for the firearms bearing the trademark SCAR do not use the wording "[S.O.F. Combat Assault Rifle]." (*See e.g.*, Exhibit 5 hereto, FN100196, FN100328, FN100817-19, FN100000-02, FN100008-15, FN100024-39, FN100549-57, FN100561-62, FN100582-83, FN100589-91, FN100596-98, FN100612-17, FN100642-44, FN100648-49, FN100652-54, FN100697-98, FN100709-18, FN100754-57, FN100764-69, FN101411-15, FN100422-23, FN103291, FN103295-97). Furthermore, one of the documents referenced in Paragraph 19 of Defendant's Statement of Facts, i.e. FN100415, includes the wording "BATTLE SCARS." in large font directly below the smaller-sized wording "SCAR – SOF COMBAT ASSAULT RIFLE." This suggests that, at least in that particular document, Plaintiff intended for a double-entendre or dual meaning for the trademark SCAR as also signifying or connoting a wound that has not healed completely. (Dkt. 92, Plaintiff's Brief, pgs. 9-10, and Ex. C thereto, Umansky Decl., ¶8). Another document referenced by Defendant in Paragraph 19, i.e. FN100389, appears to be an Internet article from Defense Update International Online Defense Magazine rather than an advertisement from Plaintiff. This same article, showing the Defense Update name and website address, was separately produced by Plaintiff. (Exhibit 6 hereto, FN102685-88). These documents include the wording "Year 2005 Issue: 1," indicating that this Defense Update article was written and published early in 2005, before Defendant had even considered the mark SCAR-Stock as a potential

12

trademark for Defendant's firearms products. Moreover, the advertisements and marketing pieces referenced in Paragraph 19 of Defendant's Statement of Facts all use SCAR as a trademark and a source identifier for Plaintiff's firearms, notwithstanding any references to "[S.O.F. Combat Assault Rifle]."

21-22. Regarding Paragraphs 21 and 22, and as indicated above in response to Paragraph 19, many of Plaintiff's advertisements and marketing materials did not include the statement referenced within Paragraph 21 or the USSOCOM emblem. Use of the words "many" and "several" in these two paragraphs is also misleading, vague and improperly argumentative given the few documents identified by Defendant as including such wording or emblem. The Defendant refers to "several" documents that use an official emblem of the U.S. military and by that statement it is apparent that most such documents beyond the several ones noted do not use the emblem. Moreover, the information listed in paragraph 21 has long been public knowledge from even USSOCOM documents. (Exhibit 7 hereto, FN102819 – December 10, 2013 letter from USSOCOM to Plaintiff references publicly available information, and Defendant's exhibits show such as being publicly available).

23. Regarding Paragraph 23, Plaintiff notes that the '427 patent application issued on July 19, 2011, not on July 9, 2011 as alleged by Defendant. (Dkt. 91-9, Ex. I – CA00153-163, attached to Defendant's Brief).

24-26. Regarding Paragraphs 24, 25 and 26, this action being referenced filed in the U.S. District Court for the Northern District of Texas was for design patent infringement or design issues on a particular rifle, as well as for false advertising, tortuous interference with prospective relations, and common law unfair competition, and

was filed by attorneys who were advancing the interests of Plaintiff's licensee Cybergun, S.A. against a third party having no relation or connection to the current matter (Dkt. 91-9, Ex. I – Plaintiffs' Original Complaint, attached to Defendant's Brief). Contrary to Defendant's allegation in Paragraph 25, the Texas action did not allege claims for trademark infringement involving the SCAR trademark. Count IV of the Original Complaint in the Texas action entitled "Trademark Infringement in Violation of the Lanham Act" specifically referenced the marks "SOFT AIR, SOFTAIR, and/or CYBERGUN" as the asserted trademarks. Such trademarks are owned by Cybergun, S.A., not by Plaintiff. Moreover, the Texas lawsuit was dismissed approximately one month after it was filed (Exhibit 8 hereto, Plaintiffs' Motion to Dismiss Without Prejudice and Order of Dismissal). In Plaintiff's Reply and Affirmative Defenses to Defendant's Answer to Amended Complaint with Counterclaims filed in the current action, Plaintiff provided actual notice to Defendant of the dismissal and generally irrelevant nature of such claims, as well as the inaccurate allegations contained in such withdrawn and never served pleading. (Dkt. 75, pages 7-9, ¶¶43-45).

29.     Regarding Paragraph 29, while the quoted language accurately reflects the wording found in the referenced letter, Defendant has provided no documentation that this letter was "postmarked March 3, 2009," and, while this letter includes a signature block for Louis Dillais, President & CEO of FNH USA, LLC, Plaintiff's subsidiary, it was apparently signed by another individual who also included the handwritten wording "Vice President." Regardless, the signatory of the letter was a non-attorney corporate officer of Plaintiff's subsidiary, and was not an attorney versed in trademark law. Moreover, there is no information or evidence to suggest what the drafter of the letter

14

intended by, "[T]he acronym SCAR in US Government jargon does refer to the USSOCOM Program." This phrase reflects that early on SCAR was at times used by USSOCOM as an acronym or abbreviation in association with the referenced program. (Dkt. 92, Plaintiff's Brief, p. 11 and fn. 9; Dkt. 92-4, Ex. C – Umansky Decl., ¶¶10 and 11). However, this does not change the fact that Plaintiff began promoting, selling and shipping firearms bearing the trademark SCAR to the U.S. military starting in 2004 or that Plaintiff was awarded the contract by the U.S. military and was the only authorized supplier of the Plaintiff's SCAR brand firearms. The letter clearly shows Plaintiff's subsidiary claiming that Plaintiff has rights in the SCAR brand and requesting before apparently a letter might become necessary from Plaintiff's legal counsel for Defendant to discontinue use of the SCAR brand to avoid further confusion in the marketplace. (Dkt. 92-1, Plaintiff's Material Facts ¶¶9, 11 and 13).

30.    Regarding Paragraph 30, the referenced document, "Ex. J [CA0023-0024]," was not attached as an exhibit to Defendant's Brief. Nevertheless, this document, had it been attached, would speak for itself and includes the alleged language which Defendant asserts in Paragraph 30. However, Plaintiff notes it has rights in the trademark SCAR dating back to when it first began offering or providing firearms products bearing the trademark SCAR in 2004-2005. (Dkt. 92, Plaintiff's Brief, pgs. 10-16; Dkt. 92-1, Plaintiff's Material Facts ¶¶8-11, 13-15, 17-19). Furthermore, the Federal trademark application for what would eventually become Plaintiff's '448 Registration shows a special design form and stylized version of the mark SCAR. (Dkt. 92-4, Umansky Decl., ¶3, and Exhibit 1 attached thereto). While this registration claims a first use date in commerce of November 1, 2008, it was filed by a non-attorney corporate

15

officer of Plaintiff's subsidiary FNH USA, rather than with the help of legal counsel, and the asserted first use date was listed without the advice of skilled legal counsel, much less that of a Trademark lawyer. However, as shown by actual evidence, Plaintiff is able to assert an earlier priority date based upon the substantially earlier significant use of the mark SCAR dating back to at least 2004, and at any rate prior to Defendant's alleged first use date of September 2006, not to mention significant media attention, and marketing, promotions, sales and transport early-on of products bearing the Plaintiff's trademark SCAR. (Dkt. 92-1, Plaintiff's Material Facts ¶¶8-11, 13-15, 17-19).

31.     No citation to the record is referenced as required by Local Rule 56, so no response is necessary. However, the statement is incorrect as obviously the responses would include the Plaintiff's parent corporation having filed this lawsuit, as well as the existence of the prior adversarial proceedings in the Trademark Office.

35-41. Paragraphs 35, 36, 37, 38, 39, 40 and 41 are objected to on the basis that they are not in compliance with Local Rule 56. They are not statements of facts, but purport to be citations to legal provisions or portions thereof. As stated in Local Rule 56, asserted statements of issues or of law "will not be considered by the Court," so no response is necessary. Additionally, reference to 48 C.F.R. § 5652.204-9003 in Paragraphs 39, 40 and 41 appears to be improper as Plaintiff has been unable to find this particular section within Title 48 of the Code of Federal Regulations. Moreover, none of Paragraphs 35 through 41 have any citations at all to the factual record in the case as required by Local Rule 56, and as such the statements are objectionable and do not require a response. Other statements are also objectionable as not factual statements, but calling for legal conclusions without factual citations to the record, such as Paragraph 41.

Regarding Paragraphs 38, 39, 40 and 41, in a letter dated May 14, 2010 addressed to Plaintiff's subsidiary FNH USA, USSOCOM wrote as follows:



(Exhibit 9 hereto, FN102837-38 - May 14, 2010 letter from USSOCOM to FNH USA, LLC) (Emphasis added). ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████ Additionally, as shown by Defendant's Court filings, the contracts and information were all publicly available, with USSOCOM publishing even the 2004 documents and thereafter publishing an array of subsequent materials on FedBizOps, www.fbo.gov. The Defendant's exhibits show these USSOCOM documents filed without any level of confidentiality and a separate USSOCOM letter dated December 10, 2013 in response to Plaintiff's request for authorization to release certain unclassified information indicates ████████████████████████████ ████████. (Exhibit 7 hereto, FN102819 – December 10, 2013 letter from USSOCOM to Plaintiff). Defendant simply is unable to identify what was wrongfully disclosed and not

already public knowledge, and further what relevance such disclosure may have to any

issue in this case. None of this has anything to do with the use of the Plaintiff's mark

SCAR on the actual product, or on labels or packaging for the product, and Defendant

never challenges any such use as allegedly being wrongful.

## STATEMENT OF ADDITIONAL MATERIAL FACTS
## SUBMITTED BY PLAINTIFF

42.     As stated in Paragraph 13 of Plaintiff's Statement of Undisputed Material

Facts, on November 5, 2004, ▮▮▮▮▮▮▮ worth of firearms and attachments sold

under Plaintiff's trademark SCAR was ordered by USSOCOM, with the weapons shortly

thereafter shipped to Crane, Indiana, and inspected and accepted by the U.S. government.

(See Dkt. 92-1, Plaintiff's Material Facts ¶13 and exhibits thereto:  Ex. A, Mills Decl.

¶11; Ex. D, Mills Dep., p. 162:24-163:21 and Exhibit 5, p. 11 at No. 2 and Exhibit 53

thereto).

43.     As stated in Paragraph 9 of Plaintiff's Statement of Undisputed Material

Facts, documents show order and shipment dates including May 2004, June 2004,

November 2004, February 2005, March 2005, May 2005, and July 2005 of rifles bearing

Plaintiff's trademark SCAR.  (See Dkt. 92-1, Plaintiff's Material Facts ¶9 and exhibits

thereto:  Ex. D, Mills Dep., p. 52:19-53:9, 56:14-61:15, 154:11-156:6, 158:4-160:3,

160:11-166:4 and Exhibit 4, Exhibit 5, p. 11 at No. 2, and Exhibits 49 and 51-54 thereto).

44.     As stated in Paragraph 11 of Plaintiff's Statement of Undisputed Material

Facts, as early as June 2004, prototype firearms sold under Plaintiff's trademark SCAR

were transported from Belgium to Indianapolis, Indiana, and delivered to NCSW Crane, a

shore command of the U.S. Navy. (See Dkt. 92-1, Plaintiff's Material Facts ¶11 and

18

exhibits thereto: Ex. A, Mills Decl. ¶8; Ex. D, Mills Dep., p. 57:13-58:9 and 160:11-162:19, and Exhibits 4 and 52 thereto).

45.    As stated in Paragraph 14 of Plaintiff's Statement of Undisputed Material Facts, by at least 2005 Plaintiff was distributing hats, t-shirts, brochures and other marketing materials all bearing Plaintiff's trademark SCAR.  Plaintiff distributed these promotional items to persons in the trade or industry and those having an interest in firearms as a further means of marketing the Plaintiff's trademark SCAR for Plaintiff's rifles and related firearms products.  (See Dkt. 92-1, Plaintiff's Material Facts ¶14 and exhibits thereto:  Ex. A, Mills Decl. ¶12; Ex. D, Mills Dep., p. 94:25-103:20, 103:23-110:7 and Exhibit 5, p. 10-11 at No. 2 and Exhibits 24-26 thereto).

46.    As stated in Paragraph 15 of Plaintiff's Statement of Undisputed Material Facts, solicited or even unsolicited media mentions, including numerous magazine and newspaper articles, served to promote Plaintiff's firearms under the trademark SCAR in 2005 and 2006.  (See Dkt. 92-1, Plaintiff's Material Facts ¶15 and exhibits thereto:  Ex. A, Mills Decl. ¶15; Ex. 5 to Spaniel and Mills Deps., p. 18-20 at No. 6; Exhibits 6 and 17 to Spaniel and Mills Deps.; Ex. C, Umansky Decl. ¶13 and exhibit thereto).

47.    As stated in Paragraph 17 of Plaintiff's Statement of Undisputed Material Facts, Plaintiff promoted its firearms products bearing the trademark SCAR and distributed its 2006 product catalog which referenced the SCAR brand rifle at the SHOT Show held in Las Vegas, Nevada in February 2006, which was attended not only by military personnel, but by other governmental agencies, law enforcement organizations, manufacturers, distributors, retailers of firearms, sportsmen, hunters, and others having an interest in firearms.  Rifles bearing the Plaintiff's mark SCAR were also exhibited to

19

the public at that show. (See Dkt. 92-1, Plaintiff's Material Facts ¶17 and exhibits thereto: Ex. A, Mills Decl. ¶13; Ex. D, Mills Dep., p. 43:14-44:4, 73:21-76:17, 138:19-139:9 and Exhibit 5, p. 10-11 at No. 2 and Exhibits 6 and 17 thereto; Ex. E, Spaniel Dep., p. 51:13-24, 53:22-54:10).

48.    As stated in Paragraph 18 of Plaintiff's Statement of Undisputed Material Facts, Plaintiff promoted its products bearing the trademark SCAR at many other trade shows throughout 2006, and during visits to gun dealers, law enforcement agencies, stores and distributors. (See Dkt. 92-1, Plaintiff's Material Facts ¶18 and exhibits thereto: Ex. A, Mills Decl. ¶14 and exhibit thereto; Ex. D, Mills Dep., p. 28:13-30:6, 33:12-37:3).

49.    Certain Internet records indicate that as early as January 2005 potential civilian purchasers of Plaintiff's SCAR brand rifles were already recognizing the Plaintiff's trademark SCAR and associating the trademark with Plaintiff and Plaintiff's firearms, and that such consumers were growing excited about the possibility of owning such firearms, even inquiring as to their availability. (Exhibit 3 hereto, Umansky Supplemental Decl., ¶3-7 and exhibits thereto).

50.    Defendant has alleged a first use date of the mark SCAR-Stock as no earlier than September 2006. (Dkt. 91, Defendant's Brief, pgs, 2-3, 5, 7-8, 10, 15, 17, 19-20, 28; Dkt. 92-1, Plaintiff's Material Facts ¶¶44-45).

51.    As stated in Paragraph 37 of Plaintiff's Statement of Undisputed Material Facts, Defendant is unable to provide any proof in writing of ever considering the mark SCAR-Stock prior to or even at the February 2006 SHOT Show attended by Defendant and where Plaintiff exhibited the SCAR brand rifle and passed out brochures promoting

the SCAR brand. (See Dkt. 92-1, Plaintiff's Material Facts ¶37 and exhibits thereto: Ex. B, Clyde Dep., p. 25:23-26:11 and 32:18-35:19 and Exhibit 3 thereto – Defendant's Responses to Plaintiff's First Set of Interrogatories thereto at pgs. 4-5, No. 3; Exhibit 1 hereto, Klein Dep., p. 37:3-38:3).

52.    Defendant "debuted" and rolled out its SCAR-Stock product, a product not targeted for use by the military, at the 2007 SHOT Show. (Exhibit 10 hereto, Clyde Dep. pgs. 49:25-50:22, 56:19-57:12, 59:7-60:1, and 74:22-25; Dkt. 91, Defendant's Brief, p. 4).

53.    Mr. John Klein, the individual who personally dealt with Mr. Clyde about designing and manufacturing the product for Defendant, and who is the President of Sage International, Ltd., the manufacturer for the underlying product, testified that ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ (Exhibit 1 hereto, Klein Dep. pgs. 36:21-37:22, 39:7-40:7).

54.    Mr. Joshua Smith, Defendant's former Chief Operating Officer, testified that in adopting the mark SCAR-Stock for use with Defendant's firearms products, Defendant intended to associate Defendant's product with the prior use of the trademark SCAR by Plaintiff and the considerable media and industry attention surrounding such use. (Dkt. 92-1, Plaintiff's Material Facts ¶26 and Dkt. 92-13, Exhibit H – Smith Dep., pgs. 46:19-49:9 and 56:21-57:13).

55.    During his deposition, Mr. Clyde (Defendant's sole shareholder and owner) testified that Defendant marked the SCAR-Stock brand rifles with "patent

pending" knowing full-well that a patent application was never filed and a patent was not pending. This patent pending notice appeared on Defendant's firearms products from 2006 until at least 2013. (Exhibit 1 hereto, Klein Dep. pgs. 42:3-44:23; Exhibit 10 hereto, Clyde Dep., pgs. 16:14-19:19 and 95:22-97:4, and Exhibit 2 attached thereto).

56.     Sage International, Ltd.'s President and founder, Mr. Klein, testified during his deposition held on October 30, 2013 that ██████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████ (Exhibit 1 hereto, Klein Dep. pgs. 42:3-44:23).

Respectfully submitted,

/s/ Burton S. Ehrlich
Burton S. Ehrlich

**LADAS & PARRY LLP**
Burton S. Ehrlich (admitted pro hac vice)
John P. Luther (admitted pro hac vice)
224 S. Michigan Avenue, Suite 1600
Chicago, Illinois  60604
Telephone: (312) 427-1300 Facsimile: (312) 427-6663

**TAYLOR ENGLISH DUMA LLP**
W. Scott Creasman, Georgia Bar No. 194860
Jeffrey R. Kuester, Georgia Bar No. 429960
1600 Parkwood Circle, Suite 400
Atlanta, Georgia  30339
Telephone: (770) 434-6868, Facsimile: (404) 434-7376

*ATTORNEYS FOR PLAINTIFF FN HERSTAL, S.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2014, I electronically filed the foregoing PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT with its exhibits with the Clerk of the Court using the CM/ECF system which will electronically send notice of such filing to all counsel of record and Plaintiff's counsel is also sending via overnight courier service delivery on July 25, 2014 a copy of the full set of documents including the unredacted version of documents being filed under seal to Defendant's counsel as follows:

Glenn D. Bellamy
WOOD HERRON & EVANS, LLP
2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202-2917

And
Michael C. Daniel

Victoria Rooks
PRIOR, DANIEL & WILTSHIRE, LLC
490 North Milledge Avenue
Athens, GA 30601

_/s/ Burton S. Ehrlich_____
Burton S. Ehrlich
**LADAS & PARRY LLP**
224 S. Michigan Avenue, Suite 1600
Chicago, Illinois  60604

*ATTORNEYS FOR PLAINTIFF*
*FN HERSTAL, S.A.*

23