# EXHIBIT 10
# TO PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

## SELECTED PORTIONS OF DEPOSITION OF ANDREW CLYDE
### With Exhibit 2 thereto

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

FN HERSTAL, S.A.,                    )
                                     )
              Plaintiff,             ) CIVIL ACTION FILE
                                     )
        vs.                          )
                                     ) NO. 3:12-CV-00102-CAR
CLYDE ARMORY, INC.,                  )
                                     )
              Defendant.             )

DEPOSITION OF
ANDREW SCOTT CLYDE
CLYDE ARMORY, INC. 30(b)(6)

AUGUST 21, 2013
10:00 A.M.

1600 PARKWOOD CIRCLE
SUITE 400
ATLANTA, GEORGIA

JUDY J. SMITH, RMR
CCR-A-521

INDEX

PLAINTIFF'S EXHIBIT                              PAGE

          Exhibit 1                               6

          Notice of Deposition Under
          Rule 30(b)(6) of the Federal
          Rules of Civil Procedure


          Exhibit 2                              16

          Clyde Armory
          Price Quotation


          Exhibit 3                              23

          Responses to FN Herstal, S.A.'s
          First Set of Interrogatories to
          Clyde Armory, Inc.


          Exhibit 4                              67

          2006 Law Enforcement
          Trade Shows


          Exhibit 5                              85

          Defendant Clyde Armory, Inc.'s
          Responses to Plaintiff FN Herstal,
          S.A.'s Second Set of
          Interrogatories


          Exhibit 6                             107

          Supplemental Responses to
          FN Herstal, S.A.'s First Set
          of Interrogatories to
          Clyde Armory, Inc.

Exhibit 7                                    129

FHN USA, LLC 2010 Distribution
Agreement for FN Herstal Firearms

Exhibit 8                                    171

Amended Answer to Complaint
and Counterclaims

(Original Exhibits 1 through 8 were

retained by Mr. Ehrlich)

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:

    BURTON S. EHRLICH, Esq.
    JOHN P. LUTHER, Esq.
    Ladas & Parry, LLP
    224 South Michigan Avenue
    Suite 1600
    Chicago, Illinois  60604
    (312) 427-1300
    burte@ladas.com
    john.luther@ladas.net

On behalf of the Defendant:

    GLENN D. BELLAMY, Esq.
    Wood, Herron & Evans, LLP
    2700 Carew Tower
    441 Vine Street
    Cincinnati, Ohio  45202-2917
    (513) 241-2324
    gbellamy@whe-law.com

Also Present:

    Ms. Abla Fahim

Q.   As you sit here today, you're not sure what you were looking for, you've already made that pretty clear in your answer.  Was it something in this case that you were looking for?

A.   I don't remember right now.

Q.   That's fine.

A.   I'm sorry.

MR. EHRLICH:  I would like to have the court reporter mark Exhibit 2 for identification, please.

(Exhibit 2 was marked for identification.)

BY MR. EHRLICH:

Q.   This is a series of documents that were produced by Clyde Armory that are Bates numbered with the numbers showing, I believe it's CA-03483 through CA-03489.  I'm not sure that any of these documents really go together, but I would like for you to take a moment and just look at these documents.

A.   Yes.

Q.   Are you familiar with these documents?

A.   Yes, I am.

Q.   I would like to call your attention to a particular page here, the page that is Bates

numbered at the bottom as part of Exhibit 2, CA-03488.

A.   Yes.

Q.   It says at the top, it says SCAR-CQB Stock, ClydeArmory.com, Bogart, Georgia, 30622, Patent Pending?

A.   Correct.

Q.   Is there a patent pending?

A.   No, there's not.

Q.   When was this document prepared, approximately?

A.   According to what I pulled up on this document, it was August 26th of 2006.

Q.   Was there a patent pending on August 26th of 2006?

A.   We were in the process of doing that.

Q.   And who was doing that for you?

A.   We were doing it ourselves.

Q.   Had you contacted legal counsel at all about the patent?

A.   No, we hadn't.

Q.   Has there at any point in time been a patent pending on this?

A.   You mean one actually acknowledged by the Patent Office?

Q.   Yes.

A.   No.

Q.   So a patent was never pending or filed on the SCAR-CQB Stock or any other SCAR product sold by your company?

A.   No.   It was our intention to do so, but it was more than I could do.

Q.   And you never consulted with legal counsel about it?

A.   No, I never did.

Q.   What was it about the product that you felt you were an inventor of, if anything?

A.   The design for the particular stock or for the particular rifle.

Q.   You mean the rifle with the stock?

A.   No, the design of the stock for the particular rifle.   To my knowledge, nothing like that had ever been done for a Ruger AC-556 or Mini 14.

Q.   So would the patent have covered the design itself or the way the design works for the rifle?   I'm just getting at whether it's a design patent or utility patent.

A.   I couldn't tell you the difference.   So I don't know.

Q.   Where was this taken from?  You've got this notation here on this page.  What is that reproduced from?

A.   What do you mean?

Q.   Where it says SCAR-CQB Stock, ClydeArmory.com.  Is that from your website or where did that appear?

A.   It was simply a document created in Word.

Q.   But what was it used on?

A.   It would have been sent to Sage for the marking of the stock.

Q.   So you gave Sage instructions to mark it with this?

A.   That's correct, yes.

Q.   And Sage was to follow your instructions, were they not, on marking the product?

A.   That's correct.

Q.   Okay, the next page I'm going to call your attention to, CA-03489, that's the Bates number on it and it's in Exhibit 2 here.

A.   Yes.

Q.   I see you said yes.  That means, I guess, you're familiar with it?

Q.    Within three years?

A.    I don't know, Burt.

Q.    So you had the meeting at the Shot Show with Klein of Sage.    What occurred after that?

A.    I came home from Shot Show, and I would have sent him some engineering, some product, some engineering product which is outlined in our agreement there, for him to map, if you will, for fitting of the stock, the SCAR-Stock; and then John would have built a prototype for us and sent us a prototype and then I would have tested the prototype.    During that time frame, I would have drafted the document shown as Plaintiff's Exhibit 2, the draft of the new product contract, and we would have -- we did approve it, and then I would have sent him purchase orders.    He would have come up with a price.    I would have sent him purchase orders and the deal was that he creates the chassis for me and we assemble the different parts to it inhouse and then we sell it as the completed product.    So our responsibility would have been to procure the parts that would be assembled onto the chassis which would be the pistol grip and the sliding buttstock.

Q.    Now, your target audience, you mentioned

before that you knew that Ruger had 10,000 to 15,000 of these weapons out there; is that correct?

A.    Yes.

Q.    So your target audience would have been that 10,000 to 15,000 potential replacement stocks?

A.    Yes, and I knew that an advantage of having it fit an AC-556 is that it would also fit a Mini 14.  So I reasonably assumed that there would be some ancillary sales into the Ruger Mini 14 market, and I have no idea the size of the Ruger Mini 14 market, but I know it's huge.

Q.    But your main primary focus, at least --

A.    It was the AC-556, that's correct.

Q.    Who owns the AC-556, is that law enforcement?

A.    The AC-556 is used by law enforcement, that's correct, and also by civilians.  It's a transferable machine gun.  So it would be a gun that Joe Citizen can buy.

Q.    Back then was it your understanding that most of that 10,000 to 15,000 would have been law enforcement owned?

necessarily adhered to. No additional agreement was ever produced after the first year like it talks about in here. I mean each stock system was slipped in an individual plain brown box bubble wrapped, just like it says in here. We never paid Sage a penalty for low orders or any penalty of any sort. There was no profit-sharing between the two of us. We never marked each stock with a serial number like it says in here. We found that to be too cumbersome of a requirement. There are some things that you think about when you create a product that when manufacturing time comes, just don't work, great ideas, but -- product manufacturer, it included the pistol grip screw and the buffer tube screw, I mean was there. So significant portions of this draft have come through.

Q. Now, you referenced that there was a handshake. You're not actually referring to a physical handshake, you're just referring to that you reached an agreement, basically an informal agreement; is that correct?

A. Well, we shook hands at Shot Show.

Q. Was that the handshake? This agreement

was after Shot Show?

A.    That's correct, it was.

Q.    I mean I'm not trying to, I mean I understand what you're saying is that there was some sort of agreement, but it wasn't at a physical meeting; is that right?

A.    And I know that when I went back up there, we shook hands then, too, but no, those would have been the only, other than I'm sure Shot Show 2007 because we rolled this out in Sage's booth in Shot Show 2007.  Of that, I'm certain.  So Shot Show 2007, I spent the majority of my time at Sage's booth with this product in 2007.  This product was also displayed in Ruger's booth in 2007, as well.

Q.    After they bought one, ████████ ████████, they tested it; is that correct?

A.    I don't know what they did after they bought it.

Q.    Do you know if they tested it, ██████

A.    I don't know if they tested it, but I know that Ruger did buy OEM directly from Sage

addresses?

A.    No, it would be a brown box.    The label would go on the brown box.

Q.    And there's no mention of what's inside?

A.    No.    It keeps your product safe or safer.

Q.    What was done, you mentioned that there was a rollout at Shot Show 2007 in the Sage booth?

A.    That's correct.

Q.    What was done on that rollout, what you described as the rollout in 2007 at the Sage booth?

A.    We printed a number of fliers, tri-folds, 1,000 or 2000 of them, I don't remember which.    It was at least 1,000 that we printed.    We brought three or four stocks to Shot Show.    We put one in Ruger's booth, with their permission, and we had them in the different configurations of the AC-556 and Mini 14, displayed short barrel, long barrel, blued, stainless.    We advertised in Law Enforcement Product News on the front page.    We put it in there for Shot Show.    That was specifically for the Shot Show.    We wanted the SCAR-Stock to get

good visibility, as much as we could.

Q. Did you have a booth at Shot Show in 2007?

A. No.

MR. EHRLICH: Let's go off the record for a minute.

(Lunch recess.)

BY MR. EHRLICH:

Q. Back on the record. This is the continuation of the Andrew Clyde deposition, the afternoon session.

Andrew, you realize, of course, you're still under oath, right?

A. Yes.

Q. Thank you. Has there ever been an occasion where Herstal ever visited with you at your facility in Athens, Georgia?

MR. BELLAMY: To clarify, do you mean any reps or are you talking about company personnel?

MR. EHRLICH: Anyone, yes.

THE WITNESS: I don't believe anyone from the company itself has come to visit us, but I am reasonably certain that we would have been visited by at least a rep or two from the

fact.

Q.   Now, did you have booths at any trade shows in 2006?

A.   We would have had a booth at Knob Creek.

Q.   Any others?

A.   If I went to the Southeast SWAT Conference, we would have had a booth there.   I wouldn't go there without having a booth.   If we went to SWAT Round-Up, which I don't believe we did because I think that's too early, we would have had a booth there because I've never been to SWAT Round-Up without having a booth, and I've never had a booth at Shot Show other than in conjunction with Sage where we really just kind of --

Q.   Shared?

A.   Shared, right, their booth, but some of our product in their booth.

Q.   Flip the page for a second to 2007.

A.   (Witness complies with request of counsel.)

Q.   Which of these shows would you have attended in 2007?

A.   I know I attended Shot Show because we debuted the SCAR-Stock at Shot Show in 2007.   Of

with the 54?

A. I think the experimentation by this time had already occurred because we got the first prototype model back in March or April.

Q. And this is occurring in August, you're ordering it?

A. Uh-huh.

Q. And it's to be delivered in September?

A. Right.

Q. So until September 8, 2006 when that was to be delivered, you could not have sold any finished product?

A. That is correct.

Q. Under the SCAR-CQB mark, right?

A. That's right.

Q. And were these to be with periods or would it be SCAR, without periods, CQB?

A. That evolved a little bit. As you saw, it started with S.C.A.R., with periods, and then it evolved to the document that you saw, wherever it went, right here, (indicating).

MR. BELLAMY: The witness is referring to Exhibit 2.

BY MR. EHRLICH:

Q. So that was the first version of what

was to appear; is that right?

A.   This is the only version that has ever actually -- well, no, that's not correct.   This is the --

Q.   Final version?

A.   At that time it was the final version of what was to appear in the production room of the stock.   Does that make sense?

Q.   I'll ask some more questions.

A.   Okay.   We eventually took the patent pending off.

Q.   When did you take that off?

A.   Later.   I don't exactly remember when.

Q.   2008?

A.   I couldn't tell you when, but it did come off.

Q.   Eventually?

A.   Eventually, but all the stocks that would have been produced up to that point in time would have had that mark on it.

Q.   Patent pending mark?

A.   Uh-huh, right.

Q.   Do you know how many were produced up to that point in time when it was taken off?

A.   No, but I think we got about ███ a month,

Case 3:12-cv-00102-CAR  Document 97-8  Filed 07/25/14  Page 19 of 26

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)                    Andrew Scott Clyde on 08/21/2013                    Page 97

was about what our ordering was, ended up being.

Q. You mean that's what you would get every month from Sage?

A. I think it was ▮ a month.

Q. How come ▮ a month, ▮?

A. That ended up being the more appropriate number.

Q. More appropriate for who?

A. ▮ It was just an agreed number between Clyde Armory and Sage. I think it had to do with probably part of their production and what our feel was for sales in the market. We didn't want to over-buy and not have, you know, and have a glut of product. You never want to do that in business. Then you have inventory holding costs, if the product is expensive.

Q. The last sentence says, and this is the Knob Creek Machine Gun Shoot in West Point, Kentucky, is that that trade show we have been referring to, is that what it's called?

A. You're in Exhibit 5?

Q. The last sentence, yeah. Your counsel took your exhibit away. Would you mind if we put the exhibit sticker on the one that I didn't draw on?

# CLYDE ARMORY

- **Mossberg / Colt**
- **H & K / Trijicon**
- **FNH-USA / EoTech**



165 Ben Burton Road # D
Athens-Bogart, GA  30622

Cellular: (706) 338-2944
Office: (706) 549-1842
Fax:    (706) 549-3232
E-mail: aclyde@policeguns.com

October 9, 2006

# PRICE QUOTATION

Bruce Park
San Bernardino County Sheriff's Office
18000 Institution Road
San Bernardino, CA 92402

Ph: (909) 473-2548
Fax: (909) 473-2682

CLYDE ARMORY offers the following law enforcement agency price quotation:

| Description | Order # | L/E Price | Retail |
|---|---|---|---|
| SCAR-CQB stock system for Ruger Mini-14 / Mini 30, AC-556 with palm swell hand guard, M4 sliding stock and standard quad rail system, black finish | SCAR-CQB | $459 | $559 |
| SCAR-CQB stock system for Ruger Mini-14 / Mini 30, AC-556 with **slim line hand guard**, M4 sliding stock and **short quad rail system**, black finish | SCAR-CQB-S | $459 | $559 |
| SCAR-CQB stock system for Ruger Mini-14 / Mini 30, AC-556 with **slim line hand guard, side folding M4 stock** and short quad rail system, black finish | SCAR-CQB-SF | $559 | $659 |
| Laser engraved numbering on all 4 rails, additional per stock: | | $35 | $40 |

Shipping of $7 per stock for FEDEX Ground applies to all orders.

Expect delivery of orders under 15 units within 2 weeks.  Greater than 15 units requires a 30 day lead time.  Prices valid through 12/31/2006.

Sincerely,

Andrew S. Clyde
CLYDE ARMORY



**CA03483**

# DRAFT - Created by Andrew Clyde

New Product Contract
Sage International Ltd. – Clyde Armory

This contract shall govern the sales and financial relationship between Sage International, Ltd. located at 3391 East Eberhardt Street, Oscoda, MI 48750 (Sage) and Clyde Armory located at 165 Ben Burton Road, #D, Bogart, GA 30622 (Clyde) for the below mentioned product.

Product Design:      The product covered by this contract is a milled aluminum chassis system that will fit both the Ruger Mini-14 and Ruger AC556 series of rifles. The concept though conceived by Clyde will be designed in partnership with Sage. The product is similar in appearance to the current Sage M4 Enhanced Battle Rifle chassis system. Clyde will cover the cost of providing the following Ruger foundation rifles to Sage for fitting, function testing and initial photographic work of all prototypes. When no longer needed, the foundation guns will be returned to Clyde. They are as follows:
1. Ruger Mini 14, Blued, 16" bbl
2. Ruger Mini-14GB, Stainless, 18" bbl
3. Ruger AC-556F Stainless, 13" bbl

Clyde shall also function test the prototype design as provided by Sage and certify for acceptance.

Product Nomenclature:  The name of the product shall be the acronym "SCAR-CQB stock" which stands for Sage Clyde Armory Rifle – Close Quarters Battle stock and "SCAR-DM stock" which stands for Sage Clyde Armory Rifle – Designated Marksman stock.

Product Marking:  All SCAR-CQB stock systems shall be marked the same so there is no confusion in the market as to the origin of the stock. All SCAR-DM stock systems shall also be marked alike. The stocks shall be marked as follows.

SCAR-CQB Stock S/N. 00000
from ClydeArmory.com
Sage International, LTD.

SCAR-DM Stock S/N. 00000
from ClydeArmory.com
Sage International, LTD.

Product Manufacture:  The SCAR-CQB stock shall be manufactured in a condition ready to accept a M4 buttstock buffer tube and standard M4 pistol grip. The SCAR-CQB stock system shall also include the M4 pistol grip screw and buffer tube set screw. No M4 buffer tube, sliding stock, pistol grip, or manual shall be included in the SCAR-CQB stock system package.

**CA03484**

# DRAFT - Created by Andrew Clyde

<u>Modifications:</u>  All modifications to the SCAR stock system will be approved by Clyde. Approved modifications requiring additional work will warrant price changes to the original contract price.

<u>Quantity and Pricing:</u>  Clyde agrees to purchase at least 1,000 SCAR stock systems from Sage over the next 20 months at a price of $_____ per stock with a minimum cumulative order quantity of 50 stocks per month.  Payment terms shall be 2%/10 net 30 days.  Sage agrees that the pricing charged to Clyde for the SCAR stock systems (less the cost of the sliding stock and pistol grip) will always be at least 5% less than any other buyer, Ruger and overseas clients included.  If Clyde is able to achieve sales of at least 1,200 SCAR stock systems within the 24 months of this contract, Sage agrees to renew the exclusivity of this contract for another two years at the same quantities.  The price of any contract renewal shall be negotiated at the time of renewal but shall not be greater than an increase of 10%.   The stock shall be shipped in either black or grey as determined by the Clyde purchase order but the price shall be the same for both colors. Minimum order for the grey stock shall be 50 due to the Sage batch requirements for a grey finish.  When the SCAR-DM becomes available, pricing shall be determined at that time but the price to Clyde shall always be at least 5% less than any other buyer.

<u>Duration:</u>      The duration of this contract shall be for 24 months from the invoice date of the first shipment of covered product.  This contract is extendable for another 24 months if the contracted minimum sales volume of 1,000 stock chassis systems is exceeded by 20% within the allotted 24 months.

<u>Exclusiveness of Agreement:</u>  The manufacture of the SCAR stock system (CQB & DM) covered in this agreement is exclusive by Sage for Clyde.  Sage agrees not to produce product for any entity other than Clyde for the duration of this contract and any extensions, with the following two exceptions.

1.      Sage may produce and sell this stock system for Sturm & Ruger, Inc. providing that Ruger agrees to only assemble this stock on new manufactured rifles.  No retrofitting of previously shipped firearms and no selling of the stock as a part or parts outside of a new gun.
2.      Sage may produce and sell this stock system for overseas end-user customers providing they agree not to export the stock back into the United States for resale during the term of this contract. (prohibition on grey market sales)

<u>Production and Shipping Time Frames:</u>  Clyde shall give Sage _30_ days advance notice on all required delivery date orders and Sage agrees to meet all negotiated required delivery dates with 30 days notice.  United States Military contracts for Sage EBR products shall have precedence over all delivery terms of this contract.  Clyde SCAR orders shall take precedence over any other SCAR orders. (Ruger or overseas)

<u>Shipping:</u>  Each SCAR stock system shall be shipped in an individual plain brown box like the current Sage EBR stocks.

CA03485

## DRAFT - Created by Andrew Clyde

<u>Low Order / Termination Clause Penalty</u>. If Clyde does not purchase the agreed upon cumulative minimum quantity of 50 units per month, Clyde agrees to pay Sage a penalty of $1,000 per month for every low order month (up to 20 months) and a $10,000 penalty if a mutual decision is made for termination of this contract due to Clyde's inability to finance the required 1,000 units.

<u>Profit Sharing of Non Clyde Sales:</u>   Sage shall retain for Clyde 1% (one percent) of all sales made by Sage to entities other than Clyde for the duration of this contract and any extensions. This royalty shall be a recognition of Clyde's contribution to this partnership and shall not be payable in cash but only payable as a credit on future Sage invoices.

Accepted,                                             Accepted,


_____                    _____
Andrew Clyde, Owner                      John Klein, Owner
CLYDE ARMORY                            Sage International, LTD.

Date:_____                          Date:_____

**CA03486**



A03487

**SCAR-CQB** stock
**CLYDE ARMORY**.com
**Bogart, GA 30622 Patent Pending**

CA03488



A03489