# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

FN HERSTAL, S.A.,                                        :
                                                        :
    Plaintiff,                       :
                                                        :
v.                                                      :
                                                        :        No. 3:12-CV-102 (CAR)
CLYDE ARMORY, INC.,                                     :
                                                        :
    Defendant.                       :
_____        :

## ORDER ON SUMMARY JUDGMENT

This trademark infringement action is currently before the Court on Plaintiff FN Herstal, S.A.'s Motion for Summary Judgment [Doc. 85] and Defendant Clyde Armory, Inc.'s Motion for Partial Summary Judgment [Docs. 85].  Having considered the parties' arguments, the record, and the applicable law, both Motions are **DENIED**.[1]

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a

---

[1] Defendant also filed a Motion for Oral Argument [Doc. 104] to discuss the merits of its Motion for Partial Summary Judgment. The Court generally decides motions without a hearing but may, in its discretion, schedule a hearing upon counsel's request. *See* M.D. Ga., L.R. 7.5.  In this case, the Court granted the parties' requests for page extensions and allowed additional time to brief the issues on summary judgment.  Having done so, the Court finds the record is complete and the issues sufficiently briefed.  Therefore, Defendant's Motion for Oral Argument [Doc. 104] is **DENIED** as unnecessary.

[2] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

jury to return a verdict for that party."[3]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[4]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[5]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[6]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[7]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[8]

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on

---

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[4] *See id.* at 249-52.

[5] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[6] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[7] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

[8] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

the facts that are not disputed.[9]  The court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.[10]  The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."[11]  Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts.[12]

## BACKGROUND

The current trademark dispute arises out of the parties' use of the "SCAR" and "SCAR-Stock" marks in the firearms industry.  Unless otherwise indicated, the facts presented below are undisputed.

### A.  Plaintiff's Use of SCAR

Plaintiff is a firearms and weapons manufacturer incorporated under the laws of Belgium with its principal place of business in Herstal, Belgium.[13] Plaintiff manufactures and distributes a full range of firearms and accessories for defense, law enforcement, hunting, marksmanship, and others having an interest in acquiring such

---

[9] *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).
[10] *Id.*
[11] *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984).
[12] *Id.* at 1555-56.
[13] Charles Newton Mills Decl. ¶ 2 [Doc. 89-1]; Amended Compl. ¶ 1 [Doc. 73].

firearms and accessories.[14]  The current dispute arises out of Plaintiff's development and branding of its SCAR rifle.

### 1.  Plaintiff's Sales to the US Military

In 2003, the United States Special Operations Command ("USSOCOM") initiated the Special Operation Forces ("SOF") Combat Assault Rifle Program, which was abbreviated at times as the "SCAR" Program.[15]  Publicized as the first full and open competition since the M16 trials held in the mid-1960s, the USSOCOM Program solicited an open bid to firearm manufacturers to design a new modular assault rifle system for the US Military.[16]  Defendant contends that the USSOCOM Program serves as the origin of the SCAR mark at issue in this case.  Plaintiff, however, represents that it adopted the SCAR mark in 2003 prior to the USSOCOM Program to designate a specifically designed weapon for commercialization in the North American market and abroad.[17]

Pursuant to the Program, USSOCOM specified that the SCAR rifle would be a modular system in two threshold configurations, a "SCAR-Light (SCAR-L)" and a

---

[14] Mills Decl. ¶ 2 [Doc. 89-1].
[15] March 2006 Press Release, CA00133 [Doc. 90-5]; John M. Klein Dep. 26:12-18 [Doc. 91-3]; Paul Hochstrate Dep. 19:25-20:3 [Doc. 91-6].
[16] March 2006 Press Release, CA00133 [Doc. 90-5]; Mills Decl. ¶ 16 [Doc. 89-1].
[17] Frank Spaniel Dep. 47:18-23 [Doc. 89-7].

"SCAR-Heavy (SCAR-H)."[18]  Both the SCAR-L and the SCAR-H were available in three variants: Standard (S), Close Quarter Combat (CQC), and Sniper Variant (SV).[19]

In 2003 and 2004, Plaintiff and other firearm manufacturers submitted prototypes of rifles meeting USSOCOM specifications.[20]  USSOCOM officially awarded the contract to Plaintiff to produce the SCAR rifle and attachments on November 5, 2004.[21]  On that same day, USSOCOM ordered over $634,000 of firearms and attachments from Plaintiff.[22]  Shortly thereafter, the ordered weapons were shipped to Crane, Indiana, inspected, and accepted by the US government.[23]  To fulfill its obligations under the USSOCOM Program, Plaintiff shipped firearms bearing the SCAR mark throughout 2004 and 2005 to various US military institutions, including USSOCOM, Naval Air Systems Command ("NAVAIR") and Naval Surface Warfare Center ("NSWC").[24]

Throughout 2005 and 2006, magazine and newspaper articles tracked the development of the new assault rifle for the USSOCOM Program, highlighted Plaintiff's

---

[18] March 2006 Press Release, CA00134 [Doc. 90-5].

[19] *Id.*

[20] Mills Decl. ¶¶ 10-11 [Doc. 89-1].

[21] Mills Decl. ¶ 11 [Doc. 89-1]].

[22] Mills Decl. ¶ 11 [Doc. 92-2].

[23] Mills Decl. ¶ 11 [Doc. 89-1].

[24] Charles Newton Mills Dep. 56:14-61:14, 154:11-156:6, 158:4-160:3, Exs. 4, 5 p. 11, 49, 51-54 [Docs. 89-5 & 92-10]; Def.'s Statement of Material Facts, Ex. G, FN102493-94 [Doc. 91-7].

role in the Program, and outlined the features and benefits of the different variants and forms of the new SCAR rifle system.[25]

## 2.   Promotion of Plaintiff's SCAR Rifles

After the USSOCOM Program award, Plaintiff began promoting its SCAR mark to the wider commercial market.  In 2005 and 2006, Plaintiff promoted its SCAR rifles at trade shows and during visits to gun dealers, law enforcement agencies, stores, and distributors.[26]  For example, in February 2006, Plaintiff unveiled its SCAR-Light and SCAR-Heavy prototypes during the SHOT Show held in Las Vegas, Nevada, a major industry trade show attended by military personnel, other government agencies, law enforcement organizations, manufacturers, distributors, retailers, sportsmen, hunters, and other firearms enthusiasts.[27]

During these promotional activities, it is undisputed that Plaintiff did not have a semi-automatic version available for purchase by law enforcement and civilian consumers.  The firearms displayed at the tradeshows were fully automatic machine guns, the sale of which is restricted to military and law enforcement agencies only.[28]  In order for Plaintiff to sell a semi-automatic SCAR to the civilian market, Plaintiff first

---

[25] Mills Decl. ¶ 15 [Doc. 89-1]; Mills Dep., Ex. 5 pp. 18-20, Ex. 6 [Docs. 89-5]; Umanksy Decl. ¶ 13, Ex. 11 [Docs. 89-3, 89-4].

[26] Mills Decl. ¶ 14, Ex. 3 [Doc. 89-1, 92-2]; Mills Dep. 28:13:30:6, 33:12-37:3 [Doc. 89-5].

[27] Mills Decl. ¶ 13 [Doc. 89-1]; Mills Dep. 138:19-139:9, Ex. 5 p. 11 [Doc. 89-5].

[28] *See* Def.'s Statement of Material Facts, Ex. G, CA01398 [Doc. 90-7]; Mills Dep. 25:9-26:3 [Doc. 89-5].

needed government approval.[29]

Nevertheless, Plaintiff continued to promote its SCAR rifle to law enforcement and civilian markets.  Plaintiff distributed hats, t-shirts, brochures, and other marketing materials bearing the SCAR mark to others in the firearm industry.[30]   Plaintiff even referenced the new SCAR rifle in its 2006 product log and highlighted its role in creating USSOCOM's SCAR rifle.[31]   In several of Plaintiff's advertisements, the SCAR mark is displayed beside or above the words "S.O.F. Combat Assault Rifle" or some variant thereof.[32]   Several of Plaintiff's advertisements boast that Plaintiff's SCAR rifle was chosen by "US Special Operations Command,"[33] and three of those advertisements depict the official emblem of the U.S. Special Operation Forces for the US Military in connection with Plaintiff's SCAR mark.[34]

Then, on March 2, 2006, Plaintiff issued a press release, entitled "The Making of the 21st Century Assault Rifle: SCAR SOF Combat Assault Rifle," announcing its plan to introduce a semi-automatic version of the SCAR "in the next two years" for law enforcement and commercial markets.[35]

---

[29] *See* Mills Dep. 24:13-26:3, Ex. 4 [Doc. 89-5].
[30] Mills Decl. ¶ 12 [Doc. 89-1]; Mills Dep. 94:25-110:7, Ex. 5 pp. 10-11, Exs. 24-26 [Docs. 89-5, 92-9].
[31] Mills Dep. 73:21-74:5, Ex. 17 [Docs. 89-5, 89-6].
[32] Def.'s Statement of Material Facts, Ex. H, CA02764, FN100412, FN100413, FN100414-100416, FN100389 [Doc. 90-8].
[33] *Id*.
[34] *Id*. at CA02764, FN100412, FN102638.
[35] *Id*.

Plaintiff began accepting orders for SCAR rifles from law enforcement agencies in either 2007 or 2008, and filled its first orders to law enforcement and civilian consumers in late 2008.[36]   Since that time, Plaintiff has sold nearly one hundred million dollars ($100,000,000.00) of SCAR firearms to law enforcement and civilian consumers.[37]

### 3.  Plaintiff's Trademark and Patent Registrations

To protect its interest in the SCAR mark, Plaintiff filed three trademark applications with the United States Patent and Trademark Office (the "USPTO").[38]   On April 22, 2008, Plaintiff filed the first application (the '575 Application) for the use of SCAR on firearms and related items, which is still pending before the USPTO.[39]   On January 13, 2009, Plaintiff filed a trademark application for SCAR and Design for use in connection with firearms and related items.[40]   The application claimed Plaintiff first used the mark in commerce on November 1, 2008.[41]   The USPTO registered the SCAR and Design mark on June 15, 2010 (the '448 Registration).[42]   On January 13, 2011, Plaintiff filed its third trademark application for SCAR for use in connection with games, toy replicas of weapons, and other related items.[43]   The USPTO registered the

---

[36] *Id.* at 30:7-11; Mills Decl., Ex. 1 at FN101429 [Doc. 92-2].
[37] Mills Decl. ¶ 5, Ex. 1 [Doc. 92-2].
[38] Boris Umansky Decl. ¶¶ 3-5, Exs. 1-3 [Doc. 89-3].
[39] *Id.* at ¶ 5, Ex. 3.
[40] *Id.* at ¶ 3, Ex. 1.
[41] *Id.*
[42] *Id.*
[43] *Id.* at ¶ 4, Ex. 2.

SCAR mark on February 21, 2012 (the '728 Registration).[44]

In addition to registering the SCAR mark, Plaintiff obtained a design patent for its assault rifle (the '824 Patent) on July 19, 2011.[45]  On January 10, 2012, Plaintiff filed an action for patent and trade dress infringement involving the '824 Patent in the US District Court for the Northern District of Texas, wherein Plaintiff alleged that it "introduced the FNH SCAR (Special Combat Assault Rifle) assault rifle, today known by two different models including the FN SCAR 16 and FN SCAR 17" in 2009.[46] Plaintiff voluntarily dismissed the Texas suit prior to service of the complaint.[47]

### B.  Defendant's Use of SCAR-Stock

Defendant is a firearms retailer and distributor incorporated under the laws of Georgia with its principal place of business in Bogart, Georgia.[48]   In 2005, Andrew Clyde, Defendant's CEO and owner, contacted John Klein, the president of Sage International, Ltd., to discuss the possibility of making replacement stock for certain rifles made by Sturm Ruger & Co., including the Mini-14, Mini-30, and AC-556, among others.[49]   The two followed up with each other in person at the February 2006 SHOT

---

[44] *Id.*
[45] Def.'s Statement of Material Facts, Ex. I at CA00153 [Doc. 90-9].
[46] *Id.* at Compl. ¶ 12.
[47] Pl.'s Resp. to Def.'s Statement of Material Facts, Ex. 8 [Doc. 97-7].
[48] Amended Compl. ¶ 2 [Doc. 73].
[49] Andrew Scott Clyde Dep. 33:5-35:5 [Doc. 90-3]; John M. Klein Dep. 37:3-4 [Doc. 100-1]; Clyde Dep., Ex. 3 pp. 6-7 [Doc. 89-2].

show in Las Vegas to discuss the details of the new product.[50]  After the February 2006 SHOT Show, Defendant adopted the SCAR-Stock mark as an acronym for "Sage Clyde Armory Rifle Stock" to refer to the new product and to reflect the collaborative effort behind the product's design.[51]

The testimony regarding the circumstances and purpose of adopting the SCAR-Stock mark, however, is somewhat disputed.  Mr. Clyde testified that before deciding to adopt the mark, he conducted several searches online through Google and the USPTO's website to check the availability of SCAR as a viable mark and found no prior use of the mark in the firearms industry.[52]  However, Defendant has no documentary evidence to substantiate those searches.[53]  Moreover, at the time Defendant adopted the SCAR-Stock mark, Defendant was aware of Plaintiff's participation in the USSOCOM Program to create the SOF Combat Assault Rifle and knew that the acronym for that rifle was SCAR.[54]  Defendant's former Chief Operating Officer, Joshua Smith, testified that Defendant adopted SCAR-Stock, in part, to take commercial advantage of the popularity of the SCAR rifles in the firearms industry.[55]  Mr. Clyde, however, specifically disclaims any such purpose in adopting the mark.[56]

---

[50] Clyde Dep. 32:23-25 [Doc. 90-3].
[51] *Id.* at 84:1-23; Clyde Dep., Ex. 3 p. 4 [Doc. 89-2].
[52] Clyde Dep. 24:4-29:1, Ex. 3 pp. 4-5 [Doc. 89-2].
[53] *Id.*
[54] Def.'s Resp. to Pl.'s First Set of Req. for Admission, pp. 2-3 [Doc. 89-11].
[55] Joshua Smith Dep. 13:7-9, 48:16-49:9 [Doc. 89-10].
[56] Clyde Decl. ¶¶ 9-11 [Doc. 95-3].

By early fall of 2006, Defendant and Sage completed initial manufacturing of the SCAR-Stock product and introduced it to the firearms market.[57]  On August 29, 2006, Defendant began soliciting customer orders for its SCAR-Stock products.[58]  Defendant received and accepted its first order for SCAR-Stock on September 14, 2006.[59] Defendant then shipped orders beginning the week of September 18, 2006.[60]  It is undisputed that the gun stock bearing Defendant's SCAR-Stock is not compatible with and cannot be used with Plaintiff's SCAR rifle.[61]

From the end of 2006 through 2008, Defendant enjoyed an annual increase in sales of its SCAR-Stock product.[62]   In 2009, sales dropped slightly due to the unavailability of the product and delivery issues from Sage.[63]  During that time, Sage had substantial orders from the military, and those orders were given priority over all other orders, including those for Defendant's SCAR-Stock product.[64]

## C.  Events Leading to the Current Dispute

On February 6, 2009, Louis Dillais, President and CEO of FNH USA, LLC, a subsidiary of Plaintiff, sent Defendant a letter asserting senior rights in the SCAR mark

---

[59] Clyde Dep. 93:5-11, Ex. 5 pp. 4-5 [Doc. 89-2].
[58] *Id*. at Ex. 5 p. 5.
[59] *Id*.
[60] *Id*.
[61] Clyde Decl. ¶ 7 [Doc. 95-3].
[62] Clyde Dep., Ex. 6 [Doc. 92-3].
[63] Clyde Dep. 118:9-14 [Doc. 89-2].
[64] Clyde Dep. 118:9-14 [Doc. 89-2]; Klein Dep. 62:14-63:16 [Doc. 92-12].

and demanding that Defendant cease and desist all use of its SCAR-Stock mark.[65]   Mr.

Clyde responded on Defendant's behalf indicating he had no knowledge of Plaintiff's

rights in the mark and requesting documentation to support that claim.[66]   The following

day Defendant filed a trademark application for the SCAR-Stock mark (the '128

Application) with the USPTO for use on "gun stocks" and claiming a first use date in

commerce of September 14, 2006.[67]

Defendant received a reply from FNH USA[68] stating that "the acronym SCAR in

US Government jargon does refer to the USSOCOM Program."[69]   The letter went on to

state "[h]owever, in Commercial firearms use of the term SCAR has been registered by

[Plaintiff], our parent company, as a Trademark."[70]

Defendant then filed a Petition for Cancellation with the USPTO of Plaintiff's

'448 Registration for SCAR and Design and an Opposition to Plaintiff's '575 Application

---

[65] Def.'s Statement of Material Facts, Ex. J at CA00021 [Doc. 90-10].

[66] *Id.* at FN101158.

[67] Umansky Decl. ¶ 12, Ex. 10 [Doc. 89-3]. The USPTO initially denied registration of the SCAR-Stock mark because it was merely descriptive of a feature and characteristic of the product. Def.'s Statement of Material Facts, Ex. D, p. 9 [Doc. 90-4]. The initial refusal explained that a "scar rifle" is a modular rifle created by Plaintiff for USSOCOM to satisfy the requirements of the SCAR Program, and the "scar stock" is a gun stock that is specifically made for a "scar assault rifle." *Id.* at 10.   In response to the first refusal, Defendant explained that SCAR as used in its SCAR-Stock mark is an arbitrary acronym for "Sage/Clyde Armory Rifle" and that Defendant's SCAR-Stock products are not compatible with Plaintiff's SCAR rifles. *Id.* at 12-13. Thereafter, the USPTO refused registration of Defendant's mark on the grounds that consumers would likely confuse Defendant's mark with Plaintiff's SCAR mark in the '448 Registration. *Id.* at 17.

[68] It is unclear which individual responded on behalf of FNH USA. The letter includes a signature block with Dillais' name, but the handwritten signature appears to belong to someone else.

[69] Def.'s Statement of Material Facts, Ex. J at CA0022 [Doc. 90-10].

[70] *Id.*

for SCAR.[71]   The USPTO suspended those proceedings pending the outcome of this case.[72]

### D. Procedural History

On March 12, 2012, Plaintiff filed this suit in the Eastern District of Virginia against Defendant and Sage.  Thereafter, the Court dismissed Sage for lack of personal jurisdiction and transferred the remaining case against Defendant to the Northern District of Georgia.  Upon determining that Defendant's principal place of business is located in the Middle District of Georgia, the case was transferred to this Court on August 8, 2012.

Shortly after the transfer, Plaintiff filed an Amended Complaint.   Therein, Plaintiff raises federal claims for trademark infringement, unfair competition, and dilution,[73] in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq*.  Plaintiff also raises state law claims for unfair competition, deceptive trade practices, and unjust enrichment.   Plaintiff seeks punitive damages and litigation expenses, including attorney's fees.   Plaintiff also seeks injunctive relief enjoining Defendant from any further use of SCAR-Stock and ordering Defendant to (1) abandon its pending

---

[71] *Id*. at pp. 9-20.

[72] *Id*. at pp. 21-22.

[73] In its Motion for Summary Judgment, Plaintiff represents that it is withdrawing its federal dilution claim.

trademark application for SCAR-Stock and (2) dismiss its opposition and cancellation petitions to Plaintiff's '448 Registration and "575 Application.

Defendant asserts affirmative defenses based on priority of use in its SCAR-Stock mark and unlawful use of the SCAR mark by Plaintiff.  In addition, Defendant raises counterclaims for federal trademark infringement and declaratory relief, seeking cancellation of Plaintiff's trademark registrations and refusal of the pending '575 Application pursuant to 15 U.S.C. § 1119 due to Defendant's superior rights in the SCAR-Stock mark and Plaintiff's lack of bona fide use or intent to use the SCAR mark in commerce.  Defendant seeks similar damages and injunctive relief.

## DISCUSSION

As acknowledged by the parties, the success of all the claims and counterclaims in this case depends on the outcome of their trademark infringement claims.[74] Accordingly, the Court will limit its discussion to the trademark infringement issues presented.

Both parties have moved for summary judgment, each asserting a superior trademark right in the use of SCAR or SCAR-Stock.  Plaintiff claims a superior right in its SCAR mark arguing that the mark is distinctive, and Plaintiff was the first to use the

---

[74] *Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1539 n.11 (11th Cir. 1985) (observing that the standards governing Georgia state law claims for trademark infringement, deceptive trade practices, and unfair competition are "similar, if not identical, to those under the Lanham Act."); *see also Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n.4 (11th Cir. 2001) ("Courts may use an analysis of federal infringement claims as a "measuring stick" in evaluating the merits of state law claims of unfair competition.").

mark in commerce in 2004.  Like Plaintiff, Defendant also asserts superior rights in its SCAR-Stock mark arguing that SCAR-Stock is distinctive, and Defendant was the first to use the mark in commerce in September 2006.  For the reasons set forth below, the Court finds genuine issues of material fact exist as to which party used the mark first in commerce, and whether the parties' SCAR and SCAR-Stock marks are distinctive.

A trademark is "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [a producer's] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."[75]  To prevail on a trademark infringement claim, a party must prove that (1) it owns a valid and protectable mark, and (2) the opposing party's use of an identical or similar mark is likely to cause confusion.[76]  Because the parties market and sell their SCAR and SCAR-Stock products in the firearms industry, they agree that simultaneous use of the marks would likely confuse the purchasing public.[77]  Therefore, the only issue before the Court is whether either party owns a protectable mark.  In order to establish a valid protectable trademark, a party must prove (1) it used the mark in commerce and (2) the mark is distinctive.[78]

---

[75] 15 U.S.C. § 1127.

[76] *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003) (citing 15 U.S.C. § 1125(a)).

[77] In addition to the parties' agreement on the likelihood of confusion issue, the USPTO found consumers will likely confuse the two marks, as evidenced by its refusal to register Defendant's SCAR-Stock mark. *See* Second Office Action, Ex. D, p. 17 [Doc. 90-4].

[78] *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011).

With respect to the issue of whether a party owns a protectable trademark, the Lanham Act provides that registration is prima facie evidence that the registrant owns the mark and has the exclusive right to use the mark.[79]   Accordingly, registration creates a rebuttable presumption of ownership dating back to the filing date of the application.[80]  Here, however, Plaintiff did not file the applications giving rise to its '448 Registration and '728 Registration until January 13, 2009 and January 13, 2011. Defendant began using its SCAR-Stock mark prior to either of those dates in September 2006.  The heart of this dispute centers on Plaintiff's use of SCAR prior to September 2006 and the circumstances surrounding Defendant's adoption of the SCAR-Stock mark.  Because these events occurred prior to the filing of Plaintiff's first trademark application, the presumption of ownership and exclusive use afforded to Plaintiff's trademark registrations does not operate against these earlier uses.[81]

Thus, the Court now turns to the issues of which party first used the mark in commerce and whether their marks are distinctive.

---

[79] *See* 15 U.S.C. §§ 1057(b), 1115(a).

[80] *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 400 n.15 (4th Cir. 2009); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) *as modified*, 97 F.3d 1460 (9th Cir. 1996).

[81] *See John C. Flood of Virginia, Inc. v. John C. Flood, Inc.*, 700 F. Supp. 2d 90, 95 n.3 (D.D.C. 2010) (finding trademark registrations could not establish priority over opposing party's use of marks because registrant did not file applications until three years after opposing party began using the marks), *aff'd and remanded*, 642 F.3d 1105 (D.C. Cir. 2011).

I.      **First Use in Commerce**

In determining which party has a protectable mark, the Court first examines the marks' "use in commerce."  Under common law, "actual and continuous use is required to acquire and retain a protectable interest in a mark."[82]  Under the Lanham Act, a mark is used in commerce when

> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B)  the goods are sold or transported in interstate commerce.[83]

To determine whether use is sufficient to create a protectable trademark interest, the Eleventh Circuit requires a trademark claimant to show it (1) adopted the mark and (2) "used [the mark] in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."[84]  Courts should evaluate whether a party has met both prongs of this test by considering "the 'totality of the circumstances'—including sales, advertisements, and distribution of goods—in order to determine whether the mark has been sufficiently used in commerce."[85]

---

[82] *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022-23 (11th Cir. 1989).

[83] 15 U.S.C. § 1127.

[84] *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001).

[85] *Freeway Ford, Inc. v. Freeway Motors, Inc.*, 512 F. Supp. 2d 1353, 1361 (M.D. Ga. 2007).

Under this approach, evidence of sales is "highly persuasive," but actual sales are not required to prove prior use.[86]  When sales are absent, a party may show use by "analogous use."[87]  Analogous use refers to pre-sale promotional efforts such as "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications."[88]  When a party relies on analogous use to establish trademark rights "actual technical trademark use must follow the use analogous to trademark use within a commercially reasonable period of time."[89]  Moreover, whatever activities are utilized to establish rights in a mark, such use must be continuous.[90]

When, as here both parties claim a protectable trademark interest, the Court must determine who used the mark first.[91]  Not surprisingly, both parties claim to be the senior user of the mark in the firearms industry.  Plaintiff argues that it was the first to use SCAR in commerce, as evidenced by its sale of SCAR rifles to USSOCOM as well as its pre-sale promotional activities for its civilian-friendly SCAR rifle.  Defendant, on the other hand, argues it was the first to use its SCAR-Stock mark in September 2006 because Plaintiff did not have a semi-automatic SCAR rifle available for purchase at

---

[86] *Planetary Motion, Inc.*, 261 F.3d at 1195.

[87] *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007).

[88] *T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996).

[89] *Dyneer Corp v. Automotice Products Plc*, 37 U.S.P.Q.2d 1251, 1256 (T.T.A.B. 1995); *see also Am. Express Co. v. Goetz*, 515 F.3d 156, 162 (2d Cir. 2008) (noting that promotional activities must be followed within a commercially reasonable time prior to actual use to be considered analogous uses).

[90] *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("[E]ven a single use in trade may sustain trademark rights if followed by continuous commercial utilization.")

[91] *See, e.g., Tally-Ho, Inc.*, 889 F.2d at 1023 (11th Cir. 1989) ("The first to use a mark on a product or service in a particular geographic market, the senior user, acquires rights in the mark in that market.").

18

that time.  In support of its Motion, Defendant argues the undisputed evidence shows (1) Plaintiff admitted it did not use the SCAR mark in commerce until November 1, 2008; and (2) Plaintiff's pre-sale promotional activities constituted unlawful use of the SCAR mark, and thus cannot create a protectable trademark interest in SCAR.  Having reviewed both arguments, the Court finds that a genuine issue of material fact remains as to which party used the mark in commerce first.

### A. Plaintiff's Admission of First Use Date

Defendant first argues that Plaintiff cannot claim prior use in its SCAR mark because, in the trademark application giving rise to the '448 Registration, Plaintiff admitted it did not use the SCAR mark in commerce until November 1, 2008—over two years after Defendant's first use of SCAR-Stock in September 2006.[92]   Similarly, Defendant argues that Plaintiff alleged in its complaint filed in the Texas patent infringement case that it did not introduce the SCAR rifle until 2009.  Plaintiff, however, is not bound by either of these dates.

With respect to the patent infringement case, Defendant submits that Plaintiff's allegation operates as an admission that Plaintiff did not introduce the SCAR rifle in commerce until 2009.  Defendant, however, overstates the evidentiary effect of this allegation.  Pleadings by a party in one suit do no serve as binding judicial admissions

---

[92] Defendant also notes that the Plaintiff's pending '575 Application claims priority to a Benelux Trademark Application filed on November 12, 2007, which also post-dates Defendant's first use.

against that party in subsequent litigation, but may serve as evidentiary admissions, which the party may explain or contradict.[93]

Similarly, Plaintiff is not bound by the first use date alleged in its trademark application and instead may prove an earlier date of use by clear and convincing evidence.[94]  This is a particularly "heavy burden" upon a plaintiff when "the date on which the trademark application was filed is substantially contemporaneous with the date of first use alleged therein and an attempt is made many years later to establish an earlier date."[95]  Evidence in support of a prior use date "should not be characterized by contradictions, inconsistencies, and indefiniteness, but should carry with it conviction of its accuracy and applicability."[96]

Here, Plaintiff filed its trademark application for SCAR and Design for use in connection with firearms on January 13, 2009, claiming a first use in commerce on

---

[93] *See Muhs v. River Rats, Inc.*, 586 F. Supp. 2d 1364, 1378 (S.D. Ga. 2008) ("A party's pleading in one case may generally be used as an evidentiary admission in another litigation.") (quoting *McCormick on Evidence* § 257 (6th ed. 2006)).  Moreover, he Court also questions the admissibility of this allegation as evidence in this case in light of the fact that the patent infringement case was voluntarily dismissed. Generally withdrawn pleadings within the same case are admissible evidence. *See Borel v. U.S. Cas. Co.*, 233 F.2d 385, 387-88 (5th Cir. 1956) (finding that allegation in superseded answer could be considered by jury along with all the other evidence). A closer question exists for withdrawn pleadings in another case. *See Fuller v. King*, 204 F.2d 586, 590-91 (6th Cir. 1953) (finding complaint that was voluntarily dismissed inadmissible in subsequent proceeding because the pleadings were not seen or sworn to by the parties). In any event, with or without the patent case allegation, a genuine issue of material fact exists as to when Plaintiff first used the mark in commerce.  The Court will consider the admissibility of the prior complaint and allegation therein at the pretrial conference, if necessary.

[94] *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1473 (Fed. Cir. 1987); *Elder Mfg. Co. v. Int'l Shoe Co.*, 194 F.2d 114, 118 (C.C.P.A. 1952).

[95] *Elder Mfg. Co.*, 194 F.2d at 118.

[96] *Id.*

November 1, 2008.  Now, Plaintiff seeks to prove a first use date nearly four years before the date claimed in its application.  Therefore, to overcome Defendant's arguments and prevail on summary judgment, Plaintiff must show, by clear and convincing evidence, that it adopted and used the SCAR mark in commerce prior to September 2006.

Plaintiff argues the undisputed facts show it was the first to use the mark in commerce as evidenced by its (1) actual sale of SCAR rifles to the US Military in 2004 and (2) analogous use of its SCAR mark through pre-sale promotional activities of its civilian-friendly SCAR rifle.  A genuine issue of material fact, however, exists as to whether these activities were sufficiently continuous and public to allow firearms customers to distinguish Plaintiff's products from others in the firearms industry.

With respect to actual sales,  the evidence shows that Plaintiff sold SCAR firearms to USSOCOM on November 5, 2004, but did not sell SCAR firearms to the rest of the firearms industry—namely to law enforcement and civilian consumers—until late 2008.  A reasonable juror could find that a sale to a single customer is not sufficiently public to constitute use in commerce.  Moreover, because additional sales of SCAR rifles did not occur until four years later, one may conclude that Plaintiff's use of SCAR was too sporadic to give rise to a protectable interest.

On the other hand, certain factors unique to this case could allow a reasonable juror to conclude that Plaintiff's sales to USSOCOM coupled with its promotional

activities were sufficiently continuous and public to constitute use in commerce. Unlike other cases involving a single sale,[97] the sale to USSOCOM was significant, amounting to over $634,000 in SCAR rifles.[98] To fulfill its obligations under the contract, Plaintiff shipped firearms bearing the SCAR mark to various military institutions from the end of 2004 throughout 2005.

Moreover, evidence in the record suggests the US Military is a prominent and influential consumer in the firearms industry, and therefore, Plaintiff's development and sale of the SCAR rifle pursuant to the USSOCOM Program could be viewed as sufficiently public for trademark protection purposes. Indeed, several witnesses testified that the US Military orders get first priority in the firearms industry, including Mr. Clyde who acknowledged that delivery of SCAR-Stock from Sage was postponed because Sage had to dedicate its manufacturing capacity to fulfilling military orders first. In addition, since the USSOCOM Program was the first open competition to create a new rifle in approximately forty years, the Program and Plaintiff's participation in it

---

[97] *See, e.g., Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 485 (7th Cir. 2007) (holding that one sale of a van under the mark was insufficient to constitute use in the ordinary trade); *see also Harod*, 188 F. Supp. 2d at 1378 (finding the plaintiff's sale of $70 of product in 1996, $75 of product in 2000, and $60 in 2001 was too sporadic and inconsequential to give rise to a protectable trademark right).

[98] *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:110 (4th ed.) (stating that the "definition of ["use in commerce"] should be interpreted with flexibility so as to encompass various genuine, but less traditional, trademark uses, such as those made in test markets, <u>infrequent sales of large or expensive items</u>, or ongoing shipments of a new drug to clinical investigators by a company awaiting FDA approval, and to preserve ownership rights in a mark if, absent an intent to abandon, <u>use of a mark is interrupted due to special circumstances</u>.") (quoting Senate Judiciary Committee Report on S. 1883, S. Rep. No. 100-515, p. 44-45 (Sept. 15, 1988)).

generated publicity through numerous magazine and newspaper articles throughout 2005 and 2006.

Moreover, Plaintiff's pre-sale promotional activities for its civilian-friendly SCAR assault rifle prior to September 2006 may constitute analogous use of the mark.  In that regard, Plaintiff promoted its SCAR rifles during visits to gun dealers and at trade shows, including the SHOT Show in Las Vegas, Nevada in February 2006, one of the largest tradeshows in the industry.  In addition, Plaintiff distributed brochures, t-shirts, hats, and its 2006 product log bearing the SCAR mark or referencing its SCAR rifle at these events.  Finally, in March 2006, Plaintiff issued a press release announcing its plan to release a semi-automatic version of its SCAR rifle to the law enforcement and civilian markets within the next two years.  Plaintiff, however, did not sell its SCAR rifle to law enforcement and civilian consumers until late 2008.

Whether these promotional activities constituted analogous use sufficient to give rise to a protectable trademark interest is a question of fact for the jury.  As mentioned above, to constitute analogous use, actual use must follow the promotional activities within a commercially reasonable time.  Here, approximately two years lapsed before Plaintiff sold its first SCAR rifle to law enforcement and civilian consumers, a delay one witness attributed to the need for prior government approval before release of a semi-automatic SCAR rifle to the general public. Whether such a delay constitutes a "commercially reasonable time" within the firearms industry is an issue for the jury's

determination.

## B. Unlawful Use

Alternatively, Defendant argues Plaintiff cannot rely on its pre-September 2006 promotional activities to show use of the SCAR mark because its advertisements and promotional activities violated federal regulations and thus cannot provide the basis for a protectable trademark interest in SCAR.

The United States Trademark Trial and Appeal Board interprets the "use in commerce" requirement to mean <u>lawful</u> use.[99]  In what has now become known as the "unlawful use doctrine" or the "unlawful use defense," "the sale or shipment of the product under the mark ha[s] to comply with all applicable laws and regulations" before a party may claim trademark protection for the mark.[100]

While the unlawful use defense has long been recognized by the Trademark Trial and Appeal Board, it has not been widely adopted by federal courts.[101]  The Ninth, Tenth, and Federal Circuits have expressly adopted the unlawful use defense.[102] The Eleventh Circuit has not adopted the defense; however, a district court in this Circuit

---

[99] *Clorox v. Armour-Dial, Inc.*, 214 U.S.P.Q. 850, 851 (T.T.A.B. 1993).

[100] *In re Pepcom Indus., Inc.*, 192 U.S.P.Q. 400, 401 (T.T.A.B. 1976).

[101] *Dessert Beauty, Inc. v. Fox*, 617 F. Supp. 2d 185, 190 (S.D.N.Y. 2007), *aff'd*, 329 F. App'x 333 (2d Cir. 2009).

[102] *See, e.g.*, *CreAgri, Inc. v. USANA Health Sciences, Inc.*, 474 F.3d 626, 630 (9th Cir. 2007); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1225 (10th Cir. 2000); *Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522, 526 (Fed. Cir. 1987).

has applied the defense in trademark infringement actions.[103]   Thus, the Court will address Defendant's arguments.  Having considered the merits of Defendant's unlawful use defense, however, the Court finds it to be without merit.

"Unlawful use will be found where: (1) the issue of compliance has previously been determined (with a finding of non-compliance) by a court or government agency having competent jurisdiction under the statute involved, or (2) where there has been a *per se* violation of a statute regulating the sale of a party's goods."[104]   Not every violation, however, will be sufficient to justify denial of trademark protection based on unlawful use.  There must be a nexus between the use of the mark and the violation, and the violation must be material.[105]   To be material, the violation must be of "such gravity and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it could create no trademark rights."[106]   A party raising the unlawful use defense must prove all these elements by clear and convincing evidence.[107]   "[T]he

---

[103] *See, e.g., Davidoff Extension S.A. v. Davidoff Intern., Inc.*, 612 F. Supp. 4, 7 (S.D. Fla. 1984) (holding that defendants failed to meet their burden of showing plaintiff unlawfully used the Davidoff mark in the sale of cigars by illegally selling cigars containing Cuban tobacco in the US); *see also Kratom Lab, Inc. v. Mancini*, No. 11-80987-CIV, 2013 WL 3927838, at *3-5 (S.D. Fla. July 29, 2013) (finding plaintiff had no valid trademark in "Mr. Nice Guy" mark used on incense because plaintiff fraudulently misrepresented that the incense was not for human consumption but plaintiff's principals pled guilty to violating the Analogue Act, 21 U.S.C. § 813, and admitted that they intended the product to be used for human consumption).

[104] *Dessert Beauty, Inc.*, 617 F. Supp. 2d at 190.

[105] *General Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1274 (T.T.A.B. 1992) (citing *Santinine Societa v. P.A.B. Produits*, 209 U.S.P.Q. 958 (T.T.A.B. 1988)).

[106] *General Mills, Inc.*, 24 U.S.P.Q.2d at 1274.

[107] *Dessert Beauty, Inc.*, 617 F. Supp. 2d at 190; *Davidoff Extension S.A.*, 612 F. Supp. at 7.

proofs submitted by the party [charging noncompliance] must leave no room for doubt speculation, surmise, or interpretation."[108]  Here, Defendant cannot meet this burden.

Defendant argues that Plaintiff's use of the SCAR mark outside of its sales to the US Military constitutes a *per se* violation of Federal Acquisition Regulations ("FAR") related to Department of Defense contracts, more specifically USSOCOM contracts regulated under the USSOCOM FAR Supplement ("SOFARS").  SOFARS Section 5652.204-9003 prohibits those who contract with USSOCOM from releasing unclassified information regarding those contracts, associating themselves with USSOCOM or Special Operation Forces, or using the USSOCOM emblem or logo, without prior authorization from USSOCOM.[109]

Defendant contends Plaintiff, through its advertisements and promotional materials, violated this regulation by printing unclassified information regarding Plaintiff's participation in the USSOCOM Program and unlawfully attempting to associate its commercial SCAR rifle with USSOCOM by displaying the official emblem of US Special Operation Forces.  Defendant further argues that Plaintiff's adoption of the SCAR mark constitutes an unlawful attempt to associate itself with USSOCOM in the commercial arena.

---

[108] *General Mills, Inc.*, 24 U.S.P.Q.2d at 1274 (quoting *Santinine Societa*, 209 U.S.P.Q. at 965).
[109] Defendant cites to this regulation as "48 C.F.R. § 5652.204-9003." The Court, however, was unable to find the cited provision. The Court is relying on the text of the regulation as set forth in a letter from USSOCOM to Plaintiff's subsidiary. Pl.'s Resp. to Def.'s Statement of Material Facts, Ex. 9 [Doc. 100-3].

The Court, however, cannot find Plaintiff's activities constitute a *per se* violation because Defendant fails to establish that the original contract between Plaintiff and USSOCOM even incorporated the regulation prohibiting such conduct.  On May 14, 2010, USSOCOM addressed a letter to FNH USA, Plaintiff's subsidiary, acknowledging the ambiguity as to whether the regulation even applied to Plaintiff's contract.  In that letter, USSOCOM notified FNH USA that SOFARS Section 5652.204-9003 provides that release of unclassified information related to USSOCOM contracts requires prior written authorization.  However, USSOCOM further explained that "this guidance was not made clear in the contract, as the applicable contract clause that identifies this guidance had not yet been established at the time of the contract award. Therefore, a unilateral modification to the contract incorporating SOFARS clause 5652.204-9003 will be issued."[110]  Because USSOCOM acknowledged that the guidance regarding the applicability of this regulation to Plaintiff's contract was unclear, the Court cannot find that Plaintiff's advertisements in 2006 constituted a *per se* violation of federal regulations.

Even if Plaintiff's advertisements constituted a *per se* violation, any such violation is immaterial.  One of the primary purposes behind trademark law is to

---

[110] Pl.'s Resp. to Def's Statement of Undisputed Facts, Ex. 9 at FN102837 [Doc. 100-3].

protect the consumer.[111]   Unlike the cases cited by Defendant involving violations of Food and Drug Administration regulations, the violation here does not implicate consumer protection concerns.   On the contrary, the regulation was enacted to protect USSOCOM.   Thus, even if Plaintiff's use of SCAR in its pre-sale promotional advertisements constituted a *per se* violation, the violation was immaterial and therefore nullifies Defendant's unlawful use defense.[112]

Because Defendant cannot proceed with its unlawful use defense, the jury may consider evidence of Plaintiff's pre-sale promotional activities when determining whether those activities, coupled with Plaintiff's sale of SCAR rifles pursuant to the USSOCOM Program, constitute sufficient prior use of the mark in commerce to create a protectable trademark interest in SCAR prior to September 2006.

## II.    Distinctiveness of SCAR and SCAR-Stock

In addition to showing use of the mark in commerce, the parties must also show that SCAR and SCAR-Stock are distinctive in order to receive trademark protection.[113] A distinctive mark is one that "serve[s] the purpose of identifying the source of the

---

[111] *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (noting that the dual purpose behind the Lanham Act is to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.").

[112] *See S. California Darts Ass'n v. Zaffina*, 762 F.3d 921, 931-32 (9th Cir. 2014) (finding unlawful use defense failed, in part, because"[e]ven assuming that [plaintiff] unlawfully failed to pay taxes, its misconduct would be <u>unrelated to the purpose of the federal trademark laws</u> and, therefore, collateral and immaterial.") (emphasis added).

[113] *Knights Armament Co.*, 654 F.3d at 1188.

goods or services."[114]   "An identifying mark is distinctive and capable of being protected if it <u>either</u> (1) is inherently distinctive <u>or</u> (2) has acquired distinctiveness through secondary meaning."[115]   In that regard, trademark law recognizes the following four categories of distinctiveness:

> (1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.[116]

Arbitrary, fanciful, and suggestive marks are considered inherently distinctive and, therefore, are protectable without a showing of secondary meaning.[117]   A descriptive mark, by contrast, is not inherently distinctive, and receives trademark protection only if it acquires distinctiveness through secondary meaning.[118]   A descriptive mark has acquired distinctiveness through secondary meaning "when the primary significance of the [mark] in the minds of the [consuming] public is not the product but the producer."[119]   The key factor in determining whether a descriptive mark has acquired secondary meaning is how the mark is perceived by the average prospective consumer

---

[114] *Id.*

[115] *Two Pesos, Inc.*, 505 U.S. at 769 (emphasis in original).

[116] *Gift of Learning Found., Inc.*, 329 F.3d at 797-98.

[117] *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1560 (11th Cir. 1991).

[118] *Knights Armament Co.*, 654 F.3d at 1188.

[119] *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007).

in the relevant industry.[120]  Whether a mark is distinctive is a question of fact not easily

adjudicated on summary judgment.[121]

Here, both parties argue no genuine issue of material fact exists as to whether

their respective marks are distinctive.  This Court disagrees.

### A. Distinctiveness of Plaintiff's SCAR Mark

Plaintiff argues that its SCAR mark is inherently distinctive, or alternatively, if it

is descriptive, it has acquired distinctiveness through secondary meaning.  In response,

Defendant argues that Plaintiff's use of the SCAR mark was merely descriptive of the

firearms solicited by the USSOCOM Program, and the mark did not acquire secondary

meaning in the firearms industry prior to Defendant's first use of SCAR-Stock in

September 2006.   As explained below, facts support both parties' positions, and,

therefore, a genuine issue of material fact remains as to whether Plaintiff's SCAR mark

is merely descriptive or inherently distinctive of the rifles upon which it is used.

When determining the distinctiveness of an abbreviation or acronym such as

SCAR, the Court must consider the relationship between the acronym and its

underlying phrase.[122]  For classification purposes, an abbreviation is treated similarly to

its underlying phrase "where the average prospective consumer recognizes the

---

[120] *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 995 (7th Cir. 1989).

[121] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 232 (5th Cir. 2009).

[122] *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 647 F. Supp. 2d 1321, 1331 (M.D. Fla. 2009), *aff'd*, 654 F.3d 1179 (11th Cir. 2011).

abbreviation as equivalent to the underlying phrase."[123]  "An abbreviation of a generic or descriptive phrase is protectable 'if the party claiming protection for the abbreviation shows that the abbreviation has a meaning distinct from the underlying words in the mind of the public.'"[124]  When determining how the public views the mark, courts should consider sources such as consumer surveys, use of the mark in media publications, use of the mark by competitors in the industry, and the trademark claimant's use of the mark.[125]  After considering these factors in this case, the Court finds a genuine issue of material fact exists as to whether SCAR is distinctive.

On the one hand, SCAR may be considered descriptive of a type of rifle because it serves as an acronym for "Special Operation Forces Combat Assault Rifle"—a descriptive phrase used to designate a particular rifle requested by the USSOCOM Program.  Indeed, evidence in the record shows that Plaintiff and others associated the term SCAR with this underlying descriptive phrase.  For example, the majority of the newspaper and magazine articles reference SCAR in connection with "Special Combat Assault Rifle" or some variant thereof.  In addition, a representative for another firearms manufacturer testified that he recognized SCAR as an identifier of the rifles

---

[123]*Am. Historic Racing Motorcycle Ass'n, Ltd. v. Team Obsolete Promotions*, 33 F. Supp. 2d 1000, 1004 (M.D. Fla. 1998), *aff'd sub nom., Am. Historic v. Team Obsolete*, 233 F.3d 577 (11th Cir. 2000).
[124] *Knights Armament Co.*, 647 F. Supp. 2d at 1331 (quoting *Forman*, 509 F.3d at 1359).
[125] *See Colt Defense LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 706 (1st Cir. 2007).

solicited by the USSOCOM Program.[126]  Even Plaintiff's own subsidiary indicated that SCAR is recognized as an acronym in government jargon to refer to the USSOCOM Program.

Moreover, Plaintiff's own use of SCAR with its underlying phrase could support a finding that the mark is descriptive.  If a trademark claimant uses the acronym in conjunction with its underlying phrase, courts are reluctant to find that the acronym has an independent meaning apart from the underlying phrase.[127]  In several of its advertisements and promotional materials, Plaintiff displays the SCAR mark with the underlying phrase presented predominately beside or underneath it.  For example, Plaintiff places the two side by side in its March 2006 press release entitled "The Making of the 21st Century Assault Rifle: SCAR SOF Combat Assault Rifle."[128]  Because SCAR is used at times with Special Operation Forces Combat Assault Rifle, the public could perceive that SCAR does not have a meaning distinct from its underlying phrase, and, by extension, is merely descriptive of a type of rifle.

On the other hand, because SCAR has an ordinary meaning outside the firearms industry, and no other competitors in the market use the mark commercially, the mark

---

[126] Paul Hochstrate Dep. 19:25-20:18 [Doc. 91-6].

[127] *See, e.g.*, *Forman*, 509 F.3d at 1360 (finding that party failed to show "WSI" as abbreviation for "Welding Services Inc." had a distinct meaning apart from the underlying phrase because advertising material displayed the WSI logo next to the underlying phrase);  *Knights Armament Co.*, 647 F. Supp. 2d at 1331 (finding that party failed to show "UNS" had a distinct meaning where the party "consistently use[d] UNS in conjunction with and as an abbreviation of 'Universal Night Sight.'").

[128] Mills Dep., Ex. 4 [Doc. 89-5].

could be viewed as inherently distinctive. "Scar" is a common word in the English language signifying a mark left on the skin by the healing of injured tissue.[129]  To the extent that the public views SCAR as synonymous with its dictionary definition, the mark would be inherently distinctive because the word bears no relationship to the firearm upon which it is used.  Indeed, such a connotation would be creatively fitting for a firearm capable of causing bodily injury.  Plaintiff even attempts to invoke this alternative meaning of "scar" in one of its SCAR rifle advertisements by including the words "BATTLE SCARS."[130]  Because the word doubles as both a mark on the skin and as an acronym for Special Operation Forces Combat Assault Rifle, the public could view the mark as inherently distinctive.[131]

Another factor that weighs in favor of finding Plaintiff's SCAR mark distinctive is the fact that other competitors in the firearms industry do not use the mark commercially.  If other competitors in the market use the mark, then that is probative evidence that the mark is merely descriptive or generic because, the more the public sees the mark used by others in the industry, the less likely the public will identify the mark with one particular producer.[132]  Here, there is no evidence in the record showing

---

[129] Umansky Decl., Ex. 6 [Doc. 89-3].

[130] Def.'s Statement of Material Facts, Ex. H at FN100415 [Doc. 90-8].

[131] *Accord American Historic Racing Motorcycle Association, Ltd.*, 33 F. Supp. 2d 1000, 1004-05 (M.D. Fla. 1998) (holding that "BEARS," an abbreviation for "British-European-American-Racing Series" was inherently distinctive for a class of motorcycles, in part, because BEARS doubled as both an animal and as an abbreviation, and thus consumers may associate the word with multiple things).

[132] *See Colt Defense LLC*, 486 F.3d at 706.

that competitors, other than Defendant, use the SCAR mark to sell firearms or related products.  Therefore, a reasonable juror could find that SCAR is inherently distinctive.

## B.  Distinctiveness of Defendant's SCAR-Stock Mark

Similarly, Defendant argues its SCAR-Stock mark is inherently distinctive because it is an arbitrary acronym for "Sage Clyde Armory Rifle Stock," a phrase adopted to reflect the origin of the product's design.  Plaintiff, however, argues that Defendant's position that SCAR-Stock is inherently distinctive is inconsistent and contradicts its position that Plaintiff's SCAR mark is merely descriptive.  According to Plaintiff, SCAR is either inherently distinctive for firearm products or it is not; Defendant cannot have it both ways.  This Court disagrees.

When determining whether a mark is distinctive, the factfinder must look to the particular goods or services upon which the mark is used.[133]  The same mark "may shift categories depending upon the product to which it is affixed."[134]  Here, the products upon which Plaintiff and Defendant use their respective marks are different: one is a type of firearm (a rifle) and the other is replacement gun stock (i.e., a gun accessory) compatible with Ruger rifles.  Because the marks are used to designate different products, the factfinder could also determine that their distinctiveness differs.  An

---

[133] *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:16 (4th ed.) ("*The possible descriptiveness of a designation is highly dependent on the goods or services in connection with which the designation is used. A term can be descriptive of one product and nondescriptive of another.*").
[134] *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F. Supp. 555, 559 (S.D.N.Y. 1978).

illustrative example of this principle is the "polo" mark in the clothing industry.  One district court noted held that the "polo" mark "[is] generic to polo shirts and coats, descriptive as to other shirts and coats and fanciful as it is applied to other articles of wearing apparel."[135]   Although the products were sold in the same industry, i.e. the clothing market, the distinctiveness of the mark changed based on the type of clothing. Similarly, in this case, although SCAR and SCAR-Stock are both used in the firearms industry, the products upon which they are used differ.  Thus, the factfinder could find that the distinctiveness of SCAR and SCAR-Stock also differ.[136]

Nevertheless, given the conflicting evidence regarding Defendant's motive in adopting the mark, the Court finds a genuine issue of material fact exists as to whether SCAR-Stock actually serves as an acronym for the product's origin.  Although Mr. Clyde testified that SCAR-Stock is an acronym for "Sage Clyde Armory Rifle Stock," Mr. Clyde knew of the USSOCOM Program and that the rifle developed pursuant to the Program was known as the SCAR rifle at the time he adopted the SCAR-Stock

---

[135] *Id.*

[136] Plaintiff further argues that Defendant's position contradicts its argument made to the USPTO following denial of its SCAR-Stock application on descriptiveness grounds.  Specifically, Plaintiff contends Defendant admitted that SCAR could not be both descriptive and distinctive as used on firearms products. In response to the initial denial of its application, Defendant stated "[i]t seems incongruous to suggest that a term like SCAR, which has no dictionary definition connected to firearms, rifles or gun stocks, is both <u>descriptive of</u> a type of assault rifle and at the same time <u>a distinctive trademark</u> for a particular brand of assault rifle." Def.'s Statement of Material Facts, Ex. D [Doc. 90-4]. While the Court recognizes the tension between these two arguments, they are not wholly inconsistent because the argument before USPTO refers to the use of SCAR specifically on rifles.  Defendant's arguments to the USPTO are merely additional evidence for the jury to weigh in its determination of distinctiveness.

mark.   Further, Joshua Smith, Defendant's former COO, testified that Defendant adopted the SCAR-Stock mark, in part, to take commercial advantage of the popularity of the SCAR rifle.   Although Mr. Clyde specifically disclaims any bad faith and attempts to cast doubt on Smith's credibility, it is not the province of this Court to weigh the evidence or make credibility determinations at the summary judgment stage.[137]   Accordingly, a genuine issue of material fact exists as to the reasons for adopting, and the meaning behind, Defendant's mark.   Therefore, whether the mark is distinctive is a question for the jury.

## CONCLUSION

Based on the foregoing, the Court finds that genuine issues of material fact exists as to which party first used the mark in commerce and whether either or both parties' marks are distinctive.   Because these issues are central to all the claims raised in this case, the parties Motions for Summary Judgment [Docs. 84 & 85] are **DENIED**.

**SO ORDERED,** this 8th day of January, 2015.

S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

ADP/ssh/jrf

---

[137] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).