**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

FN HERSTAL, S.A.,

Plaintiff,

v.

CLYDE ARMORY, INC.,

Defendant.

Case No. 3:12-CV-102 (CAR)

**PLAINTIFF FN HERSTAL'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO DENY DEFENDANT CERTAIN EQUITABLE REMEDIES OR RELIEF IN LIGHT OF 15 U.S.C. §§ 1052(a) AND (e)(1)**

The Court should grant FN Herstal, S.A.'s ("Plaintiff" or "Herstal") Motion in Limine To Deny Defendant Certain Equitable Remedies Or Relief In Light of 15 U.S.C. § 1052(a) and 15 U.S.C. § 1052(e)(1) (Dkt. 123) ("Motion"), and reject the arguments made in Defendant Clyde Armory, Inc.'s ("Defendant") response brief (Dkt. 126) ("Response") based on the following considerations:

**(1)** The Court should grant Herstal's Motion because Defendant's substantive arguments – that Defendant purportedly selected SCAR-Stock in good-faith; that a consumer would ultimately realize that SCAR-Stock products are not compatible with SCAR rifles; and that SCAR-Stock is arbitrary for SCAR-Stock products – are not relevant to the Section 2(a) and Section 2(e)(1) inquiries.

**(2)** Defendant has been aware of Herstal's deceptive and misdescriptive confusion theories which support the Motion since at least the filing of the Complaint and the Amended

Complaint. Moreover, the parties addressed the issues in summary judgment briefing. Defendant's claims of prejudice are therefore specious, and this Court should proceed with ruling on the substance of this Motion. The Court should also proceed with ruling on the substance of this Motion because the deceptive Section 2(a) and Section 2(e)(1) theories at issue in this Motion, like all of the claims and defenses in this case, are equitable in nature and therefore not entitled to trial by jury. Defendant's repeated bald assertions in its Response that these issues are for trial will not make it so. Perhaps most critically, it is unfair and confusing for Defendant to argue on the one hand that SCAR is descriptive of a military selected and approved firearm, while on the other hand arguing that Defendant's use of SCAR-Stock in connection with firearm products is inherently distinctive and registrable. As a matter of law, if SCAR is descriptive of a firearms product then it is deceptive or deceptively misdescriptive for Defendant's firearms product, and Defendant should not be permitted to register the mark or assert rights to such a mark.

## I. SCAR-STOCK IS DECEPTIVELY MISDESCRIPTIVE UNDER SECTION 2(e)(1)

Under well-established law:

> [A] term is merely descriptive if it conveys an immediate idea of an ingredient, quality, characteristic, function or feature of the product with which it is used. If, however, the mark would be merely descriptive if it conveyed an accurate or true idea, but instead the idea is false (although plausible), then the term is deceptively misdescriptive[.]

*In re Ox-Yoke Originals, Inc.*, 1983 WL 51827, at *1 (TTAB Dec. 27, 1983).[1] Defendant has argued consistently throughout this case that SCAR is merely descriptive for rifles approved by the US Military; that SCAR-Stock products are not military-approved rifles; and that

[1] The test for deceptive misdescriptiveness has two parts. First it must be determined if the matter sought to be registered misdescribes the goods. If so, then it must be ascertained if anyone is likely to believe the misrepresentation. *In re Quady Winery Inc.*, 221 USPQ 1213, 1214 (TTAB 1984).

Defendant's use of SCAR-Stock is therefore arbitrary. Under this tautology, Defendant argues here that SCAR-Stock cannot be misdescriptive because it was adopted in good-faith as an arbitrary acronym "to honor the collaborative effort be[tween] Sage and Clyde Armory." Dkt. 126 at 7. Defendant also argues that SCAR-Stock cannot be misdescriptive, because no consumer would ever actually believe that SCAR-Stock products are functioning SCAR assault rifles. *Id*. But similar arguments have been rejected in light of Section 2(e)(1). *Ox-Yoke*, 1983 WL 51827.

In *Ox-Yoke*, the Board refused registration of the G.I. designation as applied to gun cleaning products. The Board found that G.I. was a well-known abbreviation for "government issue," and that the government provided gun cleaning products to its armed forces. *Id*. at *1. The applicant argued that its use of G.I. "[wa]s arbitrary" with respect to its goods, and "that no one would think applicant's goods were of government manufacture or issue." *Id*. Rejecting these arguments, the Board held that because it "would not be unreasonable" for a consumer to assume that the goods were government issue products being sold at retail to non-military personnel, the applicant's use of the mark would be misdescriptive under Section 2(e)(1). *Id*. The Board also rejected the applicant's good-faith adoption argument, holding that an applicant's intent in selecting the designation "is irrelevant" to the inquiry and that "the effect of the mark on the purchasing public" is what determines whether a designation is registrable. *Id*. at 3; *see also In re Kitaru Innovations, Inc.*, 2013 WL 3090489, at *3 (TTAB Mar. 26, 2013) ("The only part of the applicant's naming program before us is how consumers will react to the term . . . the applied-for mark must stand on its own.").

Here, Defendant's descriptiveness arguments are accepted, Defendant's use of the SCAR-Stock designation must be deceptively misdescriptive, as in *Ox-Yoke*. *See Ox-Yoke*, 1983

WL 51827, at *1. Obviously if SCAR as Defendant claims is descriptive of a military selected or approved rifle, then at least some members of the consuming public would logically find it has a descriptive connotation with the government selection or approval attributes for a firearm and the Defendant's use of SCAR-Stock (the use of the mark itself) would cause the consuming public to believe that SCAR-Stock products were selected or approved by the US Military.[2] But this last laudatory premise is false in that Defendant's SCAR-Stock was not a firearm selected or approved by the military. Accordingly, Defendant's use of SCAR-Stock is neither arbitrary nor non-descriptive as Defendant proclaims. Under the case law, it can only be deceptive and misdescriptive. Defendant's argument that SCAR-Stock is arbitrary and that it was selected in good-faith to represent a collaboration "is irrelevant" to the Section 2(e)(1) determination. *Ox-Yoke*, 1983 WL 5182, at *3.

Defendant's argument that a consumer would know that SCAR-Stock is not "an actual functioning assault rifle," Dkt. 126 at 7, is also irrelevant to the inquiry; an applicant cannot escape a finding of deceptive misdescriptiveness even if a consumer discovers the deception at some point in time to avoid the transaction. *See In re Alp of South Beach, Inc.*, 2006 WL 936984 at *4 (TTAB Marr. 27, 2006). The proper test is plausibility, not reality. *Glendale Intern. Corp. v. USPTO*, 374 F. Supp. 2d 479, 487 (E.D. Va. 2005) (TITANIUM: finding that "consumers

---

[2] Defendant's advertisements tell it all. *See Ox-Yoke*, 1983 WL 51827, at *2 (noting that the applicant's advertising labels were designed to give the impression that the product was manufactured for government issue). According to Defendant, its SCAR-Stock product will provide "a tactical edge" to the weapons of its customers. Ex. A at 1 (http://scarstock.com/?staff=mini-14-grey). Defendant's product also comes with "rails for mounting optics and accessories . . . [and an] ergonomic pistol grip," features typically associated with rifles approved by the US Military. *Id*. at 2. Its product advertisement also makes reference to the "M4," a rifle approved and heavily used by the US Military. *Id*. Indeed, Defendant even boasts that SCAR-Stock products are sold in "Navy SEAL Grey." *Id* at 1. Based on these advertising representations, which are used in conjunction with the SCAR designation, it appears Defendant is attempting to associate SCAR-Stock with the U.S. Military in an attempt to increase sales of the product. It is also more than plausible that some of the consuming public could believe that SCAR-Stock products are approved by the US Military. But they are not.

would likely believe that recreational vehicles bearing the TITANIUM mark were, in fact, made from titanium"). Accordingly, if a consumer reaches Defendant's website and realizes that SCAR-Stock products are not rifles approved by the US Military, Section 2(e)(1) nevertheless applies. *Id*; *see also In re Budge Mfg. Co., Inc.*, 857 F.2d 773, 776 (Fed. Cir. 1988) ("[T]he mark standing alone must pass muster."). When the mark LOVEE LAMB was considered for car seat covers, the fact that the trademark holder advertised that it was only synthetic did not save the mark from misdescriptiveness. As the mark by itself must not be deceptive and pass muster. The mark itself conveyed a product descriptive attribute (Lamb) that was a material positive attribute that it did not have, so the mark was not registrable as being deceptive. *Id.* at 777 .

## II.     SCAR-STOCK IS DECEPTIVE UNDER SECTION 2(a)

Contrary to Defendant's assertion, Section 2(a) is not limited to protecting rights of privacy or publicity. Dkt. 126 at 4. Rather, Section 2(a) is expansive in scope and serves to "generally protect[] against registering marks that falsely suggest a connection to a non-sponsoring entity." *In re Shinnecock Smoke Shop*, 571 F. 3d 1171, 1172 (Fed. Cir. 2009).

Defendant argues that Herstal's Section 2(a) arguments "rest squarely on an unproven conclusion that its rights to SCAR are superior to those of Clyde Armory." Dkt. 126 at 4. However, the issue of registrability does not rest on whether Herstal has any rights in its SCAR mark. *Ox-Yoke*, 1983 WL 51827, at *2 (TTAB Dec. 27, 1983) ("It is well settled that third party registrations are not conclusive on issues of registrability."). In other words, even if Herstal fails to establish ownership rights in SCAR, Sections 2(a) and 2(e)(1) should preclude the registration of SCAR-Stock. *Id*.

The ultimate question under Section 2(a) beyond those addressed under the Section 2(e)(1) analysis is whether the misdescription of SCAR-Stock "would materially affect the

decision to purchase the goods."[3] *South Beach*, 2006 WL 936984 at *5. As applied here, this question turns on whether the purchase of a firearm product selected and approved by the US Military would be "a desirable one for some portion of the population." *Id.*; *Budge*, 857 F.2d at 777 (LOVEE LAMB: "[M]isdescribing synthetic fabric [for car seats] as 'lamb' would affect a purchaser's decision to purchase the item[.]"); *Kitaru*, 2013 WL 3090489, at *5 (GREEN SEAL: "[R]elevant purchasers would be more inclined to purchase eco-friendly adhesive tape[.]"); *In re White Jasmine LLC*, 2013 WL 1775725 (TTAB 2013) (WHITE JASMINE: "The evidence establishes that consumers perceive that white tea has desirable health benefits. Thus, the misdescription is material to consumers interested in purchasing or drinking white tea to obtain these health benefits[.]").

*South Beach* speaks to the timing and substance of the materiality test. There, the Board held that the name CAFETERIA used in connection with restaurants featuring table-service accommodations and not cafeteria-style accommodations was incapable of registration under Section 2(a). The Board made its ruling in spite of the applicant's arguments that "everyone who comes into its CAFETERIA establishments knows in advance the nature of the restaurant." *Id*. at 3. The Board found that at least some prospective customers were likely to believe that the restaurants offered cafeteria-style accommodations, and that cafeteria-styled accommodations are desirable to at least a portion of the population. *Id*. at 4-5. More importantly, the Board found that the proper point in time for making this determination is not when a customer enters the restaurant, but as soon as the customer first encounters the mark in an advertisement;

---

[3] The Section 2(a) test has three elements: (1) Is the term misdescriptive of the character, quality, function, composition or use of the goods? (2) If so, are prospective purchasers likely to believe that the misdescription actually describes the goods? (3) If so, is the misdescription likely to affect a significant portion of the relevant consumers' decision to purchase? *In re Budge Mfg. Co.*, 857 F.2d 773, 8 USPQ2d 1259, 1260 (Fed. Cir. 1988).

specifically, the Board noted:

> The critical point is not when the customers walk into the restaurant . . . but when they encounter the mark in an advertisement, information road sign, or the signage on the exterior of the restaurant, and then in each of these cases, making a decision to purchase the services. And whether prospective patrons who have been misled actually stay upon learning of their misapprehension ought not to be the determining factor under Section 2(a) of the Act.

*Id*. at *7.

Here, the record demonstrates that the U.S. Military had not selected or approved a new replacement rifle in more than 50 years over the M16 rifle, and that the newly selected or approved rifle would give the selected or approved item a very positive attribute. Dkt. 109 at 4 (noting that the SCAR rifle program was "the first full and open competition since the M16 trials held in the mid-1960s"); *id*. at 5-6 (noting that "[t]hroughout 2005 and 2006, magazine and newspaper articles tracked the development of the new assault rifle . . . and outlined the features and benefits of the different variants and forms of the new SCAR rifle system"). The record also demonstrates that the U.S. Military is a very prominent and influential firearms consumer, *id*. at 22, which suggests that other firearms consumers such as law enforcement agencies and civilians would seek to purchase similar grade weapons, *id*. at 7-8, as products associated with the military possess a special allure for customers, especially firearms-related products, *see Ox-Yoke*, 1983 WL 51827, at *2-3 (G.I. mark on gun cleaning products held to be deceptive if not used with products issued by the US Government).[4]

Furthermore, like the CAFETERIA designation in *South Beach*, which deceptively lured some customers to the restaurant who may have ultimately decided not to patronize the

---

[4] Defendant has consistently agreed with this notion. See, Dkt. 95-1, Nos. 21 and 22; Dkt. 105-2, No. 22; Dkt. 89-8, Jamieson Dep., p. 30:25-31:6, 32:22-33:16, 34:5-35:7, 116:13-117:10; Dkt. 89-10, Smith Dep., p. 57:13-58:17.

restaurant, if we accept Defendant's arguments that SCAR is merely descriptive for rifles approved by the US Military, then Defendant's use of the SCAR-Stock designation deceptively lures customers to Defendant's website or product. Even though some of those customers reach Defendant's website only to realize that SCAR-Stock products are not rifles approved by the US Military, this is not relevant, because the mark standing alone must pass muster. Under *South Beach*, therefore, even just the pre-sale confusion caused by Defendant's use of SCAR-Stock violates Section 2(a). *Id*. at *7.

## III. HERSTAL'S MOTION DOES NOT RAISE NEW ISSUES AND DOES NOT REQUIRE A JURY

Defendant's Response concedes that the issues raised in the Motion are not new. Indeed, Herstal provided notice of its confusion theories nearly three years ago in the Complaint and First Amended Complaint. *See* Dkt. 73 at ¶¶12, 28, 37.[5] Because Herstal provided affirmative allegations of Defendant's deceptive use of SCAR in the Complaint, Herstal was not required to formally plead Sections 2(a) and 2(e)(1) also as affirmative defenses to counterclaims. Also, under Fed. R. Civ. P. 8(c), "If a party mistakenly designates a defense as a counterclaim . . . the court must, if justice requires, treat the pleading as though it were correctly designated".[6]

---

[5] For example, Herstal alleged that "Defendant's use of the trademark SCAR constitutes false representations that Defendant has some connection or association with, or sponsorship by Plaintiff, and that the services and products identified with Plaintiff are available from Defendant." Dkt. 73 at ¶28. A likelihood of confusion could exist as to confusion, mistake or deception as to association, affiliation or common source of sponsorship and Defendant has admitted confusing similarity.

[6] *See Reiter v. Cooper*, 507 US 258, 263 (1993) (noting that affirmative defenses are "properly raised" as an affirmative cause of action to the extent "they relate to the same" issues); *Myers v. Central Florida Investments, Inc.*, 592 F. 3d 1201, 1225 (11th Cir. 2010) ("[T]his Court has excused technical noncompliance with pleading requirements where the substance of the pleading is sufficient."). In the alternative, Herstal's claims are a negative defense which are sufficiently pled in the Complaint. *In re Rawson Food Service, Inc.*, 846 F. 2d 1343, 1349 (11th Cir. 1988) (noting that a negative defense is a "defense which points out a defect in the plaintiff's prima facie case"); *Home Mgmt. Solutions, Inc. v. Prescient, Inc.*, 2007 WL 2412834, at *3 (S.D. Fla. Aug. 21, 2007) (noting that "the proper remedy is not to strike the claim, but rather to treat it as a specific denial"). However, to the extent the Court holds that these also must be plead as affirmative defenses, also pleadings under Federal Rule of Civil Procedure

Defendant acknowledges that Herstal also argued these points in summary judgment briefing, providing Defendant with subsequent ample notice of these issues more than one year ago.[7] Dkt. 126 at 2. Defendant notes that the Court did not rule on the issue at summary judgment, but Defendant does not contend that this issue is somehow resolved by the Court's prior rulings at any time.[8] Nor does Defendant contend that this Court lacks the inherent authority to control the streamlining of the issues of this case as its sees fit.[9]

As a final matter, and as fully explained in Herstal's motion to strike the parties' jury demands (Dkt.127), there are no claims triable to a jury in this case because all of the remaining claims in this case – including the issues raised in this Motion – are equitable in nature. *See* Dkt. 127 at 3 n.2.  Defendant simultaneously arguing Plaintiff's prior use of SCAR is descriptive of firearms, but Defendant's use of SCAR-Stock in connection with a firearm product is inherently distinctive and not at all descriptive or misdescriptive, would further be an issue that could lead to jury confusion and those arguments would not even be appropriate for submission to a jury, but rather for resolution by the Court.  Accordingly, the Court should proceed with ruling on the substance of this Motion.

---

15(b), permits the amendment of pleadings even during or after trial.

[7] In Herstal's Summary Judgment Motion, Herstal argued, among other things, that "While Defendant's SCAR-Stock gun stock product cannot be used with Plaintiff's SCAR brand rifles, use of the mark by Defendant still has the capacity to capture initial consumer attention, causing pre-sale confusion and thus potentially helping Defendant make sales of its SCAR-Stock and possibly even other of Defendant's products. Opportunities for confusion are further heightened in that both Plaintiff's SCAR brand rifles and Defendant's SCAR-Stock firearms products are advertised and promoted on Defendant's website." Dkt. 88 at 21 n.14.

[8] *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 12-13 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge.").

[9] *In re Parklane/Atlanta Joint Venture*, 927 F. 2d 532, 539 (11th Cir. 1991). The case cited by Defendant, *Rogers v. South Star Logistics, Inc.*, 2015 WL 3440335 (M.D. Ala. May 28, 2015) does not state otherwise. Nor is it binding on this Court.

## IV.  CONCLUSION

This Court should rule that SCAR-Stock is not capable of Federal registration as a trademark and is also not capable of protection under §43(a) as a common law mark, because it is deceptively misdescriptive and because it falsely suggests a connection to rifles selected and approved by the US Military.  The relief herein requested is that Defendant cannot simultaneously argue SCAR for Plaintiff is descriptive and then argue any rights or registrability for SCAR-Stock by asserting SCAR-Stock is inherently distinctive and registrable for Defendant, because if SCAR is descriptive for a government selected and approved firearm, then SCAR is deceptive or misdescriptive when used by Defendant for a completely different firearm related product.

Dated: July 8, 2015                                  Respectfully submitted,

 /s/ Burton S. Ehrlich
Burton S. Ehrlich
LADAS & PARRY LLP
224 S. Michigan Avenue, Suite 1600
Chicago, Illinois 60604
Telephone: (312) 427−1300
Email: burte@ladas.net

Charles H. Hooker III
Georgia Bar No. 375622
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6376
Email: chooker@kilpatricktownsend.com

*Attorneys for Plaintiff/Counterclaim-Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2015 I electronically filed the foregoing PLAINTIFF FN HERSTAL'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE TO DENY DEFENDANT CERTAIN EQUITABLE REMEDIES OR RELIEF IN LIGHT OF 15 U.S.C. §§ 1052(a) AND (e)(1) with the Clerk of the Court using the CM/ECF system which will electronically send notice of such filing to all counsel of record.

                                                       /s/ Burton S. Ehrlich