**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION**

| | | |
|---|---|---|
| **FN Herstal, S.A.**, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:12-cv-102-CAR |
| | ) | |
| v. | ) | |
| | ) | |
| **Clyde Armory, Inc.**, | ) | |
| | ) | |
| Defendant. | ) | |

## PRETRIAL ORDER – NON JURY

The following constitutes a pretrial order entered in the above-styled case after conference with counsel for the parties:

(1) (a) The name, address, and telephone number of all attorneys who personally appeared at pretrial and who will conduct the trial are as follows:

Plaintiff:

Burton S. Ehrlich (burte@ladas.net)
Ladas & Parry LLP
224 S. Michigan Avenue
Suite 1600
Chicago, IL 60604
(312) 427-1300

Charles H. Hooker, III (chooker@kilpatricktownsend.com)
KILPATRICK TOWNSEND & STOCKTON LLP
Suite 2800, 1100 Peachtree Street NE
Atlanta, GA  30309-4528
(404) 815-6376

Defendant:

Glenn D. Bellamy (gbellamy@whe-law.com)
Paul J. Linden (plinden@whe-law.com)

1

WOOD HERRON & EVANS LLP
2700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202
(513) 241-2324

Michael Daniel (mdaniel@pdwlawfirm.com)
PRIOR, DANIEL & WILTSHIRE, LLC
490 North Milledge Avenue
Athens, Georgia 30601
(706) 543-0002

Other:    N/A

 (b) The name, address, and telephone number of all nonparty persons including

attorneys who have a fixed or contingent financial interest in this case are as follows:

None.

(2) (a) Companion cases pending in this and other federal or state courts are:

None.

(b) Possible derivative claims not now the subject of pending litigation:

None known.

(3) The estimated time required for trial is: Four (4) days

(4)  The parties agree that the court has jurisdiction of the parties and the subject matter.

15 U.S.C. §§ 1121 and 1125, and 28 U.S.C. §§ 1331, 1338, 1367. Jurisdictional challenges

previously were raised in this case after it originally was filed in the Eastern District of Virginia,

Civ. Action No. 1:12-CV-275. Defendant moved that court to dismiss for lack of personal

jurisdiction and improper venue pursuant to Fed. R. Civ. P. 12(b)(2), (3). After hearing from the

parties, the court in the Eastern District of Virginia denied Defendant's motions and found that it

had specific personal jurisdiction over Defendant and that the Eastern District of Virginia was a

proper venue (Doc. 34). However, that court held that the Northern District of Georgia was a

more appropriate venue and transferred the case there, Civ. Action No. 1:12-cv-01867. Subsequently, the parties consented to have this case transferred to the Middle District of Georgia, Civ. Action No. 3:12-cv-00102-CAR. Since being transferred to this Court, jurisdiction has not been challenged by either party.

(5) **Proposed findings of fact and conclusions of law with citations** to the record where the evidence may be found or to the statute or a case from which the law is derived **shall be filed with the court within seven (7) days after trial**. Also, those parties having the appropriate resources are requested to provide the court with a copy of their proposed findings of fact and conclusions of law on a CD.

(6) Unless either party seeks to take an additional deposition or produces any further documents, all discovery has been completed. The court will not consider any further motions to compel discovery except for good cause shown. The parties, however, shall be permitted by agreement to take depositions of any person(s) for the preservation of evidence or for use at trial.

(7) Unless otherwise noted, the names of the parties as shown in the caption to this order are correct and complete, and there is no question by any party as to the misjoinder or nonjoinder of any parties.

(8) The following is the plaintiff's brief and succinct outline of the case and contentions:

In 2003 the United States Special Operations Command ("USSOCOM") instituted a program to produce a modular rifle system for the United States military to replace versions of the M-4 and M-16 rifles, which had been in use for many years.  This was the first such competition the U.S. military has held since the M16 rifle was developed half a century ago. Plaintiff FN Herstal, S.A. ("Herstal"), a well-known firearms manufacturer, prevailed in the bidding process and was selected by USSOCOM in 2004 to manufacture Herstal's newly

designed rifles for use by the United States military. On November 5, 2004, Herstal received a significant order from USSOCOM for its SCAR brand rifles and began shipping SCAR brand rifles to the military shortly thereafter.

The U.S. military at times used the acronym SCAR as an imprecise abbreviation for Special Operations Forces ('SOF') Combat Assault Rifle. However, Herstal is the only seller of the commercialized SCAR brand rifle, other than some prototypes or initial informational materials that other manufacturers may have provided to the military early-on during the proposal phase of the procurement.

Herstal received widespread publicity and media attention for Herstal's new SCAR brand rifles during the USSOCOM competition and following Herstal's initial sales of SCAR brand rifles to the military in late 2004. As usual with military weapons receiving high acclaim and publicity, law enforcement, sportsmen, hunters and gun enthusiasts were clamoring for a SCAR brand rifle that could be lawfully sold to them (i.e., not fully automatic for civilian consumers). Developing the semi-automatic version of the SCAR brand rifle and receiving government approval for commercial sale took a number of years. In addition to the publicity Herstal received after winning the government contract for SCAR brand rifles, around the same time, Herstal began promoting SCAR brand rifles to law enforcement personnel and civilians. Herstal promoted the SCAR brand rifle at trade shows throughout the United States and internationally and visits to gun dealers, law enforcement agencies, retail stores, and distributors. Indeed, by the February, 2006 SHOT Show held in Las Vegas, Nevada, the biggest firearms industry trade show in the world attended by civilian, law enforcement and military consumers, Herstal was already exhibiting and promoting the SCAR brand directly to the public. On March 2, 2006,

Herstal formally announced it would offer SCAR brand rifles to law enforcement and civilian consumers.

Herstal's sales of SCAR brand rifles to the United States military, law enforcement agencies, and civilians total tens of millions of dollars, and Herstal's first sale to USSOCOM in 2004 alone was for the sum of over $634,000. Herstal protected the SCAR brand and owns two federal trademark registrations for the SCAR mark, with a third application presently pending (and being opposed by Defendant).

Defendant Clyde Armory, a firearms retailer and distributor, began working with Sage International, Ltd. in 2006 to produce and sell a rifle replacement stock for certain Ruger firearms. Clyde Armory's sole shareholder and owner, Mr. Andrew Clyde, who was familiar with Herstal's products as a former distributor of Herstal's U.S. subsidiary, FNH USA. Mr. Clyde was well aware of Herstal's prior use of SCAR in connection with rifles and attended the same February 2006 SHOT Show where Herstal was exhibiting and promoting the SCAR brand rifle. At the 2006 SHOT Show, Mr. Clyde met with Mr. John Klein, the President and founder of Sage International, Ltd., to discuss what would only later become known as Clyde Armory's SCAR-Stock firearms product. Clyde Armory's former Chief Operating Officer Josh Smith testified that Clyde Armory selected and adopted its SCAR-Stock mark, in part, to take commercial advantage of the popularity of Herstal's SCAR brand rifles in the firearms industry. Clyde Armory nevertheless claims that its use of SCAR stands for "Sage Clyde Armory Rifle" or "Sage Clyde Armory Replacement," as an indication of the relationship between the manufacturer of the product Sage International, Ltd. and Clyde Armory, Inc. However, Clyde Armory admits that most prospective purchasers would not be aware of such a meaning. Additionally, Mr. John Klein, the individual at Sage International who personally worked with

Mr. Clyde to design and manufacture the SCAR-Stock product for Clyde Armory, testified that he has no independent knowledge as to what SCAR-Stock stands for and apparently until reading the deposition testimony in this case of Andrew Clyde in 2013 or being told by Mr. Clyde, he did not know the purported meaning of SCAR-Stock.

Clyde Armory began offering its SCAR-Stock product for sale in approximately September 2006, long after the sales by Herstal to the U.S. military, which began in 2004. Based on this, Clyde Armory claims it has priority of rights in the SCAR-Stock mark, which somehow preceded Herstal's first use in commerce of its SCAR mark, on the theory that neither Herstal's extensive U.S. military sales nor its wide ranging promotional activities to civilian and law enforcement consumers constitute prior use under the Lanham Act. Defendant further takes the contradictory position that its SCAR-Stock mark is inherently distinctive, and thus protectable, while Herstal's SCAR mark is merely descriptive, and thus not protectable (or not protectable at the time Defendant began selling SCAR-Stock products).

(9) The following is the defendant's brief and succinct outline of the case and contentions:

Clyde Armory contends it owns priority of rights in its "SCAR-Stock" trademark, a claim that Clyde Armory must prove by a preponderance of the evidence. Clyde Armory will show that it adopted the "SCAR-Stock" and/or "SCAR-CQB Stock" mark for replacement rifle stocks for use with Mini-14, Mini Thirty, and AC-556 rifles made by Sturm Ruger & Co., Inc. Importantly, "SCAR-Stock" replacement stocks are not, and cannot be, used on the Plaintiff's SCAR-type rifles.

Clyde Armory contends that "SCAR-Stock" and/or "SCAR-CQB Stock" is an inherently distinctive mark because, as used by Clyde Armory on the above-identified goods, it is not

descriptive of the goods, but rather is arbitrary (or at least suggestive) and, therefore, merits trademark protection as soon as it was used in commerce on goods in trade. Clyde Armory will further show through contemporaneously produced invoices that it first used the "SCAR-Stock" and/or "SCAR-CQB Stock" mark in commerce no later than September 2006 (Clyde Armory's priority date), when it began selling its replacement stocks, so marked, to customers throughout the United States.

Clyde Armory also contends that FN's claim to priority of rights in the "SCAR" mark lacks merit. FN cannot establish that, before Clyde Armory's date of first use in September 2006, it used "SCAR" as a trademark in commerce and that "SCAR" was either inherently distinctive or had acquired distinctiveness. Clyde Armory contends that FN merely used the U.S. Military's descriptive designation "SCAR," which stands for <u>S</u>pecial Operations Forces <u>C</u>ombat <u>A</u>ssault <u>R</u>ifle, on the very products for which FN was awarded a contract by the U.S. Military to produce SCAR-type rifles. As such, any use of "SCAR" by FN on products sold to the U.S. Military was merely descriptive of the products on which FN used "SCAR,", and, therefore, cannot be distinctive.

FN cannot prove it owns priority of rights in the "SCAR" trademark. FN must establish that "SCAR" acquired distinctiveness, apart from its descriptive meaning (as an acronym for the descriptive "SOF Combat Assault Rifle") before September 2006. FN also cannot establish that it sold any "SCAR" rifles to non-military customers before September 2006 and, therefore, could not establish acquired distinctiveness through actual use in commerce before Clyde Armory's priority date. The fact that the "SCAR" mark may have acquired distinctiveness and become protectable after Clyde Armory's priority date is irrelevant to priority of rights.

FN also cannot establish analogous trademark use before September 2006 because (1) it cannot prove that its pre-sale promotional activities created distinctiveness in the descriptive term "SCAR" in the minds of the consuming public, and (2) FN has admitted that it had no commercially available SCAR weapon available for non-military purchase before 2008. When a party relies on analogous use to establish trademark rights, "actual technical trademark use must follow the use analogous to trademark use within a commercially reasonable period of time." Doc. 109 at 18 (quoting *Dyneer Corp. v. Automotive Products PLC*, 37 USPQ 2d 1251, 1256 (TTAB 1995)). Finally, Clyde Armory contends FN cannot carry the high burden it faces to show first use before November 1, 2008, the date of first use claimed on its trademark application for "SCAR." While FN is not bound by the first use date alleged in its trademark application, it must prove an earlier date of use (or analogous use) in commerce by clear and convincing evidence. *See* Doc. 109 at 20-21.

Clyde Armory contends that the party who establishes priority of rights is entitled to the trademark registration(s) it has sought (and the other party denied the registration(s) it sought) and a permanent injunction against the other party.

(10) The issues for determination by the court are as follows:

(a-b) Plaintiff and Defendant:

The court will decide which party has proved it owns priority of rights in a trademark incorporating the term "SCAR" by establishing that it was the first to use a distinctive (i.e., protectable) mark in commerce. To make this determination, the court must determine (1) whether FN Herstal's "SCAR" mark and/or Clyde Armory's "SCAR-Stock" mark is inherently distinctive or acquired distinctiveness in the minds of the consuming public or whether such marks are merely descriptive, (2) if not merely descriptive, when each party's respective mark

became distinctive, and (3) when each party first used its distinctive mark in commerce in the United States. The parties agree that a likelihood of confusion exists, so there is no infringement issue to be determined. Neither party is seeking damages and the parties further agree that whichever party establishes its priority of rights will request to be entitled to the trademark registration(s) it has sought (and the other party denied the registration(s) it sought) and seek a permanent injunction against the other party.

(11) If a tort action, specifications of negligence, including applicable code sections, are as follows: ___N/A_____

(12) If a contract action, the terms of the contract are as follows (or, the contract is attached as an Exhibit to this order): _____N/A_____

(13) The types of damages and the applicable measure of those damages are as follows:

(a) Plaintiff: N/A

(b) Defendant: N/A

(14) All material undisputed facts established by the pleadings, depositions, or admissions of the parties are attached as Addendum A, and are signed by counsel: N/A

(15) Special authorities relied upon by plaintiff relating to peculiar evidentiary or other legal questions are as follows: ___N/A_____

(16) Special authorities relied upon by defendant relating to peculiar evidentiary or other legal questions are as follows: ___N/A_____

(17) The following are lists of witnesses the:

(a) Plaintiff will have present at trial: Charles Newton Mills, III, Frank Spaniel, and Patrick Bosschaerts.

(b) Plaintiff may have present at trial: Joshua Thomas Smith; any witness listed by the Defendant.

(c) Defendant will have present at trial: Andrew Clyde

(d) Defendant may have present at trial: Bret Jamieson; any witness listed by the Plaintiff.

Opposing counsel may rely on representation by the designated party that he <u>will</u> have a witness present unless notice to the contrary is given in sufficient time prior to trial to allow the other to subpoena the witness or obtain this testimony by other means. Counsel should be prepared to state at the pretrial conference objections to any witness listed.

(18) The following depositions may be used at trial:

(a) by Plaintiff: John Klein, Paul Hochstrate, and Joshua Thomas Smith.

(b) by Defendant: Paul Hochstrate; John Klein

The Parties may use any deposition identified by the opposing party.

(19) The possibilities of settling the case are: of a continuing nature with further efforts to be attempted.

(20) Other matters: N/A

It is hereby **ORDERED** that the foregoing constitutes the pretrial order in the above case and supersedes the pleadings which may not be further amended except by order of the court to prevent manifest injustice.

This 14th day of July, 2015.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
United States District Court