Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 1 of 235    DX200.0001

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
30(b)(6)    Charles Newton Mills, III on 08/14/2013    Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF GEORGIA

3                      ATHENS DIVISION

4          Civil Action No. 1:12-CV-275(CAR)

5

6    FN HERSTAL, S.A.,

7          Plaintiff,

8    VS.

9    CLYDE ARMORY, INC.,

10         Defendant.

11

12              30(B)(6) DEPOSITION OF:

13              CHARLES NEWTON MILLS, III

14

15

16          Wednesday, August 14, 2013

17          9:07 a.m. to 3:27 p.m.

18

19              FN Manufacturing

20          Columbia, South Carolina

21

22

23

24

25

```
 1                    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3         FN HERSTAL, S.A.

 4         BY:  BURTON S. EHRLICH

 5         LADAS & PARRY, LLP

 6         224 South Michigan Avenue

 7         Suite 1600

 8         Chicago, IL   60604

 9         312-427-1300 - telephone

10         Burte@LADAS.NET

11    FOR THE DEFENDANT:

12         CLYDE ARMORY, INC.

13         BY:  GLENN D. BELLAMY

14         WOOD HERRON & EVANS, LLP

15         2700 Carew Tower

16         441 Vine Street

17         Cincinnati, OH   45202-2917

18         513-241-2324 - telephone

19         gbellamy@whe-law.com

20

21

22

23

24

25
```

**DX200**

```
 1                        EXHIBIT INDEX

 2      EXHIBIT 12 - THE SPECIAL OPERATIONS              49
               COMMAND CONDUCTS FIRST CRITICAL DESIGN
 3             REVIEW FOR THE SPECIAL OPERATIONS FORCES
               COMBAT ASSAULT RIFLE (SCAR) WITH THE
 4             DOWN SELECT OF FN HERSTAL, HELD AT FN
               HERSTAL HEADQUARTERS IN HERSTAL,
 5             BELGIUM, 15 THROUGH 17 DECEMBER, '04

 6      EXHIBIT 13 - FN SCAR (SPECIAL COMBAT            61
               AUTOMATIC RIFLE) FOR LAW ENFORCEMENT
 7             DEBUTS AT IACP

 8      EXHIBIT 14  - COLLECTION OF DOCUMENTS           66

 9      EXHIBIT 15 - ONE-PAGE MARKETING AD             71

10      EXHIBIT 16 - ONE-PAGE MARKETING AD             72

11      EXHIBIT 17 - FNH 2006 PRODUCT CATALOG          73

12      EXHIBIT 18 - PAGES OUT OF THE 2007             80
               PRODUCT CATALOG
13

14      EXHIBIT 19 - 2008 MILITARY PRODUCT             84
               CATALOG
15

16      EXHIBIT 20 - FN HERSTAL PRODUCT CATALOG        89

17      EXHIBIT 21 - PRINTED MATERIAL FROM FN          91
               HERSTAL
18

19      EXHIBIT 22 - MATERIAL FROM FN HERSTAL ON       92
               THE FN SCAR BRAND FIREARMS
20

21      EXHIBIT 23 - MATERIAL FROM FN HERSTAL ON       93
               THE FM SCAR BRAND FIREARMS
22

23      EXHIBIT 24 - E-MAIL STRING, 420, 421,          94
               422 AND 423
24

25      (Exhibit Index Continued:)
```

**DX200**

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
**30(b)(6)**          Charles Newton Mills, III on 08/14/2013          Page 4

```
 1    EXHIBIT 25 - E-MAIL STRING, 538 and 539          100

 2    EXHIBIT 26 - COPY OF A BACK-UP REPORT            103
             FOR A PRINT AD
 3

 4    EXHIBIT 27 - PRINT OUT FROM ONLINE WEB           110
             PUBLICATION KNOWN AS DEFENSE REVIEW
 5

 6    EXHIBIT 28 - MATERIAL THAT WAS CUT AND           111
             PASTED FROM SERVER AL MATERIALS
 7

 8    EXHIBIT 29 - TRIFOLD BROCHURE                    113

 9    EXHIBIT 30 - TWO-PAGE DOCUMENT BATES 328         116
             AND 329
10

11    EXHIBIT 31 - DOCUMENT IN FRENCH FROM             116
             ANDRE KARTHEUSER
12

13    EXHIBIT 32 - INVOICE FROM THE SANDS ONE          120
             PROMOTION TO FN HERSTAL FOR 100 PIECES
14           OF PLASTIC SCALE MODELS OF THE SCAR

15    EXHIBIT 33 - PHOTOGRAPHS, BATES NOS.             124
             1120 THROUGH 1129
16

17    EXHIBIT 34 - OCTOBER 19, '06 LETTER TO           128
             MR. VASQUES
18

19    EXHIBIT 35 - POWERPOINT PRESENTATION TO          130
             ACU SPORT DEALER SHOW, JANUARY 20, 2007
20

21    EXHIBIT 36 - SHOT SHOW 2006 INFORMATION          132

22    EXHIBIT 37 - SOTECH 3.2                          133

23    EXHIBIT 38 - POPULAR MECHANICS,                  134
             SEPTEMBER, 2004
24

25    (Exhibit Index Continued:)
```

**DX200**

```
 1    EXHIBIT 39 - REPRINT OR COPY FROM JANES        135
              DEFENSE
 2

 3    EXHIBIT 40 - UNIDENTIFIED DOCUMENT             136

 4    EXHIBIT 41 - DEFENSE NEWS, OCTOBER 9,          137
              2006
 5

 6    EXHIBIT 42 - WWW.TOMAGONLINE.COM               137

 7    EXHIBIT 43 - 2008 EUROSATORY                   139

 8    EXHIBIT 44 - PHOTOGRAPHS, 318 THROUGH          140
              325
 9

10    EXHIBIT 45 - SHIPPING RE:  SCAR-LIGHT,         145
              SCAR 16 FLAT DARK GRIP, SNIPER VARIANT
11            BLACK

12    EXHIBIT 46 - SPREADSHEET                       148

13    EXHIBIT 47 - COMPUTER PROGRAM REGARDING        149
              SHIPPING
14

15    EXHIBIT 48 - COLLECTION OF DOCUMENTS,          150
              2615 THROUGH 2629
16

17    EXHIBIT 49 - FN HERSTAL MARKETING              154
              INFORMATION, 3/3/05
18
      EXHIBIT 50 - COMPUTER-GENERATED REPORT,        156
19            BATES NO. 2697 THROUGH 2700

20
      EXHIBIT 51 - HERSTAL-GENERATED DOCUMENT,       158
21            354 TO 357

22
      EXHIBIT 52 - FAXES 2694 TO 2696                160
23
      EXHIBIT 53 - PARTIAL CONTRACT, 369 AND         162
24            370
      (Exhibit Index Continued:)
25
```

```
 1          00103, BATES ENDING 417

 2
      EXHIBIT 55 - EQUIPMENT CUSTODY REPORTS,        165
 3          BATES 2701 THROUGH 2708

 4
      EXHIBIT 56 - LIMITED LICENSE AGREEMENT         171
 5          BETWEEN FNH USA AND ATK

 6
      EXHIBIT 57 - SCAR ACCESSORIES BETWEEN          173
 7          FNA USA AND ATK, BATES NO. 540 THROUGH
            548
 8
      EXHIBIT 58 - MASTER LICENSING AGREEMENT        175
 9          BETWEEN FN HERSTAL AND CYBER GUN

10
      EXHIBIT 59 INFORMATION REGARDING CYBER         175
11          GUN

12
      EXHIBIT 60 - OVERALL STUDY ON FIREARMS         177
13          INDUSTRY

14  (Exhibits retained)
                    WITNESS INDEX:
15
    CHARLES NEWTON MILLS, III:
16
          Examination by Mr. Bellamy                   7
17

18

19

20

21

22

23

24

25
```

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 7

```
 1    right hand, please.  Do you solemnly swear that the

 2    testimony you are about to give shall be the truth,

 3    the whole truth, and nothing but the truth, so help

 4    you God?

 5                  THE WITNESS:  I do.

 6                    CHARLES NEWTON MILLS, III,

 7    having been first duly sworn, on his oath, testified

 8    as follows:

 9                          EXAMINATION

10    BY MR. BELLAMY:

11        Q.    Sir, my name is Glenn Bellamy.  I'm an

12    attorney with Wood Herron and Evans in Cincinnati.

13    And I represent Clyde Armory in this case.

14              I know we said hello to each other this

15    morning, but I just wanted to explain that.

16              Could you state your full name and spell

17    your last name for us?

18        A.    Charles Newton Mills, III.  M-i-l-l-s.

19        Q.    Is it correct that you are, however,

20    commonly known as Bucky Mills?

21        A.    Yes, sir.

22        Q.    In what city and state do you reside?

23        A.    Fredrick, Maryland.

24        Q.    Have you had your deposition taken before?

25        A.    Yes, sir.
```

**DX200**

```
 1      Q.      How many times?

 2      A.      Six, seven.

 3      Q.      Were all of those in your capacity of your

 4  employment with FN?

 5      A.      No, sir.

 6      Q.      Which of those were other than in your

 7  capacity of your employment with FN?

 8      A.      Five or six.

 9      Q.      Can you tell me just, then, very generally,

10  if you would list -- start with the earliest one you

11  can recall.  What year was that?  And what did it

12  relate to?  Was it a civil case involving a dog bite

13  or whatever?

14      A.      The earliest one that I can remember off

15  the top of my head would have been from my previous

16  employment, Prince George County Police Department.

17      Q.      All right.

18      A.      And it would have been in reference to a

19  civil case.  A police use of force case.

20      Q.      Were all of your prior depositions in your

21  capacity with Prince George County Police?

22      A.      Five or six of them were; yes, sir.

23      Q.      Are there any that were not related to your

24  employment with Prince George County?

25      A.      Yes, one of them.
```

**DX200**

```
 1      Q.      And when was that?

 2      A.      2012.

 3      Q.      And what did it relate to?

 4      A.      (No response.)

 5      Q.      Was it -- let me back up:  Was it in your

 6   capacity as employment with FN?

 7      A.      Yes, sir.

 8      Q.      Did that have anything to do with the SCAR

 9   weapon system, the topic of that deposition?

10      A.      No, sir.

11      Q.      You probably already know these, but I'll

12   take just a half a minute to cover a few ground

13   rules -- as we sometimes call them -- that will make

14   this easier.

15              As I'm sure you are aware, this is being

16   taken down by the court reporter.  She can only record

17   oral answers.  So, I ask you to answer my questions

18   out loud and not by a shake or nod of the head,

19   because that is confusing; do you understand that?

20      A.      Understood.

21      Q.      And as I'm sure you know, "uh-huh" or

22   "un-huh" doesn't translate very well on paper.  And so

23   we may ask you to clarify that if that is your

24   custom.

25      A.      Understood.
```

**DX200**

1    Q.    The other thing, and I'm sure you are good

2   at this, is to wait until I finish my question, to

3   answer.  And I will try to do the same and not talk

4   over you because that also makes it impossible for the

5   court reporter and makes the transcript a mess.

6    A.    Understood.

7    Q.    Do you have any kind of health issue or

8   medication that you've taken that would impair your

9   ability to testify today?

10    A.    No, sir.

11    Q.    How are you currently employed?

12    A.    I'm employed by FNH USA, LLC.

13    Q.    And what is your current position?

14    A.    Manager Law Enforcement Sales and Support.

15    Q.    How long have you had that position?

16    A.    Since, I believe, around 2007.

17    Q.    And what are your duties in that position?

18    A.    My total overall duties?

19    Q.    What does that include?  Under that title,

20   what do you do?

21    A.    (No response.)

22    Q.    What are you responsible for?

23    A.    I am responsible for sales and support to

24   the law enforcement community of the FN product.

25    Q.    Do you interact -- in that capacity, do you

 1   interact directly with the end customer of the FN

 2   product?

 3       A.     If you refer to the end customer as the

 4   agency or police department; yes, sir.

 5       Q.     Yes, that's what I meant by --

 6       A.     Yes.

 7       Q.     -- by it.

 8              Do you also interact with distributors or

 9   retailers who sell to law enforcement agencies?

10       A.     Yes, sir, I do.

11       Q.     With respect to the support side, what sort

12   of support is involved in your job?

13       A.     I break it down into a couple of different

14   categories.  Armorer's training, operator's

15   training -- when we sell a product to a law

16   enforcement agency, they require support of that

17   product.  The support of that product would be

18   armorer's classes, so that they can armor their own

19   guns on a low level.

20              It would also be -- we call it new

21   equipment training, which is when an agency gets a new

22   product, we will give them the basic training on how

23   that product functions, so that they understand how to

24   properly operate that product.

25              We also then break it down into a parts

 1    side.  If they need spare parts, or if they have need

 2    a parts kit or special tools, we assist them in how to

 3    acquire those.

 4        Q.    The armorer training, do you do that

 5    training yourself?

 6        A.    Some of it I do.  We also have several

 7    other instructors that assist with the armorer's

 8    classes.

 9        Q.    The operator's training, do you do that

10    personally?

11        A.    Sometimes I still do that for major

12    agencies; yes, sir.

13        Q.    Prior to having the position of Manager of

14    Law Enforcement Sales and Support, did you have a

15    different position with FN?

16        A.    Yes, sir.

17        Q.    I was going to say:  Or a different title?

18        A.    (No response.)

19        Q.    What was that?

20        A.    I was the Director of Commercial and Law

21    Enforcement Sales and Support for FNH USA, Inc.

22        Q.    Were your duties any different as the

23    Director of Commercial and Law Enforcement Sales and

24    Support?

25        A.    Yes, sir.

1    Q.      How were they different?

2    A.      We were a small company then, so I was in

3  charge of the commercial and law enforcement sales at

4  that time, which meant that I also took on the

5  responsibility of all the commercial distributors --

6  on top of the law enforcement distributors.

7    Q.      And how long did you have that position?

8    A.      I believe from 2004 to 2007, thereabouts.

9            MR. BELLAMY:  I don't need to make this an

10  exhibit --

11   Q.      -- but I have seen an FN press release

12  dated October 30 of 2006, that announced:  Bucky Mills

13  has taken over the reins as Director of Sales

14  Marketing and Training for the FNH USA Law Enforcement

15  and Commercial Sales Division.  Does that sound --

16  October 30 of '06 -- does that sound about like the

17  time of the transition?

18   A.      From Deputy Director to Director, yes.

19   Q.      Okay.

20   A.      Yes, sir.

21   Q.      And then it was about a year later, I take

22  it, that there was a split between commercial sales

23  and the law enforcement sales?

24   A.      We started growing rapidly; yes, sir.

25   Q.      And so you then became Manager of the Law

```
 1    Enforcement side, correct?

 2        A.    Yes, sir.

 3        Q.    And someone else took over the commercial

 4    side?

 5        A.    Yes, sir.

 6        Q.    And who was that?  Who took over the

 7    commercial side?

 8        A.    I believe Chris Chambers.

 9        Q.    And before you were Director of Commercial

10    and Law Enforcement Sales, did you have another

11    position with FNH?

12        A.    Yes, sir.  Deputy Director of Commercial

13    Sales and Law Enforcement Sales.

14        Q.    As Deputy Director, did you report to

15    someone who was the Director?

16        A.    Yes, sir.

17        Q.    And who was the Director at that time?

18        A.    Rick Demilt, D-e-m-i-l-t.

19              COURT REPORTER:  Thank you.

20        A.    That is actually Richard, but known as

21    Rick.

22        Q.    Prior to being Deputy Director, did you

23    have another position with FN?

24        A.    Yes, sir.

25        Q.    And what was that?
```

**DX200**

```
 1      A.      Manager of Law Enforcement Training.  It

 2  might have been Sales and Training.  I do not remember

 3  the exact title off the top of my head.

 4      Q.      What were your duties in that position?

 5      A.      Pretty much what it says.  I handled and

 6  scheduled the training, and I believe the sales of law

 7  enforcement product for FNH USA.

 8      Q.      Before that position, did you have a

 9  different position with FN?

10      A.      In 2002, I was an Adjunct Instructor which

11  is a part-time type instructor for FNH USA.

12      Q.      Did you have other employment during that

13  time that you were an adjunct instructor?

14      A.      I'm not sure.  But I believe I retired from

15  Prince George County at the end of 2001 and then just

16  did adjunct instructing for FN in 2002.  But I'm not

17  100 percent sure at the very beginning if it didn't

18  overlap a little bit.

19      Q.      All right.  So is it correct that your

20  position as an Adjunct Instructor was your first

21  employment position with FNH USA?

22      A.      Yes, sir.

23      Q.      And prior to that, you said you had been in

24  the Prince George County, Maryland, Police Department?

25      A.      Correct, sir.
```

```
 1      Q.      And how long were you employed there?

 2      A.      Around 27 years.

 3      Q.      And was that continuous employment?

 4      A.      Yes, sir.

 5      Q.      All right.  Beyond high school, do you have

 6   any formal education?

 7      A.      Only through the police department, sir.

 8      Q.      In your employment in various positions

 9   with FNH USA, have you been involved with the SCAR

10   weapon system?

11      A.      Yes, sir.

12      Q.      And when was your first involvement?

13      A.      Either 2005 or 2006 -- either late 2005,

14   but for sure 2006.

15      Q.      And what was that first involvement?

16      A.      As it pertains to how?

17      Q.      Well --

18      A.      I just don't understand the question.  It's

19   not very specific.

20              MR. BELLAMY:  Fair enough.

21      Q.      You said that your first involvement with

22   the SCAR weapon system was either late 2005 or early

23   2006.

24              How was it that you came to be involved

25   with that product?
```

```
 1      A.      On two different fronts:

 2              The first front, I was the one that was

 3      handling all the ATF and State Department paperwork to

 4      import the SCAR into the country, that is one aspect

 5      of it.

 6              And then I was also the one that scheduled

 7      all the shows and demos where we would have shown that

 8      product to law enforcement and/or commercial

 9      customers, mostly law enforcement, at that time, or US

10      government customers non-DOD.

11      Q.      Was there someone else who handled the

12      government DOD sales?

13      A.      That would have been our military section;

14      yes, sir.

15      Q.      Do you know who in the military section was

16      involved with sales involving the SCAR weapon system?

17      A.      What year?

18      Q.      Let's start with the earliest that you are

19      aware of.

20      A.      2004, 2005, it would have been a

21      combination of several people from FNMI here, the

22      manufacturing plant and our military division -- the

23      exact names, I don't have.  I don't remember off the

24      top of my head from that far back.

25              Some of them that were involved would have
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 18 of 235    DX200.0018

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 18

     1   been Jim Owens, I believe Paul Evanco.

     2          Down here, Frank Spaniel that you talked to

     3   yesterday.  I believe Eric Brisbon from down here, and

     4   probably five to ten other people from both -- there

     5   was a lot of people involved.

     6      Q.    What about Brad Westcott?

     7      A.    He worked for FNH USA.  He was on our

     8   military side.  He would have been involved, but I do

     9   not remember what years.  He would have been one of

    10   the people involved, too.  I don't know what timeframe

    11   in years, though.

    12      Q.    So when you first got involved on the law

    13   enforcement and commercial side, what were you asked

    14   to do?

    15      A.    Are we talking on the sales?  Or the

    16   importation side?

    17      Q.    Let's talk about the importation side

    18   first.

    19      A.    Okay.  Can you ask me the question again

    20   now?

    21      Q.    Okay.  What were you -- when you became

    22   involved with the SCAR weapon system on the ATF

    23   importation side, ATF Department of State, what were

    24   you asked to do?

    25      A.    To complete the import paperwork and get

```
 1    approval from ATF to import prototype SCARs into the

 2    country.

 3         Q.    Was that the first importation of prototype

 4    SCAR weapons by FN?

 5         A.    By who?  There's three divisions of FN,

 6    sir.

 7         Q.    By any division of FN?

 8         A.    I cannot speak for FN Manufacturing down

 9    here.  I believe FN Herstal brought some in or shipped

10    some straight to Crane.  But then we were asked to

11    bring some into our facility to support the

12    development of the project.

13         Q.    So you submitted the requests for an

14    importation license?

15         A.    Yes, sir, Form 6 ATF.

16         Q.    And you did the Form 2 of importation

17    notice?

18         A.    The ATF Form 2; yes, sir.

19         Q.    Was there some point when it was no longer

20    your duty to take care of those ATF Form 6 and Form 2

21    paperwork for the SCAR weapon system?

22         A.    Yes, sir.

23         Q.    And when was that?

24         A.    I do not have an exact date.  I would guess

25    between 2007/2008 timeframe, but I'm -- without going
```

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 20 of 235    DX200.0020

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 20

1    back and looking, I'm not sure.

2        Q.    That's fine.  Was there someone else who

3    took over that responsibility?

4        A.    Yes, sir.

5        Q.    And who was that?

6        A.    Colleen Davis, D-a-v-i-s.

7        Q.    And what was her position?

8        A.    She was the Specialist for -- Compliance

9    Specialist for ATF State Department paperwork.

10       Q.    Was that a newly-created position at that

11   time?

12       A.    Yes, sir.  As we grew; yes, sir.

13       Q.    Did you have any involvement with the SCAR

14   program prior to the contract award by SOCOM in 2004?

15       A.    Personally?  No, sir, I did not.

16       Q.    We talked about the import compliance and

17   documentation side on the sales and training side.

18            What was your first involvement relating to

19   the SCAR weapon system?

20       A.    Repeat that, please.

21       Q.    On the sales or training side, as opposed

22   to the importation and paperwork compliance side, what

23   was your first involvement with relating to the SCAR

24   weapon system?

25       A.    On the sales and training side, to the best

Case 3:12-cv-00102-CAR     Document 146-146     Filed 07/23/15     Page 21 of 235     DX200.0021

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
30(b)(6)         Charles Newton Mills, III on 08/14/2013                    Page 21

 1    of my memory, would have been when I personally flew

 2    out with the SCAR-Light and SCAR-Heavy to the 2006

 3    Shot Show.

 4         Q.      And those weapons that you personally took

 5    to the 2006 Shot Show, were those prototype weapons?

 6         A.      What do you consider a prototype, sir?

 7         Q.      Well, let me ask:  Did FN, whichever branch

 8    would be appropriate, did FN consider them to be

 9    prototype?

10         A.      Again, we go by GEN 1, GEN 2, GEN 3.

11         Q.      What generation were those?

12         A.      To the best of my memory, without going

13    back and reviewing specific paperwork, a GEN 1 or GEN

14    2, probably.  In 2006, maybe a Gene 3.

15              THE WITNESS:  And the "GEN" is for

16    generation, ma'am, I'm sorry.

17              COURT REPORTER: Thank you.

18         Q.      So you took those to Shot Show 2006.  Did

19    you intend -- did you attend Shot Show in 2006?

20         A.      Yes, sir.  I would have had to.  They had

21    to stay in my possession.

22         Q.      And what were your -- what was your role at

23    Shot Show 2006?

24         A.      Could you be more specific, please?

25         Q.      Well, what were you expected to do at the

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 22 of 235    DX200.0022

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 22

 1  show?

 2      A.    2006 Shot Show, I was in charge to -- I was

 3  directed to make sure that the show ran correctly.

 4  All the people were positioned correctly.  That was

 5  one of my responsibilities, as either Director or

 6  Deputy Director.  I assigned people to different

 7  kiosks, different stations.  And I made sure they had

 8  the proper training for that product and that specific

 9  show.  I assigned myself to the SCARs for that whole

10  show.

11      Q.    And what were you expected to do in your

12  assignment to the SCARs?

13      A.    I don't understand what you mean by

14  "expected to do"?

15      Q.    Well --

16      A.    I'm sorry.

17      Q.    Since you were the one giving out the

18  assignments, what did you do?

19      A.    What were my responsibilities?

20      Q.    Yes.  That's a good way of putting it.

21      A.    Okay.  As it pertained to what?

22      Q.    To that kiosk.

23      A.    The SCAR kiosk?

24      Q.    Correct.

25      A.    When commercial, law enforcement dealers,

**DX200**

1   distributors would come through the booth, which

2   several thousand did, or law enforcement government

3   customers, end users, I would go over the features and

4   benefits of the product; meaning, the SCARs, the 556

5   and the 762 version, the light and the heavy.

6            I would discuss in detail the features and

7   benefits, what made this system different than any

8   other system that was out there at the time; that I

9   would answer their questions, which everybody had

10  questions.

11           I would break the system down to an

12  operator level; meaning, disassemble it to an operator

13  level.  Go over the parts, the commonality of the

14  parts between the 556 and the 762 version.  Answer a

15  lot of questions on the parts, the subassemblies, then

16  put the system back together.

17           Some of the end users in major distributors

18  would want to put it back together and take it apart

19  themselves; I would allow that if I knew them or

20  trusted them.  That was some of my duties working that

21  kiosk, sir.

22      Q.    Did you field questions about how the

23  weapon system was developed?

24      A.    Specifically, I don't remember that.  Very

25  good possibility, though, yes.

**DX200**

```
 1      Q.      Did you field questions about the SOCOM

 2   SCAR program?

 3      A.      I don't understand that question.

 4      Q.      Well, it's probably the same question as

 5   before.  Were there inquiries about the competition

 6   for the contract award in SOCOM's SCAR program?

 7      A.      I'm still not -- I'm sorry.  I'm just not

 8   following you.  I'm sorry.

 9      Q.      FN -- I believe FN Herstal, was involved in

10   a program created by USSOCOM to develop the SOF Combat

11   Assault Rifle system; is that correct?

12      A.      Yes, sir.

13      Q.      Did attendees at Shot Show 2006, have

14   questions about FN Herstal's participation in that

15   program?

16      A.      That is a possibility, but I do not

17   remember any specific questions at this time.

18      Q.      Did any of those attendees who were

19   non-military, non-DOD, inquire as to when the product

20   would be available to them?

21      A.      Ninety-five percent of the attendees were

22   non-military, non-DOD.  Ninety-five percent were

23   commercial or LE dealers or distributors from across

24   the country or law enforcement or non-DOD government

25   people, end users.
```

```
 1              The military contingent at Shot Show every

 2   year is less than five percent.  It's mostly -- it's a

 3   commercial show, where commercial FFL holders go in

 4   and look at product and commercial distributors that

 5   manufacturers are going to introduce or have already

 6   introduced.

 7              And I don't remember the second half of

 8   your question.  I'm sorry.

 9       Q.      My question was:  Did those attendees

10   inquire as to when the product would be available to

11   them?

12       A.      Yes, sir.

13       Q.      And what did you tell them?

14       A.      As soon as we could get it past -- approved

15   by ATF on the select fires, and then again as soon as

16   we could get a semiautomatic version approved through

17   ATF for commercial sales.

18       Q.      Did you have any estimate of time that you

19   shared with them as to when those approvals might

20   happen?

21       A.      To the best of my memory, and, again, it's

22   a guess right now, because I didn't review anything on

23   that, we were hoping to have it out sometime in

24   2006 -- to law enforcement and commercial.

25       Q.      And in the category of commercial, that
```

**DX200**

 1   would be the -- the semiauto-only version?

 2       A.      Yeah.   That's the only one that's allowed

 3   by ATF to be sold to civilians.   Yes, sir.

 4       Q.      Did you distribute any literature about the

 5   SCAR weapon system at Shot Show 2006?

 6       A.      I honestly do not remember.   I know I had

 7   them on display.   I honestly do not remember if I had

 8   literature for it at that time.

 9       Q.      Did attendees at that Shot Show ask about

10   the meaning of the term SCAR?

11       A.      Not to my memory, no, sir.   They were more

12   interested in what it was, how it worked, and when

13   could they get it.

14       Q.      But at that time, they could not get it

15   yet; is that correct?

16       A.      Are we talking the 2006 Shot Show?

17       Q.      Yes, sir.

18       A.      Correct.

19       Q.      Do you know when it actually did become

20   available -- let's say first to commercial law

21   enforcement?

22       A.      That's a totally different -- commercial is

23   totally different.

24       Q.      I'm sorry.   I'm sorry.   Exactly.   Do you

25   recall when it first became available to law

**DX200**

```
 1   enforcement agencies?
 2             MR. EHRLICH:  Objection as to what you mean
 3   by "available" in this context?  Vague.
 4        Q.    Do you recall when -- let me rephrase that
 5   then -- do you recall when any announcement was made
 6   that the SCAR rifle product was available for purchase
 7   by law enforcement agencies in the United States?
 8             MR. EHRLICH:  Objection.  That is still
 9   vague.  The problem is, it's offered at the show.
10   What you're distinguishing, I think, isn't clear.  You
11   see what I mean?  I think --
12             MR. BELLAMY:  Not really, but --
13        Q.    We just discussed that at the show, a law
14   enforcement agency could not yet place an order for
15   the product; is that correct?
16        A.    That's not what I said, sir.
17        Q.    Could a law enforcement agency have placed
18   an order for the product at Shot Show 2006?
19        A.    We had law enforcement agencies that
20   requested to get more information, requested test and
21   evaluation samples, so that they could run it through
22   their pace, their testing and decide if they wanted to
23   buy that system in 2006.  We did field those
24   inquiries.  Yes, sir.
25        Q.    By "field those inquiries," do you mean
```

DX200

```
 1    answer those questions?

 2        A.      Right.

 3        Q.      Or do you mean -- all right.  Was there a

 4    time that you actually made weapons available for

 5    tests and evaluation to law enforcement agencies?

 6        A.      What year?

 7        Q.      That is what I'm asking you.  Was there a

 8    time when that happened?

 9        A.      Yes, sir.

10        Q.      And when did that happen?

11        A.      Without going back and reviewing a lot of

12    paperwork, 2007/2008.

13                But in 2006, I did do numerous demos for

14    law enforcement agencies so that they could look at

15    the systems, test them; but they were not allowed to

16    keep them.  I kept them with myself.

17                So to answer your question, they were doing

18    -- I was doing demos, and we were doing modified

19    testing and evaluations in 2006 for major law

20    enforcement agencies.

21        Q.      Can you recall any ones in specific?  Any

22    ones specifically --

23        A.      (No response.)

24        Q.      -- in 2006?

25        A.      Calvert County Sheriff's Office, which is
```

**DX200**

```
 1   Maryland.  US Customs and Border Patrol, US Secret

 2   Service, US Department of State, US Marshal's Office.

 3               I want to say about 30 SWAT teams when I

 4   did SWAT Roundup in 2006.  We had it there, and we let

 5   them all shoot it, and it was 30 SWAT teams --

 6   international and US -- it might have been 40 --

 7   somewhere between 30 and 40 SWAT teams.  They all had

 8   an opportunity to shoot it, look at it, ask questions

 9   about it.

10               And there's probably at least another 15 to

11   30 demos that I did that I honestly just don't

12   remember right now in 2006.

13       Q.     You mentioned SWAT Roundup, is that what

14   you called it?

15       A.     Yes, sir.

16       Q.     Do you recall what month that was in, in

17   2006?

18       A.     Either -- somewhere between October to

19   December.  It changes every year, but somewhere in

20   that timeframe, late fall, early winter, 2006.  I

21   could not give you an exact date, sir.

22       Q.     During any of those presentations of the

23   SCAR weapon system to law enforcement agencies, did

24   you field inquiries as to when it would be available

25   for them to purchase?
```

**DX200**

```
 1      A.      Yes, sir.

 2      Q.      And what did you tell them?

 3      A.      That I did not have a firm date, but as

 4   soon as I did, I would get back in contact with each

 5   agency that showed an interest and let them know that

 6   it was becoming available.

 7      Q.      When did it become available for law

 8   enforcement agencies to purchase?

 9      A.      Again, without going back and reviewing

10   paperwork for exact timeframes, I would say we started

11   taking orders sometime in 2007 or 2008.

12              We had to wait until we shipped a certain

13   amount of them to SOCOM first, US Special Forces had

14   first -- the first ones of everything.  And then it

15   was law enforcement's turn.

16      Q.      Was there any operational difference in the

17   product between what was shipped to SOCOM and what was

18   then shipped to law enforcement agencies?

19      A.      What do you mean by "operational

20   difference"?

21      Q.      Well, was there any mechanical difference

22   in those products?

23      A.      I'm not an engineer, but I do believe it

24   was the same product, the same select fire systems

25   that the military were getting, US law enforcement was
```

1   getting in that timeframe.

2   Q.      Do you recall how many of the SCAR weapon

3   systems -- and by that I mean collectively the SCAR-

4   Light or SCAR-Heavy -- do you remember how many units

5   were delivered to SOCOM before any sales were made to

6   law enforcement agencies?

7           MR. EHRLICH:  Objection.  Foundation.

8   Q.      Do you understand my question?

9   A.      No, sir.

10  Q.      You testified a moment ago that SOCOM had

11  dibs on the first so many units of product before you

12  could start selling them to law enforcement agencies;

13  is that correct?

14          MR. EHRLICH:  I object.  I think it

15  mischaracterized what he said, but go ahead.

16  A.      Ask the question again.  I'm sorry.

17  Q.      I believe that you testified that a certain

18  number of units, the first run of some number of units

19  were to be delivered to SOCOM before FN would make

20  sales to law enforcement agencies; is that correct?

21  A.      Yes, sir.

22  Q.      And do you know how many units that was?

23          MR. EHRLICH:  Objection.  Foundation.

24  Q.      Do you know how many units that was to be

25  delivered to SOCOM before sales could be made to law

```
 1   enforcement agencies?

 2              MR. EHRLICH:  Same objection.

 3        Q.    You understand my question?

 4        A.    Yes, sir.  Without reviewing numbers, no, I

 5   do not know.

 6              MR. EHRLICH: Glenn, I think that there is

 7   an -- and I'll just clarify this -- because it's, you

 8   know, I'm not sure that there was a number.  I think

 9   he said that they had first dibs.

10              So maybe when the demand supply without a

11   set number in advance, was met, then there was no --

12   there was nothing in the pipeline for them.

13              So I don't know if it was a number.  I'm

14   just clarifying that for you.

15              MR. BELLAMY:  All right.  That's fine.

16        Q.    Let's look at the commercial side.  At Shot

17   Show 2006, when commercial purchasers were inquiring

18   when it would -- when a SCAR product would be

19   available to them -- by that I mean a semiautomatic

20   only, what did you tell those inquiries?

21        A.    The same as I answered before, sir.

22        Q.    And was that that you had hoped that it

23   would be in 2006?  Or was it something later than

24   that?

25        A.    I do believe I mentioned before that we had
```

**DX200**

```
 1    hoped it would be in 2006.

 2         Q.    Do you recall when it was that a

 3    semiautomatic-only version actually became available

 4    for commercial sale?

 5         A.    I didn't understand the very first part of

 6    that questions.  I'm sorry.

 7         Q.    Do you know when a semiautomatic-only

 8    version of the SCAR system became available for

 9    commercial sale?

10         A.    Again, without reviewing, I believe

11    sometime in 2008.

12         Q.    You talked to me about several

13    presentations or demonstrations that you made to

14    various law enforcement agencies in 2006 of the SCAR

15    system --

16         A.    Yes.

17         Q.    -- did you make any presentations to -- on

18    the commercial side after Shot Show 2006 and during

19    the rest of 2006?

20              MR. EHRLICH:  Objection.  It

21    mischaracterizes his testimony.  He said several.  I

22    think he gave you a long list and said there were 15

23    to 30 more.

24              With that correction, I'll allow him to

25    answer.
```

**DX200**

```
 1              THE WITNESS:  I'm sorry.  The question?

 2      Q.      Whatever the number of presentations you

 3  made to law enforcement agencies in 2006 relating to

 4  the SCAR weapon system, were there any presentations

 5  made other than to law enforcement agencies?  In other

 6  words, on the commercial side?

 7      A.      Yes, sir.

 8      Q.      And what were those?

 9      A.      I personally showed the system and did

10  presentations, features and benefits of the product to

11  commercial distributors, our commercial distributors

12  in 2006.

13              We also displayed it at the NRA show, which

14  is a strictly commercial show in 2006.

15      Q.      What was displayed at the 2006 NRA show?

16      A.      SCAR-Light, SCAR-Heavy.

17      Q.      Was it the same units that were displayed

18  at the Shot Show that year?

19      A.      Without reviewing paperwork, I could not

20  tell you if it was the exact same firearm.

21      Q.      Was it the select five version that was

22  displayed at the NRA show?

23      A.      Yes, sir.

24      Q.      Was any literature distributed at the 2006

25  NRA show relating to the SCAR weapon system?
```

**DX200**

```
 1      A.      I do not remember any literature, sir, at
 2  this time.
 3      Q.      The AUSA show in 2006, did you attend that?
 4      A.      I went there for meetings; yes, sir.
 5      Q.      Did you display any SCAR weapon systems at
 6  that show?
 7      A.      Did I personally display them, sir?
 8      Q.      Yes.
 9      A.      No, sir.  I personally did not display
10  them.
11      Q.      Did anyone from any division of FN display
12  SCAR weapon systems at the AUSA show in 2006?
13      A.      The SCAR firearms SCAR-Light and SCAR-Heavy
14  were on display in 2006 at the AUSA show.  Yes, sir.
15      Q.      Who attended the AUSA show?
16      A.      I know some of the attendees:  US
17  Department of Defense personnel, local law
18  enforcement, US government law enforcement, US
19  Department of State.
20              Pretty much all of the lettered agencies in
21  the Washington, DC, area.
22      Q.      Is it correct that that show is not
23  intended for the commercial side of the industry?
24      A.      That's a correct statement.  Yes, sir.
25      Q.      The NDIA Small Arms Symposium in 2006, did
```

**DX200**

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 36

```
 1   you attend that?

 2       A.    I do not recall attending that one, sir.

 3       Q.    Do you know whether anyone from any of FN's

 4   branches attended that symposium in 2006?

 5       A.    I would have to assume, but I do not know

 6   personally, sir.

 7       Q.    Do you know whether any presentations were

 8   made with respect to the SCAR weapon system at that

 9   symposium in 2006?

10       A.    Do I personally know?

11       Q.    Yes.

12       A.    No, sir.  Personally, I do not.

13       Q.    There is another event -- I'm not positive

14   on how it's pronounced, Eurosatory; is that correct?

15       A.    That's close.  Yes, sir.

16       Q.    And that event in 2006, did you attend

17   that?

18       A.    No, sir.  I did not.

19       Q.    Do you know whether the SCAR weapon system

20   was displayed at that event in 2006?

21       A.    Yes, sir.  It was.

22       Q.    Where did that event take place?

23       A.    I don't know the specific town or location.

24   I know it was -- I would be guessing -- I know it was

25   over in Europe.  I would be guessing.
```

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 37 of 235    DX200.0037

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)            Charles Newton Mills, III on 08/14/2013            Page 37

```
 1      Q.     I was going to say:  Can you narrow it down
 2   to the continent?  It's in Europe; is that right?
 3      A.     Yes, sir.
 4      Q.     All right.
 5             MR. BELLAMY:  If it's okay with you, let's
 6   take a short break, and I will organize some documents
 7   so that we can proceed with those.
 8             THE WITNESS:  Yes, sir.
 9             MR. BELLAMY:  Five or ten minutes.
10             MR. EHRLICH:  Fine.  Sure.
11             (OFF THE RECORD.)
12             MR. BELLAMY:  Okay.  Let's go back on the
13   record.
14      Q.     (BY MR. BELLAMY:)  Mr. Mills, I'm handing
15   you what has been marked as Exhibit 1 to Mr. Spaniel's
16   deposition yesterday.
17             And we will be using some of the same
18   exhibits here, and we will continue on with our
19   numbering system today.
20             Have you seen this document before?
21      A.     I believe I have seen something that looks
22   like this.  Yes, sir.
23      Q.     Clyde Armory's Notice of Deposition under
24   Rule 30(b)(6), which is a Rules of Civil Procedure.
25   It's a Notice of Deposition to FN Herstal as a party
```

```
 1   who is then asked to designate certain individuals to

 2   testify with respect to a list of topics that are

 3   provided there.

 4           I would like to turn your attention to Page

 5   3 of that document, and Item No. 15 near the bottom

 6   which lists the topic:  The identification, selection

 7   and use by FN of the SCAR brand in 2002 to 2003 as

 8   referenced in Plaintiff's Supplemental Answer to

 9   Interrogatory No. 2, dated March 28, 2013.

10           I will now hand you what has been marked as

11   Exhibit 5, which I will represent to you includes

12   Plaintiff's Supplemental Answer to Interrogatory No.

13   2, that was just mentioned in the prior document.

14           And I would ask you to turn in Exhibit 5 to

15   the bottom of Page 9, Interrogatory No. 2, and then on

16   Page 10 where that Answer to that Interrogatory

17   begins.

18           First, let me ask:  With respect to the

19   Topic No. 15 identified in Exhibit 1:  The

20   identification, selection and use by FN of the SCAR

21   brand in 2002 to 2003, are you prepared to testify on

22   that topic today?

23       A.    I believe that Frank Spaniel was to testify

24   on that topic, sir.

25       Q.    I believe that both of you were indicated
```

**DX200**

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)                Charles Newton Mills, III on 08/14/2013                Page 39

```
 1    as having information.

 2              I did ask Mr. Spaniel about it, but I'll

 3    ask you to the extent that you have any knowledge of

 4    it?

 5         A.    My knowledge started in 2004, sir --

 6         Q.    Okay.

 7         A.    -- to the best of my memory.

 8         Q.    All right.  Let me refer you then to

 9    Exhibit 5, which you have in front of you.  And there

10    on Page 10, in the middle of the second paragraph

11    where it says:  A display of the SCAR brand rifle

12    occurred in the FNH USA Stand Show in April, 2004,

13    held in Paris, France, with international persons

14    attending the show.

15              Can you tell me -- what is the Stand Show?

16         A.    I do not know of a Stand Show.  This would

17    make me think that whoever wrote this was talking

18    about the Eurosatory show in Paris, France.  And that

19    the SCAR was placed on a stand in the FN booth at that

20    show.

21         Q.    Was the -- was the FN SCAR rifle displayed

22    at the Eurosatory show in 2004?

23         A.    I did not go to that show, sir, so I have

24    no personal knowledge.  But I was advised that a

25    prototype of that system was available.
```

```
 1      Q.     In April of 2004, FN had not been awarded

 2   the SOCOM SCAR contract yet, had it?

 3      A.     Correct.

 4      Q.     So in April of 2004, is it correct that

 5   there was still the chance that some other

 6   manufacturer would be awarded the SCAR contract from

 7   SOCOM; is that correct?

 8             MR. EHRLICH:  Objection.  Confusing,

 9   foundation.

10      Q.     Do you understand my question?

11      A.     Not exactly.

12             MR. BELLAMY:  Okay.

13             THE WITNESS:  Excuse me.

14      Q.     In April of 2004, the SOCOM SOF Combat

15   Assault Rifle contract not having been awarded yet,

16   there was still the possibility that some other

17   manufacturer other than FN would be awarded that SOCOM

18   contract; isn't that correct?

19      A.     Was that a possibility?  Yes, sir.

20      Q.     Handing you what was previously identified

21   as Exhibit 6 -- and I would like to ask you to look at

22   that.

23             THE WITNESS:  Would you like one and five

24   back, sir?

25             MR. BELLAMY:  That would be fine.  Thank
```

**DX200**

 1    you.

 2        Q.      Have you seen this document before, sir?

 3        A.      I might have seen something like this when

 4    preparing for the case, sir.

 5        Q.      The photograph in the center near the top

 6    of the first page of Exhibit 6, do you recognize what

 7    is shown in that photograph?

 8        A.      It is a SCAR with a EGLM underneath of it

 9    attached to it with a magazine.

10        Q.      Do you know where that photo was taken?

11        A.      It looks like one of our -- it looks like

12    our booth at one of our shows, sir.

13               With the stands -- looking at the stands

14    and the placard, it's definitely our booth at one of

15    our shows.

16        Q.      I would like you to look at the third page

17    of that document in the photograph shown there.  Do

18    you recognize what is shown in that photograph?

19        A.      It's not a very good picture of the

20    firearm, but it's a SCAR.  By looking at the magazine,

21    it's a SCAR-Heavy or 762 version.

22        Q.      Do you know where that photo was taken?

23        A.      Again, it looks like -- by looking at the

24    stand and the markings -- it was at one of our major

25    shows -- with just looking at this very poor quality

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 42

1    picture, that's all I can tell you on it.

2         Q.     I see two placards visible in that photo.

3    The one that is near the top says SCAR-H; is that

4    correct?

5         A.     Yes, sir.  It does.

6         Q.     And that refers to the SCAR-Heavy?

7         A.     (No response.)

8         Q.     Is that correct?

9         A.     What do you mean by that?

10        Q.     Well, SCAR-H, does that mean the same thing

11   as SCAR-Heavy?

12        A.     For FNH USA it does.  It's the 762 version

13   of the SCAR.

14        Q.     Does it have a different meaning for FN

15   Herstal?

16        A.     I do not believe so.

17        Q.     Do you believe that SCAR-H has a different

18   meaning than SCAR-Heavy to others as it relates to a

19   rifle?

20        A.     No, sir.

21        Q.     The placard to the right is partially

22   obscured by the end of the barrel.

23        A.     In the muzzle break?  Yes, sir.

24        Q.     Yes.  But I believe what's partially

25   obscured says FN Herstal; is that correct?

**DX200**

```
 1                 MR. EHRLICH:  Are you asking him

 2    independent -- well, go ahead.  Go ahead.

 3        Q.      Well --

 4        A.      It looks like it could be, yes.

 5        Q.      Okay.

 6        A.      But most of it's blocked out.

 7        Q.      But at the bottom, it says:  For USSOCOM;

 8    is that correct?

 9        A.      That's highlighted outside of the FN logo

10    football.  Yes, sir.

11        Q.      Yes.  It's partially on top of the logo; is

12    that correct?

13        A.      Yes, sir.

14        Q.      Below that photo it says:  On February,

15    2006, at the Las Vegas Shot Show in Nevada, FNH

16    announced plans to introduce within two years, (circa

17    2008) a semiautomatic version of the SCAR modular

18    rifle system designed for the law enforcement and

19    commercial markets.

20                Is that an accurate statement?  Not did I

21    read it correctly.  But is the content of that

22    statement accurate?

23        A.      That within two years of this --

24        Q.      Yes.

25        A.      -- we were going to come out with a
```

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)   Charles Newton Mills, III on 08/14/2013   Page 44

```
 1   semiautomatic version?

 2       Q.     Yes.

 3       A.     Worse-case scenario, yes.  We wanted to

 4   come out within two years of that.

 5       Q.     Handing you what's been marked previously

 6   as Exhibit 4 to Mr. Spaniel's deposition, do you

 7   recognize this document?

 8       A.     I do believe I have seen something like

 9   this as I was reviewing paperwork.

10       Q.     In 2006, I believe you testified you were

11   either Deputy Director or Director of Commercial and

12   Law Enforcement Sales for FNH; is that correct?

13       A.     Actually, I testified today, but that in

14   2006 I --

15       Q.     Okay.  Previously today?

16       A.     Yes.

17       Q.     In that position, would you see press

18   releases issued by FNH USA that related to products

19   that you had responsibility for selling?

20       A.     Yes, sir.

21       Q.     Do you recall seeing this particular press

22   release in March of 2006?

23       A.     Sitting here today, I can't tell you that

24   100 percent.  But the probability is high, yes.

25       Q.     The title -- this press release indicates
```

```
 1   at the top:  For immediate release, March 2, 2006; is
 2   that correct?
 3        A.    You're characterizing it as a press
 4   release.  It says:  For immediate release, March 2,
 5   2006, correct.
 6        Q.    Is this, in fact, a press release?
 7        A.    What do you consider a press release, sir?
 8        Q.    I don't know.  What is this document then?
 9   What would you call it?
10             MR. EHRLICH:  Objection.  He's not
11   necessarily familiar with it.
12             MR. BELLAMY:  Okay.
13        A.    I'm not sure what marketing would
14   technically call it.  It looks like a release, a
15   statement of information that writers, reporters could
16   extract from, if they are going to do an article or
17   something.
18        Q.    Near the top, it indicates contacts and
19   lists Barbara Sadowy, S-a-d-o-w-y.
20        A.    Very good.  Yes.
21        Q.    Is that name often mispronounced?
22        A.    Yes, sir, it is.
23        Q.    Who is Ms. Sadowy?
24        A.    At the time, she was the Marketing Director
25   for FNH USA.
```

**DX200**

1     Q.     And below that, it says:  David A.

2    Golliday?

3     A.     Very good.  Two for two.

4     Q.     And --

5            MR. EHRLICH:  Except it's Golliday, Jr.

6     Q.     Golliday, Jr.?

7     A.     Yes, sir.

8     Q.     And do you know what his position was in

9    2006?

10    A.     An independent contractor for FNH USA, sir.

11    Q.     Do you know what his role was as an

12   independent contractor?

13    A.     I know that he dealt with the marketing

14   department and handled things with marketing.

15    Q.     Below that centered with the appearance of

16   a title it says:  The making of the 21st Century

17   Assault Rifle, SCAR SOF Combat Assault Rifle; do you

18   see that?

19    A.     Yes, sir.  I do.

20    Q.     Below that, there is a paragraph that --

21   well, let's start with the first paragraph, it says:

22   McLean, Virginia -- FN Herstal is now entering the

23   final phase of the development of the SCAR SOF Combat

24   Assault Rifle.  The first assault rifle procured

25   through an open competition since the M4/M-16; do you

**DX200**

1    see that?

2        A.      Yes, sir.  I do.

3        Q.      In this case, after the word SCAR, it

4    says:  SOF Combat Assault Rifle.  Do you know why that

5    second part was included with the term SCAR?

6        A.      I didn't draft this document, so it would

7    be pure speculation, but I would take it that it's

8    Special Operations Forces.

9        Q.      Well, the SOF Combat Assault Rifle, that

10   entire phrase, do you know why that was included after

11   the term SCAR?

12       A.      Again, I didn't draft this.  So no, sir.

13              MR. EHRLICH:  Speculation.

14       Q.      Below that is a heading:  Project

15   Timeline.  And then it lists the timeframe of 2002 to

16   2003, a search begins for a new SOF assault rifle.

17              In that first paragraph, it mentions:

18   Joint operational requirements document.  And in

19   parens it abbreviates that (JORD); do you know what a

20   JORD is?

21       A.      Other than that it's a military document

22   that outlined specific requirements for a specific

23   product, no, sir.

24       Q.      Are you familiar with the JORD for the SCAR

25   program?

```
 1      A.      Personally?  No, sir.

 2      Q.      Turning to the second page where it begins

 3  with the heading:  SCAR Requirements.  If you would

 4  look at those -- that -- those paragraphs on that

 5  page, can you tell me, do those -- what is shown on

 6  that page under that heading:  SCAR Requirements?

 7          Do those appear to be specifications in the

 8  JORD that was issued by SOCOM for the SCAR project?

 9          MR. EHRLICH:  Objection.  I'm sorry --

10  objection.  He said he wasn't familiar with the JORD

11  documents.  So, I don't know, it calls for speculation

12  and conjecture.

13          MR. BELLAMY:  Okay.  Let me try to rephrase

14  that then.

15      Q.      Are you familiar with what the requirements

16  were specified by SOCOM for the SCAR SOF Combat

17  Assault Rifle program?

18      A.      I do know that there were requirements.

19  And I do remember seeing some paperwork on them.

20          But to tell you these were the exact

21  requirements without reviewing that paperwork, I

22  couldn't answer that question.

23      Q.      Have you reviewed the solicitation for

24  proposal issued by SOCOM relating to the SCAR rifle

25  system?
```

```
 1      A.      That is a possibility.  I reviewed about --
 2  I don't know -- 15 inches of paperwork.
 3              I don't honestly remember everything I
 4  reviewed.  But that is a good possibility.
 5              MR. BELLAMY:  Let's mark this next.
 6              (EXHIBIT 12 MARKED.)
 7              COURT REPORTER:  Okay.  This will be
 8  Exhibit 12.
 9              THE WITNESS:  Thank you, ma'am.
10              COURT REPORTER:  Uh-huh.
11      Q.      You have been handed what's been marked as
12  Exhibit 12.  Are you familiar with this document?
13      A.      I'm sorry.  Give me a minute to review it.
14      Q.      Absolutely.
15      A.      I believe I might have seen this in the 15
16  inches of paperwork I reviewed, sir.
17      Q.      Let me have you confirm for me, I believe
18  -- well, the title says:  The Special Operations
19  Command Conducts First Critical Design Review For the
20  Special Operations Forces Combat Assault Rifle (SCAR),
21  With the Down Select of FN Herstal, Held at FN Herstal
22  Headquarters in Herstal, Belgium, 15 Through 17
23  December, '04; is that correct?
24              MR. EHRLICH:  Well, is that what it reads?
25  Or --
```

**DX200**

```
 1      Q.      Is that what it reads?

 2              MR. EHRLICH:  That's what the document

 3   reads?

 4      A.      Correct.  That's what it reads.

 5      Q.      And the publication date indicates 20

 6   January '05; is that correct?

 7              MR. EHRLICH:  You mean --

 8      Q.      Is that what it says?

 9      A.      That's what this document states.  Yes,

10   sir.

11      Q.      Let me ask something that is outside of

12   this document:  When did any branch of FN first use

13   the term SCAR as a brand for a product?

14              MR. EHRLICH:  I have an objection -- that

15   he's not a trademark attorney, but --

16      A.      Without reviewing the 15 inches of

17   documentation, I would say somewhere in the 2003/2004

18   timeframe.

19      Q.      And what was the nature of that use of SCAR

20   as a brand?

21      A.      Again, without reviewing the paperwork, I

22   would say that it was on the side of the firearm.  The

23   SCAR brand was marked on the side of the firearm.  The

24   SCAR brand would have been, as you saw in pictures,

25   the label or a placard at an event, a show, those two
```

**DX200**

 1    for sure.

 2        Q.    In 2003, FN had not yet been awarded a

 3    contract from SOCOM for the SOF Combat Assault Rifle,

 4    correct?

 5        A.    I have already answered that question, but

 6    the same answer, correct.

 7        Q.    Is it your testimony that FN was

 8    nevertheless using SCAR as a brand on a rifle in 2003?

 9        A.    Or 2004.

10        Q.    But in any event, prior to the award of the

11    SOCOM contract?

12            MR. EHRLICH:  Objection.  Asked and

13    answered.

14        A.    Yes, I have already answered that.  And

15    yes, sir.

16        Q.    Do you know -- were any other rifle

17    manufacturers using SCAR as a brand for a rifle in

18    that 2003/2004 time period?

19        A.    Personally?  No, sir.

20        Q.    Were you aware of any other manufacturers

21    competing in the SOF Combat Assault Rifle program that

22    SOCOM was running?

23        A.    As solicitation?

24        Q.    Yes.

25        A.    Yes, sir.

**DX200**

```
1       Q.      What other companies?

2       A.      Specifically, I do not know.  I do believe

3    there was eight or nine companies that submitted

4    product to be tested.

5       Q.      Do you know if any of them used SCAR as a

6    brand on the rifles they submitted in that

7    competition?

8       A.      Again, no, sir.  I do not.

9       Q.      Did FN use the term SCAR as a brand for a

10   rifle at any time prior to its participation in the

11   SOCOM SOF Combat Assault Rifle program?

12      A.      To my knowledge, no, sir.

13      Q.      When you say that FN used the term SCAR as

14   a brand on rifles in that 2003 to 2004 time period, do

15   you mean by that, that it -- that the term SCAR

16   indicated who the manufacturer was of the product?

17      A.      I don't think I really understand the

18   question, sir.

19      Q.      Well, when FN put the term SCAR on rifles

20   in the -- on at least one rifle --

21      A.      Yes, sir.

22      Q.      -- in the 2003/2004 time period, was that

23   term SCAR put on the rifle as an indicator of who

24   manufactured the rifle?

25              MR. EHRLICH:  Objection.  Foundation.
```

**DX200**

```
 1      Q.      Do you understand my question?

 2      A.      I think so.

 3      Q.      You can go ahead and try to answer.

 4              MR. EHRLICH:  Same objection.  Go ahead.

 5              THE WITNESS:  Okay.

 6      A.      I believe that FN put that SCAR markings on

 7   their firearm to identify that firearm so that the

 8   public, and whoever saw that firearm, would realize

 9   it's an FN SCAR brand firearm.

10      Q.      Why was the term SCAR selected to use as a

11   brand?

12      A.      I do not have personal knowledge of that.

13   From things I believe I might have seen, the SCAR was

14   from a program -- one of many acronyms from a program,

15   and -- that FN decided to use to identify their

16   product and brand their product to show the difference

17   between their product and other products that were

18   submitted.

19      Q.      If other manufacturers were submitting

20   products as part of SOCOM's SOF Combat Assault Rifle

21   program, how would the designation SCAR differentiate

22   FN's from another manufacturer's product that was

23   submitted in that same program?

24              MR. EHRLICH:  Objection.  Foundation,

25   speculation, compound.
```

**DX200**

```
 1        Q.      Do you understand my question?

 2        A.      No, sir.

 3        Q.      If FN put the term SCAR on rifles it

 4   entered in the SOCOM SCAR competition, how would that

 5   term differentiate the SCAR rifle from -- or the FN

 6   rifle from other manufacturers' entries in the SCAR

 7   competition?

 8              MR. EHRLICH:  Objection.  Mischaracterizes

 9   his testimony.  He said if they did it.  FN did do

10   it.  That was his testimony.  And it also calls for

11   hypothetical foundation.

12        Q.      Do you understand my question?

13        A.      Yes, sir.

14        Q.      Can you answer it, please?

15        A.      It would be pure speculation as to what the

16   other manufacturers actually had on their firearms,

17   because I'm not sure what markings, if any, they had

18   on their firearms they submitted.

19              I can only attest to what FN had on their

20   firearms when they submitted.

21        Q.      Firearms that FN submitted, did it also say

22   FN Herstal on the firearm?

23        A.      On one side it would have, sir, to be

24   imported into the country.  Yes, sir.

25              MR. BELLAMY:  Okay.
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 55 of 235    DX200.0055

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 55

```
 1              THE WITNESS:  Are you done with this one,
 2    sir?
 3              MR. BELLAMY:  Yes.
 4       Q.      In your personal opinion, wasn't it rather
 5    presumptuous on the part of FN to use the term SCAR as
 6    a brand when it had not yet been awarded a contract in
 7    SOCOM's SCAR program?
 8              MR. EHRLICH:  Objection.  Calls for opinion
 9    of a fact witness and calls for speculation.  Also,
10    it's argumentative and vague and compound.
11       Q.      Do you have an opinion?
12       A.      I'm not here for my personal opinion, sir.
13    And I don't have an opinion at that time or at this
14    time on that.
15       Q.      All right.  I'm handing you, again, what's
16    been marked as Exhibit 4.  We talked about this
17    earlier.
18              If I could have you turn -- this has a
19    section starting on the first page marked:  Product
20    Timeline -- if I could have you turn to the fourth
21    page.  It begins:  SCAR Contract Award.  And it has
22    sub-headings.  The first one is January, 2003.  And it
23    references when SOCOM prepared a SCAR Sources Sought
24    announcement.
25              Do you know whether that January, 2003, is
```

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 56 of 235    DX200.0056

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 56

```
 1   an accurate timeframe for when SOCOM issued a SCAR

 2   Sources Sought announcement and the related

 3   solicitation that is referenced there; do you know

 4   whether the January, 2003, date is correct?

 5       A.     Without reviewing the paperwork you are

 6   referring to, it would be speculation, sir.

 7       Q.     Well, the only paperwork I was referring to

 8   is this document, which appears to have been created

 9   by FNH USA.  Do you -- was this created by FNH USA?

10              MR. EHRLICH:  I'm a little confused here.

11   I will let that question go.

12              MR. BELLAMY:  Okay.

13              MR. EHRLICH:  If he can --

14       Q.     Was this document, Exhibit 4, was this

15   created by FNH USA?

16       A.     It looks like it was, sir.

17       Q.     So then I'm asking you whether the

18   statement in that document saying that January, 2003,

19   was when this SCAR solicitation was created; do you

20   know -- is that an accurate statement?

21       A.     Without looking at Solicitation No.

22   N001164-03-R-0025, I cannot tell you 100 percent that

23   that is an accurate date.

24       Q.     The next heading, August 5 through 7,

25   2003:  Preliminary Market Research Briefing.  And then
```

```
 1    says:  SCAR Industry Day Conference; do you know

 2    whether that accurately reflects the dates on which

 3    this preliminary market research briefing took place?

 4         A.      Without speaking to Ms. Sadowy, I could

 5    not -- I would be speculating on the answer there,

 6    sir.

 7         Q.      Is Ms. Sadowy still employed by FN?

 8         A.      No, sir.  She is not.

 9         Q.      Do you know whether she has retired?

10         A.      I know that she no longer works for FN.

11    She became married and now has two children and is

12    raising two children, sir.

13         Q.      Further down the page, it says:  June,

14    2004, FN Herstal Releases Prototype Weapons to NCSW

15    Crane.

16              Do you know whether that is accurate as to

17    the June, 2004, being when FN Herstal released

18    prototype weapons under the SCAR program?

19         A.      I know that there were prototype firearms,

20    SCAR firearms delivered to Crane in 2004.

21              Exact amounts?  Honestly, without reviewing

22    the paperwork, I couldn't tell you, sir.

23         Q.      Do you know whether those prototype weapons

24    include the -- included the term or the designation

25    SCAR on the weapons themselves?
```

**DX200**

```
 1      A.      Do I personally know that?

 2      Q.      Yes.

 3      A.      Personally?  No, sir.

 4      Q.      Do you have information as to whether they

 5   were?

 6      A.      Everything that came in to the United

 7   States would have been marked FN Herstal on one side.

 8              SCAR -- at that time, SCAR on the other

 9   side, either an L or H, SCAR-Light or SCAR-Heavy.

10      Q.      And how is it that you know that to be the

11   case?

12      A.      Per ATF regulations.

13      Q.      Did ATF regulations require that the term

14   SCAR be engraved on the rifle?

15      A.      ATF regulations require that the model, the

16   caliber and the manufacturer be engraved on the rifle,

17   along with the serial number.

18      Q.      And was SCAR the model name given to the

19   rifles that it imported for purposes of the SOF Combat

20   Assault Rifle program?

21              MR. EHRLICH:  Objection.  He said, I think,

22   that he was saying that there was more that -- on both

23   sides of the rifle.  And it also calls for, you know,

24   speculation or understanding of what a model is

25   -versus- a brand -versus- you know, other things.
```

**DX200**

```
 1                    Go ahead, if you understand the question,
 2    foundation.
 3        A.      You are going to have to repeat that.
 4    Sorry.
 5        Q.      You just testified that ATF regulations
 6    required, among other things, that the model be
 7    engraved on a rifle that is imported, correct?
 8        A.      Yes, sir.
 9        Q.      And in the case of these prototype weapons
10    that we were just discussing, that FN Herstal imported
11    for delivery to NCSW Crane, as part of its
12    participation in the SCAR program with SOCOM, that
13    SCAR was engraved on those rifles; is that correct?
14        A.      That's a long question.
15        Q.      It is.
16                THE WITNESS:  Could you repeat that?  I'm
17    sorry.
18                MR. BELLAMY:  You know, let me try to break
19    it down for you.
20                THE WITNESS:  Thank you.
21        Q.      You testified these rifles that we were
22    talking about that were prototypes that were imported
23    by FN Herstal --
24        A.      Delivered to Crane.
25        Q.      -- delivered to Crane, as part of
```

**DX200**

 1    participation in the SCAR program?

 2        A.      Okay.

 3        Q.      You said that those had the term SCAR

 4    engraved on them; is that correct?

 5        A.      They were properly marked per ATF

 6    regulations.

 7        Q.      Okay.

 8        A.      Yes, sir.

 9        Q.      And you said that ATF required that certain

10    information be marked on those rifles imported, among

11    the other things, the manufacturer's name and location

12    and serial number and caliber, you also listed model,

13    correct?

14        A.      Yes, sir, I did.

15        Q.      And was SCAR the model that FN designated

16    those rifles?

17        A.      The SCAR brand is what was on the side of

18    the rifles.  That's what FN designated it.  ATF

19    paperwork requires a model, which would have been the

20    SCAR, because that's what was inscribed on the side of

21    it.

22        Q.      So for ATF paperwork purposes, at least, FN

23    indicated that the model was SCAR; is that correct?

24            MR. EHRLICH:  Objection.  I mean, he hasn't

25    said that he has a foundation.

**DX200**

```
 1                      But in addition to that, I'm not sure that
 2      ATF said you identify this being the name, this being
 3      this, this being this.  And it also mischaracterizes
 4      his testimony here because he did say H or L was on
 5      it -- I thought.
 6                      THE WITNESS:  Correct.
 7          Q.      ATF requires that an imported rifle have
 8      identified on it, among other things, a model; is that
 9      correct?
10          A.      Yes, it does.
11          Q.      And with respect to these rifles that we
12      were just talking about that were imported and
13      delivered to Crane, did FN indicate on that paperwork
14      that the model name was SCAR or SCAR-H or SCAR-L?
15          A.      Depending on the caliber; yes, sir.
16                      (EXHIBIT 13 MARKED.)
17                      THE WITNESS:  Thank you, Miss.
18                      COURT REPORTER:  Uh-huh.
19          Q.      Handing you what's been marked as Exhibit
20      13, do you recognize this document?
21          A.      I believe I have seen it before; yes, sir.
22          Q.      The heading or title appears to read:  FN
23      SCAR (Special Combat Automatic Rifle) for law
24      enforcement debuts at IACP.  What is IACP?
25          A.      It's an abbreviation for International
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 62 of 235    DX200.0062

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 62

 1    Association Chiefs of Police.

 2         Q.     And when it says debuts at IACP, what does

 3    that mean?  Was there some particular event?

 4              MR. EHRLICH:  Objection.  Foundation.  He

 5    didn't write it.  He didn't say he wrote it -- at

 6    least.

 7         A.     I did not write it, sir, and I'm not the

 8    one that interpreted what it was supposed to mean.

 9         Q.     Have you seen the word Special Combat

10    Automatic Rifle used in association with the term

11    SCAR, other than in this instance?

12         A.     Other than on this piece of paper?

13         Q.     Yes.

14         A.     I believe I read other pieces of paper that

15    might have said that.

16         Q.     Was -- do you know the origin of that

17    designation:  Special Combat Automatic Rifle?

18         A.     Do I know the origin from -- as to who from

19    FN?  From the general public?  From who?

20         Q.     From anywhere?

21         A.     No, I don't know the origin.

22         Q.     In the other things that we have been

23    looking at, the acronym SCAR stood for SOF Combat

24    Assault Rifle; is that correct?

25         A.     You would have to show me the paperwork

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 63 of 235    DX200.0063

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)                Charles Newton Mills, III on 08/14/2013                Page 63

1    again to look at it.  We looked at a lot of stuff

2    today.

3        Q.    Well, with respect to the SOF Combat

4    Assault Rifle program held by SOCOM, in that context,

5    SCAR stood for SOF Combat Assault Rifle; isn't that

6    true?

7        A.    Again, I would like to see the paperwork

8    before I said yes or no.

9              Could it be?  Yes.

10             Am I 100 percent sure without looking at

11   it?  No.

12       Q.    In the first paragraph, it indicates a

13   dateline of McLean, Virginia, October 26, 2007; is

14   that correct?

15       A.    That's what it states on the paper; yes,

16   sir.

17       Q.    And the gist of that first paragraph is

18   that FNH USA announced during the recent IACP

19   Conference in New Orleans that the FN SCAR will be

20   available for purchase by law enforcement agencies in

21   2008; is that correct, as to the gist of that first

22   paragraph?

23             MR. EHRLICH:  Objection.  Mischaracterizes

24   the paragraph.  It states what it states.  If you are

25   asking him to read the paragraph, the paragraph is

```
 1   right here.

 2                   I mean, when you just went over it, you

 3   left some stuff out in reading it.

 4       Q.     What does the first paragraph tell us, sir?

 5                   MR. EHRLICH:  Objection.  If you're asking

 6   him to read the document, you know, I mean, we could

 7   stipulate the first paragraph reads what it says there

 8   on this piece of paper.

 9                   If you are asking him for his independent

10   recollection or his independent knowledge, you know,

11   then go ahead and ask the question.

12       Q.     Did FNH USA announce during the IACP

13   Conference in 2007, that the FN SCAR would be

14   available for purchase by law enforcement agencies in

15   2008?

16       A.     Do I know that for 100 percent?  No.

17                   Do I believe that is correct?  Yes.

18       Q.     And was the FN SCAR available for purchase

19   by law enforcement agencies in 2008?

20       A.     Yes, sir.

21       Q.     Was it available for purchase by law

22   enforcement agencies prior to 2008?

23                   MR. EHRLICH:  Objection.  I think it's

24   vague -- and foundation as to what you mean by

25   "purchase."  Do you mean orders?  I don't know.
```

**DX200**

```
 1      Q.      Do you understand my question?

 2      A.      I think so.

 3      Q.      Go ahead and answer it then.

 4              MR. EHRLICH:  Same objection.

 5      A.      I believe that we were taking orders in

 6   late 2007 for delivery in 2008 on this SCAR law

 7   enforcement version select fire.

 8              THE WITNESS:  I'm sorry.  Are you done with

 9   this one, sir?

10              MR. BELLAMY:  Yes.

11      Q.      Do you know when the semiauto-only version

12   of the FN SCAR was first available for purchase?

13      A.      Delivered?  Or orders taken?

14      Q.      Either one.

15      A.      Orders taken, I would say early 2008 or

16   late 2007.  Delivery, late 2008.

17      Q.      In your role as Deputy Director or Director

18   of Commercial and Law Enforcement Sales for FNH, were

19   you involved at all in the creation of advertising

20   materials -- printed advertising materials?

21      A.      No, sir.  That would have been our

22   marketing folks.

23      Q.      Were you involved in the placement of any

24   print ads in publications?

25      A.      Again, that would have been our marketing
```

**DX200**

```
 1   folks.

 2                   (EXHIBIT 14 MARKED.)

 3                   MR. EHRLICH:  Thank you.

 4                   THE WITNESS:  Thank you, ma'am.

 5       Q.      You have been handed what's been marked as

 6   Exhibit 14.  And this is a collection of documents,

 7   all of which were produced to us in the course of this

 8   litigation.

 9                   As to whether they are associated with one

10   another in this order or in this group, I don't really

11   know.  But I will ask you about that.

12                   But I would like you to look through this,

13   if you could, please.

14       A.      Yes, sir.

15       Q.      Give me a second.

16       A.      Okay, sir.

17       Q.      If you turn to the second page, can you

18   tell me what that is?

19       A.      It looks like a one-page advertisement of

20   the SCAR brand firearm.

21       Q.      And do you know whether this one-page

22   advertisement was run in printed publications?

23       A.      Off the top of my head, I could not tell

24   you that, sir.

25                   I'm sure that if we spent the money to have
```

**DX200**

1    this done, that it would have been handed out to media

2    firms and at trade shows.

3         Q.    Do you know whether advertisement space in

4    printed publications was purchased by FN with respect

5    to its SCAR products?

6         A.    SCAR brand firearms, there was printed

7    advertising in 2005, 2006, 2007, 2008; yes, sir.

8         Q.    Do you know -- the first page of this

9    selection of documents appears to be the front page or

10   the cover of a publication called Armed Forces

11   Journal, bearing a date of August, 2005.

12              The next page is sequentially numbered in

13   production number.

14              Do you know whether that second page was an

15   ad that appeared in the publication that is shown in

16   the first page?

17        A.    I'm not 100 percent sure that it was, sir,

18   no.

19        Q.    If you will turn to the fourth page, can

20   you tell me what that is?

21        A.    Again, it look like another single page ad,

22   showing the SCAR brand products.

23        Q.    Do you know when this ad was created?

24        A.    On this bad copy?  No, sir, I can't tell.

25              Most of them -- if you will notice at the

```
 1   very end of the bottom, will give you a year date.

 2   And I don't see that one on this one, sir.  I don't

 3   know if it's because of the quality of the copy or

 4   not.

 5        Q.     You know who would know at FN when ad copy

 6   like this was created?

 7        A.     It probably would have been Barbara Sadowy,

 8   but she's no longer there.

 9        Q.     Is there anybody who is currently at FN who

10   would have that information?

11             MR. EHRLICH:  Objection.  Speculation.

12        A.     It would be pure speculation on my side,

13   sir.

14        Q.     Does FNH have records of advertising --

15   print advertising -- expenditures going back to 2005?

16             MR. EHRLICH:  Objection.  Speculation.

17        A.     Again, it's not my department.  I would be

18   purely speculating.  No, sir.

19        Q.     Do you know, looking at that fourth page

20   there again, kind of the greenish color?

21        A.     Yes, sir.

22        Q.     Do you know whether that was actually run

23   as an ad in a print publication?

24        A.     The same answer as before, sir, if they

25   went through the expenditure, I would believe that it
```

**DX200**

```
 1   was given out to the media and also at trade shows.

 2       Q.      Do you have any information as to when that

 3   would have been done?

 4       A.      Again, without a date on it, sir, I --

 5   honestly, it would be pure speculation.

 6       Q.      Turning to the sixth page, the next one,

 7   that says:  The Chosen One?

 8       A.      Yes, sir.

 9       Q.      Can you tell me what this is?

10       A.      Again, it looks like a full-page print ad

11   on the SCAR brand products.

12       Q.      At the top it indicates SCAR SOF Combat

13   Assault Rifle; is that correct?

14       A.      That's what it states in writing.  Yes,

15   sir.

16       Q.      And if you will go to the next page, the

17   last page of that.

18       A.      I'm sorry.  The next?  Or the very last?

19       Q.      The very last page.

20               MR. BELLAMY:  I'm sorry.

21               THE WITNESS:  Okay.

22       Q.      Do you know what this is?

23       A.      A very bad copy of something, sir.

24   Honestly, I'm sorry, I'm not trying to be smart, but

25   it's very hard to read most of it.
```

**DX200**

```
 1              It looks like another ad, it looks like

 2      another print ad, sir.  Can you see the date with that

 3      magnifying glass?

 4         Q.    I'm looking to see if there's anything that

 5      might help you, but it's not very legible.

 6         A.    No, sir.  It's not.  I'm in total agreement

 7      with you on that.

 8         Q.    I don't think it will help me.  But you are

 9      welcome to use it if you would like, to take a look.

10         A.    Sure.  No, sir, it doesn't.

11              MR. EHRLICH:  We will see who has the best

12      eyesight.  I see a date --

13         A.    Actually, 2007, but that is it.

14              MR. EHRLICH:  I did see a date.

15         A.    It was done in 2007, but --

16         Q.    Okay.

17         A.    That's about it.

18         Q.    Where do you see that?

19         A.    Okay.

20         Q.    I do see it now.

21         A.    You see it?  The very first paragraph under

22      the FN football?

23         Q.    Yes.

24              MR. EHRLICH:  I saw that before the

25      magnifying glass.
```

```
 1      Q.     I was looking below that, but I do see the

 2   2007.  What does that indicate to you, if anything?

 3      A.     That this print ad was done in 2007

 4   sometime, sir.

 5             MR. EHRLICH:  Off the record.

 6             (OFF THE RECORD.)

 7             (EXHIBIT 15 MARKED.)

 8             COURT REPORTER:  There you go.

 9             THE WITNESS:  Thank you, ma'am.

10             MR. BELLAMY:  Off the record.

11             (OFF THE RECORD.)

12             MR. BELLAMY:  All right.  Let's go back on

13   the record.

14             THE WITNESS:  Yes, sir.

15      Q.     (BY MR. BELLAMY:)  Before the break, you

16   were handed what's been marked as Exhibit 15; do you

17   recognize this document?

18      A.     I might have seen it before, sir, in some

19   of the paperwork I reviewed.

20      Q.     Is there any way that you can tell from the

21   document when it was created -- when the, you know,

22   whatever it is, when the content of it was created?

23      A.     Can I see your magnifying glass again?

24   Thank you.

25             No.  No sir, I can't.
```

**DX200**

```
 1      Q.      Do you know what this is?  Did I already
 2  ask you that?
 3      A.      I believe so.  But if not, it looks like
 4  another marketing --
 5      Q.      Like a one-page ad?
 6      A.      Or a one-page flier that could have been
 7  handed out at a trade show, either or, sir, or both.
 8      Q.      Do you have any independent knowledge of
 9  when this was created?
10      A.      I personally have no independent knowledge
11  of that, sir.
12              (EXHIBIT 16 MARKED.)
13              THE WITNESS:  Thank you, ma'am.
14              COURT REPORTER:  Uh-huh.
15      Q.      You have been handed what's been marked as
16  Exhibit 16.  Can you tell me what this is?
17      A.      Again, it looks like a one-page either ad
18  or flier for the SCAR brand product with EGLM.
19      Q.      Is the EGLM sold to law enforcement
20  agencies?
21      A.      Yes, sir, it is.
22      Q.      Is it sold to commercial customers?
23      A.      A commercial customer could buy one if they
24  have all the correct ATF paperwork and if ATF approves
25  their application.
```

**DX200**

```
 1                 And then if US Customs approves it because

 2    it would be kept in a custom-bonded warehouse, so both

 3    ATF imports, ATF NFA side and US Customs would have to

 4    approve it --

 5        Q.      Okay.

 6        A.      -- before it could be sold to a US citizen.

 7        Q.      It's considered a destructive device?

 8        A.      It is a DD.  Yes, sir.

 9        Q.      Can you tell me when this document was

10    printed?

11        A.      (No response.)

12        Q.      And I have a magnifying glass.

13        A.      I can actually read that one, sir.

14        Q.      All right.

15        A.      It says 2011.

16        Q.      And does that indicate to you when this was

17    created?

18        A.      Sometime in 2011.  Yes, sir.

19                (EXHIBIT 17 MARKED.)

20                THE WITNESS:  Thank you, ma'am.

21        Q.      Handing you what has been marked as Exhibit

22    17.  I ask you to look that over and tell me what it

23    is, if you can.

24        A.      No response.)

25        Q.      Can you tell me what this is?
```

**DX200**

```
 1        A.      It looks like a copy of the FNH 2006

 2   Product Catalog.

 3        Q.      Would this have been distributed at Shot

 4   Show 2006?

 5        A.      Yes, sir.  It should have been, yes.

 6        Q.      Would it have been distributed before Shot

 7   Show 2006?

 8        A.      Without going back to my records, if there

 9   was any dealer shows -- I'm sorry -- distributor

10   shows, it could have been distributed before the Shot

11   Show in 2006, sometime in 2006, in January.

12        Q.      Do you know what month this catalog would

13   have been printed?

14        A.      Sometime in 2005, but I don't know what

15   month, sir, late 2005, for sure.

16        Q.      I would like you to turn to the inside,

17   what on the document is labeled Page 2:  A Message

18   From FNH USA; do you see that page?

19        A.      Yes, sir, I do.

20        Q.      And looking at the second paragraph there,

21   it says:  2005 has been very exciting for FN.

22              And then there are a couple of bullet point

23   statements below that.

24              The first one begins:  We are proud to

25   announce that the United States Special Operations
```

**DX200**

1    Command -- and then after that it has in (USSOCOM);

2    USSOCOM an acronym for United States Special

3    Operations Command?

4         A.    Yes, sir.

5         Q.    And then it goes on to say:  SOCOM awarded

6    the contract for the Special Combat Assault Rifle in

7    (SCAR), is SCAR an acronym for Special Combat Assault

8    Rifle?

9         A.    It could be.  Yes, sir.

10        Q.    In this context, is that what it is?

11             MR. EHRLICH:  Objection.  Speculation,

12   foundation.  He didn't write it.

13        A.    I did not write this.  Paul Evanco did.  I

14   can't attest to what was in his mind at the time, but

15   it could be one of the acronyms for it.

16        Q.    In the context used here, is the term SCAR

17   used as a brand of product?

18             MR. EHRLICH:  Objection.  Foundation.  He

19   didn't write it.  And also he's not a trademark

20   lawyer.

21        Q.    Do you understand my question?

22        A.    No.

23        Q.    Okay.

24        A.    Sorry.

25        Q.    Earlier you stated that SCAR had been used

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 76 of 235    DX200.0076

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)        Charles Newton Mills, III on 08/14/2013        Page 76

1    as a brand by FN for rifles.

2            In this context, is SCAR being used to

3    indicate a brand of rifles?

4            MR. EHRLICH:  Objection.  Foundation.  Go

5    ahead.  Sorry.

6        A.    I didn't write this, sir.  If you're asking

7    my opinion, I would say that the SCAR brand they are

8    referring to -- SCAR brand FN rifle in this paragraph.

9        Q.    Well, I don't mean what rifle they are

10   referring to.  But I mean in the context of this, when

11   it says SCAR right after Special Combat Assault Rifle,

12   is that an indicator of a brand of rifle?

13           MR. EHRLICH:  Objection.  Asked and

14   answered.  He just said SCAR brand.

15       A.    SCAR brand, sir.  But I'm not a lawyer.  So

16   that would be something for you to decide -- and the

17   court.

18       Q.    Is there any other mention in this catalog

19   of FN SCAR product?

20           MR. EHRLICH:  Objection.  He would have to

21   read the entire document.  If there is -- if there

22   isn't, there isn't.  I don't know what is in there.

23           But, you know, unless you want to take the

24   time for him to read a 42-page document --

25           THE WITNESS:  If you wish me to read it,

```
 1    I'll read it, sir.

 2        Q.      Let me ask you this:  Turning on in the

 3    next page, it indicates handguns.

 4        A.      Yes, sir.

 5        Q.      And following that it displays several FN

 6    handguns; is that correct?

 7        A.      (No response.)

 8        Q.      In the pages that follow that?

 9        A.      Yes, sir.

10        Q.      And none of those handguns are branded

11    SCAR, are they?

12        A.      No, sir.

13        Q.      And the next section indicates shotguns.

14    And it shows, then, several models of FN shotguns.

15    None of those shotguns are branded SCAR, are they?

16        A.      Correct.  They are not.

17        Q.      Following that is a section for less

18    lethal?

19        A.      Yes, sir.

20        Q.      None of those less lethal products are

21    branded as a SCAR, are they?

22        A.      No, sir.

23        Q.      The next section says rifles.

24        A.      Patrol boat rifle, sir?

25        Q.      Yes.
```

**DX200**

 1     A.      Okay.

 2     Q.      The patrol boat rifle in this catalog is

 3  not branded as a SCAR, is it?

 4     A.      Correct.  It is not.

 5     Q.      The next section -- still under rifle:

 6  Special police rifles, none of those special police

 7  rifles are branded a SCAR, are they?

 8     A.      Again, correct, they are not.

 9     Q.      Moving on to the next section is carbines.

10  There we see the PS-90 and the FS-2000, neither of

11  those are branded as SCAR, are they?

12     A.      PS-90 and FS-2000 are not, sir.

13     Q.      Following that, it's a tactical systems

14  section.

15     A.      Yes, sir.

16     Q.      None of the products in that section are

17  branded a SCAR, are they?

18     A.      I'm going to have to look at that whole

19  section and make sure there's not a SCAR in there,

20  sir.

21     Q.      Okay.

22     A.      But give me a second.  You are correct,

23  sir, no.

24     Q.      The next section is titled machine guns?

25     A.      Yes, sir.

**DX200**

```
 1        Q.      None of those machine guns are branded
 2   SCAR, are they?
 3        A.      Again, I'm going to need to look at it all.
 4        Q.      Please do.
 5        A.      Okay.
 6                Would you like me to continue on to heavy
 7   machine guns, too?
 8        Q.      Yes.
 9        A.      Okay.  No, sir.
10        Q.      And the final section is titled
11   accessories.  Can you look at that, can you tell me --
12   are there any accessories that are branded as SCAR?
13        A.      No, sir.
14        Q.      In looking through this catalog, as you
15   just did, was there any image picturing a rifle that
16   FN branded as a SCAR?
17        A.      No, sir.
18        Q.      This -- on the front it says 2006 FNH USA
19   Product Catalog.
20                Was there any separate catalog for military
21   -versus- law enforcement and commercial in 2006?
22        A.      No, sir.  Everything is in here for both.
23   There would be individual fliers if a new product came
24   out or things like that, like one-page things that we
25   saw earlier, but not the catalog.
```

```
 1      Q.      Were there any fliers for the SCAR product
 2   at Shot Show 2006?
 3              MR. EHRLICH:  Objection.  Asked and
 4   answered.
 5      A.      I believe I already answered that question,
 6   sir.  To my knowledge, don't remember seeing any.
 7      Q.      Were there any product brochures for FN
 8   SCAR at the NRA show in 2006?
 9              MR. EHRLICH:  Objection.  Asked and
10   answered.
11      A.      As I stated before, I don't remember seeing
12   any, sir.
13              (EXHIBIT 18 MARKED.)
14              THE WITNESS:  Thank you, ma'am.
15      Q.      You have been handed what's been marked as
16   Exhibit 18.  I would ask you to take a look at that.
17   And my first question to you will be:  Do you know
18   what this is?
19      A.      It looks like a copy of some of the pages
20   out of the 2007 Product Catalog, but not the whole
21   catalog, sir.
22      Q.      On the front it says 2007 FNH USA Product
23   Catalog.  As I asked you about 2006, in 2007, was
24   there a separate catalog for military -versus- law
25   enforcement and commercial?
```

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 81

```
 1       A.      It would be speculation.  I'm not sure.  We
 2   could have had a separate one that year.  I would have
 3   to go back and check everything, sir.  I honestly
 4   don't remember.
 5       Q.      At the top on the front page, it appears to
 6   have been handwritten A. Kartheuser; do you know what
 7   that refers to?
 8       A.      (No response.)
 9       Q.      Kartheuser, is that a person's name?
10       A.      Yes, sir.
11       Q.      Who is that?
12       A.      He's the marketing manager for FN Herstal,
13   he was at this time.
14       Q.      What does the A. stand for?
15       A.      Andre.
16       Q.      In the second page of this exhibit,
17   indicates a message from US -- pardon me -- a message
18   from FNH USA, that is in a style of a letter similar
19   to what we saw in Exhibit 16.  This one at the bottom
20   is signed by Mark Cherpes?
21       A.      Cherpes.
22       Q.      Cherpes?
23       A.      Yes, sir.
24       Q.      And the one in Exhibit 17 was signed by
25   Paul Evanco?
```

1       A.      Yes, sir.

2       Q.      In the second paragraph of that message on

3  that page, it says:  In January, 2007, we will begin

4  to fulfill the low-rate initial production portion of

5  our contract with the United States Special Operations

6  Command, SOCOM, to field the SCAR SOF Combat Assault

7  Rifle.

8               Is that a true statement; that is, that in

9  January, 2007, that that would happen?

10      A.      I know that it happened in 2007.  Do I know

11 that it happened?  January?  I'm not 100 percent sure.

12      Q.      Turning to the next page.

13      A.      Page 3 of this document?

14      Q.      Yes, sir.

15      A.      Okay.

16      Q.      It's FN 100363, as indicated at the bottom.

17      A.      Yes, sir.  Okay.

18      Q.      This page shows -- illustrates a SCAR-

19 Light.  And in the lower photo, it's the SCAR-Light

20 CQC; is that correct?

21      A.      That's what it states in print.  Yes, sir.

22      Q.      And below that it says:  SCAR-Light CQC

23 New!

24      A.      Okay.

25      Q.      Was this a new product for 2007?

**DX200**

```
 1      A.      I'm not understanding the question.

 2      Q.      Well, why does it say "new"?

 3      A.      I didn't write this.  I didn't -- I wasn't

 4   in marketing.  I did not do this.  I don't know why

 5   they put "new" there, sir.

 6      Q.      And to the right of that, it says

 7   Specifications (tentative).  Do you know why tentative

 8   was put there?

 9      A.      No, sir.  Again, I didn't write it.  It

10   would be pure speculation.

11      Q.      If you would turn two more pages in, to the

12   one that is labeled 365 at the bottom.

13      A.      Yes, sir.

14      Q.      Was this page part of that catalog also?

15      A.      Again, without seeing the full catalog,

16   sir, it's pure speculation.

17      Q.      Do you believe it was?

18      A.      I can't speculate, sir.

19              MR. EHRLICH:  Objection.

20      A.      There is no page numbers or anything.  So

21   that would be pure speculation.

22      Q.      If you turn to the immediately following

23   page that has the Bates No. 366 at the bottom.

24      A.      Yes, sir.

25      Q.      The very top of that, it's partially cut
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 84 of 235    DX200.0084

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 84

 1    off, but it looks like it says:  FN SCAR will be

 2    available to military law enforcement, does that --

 3       A.     That's what it looks like in print, sir.

 4       Q.     Was this product that is illustrated here,

 5    already available to the military, at this point in

 6    time?

 7              MR. EHRLICH:  Objection as to what

 8    available means.  Vague.

 9       Q.     Do you understand my question?

10       A.     Yes, sir.  And I have already testified

11    that we delivered SCARs to the military in 2004.  So I

12    think I have already answered it.

13              (EXHIBIT 19 MARKED.)

14              THE WITNESS:  I'm sorry.  Are you done with

15    this one, sir?

16              MR. BELLAMY: Yes, sir.

17              THE WITNESS:  Thank you, ma'am.

18       Q.     You have been handed what's been marked as

19    Exhibit 19.  Can you take a look at that and tell me

20    what that is?

21       A.     It looks like the 2008 Product -- or copy

22    of the 2008 Military Product Catalog.

23       Q.     Do you know whether in 2008, there was a

24    separate catalog produced for military products

25    -versus- the law enforcement and commercial?

1    A.    I believe there was, sir.

2    Q.    Turning to what is the fourth page, but is

3  labeled two at the bottom, the message from FNH USA?

4    A.    Yes, sir.

5    Q.    This is another piece of text that is

6  presented in the form of a letter like the previous

7  catalogs; is that correct?

8    A.    It looks like it.  Yes, sir.

9    Q.    And this one is signed by Mark Cherpes,

10 again?

11   A.    Cherpes again.

12   Q.    Cherpes?

13   A.    Yes.

14   Q.    Vice-President Military Operations, does he

15 still hold that title?

16   A.    Today?

17   Q.    Yes.

18   A.    No, sir.

19   Q.    Is he still employed by FNH?

20   A.    FNH USA.  Yes, sir.

21   Q.    What is his title today?

22   A.    CEO.

23   Q.    The third paragraph of that message on that

24 page, it reads:  2008 will be another exciting and

25 fast-paced year for FN.  We will begin full-rate

**DX200**

```
 1   production of US SOCOM's new family of assault rifles,

 2   commonly known as the SCAR.

 3            Do you know what he meant by US SOCOM's new

 4   family of assault rifles?

 5       A.   I would be speculating, since I didn't

 6   write it.

 7       Q.   Well, I'm asking, do you have an

 8   understanding of what was meant there?

 9       A.   Yes, sir.

10       Q.   And what is that?

11       A.   That it was in full production, which meant

12   that now they had designated it as a full-production

13   product, which now has the MK designation behind it.

14       Q.   When I was talking about SOCOM's new family

15   of assault rifles, what was it referring to there?

16       A.   (No response.)

17       Q.   Do you have an understanding?

18       A.   The SCARs.

19       Q.   When it says:  Commonly known as the SCAR,

20   do you have an understanding of what was meant by

21   "commonly known as"?

22            MR. EHRLICH:  Objection on this one.  He

23   would not only have to know what the writer meant but

24   what he was referring to as commonly known as.

25   Speculation.
```

**DX200**

```
 1     A.      That's pure speculation, sir.

 2     Q.      So you don't have an understanding,

 3   yourself?

 4     A.      I would say it's the SCAR brand, either a

 5   16 or 17 or SCAR-Light or SCAR-Heavy.

 6     Q.      If you -- if you would turn two more

 7   pages --

 8     A.      What page number, sir?

 9     Q.      It would be the page labeled four at the

10   bottom.

11     A.      Yes.

12     Q.      Printed as page four.

13     A.      Got you, sir.

14     Q.      Mark 16 FN SCAR is at the top?

15     A.      Yes, sir.

16     Q.      In this section of the catalog, talking

17   about the FN SCAR products, are any of these

18   illustrated in this catalog the semiautomatic-only

19   version of the SCAR?

20     A.      The top picture is a full automatic.  You

21   can look at the selector switch and see safe one and

22   A, that's a full automatic gun.

23             The bottom picture is too blurred for me to

24   see the selector switch, sir.

25     Q.      Well, let me try to phrase it this way:
```

1    Below the caption that I just read:  Mark 16 -- and

2    Mark is abbreviated MK, FN SCAR, it says:  Available

3    to law enforcement, military -- does that provide any

4    indication to you whether what is being offered in

5    this catalog included the -- a semiautomatic-only

6    version?

7        A.    Does available to law enforcement

8    military --

9        Q.    -- provide any indication to you as to why

10   this catalog was offering a semiautomatic-only version

11   of the SCAR?

12       A.    That statement doesn't tell me anything

13   about it, sir.

14       Q.    The Mark 16 rifles, were they select fire?

15       A.    The MK 16s are select fire, sir.

16       Q.    And the MK 17 is select fire?

17       A.    MK 17 is a select fire.

18       Q.    And the MK 13, the EGLM, that is a

19   destructive device, correct?

20       A.    It's a grenade launcher, yes, sir, it's a

21   DD, semiautomatic.

22       Q.    Yeah.  Okay.

23       A.    We have full automatics now too.  So I

24   figured I would clarify it for you.

25              MR. EHRLICH:  That makes it doubly

**DX200**

```
 1   destructive.

 2               MR. BELLAMY:  Off the record.

 3               (OFF THE RECORD.)

 4                   (EXHIBIT 20 MARKED.)

 5               THE WITNESS:  Thank you, ma'am.

 6       Q.     You have been handed what's been marked as

 7   Exhibit 20.  Can you take a look at that and tell me

 8   what this is?

 9       A.     It looks like a FN Herstal product catalog,

10   sir.

11       Q.     Is it a complete product catalog for FN

12   Herstal?

13       A.     I have no clue.  It would be pure

14   speculation.

15       Q.     Well, let me ask you this:  Is it a catalog

16   that focuses on one particular product or product

17   line?

18       A.     Give me a second and I'll look at it again.

19               It only highlights the FN SCAR products.

20   So I would say it is specific to the FN SCAR brand

21   product.  It's not highlighting or specking out

22   anything else.

23       Q.     From the last page of the document, is

24   there any indication to you there as to the date this

25   document -- that this --
```

**DX200**

```
 1      A.      Yes, sir.

 2      Q.      -- was printed?

 3      A.      Yes, sir.

 4      Q.      And what does it indicate?

 5      A.      June, 2008.

 6      Q.      Is that a standard nomenclature that FNH or

 7   FN Herstal uses on its printed literature?

 8      A.      They try to.  Yes, sir.  But as we have

 9   seen before, some things apparently slipped through.

10              MR. EHRLICH:  With reference to what we

11   were referring to the language at the bottom of the

12   last page?

13              MR. BELLAMY:  Yes.

14              MR. EHRLICH:  Okay.  I just wanted to

15   clarify, because I wasn't sure where we were going on

16   the document.

17      Q.      On the last page, at the very end, the fine

18   print as I call it, there's a copyright symbol FN

19   Herstal SA.  And then it indicates 06/2008.  And then

20   there are some other numbers there.  Was it the

21   06/2008 that indicated to you June of '08?

22      A.      Yes, sir.

23      Q.      And on the front page of this, the term

24   SCAR is written.  And following that is a super script

25   TM; do you see that?
```

```
 1      A.      I see that, sir.

 2      Q.      Does that indicate anything to you?

 3      A.      As a lay person, it would tell me

 4   trademark.

 5      Q.      And on the second page there, for example,

 6   is the same designation, same indication used with the

 7   term SCAR on that page?

 8      A.      I'm sorry.  The question is what?

 9      Q.      Is that super script TM, is that used with

10   the term SCAR on the second page also?

11      A.      One, two, three -- at least four times.

12      Q.      Okay.

13      A.      Yes, sir.

14              THE WITNESS:  I'm sorry.  Are you done with

15   this one?

16              MR. BELLAMY:  Yes, I am.

17              (EXHIBIT 21 MARKED)

18              THE WITNESS:  I'm sorry.  Thank you, ma'am.

19      Q.      Can you look at what's been labeled as

20   Exhibit 21.  And tell me what this is?

21      A.      Give me a second, sir.

22      Q.      Uh-huh.

23      A.      Sir, I honestly don't know.  It looks like

24   printed material from FN Herstal, either printed or

25   ran at different dates.
```

**DX200**

```
 1              There is January '06.  There is September,
 2    '09 -- I'm sorry -- '08.  June '08.  June '08.  I
 3    would speculate, to be quite honest.
 4         Q.    Where are you seeing those dates indicated?
 5         A.    Look at the bottom left corner of Page 1.
 6         Q.    Where it says James?
 7         A.    Yeah.  06/08, that's June '08.  The next
 8    page two, 09/08, again, bottom left corner.
 9         Q.    Uh-huh.
10         A.    The next page, 06/08, bottom left corner.
11    06/08, bottom left corner of the Page No. 4.
12         Q.    Okay.
13         A.    But then it shows on Page 4 in the bottom
14    right corner, probably a print date of 05/08, and then
15    it has a time 10:39:44 seconds.
16         Q.    I know you are not a marketing expert, but
17    looking, for example, at the first page of this, at
18    the very outer margins, are some marks and colors,
19    does that have any -- does that mean anything to you?
20         A.    Sir, I have no clue.
21         Q.    Okay.
22         A.    Pure speculation.
23         Q.    I'm not going to ask you to do that.
24         A.    I appreciate that, sir.
25               (EXHIBIT 22 MARKED.)
```

**DX200**

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 93

```
 1                MR. EHRLICH:  That's a good observation by

 2     you.

 3                MR. BELLAMY:  Well, I think -- off the

 4     record.

 5                (OFF THE RECORD.)

 6          Q.    (BY MR. BELLAMY:)  All right.  You have

 7     been handed what's been marked as Exhibit 22.  Can you

 8     take a look at that and tell me, if you can, what it

 9     is?

10          A.    It looks like some printed material from FN

11     Herstal on the FN SCAR brand firearms.

12          Q.    Looking at the last page, is there an

13     indicator to you of the print date of this document?

14          A.    September, 2008, that's what the last page

15     indicates; that that page was done on September, 2008.

16                (EXHIBIT 23 MARKED.)

17          Q.    With respect to Exhibit 22?

18          A.    Yes, sir.

19          Q.    Do you know whether this -- all the pages

20     of this document were a unitary document of some sort?

21          A.    No clue, sir.  Pure speculation to answer

22     that.

23                THE WITNESS:  Are you done with that one?

24                MR. BELLAMY:  Yes, sir.

25                THE WITNESS:  Okay.
```

**DX200**

```
 1      Q.      You have been handed what's been marked as
 2   Exhibit 23.  Ask you to look at it and tell me if you
 3   can, what that is?
 4      A.      Again, it looks like some printed material
 5   from FN Herstal on the SCAR brand family of firearms.
 6      Q.      Can you tell from this, do you know was
 7   this a unitary document?
 8      A.      Pure speculation, sir.
 9      Q.      Looking at the last page, is there an
10   indication to you as to the print date?
11      A.      The last page looks like it was printed
12   January, 2011.
13      Q.      On a slightly different topic, were you
14   involved at all in FN's decision to use the term SCAR
15   as a brand?
16      A.      No, sir.
17      Q.      Do you know who was?
18      A.      Personally?  No, sir, I don't, without
19   going through records and trying to research that.
20      Q.      Do you know whether there would be records
21   that would indicate that?
22      A.      Honestly, I do not, sir.
23              (EXHIBIT 24 MARKED.)
24              THE WITNESS:  Thank you, ma'am.
25      Q.      You have been handed what's been marked as
```

**DX200**

 1    Exhibit 24.  These documents have a Bates label number

 2    of 420, 421, 422 and 423.  They are marked

 3    confidential, attorneys eyes only, but I believe that

 4    these are the --

 5              MR. EHRLICH:  We redesignated these to a

 6    lower level, just as confidential.

 7              MR. BELLAMY:  Confidential.

 8              MR. EHRLICH:  That's right.  That's

 9    correct.

10              MR. BELLAMY:  All right.

11      Q.    Mr. Mills, can you -- have you seen this

12    document before?

13      A.    I believe going through the paperwork for

14    this case, I might have reviewed this, sir.

15      Q.    Do you know what it is?

16      A.    (No response.)

17      Q.    Can you tell me what it is?

18      A.    Page one is e-mail traffic from Laurie

19    Collette who was the CFO -- I'm sorry -- to Laurie

20    Collette, who was the CFO, from Cindy Agresto.

21              Then further down from -- to Barbara Sadowy

22    from -- I don't know who that person is.

23              COURT REPORTER:  Thank you.

24              THE WITNESS:  Yes, ma'am.

25      Q.    Laurie Collette, what did you say her title

```
 1   was?

 2       A.      At that time she was CFO.

 3       Q.      Is she still CFO?

 4       A.      No, sir.  I believe she retired.

 5       Q.      And Cindy Agresto, at that time, what was

 6   her title?

 7       A.      I honestly don't know, sir.  I know she was

 8   in the marketing department, had something to do with

 9   that.

10       Q.      Looking at the content of the e-mail thread

11   printed here, can you tell me what is going on?  What

12   is being discussed?

13       A.      Well, in 2004, Paul Evanco sent an e-mail

14   to Claude Dello, D-e-l-l-o.

15           COURT REPORTER:  Thank you.

16       A.      It looks like it's an estimation on the

17   cost of -- we call them give away or swags, hats,

18   shirts, is what it looks like, sir.

19       Q.      Do you know whether those hats and/or

20   shirts were ever ordered?

21       A.      Yes.  Yes, sir.  They were.

22       Q.      And do you know when they were ordered?

23       A.      The exact date?  No, sir.

24       Q.      Do you know how long after this December,

25   2004 date, if they were ordered?
```

**DX200**

```
 1        A.      I know they were ordered.  I know we had

 2   them.  And I know we gave them out.  Because I also

 3   gave out some, sir.  Without dates, without going

 4   back, I couldn't give you a date.

 5        Q.      To what type of recipient did you give

 6   those hats and shirts?

 7        A.      Usually at trade shows or demos or

 8   demonstrations.  It would be the end users, most of

 9   the time.

10        Q.      Did you give those out at Shot Show 2006?

11        A.      I honestly don't remember, sir.

12        Q.      Who else would give these out?

13        A.      It could be anybody in FNH USA, sir.  It

14   could have been any of 30 or 40 people, easily.

15        Q.      Were these distributed to military

16   customers?

17        A.      (No response.)

18        Q.      Let me say military contacts?

19        A.      Yes, sir.  Some were.  Yes, sir.

20        Q.      Are there any of those hats and shirts

21   still around?

22        A.      I have a couple.  They are a little old

23   now, but --

24        Q.      I don't mean that.  Does FN still have any

25   of these that it continues to give away?
```

```
 1       A.      They still give away swag.  These exact
 2   style shirts from 2004, I would say no.  I'm sure we
 3   have upgraded.  And we give away other SCAR products,
 4   key changes and things like that now.
 5       Q.      Do you know when this supply was depleted?
 6       A.      No, sir.  I don't.  That would be
 7   marketing, I have no clue.
 8       Q.      If you turn to the third page, it appears
 9   to be photo of a hat, probably a shirt, something
10   else -- it looks like a rail cover there --
11       A.      Very good.  Yes.
12       Q.      -- to me.
13       A.      Yes.
14               MR. EHRLICH:  A what cover?
15               THE WITNESS:  Rail.
16               MR. BELLAMY:  Rail.
17               MR. EHRLICH:  Okay.
18               THE WITNESS:  1913 Picatinny rail.
19               COURT REPORTER:  1913 what?
20               THE WITNESS:  Picatinny rail,
21   P-i-c-a-t-i-n-n-y.
22               MR. BELLAMY:  I think it's a city
23   somewhere.
24               THE WITNESS:  I'm impressed.
25       Q.      (BY MR. BELLAMY:)  The hat and shirt
```

**DX200**

```
 1   pictured there on the third page, is that an image of

 2   the hat and shirt that is being discussed in the

 3   e-mail in the first two pages?

 4        A.      I do not believe so, sir.

 5        Q.      Do you know what the hat and shirt being

 6   discussed in the e-mail -- what they looked like?

 7        A.      We had a couple of different versions of

 8   the shirts.  And the hats looked different than this

 9   hat on Page 3.

10        Q.      How did it look different?

11        A.      It was a totally different style ball cap.

12   And it had a different -- it didn't have that logo.

13        Q.      Okay.

14        A.      That's the ATK logo, Adam, Tom, King.

15                MR. BELLAMY:  Those are the letters; that's

16   not what it stands for.

17                THE WITNESS:  Yes.

18        Q.      Do you recall what was printed or

19   embroidered on those shirts and hats?

20        A.      I would be speculating, sir, honestly, I

21   don't.

22        Q.      Did it include the term SCAR?

23        A.      I do remember SCAR was on them.

24        Q.      Do you remember what color they were?

25        A.      The shirts and hats?
```

```
 1     Q.     Yes.

 2     A.     No, sir.  Some were black.  Some were

 3  white.  That's the shirts.

 4            The hats, I don't remember what color they

 5  were, but I have a white SCAR shirt and a black SCAR

 6  shirt.

 7     Q.     Besides the term SCAR, is there any other

 8  printing or embroidery on this?

 9     A.     Without going back and looking at them, I

10  couldn't tell you, sir, I would just be speculating.

11     Q.     All right.  I just want to know if you

12  recall?

13     A.     I don't recall.

14            (EXHIBIT 25 MARKED.)

15            THE WITNESS:  Thank you, ma'am.

16     Q.     You have been handed what's been marked as

17  Exhibit 25.  This is two pages that bear the Bates

18  numbers at the bottom ending in 538 and 539.  This is

19  also marked confidential, attorneys eyes only, but I

20  believe these pages also were included in the group

21  redesignated as confidential.

22            MR. EHRLICH:  I don't remember, but I don't

23  care.

24            MR. BELLAMY:  Okay.

25            MR. EHRLICH:  So --
```

**DX200**

```
 1              MR. BELLAMY:  All right.

 2              MR. EHRLICH:  I think you are right about

 3     that.

 4              MR. BELLAMY:  Okay.

 5              MR. EHRLICH:  I thought it was, but I just

 6     am not positive.

 7         Q.    (BY MR. BELLAMY:)  If you will look at this

 8     document, can you tell me, Mr. Mills, what this is?

 9         A.    It looks like a reprint with a little bit

10     added of Exhibit No. 24.

11         Q.    So part of the same e-mail thread?

12         A.    Actually, most of the same e-mail thread,

13     yes.

14         Q.    The part at the very top of the first page,

15     that is different, is it not, than what is on Exhibit

16     24?

17         A.    Yes, I don't see that on Exhibit 24, sir.

18     Exhibit 24 was started out with the e-mail from Paul

19     Evanco to Claude Dello.

20              Twenty-five starts out with a response from

21     Claude Dello to Paul Evanco.

22         Q.    And Claude Dello, did you tell me what his

23     title was?

24         A.    Oh, I don't know his exact title -- what it

25     was then.
```

```
 1       Q.      Was he located in --

 2       A.      Herstal, Belgium.  He oversaw most of the

 3    worldwide operations for FN products.

 4               But without -- I don't have his title.  I'm

 5    sorry.

 6       Q.      Was he on the technical side of products?

 7       A.      I couldn't answer that question.

 8       Q.      Okay.

 9       A.      No, sir.

10       Q.      Do you know whether he was involved in the

11    marketing side of products?

12       A.      He had his hand in a little bit of all of

13    it.

14       Q.      Okay.

15       A.      So --

16       Q.      His response to Paul Evanco says:  Hello,

17    Paul.  Well received.  Please note that the marketing

18    budget for the SCAR is in your budget; and, thus, the

19    blanked dollar amount will be part of the blanked

20    dollar amount that you proposed in your marketing

21    budget.

22               It goes on to say:  Let's go for the shirt

23    and hat.

24               Then it says:  Note that the FNH USA

25    military budget is equally funded by the FN Herstal
```

**DX200**

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 103

```
 1    and FNM LLC.  And then in parens, (new appellation).

 2              The line beginning with note, do you have

 3    an understanding as to what that means?

 4        A.    Yes, sir.

 5        Q.    Can you explain that to me?

 6        A.    Sure.  The -- in 2004, the FNH USA military

 7    budget was split by FN Herstal and FN Manufacturing,

 8    which you are sitting in right now.

 9        Q.    And when he says (new appellation), do you

10    know when that means?

11        A.    No clue, sir.  It's pure speculation.

12        Q.    Was the FN Manufacturing arm, was it

13    relatively new in 2004?

14        A.    No, sir.

15        Q.    Okay.

16        A.    They were making machine guns here in -- I

17    want to say '88 and '89.

18        Q.    Your reference to military budget, does

19    that indicate a marketing budget?

20        A.    Pure speculation, sir.

21              (EXHIBIT 26 MARKED.)

22              THE WITNESS:  Thank you, ma'am.

23        Q.    You have been handed what has been marked

24    as Exhibit 26, which is a collection of documents.

25    I'm not -- these are sequentially Bates No.'d, I don't
```

```
 1    know to what extent they really belong together as a
 2    group, but I will ask you about that.  And ask you to
 3    look these other, and then I'm going to ask you
 4    beginning at the first page, if you could tell me what
 5    these things are?
 6        A.    Okay.
 7        Q.    All right.  Looking at the first page, can
 8    you tell me what that first page document is?
 9        A.    Besides a copy of an invoice back-up
10    report, and that it was for a SCAR print ad, no, sir.
11        Q.    When it says the words "back-up report with
12    invoice," does that have any meaning to you?
13        A.    It means that it came out of our computer
14    system at the time.
15        Q.    I'm sorry.  I don't really understand.  Do
16    you mean it was some sort of archived copy?
17        A.    I would say probably an accounting computer
18    program.
19        Q.    From this document, it says:  SCAR print
20    ad.
21              Is there anything on here that tells you
22    where that print ad was to appear?
23        A.    No, sir.
24        Q.    Is there anything in here that tells you
25    which print ad it was?
```

**DX200**

```
 1      A.      The job number.

 2      Q.      Would that job number be an FN internal

 3   number?

 4      A.      I don't believe so, sir.

 5      Q.      All right.  The only party indicated on

 6   this is FNH USA military, but an invoice is usually

 7   from one party to another.

 8              Is there anything in here that tells you

 9   was this to FNH USA?  Or was this from FNH USA?

10              MR. EHRLICH:  I mean, on this page itself?

11              MR. BELLAMY:  This page itself.

12              MR. EHRLICH:  Okay.

13      A.      This tells me that the commercial law

14   enforcement was invoiced by the military side of the

15   house for this $320.50.

16      Q.      How do you know the commercial law

17   enforcement?

18      A.      Because the next line down from the FNH USA

19   military says:  General Marketing.  Rick Demilt was

20   the -- seemed to be Director at the time in 2005, of

21   Law Enforcement and Commercial Sales.

22      Q.      Okay.

23      A.      That's what it tells me.

24      Q.      Is this some sort of cross-charge, then,

25   from FNH USA military?
```

```
 1     A.     Yes, sir.

 2     Q.     To the --

 3     A.     To the commercial law enforcement side of

 4  the house.

 5     Q.     Okay.

 6     A.     Yes, sir.  Different budgets.

 7     Q.     Do you know whether the commercial and law

 8  enforcement side ran print ad for SCAR in 2005?

 9     A.     One hundred percent?  I can't -- I can't

10  say.

11            But if we had it printed out, we would have

12  used it.

13     Q.     Well, this doesn't appear to be really for

14  the printing of the ad, does it?

15     A.     I'm not sure, sir.

16     Q.     Okay.

17     A.     I didn't do this.

18     Q.     You couldn't print very much for $320?

19     A.     I would probably say it was one page to

20  show.

21     Q.     The second page of this document, can you

22  tell me what that is?

23     A.     It's a copy of a check to Leslie --

24  L-e-s-l-i-e -- Advertising for $24,253.40.

25     Q.     And do you know what that check was for?
```

**DX200**

```
 1      A.      It doesn't state on here at all, sir.  So
 2  without going to the voucher or the invoice number and
 3  looking it up that way, I could not tell you off of
 4  this piece of paper.
 5      Q.      Can you tell from this whether this was
 6  paid out of the military side of FNH USA -versus- the
 7  commercial and law enforcement?
 8      A.      Honestly, sir, without the voucher, invoice
 9  and checking with finance, I could not tell you, sir.
10      Q.      Okay.
11      A.      Pure speculation.
12      Q.      On the next page, with the Bates No.'d
13  ending in 426 at the bottom --
14      A.      Yes, sir.
15      Q.      -- can you tell me what this is?
16      A.      It looks like an invoice from At Large
17  Marketing Solutions.  We are the client, FNH is.  The
18  job title is SCAR brochure FNH 001.
19              It looks like a SCAR brochure shirt was
20  designed, created and shipped to FNH marketing for the
21  amount of $2,740.42.  And that Barbara Sadowy approved
22  it on June 20th of '05.
23      Q.      Where it says:  Job title, SCAR brochure,
24  then it says:  FNH 0001.  Do you know whether that is
25  a FN reference number?  Or not?
```

```
 1      A.      I don't know, sir.

 2      Q.      Is there any way you can tell from this,

 3   what brochure this refers to?

 4      A.      Other than a SCAR brochure, no, sir,

 5   honestly not, pure speculation.

 6      Q.      And turning to the next page, with the

 7   Bates number ending in 427, that appears to be a check

 8   for the same amount?

 9      A.      It's got the same invoice number for the

10   Page 426.

11      Q.      It appears to be the payment of that

12   previous invoice?

13      A.      It does look that way, sir.

14      Q.      Turning to the next page, can you tell me

15   what that shows; the one with the Bates number ending

16   in 428 at the bottom?

17      A.      It looks like an invoice for 500 SCAR

18   folders.  It looks like a four-page, high-gloss

19   folder.

20              And I honestly believe it's the one you

21   were looking at earlier today, sir, 500 of them for

22   the price of $1,029.05.

23      Q.      At the top, there is handwritten -- it

24   says:  Duplicate for billing.  And says:  FNH 0001.

25   Does that indicate anything to you?
```

**DX200**

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)    Charles Newton Mills, III on 08/14/2013    Page 109

```
 1      A.      No, sir, I -- it honestly does not.

 2      Q.      Turning to the next page, it appears to be

 3  a check, the amount of which corresponds with that

 4  previous invoice?

 5      A.      Yes, sir.

 6      Q.      The check, however, seems to be payable to

 7  At Large Marketing Solutions, or the invoice came

 8  from --

 9      A.      At Large Marketing Solutions.

10      Q.      Oh, I see.  I see.  Yup.  I was confused by

11  that logo above it.

12      A.      Yeah.

13      Q.      Okay.

14      A.      I was too at first, sir.

15      Q.      All right.  Thank you.  And then looking at

16  the next page, with the Bates number ending in 430 at

17  the bottom, can you tell me what that is?

18      A.      It looks like another invoice for At Large

19  Marketing, for SCAR brochure.  The same FNH number,

20  001.  Then at the bottom of it from Barbara Sadowy.

21  From the handwriting, it looks like SCAR brochure for

22  AUSA, which tells me that this would have been shown

23  at the AUSA in 2005.  Because this is right before

24  that AUSA show.

25      Q.      But we don't -- we can't tell from this
```

**DX200**

```
 1   what that brochure was?

 2       A.      Other than it's the same one that was

 3   talked about in these other ones; yes, sir, other than

 4   it's a SCAR brochure.

 5       Q.      And the last page there appears to be a

 6   check paying that invoice?

 7       A.      Yes, sir, it does.

 8               (EXHIBIT 27 MARKED.)

 9               THE WITNESS:  Thank you, ma'am.

10       Q.      You have been handed what's been marked as

11   Exhibit 27, which appears to be a print out from an

12   online web publication known as Defense Review; does

13   that appear to be correct to you?

14       A.      It looks correct to me, sir.

15       Q.      Are you familiar with the website

16   defensereview.com?

17       A.      I have heard if it.  I have been on it a

18   couple of times, yeah.

19       Q.      Are you familiar with David Crane who is

20   indicated in the byline?

21       A.      Off the top of my head, I don't know that

22   name, sir.

23       Q.      The title of this online article appears to

24   say:  Def rev, which I presume is an abbreviation or

25   defense review, exclusive:  FN SCAR update, NAVC/NSWC
```

```
 1   Crane Division, FNH trifolds.  Do you know what is

 2   meant by FNH trifolds?

 3       A.    No clue, sir.

 4       Q.    Below that in the text it says:  Below are

 5   scanned photos of a NAVC/Naval Surface Warfare Center

 6   Crane Division and parens (NSWC) Crane Division

 7   trifold fact sheet on the Special Operations Forces

 8   Combat Assault Rifle and (SCAR) family -- and so

 9   forth.

10             And below that appear to be some images; do

11   you see those?

12       A.    Yeah, I see what you are saying.

13       Q.    Okay.

14       A.    Yes, sir.

15             MR. EHRLICH:  Are we talking at the bottom

16   of the page now?

17             MR. BELLAMY:  Yes.  In the left-hand

18   corner.

19             MR. EHRLICH:  Okay.  Great.

20             THE WITNESS:  Okay.

21             (EXHIBIT 28 MARKED.)

22       Q.    And if you would, you have been handed

23   what's been marked as Exhibit 28.

24             And I would ask you to look at that, and if

25   you would compare those to the images shown there on
```

```
 1   Exhibit 27, and I would ask you:  Do those appear to
 2   match up?
 3        A.     From the layman's eye; yes, sir.
 4        Q.     Exhibit 28, have you seen that before?
 5        A.     I'm not sure that I have, sir.
 6             MR. EHRLICH:  Excuse me, is this a document
 7   from the production Exhibit 28?  I don't see it
 8   marked.
 9             MR. BELLAMY:  No.  This is -- I will
10   explain to you that this -- I simply, as this article
11   said from the document produced by FN, if you click on
12   these, you can see full-size versions.  And so I
13   simply printed out the full-size version of the images
14   here.
15             MR. EHRLICH:  Okay.
16        Q.     This Exhibit 28, do you know whether this
17   was something produced -- created by FN; can you tell
18   from this?
19        A.     Pure speculation, sir.  No clue.  It looks
20   like material that was cut and pasted from several
21   different sources, different fonts, different things.
22        Q.     At the end, it indicates:  Contact Troy
23   Smith, USSOCOM SOM weapons program manager; do you
24   know who Troy Smith is?
25        A.     I have heard of his name before; yes, sir.
```

```
 1    Q.    Is he at SOCOM?

 2    A.    Currently?

 3    Q.    Was he at the time?

 4    A.    I don't know when this was done, sir, so --

 5    Q.    Was he in 2005?

 6    A.    I believe so.  Am I 100 percent sure?  No.

 7    Q.    Is he there now?

 8    A.    I do not know, sir.

 9    Q.    If you will look at Exhibit 27 again.

10    A.    Yes, sir.

11    Q.    And continue on back through there to the

12  page with the Bates number at the bottom that ends in

13  1840.

14    A.    Yes, sir.

15    Q.    In the middle of that page, it says:  FN

16  Herstal/FNH USA Company, trifold picks below.  Click

17  on image to see them full size.

18    A.    Okay.

19    Q.    Those are really poor images down there in

20  that in Exhibit 27 --

21          MR. BELLAMY:  But I would like to mark and

22  hand you what we would mark as Exhibit 29.

23          (EXHIBIT 29 MARKED.)

24          THE WITNESS:  Thank you.

25          MR. EHRLICH:  They might be even worse on
```

**DX200**

```
 1    Exhibit 29.  I can see why they are bad on the other

 2    one.

 3         Q.     Well, I will represent to you that Exhibit

 4    29 was an enlargement of these images that were shown

 5    here.

 6              While it appears to be, Exhibit 29 has the

 7    -- has an FN Bates number at the bottom that was

 8    produced by FN.

 9              Referring to Exhibit 29; do you recognize

10    this?

11         A.     It looks like the trifold flier brochure,

12    for lack of a better word, that we had done at one

13    time for the SCAR product.

14         Q.     Do you know when it was done?

15         A.     I would be speculating, sir, but it matches

16    the trifold that we were just talking about for the

17    invoices.

18              Without a better quality of seeing this, I

19    honestly could not tell you, sir.  I don't see

20    anywhere on here where it's got a date from this copy

21    that I have.

22         Q.     Do you have any independent knowledge of

23    whether the trifold shown in Exhibit 29 was

24    distributed by FN?

25         A.     Yes, sir, I do.
```

```
 1      Q.     And what is that knowledge?

 2      A.     I passed out some to law enforcement

 3   customers.

 4      Q.     Do you know when you did?

 5      A.     After it was completed, until the latest

 6   version of it came out, which is that other one.

 7      Q.     That other one being a document we looked

 8   at earlier today?

 9      A.     Yes, sir.  I don't think it was in there.

10             THE WITNESS:  It's over there.

11             MR. BELLAMY:  Oh, okay.

12             THE WITNESS:  Not that I'm trying to help

13   you or anything.  He's going to fuss at me if I try to

14   help you, sir.

15             MR. EHRLICH:  But if we can --

16             MR. BELLAMY:  Okay.

17      Q.     (BY MR. BELLAMY:)  Do you know whether you

18   handed out this trifold that is shown in Exhibit 29 at

19   Shot Show in 2006?

20      A.     I do not know, sir.

21      Q.     Do you know whether you handed it out in

22   2006?

23      A.     I don't remember the date, sir.  I honestly

24   don't.  Off the top of my head, right now sitting

25   here, strong possibility; since it was printed in
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 116 of 235    DX200.0116

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 116

 1    2005, yes.

 2       Q.       Are you confident that this is the trifold

 3    that was referred to in the invoices that were part of

 4    Exhibit 26?

 5       A.       I only remember seeing one trifold on the

 6    SCAR program, ever.

 7                (EXHIBIT 30 MARKED.)

 8                THE WITNESS:   Thank you, ma'am.

 9       Q.       You have been handed what's been marked as

10    Exhibit 30.

11                This is a two-page document bearing the

12    Bates number produced by FN ending in 328 and 329.  Do

13    you recognize this document?

14       A.       It looks like an FN flier, sir.  And the

15    second page looks -- I don't speak French -- but it

16    looks like an invoice for at least 1,500 of these

17    fliers -- a crazy amount of money.

18       Q.       Looking at the front page, this appears to

19    be kind of a photograph.  Do you know whether this was

20    something other than a brochure?

21       A.       Pure speculation, sir.  It's Herstal

22    generated, and I might have saw this when I was

23    reviewing information.  But before that, I don't

24    believe I saw it or have seen it.

25                (EXHIBIT 31 MARKED.)

```
 1                MR. EHRLICH:  Did you see how many euros it

 2   was?

 3        Q.     You have been handed what's been marked as

 4   Exhibit 31, which is a collection of documents mostly

 5   in French, it appears.

 6        A.     Yes, sir.

 7        Q.     And I also don't read French, but do you

 8   have any knowledge as to -- starting with the first

 9   page, what this is, what this relates to?

10        A.     It looks like an e-mail from Andre

11   Kartheuser -- and that's the same spelling as before

12   spelling -- to -- oh, my goodness -- the last name is

13   S-a-l-e-s-s-e.

14        Q.     Jean Jacque?

15        A.     Don't ask me, sir.  I would butcher it --

16   for SCARs, it looks like for 12 SCAR units going to --

17   sir, I would be guessing.  I'm sorry.

18        Q.     Turning to the next page, can you tell me

19   what that is?

20        A.     That is a Herstal-generated marketing form

21   that they fill out when they send product to a trade

22   show.

23               This one is going to the Eurosatory 2006

24   show.

25               And then it's got sign-offs, it has to be
```

```
 1    approved and stuff.  It's got signatures for approval.
 2        Q.      So this doesn't really -- this relates to
 3    an actual firearm?
 4        A.      This relates --
 5        Q.      This request?
 6        A.      A request to show product at that show, but
 7    it's not stating which product on that page, sir.
 8    That's just the first page of many others.
 9        Q.      The next page appears -- well, let me ask
10    you -- the next page; do you know what that is?
11        A.      It looks like a computer-generated request
12    for product from FN Herstal for different products.
13                It's going to the same show, sir, 2006
14    show.
15        Q.      If you look on the third page, if you look
16    in the upper left-hand corner below the line that goes
17    all the way across, there's a No. 700195, and that
18    appears to be the same number that is on the preceding
19    page?
20        A.      Oh, I see it.  Okay.  Yes, sir.
21        Q.      And the date of the preceding page appears
22    to be the 25th of April, '06.
23                And does that appear to correspond with the
24    dates below that number on the third page?
25        A.      (No response.)
```

**DX200**

```
 1      Q.      I think you are one page ahead of me.  Yes.

 2      A.      I'm on to third page.  Are you on the third

 3   page?  No.

 4      Q.      The first page is the e-mail.

 5      A.      Okay.  I'm on a page ahead of you, sir.

 6      Q.      All right.  So there, does that number and

 7   date appear -- on the third page -- appear to

 8   correspond to the number and date shown on the second

 9   page?

10      A.      Yes, sir.

11      Q.      And can you tell from looking at the items

12   listed there in this request, which seem to be in a

13   relatively universal language, things like 57

14   tactical?

15      A.      Correct.

16      Q.      I see SCAR-Light, SCAR-Light CQC, SCAR-

17   Heavy standard?

18      A.      Right.

19      Q.      MINIMI?

20      A.      Correct.  Grenade launcher, standalone,

21   P-90 laser visibles.  Yes, that 2000 tacticals.

22      Q.      So is it a correct inference to draw that

23   this is a list of those items that were requested to

24   be displayed at that show?

25      A.      It looks that way; yes, sir.
```

**DX200**

```
 1       Q.     I believe you testified that you were not
 2   at that show?
 3       A.     Correct, sir.
 4       Q.     I'll ask you to turn to the very last page
 5   of this exhibit.
 6       A.     Yes, sir.
 7       Q.     And, again, it's in French, but do you
 8   recognize what this -- what this is?
 9       A.     I honestly don't know what this is, sir.
10       Q.     Okay.
11       A.     It looks -- it looks like an itinerary for
12   somebody.  It's got dinner and hotels and
13   presentation.
14              Then on the second day of -- October 5th,
15   it's got a demonstration of SCAR product, the F-2000,
16   the 57.
17              And then it looks like they depart Herstal,
18   it's got Jim Healey, H-e-a-l-e-y, who back in 2005,
19   2006 was in charge of doing all the product
20   demonstrations for FN Herstal.
21       Q.     And they are located in Herstal, Belgium?
22       A.     Yes, sir.
23              (EXHIBIT 32 MARKED.)
24              THE WITNESS:  Thank you -- whoops -- thank
25   you, ma'am.
```

**DX200**

1    Q.    You have been handed what's been marked as

2    Exhibit 32.  Can you tell me what this document is?

3    A.    It looks like an invoice from the Sands One

4    Promotion to FN Herstal for 100 pieces of plastic

5    scale models of the SCAR.

6    Actually, I'm sorry, 50 for the mag, which

7    would be a mag 58.  It's a belt-fed machine gun.

8    Q.    7.62?

9    A.    7.62 caliber, yes.  And then 50 pieces of

10   the SCAR models.

11   Q.    Do you know what those models were?

12   A.    I have never seen them, sir.  So I would

13   speculate as to if they are solid, plastic, or what

14   they are.  I would be speculating.

15   Q.    Do you have any knowledge of whether FN

16   Herstal has used plastic scaled models of their

17   products for any --

18   A.    We have.

19   Q.    -- purpose?

20   A.    FNH USA has.

21   Q.    What does FNH USA use them for?

22   A.    Sometimes if we go to a certain location,

23   and we can't take a real firearm, we will take a

24   plastic version of it just to demonstrate.

25   Q.    Would that be a one-to-one scale, a full

```
 1   scale?

 2       A.      You are asking the wrong person, sir.

 3       Q.      Oh.

 4       A.      I'm not technical in that aspect.  I mean,

 5   layman eyes, they looked like the same gun.

 6       Q.      What I mean is, as opposed to a

 7   miniaturized version?

 8       A.      Again, layman's eyes, it looks and feel

 9   like the same system --

10       Q.      Okay.

11       A.      -- if that help you.

12       Q.      It does.  Does FNH sell any of those

13   models, plastic models?

14       A.      I don't believe we have ever sold them,

15   sir.  To my knowledge, we haven't.  We don't have a

16   part number for them, and they are not in our catalog

17   either.

18       Q.      Looking at the second page --

19       A.      Yes, sir.

20       Q.      -- tell me what that is.

21       A.      It looks like a debt note paying the --

22   paying --

23       Q.      The shipping charge?

24       A.      The shipping charges, it looks like, sir.

25       Q.      Okay.
```

```
 1      A.      That's what it looks like; yes, sir.

 2      Q.      And both of the first two pages, they bear

 3   a date of 4 July 2012?

 4      A.      Yes, sir.

 5      Q.      Looking at the third page?

 6      A.      Yes, sir.

 7      Q.      Can you tell me what that is?

 8      A.      It looks like an invoice from the same

 9   promotional company to Herstal.

10              The first one is for watches -- for 300

11   watches; and then 75 plastic models of the MINIMI,

12   which is a 5.56 belt-fed machine gun; and then 75 of

13   the SCAR -- it doesn't say what model, just plastic

14   model.

15      Q.      Just for clarity, this invoice -- referring

16   to the MINIMI -- is not for actual belt-fed machines,

17   as far as --

18      A.      It's plastic models, it says.

19      Q.      Okay.

20      A.      I would love to go buy a belt fed for $79.

21      Q.      The watches, do you have any idea what

22   those are?

23      A.      I would say they are give-aways, sir; but I

24   would be speculating.

25      Q.      And the date on this is 6 July 2009; is
```

```
 1    that correct?

 2        A.      That is correct, sir.

 3        Q.      And on the last page of this, can you tell

 4    me what that appears to be?

 5        A.      It's another invoice dated 2 May 2007 from

 6    the same Sands One Promotions.

 7                It's for one prototype SCAR model, for 165

 8    plastic SCAR models, for 50 plastic F-2000 models,

 9    1,000 multi-tools.  I don't know what that is, sir,

10    but at $2.75, I'm sure it's a give-away.

11                And then I guess that's the shipping charge

12    at the bottom.

13        Q.      All right.  And the date on this -- is that

14    2 May of 2007?

15        A.      Yes, sir, it is.

16        Q.      All right.

17                (EXHIBIT 33 MARKED.)

18                THE WITNESS:  Thank you.

19        Q.      You have been handed what's been marked as

20    Exhibit 33.

21        A.      Yes, sir.

22        Q.      It bears FN Bates Nos. ending in 1120

23    through 1129.

24        A.      Yes, sir.

25        Q.      A collection of photographs.  Can you tell
```

 1    me, on the first page, what is shown there, if you can

 2    tell?

 3         A.     It looks like the, again, ATK SCAR t-shirt,

 4    SCAR hat and SCAR soft bag, carry bag.

 5         Q.     ATK, that is a company in Minnesota; is

 6    that correct?

 7         A.     I don't remember where they are at.

 8         Q.     Okay.

 9         A.     But --

10         Q.     ATK is that the same company that

11    manufactures ammunition?

12         A.     ATK/Federal.

13         Q.     Okay.

14         A.     Yes, sir.

15         Q.     And is it your testimony that ATK produced

16    these items?

17         A.     Yes, sir.

18         Q.     Do you know whether they sold those items?

19         A.     I believe they did; yes, sir.

20         Q.     Do you know when?

21         A.     Somewhere in our paperwork -- we were

22    looking through it -- I believe there was a licensing

23    agreement with FN Herstal and ATK.  I don't know

24    exactly when they sold them.  No, sir.

25         Q.     All right.  If you look further back,

**DX200**

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)    Charles Newton Mills, III on 08/14/2013    Page 126

```
 1   starting at the page with the Bates No. 1124 at the

 2   bottom --

 3       A.    Yes, sir.

 4       Q.    -- can you tell me what is shown there?

 5       A.    I have no clue.  It's just the packing

 6   slip.  I mean the -- I guess packing.

 7       Q.    Maybe a hang tag?

 8       A.    A hang tag on the top and then on the

 9   ergonomic grip; again, the same thing with the next

10   page.

11       Q.    The next page is, perhaps, the reverse

12   side?

13       A.    The back side of the same items; yes, sir.

14       Q.    And were these items sold by ATK?

15       A.    Yes, sir.

16       Q.    And the next page, 1126 and 1127, that,

17   again, is that packaging shown there?

18       A.    Yes, sir.  That's packaging for the rail

19   covers, which are the 1913 Picatinny rail covers.

20       Q.    And, again, these were sold by ATK?

21       A.    Yes, sir.

22       Q.    And then the last two pages appear to be

23   front and back of packaging again?

24       A.    Yes, sir, it does.

25       Q.    And that's for a SCAR-L pull-through
```

```
 1   cleaning kit?

 2      A.     Yes, sir.

 3      Q.     And, again, that was sold by ATK?

 4      A.     Yes, sir.

 5      Q.     Looking at the bar code on the last page

 6   there, for example, it appears to be all zeros.

 7      A.     Okay.

 8      Q.     Is that correct?

 9      A.     That's what it looks like; yes, sir, with a

10   996142 on the top of it --

11      Q.     Okay.

12      A.     -- for something.

13      Q.     To the left of that, it indicates Onalaska

14   Operations?

15      A.     Okay.

16      Q.     PO Box 39, Onalaska, Wisconsin?

17      A.     Okay.

18      Q.     Do you know what Onalaska Operations is?

19      A.     No clue, sir.

20             MR. BELLAMY:  Onalaska is spelled O-n

21   Alaska.

22             MR. EHRLICH:  I like how they spelled that.

23             MR. BELLAMY:  This would be a good point to

24   take another brief break.

25             (OFF THE RECORD.)
```

```
 1                 (EXHIBIT 34 MARKED.)

 2                 THE WITNESS:  Thank you, ma'am.

 3       Q.     I'm handing you what's been marked as

 4   Exhibit 34.

 5                 For the record, there was a group of

 6   documents that I was supplied, three copies each of

 7   this morning, as some supplemental document production

 8   from FN.

 9                 This was one of those.  My expectation is,

10   is that this will be produced with the Bates number

11   later.  But we won't wait for that -- go ahead and ask

12   you a question about it now.

13       Q.     Okay.

14                 MR. EHRLICH:  And just to complete what we

15   talked about, we will designate the level of

16   confidentiality on documents, if any.  But until then,

17   we will just keep them attorney's eyes only, until we

18   designate them.

19                 MR. BELLAMY:  Okay.

20                 MR. EHRLICH:  Thank you.

21       Q.     (BY MR. BELLAMY:)  Exhibit 34, can you tell

22   me what this is?

23       A.     It's a letter that I wrote to Mr. Vasques,

24   V-a-s-q-u-e-s, dated October 19, '06.  Telling him

25   that --
```

**DX200**

```
 1      Q.      Let me interrupt.

 2      A.      I'm sorry.

 3      Q.      Mr. Vasques is at the ATF Firearms

 4   Technology Branch?

 5      A.      Yes, sir, he is.

 6      Q.      Go ahead.

 7      A.      What is your question then now?

 8      Q.      Go ahead and tell me -- just let me clarify

 9   who that was.  Tell me what this document is then?

10      A.      It's a response to a phone call that he

11   gave me, asking about production of SCARs.  When I say

12   SCARs:  Production Select Fire SCAR, that they wanted

13   to test and evaluate for possible purchase by ATF.

14              And dated this October 19, '06.  I told him

15   that we only had prototype.  We, as in FNH USA, only

16   prototype SCARs.  We had GEN 1, 2 and 3 at the time.

17   And that we didn't want them to test a thing for

18   evaluation until we had a production version of it.

19      Q.      Just so I'm clear, the inquiry was about

20   ATF purchasing firearms?

21      A.      Purchasing SCARs; yes, sir.

22      Q.      As opposed to testing for some sort of --

23      A.      No.  This was for purchase.

24      Q.      -- for approval?

25      A.      Yes.  It says:  For possible purchase.
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 130 of 235    DX200.0130

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 130

```
 1            It's for their -- to buy.  They wanted to
 2    carry it.
 3            (EXHIBIT 35 MARKED.)
 4       Q.    You have been handed what's been marked as
 5    Exhibit 35.
 6            MR. BELLAMY:  And, again, this was one of
 7    the documents provided this morning and the same --
 8            MR. EHRLICH:  That's right.
 9            MR. BELLAMY:  -- same details apply?
10            MR. EHRLICH:  Yes, sir.
11       Q.    (BY MR. BELLAMY:)  Can you tell me what
12    this document is?
13       A.    It's a printed copy of a PowerPoint
14    presentation to the ACU Sport Dealer show dated --
15            COURT REPORTER:  To the what, please?
16            THE WITNESS:  To the ACU Sport Dealer show,
17    A-C-U.
18       A.    They are one of our commercial
19    distributors, one of the largest ones in the
20    country -- dated January 20, 2007, presented by Rick
21    Demilt -- and you had that from before.
22       Q.    Who would attend the ACU Sport Dealer show?
23       A.    Commercial FFL owners/FFL dealers.  And the
24    FFL is Federal Firearms License -- dealers.
25            They had -- I want to say between four and
```

```
 1    800; they would fly in dealers from across the country

 2    to their show every year.  It's usually a three-day

 3    show.

 4       Q.     Do you know whether there are similar

 5    documents?  And by that I mean, PowerPoint

 6    presentations for earlier shows, earlier than 2007 ACU

 7    Sport Dealer shows?

 8       A.     This one was -- I'm sorry.  Ask the

 9    question again.  I apologize.

10       Q.     Well, this was presented in 2007 at the ACU

11    Sport Dealer show?

12       A.     Yes, sir.

13       Q.     What I'm asking is, let me ask this:  Did

14    Rick Demilt, or someone from FN, routinely present at

15    the ACU Sport Dealer show every year?

16       A.     We showed our product every year, myself

17    included, because I worked these shows with them.

18    This one show here was special because they started

19    something new, where they would have, I believe, 40

20    dealers at a time come in for sessions, and we would

21    explain our company, explain our product features and

22    benefits of our product.

23              So it was a more -- instead of just coming

24    by our booth, it was a captured audience, and they did

25    it this one year.  I'm not sure they did it ever
```

**DX200**

```
 1   again.

 2       Q.      Okay.

 3       A.      But that's why this PowerPoint presentation

 4   was developed.

 5               MR. BELLAMY:  That's all I need to -- okay.

 6               THE WITNESS:  That was an easy one.  That

 7   was a thick one.

 8               MR. BELLAMY:  Yeah.

 9               (EXHIBIT 36 MARKED.)

10       Q.      You have been handed what's been marked as

11   36.

12               This is a document that FN produced in the

13   course of this litigation -- produced to us.  Can you

14   tell me what this is?

15       A.      Um, sorry.  I think I might have saw this

16   when -- or seen this when I was scanning through the

17   paperwork.

18               Other than that, I could not tell you, sir,

19   other than it looks like something that was downloaded

20   from the Internet that talks about the Shot Show 2006,

21   and it mentions the SCAR brand rifles along with other

22   things.

23       Q.      At the bottom left, it appears -- it looks

24   to me like a page number, and then it says Sotech.  Is

25   that -- is Sotech a publication?
```

**DX200**

```
 1      A.      Sir, I don't know if that's what it says.

 2      Q.      Okay.

 3      A.      Honestly, that would be pure speculation on

 4   my part.

 5              MR. BELLAMY:  All right.

 6      A.      Good enough.

 7      Q.      Well, let's go back to that a moment.

 8      A.      Yes, sir.

 9      Q.      At the top, it says compiled by:  KMI

10   staff.  Do you know what KMI is?

11      A.      No, sir.  Sorry.

12      Q.      Blackwatch, does that mean anything to you

13   in this context?

14      A.      No, sir, it doesn't.

15              (EXHIBIT 37 MARKED.)

16              THE WITNESS:  Thank you.

17      Q.      You have been handed what's been marked as

18   37, Exhibit 37.

19              And, frankly, I don't know whether these

20   two -- this is a two-page document -- and I don't know

21   whether these two go together or not; do you know?

22      A.      No, sir --

23      Q.      Okay.

24      A.      -- I don't.

25      Q.      Looking, then, at the second page, Bates
```

**DX200**

```
 1   number ending in 400.  Again, at the bottom this is a
 2   little more clear, it looks like Page No. 44, and then
 3   Sotech, S-o-t-e-c-h, 3.2.  Does that mean anything to
 4   you?
 5       A.    No, sir, it doesn't.  Other than it might
 6   be -- from the top header -- Special Operations
 7   Technology.  It might be abbreviation for that.
 8       Q.    So is it correct that you are not familiar
 9   with a publication known as Special Operations
10   Technology?
11       A.    I have seen it before, sir.
12       Q.    So it is a publication of -- some sort of a
13   printed publication?
14       A.    I have seen it before, a print magazine;
15   yes, sir.
16       Q.    Okay.
17       A.    I have seen that before.
18             MR. BELLAMY:  All right.
19                  (EXHIBIT 38 MARKED.)
20             THE WITNESS:  Thank you, ma'am.
21       Q.    You have been handed what's been marked as
22   Exhibit 38.  This was a document that was produced by
23   Clyde Armory in discovery in this case.
24             And I will represent to you that it's the
25   cover, the table of contents pages and so forth, of an
```

**DX200**

```
 1    issue of Popular Mechanics from September, 2004.

 2              Have you seen this --

 3    A.      No, sir.

 4    Q.      -- before?

 5    A.      No, sir.

 6    Q.      Do you recall ever seeing this issue of

 7    Popular Mechanics?

 8    A.      No, sir; I do not.

 9              MR. BELLAMY:  Okay.

10              (EXHIBIT 39 MARKED.)

11              THE WITNESS:  Thank you -- whoops -- thank

12    you, ma'am.

13              MR. BELLAMY:  Burt, I think I gave you my

14    copy; it has some highlighting.

15              MR. EHRLICH:  Yeah, yeah.  But I have no

16    idea of that, so --

17              MR. BELLAMY:  Okay.  That's fine.

18              MR. EHRLICH:  I mean, I just I went right

19    to the highlighting.

20              MR. BELLAMY:  I didn't want you to think

21    that was in the original or anything.

22    Q.      (BY MR. BELLAMY:)  You have been handed

23    what's been marked as Exhibit 39.  This is a document

24    that was provided in the production of documents in

25    this litigation by FN.  Do recognize what this is?
```

**DX200**

```
 1      A.      I might have seen it before, sir.

 2      Q.      It appears to be a reprint or a copy from

 3   Janes Defense?

 4      A.      Correct.

 5      Q.      Is that a publication that you regularly

 6   read?

 7      A.      No, sir.

 8      Q.      Did you regularly read it back in 2005?

 9      A.      No, sir.

10              THE WITNESS:  I have two copies -- for some

11   reason.

12              MR. EHRLICH:  Do I have the one with the

13   court reporter seal -- excuse me -- I'm sorry.

14   Somebody wrote Exhibit 39 on this other than me.

15              MR. BELLAMY:  I did.

16              THE WITNESS:  He did.  Until he realized it

17   was not his.

18              MR. BELLAMY:  Okay.

19              (EXHIBIT 40 MARKED)

20               THE WITNESS:  Thank you, ma'am.

21              MR. BELLAMY:  Sorry.  Is this Exhibit 40?

22              COURT REPORTER:  Yes, 40.

23      Q.      (BY MR. BELLAMY:)  You have been handed

24   what's been marked as Exhibit 40.

25      A.      Yes, sir.
```

**DX200**

```
 1      Q.      Have you seen this document before?

 2      A.      I might have reviewed it when I was

 3   scanning through the material for this case, sir.

 4      Q.      Do you have any independent knowledge about

 5   this document?

 6      A.      No, sir.

 7              MR. BELLAMY:  Okay.

 8              (EXHIBIT 41 MARKED.)

 9              THE WITNESS:  Thank you.

10      Q.      You have been handed what's been marked as

11   Exhibit 41.

12              This appears to be a copy of a page from a

13   publication Defense News, October 9, 2006.

14      A.      Okay.

15      Q.      Have you seen this document before?

16      A.      Again, I might have scanned it -- reviewed

17   it when I was scanning through the materials, sir.

18      Q.      Do you have any independent knowledge about

19   this document?

20      A.      No, sir.

21              (EXHIBIT 42 MARKED.)

22              THE WITNESS:  Thank you.

23      Q.      You have been handed what's been marked as

24   Exhibit 42.  Do you know what this document is?

25      A.      It looks like something copied off the
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 138 of 235    DX200.0138

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 138

 1    Internet, sir, I don't know.

 2        Q.    From the bottom right-hand corner, can you

 3    tell what that source is?

 4              THE WITNESS:  Thank you.

 5        A.    WWW.tomagonline.com.  Never heard of them,

 6    sir.

 7        Q.    To being T-O?

 8        A.    Yes, T-O.

 9        Q.    Mag, M-A-G, online?

10        A.    Yes, sir.

11        Q.    At the top right-hand corner, handwritten

12    is:  2008 Shot Show; do you recognize that

13    handwriting?

14        A.    No, sir.  It's too good for mine.

15        Q.    In the green block, lower left quadrant,

16    the second paragraph, it reads:  New for 2008, is the

17    law enforcement introduction of the SCAR-L and SCAR-H

18    rifles.

19              Do you recall, was Shot Show 2008 when the

20    law enforcement introduction was of the SCAR-L and

21    SCAR-H rifles?

22              MR. EHRLICH:  Objection.  I think he

23    testified to showing the product at Shot Show 2006.

24                 But, you know, I think it mischaracterizes

25    -- I don't know what it means by "new," but go ahead.

```
 1        A.     I showed them to law enforcement in 2006,

 2   the SCAR-Light and SCAR-Heavy.

 3        Q.     So is it your testimony that this statement

 4   in this document -- wherever it came from -- that:

 5   New for 2008 is the law enforcement introduction of

 6   the SCAR-L and SCAR-H rifles; that that is incorrect?

 7        A.     My testimony is that I showed these in the

 8   2006 Shot Show to law enforcement, the SCAR-Light and

 9   SCAR-Heavy, that's my testimony, sir.

10               I didn't write this article or know what

11   direction this person was going in.

12        Q.     Two sentences later it says:  The SCAR,

13   which is an acronym for Special Combat Automatic

14   Rifle, has been developed in two versions.

15               Is it correct that SCAR is an acronym for

16   Special Combat Automatic Rifle?

17        A.     Again, I did not write this.  Could that be

18   one of the acronyms?  Yes, sir.

19               (EXHIBIT 43 MARKED.)

20               THE WITNESS:  Thank you, ma'am.

21               MR. BELLAMY:  Off the record.

22               (OFF THE RECORD.)

23        Q.     You have been handed what's been marked as

24   Exhibit 43.  Do you recognize what this document is?

25        A.     Do I recognize it?  No, sir.  I may have
```

**DX200**

```
 1    seen it when I was scanning through the piles of

 2    paperwork.

 3        Q.    At the top, it appears to say -- top

 4    middle:  2008 Eurosatory; is that correct?

 5        A.    The very top header?

 6        Q.    Yes.

 7        A.    It looks like that; yes, sir.

 8        Q.    Do you have any independent knowledge of

 9    this article?

10        A.    No, sir.

11              (EXHIBIT 44 MARKED.)

12              THE WITNESS:  Thank you, ma'am.

13        Q.    You have been handed Exhibit 44, which is a

14    collection of photographs that were provided to us by

15    FN, bearing the Bates Nos. ending in 318 through 325.

16              Can you take a look at those, and I'll ask

17    you some questions?

18        A.    Yes, sir.

19        Q.    The first page that is marked with the

20    number ending in 318, can you tell me what that is a

21    photograph of?

22        A.    It looks like a photograph of the show in

23    2006.

24        Q.    Of which show?

25        A.    I'm sorry.  Eurosatory.
```

**DX200**

```
 1      Q.      Eurosatory?

 2      A.      Eurosatory; yes, sir.

 3      Q.      In 2006?

 4      A.      Yes, sir.

 5      Q.      How do you know what year?

 6      A.      Because I asked Jim Sharp, who was on Page

 7   3, far left-hand side -- S-h-a-r-p.  He told me that

 8   was the show in 2006 that he attended.  He works for

 9   FNH USA on the military side.

10              And then the young lady in the middle was

11   Barbara Sadowy.

12      Q.      And he told you that this was taken in

13   2006?

14      A.      Yes.  To his knowledge, he remembered this

15   being the 2006 setup.

16      Q.      And the second photograph, number ending in

17   319, can you tell me what that is?

18      A.      Somebody holding a SCAR.  It's a very poor

19   picture quality, but it's a SCAR-Heavy that somebody

20   is holding.  That's pretty much all I can tell from

21   that.

22      Q.      Did you inquire as to when this photo was

23   taken?

24      A.      I did not, sir.

25      Q.      And the third page, ending in the No. 320;
```

**DX200**

1    there again, can you identify the three people?

2        A.    I can just identify the two; I do not know

3    the third person --

4        Q.    Okay.

5        A.    -- sir.

6        Q.    And you were told just to confirm that this

7    photo also was taken in 2006 at Eurosatory?

8        A.    Yes, by Jim Sharp, who is on the far left.

9        Q.    You were told by him?

10       A.    Yes.

11       Q.    He probably didn't take the photo, since

12   he's in it?

13            MR. EHRLICH:  He may have.  He may have set

14   up a camera.

15            MR. BELLAMY:  Maybe.

16       A.    I don't know that; that's pure speculation,

17   sir.

18       Q.    The next photo, with the number ending in

19   321, the same questions about it:  Can you tell me

20   what this is?  Do you know where and when?

21       A.    No, sir, I can't.

22       Q.    Did you inquire as to the place or the time

23   and location of this photograph?

24       A.    I did ask Jim Sharp, but he did not

25   remember this photograph, sir.

1    Q.    The next one with the number ending in 322,

2    same question:  Do you have any knowledge of where and

3    when this was taken?

4    A.    No, sir; I do not.

5    Q.    Do you recognize the booth shown in there?

6    A.    No, sir; I do not.

7    Q.    The next page, with the number ending in

8    323, do you have any knowledge of where and when that

9    was taken?

10    A.    No, sir; I do not.

11    Q.    Do you recognize the FN Herstal booth

12    that's shown in the photo?

13    A.    No, sir; I have never been to that show, so

14    I have never seen that booth.

15    Q.    Had you seen that particular setup of a

16    booth with the blue panels?

17    A.    No, sir.

18    Q.    And --

19    A.    (No response.)

20    Q.    And, finally, okay -- not finally, the next

21    one ending in 324, that photograph, do you have any

22    knowledge of where and when that was taken?

23    A.    No, sir; again, I do not.

24    Q.    Did you make the same inquiry?

25    A.    Yes, sir; I did.

```
 1      Q.      And as to the last page ending in the

 2   numbers 325, do you have any knowledge of where and

 3   when that was taken?

 4      A.      No, sir; I do not.

 5      Q.      And did you make the same inquiry?

 6      A.      Yes, sir; I did.

 7      Q.      Let me go in a little different direction.

 8              The designation SCAR 16-S and SCAR 17-S, do

 9   those designations have any particular meaning?

10      A.      To myself, personally?

11      Q.      Yes.

12      A.      Yes, sir; they do.

13      Q.      What do they mean?

14      A.      The SCAR 16-S is the SCAR brand 5.56

15   semiautomatic commercial version.

16      Q.      An the SCAR 17-S?

17      A.      The SCAR 17-S is the SCAR brand 7.62

18   semiautomatic version.

19      Q.      And the select fire versions in 5.56 are

20   known as what?

21      A.      Depends on which year, sir.

22      Q.      What different designations have they been

23   given?

24      A.      Okay.  The original SCAR 5.56 was the SCAR-

25   Light.
```

**DX200**

```
 1              The select fire version, until it was fully

 2    adopted by SOCOM, at which time it became the MK-16,

 3    but for law enforcement it stayed SCAR-Light, at

 4    first.

 5              Then about three or four years ago, we

 6    flipped it to -- we changed the designation to SCAR-

 7    16; we took the L out.

 8        Q.    And the same nomenclature?

 9        A.    For the 17, sir.

10        Q.    Okay.

11        A.    Yes, sir.

12        Q.    The 17 and the 7.62?

13        A.    17 is the 7.62, 5.51.  And it's currently a

14    SCAR 17 or an MK 17, military MK 17, US law

15    enforcement SCAR 17, commercial SCAR 17-S.

16              (EXHIBIT 45 MARKED.)

17              THE WITNESS:  Thank you.

18              MR. BELLAMY:  Burt, I said I was going to

19    give you that.

20              MR. EHRLICH:  Okay.  I'm sorry.  That was

21    43.  Okay.

22        Q.    Handing you what has been marked as Exhibit

23    43.  This was provided to me by FN in response to some

24    document requests.  Can you tell me what this is?

25        A.    It looks like a -- pretty much a ship
```

 1    report on everything that FNH USA has ordered on the

 2    SCAR-Light or the SCAR 16 and flat dark grip, Sniper

 3    Variant, black.  And then what is actually -- what has

 4    actually been shipped, it looks like.

 5            Again, a lot of this is in French, so I'm

 6    sorry.

 7        Q.    Where do you see the distinction between

 8    ordered and shipped?  Can you point that out?

 9        A.    On these, ordered would be like 20,000 or

10    100,000; and the shipped -- it looks like a thousand

11    here, if that's what the ship is.  That's my

12    interpretation of it only, sir.

13            If I understood French, I could probably

14    explain it a lot better.

15        Q.    In the left-hand column is a listing of

16    dates associated with each entry?

17        A.    Yes, sir.

18        Q.    Do you know, was that an order date?  A

19    ship date?

20        A.    Again, I don't know what that word means.

21    So I don't know, sir.

22        Q.    And you said this is from FN Herstal --

23    shipped to FNH; how do you know it was to FNH?

24        A.    The third column over:  FNH USA, LLC.

25        Q.    I see.  Were all SCAR rifles produced by FN

```
 1   Herstal that were imported to the US -- to the United

 2   States -- shipped to FNH USA?

 3             MR. EHRLICH:  Objection.  Asked and

 4   answered this morning.  He testified about something

 5   different.

 6       Q.    Do you understand my question?

 7       A.    Say it again, please.

 8       Q.    Were all FN SCAR rifles that were imported

 9   from FN Herstal to the United States, shipped to FNH

10   USA?

11       A.    As I answered this morning, no, sir.  Some

12   were shipped directly to Crane or US Special Forces or

13   US Department of Defense.

14       Q.    The first date listed in this document of

15   Exhibit 43 appears to be January 8 of 2005?

16       A.    Yes, sir.

17       Q.    Do you know, were any FN SCAR rifles

18   imported by FN Herstal into the United States to Crane

19   after January of 2005?

20       A.    Your question is way -- you're way mixed up

21   in your question, sir.  You need to repeat it.

22       Q.    Okay.

23       A.    FN Herstal didn't import guns.   FNH USA

24   did.

25       Q.    Well, you testified that there were some
```

**DX200**

```
 1    SCAR rifles sent from FN Herstal directly to Crane?

 2       A.      Correct.

 3       Q.      And my question is:  Were any of those done

 4    -- was that done after January of 2005?

 5       A.      Were any additional rifles sent to Crane

 6    after 2005?

 7       Q.      Yes.  Sent directly to Crane?

 8       A.      There were some sent in 2004.

 9       Q.      Okay.

10       A.      We already testified to that.  I do not

11    have any knowledge of that, sir.  I have not read any

12    documentation that says that.

13               (EXHIBIT 46 MARKED.)

14       Q.      You have been handed what's been marked as

15    Exhibit 46.  This was produced to us in the course of

16    this litigation by FN Herstal.

17               At the top it says:  This document was

18    especially prepared for litigation purposes.  Can you

19    tell me what this document is?

20       A.      No, sir.  I might have scanned it when I

21    was going through the paperwork; but other than that,

22    it looks like somebody's done a spreadsheet on the

23    year, the NSN number or part number and who it went

24    to, either NAVAIR or SOCOM and what type of guns and

25    then the quantities of each gun.
```

```
 1      Q.      And NAVAIR would have been Crane?

 2      A.      (No response.)

 3      Q.      Is that correct?

 4      A.      No.

 5      Q.      No?

 6      A.      No, sir.  I don't think so.

 7      Q.      Well, I see there's NSWC, that would be

 8   Crane?

 9      A.      Yes, sir.

10      Q.      And what would NAVAIR be?

11      A.      NAVAIR is NAVAIR.  And those are -- those

12   are M3M GAU 21s.  They are 50 cal machine guns.

13      Q.      I'm sorry.  I was -- I didn't notice that,

14   thank you.

15      A.      Yes, sir.  All the NAV are 50 cals.

16      Q.      So the listings where it says:  Client

17   SOCOM, would that have been -- would SOCOM have been

18   different from Crane?

19      A.      I didn't compile this, so -- so I can't

20   answer that.  I would be speculating.

21      Q.      The right-hand-most column, do you know,

22   does that indicate quantities?

23      A.      Again, I'm speculating, but it looks like

24   it.

25              (EXHIBIT 47 MARKED.)
```

1              THE WITNESS:  Thank you, ma'am.  Can we get

2       anything in English.  Killing me, man.

3              Q.     You have been handed what's been marked as

4       Exhibit 47, which is a collection of pages starting

5       with the number starting with 904 and ending in 958.

6       Can you tell me what this document is?

7              A.     Something that came from FN Herstal, sir.

8       Looks, again, like it gives you a description of

9       MK-16, Sniper Variants.  It's got what year, who is

10      paying for it, the client, either FN Manufacturing,

11      FNH USA, US Special Forces at the very bottom of Page

12      1.

13             General Dynamics -- it looks like it's a

14      computer program generated by FN Herstal that shows

15      where all these SCARs were shipped to.

16             Q.     Okay.

17             A.     To be quite honest, sir --

18             Q.     Okay.

19             A.     -- to include foreign countries.

20             Q.     That's what it looked like to me, too.

21             A.     Good.

22             MR. BELLAMY:  Thank you.

23             (EXHIBIT 48 MARKED.)

24             THE WITNESS:  Thank you, ma'am.

25             Q.     You have been handed what's been marked as

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 151 of 235    DX200.0151

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
30(b)(6)           Charles Newton Mills, III on 08/14/2013           Page 151

```
 1   Exhibit 48.  It's a collection of documents starting
 2   with the Bates No. -- from FN -- 2615, ending in 2629.
 3        A.     Yes, sir.
 4        Q.     Can you tell me what these are?
 5        A.     They look like invoices for -- from FN
 6   Herstal to FNH USA, LLC, for different quantities of
 7   SCARs and SCAR magazines, select fire semiautomatics,
 8   semiautomatics, a lot of select fires, more
 9   semiautomatics, an assortment of select fires and
10   semiautomatic SCARs, sir, that FN Herstal was billing
11   FNH USA for.
12        Q.     Let's look at a few of these.  The first
13   one --
14        A.     Yes, sir.
15        Q.     -- it appears to be dated in one of the
16   blocks near the upper right as 3/6/2008?
17        A.     Yes, sir.
18        Q.     And then one of the item descriptions is
19   the MK-16 mod zero?
20        A.     Yes, sir.
21        Q.     Okay.
22        A.     Standard version, which was a 14-inch
23   barrel version.
24        Q.     And would that rifle have been marked with
25   the brand SCAR?
```

1      A.      It should be marked with a brand SCAR

2   MK-16; yes, sir.

3      Q.      So is it correct that even those -- when

4   the designation was changed to MK-16 -- that they were

5   also marked with SCAR?

6      A.      I know the first batches were.  And I think

7   after that we went to ATF, and they said we could just

8   put MK-16.  But I don't know when we exactly flipped

9   that over.

10     Q.      Okay.

11     A.      So to be on the safe side, it could have

12  been marked either way.

13     Q.      Let me have you turn to the page -- the

14  bottom Bates number ending in 2620.

15     A.      Got you.

16     Q.      There I see two different types of -- two

17  different items listed:  One is the MK-16 mod zero --

18     A.      Yes, sir.

19     Q.      -- standard; the second one MK-17 mod zero

20  standard?

21     A.      Yes, sir.

22     Q.      Those would be select fire weapons?

23     A.      Yes, yes.  They are select fire, and they

24  went to our custom-bonded warehouse.

25             Down where it says Marks, CDS Air Freight

```
 1    is our custom bonded warehouse.  And that's where they

 2    are kept until ATF approves them to be shipped.

 3         Q.     And the date on this invoice is 15/09/2009;

 4    which I agree to be the 15th of September, 2009?

 5         A.     I would read it that way, too, sir.

 6         Q.     And the very next page, Bates number ending

 7    2621, has the same date?

 8         A.     Yes, sir.

 9         Q.     And the item entry there says:  7.62 by 51

10    SCAR 17, black 16-inch full auto rifle?

11         A.     Correct.

12         Q.     Can you explain to me the difference, if

13    any, between the SCAR-17 and the MK-17 that is on the

14    previous page?

15         A.     The only thing different is the muzzle

16    break.

17         Q.     And what is different about that?

18         A.     The law enforcement version has a

19    compensated muzzle break, where the military version

20    does not.

21         Q.     Does the military version have a muzzle

22    break with a suppressor mount?  Or it may or may not.

23         A.     It may or may not.

24         Q.     Oh.

25         A.     It did at one time.  I don't think it does
```

**DX200**

```
 1   anymore, sir.

 2      Q.      So am I correct in inferring that if the

 3   item said SCAR 17, that that was not a rifle intended

 4   to be sold to the military?

 5      A.      That could be sold to the military if they

 6   wanted it, but most of them were sold to US law

 7   enforcements.

 8      Q.      All right.

 9              (EXHIBIT 49 MARKED.)

10              (OFF THE RECORD.)

11      Q.      You have been handed what's been marked as

12   Exhibit 49.  Can you tell me -- do you know what this

13   is?

14      A.      Again, it's from FN Herstal Marketing,

15   dated 3/3/05, for an evaluation.

16              The product was delivered to FNH USA, to

17   our Crucible Fredericksburg location, and it's a SCAR-

18   Light CQC kit, which is a barrel kit;

19              And the second SCAR-Light the SV -- is the

20   Sniper Variant;

21              SCAR-Heavy, standard, a CQC kit for that;

22              And then a SCAR-Heavy Sniper Variant, a

23   grenade launcher, a grenade launcher trigger housing

24   for the SCAR-Light, a grenade launcher trigger housing

25   for the SCAR-Heavy, and a standard -- sorry -- a
```

```
 1    standalone stock that would fit either gun -- I'm

 2    sorry -- either grenade launcher.

 3        Q.     On the first page there are checked boxes

 4    for demonstration, exposition, evaluation -- and the

 5    fourth one, whatever that is --

 6        A.     I have no --

 7        Q.     What is the distinction between evaluation,

 8    demonstration and exposition?

 9        A.     Again, it's not my document.

10        Q.     Okay.

11        A.     It's a Herstal document, but a

12    demonstration would be, in my view, when they took a

13    product out to demonstrate for Herstal to a foreign

14    country.

15        Q.     Uh-huh.

16        A.     Exposition is the show, is they have taken

17    it to show.

18               And evaluation, it's being sent to somebody

19    for evaluation.

20               The last one is -- I have no clue.

21        Q.     Would that evaluation -- could that include

22    evaluation for someone outside of FNH?

23        A.     Speculation, sir.

24        Q.     Okay.

25        A.     I honestly don't know.
```

**DX200**

```
 1      Q.      And FNH USA Crucible --

 2      A.      That is our military -- that is where our

 3   military instructors and staff work out of.

 4      Q.      Okay.

 5      A.      It's in Fredericksburg, Virginia.  That's

 6   the location.

 7              (EXHIBIT 50 MARKED)

 8                 THE WITNESS:  Thank you, ma'am.

 9      Q.      You have been handed what's been marked as

10   Exhibit 50.  This bears FN's Bates Nos. ending in 2697

11   through 2700.  Can you tell me what this document is?

12      A.      Sure can.  It is a computer-generated

13   document by FNH USA that shows an individual -- an

14   employee of FNH US, when they checked guns in, checked

15   guns out.

16              The employee, which is Location 2014, which

17   is the fifth column over, is me.  This is my computer-

18   generated list from 2008 to current.

19      Q.      So this shows checked out to you; does it

20   show returned to someone else anywhere?

21      A.      No.  This shows checked out to me.  And

22   then it would be checked back in -- checked back in

23   date, take the second one down, Serial Number 105.

24      Q.      Yes.

25      A.      If you go down -- I don't know -- six or
```

**DX200**

```
 1   seven columns.

 2       Q.      Yes.

 3       A.      1055 is there again.  And it's got a

 4   different date, 3/9/2009.

 5       Q.      Right.

 6       A.      That was the check back-in date.

 7       Q.      How do you know what is in and what's out?

 8       A.      The first date is when I checked it out.

 9       Q.      Okay.

10       A.      And then when I returned it --

11       Q.      Okay.

12       A.      -- for a different version or different

13   model, or I didn't need that particular product

14   anymore.

15       Q.      So this is every transaction in or out?

16       A.      Of these particular firearms.

17       Q.      Of these?

18       A.      Serialized firearms.

19       Q.      To you?

20       A.      Yes.

21       Q.      And you are Location 2014?

22       A.      That's my employee No. 2014.

23       Q.      And for any given serial number, the first

24   one would be checked out to you, and the second time

25   it appears or the subsequent time it would be checking
```

**DX200**

```
 1    it back?

 2         A.      Yes, sir.  Yup.  That's how you read it.

 3               (EXHIBIT 51 MARKED.)

 4         Q.      You have been handed what's been marked as

 5    Exhibit 51, bears FN Bates numbers beginning 354

 6    ending in 357.

 7         A.      Yes, sir.

 8         Q.      Can you tell me what this document is?

 9         A.      It's a Herstal-generated document, sir.

10    It's talking about a SCAR 556, that apparently was

11    delivered June 15th of '04 to FNH USA at our

12    Fredericksburg Crucible location.

13               It does not show a serial number -- on Page

14    1, it does not at least.  And I apologize, but

15    everything is in French on Page 2.

16               Again, it shows a 55 -- no -- it shows

17    SCAR-Heavy, that's the only thing I can make out on

18    that page, sir.  Honestly, I can't make it out.

19         Q.      I see further across on that line it says:

20    Subject, demo SCAR?

21         A.      I'm sorry.  I see demo -- demonstration up

22    there?

23         Q.      Well --

24         A.      I see demo.  Okay.

25         Q.      Yeah.  Around the middle of that line,
```

```
 1   where you saw the Star H functional?

 2        A.     Yes.  And I see demo -- demonstration

 3   further up above that solid line.  Anything else would

 4   be a guess on my part, sir, on Page 2.

 5               Page 3, there was some product delivered to

 6   FNH; again, it looks like for demo a SCAR-Light

 7   standard version, a CQC barrel assembly, a SCAR-Light

 8   standard version -- I'm sorry -- Sniper version,

 9   SCAR-Heavy standard and another CQC, which I would

10   assume would be -- which I shouldn't -- but would be

11   for the Heavy.

12        Q.     On Page 2, right in the center of the

13   document, it looks like -- that it was addressed to --

14   oh, to McLean, Virginia?

15        A.     Yes.

16        Q.     On the third page, it looks like

17   Fredericksburg?

18        A.     McLean, Virginia, is where our headquarters

19   is, sir. Fredericksburg is where the Crucible location

20   is -- I discussed earlier with you.

21        Q.     Which is where military --

22        A.     Our military trainers; and -- for lack of

23   better words -- that's where they are out of, that's

24   where they stay.  They have an office facility down

25   there.
```

**DX200**

```
 1     Q.     Is that facility used for any non-military?

 2     A.     We do armorer classes there for law

 3   enforcement and for non-DOD US government people.

 4            THE WITNESS:  Are we done with that one,

 5   sir?

 6            MR. BELLAMY:  Probably.

 7            THE WITNESS:  Oh, I don't want to rush you.

 8            MR. BELLAMY:  Yeah.  We are done.

 9            (EXHIBIT 52 MARKED.)

10            THE WITNESS:  Whoops, I'm sorry, ma'am.

11     Q.     You have been handed what's been marked as

12   Exhibit 52, it bears FN production No. ending in 2694

13   through 2696.

14     A.     Yes, sir.

15     Q.     At the top of each page, it looks to me

16   like a fax header, does that look like that to you?

17     A.     Yes, sir, it does.

18     Q.     And first page is two, the second is three,

19   and the third one is one?

20     A.     Yes, sir.

21     Q.     Can you tell me what this set of documents

22   is?

23     A.     I would go from the third page forward.

24     Q.     Because it's in English?

25     A.     Pretty much, yes.  It is a -- they are
```

**DX200**

```
 1   sending items off of the first page to US Special

 2   Forces Command for testing -- for the solicitation,

 3   which the numbers are here in writing.

 4              It's telling how they are going to be

 5   shipped by freight.

 6              The second page is the freight forwarder;

 7   that is actually shipping the product from Herstal to

 8   US Special Forces, and it's going to Crane.

 9              And the first page is the actual items that

10   are being shipped:  Three SCAR-Lights, one SCAR-Light

11   CQC kit, tools.  I don't know what that other thing

12   is, non-material listing -- probably spare parts, that

13   would be paperwork.  Illustrative parts breakdown,

14   instruction for replacing parts.  The last -- I don't

15   know what that is, sir.

16       Q.     At the top of that description column, it

17   says:  Receiving officer, an address, and it states:

18   Attention:  Troy Smith?

19       A.     Yes, sir.

20       Q.     Did do you know Troy Smith?

21       A.     I have not personally met him, sir.  That's

22   also on the top right hand box, too.

23       Q.     Is there anything here that indicates the

24   serial numbers of these two SCAR-L --  well, I guess

25   there's one SCAR-L, the second conversion?
```

 1      A.      It looks like three SCAR-Ls.

 2      Q.      I see.  I see.  I see three?

 3      A.      It has three SCARs.  I don't see anything

 4   on that page, sir, that shows the serial numbers.

 5      Q.      Would an import license US government been

 6   necessary for this shipment?

 7      A.      If it's going to straight to DOD; no, sir.

 8              THE WITNESS:  Sorry, sir.

 9      A.      Going straight to DOD, it's not required.

10      Q.      Okay.

11      A.      To anybody else, yes.  I don't see serial

12   numbers, sir.  I'm sorry.  No where.

13      Q.      And the date on this -- I don't know if

14   you --

15      A.      28th of May, 2004.

16      Q.      On that the first page?

17      A.      Yes, sir.

18      Q.      On the third page of the fax cover sheet?

19      A.      June 4th, 2004.

20              MR. BELLAMY:  All right, thank you.

21              THE WITNESS:  Yes, sir.

22              (EXHIBIT 53 MARKED.)

23              THE WITNESS:  Thank you.

24      Q.      You have been handed what's been marked as

25   Exhibit 53, bears FN's Bates Nos. ending in 369 and

```
 1    370.  Can you tell me what this is?
 2       A.    No, sir.  I think I might have seen it when
 3    I was reading through the paperwork, but it looks like
 4    part of the contract 4/12 SCAR-Lights and two -- I'm
 5    sorry -- six SCAR CQCs delivered to Crane.
 6             And then on Page 2, there is another SCAR-
 7    Light, tool kits, gauges, EGLM modulars and EGLM fire-
 8    control unit, and an EGLM stand-alone butt stock
 9    attachment, 12 of them.
10             And it looks like they all went to the US
11    government, and they were inspected by the US
12    government, and accepted by the US government.
13       Q.    And just for the record, where do you see
14    that information about received and inspected?
15       A.    It states:  Inspected by -- it says
16    government.  Accepted by destination.  Accepted by
17    government.  And they were sent to the US -- sent to
18    Crane, US DOD, which is the "ship to" No. 14 on Page
19    1.  And the contract was issued No. 6, which is US
20    Special Operations Command.
21             MR. BELLAMY:  Okay.
22             (EXHIBIT 54 MARKED.)
23             THE WITNESS:  Whoops, thank you.
24       Q.    You have been handed what's been marked as
25    Exhibit 54, which is three documents beginning with
```

```
 1    FN's Bates No.'d ending in 417.

 2        A.      Yes, sir.

 3        Q.      Can you tell me what these are?

 4        A.      That's ATF Form 2 that I completed back in

 5    2005 for a SCAR-Light Serial No. 00103.

 6        Q.      And the date you got that from -- the

 7    filing date at the bottom, near your signature?

 8        A.      That's one of them; yes, sir.

 9        Q.      Is there another date?

10        A.      Yeah.  No. 7, it's the date of manufacture,

11    release from US Customs, which is the same date,

12    2/22/05.

13                So that's the date customs released it and

14    the date that we accepted it.

15        Q.      And the next two documents, can you tell me

16    what the next two pages, what do those show?

17        A.      Pictures of the receiver, with the same

18    serial number and branded SCAR-L.

19                And then the opposite side of the receiver,

20    which has the:  Manufactured by NF Herstal, Belgium,

21    imported by FNH USA, Fredericksburg, Virginia.  Those

22    are all markings that are required by ATF.

23        Q.      The markings on the FN SCAR weapon system,

24    are they on the upper receiver?  Or the lower

25    receiver?
```

**DX200**

```
 1     A.      There's only one receiver, sir.  There's
 2  only one receiver on any firearm.
 3     Q.      Okay.
 4     A.      You can't have multiple receivers.
 5     Q.      Is that the upper?  Or the lower?
 6     A.      On SCAR?
 7     Q.      Yes, on the SCAR?
 8     A.      The receiver is the receiver.  The lower is
 9  a trigger housing.
10     Q.      Okay.
11     A.      You are thinking of ARs and M-16 types?
12     Q.      I am.
13     A.      Where the lower is the actual receiver.
14     Q.      Exactly.
15     A.      Which is totally messed up.
16     Q.      Okay.
17     A.      We won't get into that, sir.
18             THE WITNESS:  I'm sorry.  Are you done with
19  that one?
20                 MR. BELLAMY:  Yes.
21             THE WITNESS:  Okay.
22             (EXHIBIT 55 MARKED.)
23     A.      So depending on the firearm, just depends
24  on --
25     Q.      Right.  I was just trying to clarify for
```

**DX200**

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 166 of 235    DX200.0166

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)                 Charles Newton Mills, III on 08/14/2013                 Page 166

 1    this particular firearm.

 2        A.      The receiver was the upper.

 3        Q.      Okay.

 4        A.      Yes, sir.

 5                THE WITNESS:  Thank you, ma'am.

 6        Q.      You have been handed what's been marked as

 7    Exhibit 55, which includes FN Production Bates No.

 8    ending in 2701 through 2708.

 9                This has some highlighting on there that

10    was the -- in the original, as it was provided to us,

11    just for the record.

12        A.      Okay.

13        Q.      Can you tell me what this document or these

14    documents are?

15        A.      Equipment Custody Reports, assigned to the

16    firearms that I checked out.

17                And if you see in the middle -- if there is

18    a -- I'll check them out, and at the bottom I would

19    sign and date the date that I received them.

20        Q.      Uh-huh

21        A.      And then when they were returned back in,

22    you would see like the red stamp that says "received".

23        Q.      Okay.

24        A.      And usually you would have a date on there,

25    but some of them are hard to read that they were

1    received back in.

2          The very first one is a SCAR-Light and

3    SCAR-Heavy that I checked out for 2006 Shot Show with

4    a Pelican case.

5          And then I flew with it -- which is always

6    interesting -- to the Shot Show and flew back with it.

7    Q.    How do you know it was for Shot Show?

8    A.    My memory.

9    Q.    Okay.

10   A.    Shot Show was like the following week in

11   February, early February.

12   Q.    The next page, with the Bates number ending

13   in 2702; what is this?

14   A.    Again, Equipment Custody Report, that I

15   checked out these four guns and 3/2 of 06:

16         The first two are F-2000s, the third one is

17   a SCAR-Light, the fourth one is a SCAR-Heavy.

18         And it shows the serial number on one of

19   those guns, which is actually the same serial numbers

20   that I checked out on Page 1.

21   Q.    Just for clarity, the Line Item 2 indicates

22   they are transferred to ATF Final; is that --

23   A.    That's what it says; yes, sir.

24   Q.    So just to be clear, you didn't check that

25   back in; you transferred it to ATF?

**DX200**

```
 1      A.      It was transferred to ATF.

 2      Q.      Somebody did?

 3      A.      Yes, sir.

 4      Q.      Okay.

 5      A.      Yes.  That F-2000 was not checked back in.

 6      Q.      And from your memory of this date, do you

 7   know what the purpose of checking these out was?

 8      A.      I think I did a demonstration for ATF

 9   Firearms Technology Branch.  I'm not sure, but I'm --

10   I believe that might have been what it was.

11      Q.      The next page appears to be just a

12   duplicate?

13      A.      Pretty much.

14      Q.      Following that, the Bates number ending in

15   2704?

16      A.      Yes, sir.

17      Q.      Just go through what this shows.

18      A.      SCAR QCQ, and then SCAR -- which I guess

19   would be a standard that I checked out on May 8th of

20   '06, and it was returned on May 31st, '06.

21      Q.      The next page?

22      A.      The next page are two firearms:  One is a

23   SCAR-Light I checked out on goodness -- looks like

24   June 6th of '06 -- and checked back in on the 16th.

25   And the second one is a SPR, it's a rifle, a bolt
```

```
 1   rifle, with the same dates.

 2       Q.      For June 6th -- oh, I see from your

 3   signature line --

 4       A.      At the bottom.

 5       Q.      Yes.

 6       A.      Yes, sir.

 7       Q.      Up above where it says:  Form of Request,

 8   it looks like 6/12/06?

 9       A.      Where?  I'm sorry, sir.  Oh.  Okay.  I'm

10   looking.  That's what it looks like it says.

11       Q.      All right.  Let's go to the next one and

12   just tell me what is going on there and when.

13       A.      SCAR-Light, a SCAR-Heavy checked out to

14   me -- it looks like July 18th, '06.  Returned -- oh,

15   goodness -- I don't understand those numbers.

16       Q.      Uh-huh.

17       A.      Actually, it looks like they were sent --

18   one of them was shipped to one of my folks -- one of

19   my outside sales guys on 5/29/07, but I would have to

20   look at that part number and see what it was.

21       Q.      Is that what the handwriting there at the

22   bottom of the --

23       A.      Yes, actually, the SCAR-Light was sent to

24   POLKIS, and that's the serial number, on 5/29/07.

25       Q.      The next page?
```

**DX200**

```
 1      A.      The next page is SCAR -- I'm sorry -- one,

 2   two, three, four -- four SCAR-Lights, four short

 3   barrels, four long barrels and four cleaning kits,

 4   checked out by me December 11th, '06.

 5              One of them was shipped to Ronnie Parker on

 6   5/29/07, Serial No. ending 1060.

 7      Q.      There in the column that says Returned, is

 8   that "demo" that is written?

 9      A.      It looks like it says demo; yes, sir.

10      Q.      And then the second line, can you read what

11   that says?

12      A.      It looks like a sales order number, it

13   looks like SO31502.

14      Q.      All right.  And the last page of this, same

15   questions about that.

16      A.      It is actually a copy of the very first

17   page -- it looks like.

18      Q.      Okay.

19      A.      Yes, that's a copy of the first page.

20      Q.      Save us some time, I have a second set of

21   documents with some different Bates Nos. that I

22   believe are duplicates.

23              And I'm going to look here real quick, and

24   if they are, I will have no questions.

25              MR. EHRLICH:  I can tell you off the top of
```

**DX200**

```
 1   my head, I think that those -- I noticed that wasn't

 2   quite the same set, so I wasn't sure if there was a

 3   continuity in the order, so we produced it.

 4            MR. BELLAMY:  Okay.

 5            MR. EHRLICH:  So one will be more

 6   comprehensive than the other.

 7            MR. BELLAMY:  It looks like --

 8            THE WITNESS:  -- the same thing.

 9            MR. BELLAMY:  But in different order.

10            MR. EHRLICH:  Right.  And I wasn't sure if

11   you wanted it.  So when it came in, I wasn't sure if

12   there was some significance.

13            MR. BELLAMY:  I'm not going to make you go

14   through those.

15                 THE WITNESS:  I appreciate that.

16            (EXHIBIT 56 MARKED.)

17            THE WITNESS:  Thank you, ma'am.

18       Q.    (BY MR. BELLAMY:)  You have been handed

19   what's been marked as Exhibit 56.  Can you tell me

20   what this document is?

21       A.     It looks like a Limited License Agreement

22   with -- between FNH USA and ATK for the accessories

23   that you were questioning me about earlier.

24       Q.    Okay.

25       A.     Yes, sir.  That's what it looks like.
```

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 172 of 235    DX200.0172

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 172

```
 1      Q.      This particular document appears to be

 2   unsigned?

 3      A.      Yes, sir.  It looks like it's not --

 4   doesn't have the last page.

 5      Q.      Do you know whether this document was, in

 6   fact, executed?

 7      A.      Yes, sir.

 8      Q.      Do you know when?

 9      A.      Off the top of my head; no, sir.

10      Q.      Okay.

11      A.      I know there is another signature page.  I

12   have seen it.

13      Q.      On the front page, it indicates the date

14   2008?

15      A.      Okay.

16      Q.      Does that appear to be the year in which

17   this license was created?

18      A.      Without the last page, I would be

19   speculating, sir.  And I really rather not, not having

20   seen the last page.

21      Q.      Looking at the last page of this, it's

22   titled:  Attachment B, it says:  The items the parties

23   will use are, or intend to use, in the future when

24   appropriate -- are these the accessories that are the

25   subject of this license?
```

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 173 of 235    DX200.0173

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013          Page 173

 1     A.     Yes, sir.

 2            (EXHIBIT 57 MARKED.)

 3            THE WITNESS:  Excuse me.

 4     Q.     You have been handed what's been marked as

 5     Exhibit 57, which includes FN's Production Nos. ending

 6     in 540 through 548.  Can you tell me what this

 7     document is?

 8     A.     It looks like an evaluation agreement for

 9     the commercialization of the accessories, the SCAR

10     accessories, between FNA USA and ATK.

11     Q.     Were you involved in the negotiation of

12     this agreement?

13     A.     Not at all, sir.  Short answer, no.

14     Q.     Do you know what the difference is between

15     Exhibit 57 and 56?

16     A.     No, sir, I do not, other than one looks

17     like an evaluation and the other one is -- looks like

18     a contract.

19     Q.     Yeah.  The one that is marked evaluation,

20     it's Exhibit 58, on the front page has the date 30

21     July 2009?

22     A.     Yes, sir.

23     Q.     Okay.

24            MR. EHRLICH:  Sorry.  Is this 57?  Or 58?

25            THE WITNESS:  This is 57.

```
 1              MR. EHRLICH:  Okay.  I think you just
 2    misspoke.
 3              THE WITNESS:  Fifty-six and 57.
 4              MR. EHRLICH:  Right, right.
 5              MR. BELLAMY:  I'm sorry.
 6              MR. EHRLICH:  Yeah.
 7              MR. BELLAMY:  Fifty-seven, yes.
 8       Q.    And Exhibit 57 does appear to be executed
 9    on the second-to-the-last page?
10       A.    Yes, sir.
11       Q.    And on behalf of FN Herstal, the first name
12    Claessens?
13       A.    C-l-a-e-s-s-e-n-s.
14       Q.    And what is his title?
15       A.    (No response.)
16       Q.    I mean, do you know what his title is?
17       A.    Now?
18       Q.    Yes.
19       A.    He's the boss.  He's the chairman of FN
20    Herstal Group.
21       Q.    Okay.
22       A.    He -- at that time, he was not -- he was
23    the next one down.  I don't know exactly what his
24    title would have been, sir.
25       Q.    "That time" being in 2009?
```

**DX200**

```
 1      A.      Yes, sir.

 2      Q.      And then Claude Dello?

 3      A.      D-e-l-l-o, and we discussed him before.

 4      Q.      Yes.  And then there's another signature

 5   block for FNH USA?

 6      A.      Louie Dillais, D-i-l-l-a-i-s.

 7      Q.      And he was President and CFO of FNH USA?

 8      A.      In 2009; yes, sir.

 9              (EXHIBIT 58 MARKED.)

10              (EXHIBIT 59 MARKED.)

11      Q.      All right.  You have been handed what's

12   been marked as Exhibits 58 and 59.  Referring first to

13   58, can you tell me what that is?

14      A.      It looks like a Master Licensing Agreement

15   between FN, which I would take FN Herstal, because it

16   says FH Herstal and Cyber Gun, which I -- which is

17   like an air soft gun -- or they sell air soft-type

18   products.

19      Q.      And do you know just what they were

20   licensing here?

21      A.      No, sir.  Personally, I do not.  If I was

22   to read into this, I would probably say it would be

23   some type of replica air soft firearm that looks like

24   a SCAR.

25      Q.      The date in the first line of this
```

**DX200**

```
 1   agreement, 25th day of June, 2010; is that correct?

 2        A.      That's what it states; yes, sir.

 3        Q.      And then it appears to be executed on Page

 4   17 of the document?

 5        A.      Yes, sir, it does.

 6        Q.      And for FN Herstal, there is Dominique

 7   Taquet?

 8        A.      I have never heard of that person, sir.

 9        Q.      And below that is another name with the

10   title Marketing Director?

11        A.      Correct.

12        Q.      Do you recognize that name?

13        A.      I have heard of that name.

14        Q.      Pierre Renier.

15        A.      Yes, sir, I have heard of that name.

16        Q.      And that person is in FN Herstal?

17        A.      Yes.

18        Q.      If you will -- keeping that in hand --

19   look at Exhibit 59.  I gave these to you together

20   because at the top of this I see it says Cyber Gun,

21   SA?

22        A.      Okay.

23        Q.      Can you tell me what Exhibit 59 is?

24        A.      I honestly cannot, sir.  I would be

25   speculating.  I honestly do not know if they are the
```

**DX200**

```
 1   air-soft version.  They are not our part numbers.  So

 2   I would take it they are the air-soft version of these

 3   products, because it's not our item number.  Again,

 4   that's speculation on my part.

 5                 (EXHIBIT 60 MARKED.)

 6                 THE WITNESS:  Thank you, ma'am.

 7        Q.     You have been handed what's been marked as

 8   Exhibit 60.

 9        A.     Yes, sir.

10        Q.     It says, at the top:  This document was

11   especially prepared for litigation purposes.

12                 With respect to the remainder of the

13   document, can you tell me what this is?

14        A.     I checked with Marketing Director Jo

15   Tarrent, T-a-r-r-e-n-t.  She had an outside company do

16   a study on the overall firearms industry; who was

17   buying firearms in the US, and that's what this is

18   about.

19                 It is not specific to FN product or to

20   SCAR product.

21        Q.     And was this study done in June of 2011?

22        A.     Again, it's the date that's on here.

23        Q.     Okay.

24        A.     She said it was around this.  I don't have

25   the exact date, sir.  It was a very generic study for
```

**DX200**

```
 1    the firearms industry, who's buying?

 2         Q.     And was that -- that study was paid for by

 3    FNH USA?

 4    A.     Yes, sir, to a third party.

 5               (OFF THE RECORD.)

 6    Q.     Let me hand you Exhibit 9.

 7    A.     Okay.

 8    Q.     Now, I hadn't crossed it off of my notes

 9    here.

10               THE WITNESS:  I thought we saw it earlier.

11    Q.     You have been handed Exhibit 9?

12    A.     Yes, sir.

13    Q.     Which I will represent to you is the cover

14    and title and table of contents pages and article

15    copied from the September 2006 issue of Small Arms

16    Review.

17    A.     Okay.

18    Q.     I have the entire magazine here if you

19    need to see it.  But this is just the pertinent part

20    that I copied.

21    A.     Okay.

22    Q.     Are you familiar with the publication,

23    Small Arms Review?

24    A.     By Dan Shea?  Yes, sir.

25    Q.     Is it something that you read regularly?
```

```
 1      A.      Occasionally.

 2      Q.      Is it something that you read at least

 3   occasionally in 2006?

 4      A.      I couldn't tell you, sitting here today in

 5   2013, sir.

 6      Q.      You don't have a personal subscription?

 7      A.      No, sir.

 8      Q.      If I could have you turn in Exhibit 9 to

 9   the Page 30 of the magazine.

10      A.      Okay.

11      Q.      An article titled:  The Colt SCAR Weapons

12   Types A And B?

13      A.      Okay.

14      Q.      Have you seen this article before?

15      A.      I might have saw it in reviewing paperwork

16   out of that huge stack, but I'm not sure.

17      Q.      Do you recall seeing it back in 2006?

18      A.      No, sir; I do not.

19      Q.      Do you have any awareness, independent of

20   this article of the Colt SCAR weapons that are

21   indicated in the title?

22      A.      No, sir; I do not.

23      Q.      Do you have any awareness of whether Colt

24   was one of the participants in SOCOM's SCAR program?

25      A.      I know there was nine participants, and I
```

**DX200**

```
 1    don't remember who they all were, sir.

 2       Q.    I will now refer you to Exhibit 10.

 3       A.    Yes, sir.

 4       Q.    Again, this is a reprint of portions of

 5    the October, 2006 Small Arms Review --

 6       A.    Yes, sir.

 7       Q.    -- magazine?

 8       A.    (No response.)

 9       Q.    And refer you to what is Page 50 of the

10    magazine.

11       A.    Okay.

12       Q.    Article titled:  Part Two, The Colt SCAR

13    Weapons Type C; have you seen this document before?

14       A.    No, sir, I haven't; not to my knowledge.

15       Q.    All right.

16           MR. BELLAMY:  Let's go off the record for

17    a couple of minutes, and I will see if I'm done.

18           MR. EHRLICH:  Yeah, okay.

19           (OFF THE RECORD.)

20           MR. BELLAMY:  Back on the record for just

21    a moment.

22              I don't have any other questions for you

23    today.  Thank you very much.

24           MR. EHRLICH:  And I have no questions.

25              (Off the record at 3:27 p.m.)
```

**DX200**

```
 1                        ERRATA SHEET

 2           Deposition of Charles Newton Mills, III

 3

 4     Page/Line    Description      Reason for Change

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**DX200**

```
 1              CERTIFICATE OF DEPONENT

 2

 3           I, Charles Newton Mills, III, hereby

 4    certify that I have read the foregoing pages of my

 5    deposition of testimony taken in these proceedings on

 6    August 14, 2013, and with the exception of the changes

 7    listed on the next page and/or corrections, if any,

 8    find them to be a true and accurate transcription

 9    thereof.

10

11

12

13

14

15    Signed:_____

16      Name:_____

17      Date:_____

18

19

20    Sworn to and Subscribed before me

21    _____, Notary Public.

22    This_____day of _____, 20____.

23    My Commission Expires:

24

25
```

**DX200**

```
 1                    REPORTER'S CERTIFICATION

 2

 3           I, Jane G. Drobnick LaPorte, court

 4   reporter and notary public do hereby certify that the

 5   above and foregoing transcript is true and correct.

 6           Dated this 27th day of August, 2013.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   _____

25              Jane G. LaPorte
```

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013

30(b)(6)                                                            Index: $1,029.05..17-S

**$**

**$1,029.05**
  108:22

**$2,740.42**
  107:21

**$2.75**  124:10

**$24,253.40**
  106:24

**$320**  106:18

**$320.50**
  105:15

**$79**  123:20

**-**

**-versus-**
  58:25
  79:21
  80:24
  84:25
  107:6

**0**

**0001**  108:24

**001**  107:18
  109:20

**00103**  164:5

**04**  49:23
  158:11

**05**  50:6
  107:22

**05/08**  92:14

**06**  13:16
  92:1
  118:22
  128:24
  129:14
  167:15
  168:20,24
  169:14
  170:4

**06/08**  92:7,
  10,11

**06/2008**
  90:19,21

**08**  90:21
  92:2,7

**09**  92:2

**09/08**  92:8

**1**

**1**  21:10,13
  37:15
  38:19 92:5
  129:16
  150:12
  158:14
  163:19
  167:20

**1,000**  124:9

**1,500**  116:16

**10**  38:16
  39:10
  180:2

**100**  15:17
  44:24
  56:22
  63:10
  64:16
  67:17
  82:11
  113:6
  121:4

**100,000**
  146:10

**100363**  82:16

**105**  156:23

**1055**  157:3

**1060**  170:6

**10:39:44**
  92:15

**1120**  124:22

**1124**  126:1

**1126**  126:16

**1127**  126:16

**1129**  124:23

**11th**  170:4

**12**  49:6,8,
  12 117:16
  163:9

**13**  61:16,20
  88:18

**14**  66:2,6
  163:18

**14-inch**
  151:22

**15**  29:10
  33:22
  38:5,19
  49:2,15,22
  50:16
  71:7,16

**15/09/2009**
  153:3

**15th**  153:4
  158:11

**16**  72:12,16
  81:19
  87:5,14
  88:1,14
  145:7
  146:2

**16-inch**
  153:10

**16-S**  144:8,
  14

**165**  124:7

**16s**  88:15

**16th**  168:24

**17**  49:22
  73:19,22
  81:24 87:5
  88:16,17
  145:9,12,
  13,14,15
  153:10
  154:3
  176:4

**17-S**  144:8,
  16,17

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
Charles Newton Mills, III on 08/14/2013

30(b)(6)                                                              Index: 18..2008

145:15

**18**  80:13,16

**1840**  113:13

**18th**  169:14

**19**  84:13,19
128:24
129:14

**1913**  98:18,
126:19

――――――

**2**

――――――

**2**  19:16,18,
20 21:10,
14 38:9,
13,15
45:1,4
74:17
124:5,14
129:16
158:15
159:4,12
163:6
164:4
167:21

**2/22/05**
164:12

**20**  50:5
89:4,7
130:20

**20,000**  146:9

**2000**  119:21

**2001**  15:15

**2002**  15:10,

16 38:7,21
47:15

**2003**  38:7,
21 47:16
51:2,8
52:14
55:22,25
56:4,18,25

**2003/2004**
50:17
51:18
52:22

**2004**  13:8
17:20
20:14
39:5,12,22
40:1,4,14
51:9
57:14,17,
20 84:11
96:13,25
98:2
103:6,13
135:1
148:8
162:15,19

**2005**  16:13,
22 17:20
67:7,11
68:15
74:14,15,
21 105:20
106:8
109:23
113:5
116:1
120:18

136:8
147:15,19
148:4,6
164:5

**2006**  13:12
16:13,14,
23 21:2,5,
14,18,19,
23 22:2
24:13
25:24
26:5,16
27:18,23
28:13,19,
24 29:4,
12,17,20
32:17,23
33:1,14,
18,19
34:3,12,
14,15,24
35:3,12,
14,25
36:4,9,16,
20 43:15
44:10,14,
22 45:1,5
46:9 67:7
74:1,4,7,
11 79:18,
21 80:2,8,
23 97:10
115:19,22
117:23
118:13
120:19
132:20
137:13

138:23
139:1,8
140:23
141:3,8,
13,15
142:7
167:3
178:15
179:3,17
180:5

**2007**  10:16
13:8 30:11
64:13
65:6,16
67:7
70:13,15
71:2,3
80:20,22,
23 82:3,9,
10,25
124:5,14
130:20
131:6,10

**2007/2008**
19:25
28:12

**2008**  33:11
43:17
63:21
64:15,19,
22 65:6,
15,16 67:7
84:21,22,
23 85:24
90:5
93:14,15
138:12,16,

| | | | |
|---|---|---|---|
| 19  139:5 | **25th**  118:22 | _____ | 121:2 |
| 140:4 | 176:1 | **3** | |
| 156:18 | | _____ | **320**  141:25 |
| 172:14 | **26**  63:13 | | |
| | 103:21,24 | 3  21:10,14 | **321**  142:19 |
| **2009**  123:25 | 116:4 | 38:5 82:13 | **322**  143:1 |
| 153:4 | | 99:9 | |
| 173:21 | **2615**  151:2 | 129:16 | **323**  143:8 |
| 174:25 | **2620**  152:14 | 141:7 | **324**  143:21 |
| 175:8 | | 159:5 | |
| | **2621**  153:7 | | **325**  140:15 |
| **2010**  176:1 | **2629**  151:2 | **3.2**  134:3 | 144:2 |
| **2011**  73:15, | | **3/2**  167:15 | **328**  116:12 |
| 18 94:12 | **2694**  160:12 | | |
| 177:21 | **2696**  160:13 | **3/3/05** | **329**  116:12 |
| | | 154:15 | **33**  124:17, |
| **2012**  9:2 | **2697**  156:10 | **3/6/2008** | 20 |
| 123:3 | **27**  16:2 | 151:16 | **34**  128:1,4, |
| **2013**  38:9 | 110:8,11 | | 21 |
| 179:5 | 112:1 | **3/9/2009** | |
| | 113:9,20 | 157:4 | **35**  130:3,5 |
| **2014**  156:16 | | **30**  13:12,16 | **354**  158:5 |
| 157:21,22 | **2700**  156:11 | 29:3,5,7, | |
| | **2701**  166:8 | 11 33:23 | **357**  158:6 |
| **20th**  107:22 | | 97:14 | **36**  132:9,11 |
| **21**  91:17,20 | **2702**  167:13 | 116:7,10 | **365**  83:12 |
| **21s**  149:12 | **2704**  168:15 | 173:20 | |
| | **2708**  166:8 | 179:9 | **366**  83:23 |
| **21st**  46:16 | | **30(b)(6)** | **369**  162:25 |
| **22**  92:25 | **28**  38:9 | 37:24 | **37**  133:15, |
| 93:7,17 | 111:21,23 | | 18 |
| | 112:4,7,16 | **300**  123:10 | |
| **23**  93:16 | **28th**  162:15 | **31**  116:25 | **370**  163:1 |
| 94:2 | **29**  113:22, | 117:4 | **38**  134:19, |
| **24**  94:23 | 23 114:1, | **318**  140:15, | 22 |
| 95:1 | 4,6,9,23 | 20 | **39**  127:16 |
| 101:10,16, | 115:18 | **319**  141:17 | 135:10,23 |
| 17,18 | | | 136:14 |
| **25**  100:14, | | **31st**  168:20 | **3:27**  180:25 |
| 17 | | **32**  120:23 | |

**4**

**4** 44:6
 55:16
 56:14
 92:11,13
 123:3

**4/12** 163:4

**40** 29:6,7
 97:14
 136:19,21,
 22,24

**400** 134:1

**41** 137:8,11

**417** 164:1

**42** 137:21,
 24

**42-page**
 76:24

**420** 95:2

**421** 95:2

**422** 95:2

**423** 95:2

**426** 107:13
 108:10

**427** 108:7

**428** 108:16

**43** 139:19,
 24 145:21,
 23 147:15

**430** 109:16

**44** 134:2
 140:11,13

**45** 145:16

**46** 148:13,
 15

**47** 149:25
 150:4

**48** 150:23
 151:1

**49** 154:9,12

**4th** 162:19

**5**

**5** 38:11,14
 39:9 56:24

**5.51** 145:13

**5.56** 123:12
 144:14,19,
 24

**5/29/07**
 169:19,24
 170:6

**50** 121:6,9
 124:8
 149:12,15
 156:7,10
 180:9

**500** 108:17,
 21

**51** 153:9
 158:3,5

**52** 160:9,12

**53** 162:22,
 25

**538** 100:18

**539** 100:18

**54** 163:22,
 25

**540** 173:6

**548** 173:6

**55** 158:16
 165:22
 166:7

**556** 23:4,14
 158:10

**56** 171:16,
 19 173:15

**57** 119:13
 120:16
 173:2,5,
 15,24,25
 174:3,8

**58** 121:7
 173:20,24
 175:9,12,
 13

**59** 175:10,
 12 176:19,
 23

**5th** 120:14

**6**

**6** 19:15,20
 40:21 41:6
 123:25

 163:19

**6/12/06**
 169:8

**60** 177:5,8

**6th** 168:24
 169:2

**7**

**7** 56:24
 164:10

**7.62** 121:8,
 9 144:17
 145:12,13
 153:9

**700195**
 118:17

**75** 123:11,
 12

**762** 23:5,14
 41:21
 42:12

**8**

**8** 147:15

**800** 131:1

**88** 103:17

**89** 103:17

**8th** 168:19

**9**

**9** 38:15

137:13
178:6,11
179:8

**904** 150:5

**958** 150:5

**996142**
127:10

_____

**A**

_____

**A-c-u** 130:17

**abbreviated**
88:2

**abbreviates**
47:19

**abbreviation**
61:25
110:24
134:7

**ability** 10:9

**Absolutely**
49:14

**accepted**
163:12,16
164:14

**accessories**
79:11,12
171:22
172:24
173:9,10

**accounting**
104:17

**accurate**
43:20,22

56:1,20,23
57:16

**accurately**
57:2

**acquire** 12:3

**acronym**
62:23
75:2,7
139:13,15

**acronyms**
53:14
75:15
139:18

**actual** 118:3
123:16
161:9
165:13

**ACU** 130:14,
16,22
131:6,10,
15

**ad** 67:15,
21,23
68:5,23
69:10
70:1,2
71:3 72:5,
17 104:10,
20,22,25
106:8,14

**Adam** 99:14

**added** 101:10

**addition**
61:1

**additional**
148:5

**address**
161:17

**addressed**
159:13

**adjunct**
15:10,13,
16,20

**adopted**
145:2

**ads** 65:24

**advance**
32:11

**advertisement**
66:19,22
67:3

**advertising**
65:19,20
67:7
68:14,15
106:24

**advised**
39:24

**agencies**
11:9 12:12
27:1,7,19
28:5,14,20
29:23
30:8,18
31:6,12,20
32:1 33:14
34:3,5
63:20

64:14,19,
22 72:20

**agency** 11:4,
16,21
27:14,17
30:5

**agree** 153:4

**agreement**
70:6
125:23
171:21
173:8,12
175:14
176:1

**Agresto**
95:20 96:5

**ahead** 31:15
43:2 53:3,
4 59:1
64:11 65:3
76:5
119:1,5
128:11
129:6,8
138:25

**air** 152:25
175:17,23

**air-soft**
177:1,2

**Alaska**
127:21

**allowed** 26:2
28:15

**ammunition**

Case 3:12-cv-00102-CAR   Document 146-146   Filed 07/23/15   Page 189 of 235   DX200.0189

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013   Index: amount..assignments

125:11

amount  30:13
  102:19,20
  107:21
  108:8
  109:3
  116:17

amounts
  57:21

and/or  17:8
  96:19

Andre  81:15
  117:10

announce
  64:12
  74:25

announced
  13:12
  43:16
  63:18

announcement
  27:5 55:24
  56:2

answers  9:17

anymore
  154:1
  157:14

apologize
  131:9
  158:14

apparently
  90:9
  158:10

appearance
  46:15

appeared
  67:15

appears  56:8
  61:22 67:9
  81:5 98:8
  108:7,11
  109:2
  110:5,11,
  23 114:6
  116:18
  117:5
  118:9,18,
  21 124:4
  127:6
  132:23
  136:2
  137:12
  140:3
  151:15
  157:25
  168:11
  172:1
  176:3

appellation
  103:1,9

application
  72:25

apply  130:9

approval
  118:1
  129:24

approvals
  25:19

approve  73:4

approved
  25:14,16
  107:21
  118:1

approves
  72:24 73:1
  153:2

April  39:12
  40:1,4,14
  118:22

archived
  104:16

area  35:21

argumentative
  55:10

arm  103:12

Armed  67:10

armor  11:18

armorer  12:4
  160:2

armorer's
  11:14,18
  12:7

Armory  7:13
  134:23

Armory's
  37:23

Arms  35:25
  178:15,23
  180:5

ARS  165:11

article
  45:16
  110:23
  139:10
  140:9
  178:14
  179:11,14,
  20 180:12

aspect  122:4

assault
  24:11
  40:15
  46:17,24
  47:4,9,16
  48:17
  49:20
  51:3,21
  52:11
  58:20
  62:24
  63:4,5
  69:13
  75:6,7
  76:11 82:6
  86:1,4,15
  111:8

assembly
  159:7

assigned
  22:6,9
  166:15

assignment
  22:12

assignments
  22:18

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013

**30(b)(6)**                                    Index: assist..barrels

assist  12:2,      attachment        24              113:11
  7                  163:9          auto  153:10       120:18
                     172:22                            125:25
association                         automatic          126:13,23
  62:1,10          attend  21:19      61:23            133:7
                     35:3 36:1,       62:10,17         136:8
assortment           16 130:22        87:20,22         156:22
  151:9                               139:13,16        158:1
                   attended                            164:4
assume  36:5         35:15 36:4     automatics         166:21
  159:10             141:8           88:23             167:1,6,25
                                                       168:5,24
ATF  17:3          attendees        award  20:14       179:17
  18:22,23           24:13,18,       24:6 51:10        180:20
  19:1,15,           21 26:9         55:21
  18,20 20:9         35:16                            back-in
  25:15,17                          awarded            157:6
  26:3             attending         40:1,6,15,
  58:12,13,          36:2 39:14       17 51:2         back-up
  15 60:5,9,                         55:6 75:5         104:9,11
  18,22            attention
  61:2,7             38:4           aware  9:15       bad  67:24
  72:24              161:18          17:19             69:23
  129:3,13,                          51:20            114:1
  20 152:7         attest  54:19
  153:2             75:14           awareness        bag  125:4
  164:4,                             179:19,23
  167:22,25        attorney                           ball  99:11
  168:1,8            7:12 50:15      _____
                                                      bar  127:5
ATK  99:14         attorney's            B
  125:3,5,           128:17         _____       Barbara
  10,15,23                                             45:19 68:7
  126:14,20        attorneys        back  9:5          107:21
  127:3              95:3            17:24 20:1        109:20
  171:22             100:19          21:13            141:11
  173:10                             23:16,18
                   audience          28:11           barrel  42:22
ATK/FEDERAL          131:24          30:4,9           151:23
  125:12                             37:12            154:18
                   August  56:24     40:24            159:7
attached             67:11           68:15
  41:9                               71:12 74:8      barrels
                   AUSA  35:3,       81:3 97:4        170:3
                     12,14,15        100:9
                     109:22,23,

basic  11:22

batches
  152:6

Bates  83:23
  95:1
  100:17
  103:25
  107:12
  108:7,15
  109:16
  113:12
  114:7
  116:12
  124:22
  126:1
  128:10
  133:25
  140:15
  151:2
  152:14
  153:6
  156:10
  158:5
  162:25
  164:1
  166:7
  167:12
  168:14
  170:21

bear  100:17
  123:2

bearing
  116:11
  140:15

bears  124:22
  156:10

158:5
160:12
162:25

begin  82:3
  85:25

beginning
  15:17
  103:2
  104:4
  158:5
  163:25

begins  38:17
  47:16 48:2
  55:21
  74:24

behalf
  174:11

Belgium
  49:22
  102:2
  120:21
  164:20

Bellamy
  7:10,11
  13:9 16:20
  27:12
  32:15
  37:5,9,12,
  14 40:12,
  25 45:12
  48:13 49:5
  54:25 55:3
  56:12
  59:18
  65:10
  69:20

71:10,12,
15 84:16
89:2 90:13
91:16
93:3,6,24
95:7,10
98:16,22,
25 99:15
100:24
101:1,4,7
105:11
111:17
112:9
113:21
115:11,16,
17 127:20,
23 128:19,
21 130:6,
9,11
132:5,8
133:5
134:18
135:9,13,
17,20,22
136:15,18,
21,23
137:7
139:21
142:15
145:18
150:22
160:6,8
162:20
163:21
165:20
171:4,7,9,
13,18
174:5,7

180:16,20

belong  104:1

belt  123:20

belt-fed
  121:7
  123:12,16

benefits
  23:4,7
  34:10
  131:22

billing
  108:24
  151:10

bit  15:18
  101:9
  102:12

bite  8:12

black  100:2,
  5 146:3
  153:10

Blackwatch
  133:12

blanked
  102:19

block  138:15
  175:5

blocked  43:6

blocks
  151:16

blue  143:16

blurred
  87:23

boat    77:24
  78:2

bolt    168:25

bonded    153:1

booth    23:1
  39:19
  41:12,14
  131:24
  143:5,11,
  14,16

Border    29:1

boss    174:19

bottom    38:5,
  15 43:7
  68:1 81:19
  82:16
  83:12,23
  85:3
  87:10,23
  90:11
  92:5,8,10,
  11,13
  100:18
  107:13
  108:16
  109:17,20
  111:15
  113:12
  114:7
  124:12
  126:2
  132:23
  134:1
  138:2
  150:11
  152:14

164:7
166:18
169:4,22

box    127:16
  161:22

boxes    155:3

Brad    18:6

branch    21:7
  50:12
  129:4
  168:9

branches
  36:4

brand    38:7,
  21 39:11
  50:13,20,
  23,24
  51:8,17
  52:6,9,14
  53:9,11,16
  55:6 58:25
  60:17
  66:20
  67:6,22
  69:11
  72:18
  75:17
  76:1,3,7,
  8,12,14,15
  87:4 89:20
  93:11
  94:5,15
  132:21
  144:14,17
  151:25
  152:1

branded
  77:10,15,
  21 78:3,7,
  11,17
  79:1,12,16
  164:18

break    11:13,
  25 23:11
  37:6 42:23
  59:18
  71:15
  127:24
  153:16,19,
  22

breakdown
  161:13

briefing
  56:25 57:3

bring    19:11

Brisbon    18:3

brochure
  107:18,19,
  23 108:3,4
  109:19,21
  110:1,4
  114:11
  116:20

brochures
  80:7

brought    19:9

Bucky    7:20
  13:12

budget
  102:18,21,

25 103:7,
  18,19

budgets
  106:6

bullet    74:22

Burt    135:13
  145:18

butcher
  117:15

butt    163:8

buy    72:23
  123:20
  130:1

buying
  177:17
  178:1

byline
  110:20

_____

C

C-l-a-e-s-s-e-
n-s    174:13

cal    149:12

caliber
  58:16
  60:12
  61:15
  121:9

call    9:13
  11:20
  45:9,14
  90:18
  96:17

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 193 of 235    DX200.0193

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013
30(b)(6)                                              Index: called..clarifying

129:10

called  29:14
  67:10

calls  48:11
  54:10
  55:8,9
  58:23

cals  149:15

Calvert
  28:25

camera
  142:14

cap  99:11

capacity
  8:3,7,21
  9:6 10:25

caption  88:1

captured
  131:24

carbines
  78:9

care  19:20
  100:23

carry  125:4
  130:2

case  7:13
  8:12,19
  41:4 47:3
  58:11 59:9
  95:14
  134:23
  137:3
  167:4

catalog
  74:2,12
  76:18 78:2
  79:14,19,
  20,25
  80:20,21,
  23,24
  83:14,15
  84:22,24
  87:16,18
  88:5,10
  89:9,11,15
  122:16

catalogs
  85:7

categories
  11:14

category
  25:25

CDS  152:25

center  111:5
  159:12

centered
  46:15

Century
  46:16

CEO  85:22

CFO  95:19,
  20 96:2,3
  175:7

chairman
  174:19

Chambers
  14:8

chance  40:5

changed
  145:6
  152:4

characterizing
  45:3

charge  13:3
  22:2
  120:19
  122:23
  124:11

charges
  122:24

Charles  7:6,
  18

check  81:3
  106:23,25
  108:7
  109:3,
  157:6
  166:18
  167:24

checked
  155:3
  156:14,19,
  21,22
  157:8,24
  166:16
  167:3,15,
  20 168:5,
  19,23,24
  169:13
  170:4
  177:14

checking

107:9
  157:25
  168:7

Cherpes
  81:20,21,
  22 85:9,
  11,12

Chiefs  62:1

children
  57:11,12

Chosen  69:7

Chris  14:8

Cincinnati
  7:12

Cindy  95:20
  96:5

circa  43:16

citizen  73:6

city  98:22

civil  8:12,
  19 37:24

civilians
  26:3

Claessens
  174:12

clarify  9:23
  32:7 88:24
  90:15
  129:8
  165:25

clarifying
  32:14

clarity
  123:15
  167:21

classes
  11:18 12:8
  160:2

Claude  96:14
  101:19,21,
  22 175:2

cleaning
  127:1
  170:3

clear  27:10
  129:19
  134:2
  167:24

click  112:11
  113:16

client
  107:17
  149:16
  150:10

close  36:15

clue  89:13
  92:20
  93:21 98:7
  103:11
  111:3
  112:19
  126:5
  127:19
  155:20

Clyde  7:13
  134:23

code  127:5

collection
  66:6
  103:24
  117:4
  124:25
  140:14
  150:4
  151:1

collectively
  31:3

Colleen  20:6

Collette
  95:19,20,
  25

color  68:20
  99:24
  100:4

colors  92:18

Colt
  179:11,20,
  23 180:12

column
  146:15,24
  149:21
  156:17
  161:16
  170:7

columns
  157:1

Combat  24:10
  40:14
  46:17,23
  47:4,9

48:16
49:20
51:3,21
52:11
53:20
58:19
61:23
62:9,17,23
63:3,5
69:12
75:6,7
76:11 82:6
111:8
139:13,16

combination
  17:21

Command
  49:19
  75:1,3
  82:6 161:2
  163:20

commercial
  12:20,23
  13:3,5,15,
  22 14:3,7,
  9,12 17:8
  18:13
  22:25
  24:23
  25:3,4,17,
  24,25
  26:20,22
  32:16,17
  33:4,9,18
  34:6,11,14
  35:23
  43:19

44:11
65:18
72:22,23
79:21
84:25
105:13,16,
21 106:3,
107:7
130:18,23
145:15

commercializat
ion  173:9

commonality
  23:13

commonly
  7:20 86:2,
  19,21,24

community
  10:24

companies
  52:1,3

company  13:2
  113:16
  123:9
  125:5,10
  131:21
  177:15

compare
  111:25

compensated
  153:19

competing
  51:21

competition
  24:5 46:25

52:7 54:4,
7

compile
149:19

compiled
133:9

complete
18:25
89:11
128:14

completed
115:5
164:4

compliance
20:8,16,22

compound
53:25
55:10

comprehensive
171:6

computer
104:13,17
150:14

computer-
156:17

computer-
generated
118:11
156:12

Conducts
49:19

Conference
57:1 63:19
64:13

confident
116:2

confidential
95:3,6,7
100:19,21

confidentialit
y 128:16

confirm
49:17
142:6

confused
109:10

confusing
9:19 40:8

conjecture
48:12

considered
73:7

contact 30:4
112:22

contacts
97:18

content
43:21
71:22
96:10

contents
134:25
178:14

context 27:3
63:4
75:10,16
76:2,10
133:13

continent
37:2

contingent
25:1

continue
37:18 79:6
113:11

continues
97:25

continuity
171:3

continuous
16:3

contract
20:14 24:6
40:2,6,15,
18 51:3,11
55:6,21
75:6 82:5
163:4,19
173:18

contractor
46:10,12

control
163:8

conversion
161:25

copied
137:25
178:15,20

copies 128:6
136:10

copy 67:24
68:3,5

continent
69:23 74:1
80:19
84:21
104:9,16
106:23
114:20
130:13
135:14
136:2
137:12
170:16,19

copyright
90:18

corner 92:5,
8,10,11,14
111:18
118:16
138:2,11

correct 7:19
14:1
15:19,25
22:24
24:11
26:15,18
27:15
31:13,20
35:22,24
36:14
40:3,4,7,
18 42:4,8,
25 43:8,
44:12
45:2,5
49:23
50:4,6
51:4,6
56:4 59:7,

13 60:4,
13,23
61:6,9
62:24
63:14,21
64:17
69:13
72:24
77:6,16
78:4,8,22
82:20 85:7
88:19 95:9
110:13,14
119:15,20,
22 120:3
124:1,2
125:6
134:8
136:4
139:15
140:4
148:2
152:3
153:11
154:2
176:1,11

**correction**
33:24

**correctly**
22:3,4
43:21

**correspond**
118:23
119:8

**corresponds**
109:3

**cost** 96:17

**countries**
150:19

**country** 17:4
19:2 54:24
130:20
131:1
155:14

**County** 8:16,
21,24
15:15,24
28:25

**couple** 11:13
97:22 99:7
110:18
180:17

**court** 9:16
10:5 14:19
21:17
49:7,10
61:18 71:8
72:14
76:17
95:23
96:15
98:19
130:15
136:13,22

**cover** 9:12
98:10,14
134:25
162:18
178:13

**covers**
126:19

**CQC** 82:20,
22 119:16
154:18,21
159:7,9
161:11

**CQCS** 163:5

**Crane** 19:10
57:15,20
59:11,24,
25 61:13
110:19
111:1,6
147:12,18
148:1,5,7
149:1,8,18
161:8
163:5,18

**crazy** 116:17

**created**
24:10
56:8,9,15,
19 67:23
68:6
71:21,22
72:9 73:17
107:20
172:17

**creation**
65:19

**Critical**
49:19

**cross-charge**
105:24

**crossed**
178:8

**Crucible**
154:17
156:1
158:12
159:19

**current**
10:13
156:18

**Custody**
166:15
167:14

**custom** 9:24
153:1

**custom-bonded**
73:2
152:24

**customer**
11:1,3
72:23

**customers**
17:9,10
23:3 72:22
97:16
115:3

**customs**
73:1,3
164:11,13

**cut** 83:25
112:20

**Cyber** 175:16
176:20

—————————
**D**
—————————

**D-a-v-i-s**

20:6

D-e-l-l-o
96:14
175:3

D-e-m-i-l-t
14:18

D-i-l-l-a-i-s
175:6

Dan  178:24

dark  146:2

date  19:24
29:21 30:3
50:5 56:4,
23 67:11
68:1 69:4
70:2,12,14
89:24
92:14
93:13
94:10
96:23,25
97:4
114:20
115:23
118:21
119:7,8
123:3,25
124:13
146:18,19
147:14
153:3,7
156:23
157:4,6,8
162:13
164:6,7,9,
10,11,13,

14 166:19,
24 168:6
172:13
173:20
175:25
177:22,25

dated  13:12
38:9 124:5
128:24
130:14,20
154:15

dateline
63:13

dates  57:2
91:25 92:4
97:3
118:24
146:16
169:1

David  46:1
110:19

Davis  20:6

day  57:1
120:14
176:1

DC  35:21

DD  73:8
88:21

dealer  74:9
130:14,16,
22 131:7,
11,15

dealers
22:25

130:23,24
131:1,20

dealt  46:13

debt  122:21

debuts  61:24
62:2

December
29:19
49:23
96:24
170:4

decide  27:22
76:16

decided
53:15

decision
94:14

Def  110:24

defense
35:17
110:12,25
136:3
147:13

defensereview.
com  110:16

delivered
31:5,19,25
57:20
59:24,25
65:13
84:11
154:16
158:11
163:5

delivery
59:11
65:6,16

Dello  96:14
101:19,21,
22 175:2

demand  32:10

Demilt  14:18
105:19
130:21
131:14

demo
158:20,21,
24 159:2,6
170:8,9

demonstrate
121:24
155:13

demonstration
120:15
155:4,8,12
158:21
159:2
168:8

demonstrations
33:13 97:8
120:20

demos  17:7
28:13,18
29:11 97:7

depart
120:17

department
8:16 11:4

15:24 16:7
17:3 18:23
20:9 29:2
35:17,19
46:14
68:17 96:8
147:13

depending
61:15
165:23

depends
144:21
165:23

depleted
98:5

deposition
7:24 9:9
37:16,23,
25 44:6

depositions
8:20

Deputy 13:18
14:12,14,
22 22:6
44:11
65:17

description
150:8
161:16

descriptions
151:18

Design 49:19

designate
38:1

128:15,18

designated
60:15,18
86:12

designation
53:21
57:24
62:17
86:13 91:6
144:8
145:6
152:4

designations
144:9,22

designed
43:18
107:20

destination
163:16

destructive
73:7 88:19
89:1

detail 23:6

details
130:9

develop
24:10

developed
23:23
132:4
139:14

development
19:12
46:23

device 73:7
88:19

dibs 31:11
32:9

difference
30:16,20,
21 53:16
153:12
173:14

differentiate
53:21 54:5

Dillais
175:6

dinner
120:12

directed
22:3

direction
139:11
144:7

directly
11:1
147:12
148:1,7

Director
12:20,23
13:13,18
14:9,12,
14,15,17,
22 22:5,6
44:11
45:24
65:17
105:20
176:10

177:14

disassemble
23:12

discovery
134:23

discuss 23:6

discussed
27:13
96:12
99:2,6
159:20
175:3

discussing
59:10

display 26:7
35:5,7,9,
11,14
39:11

displayed
34:13,15,
17,22
36:20
39:21
119:24

displays
77:5

distinction
155:7

distinguishing
27:10

distribute
26:4

distributed
34:24

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**
30(b)(6)        **Charles Newton Mills, III on 08/14/2013  Index: distributor..education**

74:3,6,10
97:15
114:24

**distributor**
74:9

**distributors**
11:8  13:5,
6  23:1,17
24:23  25:4
34:11
130:19

**division**
13:15
17:22  19:7
35:11
111:1,6

**divisions**
19:5

**document**
37:20
38:5,13
41:2,17
44:7  45:8
47:6,18,21
49:12
50:2,9,12
56:8,14,18
61:20  64:6
71:17,21
73:9  74:17
76:21,24
82:13
89:23,25
90:16
93:13,20
94:7  95:12

104:8,19
106:21
112:6,11
115:7
116:11,13
121:2
128:7
129:9
132:12
133:20
134:22
135:23
137:1,5,
15,19,24
139:4,
145:24
147:14
148:17,19
150:6
155:9,
156:11,13
158:8,9
166:13
171:20
172:1,5
173:7
176:4
177:10,
180:13

**documentation**
50:17
148:12

**documents**
37:6  48:11
66:6  67:9
95:1
103:24

117:4
128:6,16
130:7
131:5
135:24
151:1
160:21
163:25
164:15
166:14
170:21

**DOD**  17:12
162:7,9
163:18

**dog**  8:12

**dollar**
102:19,20

**Dominique**
176:6

**doubly**  88:25

**downloaded**
132:19

**draft**  47:6,
12

**draw**  119:22

**duly**  7:7

**duplicate**
108:24
168:12

**duplicates**
170:22

**duties**
10:17,18
12:22  15:4

23:20

**duty**  19:20

**Dynamics**
150:13

_____

E

**e-mail**  95:18
96:10,13
99:3,6
101:11,12,
18  117:10
119:4

**earlier**
55:17
79:25
108:21
115:8
131:6
159:20
171:23
178:10

**earliest**
8:10,14
17:18

**early**  16:22
29:20
65:15
167:11

**easier**  9:14

**easily**  97:14

**easy**  132:6

**education**
16:6

EGLM  41:8
  72:18,19
  88:18
  163:7,8

EHRLICH
  27:2,8
  31:7,14,23
  32:2,6
  33:20
  37:10 40:8
  43:1 45:10
  46:5 47:13
  48:9 49:24
  50:2,7,14
  51:12
  52:25
  53:4,24
  55:8
  56:10,13
  58:21
  60:24 62:4
  63:23
  64:5,23
  65:4 66:3
  68:11,16
  70:11,14,
  24 71:5
  75:11,18
  76:4,13,20
  80:3,9
  83:19 84:7
  86:22
  88:25
  90:10,14
  93:1 95:5,
  8 98:14,17
  100:22,25
  101:2,5

105:10,12
111:15,19
112:6,15
113:25
115:15
117:1
127:22
128:14,20
130:8,10
135:15,18
136:12
138:22
142:13
145:20
147:3
170:25
171:5,10
173:24
174:1,4,6
180:18,24

embroidered
  99:19

embroidery
  100:8

employed
  10:11,12
  16:1 57:7
  85:19

employee
  156:14,16
  157:22

employment
  8:4,7,16,
  24 9:6
  15:12,21
  16:3,8

end  11:1,3
  15:15
  23:3,17
  24:25
  42:22 68:1
  90:17 97:8
  112:22

ending
  100:18
  107:13
  108:7,15
  109:16
  116:12
  124:22
  134:1
  140:15,20
  141:16,25
  142:18
  143:1,7,21
  144:1
  150:5
  151:2
  152:14
  153:6
  156:10
  158:6
  160:12
  162:25
  164:1
  166:8
  167:12
  168:14
  170:6
  173:5

ends  113:12

enforcement
  10:14,24

11:9,16
12:14,21,
23 13:3,6,
14,23
14:1,10,13
15:1,7
17:8,9
18:13
22:25 23:2
25:24
26:21
27:1,7,14,
17,19
28:5,14,20
29:23
30:8,18,25
31:6,12,20
32:1 33:14
34:3,5
43:18
44:12
61:24
63:20
64:14,19,
22 65:7,18
72:19
79:21
80:25
84:2,25
88:3,7
105:14,17,
21 106:3,8
107:7
115:2
138:17,20
139:1,5,8
145:3,15
153:18

160:3

enforcement's
  30:15

enforcements
  154:7

engineer
  30:23

English
  150:2
  160:24

engraved
  58:14,16
  59:7,13
  60:4

enlargement
  114:4

entered  54:4

entering
  46:22

entire  47:10
  76:21
  178:18

entries  54:6

entry  146:16
  153:9

equally
  102:25

equipment
  11:21
  166:15
  167:14

ergonomic
  126:9

Eric  18:3

estimate
  25:18

estimation
  96:16

Europe  36:25
  37:2

euros  117:1

Eurosatory
  36:14
  39:18,22
  117:23
  140:4,25
  141:1,2
  142:7

evaluate
  129:13

evaluation
  27:21 28:5
  129:18
  154:15
  155:4,7,
  18,19,21,
  22 173:8,
  17,19

evaluations
  28:19

Evanco  18:1
  75:13
  81:25
  96:13
  101:19,21
  102:16

Evans  7:12

event  36:13,
  16,20,22
  50:25
  51:10 62:3

exact  15:3
  17:23
  19:24
  29:21
  30:10
  48:20
  57:21
  96:23 98:1
  101:24
  177:25

EXAMINATION
  7:9

exciting
  74:21
  85:24

exclusive
  110:25

excuse  40:13
  112:6
  136:13
  173:3

executed
  172:6
  174:8
  176:3

exhibit
  13:10
  37:15
  38:11,14,
  19 39:9
  40:21

49:6,8,12
55:16
56:14
61:16,19
66:2,6
71:7,16
72:12,16
73:19,21
80:13,
81:16,19,
24 84:13,
19 89:4,7
91:17,20
92:25
93:7,16,17
94:2,23
95:1
100:14,17
101:10,15,
17,18
103:21,24
110:8,11
111:21,23
112:1,4,7,
16 113:9,
20,22,23
114:1,3,6,
9,23
115:18
116:4,7,
10,25
117:4
120:5,23
121:2
124:17,20
128:1,4,21
130:3,5
132:9

133:15,18
134:19,22
135:10,23
136:14,19,
21,24
137:8,11,
21,24
139:19,24
140:11,13
145:16,22
147:15
148:13,15
149:25
150:4,23
151:1
154:9,12
156:7,10
158:3,5
160:9,12
162:22,25
163:22,25
165:22
166:7
171:16,19
173:2,5,
15,20
174:8
175:9,10
176:19,23
177:5,8
178:6,11
179:8
180:2

**exhibits**
37:18
175:12

**expectation**

128:9

**expected**
21:25
22:11,14

**expenditure**
68:25

**expenditures**
68:15

**expert** 92:16

**explain** 7:15
103:5
112:10
131:21
146:14
153:12

**exposition**
155:4,8,16

**extent** 39:3
104:1

**extract**
45:16

**eye** 112:3

**eyes** 95:3
100:19
122:5,8
128:17

**eyesight**
70:12

_____
F
_____

**F-2000**
120:15
124:8

168:5

**F-2000s**
167:16

**facility**
19:11
159:24
160:1

**fact** 45:6
55:9 111:7
172:6

**Fair** 16:20

**fall** 29:20

**familiar**
45:11
47:24
48:10,15
49:12
110:15,19
134:8
178:22

**family** 86:1,
4,14 94:5
111:8

**fast-paced**
85:25

**fax** 160:16
162:18

**features**
23:3,6
34:10
131:21

**February**
43:14
167:11

**fed** 123:20

**Federal**
130:24

**feel** 122:8

**FFL** 25:3
130:23,24

**FH** 175:16

**field** 23:22
24:1
27:23,25
29:24 82:6

**Fifty-seven**
174:7

**Fifty-six**
174:3

**figured**
88:24

**filing** 164:7

**fill** 117:21

**final** 46:23
79:10
167:22

**finally**
143:20

**finance**
107:9

**fine** 20:2
32:15
37:10
40:25
135:17

**finish** 10:2

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**

30(b)(6)                    Charles Newton Mills, III on 08/14/2013                    Index: fire..FNH

**fire** 30:24
65:7
88:14,15,
16,17
129:12
144:19
145:1
151:7
152:22,23

**fire-** 163:7

**firearm**
41:20
50:22,23
53:7,8,9
54:22
66:20
118:3
121:23
165:2,23
166:1
175:23

**firearms**
35:13
54:16,18,
20,21
57:19,20
67:6 93:11
94:5
129:3,20
130:24
157:16,18
166:16
168:9,22
177:16,17
178:1

**fires** 25:15
151:8,9

**firm** 30:3

**firms** 67:2

**fit** 155:1

**flat** 146:2

**flew** 21:1
167:5,6

**flier** 72:6,
18 114:11
116:14

**fliers** 79:23
80:1
116:17

**flipped**
145:6
152:8

**fly** 131:1

**FN** 8:4,7
9:6 10:24
11:1 12:15
13:11
14:23
15:9,16
19:4,5,7,
8,9 21:7,8
24:9,14
31:19
35:11
37:25
38:7,20
39:19,21
40:1,17
42:14,25
43:9 46:22
49:21
50:12

51:2,7
52:9,13,19
53:6,9,15
54:3,5,9,
19,21,22
55:5 57:7,
10,14,17
58:7
59:10,23
60:15,18,
22 61:13,
22 63:19
64:13,18
65:12 67:4
68:5,9
70:22
74:21
76:1,8,19
77:5,14
79:16 80:7
81:12
82:16 84:1
85:25
87:14,17
88:2 89:9,
11,19,20
90:7,18
91:24
93:10,11
94:5 97:24
102:3,25
103:7,12
105:2
110:25
112:11,17
113:15
114:7,8,24
116:12,14

118:12
120:20
121:4,15
124:22
125:23
128:8
131:14
132:12
135:25
140:15
143:11
145:23
146:22,25
147:8,9,
17,18,23
148:1,16
150:7,10,
14 151:2,
5,10
154:14
158:5
160:12
164:23
166:7
174:11,19
175:15
176:6,16
177:19

**FN'S** 36:3
53:22
94:14
156:10
162:25
164:1
173:5

**FNA** 173:10

**FNH** 10:12

12:21
13:14
14:11
15:7,11,21
16:9 18:7
42:12
43:15
44:12,18
45:25
46:10
56:9,15
63:18
64:12
65:18
68:14
74:1,
79:18
80:22
81:18
85:3,19,20
90:6 97:13
102:24
105:6,9,
18,25
107:6,17,
18,20,
108:24
109:19
111:1,2
121:20,21
122:12
129:15
141:9
146:1,23,
24 147:2,
9,23
150:11
151:6,11

154:16
155:22
156:1,13,
14 158:11
159:6
164:21
171:22
175:5,7
178:3

**FNM** 103:1
**FNMI** 17:21
**focuses**
89:16
**folder**
108:19
**folders**
108:18
**folks** 65:22
66:1
169:18
**follow** 77:8
**fonts** 112:21
**football**
43:10
70:22
**force** 8:19
**Forces** 30:13
47:8 49:20
67:10
111:7
147:12
150:11
161:2,8

**foreign**
150:19
155:13
**form** 19:15,
16,18,20
85:6
117:20
164:4
169:7
**formal** 16:6
**forward**
160:23
**forwarder**
161:6
**foundation**
31:7,23
40:9 52:25
53:24
54:11 59:2
60:25 62:4
64:24
75:12,18
76:4
**four-page**
108:18
**fourth** 55:20
68:19 85:2
155:5
167:17
**France**
39:13,18
**Frank** 18:2
38:23
**frankly**

133:19
**Fredericksburg**
154:17
156:5
158:12
159:17,19
164:21
**Fredrick**
7:23
**freight**
152:25
161:5,6
**French**
116:15
117:5,
120:7
146:5,13
158:15
**front** 17:2
67:9 79:18
80:22 81:5
90:23
116:18
126:23
172:13
173:20
**fronts** 17:1
**FS-2000**
78:10,12
**fulfill** 82:4
**full** 7:16
83:15
86:11
87:20,22
88:23

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013

30(b)(6)                                                        Index: full-page..gun

113:17
121:25
153:10

full-page
 69:10

full-
production
 86:12

full-rate
 85:25

full-size
 112:12,13

fully   145:1

functional
 159:1

functions
 11:23

funded
 102:25

fuss   115:13

future
 172:23

—————
      G
—————

GAU   149:12

gauges   163:7

gave   33:22
 97:2,3
 129:11
 135:13
 176:19

GEN   21:10,
 13,15

129:16

Gene   21:14

general
 105:19
 150:13

generally
 8:9

generated
 116:22
 150:14
 156:18

generation
 21:11,16

generic
 177:25

George   8:16,
 21,24
 15:15,24

gist   63:17,
 21

give   7:2
 11:22
 29:21
 49:13
 66:15 68:1
 78:22
 89:18
 91:21
 96:17
 97:4,5,10,
 12,25
 98:1,3
 145:19

give-away

124:10

give-aways
 123:23

giving   22:17

glass   70:3,
 25 71:23
 73:12

Glenn   7:11
 32:6

God   7:4

Golliday
 46:2,5,6

good   10:1
 22:20
 23:25
 41:19
 45:20 46:3
 49:4 93:1
 98:11
 127:23
 133:6
 138:14
 150:21

goodness
 117:12
 168:23
 169:15

government
 17:10,12
 23:2 24:24
 35:18
 160:3
 162:5
 163:11,12,
 16,17

Great   111:19

green   138:15

greenish
 68:20

grenade
 119:20
 154:23,24
 155:2

grew   20:12

grip   126:9
 146:2

ground   9:12

group   66:10
 100:20
 104:2
 128:5
 174:20

growing
 13:24

guess   19:24
 25:22
 124:11
 126:6
 159:4
 161:24
 168:18

guessing
 36:24,25
 117:17

gun   87:22
 121:7
 122:5
 123:12
 148:25

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013

30(b)(6)                                                    Index: guns..Herstal

155:1
175:16,17
176:20

**guns** 11:19
78:24
79:1,7
103:16
147:23
148:24
149:12
156:14,
167:15,19

**guys** 169:19

— H —

**H-e-a-l-e-y**
120:18

**half** 9:12
25:7

**hand** 7:1
38:10
102:12
161:22
176:18
178:6

**handed** 49:11
66:5 67:1
71:16
72:7,
80:15
84:18 89:6
93:7 94:1,
25 100:16
103:23
110:10

111:22
115:18,21
116:9
117:3
121:1
124:19
130:4
132:10
133:17
134:21
135:22
136:23
137:10,
139:23
140:13
148:14
150:3,25
154:11
156:9
158:4
160:11
163:24
166:6
171:18
173:4
175:11
177:7
178:11

**handguns**
77:3,6,10

**handing**
37:14
40:20 44:5
55:15
61:19
73:21
128:3

145:22

**handled** 15:5
17:11
46:14

**handling**
17:3

**handwriting**
109:21
138:13
169:21

**handwritten**
81:6
108:23
138:11

**hang** 126:7,
8

**happen** 25:20
28:10 82:9

**happened**
28:8
82:10,11

**hard** 166:25

**hat** 98:9,25
99:2,5,9
102:23
125:4

**hats** 96:17,
19 97:6,20
99:8,19,25
100:4

**head** 8:15
9:18 15:3
17:24
66:23

110:21
115:24
171:1
172:9

**header** 134:6
140:5
160:16

**heading**
47:14
48:3,6
56:24
61:22

**headquarters**
49:22
159:18

**Healey**
120:18

**health** 10:7

**heard** 110:17
112:25
138:5
176:8,13,
15

**heavy** 23:5
79:6
119:17
159:11

**held** 39:13
49:21 63:4

**Herron** 7:12

**Herstal** 24:9
37:25
42:15,25
46:22

49:21,
54:22
57:14,17
58:7
59:10,23
81:12
89:9,12
90:7,19
91:24
93:11 94:5
102:2,25
103:7
116:21
118:12
120:17,20,
21 121:4,
16 123:9
125:23
143:11
146:22
147:1,9,
18,23
148:1,16
150:7,14
151:6,10
154:14
155:11,13
161:7
164:20
174:11,20
175:15,16
176:6,16

**Herstal's**
24:14

**Herstal-
generated**
117:20

158:9

**Herstal/fnh**
113:16

**high** 16:5
44:24

**high-gloss**
108:18

**highlighted**
43:9

**highlighting**
89:21
135:14,19
166:9

**highlights**
89:19

**hold** 85:15

**holders** 25:3

**holding**
141:18,20

**honest** 92:3
150:17

**honestly**
26:6,7
29:11 49:3
57:21
69:5,24
81:3 91:23
94:22 96:7
97:11
99:20
107:8
108:5,20
109:1
114:19

115:23
120:9
133:3
155:25
158:18
176:24,25

**hoped** 32:22
33:1

**hoping** 25:23

**hotels**
120:12

**house** 105:15
106:4

**housing**
154:23,24
165:9

**huge** 179:16

**hundred**
106:9

**hypothetical**
54:11

———————

——— I ———

**IACP** 61:24
62:2 63:18
64:12

**idea** 123:21
135:16

**identification**
38:6,20

**identified**
38:19
40:20 61:8

**identify**
53:7,15
61:2
142:1,2

**III** 7:6,18

**illustrated**
84:4 87:18

**illustrates**
82:18

**Illustrative**
161:13

**image** 79:15
99:1
113:17

**images**
111:10,25
112:13
113:19
114:4

**immediately**
83:22

**impair** 10:8

**import** 17:4
18:25 19:1
20:16
147:23
162:5

**importation**
18:16,17,
23 19:3,
14,16
20:22

**imported**
54:24

58:19
59:7,10,22
60:10
61:7,12
147:1,8,18
164:21

imports  73:3

impossible
  10:4

impressed
  98:24

inches  49:2,
  50:16

include
  10:19
  57:24
  99:22
  150:19
  155:21

included
  47:5,10
  57:24 88:5
  100:20
  131:17

includes
  38:11
  166:7
  173:5

incorrect
  139:6

independent
  43:2
  46:10,12
  64:9,10
  72:8,10

114:22
137:4,18
140:8
179:19

indication
  88:4,9
  89:24 91:6
  94:10

indicator
  52:23
  76:12
  93:13

individual
  79:23
  156:13

individuals
  38:1

industry
  35:23 57:1
  177:16
  178:1

inference
  119:22

inferring
  154:2

information
  27:20 39:1
  45:15 58:4
  68:10 69:2
  116:23
  163:14

initial  82:4

inquire
  24:19

25:10
142:22

inquiries
  24:5
  27:24,25
  29:24
  32:20

inquiring
  32:17

inquiry
  129:19
  143:24
  144:5

inscribed
  60:20

inside  74:16

inspected
  163:11,14,
  15

instance
  62:11

instructing
  15:16

instruction
  161:14

instructor
  15:10,11,
  13,20

instructors
  12:7 156:3

intend  21:19
  172:23

intended

35:23
154:3

interact
  10:25
  11:1,8

interest
  30:5

interested
  26:12

interesting
  167:6

internal
  105:2

international
  29:6 39:13
  61:25

Internet
  132:20
  138:1

interpretation
  146:12

interpreted
  62:8

Interrogatory
  38:9,12,
  15,16

interrupt
  129:1

introduce
  25:5 43:16

introduced
  25:6

introduction

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

30(b)(6)          Charles Newton Mills, III on 08/14/2013          Index: invoice..knowledge

138:17,20
139:5

invoice
104:9,12
105:6
107:2,8,16
108:9,12,
17 109:4,
7,18 110:6
116:16
121:3
123:8,15
124:5
153:3

invoiced
105:14

invoices
114:17
116:3
151:5

involved
11:12
16:9,24
17:16,25
18:5,8,10,
12,22 24:9
65:19,23
94:14
102:10
173:11

involvement
16:12,15,
21 20:13,
18,23

involving
8:12 17:16

issue 10:7
135:1,6
178:15

issued 44:18
48:8,24
56:1
163:19

item 38:5
151:18
153:9
154:3
167:21
177:3

items
119:11,23
125:16,18
126:13,14
152:17
161:1,9
172:22

itinerary
120:11

_____

J
_____

Jacque
117:14

James 92:6

Janes 136:3

January 50:6
55:22,25
56:4,18
74:11
82:3,9,11
92:1 94:12
130:20

147:15,19
148:4

Jean 117:14

Jim 18:1
120:18
141:6
142:8,24

Jo 177:14

job 11:12
105:1,2
107:18,23

Joint 47:18

JORD 47:19,
20,24
48:8,10

Journal
67:11

Jr 46:5,6

July 123:3,
25 169:14
173:21

June 57:13,
17 90:5,21
92:2,7
107:22
158:11
162:19
168:24
169:2
176:1
177:21

_____

K
_____

Kartheuser

81:6,9
117:11

keeping
176:18

key 98:4

Killing
150:2

kind 10:7
68:20
116:19

King 99:14

kiosk 22:22,
23 23:21

kiosks 22:7

kit 12:2
127:1
154:18,21
161:11

kits 163:7
170:3

KMI 133:9,
10

knew 23:19

knowledge
39:3,5,24
53:12
64:10
72:8,10
80:6
114:22
115:1
117:8
122:15
137:4,18

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 210 of 235    DX200.0210

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013
30(b)(6)                                                    Index: L-e-s-l-i-e..list

140:8
141:14
143:2,8,22
144:2
148:11
180:14

**L**

L-e-s-l-i-e
  106:24

label  50:25
  95:1

labeled
  74:17
  83:12 85:3
  87:9 91:19

lack  114:12
  159:22

lady  141:10

language
  90:11
  119:13

Large  107:16
  109:7,9,18

largest
  130:19

Las  43:15

laser  119:21

late  16:13,
  22 29:20
  65:6,16
  74:15

latest  115:5

launcher
  119:20
  154:23,24
  155:2

Laurie
  95:18,19,
  25

law  10:14,
  24 11:9,15
  12:14,20,
  23 13:3,6,
  14,23,25
  14:10,13
  15:1,6
  17:8,9
  18:12
  22:25 23:2
  25:24
  26:20,25
  27:7,13,
  17,19
  28:5,14,19
  29:23
  30:7,15,
  18,25
  31:6,12,
  20,25
  33:14
  34:3,5
  35:17,
  43:18
  44:12
  61:23
  63:20
  64:14,19,
  21 65:6,18
  72:19

79:21
80:24
84:2,25
88:3,7
105:13,16,
  21 106:3,
  107:7
  115:2
  138:17,20
  139:1,5,8
  145:3,14
  153:18
  154:6
  160:2

lawyer  75:20
  76:15

lay  91:3

layman  122:5

layman's
  112:3
  122:8

LE  24:23

left  64:3
  92:5,8,10,
  11 127:13
  132:23
  138:15
  142:8

left-hand
  111:17
  118:16
  141:7
  146:15

legible  70:5

Leslie

106:23

lethal
  77:18,20

letter  81:18
  85:6
  128:23

lettered
  35:20

letters
  99:15

level  11:19
  23:12,13
  95:6
  128:15

license
  19:14
  130:24
  162:5
  171:21
  172:17,25

licensing
  125:22
  175:14,20

light  23:5
  31:4 82:19
  144:25
  154:18
  163:7

Limited
  171:21

list  8:10
  33:22 38:2
  119:23
  156:18

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
30(b)(6)          Charles Newton Mills, III on 08/14/2013   Index: listed..manufactured

listed
  119:12
  147:14
  152:17
listing
  146:15
  161:12
listings
  149:16
lists  38:6
  45:19
  47:15
literature
  26:4,8
  34:24 35:1
  90:7
litigation
  66:8
  132:13
  135:25
  148:16,18
  177:11
LLC  10:12
  103:1
  146:24
  151:6
local  35:17
located
  102:1
  120:21
location
  36:23
  60:11
  121:22
  142:23

154:17
156:6,16
157:21
158:12
159:19
logo  43:9,
  11 99:12,
  14 109:11
long  10:15
  13:7 16:1
  33:22
  59:14
  96:24
  170:3
longer  19:19
  57:10 68:8
looked  63:1
  99:6,8
  115:7
  122:5
  150:20
lot  18:5
  23:15
  28:11 63:1
  146:5,14
  151:8
loud  9:18
Louie  175:6
love  123:20
low  11:19
low-rate
  82:4
lower  82:19
  95:6

138:15
164:24
165:5,8,13

————————

M

M-16  165:11
M-a-g  138:9
M-i-l-l-s
  7:18
M3m  149:12
M4/m-16
  46:25
machine
  78:24
  79:1,7
  103:16
  121:7
  149:12
machines
  123:16
made  23:7
  27:5 28:4
  31:5,25
  33:13
  34:3,5
  36:8
mag  121:6,7
  138:9
magazine
  41:9,20
  134:14
  178:18
  179:9
  180:7,10

magazines
  151:7
magnifying
  70:3,25
  71:23
  73:12
major  12:11
  23:17
  28:19
  41:24
make  9:13
  13:9 22:3
  31:19
  39:17
  78:19
  143:24
  144:5
  158:17,18
  171:13
makes  10:4,5
  88:25
making
  103:16
man  150:2
manager
  10:14
  12:13
  13:25 15:1
  81:12
  112:23
manufacture
  164:10
manufactured
  52:24
  164:20

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

**30(b)(6)**              Charles Newton Mills, III on 08/14/2013 Index: manufacturer..meaning

manufacturer
  40:6,17
  58:16

manufacturer's
  53:22
  60:11

manufacturers
  25:5
  51:17,20
  53:19
  54:16

manufacturers'
  54:6

manufactures
  125:11

manufacturing
  17:22 19:8
  103:7,12
  150:10

March  38:9
  44:22
  45:1,4

margins
  92:18

mark  49:5
  81:20 85:9
  87:14
  88:1,2,14
  113:21,22

marked  37:15
  38:10 44:5
  49:6,11
  50:23
  55:16,19
  58:7 60:5,

10 61:16,
19 66:2,5
71:7,16
72:12,15
73:19,21
80:13,15
84:13,18
89:4,6
91:17
92:25
93:7,16
94:1,23,25
95:2
100:14,16,
19 103:21,
23 110:8,
10 111:21,
23 112:8
113:23
116:7,9,25
117:3
120:23
121:1
124:17,19
128:1,
130:3,4
132:9,10
133:15,17
134:19,21
135:10,23
136:19,24
137:8,10,
21,23
139:19,23
140:11,19
145:16,22
148:13,14
149:25

150:3,23,
25 151:24
152:1,5,12
154:9,11
156:7,9
158:3,4
160:9,11
162:22,24
163:22,24
165:22
166:6
171:16,19
173:2,4,19
175:9,10,
12 177:5,7

market  56:25
  57:3

marketing
  13:14
  45:13,24
  46:13,14
  65:22,25
  72:4 81:12
  83:4 92:16
  96:8 98:7
  102:11,17,
  20 105:19
  107:17,20
  109:7,9,19
  117:20
  154:14
  176:10
  177:14

markets
  43:19

markings
  41:24 53:6

54:17
164:22,23

marks  92:18
  152:25

married
  57:11

Marshal's
  29:2

Maryland
  7:23 15:24
  29:1

Master
  175:14

match  112:2

matches
  114:15

material
  91:24
  93:10 94:4
  112:20
  137:3

materials
  65:20
  137:17

Mclean  46:22
  63:13
  159:14,18

meaning
  23:4,12
  26:10
  42:14,18
  104:12
  144:9

means  84:8
  103:3,10
  104:13
  138:25
  146:20
meant  11:5
  13:4 86:3,
  8,11,20,23
  111:2
mechanical
  30:21
Mechanics
  135:1,7
media  69:1
medication
  10:8
meetings
  35:4
memory  21:1,
  12 25:21
  26:11 39:7
  167:8
  168:6
mention
  76:18
mentioned
  29:13
  32:25
  38:13
mentions
  47:17
  132:21
mess  10:5

message
  81:17 82:2
  85:3,23
messed
  165:15
met  32:11
  161:21
middle  39:10
  113:15
  140:4
  141:10
  158:25
  166:17
military
  17:13,15,
  22 18:8
  25:1 30:25
  47:21
  79:20
  80:24
  84:2,5,11,
  22,24
  85:14
  88:3,8
  97:15,18
  102:25
  103:6,18
  105:6,14,
  19,25
  107:6
  141:9
  145:14
  153:19,21
  154:4,5
  156:2,3
  159:21,22

Mills  7:6,
  18,20
  13:12
  37:14
  95:11
  101:8
mind  75:14
mine  138:14
miniaturized
  122:7
MINIMI
  119:19
  123:11,16
Minnesota
  125:5
minute  9:12
  49:13
minutes  37:9
  180:17
mischaracteriz
  ed  31:15
mischaracteriz
  es  33:21
  54:8 61:3
  63:23
  138:24
mispronounced
  45:21
misspoke
  174:2
mixed  147:20
MK  86:13
  88:2,15,
  16,17,18

  145:14
MK-16  145:2
  150:9
  151:19
  152:2,4,8,
  17
MK-17  152:19
  153:13
mod  151:19
  152:17,19
model  58:15,
  18,24 59:6
  60:12,15,
  19,23
  61:8,14
  123:13,14
  124:7
  157:13
models  77:14
  121:5,10,
  11,16
  122:13
  123:11,18
  124:8
modified
  28:18
modular
  43:17
modulars
  163:7
moment  31:10
  133:7
  180:21
money  66:25

116:17

month  29:16
 74:12,15

morning  7:15
 130:7
 147:4,11

mount  153:22

Moving  78:9

multi-tools
 124:9

multiple
 165:4

muzzle  42:23
 153:15,19,
 21

_____

        N

N001164-03-r-
0025  56:22

names  17:23

narrow  37:1

nature  50:19

NAV  149:15

NAVAIR
 148:24
 149:1,10,
 11

NAVC/NAVAL
 111:5

NAVC/NSWC
 110:25

NCSW  57:14

59:11

NDIA  35:25

necessarily
 45:11

negotiation
 173:11

Nevada  43:15

newly-created
 20:10

News  137:13

Newton  7:6,
 18

NF  164:20

NFA  73:3

Ninety-five
 24:21,22

No.'d  103:25
 107:12
 164:1

nod  9:18

nomenclature
 90:6 145:8

non-dod
 17:10
 24:19,22,
 24 160:3

non-material
 161:12

non-military
 24:19,22
 160:1

Nos  124:22

140:15
156:10
162:25
170:21
173:5

note
 102:17,24
 103:2
 122:21

notes  178:8

notice  19:17
 37:23,
 67:25
 149:13

noticed
 171:1

NRA  34:13,
 15,22,25
 80:8

NSN  148:23

NSWC  111:6
 149:7

number  31:18
 32:8,11,13
 34:2 58:17
 60:12
 67:13 87:8
 105:1,2,3
 107:2,25
 108:7,9,15
 109:16,19
 113:12
 114:7
 116:12
 118:18,24

119:6,8
122:16
128:10
132:24
134:1
140:20
141:16
142:18
143:1,7
148:23
150:5
152:14
153:6
157:23
158:13
164:18
167:12,18
168:14
169:20,24
170:12
177:3

numbered
 67:12

numbering
 37:19

numbers  32:4
 90:20
 100:18
 144:2
 158:5
 161:3,24
 162:4,12
 167:19
 169:15
 177:1

numerous
 28:13

## O

O-n  127:20

oath  7:7

object  31:14

objection
  27:2,8
  31:7,23
  32:2 33:20
  40:8 45:10
  48:9,10
  50:14
  51:12
  52:25
  53:4,24
  55:8 58:21
  60:24 62:4
  63:23
  64:5,23
  65:4
  68:11,16
  75:11,18
  76:4,13,20
  80:3,9
  83:19 84:7
  138:22
  147:3

obscured
  42:22,25

observation
  93:1

occasionally
  179:1,3

occurred
  39:12

October
  13:12,16
  29:18
  63:13
  120:14
  128:24
  129:14
  137:13
  180:5

offered  27:9
  88:4

offering
  88:10

office  28:25
  29:2
  159:24

officer
  161:17

Onalaska
  127:13,16,
  18,20

one-page
  66:19,21
  72:5,6,17
  79:24

one-to-one
  121:25

online
  110:12,23
  138:9

open  46:25

operate
  11:24

operational

30:16,19
  47:18

operations
  47:8
  49:18,20
  74:25 75:3
  82:5 85:14
  102:3
  111:7
  127:14,18
  134:6,9
  163:20

operator
  23:12

operator's
  11:14 12:9

opinion
  55:4,8,11,
  12,13 76:7

opportunity
  29:8

opposed
  20:21
  122:6
  129:22

opposite
  164:19

oral  9:17

order  27:14,
  18 66:10
  146:18
  170:12
  171:3,9

ordered

96:20,22,
  25 146:1,
  8,9

orders  30:11
  64:25
  65:5,13,15

organize
  37:6

origin
  62:16,18,
  21

original
  135:21
  144:24
  166:10

Orleans
  63:19

outer  92:18

outlined
  47:22

overlap
  15:18

oversaw
  102:2

Owens  18:1

owners/ffl
  130:23

## P

P-90  119:21

P-i-c-a-t-i-n-
n-y  98:21

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013

30(b)(6)                                    Index: p.m...percent

p.m.  180:25

pace  27:22

packaging
  126:17,18,
  23

packing
  126:5,6

pages  77:8
  80:19
  83:11 87:7
  93:19 99:3
  100:17,20
  123:2
  126:22
  134:25
  150:4
  164:16
  178:14

paid  107:6
  178:2

panels
  143:16

paper  9:22
  62:12,14
  63:15 64:8
  107:4

paperwork
  17:3 18:25
  19:21
  20:9,22
  21:13
  28:12
  30:10
  34:19 44:9
  48:19,21

49:2,16
50:21
56:5,7
57:22
60:19,22
61:13
62:25 63:7
71:19
72:24
95:13
125:21
132:17
140:2
148:21
161:13
163:3
179:15

paragraph
  39:10
  46:20,21
  47:17
  63:12,17,
  22,24,25
  64:4,7
  70:21
  74:20 76:8
  82:2 85:23
  138:16

paragraphs
  48:4

pardon  81:17

parens  47:19
  103:1
  111:6

Paris  39:13,
  18

Parker  170:5

part  47:5
  53:20 55:5
  59:11,25
  83:14
  101:11,14
  102:19
  116:3
  122:16
  133:4
  148:23
  163:4
  169:20
  177:1,4
  178:19
  180:12

part-time
  15:11

partially
  42:21,24
  43:11
  83:25

participants
  179:24,25

participation
  24:14
  52:10
  59:12 60:1

parties
  172:22

parts  11:25
  12:1,2
  23:13,14,
  15 161:12,
  13,14

party  37:25
  105:5,7
  178:4

passed  115:2

past  25:14

pasted
  112:20

patrol  29:1
  77:24 78:2

Paul  18:1
  75:13
  81:25
  96:13
  101:18,21
  102:16,17

payable
  109:6

paying  110:6
  122:21,22
  150:10

payment
  108:11

Pelican
  167:4

people  17:21
  18:4,5,10
  22:4,6
  24:25
  97:14
  142:1
  160:3

percent
  15:17
  24:21,22

```
25:2 44:24        personnel       126:19            65:23
56:22               35:17         picks  113:16     Plaintiff's
63:10             persons         picture             38:8,12
64:16               39:13           41:19 42:1      plans  43:16
67:17             pertained         87:20,23        plant  17:22
82:11               22:21           141:19          plastic
106:9             pertains        pictured            121:4,13,
113:6               16:16           99:1              16,24
period  51:18     pertinent       pictures            122:13
52:14,22            178:19          50:24             123:11,13,
person  91:3      phase  46:23      164:17           18 124:8
95:22             phone  129:10   picturing         PO  127:16
122:2             photo  41:10,     79:15           point  19:19
139:11              22 42:2       piece  62:12        74:22 84:5
142:3               43:14           64:8 85:5         127:23
176:8,16            82:19 98:9      107:4             146:8
person's            141:22        pieces  62:14     police  8:16,
81:9                142:7,11,       121:4,9           19,21 11:4
personal            18 143:12     Pierre             15:24 16:7
39:24             photograph        176:14           62:1 78:6
53:12               41:5,7,17,   piles  140:1      POLKIS
55:4,12             18 116:19     pipeline            169:24
179:6               140:21,22       32:12           poor  41:25
personally          141:16        placard            113:19
12:10               142:23,25       41:14            141:18
20:15               143:21          42:21           Popular
21:1,4            photographs       50:25             135:1,7
34:9 35:7,          124:25        placards         portion  82:4
9 36:6,10,          140:14          42:2            portions
12 48:1           photos  111:5   place  27:14        180:4
51:19             phrase  47:10     36:22 57:3      position
58:1,3              87:25           142:22            10:13,15,
72:10             Picatinny       placement          17 12:13,
94:18               98:18,20
144:10
175:21
```

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 218 of 235    DX200.0218

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.

**30(b)(6)**    Charles Newton Mills, III on 08/14/2013    Index: positioned..product

15  13:7
14:11,23
15:4,8,9,
20,21
20:7,10
44:17 46:8

**positioned**
22:4

**positions**
16:8

**positive**
36:13
101:6

**possession**
21:21

**possibility**
23:25
40:16,19
49:1,4
115:25

**Powerpoint**
130:13
131:5
132:3

**preceding**
118:18,21

**preliminary**
56:25 57:3

**prepared**
38:21
55:23
148:18
177:11

**preparing**

41:4

**present**
131:14

**presentation**
120:13
130:14
132:3

**presentations**
29:22
33:13,17
34:2,4,10
36:7 131:6

**presented**
85:6
130:20
131:10

**President**
175:7

**press**  13:11
44:17,21,
25 45:3,6,
7

**presume**
110:24

**presumptuous**
55:5

**pretty**  15:5
141:20
160:25
168:13

**previous**
8:15 85:6
108:12
109:4

153:14

**previously**
40:20
44:5,15

**price**  108:22

**Prince**  8:16,
21,24
15:15,24

**print**  65:24
68:15,23
69:10 70:2
71:3 82:21
84:3 90:18
92:14
93:13
104:10,19,
22,25
106:8,18
110:11
134:14

**printed**
65:20
66:22
67:4,6
73:10
74:13
87:12
90:2,7
91:24
93:10
94:4,
96:11
99:18
106:11
112:13
115:25

134:13

**printing**
100:8
106:14

**prior**  8:20
12:13
14:22
15:23
20:14
38:13
52:10
64:22

**probability**
44:24

**problem**  27:9

**Procedure**
37:24

**proceed**  37:7

**procured**
46:24

**produced**
66:7 84:24
112:11,17
114:8
116:12
125:15
128:10
132:12,13
134:22
146:25
148:15
171:3

**product**
10:24
11:2,15,

17,22,23,
24 15:7
16:25 22:8
23:4 24:19
25:4,10
27:6,15,18
30:17,24
31:11
32:18
34:10
47:23
50:13
52:4,
53:16,17,
22 55:19
72:18 74:2
75:17
79:19,23
80:1,7,20,
22 82:25
84:4,21,22
86:13
89:9,11,
16,21
114:13
117:21
118:6,7,12
120:15,19
131:16,21,
22 138:23
154:16
157:13
159:5
161:7
177:19,20

**production**
67:13 82:4
86:1,11

128:7
129:11,12,
18 135:24
160:12
166:7
173:5

**products**
30:22
44:18
53:17,20
67:5,22
69:11
77:20
78:16
84:24
87:17
89:19
102:3,6,11
118:12
121:17
175:18
177:3

**program**
20:14
24:2,6,10,
15 47:25
48:17
51:21
52:11
53:14,21,
23 55:7
57:18
58:20
59:12 60:1
63:4
104:18
112:23

116:6
150:14
179:24

**project**
19:12
47:14 48:8

**Promotion**
121:4

**promotional**
123:9

**Promotions**
124:6

**pronounced**
36:14

**proper**   22:8

**properly**
11:24 60:5

**proposal**
48:24

**proposed**
102:20

**prototype**
19:1,3
21:5,6,9
39:25
57:14,18,
19,23 59:9
124:7
129:15,16

**prototypes**
59:22

**proud**   74:24

**provide**

88:3,9

**provided**
38:3 130:7
135:24
140:14
145:23
166:10

**PS-90**   78:10,
12

**public**   53:8
62:19

**publication**
50:5
67:10,15
68:23
110:12
132:25
134:9,12,
13 136:5
137:13
178:22

**publications**
65:24
66:22 67:4

**pull-through**
126:25

**purchase**
27:6 29:25
30:8 63:20
64:14,18,
21,25
65:12
129:13,23,
25

**purchased**

67:4

**purchasers**
32:17

**purchasing**
129:20,21

**pure** 47:7
54:15
68:12 69:5
83:10,16,
21 87:1
89:13
92:22
93:21 94:8
103:11,20
107:11
108:5
112:19
116:21
133:3
142:16

**purely** 68:18

**purpose**
121:19
168:7

**purposes**
58:19
60:22
148:18
177:11

**put** 23:16,
18 52:19,
23 53:6
54:3 83:5,
152:8

**putting**

22:20

___

**Q**

___

**QCQ** 168:18

**quadrant**
138:15

**quality**
41:25 68:3
114:18
141:19

**quantities**
148:25
149:22
151:6

**question**
10:2 16:18
18:19
24:3,4
25:8,9
28:17
31:8,16
32:3 34:1
40:10
48:22 51:5
52:18
54:1,12
56:11
59:1,14
64:11 65:1
75:21
80:5,17
83:1 84:9
91:8 102:7
128:12
129:7
131:9

143:2
147:6,20,
21 148:3

**questioning**
171:23

**questions**
9:17 23:9,
10,15,22
24:1,14,17
28:1 29:8
33:6
140:17
142:19
170:15,24
180:22,24

**quick** 170:23

___

**R**

___

**rail** 98:10,
15,16,18,
20 126:18,
19

**raising**
57:12

**ran** 22:3
91:25
106:8

**rapidly**
13:24

**read** 43:21
61:22
62:14
63:25 64:6
69:25
73:13

76:21,24,
25 88:1
117:7
136:6,8
148:11
153:5
158:2
166:25
170:10
175:22
178:25
179:2

**reading**
163:3

**reads** 49:24
50:1,3,4
64:7 85:24
138:16

**real** 170:23

**realize** 53:8

**realized**
136:16

**reason**
136:11

**recall** 8:11
26:25
27:4,5
28:21
29:16 36:2
44:21
99:18
100:12,13
135:6
138:19
179:17

received
  102:17
  163:14
  166:19,22
  167:1

receiver
  164:17,19,
  24,25
  165:1,2,8,
  13 166:2

receivers
  165:4

Receiving
  161:17

recent  63:18

recipient
  97:5

recognize
  41:6,18
  44:7 61:20
  71:17
  114:9
  116:13
  120:8
  135:25
  138:12
  139:24,25
  143:5,11
  176:12

recollection
  64:10

record  9:16
  37:11,13
  71:5,6,10,
  11,13

89:2,3
93:4,5
127:25
128:5
139:21,22
154:10
163:13
166:11
178:5
180:16,19,
  20,25

records
  68:14 74:8
  94:19,20

red  166:22

redesignated
  95:5
  100:21

refer  11:3
  39:8
  180:2,9

reference
  8:18 90:10
  103:18
  107:25

referenced
  38:8 56:3

references
  55:23

referred
  116:3

referring
  56:6,7
  76:8,10
  86:15,24

90:11
114:9
123:15
175:12

refers  42:6
  81:7 108:3

reflects
  57:2

regularly
  136:5,8
  178:25

regulations
  58:12,13,
  15 59:5
  60:6

reins  13:13

relate  8:12
  9:3

related  8:23
  44:18 56:2

relates
  42:18
  117:9
  118:2,4

relating
  20:18,23
  34:3,25
  48:24

release
  13:11
  44:22,25
  45:1,4,6,
  7,14
  164:11

released
  57:17
  164:13

releases
  44:18
  57:14

remainder
  177:12

remember
  8:14 15:2
  17:23 18:9
  23:24
  24:17 25:7
  26:6,7
  29:12 31:4
  35:1 48:19
  49:3 80:6,
  11 81:4
  97:11
  99:23,24
  100:4,22
  115:23
  116:5
  125:7
  142:25
  180:1

remembered
  141:14

Renier
  176:14

repeat  20:20
  59:3,16
  147:21

rephrase
  27:4 48:13

replacing
  161:14

replica
  175:23

report  14:14
  104:10,11
  146:1
  167:14

reporter
  9:16 10:5
  14:19
  21:17
  49:7,10
  61:18 71:8
  72:14
  95:23
  96:15
  98:19
  130:15
  136:13,22

reporters
  45:15

Reports
  166:15

represent
  7:13 38:11
  114:3
  134:24
  178:13

reprint
  101:9
  136:2
  180:4

request
  118:5,6,11

119:12
169:7

requested
  27:20
  119:23

requests
  19:13
  145:24

require
  11:16
  58:13,15

required
  59:6 162:9
  164:22

requirements
  47:18,22
  48:3,6,15,
  18,21

requires
  60:19 61:7

research
  56:25 57:3
  94:19

reside  7:22

respect
  11:11 36:8
  38:2,18
  61:11 63:3
  67:4 93:17
  177:12

response  9:4
  10:21
  12:18
  28:23 42:7

73:11,24
77:7 81:8
95:16
97:17
101:20
102:16
118:25
129:10
143:19
145:23
149:2
174:15
180:8

responsibiliti
es  22:5,19

responsibility
  13:5 20:3
  44:19

responsible
  10:22,23

rest  33:19

retailers
  11:9

retired
  15:14 57:9
  96:4

returned
  156:20
  157:10
  166:21
  168:20
  169:14
  170:7

rev  110:24

reverse

126:11

review  25:22
  49:13,19
  110:12,25
  178:16,23
  180:5

reviewed
  48:23
  49:1,4,16
  71:19
  95:14
  137:2,16

reviewing
  21:13
  28:11 30:9
  32:4 33:10
  34:19 44:9
  48:21
  50:16,21
  56:5 57:21
  116:23
  179:15

Richard
  14:20

Rick  14:18,
  21 105:19
  130:20
  131:14

rifle  24:11
  27:6
  39:11,21
  40:15
  42:19
  43:18
  46:17,24
  47:4,9,16

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 223 of 235    DX200.0223

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013
30(b)(6)                                                     Index: rifles..SCAR

48:17,24
49:20
51:3,8,16,
17,21
52:10,11,
20,23,24
53:20
54:5,6
58:14,16,
20,23
61:7,23
62:10,17,
24 63:4,5
69:13
75:6,
76:8,9,11,
12 77:24
78:2,5
79:15 82:7
111:8
139:14,16
151:24
153:10
154:3
168:25
169:1

**rifles** 52:6,
14,19 54:3
58:19
59:13,21
60:10,16,
18 61:11
76:1,3
77:23
78:6,7
86:1,4,15
88:14
132:21

138:18,21
139:6
146:25
147:8,17
148:1,5

**right-hand**
138:2,11

**right-hand-
most** 149:21

**role** 21:22
46:11
65:17

**Ronnie** 170:5

**Roundup**
29:4,13

**routinely**
131:14

**Rule** 37:24

**rules** 9:13
37:24

**run** 27:21
31:18
68:22

**running**
51:22

**rush** 160:7

───────
S
───────

**S-a-d-o-w-y**
45:19

**S-a-l-e-s-s-e**
117:13

**S-h-a-r-p**
141:7

**S-o-t-e-c-h**
134:3

**SA** 90:19
176:21

**Sadowy**
45:19,23
57:4, 68:7
107:21
109:20
141:11

**safe** 87:21
152:11

**sale** 33:4,9

**sales** 10:14,
23 12:14,
21,23
13:3,13,
15,22,23
14:10,13
15:2,6
17:12,16
18:15
20:17,21,
25 25:17
31:5,20,25
44:12
65:18
105:21
169:19
170:12

**samples**
27:21

**Sands** 121:3

124:6

**Save** 170:20

**scale** 121:5,
25 122:1

**scaled**
121:16

**scanned**
111:5
137:16
148:20

**scanning**
132:16
137:3,17
140:1

**SCAR** 9:8
16:9,22
17:4,16
18:22
19:4,21
20:13,19,
22:23
24:2,6
26:5,10
27:6 29:23
31:2 32:18
33:8,14
34:4,25
35:5,12,13
36:8,19
38:7,20
39:11,19,
21 40:2,6
41:8,20
42:13
46:17,23
47:3,5,11,

24  48:3,6,
8,16,24
49:20
50:13,19,
23,24
51:8,17
52:5,9,13,
15,19,23
53:6,9,10,
13,21
54:3,4,5,6
55:5,7,21,
23  56:1,19
57:1,18,
20,25
58:8,14,18
59:12,13
60:1,3,15,
17,20,23
61:14,23
62:11,23
63:5,19
64:13,18
65:6,12
66:20
67:5,6,22
69:11,12
72:18
75:7,16,25
76:2,7,8,
11,14,15,
19  77:11,
15,21
78:3,7,11,
17,19
79:2,12,16
80:1,8
82:6  84:1

86:2,19
87:4,14,
17,19
88:2,11
89:19,20
90:24
91:7,10
93:11
94:5,14
98:3
99:22,23
100:5,7
102:18
104:10,19
106:8
107:18,19,
23  108:4,
17  109:19,
21  110:4,
25  111:8
114:13
116:6
117:16
120:15
121:5,10
123:13
124:7,8
125:3,4
129:12
132:21
139:12,15
141:18
144:8,14,
16,17,24
145:14,15
146:2,25
147:8,17
148:1

151:7,25
152:1,5
153:10
154:3
158:10,20
163:5
164:23
165:6,7
168:18
170:1
173:9
175:24
177:20
179:11,20,
24  180:12

SCAR-  31:3
82:18
119:16
144:24
145:6
154:17
163:6

SCAR-17
153:13

SCAR-H  42:3,
10,17
61:14
138:17,21
139:6

SCAR-HEAVY
21:2  31:4
34:16
35:13
41:21
42:6,11,18
58:9  87:5
139:2,9

141:19
154:21,22,
25  158:17
159:9
167:3,17
169:13

SCAR-L  61:14
126:25
138:17,20
139:6
161:24,25
164:18

SCAR-LIGHT
21:2  34:16
35:13  58:9
82:19,22
87:5
119:16
139:2,8
145:3
146:2
154:19,24
159:6,7
161:10
164:5
167:2,17
168:23
169:13,23

SCAR-LIGHTS
161:10
163:4
170:2

SCAR-LS
162:1

SCARS  19:1
22:9,12

**DX200**

23:4 84:11
86:18
117:16
129:11,12,
16,21
150:15
151:7,10
162:3

scenario
  44:3

scheduled
  17:6

school   16:5

script   90:24
  91:9

seal   136:13

search   47:16

second-to-the-
last   174:9

seconds
  92:15

Secret   29:1

section
  17:13,15
  55:19
  77:13,17,
  23 78:5,9,
  14,16,19,
  24 79:10
  87:16

select   25:15
  30:24
  49:21 65:7
  88:14,15,

16,17
129:12
144:19
145:1
151:7,8,9
152:22,23

selected
  53:10

selection
  38:6,20
  67:9

selector
  87:21,24

sell   11:9,
  15 122:12
  175:17

selling
  31:12
  44:19

semiauto-only
  26:1 65:11

semiautomatic
  25:16
  32:19
  43:17 44:1
  88:21
  144:15,18
  151:10

semiautomatic-
only   33:3,7
  87:18
  88:5,10

semiautomatics
  151:7,8,9

send   117:21

sending
  161:1

sentences
  139:12

separate
  79:20
  80:24 81:2
  84:24

September
  92:1
  93:14,15
  135:1
  153:4
  178:15

sequentially
  67:12
  103:25

serial   58:17
  60:12
  157:23
  158:13
  161:24
  162:4,11
  164:5,
  167:18,19
  169:24
  170:6

Serialized
  157:18

Service   29:2

sessions
  131:20

set   32:11

142:13
160:21
170:20
171:2

setup   143:15

shake   9:18

shared   25:19

Sharp   141:6
  142:8,24

Shea   178:24

sheet   111:7
  162:18

Sheriff's
  28:25

ship   145:25
  146:11,19
  163:18

shipment
  162:6

shipped   19:9
  30:12,17,
  18 107:20
  146:4,8,
  10,23
  147:2,9,12
  150:15
  153:2
  161:5,10
  169:18
  170:5

shipping
  122:23,24
  124:11
  161:7

**shirt** 98:9,
  25 99:2,
  100:5,6
  102:22
  107:19

**shirts**
  96:18,20
  97:6,20
  98:2 99:8,
  19,25
  100:3

**shoot** 29:5,8

**short** 37:6
  170:2
  173:13

**Shot** 21:3,
  5,18,19,23
  22:2 24:13
  25:1 26:5,
  9,16 27:18
  32:16
  34:18
  43:15
  74:3,6,10
  80:2 97:10
  115:19
  132:20
  138:12,19,
  23 139:8
  167:3,6,7,
  10

**shotguns**
  77:13,14,
  15

**show** 21:3,
  5,18,19,23

22:1,2,3,
  9,10 24:13
  25:1,3
  26:5,9,16
  27:9,13,18
  32:17
  33:18
  34:13,14,
  15,18,22,
  25 35:3,6,
  12,14,15,
  22 39:12,
  14,15,16,
  18,20,22,
  23 43:15
  50:25
  53:16
  62:25 72:7
  74:4,7,11
  80:2,8
  97:10
  106:20
  109:24
  115:19
  117:22,24
  118:6,13,
  14 119:24
  120:2
  130:14,16,
  22 131:2,
  3,11,15,18
  132:20
  138:12,19,
  23 139:8
  140:22,24
  141:8
  143:13
  155:16,17

156:20
  158:13
  164:16
  167:3,6,7,
  10

**showed** 30:5
  34:9
  131:16
  139:1,7

**showing**
  67:22
  138:23

**shown** 41:7,
  17,18 48:5
  67:15
  109:22
  111:25
  114:4,23
  115:18
  119:8
  125:1
  126:4,17
  143:5,12

**shows** 17:7
  41:12,15,
  25 67:2
  69:1 74:9,
  10 77:14
  82:18
  92:13 97:7
  108:15
  131:6,7,17
  150:14
  156:13,19,
  21 158:16
  162:4
  167:18

168:17

**side** 11:11
  14:1,4,7
  18:8,13,
  16,17,23
  20:17,21,
  22,25
  32:16
  33:18 34:6
  35:23
  50:22,
  54:23
  58:7,9
  60:17,20
  68:12 73:3
  102:6,11
  105:14
  106:3,8
  107:6
  126:12,13
  141:7,9
  152:11
  164:19

**sides** 58:23

**sign** 166:19

**sign-offs**
  117:25

**signature**
  164:7
  169:3
  172:11
  175:4

**signatures**
  118:1

**signed**

81:20,24
85:9

**significance**
171:12

**similar**
81:18
131:4

**simply**
112:10,13

**single** 67:21

**sir** 7:11,
21,25 8:5,
22 9:7,
10:10
11:4,10
12:12,16,
25 13:20,
24 14:2,5,
12,16,24
15:22,25
16:4,7,11
17:14
19:6,15,
18,22
20:4,12,15
21:6,20
23:21
25:12
26:3,11,17
27:16,24
28:9
29:15,21
30:1 31:9,
21 32:4,21
34:7,23
35:1,4,7,

9,14,24
36:2,6,12,
15,18,21
37:3,8,22
38:24
39:5,23
40:19,24
41:2,4,12
42:5,20,23
43:10,13
44:20
45:7,22
46:7,10,19
47:2,12,23
48:1 49:16
50:10
51:15,19,
25 52:8,
12,18,21
54:2,13,
23,24
55:2,12
56:6,16
57:6,8,12,
22 58:3
60:8,14
61:15,21
62:7 63:16
64:4,20
65:9,21
66:14,16,
24 67:7,
17,24
68:2,13,
18,21,24
69:4,8,15,
23 70:2,6,
10 71:4,

14,18,25
72:7,11,21
73:8,13,18
74:5,15,19
75:4,9
76:6,15
77:1,4,9,
12,19,22,
24 78:12,
15,20,23,
25 79:9,
13,17,22
80:6,12,21
81:3,10,23
82:1,14,
17,21
83:5,9,13,
16,18,24
84:3,10,
15,16
85:1,4,8,
18,20 86:9
87:1,8,13,
15,24
88:13,15,
20 89:10
90:1,3,8,
22 91:1,
13,21,23
92:20,24
93:18,21,
24 94:8,
16,18,22
95:14
96:4,7,18,
21,23
97:3,11,
13,19 98:6

99:4,20
100:2,10
101:17
102:9
103:4,11,
14,20
104:10,23
105:4
106:1,6,15
107:1,8,9,
14 108:1,
4,13,21
109:1,5,14
110:3,7,
14,22
111:3,14
112:3,5,
19,25
113:4,8,
10,14
114:15,19,
25 115:9,
14,20,23
116:14,21
117:6,15,
17 118:7,
13,20
119:5,10,
25 120:3,
6,9,22
121:12
122:2,15,
19,24
123:1,4,6,
23 124:2,
9,15,21,24
125:14,17,
19,24

126:3,13,
15,18,21,
24 127:2,
4,9,19
129:5,21
130:10
131:12
132:18
133:1,8,
11,14,22
134:5,11,
15 135:3,
5,8 136:1,
7,9,25
137:3,6,
17,20
138:1,6,
10,14
139:9,18,
25 140:7,
10,18
141:2,4,24
142:5,17,
21,25
143:4,6,
10,13,17,
23,25
144:4,6,
12,21
145:9,11
146:12,17,
21 147:11,
16,21
148:11,20
149:6,9,15
150:7,17
151:3,10,
14,17,20

152:2,18,
21 153:5,8
154:1
155:23
158:2,7,9,
18 159:4,
19 160:5,
14,17,20
161:15,19,
21 162:4,
7,8,12,17,
21 164:2,8
165:1,17
166:4
167:23
168:3,16
169:6,
170:9
171:25
172:3,7,9,
19 173:1,
13,16,22
174:10,24
175:1,8,21
176:2,5,8,
15,24
177:9,25
178:4,12,
24 179:5,
7,18,22
180:1,3,6,
14

sitting
44:23
103:8
115:24
179:4

sixth   69:6

size   113:17

slightly
94:13

slip   126:6

slipped   90:9

small   13:2
35:25
178:15,23
180:5

smart   69:24

Smith
112:23,24
161:18,20

Sniper   146:2
150:9
154:20,22
159:8

SO31502
170:13

SOCOM   20:14
24:1
30:13,17
31:5,10,
19,25
40:2,7,14,
17 48:8,
16,24
51:3,11,22
52:11 54:4
55:23 56:1
59:12 63:4
75:5 82:6
113:1

145:2
148:24
149:17

SOCOM'S   24:6
53:20 55:7
86:1,3,14
179:24

SOF   24:10
40:14
46:17,23
47:4,9,
48:16
51:3,21
52:11
53:20
58:19
62:23
63:3,5
69:12 82:6

soft   125:4
175:17,23

soft-type
175:17

sold   26:3
72:19,22
73:6
122:14
125:18,24
126:14,20
127:3
154:4,5,6

solemnly   7:1

solicitation
51:23
56:3,19,21

Case 3:12-cv-00102-CAR    Document 146-146    Filed 07/23/15    Page 229 of 235    DX200.0229

FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.
Charles Newton Mills, III on 08/14/2013
30(b)(6)                                                                    Index: solid..standard

161:2

solid  121:13
  159:3

Solutions
  107:17
  109:7,9

SOM  112:23

somebody's
  148:22

sort  11:11
  93:20
  104:16
  105:24
  129:22
  134:12

Sotech
  132:24,25
  134:3

Sought  55:23
  56:2

sound  13:15,
  16

source  138:3

sources
  55:23 56:2
  112:21

space  67:3

Spaniel  18:2
  38:23 39:2

Spaniel's
  37:15 44:6

spare  12:1
  161:12

speak  19:8
  116:15

speaking
  57:4

special  12:2
  30:13 47:8
  49:18,20
  61:23
  62:9,17
  74:25
  75:2,6,7
  76:11 78:6
  82:5 111:7
  131:18
  134:6,9
  139:13,16
  147:12
  150:11
  161:1,8
  163:20

Specialist
  20:8,9

specific
  16:19
  21:13,24
  22:8 24:17
  28:21
  36:23
  47:22
  89:20
  177:19

specifically
  23:24
  28:22 52:2

specifications
  83:7

specking
  89:21

speculate
  83:18 92:3
  121:13

speculating
  57:5 68:18
  86:5 99:20
  100:10
  114:15
  121:14
  123:24
  149:20,23
  172:19
  176:25

speculation
  47:7,13
  48:11
  53:25
  54:15 55:9
  56:6 58:24
  68:11,12,
  16 69:5
  75:11 81:1
  83:10,16,
  21 86:25
  87:1 89:14
  92:22
  93:21 94:8
  103:11,20
  107:11
  108:5
  112:19
  116:21
  133:3
  142:16
  155:23

177:4

spell  7:16

spelled
  127:20,22

spelling
  117:11,12

spent  66:25

split  13:22
  103:7

Sport
  130:14,16,
  22 131:7,
  11,15

SPR  168:25

spreadsheet
  148:22

stack  179:16

staff  133:10
  156:3

stamp  166:22

stand  39:12,
  15,16,19
  41:24
  81:14

stand-alone
  163:8

standalone
  119:20
  155:1

standard
  90:6
  119:17
  151:22

152:19,20
154:21,25
159:7,8,9
168:19

**stands**  41:13
99:16

**Star**  159:1

**start**  8:10
17:18
31:12
46:21

**started**
13:24
30:10 39:5
131:18

**starting**
55:19
117:8
126:1
150:4,5
151:1

**starts**
101:20

**state**  7:16,
22 17:3
18:23 20:9
29:2 35:19
107:1

**stated**  75:25
80:11

**statement**
35:24
43:20,22
45:15
56:18,20

82:8 88:12
139:3

**statements**
74:23

**states**  27:7
50:9 58:7
63:15,24
69:14
74:25 75:2
82:5,21
147:2,9,18
161:17
163:15
176:2

**stating**
118:7

**stations**
22:7

**stay**  21:21
159:24

**stayed**  145:3

**stipulate**
64:7

**stock**  155:1
163:8

**stood**  62:23
63:5

**straight**
19:10
162:7,9

**strictly**
34:14

**strong**
115:25

**study**
177:16,21,
25 178:2

**stuff**  63:1
64:3 118:1

**style**  81:18
98:2 99:11

**sub-headings**
55:22

**subassemblies**
23:15

**subject**
158:20
172:25

**submitted**
19:13
52:3,6
53:18,23
54:18,20,
21

**submitting**
53:19

**subscription**
179:6

**subsequent**
157:25

**super**  90:24
91:9

**supplemental**
38:8,12
128:7

**supplied**
128:6

**supply**  32:10
98:5

**support**
10:14,23
11:11,12,
16,17
12:14,21,
24 19:11

**supposed**
62:8

**suppressor**
153:22

**Surface**
111:5

**SV**  154:19

**swag**  98:1

**swags**  96:17

**SWAT**  29:3,
4,5,7,13

**swear**  7:1

**switch**
87:21,24

**sworn**  7:7

**symbol**  90:18

**symposium**
35:25
36:4,9

**system**  9:9
16:10,22
17:16
18:22
19:21
20:19,24

23:7,8,11,
16,23
24:11 26:5
29:23
33:8,15
34:4,9,25
36:8,
37:19
39:25
43:18
48:25
104:14
122:9
164:23

**systems**
28:15
30:24 31:3
35:5,12
78:13

---

**T**

---

**T-a-r-r-e-n-t**
177:15

**T-o** 138:7,8

**t-shirt**
125:3

**table** 134:25
178:14

**tactical**
78:13
119:14

**tacticals**
119:21

**tag** 126:7,8

**taking** 30:11
65:5

**talk** 10:3
18:17

**talked** 18:2
20:16
33:12
55:16
110:3
128:15

**talking**
18:15
26:16
39:17
59:22
61:12
86:14
87:16
111:15
114:16
158:10

**talks** 132:20

**Taquet** 176:7

**Tarrent**
177:15

**teams** 29:3,
5,7

**technical**
102:6
122:4

**technically**
45:14

**Technology**
129:4

134:7,10
168:9

**telling**
128:24
161:4

**tells**
104:21,24
105:8,13,
23 109:22

**ten** 18:4
37:9

**tentative**
83:7

**term** 26:10
47:5,11
50:13
52:9,13,
15,19,23
53:10
54:3, 55:5
57:24
58:13 60:3
62:10
75:16
90:23
91:7,10
94:14
99:22
100:7

**test** 27:20
28:15
129:13,17

**tested** 52:4

**testified**
7:7 31:10,

17 44:10,
13 59:5,21
84:10
120:1
138:23
147:4,25
148:10

**testify** 10:9
38:2,21,23

**testimony**
7:2 33:21
51:7 54:9,
10 61:4
125:15
139:3,7,9

**testing**
27:22
28:19
129:22
161:2

**tests** 28:5

**text** 85:5
111:4

**thereabouts**
13:8

**thick** 132:7

**thing** 10:1
42:10
126:9
129:17
153:15
158:17
161:11
171:8

**things** 46:14

53:13
58:25 59:6
60:11 61:8
62:22
79:24 90:9
98:4 104:5
112:21
119:13
132:22

**thinking**
165:11

**thought**
101:5
178:10

**thousand**
23:2
146:10

**thread** 96:10
101:11,12

**three-day**
131:2

**time** 13:4,
14:17
15:13 17:9
20:11 23:8
24:17
25:18
26:8,14
28:4,8
35:2 45:24
51:18
52:10,14,
22 55:13,
14 58:8
75:14
76:24

81:13 84:6
92:15
96:2,5
97:9
104:14
105:20
113:3
114:13
129:16
131:20
142:22
145:2
153:25
157:24,25
170:20
174:22,25

**timeframe**
18:10
19:25
29:20 31:1
47:15
50:18 56:1

**timeframes**
30:10

**Timeline**
47:15
55:20

**times** 8:1
91:11
110:18

**title** 10:19
12:17 15:3
44:25
46:16
49:18
61:22

85:15,21
95:25 96:6
101:23,24
102:4
107:18,
110:23
174:14,16,
24 176:10
178:14
179:21

**titled** 78:24
79:10
172:22
179:11
180:12

**TM** 90:25
91:9

**today** 10:9
37:19
38:22
44:13,15,
23 63:2
85:16,
108:21
115:8
179:4
180:23

**told** 129:14
141:7,12
142:6,9

**Tom** 99:14

**tool** 163:7

**tools** 12:2
161:11

**top** 8:15

13:6 15:3
17:24 41:5
42:3 43:11
45:1,18
66:23
69:12 81:5
83:25
87:14,20
101:14
108:23
110:21
115:24
126:8
127:10
133:9
134:6
138:11
140:3,5
148:17
160:15
161:16,22
170:25
172:9
176:20
177:10

**topic** 9:9
38:6,19,
22,24
94:13

**topics** 38:2

**total** 10:18
70:6

**totally**
26:22,23
99:11
165:15

town  36:23

trade  67:2
  69:1 97:7
  117:21

trademark
  50:15
  75:19 91:4

traffic
  95:18

trainers
  159:22

training
  11:14,15,
  21,22
  12:4,5,9
  13:14
  15:1,2,6
  20:17,21,
  25 22:8

transaction
  157:15

transcript
  10:5

transferred
  167:22,25
  168:1

transition
  13:17

translate
  9:22

trifold
  111:7
  113:16
  114:11,16,

23  115:18
116:2,5

trifolds
  111:1,2

trigger
  154:23,24
  165:9

Troy
  112:22,24
  161:18,20

true  63:6
  82:8

trusted
  23:20

truth  7:2,3

turn  30:15
  38:4,14
  55:18,20
  66:17
  67:19
  74:16
  83:11,22
  87:6 98:8
  120:4
  152:13
  179:8

turning  48:2
  69:6 77:2
  82:12 85:2
  108:6,14
  109:2
  117:18

Twenty-five
  101:20

two-page
  116:11
  133:20

type  15:11
  97:5
  148:24
  175:23
  180:13

types  152:16
  165:11
  179:12

─────────
    U
─────────

uh-huh  9:21
  49:10
  61:18
  72:14
  91:22 92:9
  155:15
  166:20
  169:16

un-huh  9:22

underneath
  41:8

understand
  9:19 11:23
  16:18
  22:13 24:3
  31:8 32:3
  33:5 40:10
  52:17
  54:1,12
  65:1 75:21
  84:9
  104:15

147:6
169:15

understanding
  58:24 83:1
  86:8,17,20
  87:2 103:3

understood
  9:20,25
  10:6
  146:13

unit  163:8

unitary
  93:20 94:7

United  27:7
  58:6 74:25
  75:2 82:5
  147:1,9,18

units  31:4,
  11,18,22,
  24 34:17
  117:16

universal
  119:13

unsigned
  172:2

update
  110:25

upgraded
  98:3

upper  151:16
  164:24
  165:5
  166:2

USA  10:12
  12:21
  13:14
  15:7,11,21
  16:9 18:7
  42:12
  44:18
  45:25
  46:10
  56:9,15
  63:18
  64:12
  79:18
  80:22
  81:18
  85:3,20
  97:13
  102:24
  105:6,9,
  18,25
  107:6
  113:16
  121:20,21
  129:15
  141:9
  146:1,24
  147:2,10,
  23 150:11
  151:6,11
  154:16
  156:1,13
  158:11
  164:21
  171:22
  173:10
  175:5,7
  178:3

users  23:3,
  17 24:25
  97:8

USSOCOM
  24:10 43:7
  75:1,2
  112:23

V

V-a-s-q-u-e-s
  128:24

vague  27:3,9
  55:10
  64:24 84:8

Variant
  146:3
  154:20,22

Variants
  150:9

Vasques
  128:23
  129:3

Vegas  43:15

version
  23:5,14
  25:16 26:1
  33:3,8
  41:21
  42:12
  43:17 44:1
  65:7,11
  87:19
  88:6,10
  112:13
  115:6

121:24
122:7
129:18
144:15,18
145:1
151:22,23
153:18,19,
21 157:12
159:7,8
177:1,2

versions
  99:7
  112:12
  139:14
  144:19

Vice-president
  85:14

view  155:12

Virginia
  46:22
  63:13
  156:5
  159:14,18
  164:21

visible  42:2

visibles
  119:21

voucher
  107:2,8

W

wait  10:2
  30:12
  128:11

wanted  7:15
  27:22 44:3
  90:14
  129:12
  130:1
  154:6
  171:11

warehouse
  73:2
  152:24
  153:1

Warfare
  111:5

Washington
  35:21

watches
  123:10,11,
  21

weapon  9:9
  16:10,22
  17:16
  18:22
  19:21
  20:19,24
  23:23 26:5
  29:23 31:2
  34:4,25
  35:5,12
  36:8,19
  164:23

weapons
  21:4,5
  28:4
  57:14,18,
  23,25 59:9
  112:23

**FN HERSTAL, S.A. vs. CLYDE ARMORY, INC.**

30(b)(6)    **Charles Newton Mills, III on 08/14/2013**    Index: web..zeros

152:22
179:11,20
180:13

**web** 110:12

**website**
110:15

**week** 167:10

**Westcott**
18:6

**whichever**
21:7

**white** 100:3,
5

**whoops**
120:24
135:11
160:10
163:23

**winter** 29:20

**Wisconsin**
127:16

**Wood** 7:12

**word** 47:3
62:9
114:12
146:20

**words** 34:6
104:11
159:23

**work** 156:3

**worked** 18:7
26:12
131:17

**working**
23:20

**works** 57:10
141:8

**worldwide**
102:3

**worse** 113:25

**Worse-case**
44:3

**write** 62:5,7
75:12,13,
19 76:6
83:3,9
86:6
139:10,17

**writer** 86:23

**writers**
45:15

**writing**
69:14
161:3

**written**
90:24
170:8

**wrong** 122:2

**wrote** 39:17
62:5
128:23
136:14

**Www.
tomagonline.
com.** 138:5

**Y**

**year** 8:11
13:21
17:17 25:2
28:6 29:19
34:18 68:1
81:2 85:25
131:2,15,
16,25
141:5
144:21
148:23
150:9
172:16

**years** 16:2
18:9,11
43:16,23
44:4 145:5

**yesterday**
18:3 37:16

**young** 141:10

**Yup** 109:10
158:2

**Z**

**zeros** 127:6

**Huseby, Inc.**
1230 West Morehead Street, #408, Charlotte, NC 28208

**www.huseby.com**
(704) 333-9889

**DX200**