IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

|  |  |  |
|---|---|---|
| FN HERSTAL, S.A., | ) ) ) ) ) | |
| Plaintiff, | ) | Case No. 3:12-CV-102 (CAR) |
| v. | ) ) | |
| CLYDE ARMORY, INC., | ) ) | |
| Defendant. | ) ) ) ) | |

# DEPOSITION DESIGNATIONS

## Paul Hochstrate
## John Klein

| | FN Herstal, S.A. |
|---|---|
| | Clyde Armory, Inc. |

HOCHSTRATE, PAUL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

ATHENS DIVISION

FN HERSTAL, S.A.,              )

      Plaintiff,              ) Civil Action No.

                          ) 3:12-cv-275 (CAR)

VS                             )

                          )

CLYDE ARMORY, INC.,            )

      Defendant.              )


DEPOSITION OF:   PAUL HOCHSTRATE

DATE:            FEBRUARY 28, 2014

HELD AT:         RADISSON HOTEL

                 50 MORGAN STREET

                 HARTFORD, CONNECTICUT



Reporter:  Sheryl L. Yeske, LSR #0000028

2

APPEARANCES:


Representing the Defendant CLYDE ARMORY, INC.:

    Wood Herron & Evans LLP

    2700 Carew Tower

    441 Vine Street

    Cincinnati, OH 45202

    513-241-2324

    By:  Glenn D. Bellamy, Esq.

         gbellamy@whe-law.com


REPRESENTING the Plaintiff FN HERSTAL S.A.:


    Ladas & Parry LLP

    Suite 1600

    224 S. Michigan Avenue

    Chicago, IL 60604

    312-427-1300

    By:  Burton S. Ehrlich, Esq.

         burte@ladas.net


REPRESENTING the Deponent PAUL HOCHSTRATE:


    Colt's Manufacturing Company, LLC

    545 New Park Avenue

    West Hartford, CT 06110

    860-244-1307

    By:  Joseph Dieso

         Deputy General Counsel and Secretary

         jdieso@colt.com

3

I N D E X

Examinations                                              Page

PAUL HOCHSTRATE

DIRECT EXAMINATION BY MR. BELLAMY                 5

CROSS-EXAMINATION BY MR. EHRLICH                 52

REDIRECT EXAMINATION BY MR. BELLAMY              61

RECROSS-EXAMINATION BY MR. EHRLICH               62

REDIRECT EXAMINATION BY MR. BELLAMY              63

CROSS-EXAMINATION BY MR. DIESO                   65


DEFENDANT'S EXHIBITS


 No.        Description                             Page


 Exhibit 61 subpoena                                7

 Exhibit 62 solicitation for SCAR program           14

 Exhibit 63 September 2006 Small Arms Review         21
             article

 Exhibit 64 October 2006 Small Arms Review           33
             article

 Exhibit 65 SCAR-L type C operator's manual          37

 Exhibit 66 SCAR-L type D operator's manual          44

 Exhibit 67 SCAR-L type A operator's manual          44

 Exhibit 68 SCAR-L type B operator's manual          48

(Original exhibits retained by Attorney Bellamy)

4

1                    S T I P U L A T I O N S

2

3

4              It is stipulated that the reading and signing of

5       the deposition transcript by the witness may be signed

6       before any Notary Public.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1              (Deposition commenced at 9:38 a.m.)
 2              PAUL HOCHSTRATE, Deponent, having been
 3         first duly sworn by Sheryl L. Yeske, a Notary
 4         Public in and for the State of Connecticut,
 5         was examined and testified as follows:
 6              DIRECT EXAMINATION BY MR. BELLAMY:
 7         Q.   Sir, could you state your name and spell the
 8    last, please?
 9         A.   Paul Hochstrate, H-O-C-H-S-T-R-A-T-E.
10         Q.   Thank you.  And let me go ahead and state on
11    the record this deposition is pursuant to a subpoena.
12    And you are represented today by counsel for your
13    employer, Colt's Manufacturing Company.
14              MR. BELLAMY:  And has the reporter recorded
15    the names of all present here?
16              THE REPORTER:  Yes.
17              MR. BELLAMY:  Okay.  Very well.
18              MR. DIESO:  Let me just indicate, I
19    discussed this matter with counsel, and I understand a
20    protective order is in place.  The understanding among
21    all of us is that we will have 30 days to review the
22    transcript and make confidentiality designations, if
23    appropriate.  And we would reserve the right to
24    designate items for confidential attorneys eyes only.
25    So, neither counsel will share the deposition materials
```

6

1    with their clients until after we've had 30 days to

2    review it.  Is that understood?

3                MR. BELLAMY:  Yes.

4                MR. EHRLICH:  That's understood.

5    BY MR. BELLAMY:

6        Q.  Also, in that same 30 days, you will have an

7    opportunity to review the transcript to see if there

8    were any errors in the transcription of it and so forth

9    and to designate that.  And I will supply that to your

10   counsel who will pass that onto you.

11       A.  Okay.

12               MR. BELLAMY:  Is that okay?

13               MR. DIESO:  Yes.

14               MR. BELLAMY:  Okay.

15   BY MR. BELLAMY:

16       Q.  Sir, are you currently employed?

17       A.  Yes.

18       Q.  By whom?

19       A.  Colt's Manufacturing.

20       Q.  And how long have you been employed by

21   Colt's Manufacturing?

22       A.  There's been several name changes, but I've

23   been with this company for over 29 years.

24       Q.  What's your current position?

25       A.  Chief engineer.

7

1      Q.  How long have you had that position?

2      A.  Approximately, two months.

3      Q.  I'll go over a little bit more of that history

4   briefly in a moment.

5           MR. BELLAMY:  First, let's mark an exhibit.

6   This will be Exhibit, Defendant's Exhibit 61.

7               (Defendant's Exhibit 61,

8               subpoena, marked for identification)

9   BY MR. BELLAMY:

10     Q.  I've handed you what has been marked

11  Defendant's Exhibit 61.  The reason it's 61 and not 1

12  is we have had previous depositions, and we have been

13  sequentially marking exhibits.  It makes it easier for

14  us.

15     A.  Okay.

16     Q.  Have you seen this document before?

17     A.  No.

18     Q.  Okay.  This is a subpoena that was accepted by

19  counsel for your employer.  Do you understand that you

20  are here pursuant to a subpoena?

21     A.  Yes, I am.  Possibly, this is what was e-mailed

22  to me.  I received a copy of a subpoena and something

23  else.

24     Q.  And some --

25     A.  This might have been it.

8

1    Q.  -- topics of the deposition?

2    A.  Of the deposition.

3    Q.  Yes.  And some documents that were being asked

4    for?

5    A.  Correct.

6    Q.  Okay.  Let me start briefly with your

7    educational background.  After high school, can you

8    tell me what, if any, formal education you have?

9    A.  I've had a couple of years at

10   Central Connecticut State College pursuing an

11   accounting degree, which I wound up changing my mind

12   and wound up going into the engineering field.  And I

13   went to Waterbury State Technical College, took a few

14   courses there.  But I don't have a degree.

15   Q.  Okay.  And, approximately, what years were, did

16   you take those courses at Waterbury, these technical

17   classes?

18   A.  Probably in 1980 something.

19   Q.  You say that you've been with Colt under one

20   name or another for over 29 years.  Prior to that, did

21   you have any employment in a technical field?

22   A.  Yes.

23   Q.  And what was that?

24   A.  I worked at UMC Electronics.  They manufactured

25   brushless DC motors.  So, I worked there for

9

1    3 1/2 years as an engineer and designer.  And then

2    before that, I worked for five years at

3    Superior Electric in Bristol as a draftsman and junior

4    designer.

5        Q.  Okay.  And, so, I'm trying to do math,

6    approximately, when did you start working for Colt?

7        A.  1985.  January 2, 1985.

8        Q.  And you said that your employer has had some

9    different names.  Can you describe to me these names

10   and the relationships and so forth briefly?

11       A.  Well, there was Colt Firearms.  There was

12   Colt's Manufacturing.  There was Colt Defense.  And

13   I've worked for all three at one time or another.  And

14   now we're back to Colt's Manufacturing.

15       Q.  Okay.

16       A.  I don't know if that's the exact order.  And I

17   might have left off a name or two.

18       Q.  Okay.  So, and just so we're clear, when I

19   refer to "Colt," I'm referring to those entities

20   broadly speaking, any of those that are relevant.  If

21   it makes a difference as to which one, if you would

22   point that out.  But I'll be generally talking about

23   your employer, Colt.

24       A.  Okay.

25       Q.  Are you familiar with a military organization

known as the Strategic Operations Command or SOCOM?
A. Yes.
Q. And are you aware of a program initiated by SOCOM known as the SOF Combat Assault Rifle program or SCAR program?
A. Yes.
Q. Did you have any involvement in that program on behalf of Colt?
A. Yes, I did.
Q. And can you tell me what that involvement was generally?
A. I was a designer. I considered myself the lead designer on that. There was a whole bunch of designers that were working on this project.
Q. And what was the project? I mean --
A. What was SCAR?
Q. What was it about?
A. It was to develop modular rifles, multi caliber with a whole host of things that SOCOM wanted that was above the M4, the capabilities of the M4.
Q. You mentioned the M4. What is that, just so that we have it on the record?
A. That is our smaller version of our M16. It's a gas impingement, 14 1/2 inch barrel rifle, collapsible stock. It's the main rifle of the U.S. military.

11

1     Q.  And when you say "our," you're referring to

2    Colt; is that correct?

3     A.  Yes.

4     Q.  Can you tell me then more broadly, what was

5    Colt's participation in SOCOM's SCAR program?

6     A.  What was Colt's participation?

7     Q.  Yes.

8     A.  Well, we were one of the players in the

9    solicitation.  You had to -- there was an initial phase

10   where you had to prove that you had the capability to

11   deliver the amount of units they were going to

12   ultimately want, and that you had the people in your

13   organization to do that.  And we were one of the

14   companies that was picked to go on into phase one.

15    Q.  So, was there something before phase one?

16    A.  There were a lot of draft solicitations that

17   had been released.  And there was paperwork, from what

18   I understand, on the contract side, where you had to

19   prove that your company was able to meet the

20   requirements of the solicitation.  It wasn't going to

21   just be open to anybody, any mom and pop gun store that

22   wanted to get in there, or small manufacturing company.

23   They wanted a large, developed manufacturing company to

24   bid on these guns.

25    Q.  And about what year was this taking place?

Paul Hochstrate                                    2/28/2014

12

1      A.  Around 2003 to 2004.

2      Q.  And you mentioned this activity prior to phase

3  one.  Did you attend any industry meetings held by

4  SOCOM in that role?

5      A.  For the initial part of this?

6      Q.  Right.

7      A.  Where you had to prove your company was --

8      Q.  Right.

9      A.  No.  No.

10     Q.  Okay.  Tell me then what was involved in

11 phase one?

12     A.  To me, phase one was the actual part we had to

13 design, develop, and deliver guns to SOCOM for their

14 evaluation.

15     Q.  And did you attend any meetings with SOCOM

16 during that phase one?

17     A.  Yes.

18     Q.  Okay.  And what were those meetings about?

19     A.  We had gone there understanding that they were

20 going to give us information on what they wanted, what

21 they wanted our company to do, what they were looking

22 for, and discuss the draft SCAR solicitation that were

23 out there.  But when we got there, they turned it

24 around, and basically wanted to know what we were going

25 to do for them.

Paul Hochstrate                                    2/28/2014

13

1    Q.   Do you know what other companies were

2  participating in the phase one?

3    A.   They didn't give us a list or tell us, but we

4  had run into a few people that my boss knew and that we

5  knew from other companies.  So, we knew a couple of the

6  companies.

7    Q.   Was FN Herstal one of those?

8    A.   Yes.

9    Q.   Was Heckler & Koch one of those?

10    A.   Yes.

11    Q.   How about Lewis Machine and Tool?

12    A.   That, I don't know.

13    Q.   Okay.

14    A.   I heard later that they may have been there,

15  but I have no firsthand knowledge of that.

16    Q.   Cobb Manufacturing?

17    A.   That, I don't.

18    Q.   What about Robinson Armament?

19    A.   I heard later on that they were a participant,

20  but at that time, I didn't know that.

21    Q.   Were there any requirements or parameters that

22  were provided to you as to what a rifle being designed

23  needed to meet?

24    A.   Yes.

25    Q.   And did those come from SOCOM?

Paul Hochstrate                                    2/28/2014

14

1      A.  The ones that were provided to me came from

2  Kevin Brown, our contracts guy.

3      Q.  Okay.

4      A.  He got his from SOCOM.

5      Q.  All right.  Are you familiar with a government

6  run website known as FedBizOpps.gov?

7      A.  Yes.

8      Q.  And can you tell me what the purpose of that

9  website is, generally?

10      A.  The announcements of new solicitations for jobs

11  for the defense industry.  Not jobs that you apply for.

12  I mean, different programs and --

13      Q.  Projects?

14      A.  -- projects.

15              MR. BELLAMY:  Mark that 62.

16              (Defendant's Exhibit 62,

17              solicitation for SCAR program,

18              marked for identification)

19  BY MR. BELLAMY:

20      Q.  You have been handed what has been marked as

21  Exhibit 62.

22      A.  Yes.

23      Q.  Do you recognize what this document is?

24      A.  Yes, I've seen it.

25      Q.  What is it?

15

1      A.   It's a, it looks like it's a synopsis or the

2   solicitation for the SCAR program.  And it lists a

3   bunch of dates when the solicitation was released, when

4   the first award was given out, the dates of various

5   changes and amendments that were done.  It's a

6   solicitation.  It also has a rough, it looks like rough

7   description of some of the things that were required

8   for the SCAR rifles.

9      Q.   There in the body of it, it has a heading

10  that's a solicitation number.  Do you recognize that

11  solicitation number?

12     A.   No, I didn't have it memorized what the SCAR

13  solicitation number was.

14     Q.   Okay.  Below that, it has a heading of

15  synopsis.  And if you would look at that, does that

16  appear to be an accurate synopsis of what the original

17  solicitation was in the SCAR program?

18     A.   Could I read it for --

19     Q.   Absolutely.

20     A.   Just skimming it over, yes, it does look like

21  it's a synopsis of what the SCAR program was.

22     Q.   In the first line there, it says "United States

23  Special Operations Command is issuing a solicitation

24  for the procurement of SCF" -- I'm sorry, "SOF Combat

25  Assault Rifles," and then in parenthesis, it's

16

1   "(SCAR)."  Do you see that?

2       A.  Yes.

3       Q.  And is this the SOF Combat Assault Rifle

4   program that we were just discussing?

5       A.  Yes.

6       Q.  And that abbreviation or acronym SCAR, is that

7   the same SCAR that we were referring to?

8       A.  Yes, it is.

9       Q.  And below that, it says, "to fulfill this

10  requirement, the SCAR will be developed in two

11  threshold configurations, a SCAR light," and then it

12  has that abbreviated "SCAR-L" "and a SCAR heavy," and

13  that's abbreviated "SCAR-H;" is that correct?

14      A.  Yes, that's what it says.

15      Q.  Were you familiar with the SCAR light version

16  and the SCAR heavy version?

17      A.  More the SCAR light.  I knew what the SCAR

18  heavy was, but I mostly worked with the SCAR-L.

19      Q.  Okay.  Going on down, it says that, "It will be

20  available in the following standard" -- or "the

21  following variants, a standard version," abbreviated

22  'S,' close quarters combat," abbreviated 'CQC,' "and

23  sniper variant," abbreviated 'SV.'"  Do you see that?

24      A.  Yes.

25      Q.  Were you familiar with those variants?

Paul Hochstrate                                    2/28/2014

17

1       A.   I was familiar with some of the specs they had

2    on those variants, but I don't remember having to

3    submit all those different variants.

4       Q.   Did you submit more than one variant?

5       A.   Yes.

6       Q.   What variants did you, did Colt submit?

7       A.   We submitted three different types of the

8    standard; a type A, a type B, and a type C, and one,

9    from what I remember, close quarter combat type, upper

10   receiver.

11      Q.   Moving on down, it talks about the ergonomic

12   and parts commonality between the SCAR-L and SCAR-H,

13   "and that they shall be maximized to create a," quote,

14   'family,' closed quote, "of SCAR weapons."

15      A.   Right.

16      Q.   Was this family of SCAR weapons a concept that

17   SOCOM talked to Colt about?

18      A.   It was in the solicitation.  I thought there

19   was an option where they said ideally they would want

20   one weapon that would be modular, but the SCAR-L and

21   SCAR-H, the two versions were acceptable.

22      Q.   And why would you need two versions, one for

23   the light, and one for the heavy?

24      A.   Well, because the length of the rounds, they

25   had several different calibers they had mentioned, and

18

1    a lot of rounds were roughly the same length,

2    approximately this long (indicating).  I would say

3    2 1/2 inches long.  So, they would fit in one size

4    weapon, basically because of the magazine well design.

5    And then the other round, they wanted a 7.62x51 gun,

6    and it's a lot longer round.  And, so, you would need a

7    bigger magazine well.  And it would be -- it wouldn't

8    be good design, a way to design something by designing

9    for this big round, and putting the small rounds in

10   there, too, you would have an unnecessarily large gun

11   for all the smaller calibers.

12       Q.  Okay.  In the paragraph below that, it talks

13   about some "shall not exceed" lengths and "weight shall

14   be no more than," and so forth.  Do you recall there

15   being limitations on the size and weight of the weapons

16   to be submitted in the program?

17       A.  Yes, that was all part of our design, yes.  We

18   had to measure the guns and weigh the guns to make sure

19   they met that.

20       Q.  If you would turn to the second page, and the

21   paragraph down at the bottom there, it indicates

22   "Offerors will be required to provide product sample

23   SCAR-L's as part of the proposal.  Product samples will

24   consist of three each SCAR-L rifles, the standard

25   barrels, one each CQC conversion and a SCAR-H technical

19

1  approach."  Do you see that?

2      A.  Yes.

3      Q.  What -- do you know what they mean by a "SCAR-H

4  technical approach"?

5      A.  Yes.  They realized that not everybody was

6  going to have a 7.62x51 design all ready to go.  So,

7  they allowed you to submit a technical approach, which

8  was basically drawings and a description of what you

9  were going to propose if you were to get the contract

10  for a 7.62x51 design.

11      Q.  When, in these solicitation requirements that

12  you were provided in the course of your work on this

13  project, when you saw the term "SCAR," what did that

14  indicate to you?  Did that have any meaning to you?

15          MR. EHRLICH:  Objection.  Foundation.

16  BY MR. BELLAMY:

17      Q.  If you understand the question, you can go

18  ahead and answer.  The objections are to preserve the

19  ability to rule on that later.

20      A.  Okay.  I was wondering where the judge was.

21      Q.  Okay.  Unless your employer's counsel instructs

22  you not to answer, then you go ahead and answer.  And

23  then it either will be allowed or not allowed later,

24  but we'll have the answer for our purposes.

25      A.  All right.  I understood the name "SCAR" came

20

1    from SOCOM's acronym at the beginning of this page for

2    the SOF Combat Assault Rifle.  So, that was the

3    shortcut name of the program, SCAR program.

4         Q.  So, in the course of your participation on

5    behalf of Colt in this program, did Colt produce any

6    rifles that were submissions for the program?

7         A.  Yes.

8         Q.  Generally speaking, what did Colt produce?

9         A.  We produced three different types of weapons; a

10   type A, we called it, a type B, we called it, and a

11   type C.  We supplied three each of those type weapons.

12   They were the standard variants as they talked about

13   here.  And we supplied one upper receiver assembly CQC

14   version, the CQC version.

15        Q.  And did Colt have any designation for what it

16   called those rifles that it submitted?

17        A.  We just called them all SCAR rifles because it

18   was for the SCAR program.

19        Q.  We will look at some documents in a moment, but

20   I had supplied to you through your counsel earlier, I

21   had a copy of an operator's manual that indicated a

22   Colt SCAR type D, as in delta?

23        A.  Yes.

24        Q.  Can you tell me, was there a type D?

25        A.  There was a type D, a fourth type in the works

Paul Hochstrate                                          2/28/2014

21

1    that never was finished.  We were working on four

2    different types of, four different types of guns for

3    this, an A, B, C, and D.  And whichever first three

4    would get completed with our testing and we got parts

5    in, and they seemed okay for this to submit for this

6    program, that's what we went with.  So, type D was a

7    version that was never finished.  There was an

8    operator's manual for it that was incorrect.  It was

9    just waiting to go to see if the type D was going to be

10   completed.  And if it was, the operator's manual would

11   have been updated to match the type D.

12        Q.  Okay.  The rifles that Colt submitted to SOCOM

13   in the program, what caliber were they?

14        A.  5.56.

15        Q.  Okay.  So, is it correct that those were all

16   SCAR-L's?

17        A.  Yes.

18              (Defendant's Exhibit 63,

19              September 2006 Small Arms Review article,

20              marked for identification)

21   BY MR. BELLAMY:

22        Q.  I'm handing you what has been marked as

23   Exhibit 63.  Have you seen this before?

24        A.  Yes.

25        Q.  Okay.  And can you tell me what this is?

22

1       A.   Small Arms Review.   You want to know what

2   Small Arms Review is, or what the article was?

3       Q.   Tell me what Small Arms Review is.

4       A.   As far as I know, that's a magazine for the

5   shooting industry, small magazine.

6       Q.   And this, the portion of this, I have the full

7   copy of the entire issue here, but for our purposes,

8   only certain pages are relevant.  So, rather than

9   slaying a forest of trees, we cut it down to those.  If

10  you would turn back in there to an article that begins

11  on what was page 30 of the magazine.  It says

12  "The Colt SCAR weapons."  Do you see that?

13      A.   Yes.

14      Q.   Have you read this article?

15      A.   Yes, I have.

16      Q.   Do you know who's pictured there at the top of

17  that page?

18      A.   Art Daigle.

19      Q.   And who is Art Daigle?

20      A.   He also worked on the SCAR program with me.

21      Q.   Okay.  And he was employed by Colt?

22      A.   Yes.  He worked in the model shop.  He was a

23  development engineer, at least that's what it says.  I

24  don't know exactly what his title was, but that's what

25  the article said.

23

1      Q.   When you say "the model shop," what do you mean

2   by "model"?

3      A.   It's a small area in Colt where we make

4   prototype parts and assemble prototype guns.

5      Q.   Okay.   So, just to be clear, a model is a

6   prototype, it's not like a toy or something?

7      A.   Correct.

8      Q.   Okay.   It's not like a model car?

9      A.   Right.

10     Q.   A model airplane?

11     A.   Right.

12     Q.   The author of this article is indicated to be

13  Christopher R. Bartocci.   Do you know who that is?

14     A.   Yes.

15     Q.   Okay.   Who is he?

16     A.   He's a fellow that, at the time he worked in

17  New York I thought as a firearms examiner, but I'm not

18  quite sure of his title.   But in his free time, he

19  wrote articles on firearms.   And he was very

20  knowledgeable on firearms.

21     Q.   In the first paragraph -- well, in the caption

22  of that photo at the top, it talks about Colt Defense's

23  three entries.   Do you see that?

24     A.   Yes.

25     Q.   Are those the three entries that you were just

24

1  describing, the type A, B, and C?

2      A.  Correct.

3      Q.  And in the first paragraph, it refers to a

4  previous article, and about the Special Operation

5  Forces Combat Assault Rifle that's manufactured by

6  FN Herstal.  But the next line says, "This weapon was

7  but one of many that was tested in the competition."

8  Do you see that?

9      A.  Yes.

10     Q.  Is that statement that the FN rifle was but one

11  of many that was tested in the competition, is that

12  accurate?

13             MR. EHRLICH:  Objection.  Foundation.

14  BY MR. BELLAMY:

15     Q.  Do you know whether there were other rifles

16  submitted by manufacturers other than Colt in the SOCOM

17  SCAR program?

18     A.  Yes.

19     Q.  And do you know whether FN was one of those

20  others?

21     A.  We only know because they won.  There was an

22  announcement that they won.  So, we know they

23  participated.

24     Q.  Okay.  And when you say "they won," what do you

25  mean by that?

25

1      A.   They won the award that was awarded after phase

2   one to go on.   And that was onto phase two, from what I

3   understand.

4      Q.   When you say "award," do you mean they were

5   awarded a contract?

6      A.   Yes.

7      Q.   Okay.   As opposed to getting a certificate or a

8   blue ribbon?

9      A.   Correct.

10     Q.   All right.

11          MR. EHRLICH:   I think it's better than a

12   blue ribbon.

13          MR. BELLAMY:   Absolutely.

14   BY MR. BELLAMY:

15     Q.   If you will, at the bottom of that page, it

16   says, "This is the right side view of Colt's type A

17   standard carbine."   Does that appear to be what, in

18   fact, is shown in that photo?

19     A.   Yes.

20     Q.   And if you'll turn the page to the next, the

21   top there shows "the left side of Colt's type A."   Does

22   that appear to be what's shown there?

23     A.   Yes.

24     Q.   In those photographs, as best I can see on

25   them, I don't see any kind of manufacturer's markings.

26

1    Do you see any there?

2        A.  No, I don't.

3        Q.  Okay.  Do you know whether there was any kind

4    of manufacturer's marking on the rifles that Colt

5    submitted to the SCAR program?

6        A.  To my knowledge, there was only a serial

7    number.

8        Q.  And from what do you base that knowledge?

9        A.  From what I remember from talking to people

10   about what we put on the guns.  And I also remember an

11   edict, and I don't know if it was in the solicitation

12   or what, that they wanted the guns that were coming in

13   to not be marked with the manufacturer's name or any

14   kind of indication of who made the gun.  So, whoever

15   was testing the gun or whoever picked up the gun

16   wouldn't know whose gun it was, didn't have the

17   preconceived notion whether they like the gun or not,

18   by, you know, "That's an FN," or "that's a Colt."

19       Q.  On that same page, there's a small column of

20   text in the bottom left, the bottom paragraph, it reads

21   "Three of the finalists were submissions by

22   Colt Defense."  Do you see that?

23       A.  Yes.

24       Q.  Was Colt, in fact, a finalist in the SCAR

25   program?

27

1    A.   Yes.

2    Q.   Okay.  And what did the status of finalist

3 mean, if you have -- do you have any understanding of

4 what that meant?

5    A.   Finalist in phase one, where you got to submit

6 the three guns and one upper receiver and anything else

7 they had asked for in the solicitation.

8    Q.   In the solicitation, was there any requirement

9 for documentation to accompany the rifles submitted?

10   A.   Yes.

11   Q.   And what documentation was required?

12   A.   That, I don't quite remember, because I didn't

13 have to handle that part.  That would have been handled

14 by contracts.  But I think there was a drawings package

15 that had to be submitted.  And we would have got

16 involved with that, making drawings.

17   Q.   Is there any other documentation?

18   A.   I'm sure there was.

19   Q.   Okay.

20   A.   But that wasn't my part.  My part was design.

21   Q.   Okay.  We talked about before these operator's

22 manuals that I had been provided before.  Do you know

23 whether those were required to be submitted with the

24 rifles?

25   A.   Yes.

28

1      Q.   And did you have any participation in their

2   creation?

3      A.   Not in the creation, but while they were being

4   created, I got to check the manuals once in a while to

5   make sure what was said in the manuals was correct.

6      Q.   So, you would, did you edit them?

7      A.   Sometimes I would mark things up and send it

8   back to my boss.  And he's the one that created the

9   manuals.

10      Q.   On the next page, at the top, it shows a photo

11   with two rifles, and the caption says "Right and left

12   side of the type B carbine"?

13      A.   Yes.

14      Q.   Do those appear to be the Colt SCAR type B?

15      A.   Yes, they do.

16      Q.   In the first paragraph of that text, the last

17   sentence says, talking about the article here, it says

18   "Part two will introduce Colt's first piston driven

19   weapon, the type C."

20      A.   I'm sorry, I don't see where that is.

21           MR. EHRLICH:  I don't see it either.  We

22   might be on a different page.

23           THE WITNESS:  I was looking up on the top

24   there.

25   BY MR. BELLAMY:

29

1      Q.  Oh, I'm sorry, in the column of text.

2      A.  Oh, okay.

3      Q.  You see where it says "type A" as kind of a

4   subheading down there?

5      A.  Yes.

6      Q.  Right above that was where I was looking at.

7      A.  Okay.

8      Q.  Do you see it now?

9      A.  I see the area, but I don't exactly know what

10   you --

11      Q.  The very last two lines, "Colt's first piston

12   driven weapon, the type C."

13          MR. EHRLICH:  Right above "type A," he was

14   reading.

15          THE WITNESS:  Yes.  Yes.  Okay.  I see that

16   now.

17   BY MR. BELLAMY:

18      Q.  Okay.  So, was the type C a piston driven

19   weapon?

20      A.  Yes.

21      Q.  And just as a brief explanation to

22   differentiate a piston driven weapon from another kind,

23   could you give us a very brief description to

24   distinguish?

25      A.  Yes.  A and B were gas impingement weapons.

30

1    And those kind of weapons, the bullet goes down the

2    barrel, gas enters, gas follows the bullet, it enters a

3    hole, about two thirds of the way down the barrel,

4    enters the front site, goes down a gas tube, and goes

5    inside the carrier where it interacts with the carrier

6    and the bolt.  And that's where everything happens in

7    there.

8        Versus a gas piston system where the bullet goes

9    down the barrel, the gas follows the bullet, goes up

10   into a hole in the barrel, and the piston is up in,

11   usually in the front site, and that drives an op rod,

12   which is a mechanical connection to the bolt carrier.

13   And then that's what cycles the weapon.

14       Q.  Was Colt's SCAR type C its first piston driven

15   weapon?

16       A.  Oh, no.  No, it wasn't.

17       Q.  But it was a piston driven weapon?

18       A.  Yes.

19       Q.  If you'll turn the page one more page, in the

20   top right, there's an illustration and caption to that,

21   it's in the top left.  And it says "Cover of the

22   operator's manual that Colt provided with the

23   SCAR-L" --

24       A.  Yes.

25       Q.  -- "type B carbine," and so forth.

Paul Hochstrate                                    2/28/2014

31

1        A.   I see that.

2        Q.   Does that appear to be, in fact, the cover of

3    the operator's manual?

4             MR. EHRLICH:   Objection.   Foundation.

5             MR. BELLAMY:   Okay.   Fair enough.

6    BY MR. BELLAMY:

7        Q.   Are you familiar with the Colt SCAR-L type B

8    operator's manual?

9        A.   Yes.

10       Q.   And based on that familiarity, does what's

11   illustrated there appear to be a cover of that manual?

12       A.   Let me look.   Yes, it does.

13       Q.   It also refers to an inset, which I take it is

14   that smaller square or rectangular box there?

15       A.   Yes.

16       Q.   It says "The inset is the cover of the

17   operator's manual that Colt provided with the SCAR-L

18   type A carbine"?

19       A.   Yes.

20       Q.   Does that appear to be correct?

21       A.   Let me look again.   It seems like it's missing

22   the Colt, the copyright that was cut off at the bottom.

23   And I see a double spacing here that I don't see on

24   there.

25       Q.   Okay.   So, that inset illustration may not be

Paul Hochstrate                                    2/28/2014

32

1    accurate?

2        A.   Right.  Right.

3        Q.   Okay.  We'll talk about the manuals that you

4    brought later.  If you will turn to the next page which

5    was page 34 of the magazine article, and bears our

6    designation in the bottom right of CA 02879.  Are you

7    on that page?

8        A.   No.  On this page here (indicating)?

9        Q.   Yes.  Down there under your right thumb.

10       A.   Oh, okay.  That's why I didn't see it.  Yes.

11       Q.   Okay.  In the middle of that page in the text,

12   not the illustrations or captions, there's a paragraph

13   that begins "One of the most interesting changes to the

14   lower receiver is the newly designed selector lever."

15   Do you see that?

16       A.   Yes.

17       Q.   And then in, further in that paragraph in the

18   next column says "This was a change based on SOCOM's

19   requirement for the selector to operate over 90 degrees

20   of travel" and then in parenthesis "(as opposed to the

21   Colt's standard 180 degrees)."  And that's the end of

22   that parenthetical.

23       A.   I see that.

24       Q.   Was that, in fact, the change that was in

25   Colt's SCAR submissions?

33

1       A.   Yes, I designed that.

2       Q.   Okay.  And can you just briefly, a little more

3  than what this one sentence did, describe to us what

4  that change was all about?

5       A.   The standard selector lever moves in a

6  180 degrees total rotation from the safe position to

7  the automatic position, moves 90 to semi, and then

8  another 90 degrees rotation to auto.  They wanted all

9  this to happen in the total of 90 degrees rotation

10  which would mean it would have to move from safe to

11  semi in 45 degrees, from semi to auto in 45 degrees for

12  a total of 90.

13       Q.   And you say "they said it was to," was that

14  part of SOCOM's requirement?

15       A.   Yes.

16       Q.   And that change was, was that, in fact,

17  integrated in the rifle that, Colt's SCAR rifles that

18  it submitted?

19       A.   Yes.

20            (Defendant's Exhibit 64,

21            October 2006 Small Arms Review article,

22            marked for identification)

23  BY MR. BELLAMY:

24       Q.   The Exhibit 63 that you still have in your

25  hand, on the front page, can you tell me what the date

34

1    of this magazine issue is?

2        A.   September 2006.

3        Q.   I am now handing you what has been marked as

4    Defendant's Exhibit 64 for our purposes of this

5    deposition.  Have you seen this document before?

6        A.   Yes, I have.

7        Q.   Can you tell me what it is?

8        A.   It's another Small Arms Review magazine article

9    from October 2006.  The article of -- do you want to

10   know about the article?

11       Q.   Yes.  If you will turn there to what was

12   page 50 of the magazine in this edition, there it says

13   "Part two, the Colt SCAR weapons type C."  Do you see

14   that?

15       A.   Yes.

16       Q.   And, again, the author is

17   Christopher R. Bartocci?

18       A.   Yes.

19       Q.   In that photo there, do you know, do you

20   recognize who that is in the photo?

21       A.   Yes, I do.

22       Q.   Who is that?

23       A.   Chris Bartocci.

24       Q.   Okay.  This article purports to -- have you

25   read this article?

35

1    A.   Yes.

2    Q.   And it purports to be about the type C; is that

3  correct?

4    A.   Correct.

5    Q.   And the type C was the piston driven version;

6  is that correct?

7    A.   Correct.

8    Q.   If you'll turn to the next page, at the top of

9  that page, there are two photographs of a rifle.  And

10  it says "Shown as the Colt model 703 designed in the

11  late 1960's."  Do you see that?

12    A.   Yes, I did.

13    Q.   Are these rifles shown in these images, are

14  they Colt SCAR rifles?

15    A.   No.

16    Q.   Are you familiar with the Colt model 703?

17    A.   Only from pictures.

18    Q.   Okay.

19    A.   It was before my time.

20    Q.   On that page, there's, in the text, there's a

21  subheading "Colt SCAR type C."  Do you see that?

22    A.   Yes.

23    Q.   In the first column.  The text begins, "SOCOM's

24  unwritten requirement for a piston operated rifle was

25  based on their belief that this system kept the gun

36

1    cleaner due to hot gases," etcetera.  Do you see that

2    sentence?

3        A.  Yes.

4        Q.  I want to ask you just about the first part,

5    "SOCOM's unwritten requirement."  Were you aware of any

6    unwritten requirement for a piston operated rifle in

7    the SCAR program?

8        A.  Yes.

9        Q.  Okay.  And what was your awareness?

10       A.  When we went to the industry conference in

11   2003, industry conference meeting down in Florida with

12   SOCOM, each manufacturer that was going to be competing

13   on SOCOM met with the SOCOM people separately so you

14   wouldn't know who your competitors were.  You had an

15   hour to meet with them.  And during this meeting, they

16   started asking us about a piston gun, and what we knew

17   about piston guns, and why we didn't currently make the

18   piston gun, and if we would make the piston gun.  And

19   we were telling them "We have a gas impingement gun.

20   The U.S. military uses it.  There's nothing wrong with

21   it.  We probably wouldn't make a piston gun."

22       And they kept on pushing, "Well, what if we added

23   to the requirement, would you make a piston gun?"  And

24   we said "Well, if it was on the requirement, we would."

25   "Well, what if we told you that you should do a piston

37

1    gun?"  And then they finally said, "What if we told you

2    that you had to do a piston gun?"  And, so, that's when

3    we got the idea they're looking for a piston gun.

4    They're maybe not going to put down it there.  But this

5    is what they want.

6        Q.  Okay.

7            MR. DIESO:  Is this a good time to take a

8    break, Glenn?

9            MR. BELLAMY:  Sure.

10           (Recess on 10:30 a.m. to 10:39 a.m.)

11           (Defendant's Exhibit 65,

12           SCAR-L type C operator's manual,

13           marked for identification)

14           MR. BELLAMY:  Okay.  Back on the record.

15   BY MR. BELLAMY:

16       Q.  Handing you what has been marked as Exhibit 65,

17   do you recognize that document?

18       A.  Yes.

19       Q.  Can you tell us what it is?

20       A.  It's the SCAR C, our type C operator's manual.

21       Q.  And by "our," you mean Colt's?

22       A.  Yes.

23       Q.  At the top, it says "SCAR-L type C," is that

24   what you were referring there?

25       A.  Correct.

38

1    Q.   And then it says "Standard version and CQC

2    version;" is that correct?

3    A.   Yes.

4    Q.   This document was provided to Clyde Armory some

5    weeks ago.  And, so, we were able to, we designated at

6    the bottom right-hand corner of each page, there's a

7    document tracking number that we've added to that.

8    A.   Okay.

9    Q.   That, is it, can you confirm that would not

10   have been part of the actual manual?

11   A.   That's correct, it wouldn't be.

12   Q.   Okay.  On the bottom of the front cover, it

13   indicates "Copyright," there's a copyright symbol,

14   "2004 Colt Defense LLC?

15   A.   Yes.

16   Q.   Does that appear to be correct?

17   A.   The correct manual?

18   Q.   The correct date.

19   A.   Oh, the direct date.  Yes.

20   Q.   Okay.  And was Colt Defense, we talked

21   about there were some different Colt entities, was

22   Colt Defense the entity that was making the submission

23   to the SOCOM SCAR program?

24   A.   Yes.

25   Q.   If I could have you turn in that document to

39

1    what's labeled as page three of the document itself at

2    the bottom.  There, it's talking about the SCAR-L

3    standard version and SCAR-L CQC version.  Do you see

4    that?

5        A.  Yes.

6        Q.  And under "type of weapon," it says, "Gas

7    operated 5.56/45mm caliber using a gas piston and

8    operating rod system similar to the M14 rifle."  Do you

9    see that?

10       A.  Yes, I do.

11       Q.  Is that a correct description of what the

12   type C was?

13       A.  Yes.

14       Q.  If I could have you turn to what is page 11 of

15   the document, there's an illustration that shows that

16   selector switch.  Is that the selector switch that we

17   were just talking about?

18       A.  Yes.

19       Q.  And that's, it shows three positions, safe,

20   semi, and auto; is that correct?

21       A.  Correct.

22       Q.  And is this one that would move in the

23   90 degrees total rotation?

24       A.  Yes.

25       Q.  Okay.  If you would turn to page 16 and 17,

40

1    there at the top it says "Maintenance continued,

2    cleaning materials."  Can you tell us what is shown on

3    these two pages?

4        A.  It looks like brushes for the chamber or the

5    bore.  And it looks like an Otis cleaning kit.

6        Q.  Do you know whether a cleaning kit was a

7    requirement of the submission?

8        A.  Yes, it was.

9        Q.  I would like you to turn to page 31.  There are

10   several illustrations in this document.  But using this

11   one as an example, the bottom illustration on page 31,

12   can you tell me what's shown there?

13       A.  The bottom one.  It's showing the lower

14   receiver assembly.  It looks like it's cut away,

15   because it isn't showing the entire receiver extension

16   tube.

17       Q.  And it also appears to be cut away around

18   the --

19       A.  Around the ammeter.

20       Q.  Yes.

21       A.  And around the grip.

22       Q.  Okay.  And this shows that same selector switch

23   we just spoke of?

24       A.  Yes.

25       Q.  And in addition to that, there is some other

41

1    writing on there.  Can you tell me that what is?

2        A.  The "safe, semi, and auto" or --

3        Q.  No, the other writing.

4        A.  It says "Property of U.S. Government, SCAR-L,

5    caliber 5.56mm," and then a bunch of zeroes for where a

6    serial number would go.

7        Q.  Why was that shown in this illustration?  Do

8    you know why that was shown in this illustration?

9        A.  I do not.  I could only guess.

10       Q.  Okay.  Do you know whether those words that you

11   just read would be on a receiver that Colt would have

12   provided if it had been awarded the contract?

13           MR. EHRLICH:  Objection.  Speculative.

14   Foundation.

15   BY MR. BELLAMY:

16       Q.  Go ahead.  You can tell me if you know.

17       A.  That's what I would assume that the reason we

18   put that there, was for the next phase that we assumed

19   we were going to win.  And that's what we would be

20   putting on the lower receiver for a marking.  But --

21       Q.  Is there -- I'm sorry, did I interrupt you?

22       A.  Yes.  But I didn't do this.

23       Q.  Okay.

24       A.  So, I can't tell you 100 percent what the

25   reasoning behind that was.  I can only assume that

Paul Hochstrate                                    2/28/2014

42

1    that's what it was for.

2        Q.  Do you know have any knowledge of what the

3    SCAR-L portion of that was intended to indicate?

4            MR. EHRLICH:  Objection.  You mean on the

5    drawing?

6            MR. BELLAMY:  Yes.

7            MR. EHRLICH:  Objection.  Speculation.  He

8    said he didn't put it on there.

9    BY MR. BELLAMY:

10       Q.  Do you have any knowledge, is what I asked, of

11   why that SCAR-L part would be on there?

12       A.  For the SCAR-L part of the solicitation, that

13   would be the smaller calibers, the 5.56 calibers, and

14   that would be the lower receiver that we would use.

15       Q.  Is there any indication shown on that drawing

16   as to who the manufacturer of that, of such a receiver

17   would be?

18       A.  Yes.

19       Q.  And what's that?

20       A.  Above all that writing, there's a rampant Colt

21   on a globe.  And that's our, it would be trademark,

22   copyright, I'm not quite sure what that --

23       Q.  Colt's logo?

24       A.  Yes.

25       Q.  The part that says "SCAR-L," do you know

43

1    whether that would be an indication of what

2    manufacturer made the receiver?

3        A.   No.

4        Q.   No, you don't know?

5        A.   No, it would not be.

6        Q.   Okay.  Let me have you turn to the back page of

7    this document, the very last, very back.  At the

8    bottom, it shows a part number.  Do you know what that

9    indicates?

10       A.   Our operator's manuals usually get a part

11   number so you can go in and find that file and change

12   the operator's manual or update it if you needed to.

13       Q.   So, is it correct that part number would be the

14   manual itself?

15       A.   Yes.

16       Q.   And to the right, it indicates "rev. June '04"?

17       A.   Correct.

18       Q.   And do you know what that indicates?

19       A.   It means it was last revised in June of 2004.

20       Q.   Do you know whether there were any later

21   revisions?

22       A.   No, I do not.  I couldn't find any when I went

23   to look.

24       Q.   Okay.  When you looked, is this the latest

25   revision you found?

Paul Hochstrate                                                2/28/2014

44

1      A.   Yes.

2                 (Defendant's Exhibit 66,

3                 SCAR-L type D operator's manual,

4                 marked for identification)

5    BY MR. BELLAMY:

6      Q.   I have handed you now what has been marked as

7    Exhibit 66.  Can you tell me, do you recognize that

8    document?

9      A.   Yes.

10     Q.   And what is it, please?

11     A.   That's the type, SCAR-L type D operator's

12   manual.

13     Q.   And is this the type D that we spoke of before?

14     A.   Yes.

15     Q.   And just for clarity, this is the type D that

16   was never completed?

17     A.   Correct.

18     Q.   Okay.

19     A.   The manual is incorrect.  And the firearm

20   wasn't completed for the SCAR competition.

21                (Defendant's Exhibit 67,

22                SCAR-L type A operator's manual,

23                marked for identification)

24   BY MR. BELLAMY:

25     Q.   I've handed you what has been marked as

45

1    Exhibit 67.  Have you seen this document before?

2        A.   Yes.

3        Q.   Can you tell me what it is?

4        A.   That's our Colt SCAR-L type A operator's

5    manual.

6        Q.   Yesterday, you through your counsel provided me

7    with a copy of a couple of additional documents.  Do

8    you know, is this one of those documents?

9        A.   Yes.

10       Q.   Okay.

11       A.   Well, I should say it appears to be.  I would

12   have to check every single page.

13       Q.   Okay.  Can you look through it, and see if it

14   appears to be what you gave me?

15       A.   I'm just going to skim through.  Yes, it

16   appears to be what we gave you.

17       Q.   If you would turn to page three of the

18   document -- well, let me do this first.  I see you have

19   in front of you a spiral bound document with a blue

20   cover on it.  Can you tell me what that is?

21       A.   That's the SCAR-L type A operator's manual.

22       Q.   All right.  And, so, is it correct that

23   Exhibit 67 is a copy thereof?

24       A.   Yes.

25       Q.   And, so, rather than providing me with the

Paul Hochstrate                                                    2/28/2014

46

1    original, which may be the, you know, a one of the

2    kind, or I don't know whether it is or not, you

3    provided me with a copy; is that correct?

4         A.   Yes, I did.

5         Q.   Okay.  If you would turn to page three -- oh,

6    and just to clarify, the bound manual with the blue

7    cover, you brought that with you today?

8         A.   Yes.

9         Q.   Okay.

10        A.   It said something on the deposition, that was

11   going to be a topic of conversation.  So, I brought all

12   three.

13        Q.   Okay.  And all three, is that the A, and which

14   other versions?

15        A.   The type A, the type B, and the type C.

16        Q.   Okay.  On page three, we'll get back to there

17   finally, in the middle of that page where it says "type

18   of weapon," it says, "gas operated 5.56x45mm caliber

19   using a gas impingement system similar to the M16/M4

20   family of weapons."  Is that, did I read that

21   correctly?

22        A.   Yes.

23        Q.   And is that, in fact, the type of weapon that

24   was Colt's SCAR-L type A?

25        A.   Yes.

47

1        Q.   And just for clarity, that's distinguished from

2    the gas piston operation?

3        A.   Correct.

4        Q.   If you would turn to the back page of this

5    document, there at the bottom is another part number

6    indicated, this one ends in A?

7        A.   Yes.

8        Q.   If you would compare that to Exhibit 65?  The

9    part number is X31354.  And in the case of Exhibit 65,

10   it's C.  And in the case of Exhibit 67, it's A; is that

11   correct?

12       A.   Yes.

13       Q.   So, is it correct that the A or the C indicated

14   the type that corresponded to the Colt SCAR-L type?

15       A.   In this case, it appears to be.  Normally,

16   we don't do that.  Normally, that letter on the end

17   would be a revision letter.  But, in this case, it

18   appears that the A corresponds to the type A.  And

19   the C corresponds to the type C.

20       Q.   On the bottom right, it shows revision

21   June of '04?

22       A.   Right.

23       Q.   Is this the latest revision that you found?

24       A.   Yes, it is.

25       Q.   Would this have been the version that would

48

1    have been submitted to SOCOM with the rifles submitted

2    in the SCAR program?

3            MR. EHRLICH:  Objection.  Compound.  And it

4    assumes facts not of record.

5    BY MR. BELLAMY:

6        Q.  Well, let's back up then.  We talked earlier

7    about the preparation of an operator's manual --

8        A.  Yes.

9        Q.  -- for each of the Colt SCAR-L types.  Do you

10   know whether it was a requirement to provide an

11   operator's manual with the submission to SOCOM?

12       A.  Yes, it was.

13       Q.  And, to your knowledge, was an operator's

14   manual supplied with the Colt's SCAR-L submissions?

15           MR. EHRLICH:  Objection.  Asked and

16   answered.

17   BY MR. BELLAMY:

18       Q.  Go ahead.

19       A.  To my knowledge, yes, it was.  Yes, they were.

20           (Defendant's Exhibit 68,

21           SCAR-L type B operator's manual,

22           marked for identification)

23   BY MR. BELLAMY:

24       Q.  Okay.  You have just been handed what has been

25   marked as Exhibit 68.  Do you recognize this document?

49

1      A.   Yes.

2      Q.   Can you tell me what it is, please?

3      A.   It's Colt's SCAR-L type B operator's manual.

4      Q.   And is this a copy of the document you provided

5    to me yesterday also?

6      A.   It appears to be.

7      Q.   Can you check that against the original --

8      A.   Yes, I could.

9      Q.   -- that you brought with you?

10     A.   Just skimming through it, it appears to be.

11     Q.   I'll have you turn again in this one to page

12   three.  This one being Exhibit 68.  And just for sake

13   of brevity, there in the middle of the page, it says

14   "type of weapon, gas operated 5.56x45mm caliber using a

15   gas impingement system similar to the M16/M4 family of

16   weapons."  Did I read that correctly?

17     A.   Yes, you did.

18     Q.   And is that, in fact, a correct description of

19   the Colt SCAR-L type B?

20     A.   Yes, it is.

21     Q.   And if I could have you turn to the last page

22   of Exhibit 68, there at the bottom of that page, we see

23   the part number again, which is X31354, this time

24   followed by a B; is that correct?

25     A.   Yes.

50

1       Q.   And, again, just for consistency, in this

2    instance, is that B referring to the Colt SCAR-L

3    type B?

4       A.   It appears to be, yes.

5       Q.   And to the right, it shows revision of

6    June '04?

7       A.   Correct.

8       Q.   Again, is that the latest revision that you

9    could find?

10      A.   Yes, it is.

11      Q.   Do you know when Colt submitted its prototype

12   SCAR-L rifles to SOCOM?

13      A.   Yes.

14      Q.   When was that?

15      A.   June of 2004.

16      Q.   And if we could just re-cap with Exhibits 65,

17   66, 67, and 68, all of these are copies of operator's

18   manuals for Colt's SCAR-L weapons; is that correct?

19       A.   Yes.

20      Q.   And the type D, you said was never completed?

21      A.   Correct.

22      Q.   Okay.  So, I'm going to take that out of our

23   discussion here.

24      A.   Never completed in time for this program.

25      Q.   Oh, okay.  Do you know, was it ever completed?

51

1        A.    I don't have firsthand knowledge of that.

2        Q.    Okay.

3        A.    I'm thinking it was, but I wasn't working on

4     the D version.

5        Q.    All right.   So, in Exhibits 67, 68, and 65, is

6     it correct that all of these on the front cover are

7     marked with a copyright notice of 2004 Colt Defense

8     LLC?

9        A.    Yes.

10        Q.    And can you tell me, do you know, were these

11    documents that were kept in the ordinary course of

12    Colt's business?

13        A.    Yes.

14        Q.    Are they business records belonging to Colt?

15        A.    Well, they're records.   They're product

16    engineering records.

17        Q.    Well, by "business," I just meant they're kept

18    in the course of Colt's business?

19        A.    Yes.

20        Q.    They're not someone's personal file that they

21    stored on the server?

22        A.    No, they're not.

23        Q.    Okay.   On the cover of Exhibit 67, is there

24    anything there that indicates to you what brand of

25    rifle this operator's manual is intended for?

52

1      A.   Yes.

2      Q.   And what is that?

3      A.   Well, it's our serpentine Colt registered

4   trademark on the front that says C-O-L-T.  And there's

5   also insignia of the rampant Colt on the globe on

6   the gun itself.  Plus, at the bottom, it says

7   Colt Defense.

8      Q.   In the title of this document, where it says

9   "operator's manual for the SCAR-L type A," does the

10  SCAR-L give any indication of what brand rifle this

11  operator's manual would go with?

12     A.   No.

13           MR. EHRLICH:  Objection.  Go ahead.

14  Foundation.

15           MR. BELLAMY:  Those are all the questions

16  that I have for you today.  I thank you for your time.

17     Mr. Ehrlich has the opportunity to follow-up with

18  some questions on behalf of his client, FN Herstal.

19           THE WITNESS:  Okay.

20           MR. EHRLICH:  Thank you.

21        CROSS-EXAMINATION BY MR. EHRLICH:

22     Q.   We've been talking about these operator's

23  manuals for, which are Exhibits 65, 66, 67, and 68.

24  And I believe they are in front of you there right now?

25     A.   Yes, they are.

53

1      Q.   They all say 2004.   Were they ever updated

2   after that?

3      A.   Not to my knowledge.

4      Q.   And were you involved in any update on these

5   things in terms of these operator's manuals?

6      A.   Yes.

7      Q.   And what's the update?

8      A.   The updates were checking the manuals as they

9   were being made, marking up anything that I saw was

10   incorrect.

11      Q.   No, I'm talking about beyond the ones that are

12   here?

13      A.   No.

14      Q.   So, the last updates would have been sometime

15   in 2004?

16      A.   Correct.

17      Q.   And after 2004, why were they not updated?

18      A.   We didn't get the -- we weren't awarded the

19   SCAR follow-on contract.

20      Q.   And who was awarded the contract?

21      A.   FN.

22      Q.   And at any point in time, did your company in

23   this program make any product that was anything other

24   than a prototype?

25      A.   During that time.   Well, we made all kinds of

54

1    products.

2        Q.  No.  No, in the SOCOM, what was referred to

3    earlier today as the SCAR program --

4        A.  Right.

5        Q.  -- did Colt only make prototypes?

6        A.  No, we made production guns.

7        Q.  No, I'm talking about for SOCOM.

8        A.  Oh, for SOCOM?

9        Q.  Right.  Under the SCAR program, under the SCAR

10   program for SOCOM, Colt only made prototypes; isn't

11   that correct?

12       A.  Correct.

13       Q.  When were those last prototypes provided to

14   SOCOM?

15       A.  June of 2004.

16       Q.  And when was the award again, did you say?

17       A.  The initial award for the solicitation was

18   October, November 2003.  But the award that FN won

19   which was phase two was November 2004, from my

20   understanding of the dates.

21       Q.  Now, we've talked about some articles that were

22   in these magazines.  And the magazines were, the

23   articles apparently were written by a

24   Christopher Bartocci, who, you know him; do you not?

25       A.  Yes.

55

1      Q.   And where did he get the information for these

2   articles?

3      A.   I don't know firsthand, but I can only

4   speculate.

5      Q.   Well, did you provide him with the information?

6      A.   No, I did not.

7      Q.   Did someone from your company provide him with

8   the information?

9      A.   I would assume so.

10      Q.   Did someone else provide him with some

11   information, to your knowledge?

12      A.   It's possible.

13      Q.   Would anybody beyond your company have had this

14   information for these articles?

15      A.   By 2006, there might have been some public

16   knowledge out there.  There might have been some stuff

17   available on the Internet that he could have gotten

18   some information from before he contacted somebody at

19   Colt.  But I would -- well, that would only be a guess

20   on my part.

21      Q.   Was there any restriction on Colt in providing

22   any information relating to the SOCOM program, to your

23   knowledge?

24      A.   To my knowledge, no.

25      Q.   And was there any restriction on Colt in

56

1    providing these operational, or these operator's

2    manuals to others in the trade?

3        A.   Yes.

4        Q.   And what was that restriction?

5        A.   We don't hand out drawings or intellectual

6    property or manuals or anything unless, the manuals

7    would only go out if the product was released.

8        Q.   By product being released, you mean beyond

9    SOCOM?

10       A.   Correct.

11       Q.   So, these manuals would not have been

12   circulating to promote the product; would they not?

13       A.   No, they would not.

14       Q.   But, yet, it appears that this author here

15   received a manual of some sort?

16       A.   He took a picture of the front cover, from what

17   I see.  I don't see the manual in there, but I see the

18   front cover.  But --

19       Q.   So -- I'm sorry, go ahead.

20       A.   -- whether he was given the manuals or not, I

21   don't know.

22       Q.   So, you have no knowledge of anyone getting

23   these manuals beyond SOCOM?

24       A.   Correct.

25       Q.   And it's your understanding that these would

57

1    not have been circulated by your company beyond SOCOM;

2    isn't that correct?

3        A.   Right.

4        Q.   I'm sorry?

5        A.   Correct.

6        Q.   Now, we looked at a drawing here on, I believe

7    it was page 37, of one of these documents.  Let me find

8    it here.  And you were asked to read some characters in

9    that drawing on one of these operator manuals.  I

10   believe it was page 31.

11       A.   Of which?

12       Q.   Exhibit 67.

13       A.   Okay.

14       Q.   Now, that's not a photograph, is it?

15       A.   No, it's not.

16       Q.   And what's depicted in that drawing may not

17   reflect what's on the actual weapon?

18       A.   Correct.

19       Q.   And, so, as you sit here today, you wouldn't

20   know how accurate or inaccurate this drawing is on what

21   the -- excuse me, let me correct that.  This is a

22   depiction of a weapon that you would have created had

23   you have gone onto the next round in the SOCOM

24   competition; is that correct?

25       A.   That would be my assumption, but I don't have

58

1    firsthand knowledge of that.  But that would be my

2    assumption.

3        Q.  But you did not go onto the next round of the

4    competition?

5        A.  Correct.

6        Q.  And maybe you could tell me what your

7    assumption is based on.  Well, you don't know what it

8    would have looked like had you gone onto the next round

9    of the competition?

10       A.  Right.

11       Q.  That's your testimony?

12       A.  Right.

13       Q.  So, this is just a guess at what it might have

14   looked like had you gone onto the next round of

15   competition?

16       A.  Correct.

17       Q.  Is there anything that you've discussed today

18   in terms of your dealings with SOCOM that you would

19   consider to be something you could not disclose as a

20   result of SOCOM's requirements?

21       A.  No.

22       Q.  So, what we've discussed here today, other than

23   that Colt might not want pictures and drawings

24   disclosed, would be subject matter that you would not

25   be prevented from disclosing; is that correct?

59

1       A.   Correct.

2       Q.   Does your company have a relationship with

3   Clyde Armory?

4       A.   No.

5       Q.   Do you know Andrew Clyde?

6       A.   No.

7       Q.   Have you spoken to opposing counsel before

8   today, Glenn Bellamy?

9       A.   Yes.

10      Q.   And when did you first talk to him?

11      A.   Yesterday afternoon.

12      Q.   I believe he said something about several weeks

13  ago, he was provided with documents?

14      A.   Correct.

15      Q.   Who provided him with those documents?

16      A.   I'm not quite sure, but I can guess.  Should --

17  I don't know, do I tell you?

18      Q.   But you searched your files, and you provided

19  the documents you had been requested to provide today?

20      A.   Right.  Right.

21      Q.   Isn't that correct?

22      A.   Yes.

23      Q.   And there's nothing else.  So, that's what you

24  provided?

25      A.   Right.

60

1       Q.   And when you were testifying earlier today

2   about SCAR and SCAR-L and that sort of thing, those

3   were, that was in relationship to the SOCOM program?

4       A.   Correct.

5       Q.   And you now know who manufactured -- and FN is

6   the manufacturer of SCAR now; isn't it?

7               MR. BELLAMY:  Objection.

8               THE WITNESS:  The manufacturer of their

9   version of the rifle that won the SCAR competition.

10  BY MR. EHRLICH:

11      Q.   But Colt doesn't make any SCAR product; does

12  it?

13      A.   No.

14      Q.   And Colt has never sold a SCAR product to the

15  public; has it?

16              MR. BELLAMY:  Objection.

17              THE WITNESS:  Well, now we're getting --

18  maybe I don't quite understand your question when

19  you're saying "SCAR product."

20  BY MR. EHRLICH:

21      Q.   Okay.  I meant anything where there's a

22  designation on the rifle "SCAR"?

23      A.   No, we don't.

24      Q.   Now, Colt is a head to head competitor with

25  FN Herstal, the plaintiff in this case; is it not?

Paul Hochstrate                                                          2/28/2014

61

1      A.   Yes.

2      Q.   And you compete in many programs with Herstal;

3    do you not?

4      A.   Yes.

5           MR. EHRLICH:  I have no further questions.

6           MR. BELLAMY:  I have a follow-up.

7           REDIRECT EXAMINATION BY MR. BELLAMY:

8      Q.   In Exhibit 67, it's open in front of you there

9    on page 31.

10     A.   Yes.

11     Q.   You were just talking about the drawing and the

12   labeling with SCAR-L on there.  Would that term

13   "SCAR-L" be an indicator of who manufactured such a

14   weapon?

15          MR. EHRLICH:  Objection.  Asked and

16   answered.

17   BY MR. BELLAMY:

18     Q.   Go ahead.

19     A.   Do I answer?

20     Q.   Yes, go ahead.

21     A.   To me, no, it doesn't designate the

22   manufacturer.  It designates the program.

23          MR. BELLAMY:  That's all I have.

24          MR. EHRLICH:  I have a further follow-up on

25   that very drawing.

62

1                RECROSS-EXAMINATION BY MR. EHRLICH:

2        Q.   I believe you've testified earlier that you

3    could not mark a brand on the products that SOCOM was

4    testing in terms of a manufacturer's name; is that

5    correct?

6        A.   For the phase that we entered for phase one.

7        Q.   So, this product here, since it shows a, quote,

8    "logo" could never have been provided to SOCOM; isn't

9    that correct?

10               MR. BELLAMY:   Objection.

11   BY MR. EHRLICH:

12       Q.   Go ahead.

13       A.   It would be correct.

14       Q.   It never was provided to SOCOM?

15       A.   Correct.  With that insignia and that writing.

16   Is that what you're asking?

17       Q.   Yes.  Because it would have prohibited the

18   SOCOM program; would it not have, to your

19   understanding?

20       A.   To my understanding, yes, it was supposed to be

21   marked so that you couldn't tell you who the

22   manufacturer was.  You weren't supposed to put anything

23   on but their serial number.

24               MR. EHRLICH:   Okay.  I have no further

25   questions.

63

1          REDIRECT EXAMINATION BY MR. BELLAMY:

2      Q.   Okay.  Just to clarify, when you said it could

3   not have been put on a rifle provided to SOCOM, is that

4   in the context of phase one --

5      A.   Correct.

6      Q.   -- of the SCAR program?

7      A.   Correct.

8      Q.   And would your understanding be different for

9   phase two and beyond?

10     A.   Yes.

11     Q.   And what would your understanding be for phase

12  two and beyond?

13     A.   Phase two, that veil of secrecy so nobody knew

14  who made the gun, would be gone.  And you would be able

15  to mark it any way you want.  And this was somebody's

16  idea of how we were going to mark the gun from that

17  point on.

18     Q.   This veil of secrecy that you mentioned, was

19  that secrecy to the public, or was that secrecy in some

20  other context?  What do you mean?

21     A.   It was to anybody that, it could have been the

22  public, a politician, a tester, anybody that would run

23  into contact with these guns while they're being tested

24  in phase one so they wouldn't know who the manufacturer

25  was.  They wouldn't want a senator coming through the

64

1    line, looking at the guns, and pick it up and seeing

2    Colt.  "Oh, I like this one."

3        Q.  Do you know whether the contract awarded for

4    phase two and beyond had any other restrictions on what

5    information about the program could be shared with the

6    public?

7            MR. EHRLICH:  I have an objection.  It goes

8    beyond the scope of re- re- re- redirect, but go ahead,

9    subject to that objection.

10           THE WITNESS:  On phase two, you said?

11   BY MR. BELLAMY:

12       Q.  Yes.

13       A.  No, I have no knowledge of that because we

14   didn't get any follow-on solicitations, amendments, or

15   anything for phase two.

16       Q.  Okay.

17           MR. BELLAMY:  That's all I have.  Thank

18   you.

19           MR. EHRLICH:  Thank you.

20           MR. DIESO:  May I ask a question?

21           MR. BELLAMY:  Yes, you certainly may.

22           MR. EHRLICH:  Should we go off the record,

23   or do you want to be on the record?

24           MR. DIESO:  I'd like to be on the record.

25           MR. EHRLICH:  Okay.  Go ahead.

65

```
 1              CROSS-EXAMINATION BY MR. DIESO:
 2      Q.   Paul, what's your position within Colt?
 3      A.   Right now?
 4      Q.   Yes.
 5      A.   Chief engineer.
 6      Q.   And you're in the engineering department?
 7      A.   Yes.
 8      Q.   Do you know everybody that Colt has a business
 9   relationship with?
10      A.   No.
11      Q.   Is it possible that Colt has a business
12   relationship or some other kind of relationship with
13   Clyde Armory that you're not aware of?
14      A.   It's possible.
15              MR. DIESO:  Okay.  That's all I have.
16              MR. BELLAMY:  Thank you.
17              MR. EHRLICH:  Thanks.
18              (Deposition ended at 11:21 a.m.)
19
20
21
22
23
24
25
```

66

```
1                              JURAT
2
3

         I, PAUL HOCHSTRATE, do hereby certify that the
4    foregoing testimony taken on February 28, 2014, is true
     and accurate, including any corrections noted on the
5    corrections page, to the best of my knowledge and
     belief.
6
7
8
                              _____
9                                PAUL HOCHSTRATE
10
11
12      At _____ in said county of _____,
     this ___ day of _____, 2014, personally appeared
13   PAUL HOCHSTRATE, and he made oath to the truth of the
     foregoing corrections by him subscribed.
14
15
16
17
18
     Before me,_____ Notary Public
19
20
21   My commission expires:
22
23
24
25
```

67

```
1                    TRANSCRIPT CORRECTIONS

2    REPORTER:   Sheryl L. Yeske

     CASE STYLE:  FN HERSTAl, S.A.

                  VS

4                  CLYDE ARMORY, INC.

5    PAGE      LINE   CORRECTION              REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22
                        NAME:   _____
23

24                      DATE:   _____

25
```

Paul Hochstrate                                    2/28/2014

68

```
 1              CERTIFICATE OF REPORTER

 2

 3        I, Sheryl L. Yeske, a Notary Public within and for

     the State of Connecticut, do hereby certify there came

 4   before me, on February 28, 2014, the following named

     person, to wit:  PAUL HOCHSTRATE, who was by me duly

 5   sworn to testify to the truth and nothing but the

     truth; that he was thereupon carefully examined upon

 6   his oath and his examination reduced to writing under

     my supervision; that this deposition is a true record

 7   of the testimony given by the witness.

 8        I further certify that I am neither counsel for,

     related to, nor employed by any of the parties to the

 9   action in which this deposition is taken; and further,

     that I am not a relative or employee of any attorney or

10   counsel employed by the parties hereto, nor financially

     or otherwise interested in the outcome of the action.

11

         WITNESS my hand this March 6, 2014.

12

13

14

15

16

                         Sheryl Yeske

17                  Sheryl L. Yeske, LSR #0000028

                    My commission expires 7/31/2018

18

19

20

21

22

23

24

25
```

1              INSTRUCTIONS TO WITNESS

2          Please read your deposition over carefully

3    and make any necessary corrections.  You should state

4    the reason in the appropriate space on the errata sheet

5    for any corrections that are made.

6          After doing so, please sign the errata sheet

7    and date it.

8          You are signing same subject to the changes

9    you have noted on the errata sheet, which will be

10   attached to your deposition.

11         It is imperative that you return the original

12   errata sheet to the deposing attorney within thirty

13   (30) days of receipt of the deposition transcript by

14   you.  If you fail to do so, the deposition transcript

15   may be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

25

Paul Hochstrate

2/28/2014

Page 1

| A | | | | |
|---|---|---|---|---|
| **abbreviated (5)** 16:12,13,21,22,23 | **announcement (1)** 24:22 | 54:21,23 55:2,14 | 48:21 49:3,19,24 50:2,3 | **beyond (9)** 53:11 55:13 56:8,23 |
| **abbreviation (1)** 16:6 | **announcements (1)** 14:10 | **asked (6)** 8:3 27:7 42:10 48:15 57:8 61:15 | **back (9)** 9:14 22:10 28:8 37:14 43:6,7 46:16 47:4 48:6 | 57:1 63:9,12 64:4 64:8 |
| **ability (1)** 19:19 | **answer (5)** 19:18 19:22,22,24 61:19 | **asking (2)** 36:16 62:16 | **background (1)** 8:7 | **bid (1)** 11:24 **big (1)** 18:9 |
| **able (3)** 11:19 38:5 63:14 | **answered (2)** 48:16 61:16 | **assault (5)** 10:4 15:25 16:3 20:2 24:5 | **barrel (5)** 10:24 30:2,3,9,10 | **bigger (1)** 18:7 **bit (1)** 7:3 **blue (4)** 25:8,12 |
| **absolutely (2)** 15:19 25:13 | **anybody (4)** 11:21 55:13 63:21,22 | **assemble (1)** 23:4 | **barrels (1)** 18:25 **bartocci (4)** 23:13 34:17,23 54:24 | 45:19 46:6 **body (1)** 15:9 |
| **acceptable (1)** 17:21 | **apparently (1)** 54:23 | **assembly (2)** 20:13 40:14 | **base (1)** 26:8 | **bolt (2)** 30:6,12 **bore (1)** 40:5 |
| **accepted (1)** 7:18 | **appear (8)** 15:16 25:17,22 28:14 | **assume (3)** 41:17 41:25 55:9 | **based (4)** 31:10 32:18 35:25 58:7 | **boss (2)** 13:4 28:8 **bottom (16)** 18:21 |
| **accompany (1)** 27:9 | 31:2,11,20 38:16 | **assumed (1)** 41:18 | **basically (3)** 12:24 18:4 19:8 | 25:15 26:20,20 31:22 32:6 38:6 |
| **accounting (1)** 8:11 | **appearances (1)** 2:1 | **assumes (1)** 48:4 | **bears (1)** 32:5 | 38:12 39:2 40:11 40:13 43:8 47:5 |
| **accurate (5)** 15:16 24:12 32:1 57:20 66:4 | **appeared (1)** 66:12 | **assumption (3)** 57:25 58:2,7 | **beginning (1)** 20:1 **begins (3)** 22:10 | 47:20 49:22 52:6 **bound (2)** 45:19 |
| **acronym (2)** 16:6 20:1 | **appears (10)** 40:17 45:11,14,16 47:15 47:18 49:6,10 | **athens (1)** 1:2 **attend (2)** 12:3,15 **attorney (2)** 3:25 | 32:13 35:23 **behalf (3)** 10:8 20:5 52:18 | 46:6 **box (1)** 31:14 **brand (3)** 51:24 |
| **action (3)** 1:4 68:9 68:10 | 50:4 56:14 | 68:9 | **belief (2)** 35:25 66:5 | 52:10 62:3 **break (1)** 37:8 |
| **activity (1)** 12:2 | **apply (1)** 14:11 | **attorneys (1)** 5:24 | **believe (5)** 52:24 57:6,10 59:12 | **brevity (1)** 49:13 |
| **actual (3)** 12:12 38:10 57:17 | **approach (3)** 19:1 19:4,7 | **author (3)** 23:12 34:16 56:14 | 62:2 | **brief (2)** 29:21,23 **briefly (4)** 7:4 8:6 |
| **added (2)** 36:22 38:7 | **appropriate (1)** 5:23 | **auto (4)** 33:8,11 39:20 41:2 | **bellamy (52)** 2:6 3:4,5,7,25 5:6,14 | 9:10 33:2 **bristol (1)** 9:3 |
| **addition (1)** 40:25 | **approximately (4)** 7:2 8:15 9:6 18:2 | **automatic (1)** 33:7 **available (2)** 16:20 55:17 | 5:17 6:3,5,12,14 6:15 7:5,9 14:15 14:19 19:16 21:21 | **broadly (2)** 9:20 11:4 **brought (4)** 32:4 |
| **additional (1)** 45:7 | **area (2)** 23:3 29:9 | **avenue (2)** 2:11,20 | 24:14 25:13,14 | 46:7,11 49:9 |
| **afternoon (1)** 59:11 | **armament (1)** 13:18 | **award (6)** 15:4 25:1,4 54:16,17 | 28:25 29:17 31:5 31:6 33:23 37:9 | **brown (1)** 14:2 **brushes (1)** 40:4 |
| **ago (2)** 38:5 59:13 | **armory (6)** 1:6 2:3 38:4 59:3 65:13 | 54:18 | 37:14,15 41:15 42:6,9 44:5,24 | **brushless (1)** 8:25 **bullet (4)** 30:1,2,8,9 |
| **ahead (12)** 5:10 19:18,22 41:16 48:18 52:13 56:19 | 67:4 | **awarded (6)** 25:1,5 41:12 53:18,20 64:3 | 48:5,17,23 52:15 59:8 60:7,16 61:6 | **bunch (3)** 10:13 15:3 41:5 |
| 61:18,20 62:12 64:8,25 | **arms (8)** 3:16,18 21:19 22:1,2,3 33:21 34:8 | **aware (3)** 10:3 36:5 65:13 | 61:7,17,23 62:10 63:1 64:11,17,21 | **burte (1)** 2:15 **burton (1)** 2:14 |
| **airplane (1)** 23:10 | **art (2)** 22:18,19 | **awareness (1)** 36:9 | 65:16 | **business (6)** 51:12 |
| **allowed (3)** 19:7,23 19:23 | **article (17)** 3:17,19 21:19 22:2,10,14 | B | **belonging (1)** 51:14 **best (2)** 25:24 66:5 | 51:14,17,18 65:8 |
| **amendments (2)** 15:5 64:14 | 22:25 23:12 24:4 28:17 32:5 33:21 | **b (17)** 3:23 17:8 20:10 21:3 24:1 | **better (1)** 25:11 | |
| **ammeter (1)** 40:19 | 34:8,9,10,24,25 | 28:12,14 29:25 | | |
| **amount (1)** 11:11 | **articles (5)** 23:19 | 30:25 31:7 46:15 | | |
| **andrew (1)** 59:5 | | | | |

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

| | | | | |
|---|---|---|---|---|
| 65:11 | **changes (3)** 6:22 | 31:17,22 34:13 | **competition (8)** | 18:25 |
| | 15:5 32:13 | 35:10,14,16,21 | 24:7,11 44:20 | **copies (1)** 50:17 |
| **C** | **changing (1)** 8:11 | 38:14,20,21,22 | 57:24 58:4,9,15 | **copy (7)** 7:22 20:21 |
| **c (23)** 3:20 17:8 | **characters (1)** 57:8 | 41:11 42:20 45:4 | 60:9 | 22:7 45:7,23 46:3 |
| 20:11 21:3 24:1 | **check (3)** 28:4 | 47:14 48:9 49:19 | **competitor (1)** | 49:4 |
| 28:19 29:12,18 | 45:12 49:7 | 50:2,11 51:7,14 | 60:24 | **copyright (5)** 31:22 |
| 30:14 34:13 35:2 | **checking (1)** 53:8 | 52:3,4,5,7 54:5,10 | **competitors (1)** | 38:13,13 42:22 |
| 35:5,21 37:12,20 | **chicago (1)** 2:12 | 55:19,21,25 58:23 | 36:14 | 51:7 |
| 37:20,23 39:12 | **chief (2)** 6:25 65:5 | 60:11,14,24 64:2 | **completed (7)** 21:4 | **corner (1)** 38:6 |
| 46:15 47:10,13,19 | **chris (1)** 34:23 | 65:2,8,11 | 21:10 44:16,20 | **correct (59)** 8:5 |
| 47:19 | **christopher (3)** | **colts (24)** 2:19 5:13 | 50:20,24,25 | 11:2 16:13 21:15 |
| **ca (1)** 32:6 | 23:13 34:17 54:24 | 6:19,21 9:12,14 | **compound (1)** 48:3 | 23:7 24:2 25:9 |
| **caliber (6)** 10:18 | **cincinnati (1)** 2:5 | 11:5,6 25:16,21 | **concept (1)** 17:16 | 28:5 31:20 35:3,4 |
| 21:13 39:7 41:5 | **circulated (1)** 57:1 | 28:18 29:11 30:14 | **conference (2)** | 35:6,7 37:25 38:2 |
| 46:18 49:14 | **circulating (1)** | 32:21,25 33:17 | 36:10,11 | 38:11,16,17,18 |
| **calibers (4)** 17:25 | 56:12 | 37:21 42:23 46:24 | **confidential (1)** | 39:11,20,21 43:13 |
| 18:11 42:13,13 | **civil (1)** 1:4 | 48:14 49:3 50:18 | 5:24 | 43:17 44:17 45:22 |
| **called (4)** 20:10,10 | **clarify (2)** 46:6 | 51:12,18 | **confidentiality (1)** | 46:3 47:3,11,13 |
| 20:16,17 | 63:2 | **column (4)** 26:19 | 5:22 | 49:18,24 50:7,18 |
| **cant (1)** 41:24 | **clarity (2)** 44:15 | 29:1 32:18 35:23 | **configurations (1)** | 50:21 51:6 53:16 |
| **capabilities (1)** | 47:1 | **com (2)** 2:7,25 | 16:11 | 54:11,12 56:10,24 |
| 10:20 | **classes (1)** 8:17 | **combat (7)** 10:4 | **confirm (1)** 38:9 | 57:2,5,18,21,24 |
| **capability (1)** 11:10 | **cleaner (1)** 36:1 | 15:24 16:3,22 | **connecticut (4)** | 58:5,16,25 59:1 |
| **caption (3)** 23:21 | **cleaning (3)** 40:2,5 | 17:9 20:2 24:5 | 1:15 5:4 8:10 | 59:14,21 60:4 |
| 28:11 30:20 | 40:6 | **come (1)** 13:25 | 68:3 | 62:5,9,13,15 63:5 |
| **captions (1)** 32:12 | **clear (2)** 9:18 23:5 | **coming (2)** 26:12 | **connection (1)** | 63:7 |
| **car (2)** 1:5 23:8 | **client (1)** 52:18 | 63:25 | 30:12 | **correction (1)** 67:5 |
| **carbine (4)** 25:17 | **clients (1)** 6:1 | **command (2)** 10:1 | **consider (1)** 58:19 | **corrections (4)** |
| 28:12 30:25 31:18 | **close (2)** 16:22 17:9 | 15:23 | **considered (1)** | 66:4,5,13 67:1 |
| **carefully (1)** 68:5 | **closed (1)** 17:14 | **commenced (1)** 5:1 | 10:12 | **correctly (2)** 46:21 |
| **carew (1)** 2:4 | **clyde (7)** 1:6 2:3 | **commission (2)** | **consist (1)** 18:24 | 49:16 |
| **carrier (3)** 30:5,5 | 38:4 59:3,5 65:13 | 66:21 68:17 | **consistency (1)** | **corresponded (1)** |
| 30:12 | 67:4 | **commonality (1)** | 50:1 | 47:14 |
| **case (6)** 47:9,10,15 | **cobb (1)** 13:16 | 17:12 | **contact (1)** 63:23 | **corresponds (2)** |
| 47:17 60:25 67:2 | **collapsible (1)** | **companies (4)** | **contacted (1)** 55:18 | 47:18,19 |
| **central (1)** 8:10 | 10:24 | 11:14 13:1,5,6 | **context (2)** 63:4,20 | **couldnt (2)** 43:22 |
| **certain (1)** 22:8 | **college (2)** 8:10,13 | **company (13)** 2:19 | **continued (1)** 40:1 | 62:21 |
| **certainly (1)** 64:21 | **colt (67)** 2:25 8:19 | 5:13 6:23 11:19 | **contract (7)** 11:18 | **counsel (12)** 2:24 |
| **certificate (2)** 25:7 | 9:6,11,12,19,23 | 11:22,23 12:7,21 | 19:9 25:5 41:12 | 5:12,19,25 6:10 |
| 68:1 | 10:8 11:2 17:6,17 | 53:22 55:7,13 | 53:19,20 64:3 | 7:19 19:21 20:20 |
| **certify (3)** 66:3 | 20:5,5,8,15,22 | 57:1 59:2 | **contracts (2)** 14:2 | 45:6 59:7 68:8,10 |
| 68:3,8 | 21:12 22:12,21 | **compare (1)** 47:8 | 27:14 | **county (1)** 66:12 |
| **chamber (1)** 40:4 | 23:3,22 24:16 | **compete (1)** 61:2 | **conversation (1)** | **couple (3)** 8:9 13:5 |
| **change (5)** 32:18 | 26:4,18,22,24 | **competing (1)** | 46:11 | 45:7 |
| 32:24 33:4,16 | 28:14 30:22 31:7 | 36:12 | **conversion (1)** | **course (4)** 19:12 |
| 43:11 | | | | |