IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| FN HERSTAL, S.A., | : | |
| | : | |
|     **Plaintiff,** | : | |
| **v.** | : | |
| | : | **No. 3:12-CV-102 (CAR)** |
| CLYDE ARMORY, INC., | : | |
| | : | |
|     **Defendant.** | : | |
| _____ | : | |

## BENCH TRIAL ORDER

In this trademark infringement case, Plaintiff FN Herstal, S.A. ("FN") and Defendant Clyde Armory, Inc. ("Clyde Armory") both claim superior rights to use "SCAR" or "SCAR-Stock" in the firearms industry.  The Court conducted a bench trial in this case on July 21-July 23, 2015, and, thereafter, directed the parties to submit their proposed findings and fact and conclusions of law.  After considering all the evidence and the applicable law, the Court makes the following Findings of Fact and Conclusions of Law.  As explained herein, the Court finds that FN has superior trademark rights in the SCAR mark and thus enters judgment in favor of FN on all claims.

### FINDINGS OF FACT

FN is a well-known firearms and weapons manufacturer with its principal place of business in Herstal, Belgium.  FN manufactures and distributes a full range of firearms and accessories for the military, law enforcement, and civilian consumers in the United

States.  In 1997, FN created FNH USA to handle development, marketing, and sales of its products to the United States market. FNH USA later merged with FN Manufacturing in 2014 to become FN America, LLC.  Clyde Armory is a firearms retailer and distributor, which sells firearms and other accessories to law enforcement and civilian consumers in the United States.  Clyde Armory's principal place of business is in Athens, Georgia.

At issue in this case is FN's use of the SCAR mark as a designation for a family of rifles and Clyde Armory's use of SCAR-Stock on replacement gun stock.  The history of each party's use of SCAR and SCAR-Stock is summarized below.

**I.      FN's SCAR**

On January 23, 2004, United States Special Operations Forces Command ("SOCOM") issued a solicitation requesting bids from firearm manufacturers to design and manufacture a new combat assault rifle for the U.S. military.[1]  The solicitation, as well as other documents issued by SOCOM, referred to the rifle as the "Special Operations Forces Combat Assault Rifle," abbreviated as the "SCAR."[2] The solicitation requested specific models of the rifle, including a SCAR-Light or SCAR-L, for the 5.56mm caliber, and SCAR-Heavy or SCAR-H, for the 7.62mm caliber, and specified a Standard (S) configuration, a close quarter combat (CQC) configuration, and a sniper variant (SV).[3]  It is clear that the term "SCAR" originated with SOCOM as an abbreviation for "Special

---

[1] JX 19 [Doc. 147-1].

[2] *Id.* at p. 2; DX 180 [Doc. 145-5].

[3] JX 19 at p.2.

Operations Forces Combat Assault Rifle," and the competition initiated by the solicitation was commonly known in the firearms industry as the SCAR Program.[4]

FN along with other firearms manufacturers, including Colt and Cobb Manufacturing, submitted SCAR prototypes to SOCOM in 2004 in hopes of winning the bid.[5]  Although it was not required to do so, FN chose to label its prototype submissions with the SCAR mark. On November 5, 2004, SOCOM officially awarded the ten-year development contract for the SCAR to FN.[6]  In that award, SOCOM ordered over $634,000.00 of SCAR firearms and attachments.[7]  To fulfill its obligations under the contract, FN sold and shipped rifles imprinted with the SCAR mark throughout 2004, 2005, and 2006, to various U.S. military-related agencies, including SOCOM, Naval Air Systems Command ("NAVAIR") and Naval Surface Warfare Center ("NSWC").[8]  By November 5, 2007, FN had filled eleven delivery orders and sold over $11,000,000.00 of SCARs and accessories pursuant to the contract.[9]

The engineering and development of the SCAR weapon system underwent a strict government approval process that lasted several years.  The process included multiple early user assessments followed by integrated product team meetings to discuss the

---

[4] See Deposition of Paul Hochstrate 16:3-8, 19:25-20:3 ("Hochstrate Dep.") [Doc. 150]; Deposition of John Klein 26:14-18 ("Klein Dep.") [Doc. 150].
[5] DX 182, CA00136 [Doc. 145-6]; Hochstrate Dep. 50:11-15; DX 151 [Doc. 146-130].
[6] JX 20 [Doc. 147-2]; PX 197 [Doc. 145-70]; DX 208 [Doc. 145-10].
[7] JX 20.
[8] PX 128 [Doc. 145-52].
[9] DX 208.

3

results of those assessments and to implement changes to the SCAR.  Once the changes were made, each new generation of the SCAR was tested again.  This cycle continued through four or five generations of the SCAR. Then, from July to December 2007, the SCAR was set for operational testing and evaluation to determine if the rifle was ready for service, followed by low rate production of the SCAR in 2008.

From its inception, the SOCOM program generated significant media coverage in the firearms industry because the SCAR was the first rifle procured by the U.S. military through a full and open competition since the military adopted the M16 rifle in the mid-1960s.  Various magazine and newspaper articles tracked the development of the SCAR pursuant to the SOCOM program. A sample of these articles appeared in *Small Arms Review* (July 2005), *National Defense* (July 2005), *Army Times* (July 2006), *Guns and Ammo* (July 2006), and *Defense News* (October 2006), each crediting FN with developing the SCAR and outlining the features and benefits of the different forms and variants of the firearm.[10] At least an article a month was dedicated to updates on FN's development of the SCAR during that time period.  While many of these articles reference FN as the winner of the SOCOM bid, four articles highlight prototypes submitted by other manufacturers.[11]

---

[10] *See, e.g.,* PX 42 [Doc. 145-20]; PX 47 [Doc. 145-22]; PX 48 [Doc. 145-23; PX 71 [Doc. 145-29]; PX 180 [Doc. 145-68]; PX 195 [Doc. 145-69]; PX 214 [Doc. 145-77]; DX 100 [Doc. 145-3]; DX 188 [Doc. 145-7]; DX 190 [Doc. 145-8].

[11] *See, e.g.,* DX 105, CA02875 [Doc. 146-94]; DX 106, CA02885 [Doc. 146-95]; DX 108, CA03176 [Doc. 146-97]; DX 151 [Doc. 146-130].

It is customary for manufacturers like FN to first develop a weapon for the military and then develop similar versions of the same weapon system for nonmilitary consumers. The reason, in part, is because civilian and law enforcement consumers tend to follow military trends in the firearms industry—when the military starts using new products, nonmilitary consumers anticipate versions of the same products.  Indeed, John Klein, the president of Sage, International, Inc., a firearms manufacturer, testified that when a new military weapon is developed, it is normal for nonmilitary consumers to inquire about a version of the same weapon for civilian use.[12]  In short, the evidence shows the U.S. military is a popular customer in the firearms industry—when the U.S. military adopts a new firearm, everyone else wants that firearm too.

Consistent with this general practice and popular demand, FN began promoting its SCAR to law enforcement and civilian gun enthusiasts in 2005.  FN, however, did not have a semi-automatic version of the SCAR available for purchase by civilian consumers at that time.  The only rifle available for display was a fully automatic SCAR—the sale of which is restricted to military and law enforcement.  Nevertheless, in February 2005, FN imported its fully automatic SCAR to display and promote at trade shows, and visits to gun dealers, law enforcement agencies, and distributors.[13]  FN displayed these firearms at hundreds of

---

[12] Klein Dep. 112:5-17.
[13] PX 76 [Doc. 145-31]; PX 77 [Doc. 145-32].

tradeshows and events throughout 2005 and 2006.[14]  The most notable example was the February 2006 Shooting, Hunting, Outdoor Trade Show ("2006 SHOT Show") held in Las Vegas, Nevada, one of the largest firearms trade shows in the world.  Thousands of firearms industry insiders attend the SHOT Show ever year, ranging from military personnel and law enforcement to firearm manufacturers, distributors, retailers, and others having an interest in firearms.  Approximately ninety percent of the SHOT Show attendees are nonmilitary consumers.  At the 2006 SHOT Show, FN unveiled two SCAR weapons at its booth, and SHOT Show attendees waited in line to see the display. There was so much buzz surrounding the SCAR at the 2006 SHOT Show that FN had three employees dedicated solely to answering the nonstop questions about the SCAR. According to Bucky Mills, the Senior Director of Law Enforcement Sales and Training at FN America, FN's SCAR was "big news" and was "the number one talked about firearm at the whole SHOT Show in 2006."

FN further promoted the SCAR at trade shows and events by distributing hats, t-shirts, key chains, as well as thousands of brochures, fliers, and other marketing materials

---

[14] Some examples include the 2006 SHOT Show, the National Defense Industrial Association ("NDIA") Small Arms Forum, the AUSA U.S. Army show, Trexpo West, BORTAC, ILEETA, Mock Prison Riot, the Southeast SWAT Conference, SPOTC, FN/Leopold Long Range Competition, IALEFI, Police & Security Expo, and Trexpo East, among others. *See* PX 142 [Doc. 145-58].  FN also presented evidence that it displayed SCAR firearms at tradeshows outside the United States, such as the 2006 Eurosatory trade show held every other year in Paris, France. "It is well settled that foreign use is ineffectual to create trademark rights in the United States." *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985).  Accordingly, the Court will not consider FN's displays of SCAR firearms outside the United States in determining priority of trademark rights in this case. In that regard, Clyde Armory's Motion in Limine [Doc. 115] regarding FN's foreign use of the SCAR mark is **GRANTED** as to these international trade shows.

imprinted with the SCAR mark.[15]   In addition, FNH USA distributed its 2006 product catalog in which it boasted, "[w]e are proud to announce [SOCOM] awarded the contract for the Special Combat Assault Rifle (SCAR) to FN."[16]   Since 2005, FN has dedicated a fourth of its annual advertising budget to promote the SCAR.   But FN has spent less than $150,000 in print advertisements yearly to promote the SCAR in the United States because the market demand for the SCAR is already so high.[17]

In response to these promotions, FN received numerous inquiries from nonmilitary consumers asking when a semi-automatic SCAR would be available for civilian purchase. On March 2, 2006, FN answered those inquiries in a press release entitled, "The Making of the 21st Century Assault Rifle: SCAR SOF Combat Assault Rifle" which told the history of its involvement in the SCAR Program and detailed the ongoing development of the SCAR for SOCOM.[18]   The press release also announced that a semi-automatic version of the SCAR "[would] potentially be available in the next two years" for law enforcement and civilian consumers.[19]   The development of a semi-automatic SCAR, however, necessarily took time.   FN had to carefully convert a fully automatic firearm to a semi-automatic in such a way that it would not be easy to reconvert into a fully automatic firearm.   Then, FN

---

[15] *See, e.g.,* PX 75 [Doc. 145-30]; PX 134 [Doc. 145-54]; PX 222 [Doc. 145-84].
[16] DX 205, p. 4 [Doc. 146-147].
[17] *See* PX 244 [Doc. 145-93].
[18] DX 182.
[19] *Id.* at CA00137.

had to seek government approval from the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") to sell the semi-automatic SCAR to the wider commercial market.

In the meantime, FN continued to advertise through similar channels—visiting trade shows, law enforcement agencies, distributors, gun dealers, and distributing promotional materials after 2006.[20] Media coverage of the SCAR also continued with between seventy-five and hundred articles have featuring FN's SCAR to date.[21]

In November 2008, the ATF approved FN's semi-automatic SCAR for commercial sale. Thereafter, FN filled its initial orders to law enforcement and civilians in late 2008.[22] Nonmilitary sales were on back order by several thousand in 2008 and 2009. Since that time, FN has sold more than a $100,000,000.00 of SCAR firearms in the United States.[23]

To enforce its rights in the SCAR mark, FN sought and obtained two trademark registrations from the United States Patent and Trademark Office ("USPTO") for the SCAR mark. The USPTO registered the SCAR and Design mark to FN for use in connection with firearms and related items on June 15, 2010, Registration No. 3,801,448 ("the '448 Registration"). The '448 Registration indicates that FN filed its application on January 13, 2009, and first used the SCAR and Design mark in commerce on November 1, 2008.[24] The

---

[20] *See, e.g.,* PX 93 [Doc. 145-33]; PX 108 [Docs. 145-38, -39]; PX 110 [Docs. 145-40, -41]; PX 123 [Docs. 145-47, -48]; PX 124 [Docs. 145-49, -50]; PX 144 [Doc. 145-59].

[21] *See, e.g.,* PX 23 [Doc. 145-18]; PX 24 [Doc. 145-19]; PX 44 [Doc. 145-21]; PX 56 [Doc. 145-25]; PX 57 [Doc. 145-26]; PX 113 [Doc. 145-42].

[22] PX 118 [Doc. 145-45]; PX 120 [Doc. 145-46].

[23] PX 216 [Doc. 145-78].

[24] PX 7, p. 2 [Doc. 145-13].

USPTO registered the SCAR mark to FN for use in connection with games, toy replicas of weapons, and related items, on February 21, 2012 ("the '728 Registration"). The '728 Registration indicates a priority date of September 8, 2010.[25]

## II.     Clyde Armory's SCAR-Stock

In 2003, at the request of the U.S. Navy SEALs, Sage International, Inc. ("Sage") began producing a replacement chassis stock system for M14 rifles and close variations thereof.  Sage's replacement chassis stock system, known as the Enhanced Battle Rifle ("EBR stock"), allowed pre-Vietnam War era M14 rifles to be updated with modern tactical features, such as mounting rails, a pistol grip, and telescoping buttstock. These tactical features allowed the M14, a larger caliber rifle, to be used as either a close quarters battle ("CQB") rifle or a designated marksman ("DM") rifle in the modern era.[26]  In 2005, Clyde Armory's President and founder, Andrew Clyde, contacted John Klein, the President of Sage, about developing a similar replacement stock system for certain rifles made by Sturm Ruger & Co, Inc., such as the Mini-14, Mini-30, and AC-556. The replacement stock system proposed by Clyde Armory was to include tactical features similar to Sage's EBR stock.[27]  At the 2006 Shot Show, Mr. Clyde met with Mr. Klein and

---

[25] PX 9, p.2 [Doc. 145-14].  On April 22, 2008, FN filed an application, Serial No. 79/053,575, for SCAR, claiming a priority date of November 12, 2007 based on a Benelux trademark registration (Benelux refers to a combined trademark registration system for Belgium, The Netherlands, and Luxembourg), which FN submitted in support of summary judgment.  *See* Boris Umansky Decl. ¶5, Ex. 3 [Doc. 89-3].  FN did not submit this application as evidence at the trial. Therefore, the Court will not consider it.
[26] DX 2 [Doc. 146-1].
[27] Klein Dep. 36:21-37:7.

planned the specific configuration of the replacement stock system for the Mini-14, Mini-30, and the AC-556.[28]

Mr. Clyde adopted the mark "SCAR-Stock" or "SCAR-CQB Stock" in April 2006 to reflect the collaborative effort of Sage and Clyde Armory in designing and manufacturing the replacement stock.[29]  "SCAR" as used on the product is an acronym for "Sage Clyde Armory Rifle" stock.  At the time Clyde Armory adopted the mark, Mr. Clyde knew about the SOCOM program, and knew that its purpose was to create the SOF Combat Assault Rifle.[30]  Mr. Clyde further knew the rifle was abbreviated as the SCAR, and that SOCOM had awarded FN the development contract to produce it.[31] Mr. Clyde admittedly saw an article in *Small Arms Review* announcing that FN won the bid to create the SCAR for SOCOM.

Indeed, Joshua Smith, Clyde Armory's former Chief Operating Officer, testified that FN's SCAR was well known in the firearms market in 2006.  When Mr. Clyde told him about the coined acronym for the replacement stock, the two discussed the fact that FN was already marketing a product under the SCAR mark.  Mr. Smith testified that, by adopting SCAR-Stock, Clyde Armory was attempting to take advantage of the popularity surrounding the SCAR mark in the firearms industry.  Mr. Clyde disavows any intent to

---

[28] *Id.* at 51:12-52:21.
[29] *See* DX 3 [Doc. 146-2], DX 4 [Doc. 146-3] (a draft agreement dated April 26, 2006, sent from Clyde Armory to Sage, reflecting the product name as "SCAR-CQB stock").
[30] PX 212, pp. 2-3 [Doc. 145-76].
[31] *Id.*

take advantage or associate SCAR-Stock with FN's SCAR mark.  Mr. Smith left Clyde Armory in October 2009 under bad circumstances following a blow up with Mr. Clyde and other employees.  Nevertheless, in light of Mr. Clyde's admission that he was familiar with the SCAR Program at the time he adopted SCAR-Stock, the Court finds Mr. Smith's testimony credible.

Throughout the spring and summer of 2006, Clyde Armory worked toward perfecting its replacement stock system in collaboration with Sage.[32]  To solidify the collaboration, Clyde Armory orally committed to purchasing 1000 replacement stocks from Sage.[33]  Clyde Armory also purchased 1000 each of the other component parts from vendors to use in the final assembly of the replacement stocks.[34]  On August 11, 2006, Clyde Armory submitted a purchase order to Sage for the first 54 replacement stocks.[35]  Thereafter, Clyde Armory shipped its first commercial sale of SCAR-Stock on September 18, 2006.[36]

In anticipation of and following the launch of its replacement stock, Clyde Armory's SCAR-Stock generated consumer and industry interest, specifically among owners of

---

[32] *See e.g.,* DXs 12-14 [Docs. 146-10, -12] (Adjustable Stock orders to TAPCO); DXs 18-19 [Docs. 146-16, -17] (grip part order to Falcon); DXs 20-21 [Docs. 146-18, -19] (folding stock mechanism part order to Ace, Inc.); Klein Dep. 69:22-72:9; 73:6-76:8; 77:6-19; 78:6-17; 128:2-17.

[33] *Id.* at 51:18-19.

[34] DX 12.

[35] DX 7 [Doc. 146-5].

[36] DX 66 [Doc. 146-62].

Ruger Mini-14s, Mini-30s, and the AC-556.[37]  Clyde Armory began promoting SCAR-Stock

through advertising online, in print advertisements, and at trade shows.[38]  For example,

Clyde Armory began displaying and selling its SCAR-Stock product through its website,

making its first internet sale in September 2006.[39]  Thereafter, in January 2007, Clyde

Armory registered and began using the internet domain name, scarstock.com. Clyde

Armory also purchased advertising space in firearms industry magazines such as *Small

Arms Review* and *S.W.A.T.* magazine, among others.[40]  In each of these advertisements, the

text clearly links the SCAR-Stock product to Ruger Mini-14, Mini-30, and AC-556 rifles.[41]

Clyde Armory further promoted SCAR-Stock at trade and consumer shows, including the

2007 Shot Show, Knob Creek (beginning in October 2006), and the 2008 SWAT Roundup.[42]

Clyde Armory's promotional efforts resulted in continuous and ongoing sales of

SCAR-Stock from 2006 to the present.[43]  In 2008, however, Clyde Armory experienced a

slight drop in sales due to delivery issues from Sage.  At that time, Sage had to meet

---

[37] *See, e.g.,* DX 27 [Doc. 146-25] (customer inquiries); DX 98, CA02809 [Doc. 146-93] (*Soldier of Fortune Magazine,* Sept. 2007); DX 163 [Doc. 146-141] (*PerfectUnion.com*).

[38] *See, e.g.,* DX 234 [Doc. 145-11] (brochure); DX 22 [Doc. 146-20] (magazine advertisement); DX 24 [Doc. 146-22] (flyer); DX 25 [Doc. 146-23] (advertisement in Law Enforcement Product News, January/February 2007); DX 106, CA02884 [Doc. 146-95] (advertisement in *Small Arms Review*, October 2006).

[39] DX 68 [Doc. 146-64].

[40] *See, e.g.,* DXs 29-59, 62 [Docs. 146-27, −58].

[41] *See, e.g.,* DX 22; DX 24; DX 98; DX 106, CA02884; DX 108, CA03184; DX 109, CA02928 [Doc. 146-98]; DX 110, CA02939 [Doc. 146-99]; DX 111, CA02949 [Doc. 146-100]; DX 112, CA03186 [Doc. 146-101]; DX 113, CA03001 [Doc. 146-102]; DX 114, CA03221 [Doc. 146-103]; DX 115, CA02953 [Doc. 146-104]; DX 116, CA02970 [Doc. 146-105]; DX 117, CA02974 [Doc. 146-106]; DX 118, CA02983 [Doc. 146-107]; DX 119, CA03243 [Doc. 146-108]; DX 120, CA03248 [Doc. 146-109]; DX 121, CA02993 [Doc. 146-110]; DX 122, CA03263 [Doc. 146-111]; DX 125, CA03300 [Doc. 146-112]; DX 126, CA03304 [Doc. 146-113]; DX 127, CA03316 [Doc. 146-114]; DX 128, CA03321 [Doc. 146-115]; DX 129, CA03336 [Doc. 146-116].

[42] Klein Dep. 80:1-81:1.

[43] DX 160 [Doc. 146-139].

military demands before using its manufacturing capacity to provide any product to Clyde Armory.  Mr. Klein testified that military orders took precedence over all other orders.[44]  Through April of 2015, Clyde Armory sold 913 units of its SCAR-Stock product, for total gross revenue of approximately $450,000.[45]

SCAR-Stock replacement stock comes in different colors, including a color dubbed "Navy SEAL Grey"—the same color as Sage's EBR stock.[46]  The "SCAR-CQB stock" mark is laser engraved on the replacement stock and appears to be of similar font style, color, and size as the SCAR mark on FN's rifles.[47]

As a firearms retailer and distributor, Mr. Clyde is familiar with FN's products.  In fact, Clyde Armory began selling FN's products in 2002 and became an official distributor of FN's products from 2006 to 2010.[48]  Since 2010, Clyde Armory has sold FN's SCAR and advertises FN's SCAR and its own SCAR-Stock through its website, www.clydearmory.com.[49]  It is undisputed that Clyde Armory's SCAR-Stock product was not designed to be used with and is incompatible with FN's SCAR.  And there have never been plans to expand the product line to make a product compatible with FN's assault rifle products.[50]

---

[44] Klein Dep. 57:15-25, 62:14-63:16.
[45] DX 160.
[46] *See* PX 238 [Doc. 145-88].
[47] *See* PX 245 [Doc. 145-94]; DX 155 [Doc. 146-134;, DX 158 [Doc. 146-137]; DX 159 [Doc. 146-138].
[48] PX 155 [Doc. 145-63].
[49] PX 239 [Doc. 145-89].
[50] Klein Dep. 129:17-130:4.

### III.    Analysis

After discovering Clyde Armory's SCAR-Stock mark, FN brought the instant suit for trademark infringement.  Clyde Armory denied liability and counterclaimed, alleging that FN's SCAR mark infringed its SCAR-Stock.  In support of their claims, both parties argue they have a superior trademark right in their respective SCAR marks, and the opposing party's use of SCAR infringes on that right.

In order to establish a protectable trademark, a party must prove (1) it used the mark in commerce, and (2) the mark is distinctive.[51]  Having carefully reviewed all the evidence, the Court finds that FN was the first to use the SCAR mark in commerce and that FN's SCAR mark was distinctive before Clyde Armory began using SCAR-Stock.

### A.  First Use

To establish a protectable mark, a party must demonstrate that it uses the mark in commerce.  "Mere adoption of a mark without bona fide use, in an attempt to reserve it for the future, will not create trademark rights."[52]  A mark is used in commerce when

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in interstate commerce.[53]

---

[51] *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011).
[52] *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1267 (5th Cir. 1975).
[53] 15 U.S.C. § 1127.

To determine whether use is sufficient to create a protectable trademark, the Eleventh Circuit requires a trademark claimant to show it (1) adopted the mark and (2) "use[d the mark] in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."[54]  The trier of fact should evaluate whether a party has met both prongs of this test by considering "the 'totality of the circumstances'—including sales, advertisements, and distribution of goods—in order to determine whether the mark has been sufficiently used in commerce."[55]

Under this approach, "evidence of sales is highly persuasive," but actual sales are not required to prove prior use.[56]  When sales are absent, a party may show use by "analogous use."[57]  Analogous use refers to pre-sale promotional efforts such as "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications."[58]  "[A]ctivities claimed to constitute analogous use must have substantial impact on the purchasing public."[59]  Moreover, when a party relies on analogous use to establish trademark rights "actual, technical trademark use must follow the use analogous

---

[54] *Blue Bell, Inc.*, 508 F.2d at 1266.

[55] *Freeway Ford, Inc. v. Freeway Motors, Inc.*, 512 F. Supp. 2d 1353, 1361 (M.D. Ga. 2007).

[56] *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195-96 (11th Cir. 2001).

[57] *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007).

[58] *T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996).

[59] *Id.*

to trademark use within a commercially reasonable period of time."[60]  Whichever way a party attempts to establish use, either by actual sales or analogous use, that use must be continuous.[61]

When both parties claim a protectable trademark interest, the Court must determine who used the mark first.[62]  The evidence clearly shows that Clyde Armory began using SCAR-Stock when it filled its first customer orders for its replacement stock in September 2006.  Therefore, FN bears the burden of proving that it used the SCAR mark prior to September 2006.  In this case, FN must meet that burden by clear and convincing evidence. The reason for this heightened burden arises from FN's '448 Registration for SCAR and Design.  In its application for the '448 Registration, FN claims it first used the mark in commerce on November 1, 2008, in connection with firearms.  FN, however, is not bound by the first use date in its trademark registration and instead may prove an earlier date of use by clear and convincing evidence.[63]  This is a particularly "heavy burden" upon FN

---

[60] *Dyneer Corp v. Automotice Products Plc,* 37 U.S.P.Q.2d 1251, 1256 (T.T.A.B. 1995); *see also Am. Express Co. v. Goetz,* 515 F.3d 156, 162 (2d Cir. 2008).  FN argues that the Eleventh Circuit does not require actual technical trademark use within a commercially reasonable time after analogous use.  The Eleventh Circuit has not directly addressed this issue. Therefore, the Court, out of an abundance of caution, addresses whether FN's actual sales of semi-automatic SCARs occurred within a commercially reasonable time of its promotional activities.

[61] *Blue Bell, Inc.,* 508 F.2d at 1265 ("[E]ven a single use in trade may sustain trademark rights if followed by continuous commercial utilization.").

[62] *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.,* 889 F.2d 1018, 1023 (11th Cir. 1989) ("The first to use a mark on a product or service in a particular geographic market, the senior user, acquires rights in the mark in that market.").

[63] *Hydro-Dynamics, Inc. v. George Putnam & Co.,* 811 F.2d 1470, 1473 (Fed. Cir. 1987); *Elder Mfg. Co. v. Int'l Shoe Co.,* 194 F.2d 114, 118 (C.C.P.A. 1952). In its post-trial submission, FN contends for the first time in this case that it need not meet this heightened standard of proof to establish prior use because the '448 registration

when "the date on which the trademark application was filed is substantially contemporaneous with the date of first use alleged therein and an attempt is made many years later to establish an earlier date."[64]  Evidence in support of a prior use date "should not be characterized by contradictions, inconsistencies, and indefiniteness, but should carry with it conviction of its accuracy and applicability."[65]  Considering the totality of the circumstances in this case, the Court finds that FN has met that burden through its sales of firearms pursuant to the SCAR Program, widespread media attention surrounding that program, and its advertisements and other promotional activities in 2005 and 2006.

On November 5, 2004, SOCOM ordered approximately $634,000 in SCAR firearms and attachments.  The SOCOM contract, however, was much more than a single sale of SCAR firearms—the award marked the beginning of a SCAR development contract that would continue, by its terms, for ten years.  From the inception of the SOCOM award, FN marked the rifles it submitted with the SCAR mark and shipped those rifles to various military-related agencies throughout 2004, 2005, and 2006.  By November 5, 2007, FN had completed eleven delivery orders, totaling over $11,000,000.00 of SCAR firearms and accessories pursuant to the SOCOM contract.[66]

---

refers to the first use of SCAR with a design feature. According to FN, the '448 Registration does not affect its common law trademark rights to SCAR—for which it much show use by a preponderance of the evidence. The dispute regarding the applicable standard, however, is of no consequence because FN has met its burden of showing prior use under both standards.

[64] *Elder Mfg. Co.*, 194 F.2d at 118.

[65] *Id.*

[66] DX 208.

Even though these sales were limited to the U.S. military and related agencies, the Court finds that these sales were sufficiently public to constitute use in commerce.[67]   The SOCOM award to FN was the first open bid to develop firearms for the U.S. military in forty years.   As a result, various media outlets publicized the program extensively, crediting FN with winning the bid and tracking the development of the new SCAR weapon system.   Given the surrounding publicity, the Court finds that FN's sales to the U.S. military were sufficiently public for trademark purposes.

The fact that FN did not have a semi-automatic SCAR for law enforcement and civilian purchase until late 2008 does not change the Court's analysis because, in additional to its military sales, FN established prior use through analogous use—that is, extensive pre-sale advertising and promotional activities for its semi-automatic SCAR dating back to 2005.   FN promoted its SCAR at hundreds of tradeshows throughout 2005 and 2006.   Indeed, at the February 2006 SHOT show—attended by thousands in the firearms industry—FN displayed two SCARs at its booth.   The SCAR was the most talked about firearm at the show, and people waited in line just to get a look at it.   At these tradeshows as well as in visits to law enforcement agencies, distributors, and gun dealers, FN distributed brochures, flyers, hats, t-shirts, and other memorabilia to further promote the SCAR.   In addition to these promotional activities, FN announced in a March 2006

---

[67] *Cf. Automedx v. Artiven*, 95 U.S.P.Q.2d 1976, at *7 (T.T.A.B. 2010) (finding sale of ventilators to military prior to FDA approval for sale to public constituted use in commerce).

press release its intent to develop a semi-automatic version of the SCAR for law enforcement and civilian consumers.  These promotional activities coupled with the media coverage surrounding FN's development of the SCAR constitute sufficient analogous use for trademark purposes.[68]

Moreover, FN's sales of the semi-automatic SCAR followed these promotional activities within a commercially reasonable time.  In late 2008, FN sold its first semi-automatic SCAR—approximately two and half years after the March 2006 press release.  Based on the evidence, the Court finds that the first sale of a semi-automatic SCAR was made as soon as commercially feasible.  On this point, the Court finds the testimony of Frank Spaniel, the Assistant Vice President of Research and Development at FN America, persuasive.  Mr. Spaniel testified at length regarding the engineering and development of the SCAR for SOCOM.   The SCAR Program involved a repeated cycle of product assessments and tests, meetings to discuss user feedback and desired changes, followed by newer generations of the SCAR to meet military demands.  After four years in production, the SCAR for the military was scheduled for low rate production in 2008.   FN was contractually obligated to fill these military orders before dedicating its manufacturing

---

[68] *See Hous. & Servs., Inc. v. Minton*, No. 97 CIV. 2725(SHS), 1997 WL 349949, at *4 (S.D.N.Y. June 24, 1997) (finding that plaintiffs' "wide-ranging promotional activities" and "substantial coverage in the print media" amounted to sufficient analogous use); *see also New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1199-1200 (9th Cir. 1979) (finding pre-printing publicity of magazine established priority of use of mark); *Knickerbocker Toy Co., Inc. v. Faultless Starch Co.*, 467 F.2d 501, 508 (C.C.P.A. 1972) (stating that a party "may rely on advertising and promotional use of a term or slogan . . . to establish superior rights over a subsequent trademark user of the term, slogan, or word.").

capacity to others in the industry.  Nevertheless, FN managed to convert the SCAR to a semi-automatic version in 2008, obtained government approval in November 2008 to sell it to the general public, and began fulfilling orders to law enforcement and civilian consumers in late 2008. Given FN's involvement in the SCAR Program during that same year, and taking into account the time needed to develop a semi-automatic version and seek government approval, the Court finds that FN sold its first semi-automatic SCAR within a commercially reasonable time following its promotional activities.

Accordingly, the Court finds that FN has shown use of the SCAR mark, by clear and convincing evidence, dating back to its first sale of rifles to SOCOM on November 5, 2004.

### B.  Distinctiveness

FN may not, however, claim a protectable trademark interest in SCAR simply by showing it used the SCAR mark in commerce. FN must also show that SCAR is "distinctive."[69]   A distinctive mark is one that "serve[s] the purpose of identifying the source of the goods or services."[70]   "An identifying mark is distinctive and capable of being protected if it <u>either</u> (1) is inherently distinctive <u>or</u> (2) has acquired distinctiveness through secondary meaning."[71]   In that regard, trademark law recognizes the following four categories of distinctiveness:

---

[69] *Knights Armament Co.*, 654 F.3d at 1188.
[70] *Id.*
[71] *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (emphasis in original).

(1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.[72]

Arbitrary, fanciful, and suggestive marks are considered inherently distinctive and, therefore, are protectable without a showing of secondary meaning.[73]  A descriptive mark, by contrast, is not inherently distinctive, and receives trademark protection only if it acquires distinctiveness through secondary meaning.[74]  A descriptive mark has acquired distinctiveness through secondary meaning "when the primary significance of the [mark] in the minds of the [consuming] public is not the product but the producer."[75]  The key factor in determining whether a descriptive mark has acquired secondary meaning is how the mark is perceived by the average prospective consumer in the relevant industry.[76]  When determining how the prospective consumer views the mark, courts should consider sources such as consumer surveys, use of the mark in media publications, use of the mark by competitors in the industry, and the trademark claimant's use of the mark.[77]

In this case, the parties disagree about the distinctiveness of their respective marks. According to FN, its SCAR mark is either inherently distinctive or, alternatively, acquired

---

[72] *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797-98 (11th Cir. 2003).

[73] *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1560 (11th Cir. 1991).

[74] *Knights Armament Co.*, 654 F.3d at 1188.

[75] *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007).

[76] *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 995 (7th Cir. 1989).

[77] *See Colt Defense LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 706 (1st Cir. 2007).

distinctiveness through secondary meaning before Clyde Armory began using SCAR-Stock in September 2006.  Clyde Armory, on the other hand, contends that FN's SCAR mark was descriptive of the rifle sought by SOCOM, and, therefore, FN acquired no protectable rights in SCAR prior to September 2006.  Moreover, Clyde Armory asserts that it was the first party to have a protectable interest in its SCAR-Stock mark—namely, because SCAR-Stock is inherently distinctive and became a protectable trademark upon its first use in commerce in September 2006.  Having considered the evidence of record, the Court finds that FN's SCAR is merely descriptive of a type of firearm.  Nevertheless, FN's SCAR mark acquired distinctiveness in the firearms industry prior to Clyde Armory's first use of SCAR-Stock in September 2006.  Thus, FN was the first party to own a protectable trademark interest.

It is clear that FN's SCAR mark originated with SOCOM as an abbreviation for Special Operations Forces Combat Assault Rifle—a phrase describing the specific weapon system solicited by SOCOM.  When determining the distinctiveness of an abbreviation such as SCAR, the Court must consider the relationship between the abbreviation and its underlying phrase.[78]  For classification purposes, an abbreviation is treated similarly to its underlying phrase "where the average prospective consumer recognizes the abbreviation

---

[78] *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 647 F. Supp. 2d 1321, 1331 (M.D. Fla. 2009), *aff'd*, 654 F.3d 1179 (11th Cir. 2011).

as equivalent to the underlying phrase."[79]  "An abbreviation of a generic or descriptive phrase is protectable 'if the party claiming protection for the abbreviation shows that the abbreviation has a meaning distinct from the underlying words in the mind of the public.'"[80]  "The party claiming protection has a heavy burden to show an independent meaning for an abbreviation of a descriptive phrase."[81]

### i.  FN's SCAR is Merely Descriptive

In this case, Clyde Armory argues that FN's use of SCAR was merely descriptive of the type of firearm requested by the SOCOM program.  This Court agrees.  The evidence shows that SCAR originated with SOCOM's solicitation, wherein SCAR is featured alongside its underlying phrase "Special Operations Forces Combat Assault Rifle" to refer to the type of rifle requested.  Moreover, the articles in evidence indicate that the average prospective consumer is likely to associate SCAR with it underlying phrase. For example, in the June 2005 issue of *Small Arms Review*, a headline reads "FN SCAR Wins!" followed below by "Special Operations Combat Assault Rifle."[82] The following month, in the July 2005 issue of *Small Arms Review*, an article informed readers "[i]t is the intent of the SOF Combat Assault Rifle (SCAR) Program to procure for [SOCOM] the most reliable, rugged,

---

[79] *Am. Historic Racing Motorcycle Ass'n, Ltd. v. Team Obsolete Promotions,* 33 F. Supp. 2d 1000, 1004 (M.D. Fla. 1998), *aff'd sub nom., Am. Historic v. Team Obsolete,* 233 F.3d 577 (11th Cir. 2000).
[80] *Knights Armament Co.,* 647 F. Supp. 2d at 1331 (quoting *Forman,* 509 F.3d at 1359).
[81] *Knights Armament Co.,* 647 F. Supp. 2d at 1331 (internal quotation marks omitted).
[82] DX 99, CA03239 [Doc. 145-2].

accurate, safe, and ergonomic weapons available."[83]   Similarly, in the July 2006 issue of

*Guns & Ammo*, an article refers to the rifle as the "Special Operations Forces Combat

Assault Rifle (SCAR, or SofCAR)" and refers to the program as the "SCAR Program."[84]

Other articles similarly demonstrate the common understanding in the industry that

SCAR is an abbreviation for Special Operations Forces Combat Assault Rifle and that

SCAR is a descriptive phrase used to designate a particular rifle requested by the SOCOM

program.[85]

    In addition, several witnesses—including Mr. Klein from Sage, a representative

from Colt's Manufacturing Company,[86] and Mr. Clyde—testified that they recognized

SCAR as an abbreviation for either the SOCOM program or the rifle sought pursuant to

the program.

    Finally, FN's own use of SCAR with its underlying phrase supports the conclusion

that SCAR is merely descriptive.  If a trademark claimant uses an abbreviation like SCAR

---

[83] DX 100, CA02840 [Doc. 145-3].

[84] PX 214, pp. 5-6 [Doc. 145-77].

[85] *See e.g.*, DX 188 [Doc. 145-7] (*Army Times*, Nov. 12, 2004: "[SOCOM] has awarded FN Herstal USA, Inc., a contract to produce SOF Combat Assault Rifles, or SCAR, for its elite forces."); DX 190 [Doc. 145-8] (*Army Times*, July 21, 2006: "Fourteen members of the House and Senate attended the July 13 event to familiarize themselves with the Special Operations Forces Combat Assault Rifle or SCAR."); PX 42 (*Defense News*, Oct. 9, 2006: "The addition to the 2007 Pentagon spending plan will pay for the operational test phase of the Special Operations Forces Combat Assault Rifle program (SCAR)."); PX 48, p. 2 (*Janes Defense Review*, October 5, 2005: "To complicate matters further, a different competition has been running in parallel for a new rifle for [SOCOM] forces under the *designation* Special Operations Forces Combat Assault Rifle (SCAR or SCR).") (emphasis added); PX 56, p.1 (*Shotgun Illustrated*, August 2009: "SCAR (SOF Combat Assault Rifle)"); PX 214, p.5 (*Combat Arms*, July 2006: "In 2002 a requirement was established for a new combat rifle to replace the M4A1 Carbine for SOCOM's Special Forces, Called the Special Operations Forces Combat Assault Rifle (SCAR, or SofCAR). . . .").

[86] Hochstrate Dep. 20:15-18.

in conjunction with its underlying phrase, courts are reluctant to find that the abbreviation has an independent meaning distinct from the underlying phrase.[87] In several of its advertisements and promotional materials, FN displays the SCAR mark with the underlying phrase presented predominately beside or underneath it. For example, FN places SCAR alongside its underlying phrase in its March 2006 press release entitled "The Making of the 21st Century Assault Rifle: SCAR SOF Combat Assault Rifle."[88] Additionally, in its promotional brochures and flyers, FN displayed SCAR beside "SOF Combat Assault Rifle."[89] Finally, FNH USA's 2006 product catalog displays SCAR with its underlying phrase when it boasts that FN was awarded the SOCOM contract to produce the SCAR.  Because SCAR is used pervasively by the media and FN in connection with "Special Operations Forces Combat Assault Rifle," or some close variant thereof, the Court finds that SCAR is merely descriptive of a type of firearm.[90]

---

[87] *See, e.g.*, *Forman*, 509 F.3d at 1360 (finding that party failed to show "WSI" as abbreviation for "Welding Services Inc." had a distinct meaning apart from the underlying phrase because advertising material displayed the WSI logo next to the underlying phrase);  *Knights Armament Co.*, 647 F. Supp. 2d at 1331 (finding that party failed to show "UNS" had a distinct meaning where the party "consistently use[d] UNS in conjunction with and as an abbreviation of 'Universal Night Sight.'").

[88] DX 182, CA00133.

[89] *See, e.g.*, PX 75, PX 134, PX 222.

[90] FN argues that SCAR is inherently distinctive because the term "scar" has a commonly known, ordinary meaning in the English language that has no direct connection to firearms.  While the Court recognizes the dual meaning of the word, the evidence of record shows a conscious effort by FN and others in the industry through advertisements, articles, and printed materials to associate SCAR with "Special Operations Forces Combat Assault Rifle" or "Special Combat Assault Rifle." Given the pervasive association of SCAR with its underlying phrase, the Court cannot finds that the mark is inherently distinctive merely because it is a common word in the English language.

### ii.     FN's SCAR Acquired Distinctiveness prior to September 2006

Since FN's use of SCAR is merely descriptive, FN must show that the SCAR mark acquired distinctiveness through secondary meaning prior to Clyde Armory's first use of SCAR-Stock in September 2006 in order to a have a protectable trademark.  FN "has the burden of sustaining a high degree of proof establishing secondary meaning for a descriptive term."[91]   When, as in this case, there are no consumer surveys in evidence, courts consider four factors to determine whether a particular mark has acquired distinctiveness through secondary meaning, including

> (1) [T]he length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by plaintiff to promote a conscious connection in the public's mind between the name and plaintiff's business; and (4) the extent to which the public actually identifies the name with plaintiff's goods and services.[92]

Timing is also important here—in order to prevail, FN must show that SCAR acquired secondary meaning <u>before</u> Clyde Armory starting using SCAR-Stock in September 2006.[93]

Given the extensive sales to the U.S. military, the publicity surrounding those sales, and FN's advertising and promotional activities in 2005 and 2006, the Court finds FN's SCAR mark acquired distinctiveness through secondary meaning in the firearms industry prior to September 2006.   With respect to the first factor—length and manner of use—FN had been using the SCAR mark in commerce for a little less than two years before Clyde

---

[91] *Gift of Learning Found., Inc.,* 329 F.3d at 800.
[92] *Id.*
[93] *See id.* (citing J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:34 (4th ed.)).

Armory introduced SCAR-Stock in September 2006.   The Court finds two years was sufficient time for the mark to acquire secondary meaning in the firearms industry.[94]   On this point, the significance of winning the SOCOM contract to develop and manufacture the SCAR cannot be overstated. The SOCOM program precipitated extensive sales of SCAR firearms.  These sales constitute "significant evidence" of secondary meaning.[95]

In addition to the significance of the volume of sales, the significance of the buyer—the U.S. military—is central to the Court's finding of secondary meaning.  The evidence demonstrates, unsurprisingly, that the U.S. military is a prominent and influential actor in the firearms industry.[96]  For example, Mr. Smith testified that law enforcement and civilian consumers in the firearms industry tend to follow military trends.  If the military starts using new camouflage or new weapons, the rest of the firearms industry wants to use those products too.  Moreover, the evidence shows that the U.S. military is an influential actor in more subtle ways. For instance, there is a general sense in the firearms industry

---

[94] In fact, courts have found far shorter periods of time sufficient to create secondary meaning in a mark or trade dress. *See, e.g., Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 541, 544 (2d Cir. 1956) (finding mark acquired distinctiveness within eleven months); *L.A. Gear, Inc. v. Thom McAnn Shoe Co.*, 12 U.S.P.Q.2d 1001, 1010-11 (S.D.N.Y. 1989) (finding shoe design acquired distinctiveness after only five months), *rev'd in part on other grounds*, 988 F.2d 1117 (Fed. Cir. 1993); *Karen Indus. v. Chiaverotti*, 181 F. Supp. 827, 829 (E.D. Wis. 1960) (finding acquired distinctiveness ten months after introduction of the plaintiff's product).

[95] *See Inmuno Vital, Inc. v. Golden Sun, Inc.*, 49 F. Supp. 2d 1344, 1357 (S.D. Fla. 1997) (finding large volume of sales was "significant evidence" of secondary meaning); *Robarb Inc. v. Pool Builders Supply of Carolinas Inc.*, No. 1:87-CV-2012-HTW, 1991 WL 335811, at *4 (N.D. Ga. Oct. 31, 1991) *aff'd sub nom.* 996 F.2d 1231 (11th Cir. 1993) (finding extensive sales contributed to secondary meaning); *Blue Bell, Inc. v. Ruesman*, 335 F. Supp. 236, 239 (N.D. Ga. 1971) (finding that WRANGLER mark acquired secondary meaning through extensive sales and advertising).

[96] *See Dyneer Corp.*, 37 U.S.P.Q.2d 1251, 1256 (P.T.O. Aug. 22, 1995) (finding promotions to a small number of "immediately recognizable major manufacturing concerns in the United States" including Ford, General Motors, and Chrysler, was sufficient analogous use to establish priority).

that the U.S. military gets priority over all other customers.  FN, for example, was contractually obligated to fill its military orders first before dedicating development and manufacturing capacity to law enforcement and civilian orders of its SCAR.  Even manufacturing of Clyde Armory's SCAR-Stock was delayed in 2008 because Sage prioritized its military orders first.  In addition, Clyde Armory markets its SCAR-Stock as being available in "Navy SEAL Grey."  Given FN's extensive sales to such an influential actor, the Court finds the first factor weighs in favor of finding SCAR acquired distinctiveness through secondary meaning.

The second and third factors—promotion and FN's attempt to create a conscious connection between SCAR and FN—also weigh in favor of finding FN's SCAR had acquired distinctiveness by September 2006. As mentioned above, media outlets extensively covered FN's development of the SCAR pursuant to the SOCOM program—crediting FN with winning the bid and engineering the SCAR.  The SCAR was "big news" in the firearms industry.  To further associate FN with SCAR, FN promoted SCAR firearms at tradeshows, and to gun dealers, distributors, and law enforcement agencies throughout the United States consistently in 2005 and 2006.  In addition to displaying SCARs at these events, FN distributed brochures, flyers, t-shirts, hats, and other items bearing the SCAR mark.  During this time period, a fourth of FN's marketing budget was dedicated solely to promoting the SCAR.

In response to the unsolicited media attention and FN's promotional efforts, the evidence shows the public associated the SCAR mark with FN in 2006.  At the February 2006 SHOT Show, for example, people waited in line to see FN's SCAR and inquired into when a SCAR would be available for civilian purchase.  Even in the absence of a semi-automatic SCAR, "[s]econdary meaning can be created . . . before a product hits the market by means of pre-sales publicity."[97]  It was clear to consumers by early 2006 at the latest that FN would expand sales of its SCAR firearms to law enforcement and civilian consumers.  By the time a semi-automatic version of the SCAR was available for sale in 2008, the SCAR was on back order by thousands.

The popularity of FN's SCAR mark in 2006 is further evidenced by Clyde Armory's intentional copying of the SCAR mark.  "Evidence of intentional copying is . . . probative of secondary meaning."[98]  In this case, FN presented sufficient evidence showing Clyde Armory intentionally copied FN's SCAR mark when it adopted SCAR-Stock.  Prior to adopting the SCAR-Stock mark, Mr. Clyde was familiar with FN's products and attended the 2006 SHOT Show where FN unveiled its SCAR firearms.  Moreover, Mr. Clyde testified that he knew about the SCAR Program, and the award of the SCAR development contract to FN.  Mr. Smith, Clyde Armory's former COO, further testified that Mr. Clyde

---

[97] 2 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:57 (4th ed.).

[98] *Robarb Inc.*, 1991 WL 335811, at *17 n.5 (citing *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983)); *see also Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("[P]roof of copying strongly supports an inference of secondary meaning."). The Court, however, recognizes that, in this Circuit, proof of intentional copying alone does not conclusively establish secondary meaning. *See Brooks Shoe*, 716 F.2d at 860.

adopted the mark, in part, to take commercial advantage of the popularity of FN's mark in the industry at the time  Even the SCAR-Stock mark imitates the font and  style of FN's laser-engraved SCAR mark.

Finally, the fact that other firearm manufacturers submitted prototypes to the SCAR Program does not prevent a finding that FN's mark acquired distinctiveness by September 2006.  To be sure, third party use of a mark weighs against a finding that a party's mark has acquired secondary meaning.[99]  The effect of third party use on the strength of the mark depends on the nature and extent of that use.[100]  Clyde Armory, however, did not present any evidence, beyond its own use of SCAR-Stock, that third parties used SCAR to sell firearms products.  While other manufacturers submitted SCAR prototypes to the SOCOM program, there is no evidence showing these manufacturers used the SCAR mark to sell firearms products, let alone the nature and extent of that use.  Thus, the Court finds that all four factors weigh in favor of finding that FN's SCAR mark had acquired distinctiveness in the firearms industry before Clyde Armory began using SCAR-Stock.

---

[99] *See Vail Associates, Inc. v. Vend-Tel-Co.,* 516 F.3d 853, 867 (10th Cir. 2008); *DeGidio v. W. Grp. Corp.,* 355 F.3d 506, 513 (6th Cir. 2004); *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 393 (7th Cir. 1992); *see also Colt Def. LLC,* 486 F.3d at 706 ("[T]he more members of the public see a term used by competitors in the field, the less likely they will be to identify the term with one particular producer.") (internal quotation marks and citation omitted).

[100] *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1173 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers."); *see also* 2 J.T. *McCarthy on Trademarks and Unfair Competition* § 11:88 (4th ed.).

## C. Distinctiveness of SCAR-Stock

Finally, Clyde Armory argues that its SCAR-Stock mark is entitled to trademark protection because it is inherently distinctive—the acronym does not describe the product itself, but rather reflects the collaborative effort between Sage and Clyde Armory in creating the product's design.  Despite Clyde Armory's representations regarding the meaning of the acronym, the Court finds that Clyde Armory adopted the mark in bad faith to take advantage of the popularity of FN's mark on the market.  "To determine whether a defendant has acted in bad faith, a court must examine whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."[101] Here, there is ample evidence of bad faith.  As mentioned above, Mr. Clyde was familiar with FN's products and knew about the SCAR firearm when he adopted the SCAR-Stock mark for use in the same industry.  More important, Mr. Smith testified that Mr. Clyde adopted the SCAR-Stock mark, in part, to profit from the popularity of FN's mark.  Even the SCAR-Stock mark imitates the style of FN's laser-engraved SCAR mark.  This evidence of intent to capitalize

---

[101] *Michael Caruso & Co. v. Estefan Enterprises, Inc.*, 994 F. Supp. 1454, 1462 (S.D. Fla. 1998) (quoting *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir.1996)), *aff'd sub nom., Caruso v. Estefan*, 166 F.3d 353 (11th Cir. 1998); *see also Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999).

on the popularity of FN's SCAR mark negates any rights Clyde Armory may claim in the SCAR-Stock mark.[102]

## CONCLUSIONS OF LAW

Based on the foregoing facts, FN brings federal trademark infringement and unfair competition claims under the Lanham Act, as well as related state law claims for unfair competition and deceptive trade practices, seeking to enjoin Clyde Armory from using the SCAR-Stock mark.   Clyde Armory brings a counterclaim for trademark infringement, seeking similar injunctive relief as well as cancellation of FN's trademark registrations. Both parties have waived their claims for damages.

### I.    Trademark Infringement

In order to prevail on a trademark infringement claim, a party must prove that (1) it owns a valid and protectable mark, and (2) the opposing party's use of an identical or similar mark is likely to cause confusion.[103]   In this case, the parties have stipulated that simultaneous use of their respective marks is likely to cause confusion.   Therefore, the issue is which party, if either, was the first to own a valid and protectable trademark.

As mentioned above, FN was the first to own a valid and protectable interest in its SCAR mark.   FN first used the mark when it sold SCARs to SOCOM in November 2004. Moreover, through extensive sales, advertising, and media promotion, FN's SCAR mark

---

[102] *See State of Fla. v. Real Juices, Inc.*, 330 F. Supp. 428, 433 (M.D. Fla. 1971) ("Good faith use is a requirement for gaining trademark rights.").
[103] *Gift of Learning Found., Inc.*, 329 F.3d at 797 (citing 15 U.S.C. § 1125(a)).

acquired distinctiveness through secondary meaning in the firearms industry prior to September 2006.  Due to Clyde Armory's bad faith in adopting its SCAR-Stock mark, it acquired no rights in that mark.  Accordingly, FN is entitled to judgment on its trademark infringement claim.

## II.  Unfair Competition under Federal Law

FN also asserts a claim for unfair competition under federal law.  "[A]n unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim."[104]  In this case, FN's unfair competition claim is based on Clyde Armory's trademark infringement.  Accordingly, FN is entitled to judgment on its unfair competition claim for the same reasons stated above.

## III.  Related State Law Claims

FN also asserts claims for unfair competition and deceptive trade practices under Georgia law.  Like the federal unfair competition claim, FN's state law claims are governed under the same framework as its trademark infringement claim.[105]  Since the Court finds in favor of FN on its trademark infringement claim, judgment is entered in its favor on the

---

[104] *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1026 n.14 (11th Cir. 1989); *see also Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir. 1975) ("As a general rule ... the same facts which would support an action for trademark infringement would also support an action for unfair competition.").

[105] *Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1539 n.11 (11th Cir. 1985) (the standards governing Georgia state law claims for trademark infringement, deceptive trade practices, and unfair competition are "similar, if not identical, to those under the Lanham Act."); *see also Planetary Motion*, 261 F.3d at 1193 n.4 (11th Cir. 2001) ("Courts may use an analysis of federal infringement claims as a "measuring stick" in evaluating the merits of state law claims of unfair competition.").

state law unfair competition and deceptive trade practices claims for the same reasons stated above.

## CONCLUSION

For the foregoing reasons, the Court grants judgment **IN FAVOR OF FN HERSTAL, S.A.** on all claims. Accordingly, **IT IS HEREBY ORDERED** that Clyde Armory, its respective directors, officers, agents, and employees:

(a) cease any use of SCAR or SCAR-Stock, or any colorable imitation thereof, in connection with the advertisement, promotion, offer for sale, and sale of firearms and related goods;

(b) abandon any trademark applications filed that show SCAR-Stock or include the designations, names, or marks SCAR and any confusingly similar variations thereof, and refrain from filing additional trademark applications for such marks;

(c) assign any domain names which include SCAR or any variant thereof to FN;

(d) dismiss with prejudice its Cancellation Petition in Cancellation Proceedings No. 92053562 against FN's Registration No. 3,801,448 for the mark SCAR and Design and its Opposition Petition in Opposition Proceedings No. 91198401 against FN's mark SCAR Application Serial No. 79/053,575;

(e) deliver up for destruction all labels, signs, prints, packages, wrappers, receptacles, advertisements, or other materials in its possession or custody and

34

control which are within the United States of America, its territories and possessions, which display the mark SCAR-Stock or related marks which show or include the designation, name or mark SCAR; and

(f) within sixty (60) after entry of final judgment, file with this Court and serve FN a report, in writing and under oath, setting forth the manner and form of Clyde Armory's compliance with the Court's order.

**SO ORDERED,** this 20th day of August, 2015.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE