```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF GEORGIA
 2                        ATHENS DIVISION

 3                   _____

 4

 5   FN HERSTAL SA,                    )
                                       )
 6           Plaintiff,                )
                                       )
 7       vs.                           ) Case No. 3:12-CV-00102
                                       )
 8   CLYDE ARMORY, INC.,               )
                                       )
 9           Defendant.                )
                                       )
10   _____

11

12                          TRIAL

13                       (Volume I)

14

15        BEFORE THE HONORABLE C. ASHLEY ROYAL
          UNITED STATES DISTRICT JUDGE, PRESIDING
16

17                    July 21, 2015

18                   Athens, Georgia

19

20

21

22

23   _____

24              DARLENE D. FULLER, USCR
                POST OFFICE BOX 1873
25             MACON, GA  31202-1873
                   (478) 752-3497
```

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFF:        BURTON S. EHRLICH
                               BORIS UMANSKY
4                              LADAS & PARRY, LLP
                               224 SOUTH MICHIGAN AVE.; SUITE 1600
5                              CHICAGO, IL  60604

6                              CHARLES H. HOOKER, III
                               JENNIFER FAIRBAIRN DEAL
7                              KILPATRICK TOWNSEND & STOCKTON LLP
                               1100 PEACHTREE ST., N.E.; STE 2800
8                              ATLANTA, GA  30309

9                              PHYLLIS ANDES
                               FN AMERICA, LLC
10                             P.O. BOX 9424
                               MCLEAN, VA  22102
11

12   FOR THE DEFENDANT:        GLENN D. BELLAMY
                               PAUL J. LINDEN
13                             WOOD HERRON & EVANS
                               441 VINE STREET
14                             CINCINNATI, OH  45202

15                             MICHAEL C. DANIEL
                               PRIOR, DANIEL & WILTSHIRE, LLC
16                             490 NORTH MILLEDGE AVENUE
                               ATHENS, GA  30601
17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                  JULY 21, 2015; VOLUME I

3

4

5     Plaintiff's
      Witnesses:              Direct      Cross      Redirect
6     _____

7     Frank Spaniel            36/93      100        122

8     Charles "Bucky" Mills    89/126     192        219

9

10

11

12    Defendant's
      Witnesses:              Direct      Cross      Redirect
13    _____

14    Andrew S. Clyde           81        86

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    EXHIBITS ADMITTED THROUGH TESTIMONY:

2

3    NUMBER              DESCRIPTION                      PAGE

4    PX023               Special Weapons Magazine         168

5    PX024               Police & Security News Ad        171

6    PX042               Defense News Article             52

7    PX044               Gun Digest Magazine Article      170

8    PX056               NRA Magazine Ad                  172

9    PX057               Shotgun News August 2009         56

10   PX071               Small Arms Review Magazine       154

11   PX075               Magazine Covers - excluding      140

12                       first and third pages

13   PX076               Import Notice                    131

14   PX077               Photo of SCAR marking            132

15   PX093               2011 Advertisement               163

16   PX108               2008 Military Catalog            164

17   PX110               2011 Military Catalog            165

18   PX113               Combat Arms July 2008            55

19   PX118               Press Release                    180

20   PX123               FN Herstel Commercial Catalog    166

21   PX124               FN Herstal Military Catalog      167

22   PX134               Brochure                         146

23   PX139               Equipment custody receipts       145

24   PX142               2006 Law Enforcement trade shows 150

25   PX144               PowerPoint Presentation          162
```

```
1              EXHIBITS ADMITTED THROUGH TESTIMONY:

2    NUMBER            DESCRIPTION              PAGE

3    PX146    FHN Letter to ATF 10/19/06        159

4    PX155    Invoices                          152

5    PX161    Promotional flier                 163

6    PX180    July 2005 article                 47

7    PX195    National Defense Article          54

8    PX214    July 2006 article                 48

9    PX218    Photos                            99

10   PX222    Brochure, August 2006             148

11   PX244    2006 Media Plan                   193

12

13   DX113    Small Arms Review Magazine        191

14   DX180    FedBizOpps screenshot             42

15   DX182    FNH USA Press Release             71

16   DX188    ArmyTimes article                 46

17   DX190    ArmyTimes article                 50

18   DX203    FNH Website page                  181

19   DX205    2006 FNH USA Military Catalog     215

20   DX232    2006 FNH USA Commercial Catalog   215

21

22

23

24

25
```

```
 1   Athens, Georgia
 2   Tuesday, July 21, 2015
 3   9:10 a.m.
 4                    P R O C E E D I N G S
 5        THE COURT:  Good morning.  How are you all today?
 6        COUNSEL COLLECTIVELY:  Fine, Your Honor.
 7        THE COURT:  Let's talk a little bit about how we're
 8   going to proceed here.  I think when we last talked about this
 9   trial, as a nonjury trial, the expectation was it was going to
10   take about four days.  Can you do your case in two days?
11        MR. EHRLICH:  Plaintiff, yes, Your Honor.
12        THE COURT:  Can you do yours in two days?
13        MR. EHRLICH:  Not the whole case.  Our case in chief
14   would be done in, you know --
15        MR. BELLAMY:  Yes.
16        THE COURT:  So we'll all be finished with this by
17   Friday?
18        MR. BELLAMY:  We certainly expect so.
19        THE COURT:  All right.  Very good.  All right.  Well,
20   let me just say that of course I'm familiar with the case.  And
21   in a jury trial we typically give you an opportunity to make an
22   opening statement.  I think probably what I would like, rather
23   than a full opening statement, is just have the lawyers tell me
24   what they think is truly important and what I need to look at
25   in terms of the evidence that's going to come in.  So if you
```

1  would like to do that, you can from your seat, you don't have

2  to stand up.  If you will, just give me a quick synopsis of

3  that.

4          MR. EHRLICH:  That's fine, Your Honor.  If you want I

5  will begin.  Or is there anything else that procedurally --

6          THE COURT:  Pull the microphone over closer to you.

7  We're going to talk about the guns, and we'll talk about how

8  they're going to be used.  I think probably what I would like

9  to do with them is to have them dealt with today, and then send

10  them on their way and not bring them back.  Because we have to

11  have a U.S. Marshal here if we're going to have guns.

12          So -- and then I don't know what else.  Is there

13  anything else you want to talk about?  I know you filed a

14  motion in limine, a motion to strike I guess, on what was

15  recently filed.  I am not going to look at those until you get

16  yours in, so there's no reason to do anything with that, and I

17  will give you the opportunity to amend if you want to.

18          What else?  Any other procedural matters we need to

19  talk about?

20      (No response.)

21          THE COURT:  All right.

22          MR. EHRLICH:  Thank you, Your Honor.  I thought I

23  would begin with where we left off in a way, Your Honor, and

24  that was the cross motions on the decision in the summary

25  judgment briefing.  That held that there were two questions of

1    fact that remain in this case.  First, who has the first use of

2    the mark SCAR or SCAR-Stock in commerce in the firearms

3    industry?  The second question, which this Court found was a

4    question of fact remaining for decision, was whether the mark

5    SCAR or SCAR-Stock are distinctive for firearms.

6          The uncontested facts shown in the summary judgment

7    order on Page 5 stated that SOCOM officially awarded the

8    contract to Plaintiff to produce SCAR rifle and attachments on

9    November 5, 2004.  On that same day, SOCOM ordered over

10   $634,000 of firearms and attachments from Plaintiff.  Shortly

11   thereafter the ordered weapons were shipped to Crane, Indiana,

12   inspected, and accepted by the U.S. government.

13         Then skipping down a little bit we note that

14   throughout 2005 and 2006, as noted by the Court, magazine and

15   newspaper articles tracked the development of the new assault

16   rifle for SOCOM, highlighted Plaintiff's role in the program,

17   and outlined the features and benefits of the different

18   variants and forms of the new SCAR rifle system.

19         Now let's consider just this one undisputed fact for a

20   moment, Your Honor.  Was Plaintiff's 2004 first order

21   sufficient to show use in commerce under the Lanham Act for

22   Plaintiff to obtain priority just on the basis of that single

23   order for $634,000?  That order, Your Honor, was essentially

24   larger than all of the Defendant's orders from 2006 to the

25   present, about a 9-year period.

Was that first order an interstate commerce shipment order? Absolutely, Your Honor. We have a sale in interstate commerce, a shipment in interstate commerce, distribution in interstate commerce, foreign commerce distribution from Belgium to the United States in filling the order. Any of those invokes the Interstate Commerce Clause and that of the Lanham Act for the use of our mark. And "SCAR" was, in fact, imprinted on those rifles.

Remember that in this case, Your Honor, no claim exists of any abandonment of Plaintiff's use.

Did the sale need to be also to the law enforcement or civilian? No, absolutely not, Your Honor. As we will demonstrate, Your Honor, this is the firearms industry. There are no laws. Law enforcement and civilians want as close to military-grade and military-approved products as possible. Indeed, law enforcement can even purchase fully automatic rifles, just like those used by the military.

How much difference is there between the government slash military and law enforcement anyway? Law enforcement agencies and the federal government, state government, across the board it's one market with information being spread immediately upon the success of a government product to the civilian and law enforcement markets. But even Defendant admits confusion in this case. Why, Your Honor? Because it is one industry, the firearms industry; otherwise, there would be

1    no confusion admitted in this case.

2          Finally -- excuse me, priority of use is with

3    Plaintiff even if it had no activities directed to the law

4    enforcement or civilian versions.  Confusion would still exist.

5    Confusion and trademark rights, Your Honor, go well beyond

6    products that are classically even just firearms.  For

7    instance, confusion would be for airguns, toys, toy guns, even

8    games.  That's why Plaintiff has licensed the mark based upon

9    the fame of the mark SCAR for firearms.  However, from day one,

10   Plaintiff had planned to go to the law enforcement and civilian

11   markets as will be demonstrated to this Court.

12         In fact, Plaintiff and other manufacturers do this

13   with virtually all of the small gun weapons they develop; first

14   for the military, once successful -- and successful and

15   demonstrated to work, then it goes into the civilian market and

16   law enforcement markets, Your Honor.

17         Why did it take so long for Plaintiff to introduce

18   these weapons to the law enforcement/civilian markets?  That's

19   one of the questions raised in summary judgment briefing.

20   Government product needed first to be perfected.  There were

21   four iterations or versions of that product before it was

22   perfected.  There was need for high-quality products for

23   special operations rifles to be used in extreme conditions,

24   from minus 40 below to 140 degrees above.  Fahrenheit, that is.

25   Some of the most challenging combat environments.

1          Then our production needed to be ramped up with the

2     proper tooling and proper manufacturing of items.  These again

3     are sophisticated ballistics products and just -- you know,

4     incredible specs on these things.  Government orders were

5     required to be fulfilled first by contractual obligations.

6     Even the Defendant admitted that in his getting some of the

7     product from his manufacturer, he couldn't get it because of

8     the government orders.

9          Your Honor, government approval that needed to be

10    obtained for civilian versions, it is not unusual for this

11    whole process to take years.  As noted in Page 6 of the Court's

12    summary judgment order, Plaintiff did promote the product to

13    the wider commercial market.

14         And if you could show the chart right now, that will

15    be very helpful for the -- for the Court.  The chart.  Okay.

16         Hard to read that chart from this distance, Your

17    Honor.  If you want, I'll pass it up to the Court.  If I could

18    take a moment to pass up the chart.  And we could -- you know,

19    here's one (delivering to counsel).

20         Is it all right to pass this up?

21         THE COURT:  (Nodding head in the affirmative.)

22         MR. EHRLICH:  Thank you, Your Honor.

23    (Counsel provided document to Court at 9:20 a.m.)

24         MR. EHRLICH:  I'll talk about the chart in a moment.

25    But the Court noted in its summary judgment order on Page 6,

1    the Plaintiff did promote to the wider commercial market.  In

2    2005-2006, Plaintiff promoted its SCAR rifles at trade shows

3    and during visits to gun dealers, law enforcement agencies,

4    stores and distributors.  Pretty comprehensive list, the Court

5    noted, of our efforts.

6            For example, the Court noted in February of 2006

7    Plaintiff unveiled its SCAR-Light and SCAR-Heavy prototypes

8    during the SHOT Show held in Las Vegas, Nevada, a major

9    industry trade show attended by military personnel and other

10   governmental agencies, law enforcement organizations,

11   manufacturers, distributors, retailers, sportsmen, hunters and

12   other firearms enthusiasts.  And that's what the Court noted.

13           The Plaintiff continued to promote, on Page 7 and 8,

14   the SCAR rifle to law enforcement/civilian markets.  Plaintiff

15   distributed hats, tee shirts, brochures and other marketing

16   materials bearing the SCAR mark to others in the firearms

17   industry.  Plaintiff even referenced the new SCAR rifle in its

18   2006 product catalogue and highlighted its role.

19           Your Honor, just the 2006 SHOT Show, it is the most

20   widely attended show in the firearms -- in the gun industry in

21   the world, Your Honor.  And it's not a military show.  It's

22   primarily for law enforcement and for gun dealers and that we

23   were promoting.  All of this, again, happening years -- I mean,

24   literally from 2004 to 2006, that's way before they came on the

25   market.  Okay.  I believe they came in in September with the

1    first product.

2            Then the Court notes then on March 2nd, 2006,

3    Plaintiff issued a press release entitled, "The Making of the

4    21st Century Assault Rifle:  SCAR SOF Combat Assault Rifle,"

5    announcing its plan to introduce a semi-automatic version of

6    the weapon SCAR in the next two years to law enforcement and

7    commercial markets.  Clearly we're trying to build demand, but

8    we can't even yet get the governmental approvals, we can't even

9    yet fill the government orders, specifications change, and

10   we're still building it.

11           Then the Court notes--you know, it wasn't like then we

12   stopped--Plaintiff began accepting orders for SCAR rifles for

13   law enforcement agencies in either 2007 or 2008, filled its

14   first orders to law enforcement and civilian consumers in late

15   2008.  Since that time, Plaintiff has sold nearly $100 million.

16   That's what the Court noted then.  We supplemented that, it's

17   more like $111 million of firearms, primarily to law

18   enforcement and civilian consumers.

19           Now, the question becomes, Your Honor, did it matter

20   whether Plaintiff was first to make law enforcement or civilian

21   sales of firearms when it had already achieved great military

22   success?  The answer is, Your Honor, absolutely not.

23   Plaintiff's initial sale established rights to protect the mark

24   wherever confusion could exist.  That's the trademark laws.

25   You don't even need a federal registration for that.  That's

1    common law rights, Your Honor.  Again, Defendant has stipulated

2    to confusion occurring in the firearms industry from the

3    simultaneous use of both marks indicating that it's one market

4    and that consumers in that one market would be confused by the

5    simultaneous use of both marks.

6         As this Court noted in the summary judgment order,

7    evidence suggests the U.S. military is a prominent and

8    influential consumer in the firearms industry and, therefore,

9    Plaintiff's development and sale of the SCAR rifle pursuant to

10   the USSOCOM program could be viewed as sufficiently public for

11   trademark protection purposes.

12        Indeed, witnesses testified that U.S. military orders

13   get first priority in the firearms, including Mr. Clyde, the

14   Defendant's CEO, who acknowledged that delivery of SCAR-Stock

15   from Sage was postponed because Sage has to dedicate its

16   manufacturing capacity to filling military orders first.  So

17   even the Defendant, with much smaller demand, that pales in

18   comparison to even our first order, is running into delays in

19   getting the product because his manufacturer had to meet

20   military things.

21        But it does say here, that the Plaintiff's

22   participation in it generated -- that's the SOCOM program --

23   generated publicity through numerous magazines and numerous

24   newspaper articles throughout 2005 and 2006.

25        Then if that were not enough, Your Honor, analogous

1      use occurred before Defendant could make any use.  That

2      analogous use was what we noted a moment ago and it's up on

3      that chart:  The hats, the brochures, the showing at the trade

4      show.  It wasn't sales yet in the civilian and law enforcement

5      because we didn't have product for them yet, but we're showing

6      the product and we're making it.  But now we're making it for

7      the military and we already had orders.

8            But Plaintiff's company sells a full line of firearms

9      products.  Defendant had no right to try to jump in in front of

10     Plaintiff and the Plaintiff's introduction of the law

11     enforcement and civilian versions of the products.  All of this

12     was prior -- again, prior to Defendant's first use of

13     SCAR-Stock, with Defendant disclaiming knowledge of Plaintiff's

14     use, except that Defendant does admit that they knew we won the

15     program, we were the only one winning the program, and that we

16     were -- you know, there was a SCAR product out there.

17           Let's say hypothetically, Your Honor, for a moment,

18     that Plaintiff could never bridge that gap.  Plaintiff didn't

19     even have the technology at Herstal, well over a hundred year

20     old company or so, even older than that actually, but let's say

21     we couldn't do it.  We couldn't build a product for the

22     civilian or law enforcement markets because we couldn't make a

23     semi-automatic weapon.  That wouldn't even matter, Your Honor,

24     because we would still win this case.  Why?  Because the

25     Eleventh Circuit *Planetary Motion* case holds it is the consumer

1    expectation that provides rights.  So we didn't even need

2    analogous use.  We just needed to make sales in priority.

3          And, Your Honor, the Teflon/Eflon case for zippers is

4    a case right on point.  Teflon couldn't bridge the gap yet.

5    They didn't have the technology yet to bridge the gap to make

6    zippers.  But the court enforced the Teflon mark against Eflon

7    because consumers had the expectation that Teflon had such

8    knowledge.  Or could bridge that gap.

9          Another case, one cited by this Honorable Court, one

10   of the versions or one of the cases in the series is the *Polo*

11   case.  Polo, we know, is shirts.  One of our witnesses is

12   wearing a Polo shirt.  But, in any event, Your Honor, Polo

13   decided one day -- and it had no steps in that direction prior,

14   there wasn't evidence that they had considered bridging the

15   gap.  But they were deciding maybe they will enter the high-end

16   magazine publishing industry.  And they did, and they were --

17   the rights were enforced, Your Honor, because there was a

18   consumer expectation that when someone saw a product like Polo,

19   that they could also be seeing a high-end magazine from Polo.

20         Now, Your Honor, all of this has been assuming that

21   there are trademark rights.  That the mark is either

22   distinctive or we've acquired distinctiveness.  So that brings

23   me to the second issue in this case, which the Court said in

24   its summary judgment order needed to be resolved.  And that is

25   whether Plaintiff's SCAR mark is distinctive.  Or Defendant's

1    mark SCAR-Stock is distinctive.  This would mean capable of

2    identifying the source of goods and distinguishing one

3    merchant's goods from those of another.  That's the definition

4    of a trademark.  Albeit the source can be anonymous.  Nobody --

5    who knows who makes Doritos, but everybody knows it comes from

6    a single source of origin.  They don't necessarily know it's

7    Frito-Lay then owned by Pepsico.

8            So, Your Honor, marks are either, as you correctly

9    stated in the summary judgment order, inherently distinctive or

10   they can acquire distinctiveness which is called secondary

11   meaning.  The first meaning being descriptiveness; the second

12   meaning now due to high levels of sales, advertising,

13   promotion, publicity the mark gains acquired distinctiveness,

14   and now consumers see the secondary meaning of it being source

15   identified.

16           And the primary significance of the mark is the

17   question.  Defendant's counsel argues the mark SCAR has since

18   2004 through today been merely descriptive of Plaintiff's sales

19   of its product to the military but not to the civilian market.

20   Well, then that admits Plaintiff's mark is distinctive beyond

21   the military.  That admits that the mark is inherently

22   distinctive even when used by Plaintiff.  Because he's saying

23   it's only descriptive for the military.

24           But now we say, is SCAR inherently distinctive?  And

25   the Court was right on track in the summary judgment ruling on

1    this, Your Honor.  Because SCAR has -- on Page 32, because SCAR

2    has an ordinary meaning outside the firearms industry and no

3    other competitors in the market use the mark commercially, the

4    mark could be viewed as inherently distinctive.

5         Scar is a common word in the English language,

6    signifying a mark left on the skin by the healing of injured

7    tissue.  To the extent the public viewed scar as synonymous

8    with its dictionary definition, the word would be inherently

9    distinctive because the word bears no relationship to the

10   firearm upon which it is used.  Indeed, such a connotation

11   would be creatively fitting for a firearm capable of causing

12   bodily injury.

13        Plaintiff even attempts to invoke this alternative

14   meaning of SCAR in one of its SCAR rifle advertisements by

15   including the words, "battle scars."  Because the word doubles

16   as both a mark on the skin and as an acronym for Special

17   Operation Forces Combat Assault Rifle, the public could view

18   the mark as inherently distinctive.

19        By the way, Your Honor, that's right on point again.

20   Courts have noted if something has a dual meaning, then the

21   mark is capable of being inherently distinctive.  SCAR has such

22   a dual meaning, or maybe it only has its normal English

23   language meaning to consumers because it is a word in the

24   English language.  It is not being used in those brochures with

25   periods, like acronyms would be used.  And if there is an

1    acronym meaning anyways, that would be the dual meaning.

2           Another factor, Your Honor, in favor of

3    distinctiveness, as noted by the Court in the summary judgment

4    order, is a very important factor.  No other competitors in the

5    firearms industry use it commercially.  In fact, we were the

6    only ones to make it to the round in SOCOM after everybody else

7    was eliminated in the SOCOM.  Here consumers would identify the

8    products with Plaintiff exclusively.

9           Another factor of distinctiveness, Your Honor, is

10   Defendants copied.  As it is admitted, Defendant knew of

11   Plaintiff and the SOCOM's use.  Whether he claims it was

12   trademark use, copying is the highest form of flattery and an

13   admission.  For Defendant to claim descriptiveness, Defendant

14   must show consumers look for the term, and then understand that

15   it's an acronym and not as a source identifier or as

16   distinguishing--if they do--one merchant's goods from those of

17   another.  Then it's source identifying and Plaintiff wins.

18          Yet in this case the only company making any of these

19   products under SCAR is the Plaintiff, except for the nominal

20   sales by Defendant, which in total, over 9 years, pale in

21   comparison to our very first sale in commerce in 2004.  We've

22   got 11, 12 years of use, Your Honor, and promotion.  Okay.

23          The origins of the mark itself make little difference.

24   The government and military use many acronyms for just about

25   everything and abbreviations, sometimes more than one, for --

1    for various things.  As noted, you know, the acronym varied.

2    The Court identified that in its summary judgment order.  For

3    instance, sometimes it was S period O period F period Combat

4    Assault Rifle, other times it's Special Forces Combat Assault

5    Rifle, that would be SFCAR, or sometimes it would be CAR for

6    Combat Assault Rifle.

7            As indicated within our Plaintiff's summary judgment

8    briefing, the government already had an existing acronym before

9    even the program for SCAR.  It was S period C period A period R

10   period, which was also something, Strike Coordination and

11   Reconnaissance.

12           Would the public know that the word has significance

13   beyond the usual meaning of SCAR?  And then if somehow it

14   really is an acronym, and then what would that acronym mean?

15   The Defendant is not going to be able to show that, Your Honor.

16           Even if it is an acronym, the overwhelming use by

17   Plaintiff would be by a single source's sponsorship and would

18   have allowed SCAR to gain acquired distinctiveness.  That its

19   marks are inherently distinctive or they gain acquired

20   distinctiveness.  For most descriptive marks, Your Honor, five

21   years of continuous and substantially exclusive use gains

22   trademark significance, gives rise to the presumption.  In this

23   case we have something way more than five years.  And the

24   slight use by them isn't that much.  But in this case, we have

25   $111 million in sales.  It certainly is such evidence, along

1    with the other activities, as shown by that chart, of the

2    Plaintiff over the years.  And those are just some highlights

3    of the year activity.  Minor use by Defendant, again, would

4    pale in comparison and it's not significant.

5         Finally another couple points, Your Honor, would be

6    that the government never used the acronym as a mark, in that

7    the government never used the mark.  They may have used an

8    abbreviation in some brochures, but the government never

9    marketed a product.  And the government never claimed any right

10   to the term.  They've pointed out, the government -- you know,

11   that we've dealt with the government, we're selling to the

12   military.  How could the military not know what's on the

13   product?  I mean, the government knows we're using SCAR.  The

14   government is not claiming rights in SCAR.  They never have and

15   they -- they -- they don't have trademark rights to claim

16   because they've never used it as a mark.

17        And the -- and we have -- you know, they know that

18   they -- we've got a letter from SOCOM, but they never said in

19   those put in before Your Honor -- you're familiar with it, on

20   their claim of unlawful use.  But they never complained, hey,

21   you're using our mark SCAR, or that's our mark.  Or we came up

22   with that that acronym, and now we hold rights.

23        Another doctrine comes into play, and it's very

24   interesting, Your Honor.  Defendant must have good faith use in

25   adopting and then using the mark.  If Defendant comes in

1     without good faith, then he's not going to gain any rights.

2     He's not going to jump in there and interdict or prevent

3     somebody else from acquiring rights.

4          Here Defendant admits prior knowledge of SCAR as shown

5     by Page 35 of the summary judgment order.  Clyde knew of the

6     USSOCOM program and that the rifle developed pursuant to the

7     program was known as the SCAR rifle at the time he adopted the

8     SCAR-Stock mark.  Further, Joshua Smith, Defendant's former

9     COO, testified that Defendant adopted the SCAR-Stock mark in

10    part to take commercial advantage of the popularity of the SCAR

11    rifle.

12         Also here, Your Honor, the Defendant has no

13    documentation of any trademark searching prior to adopting the

14    mark SCAR-Stock.  So you can't really say, oh, I did searches

15    and this and that, because all he had to do was go to the

16    internet.  In fact, we're going to show all he had to do was

17    look at the same magazine he's advertising in and he'd see

18    SCAR, our SCAR, before he came out on the market.  The chief

19    operating officer testified about bad faith and that the

20    Defendant was piggybacking in selecting the mark.

21         And finally of course the Defendant disclaims

22    knowledge, which I think is not believable.  He was in the

23    military.  He was at the SHOT Show in 2006.  You know, he's a

24    member of the industry.

25         You know, finally, Your Honor -- and just wrapping up

1    with one comment here -- Defendant's use is deceptive and not

2    capable of building rights.  SCAR-Stock has meaning as a

3    replacement stock for SCAR rifles.  The fact that consumers

4    would find out it is not a replacement stock for Plaintiff's

5    SCAR rifles is not an issue.  It is the perception of the mark

6    by itself, without any other materials, that decides whether a

7    mark is deceptive or deceptively misdescriptive.  So consumers

8    seeing the mark by itself, saw a SCAR-Stock, and thought,

9    without any other information, that it was a replacement stock

10   for a SCAR rifle, then the mark would either be deceptive or

11   deceptively misdescriptive.  And in either event, Defendant

12   would not be gaining rights.

13        And one final doctrine is that these are very

14   dangerous weapons.  If someone were to confuse something and

15   something were to happen, then it's like in the health

16   industry, with pharmaceuticals, there's a higher standard to

17   avoid any confusion from the senior user.  And in this instance

18   if the Defendant were permitted to do this, others could do it,

19   and then the public interests could be harmed with guns being

20   very, you know, dangerous weapons itself, Your Honor.

21        So since it is my birthday, I'd like to conclude with

22   a quote by Shakespeare.  Okay.  And it's one of my favorite

23   quotes in trademark cases, Your Honor.  And it comes from

24   Othello:

25             "A good name in man and woman, dear my lord,

1              Is the immediate jewel of their souls.

2              Who steals my purse, steals trash.  'Tis

3              something, nothing;

4              'Twas mine, 'tis his, and has been slave to

5              thousands;

6              But he that filches from me my good name

7              Robs me of that which not enriches him

8              And makes me poor indeed."

9    And in this case, I think that's -- that's -- this is apropos

10   for a number of reasons, Your Honor.  Even the Defendant, his

11   sales are so small compared to our sales, they pale in

12   comparison.  And it's --

13             THE COURT:  One of my favorite Shakespeare quotes that

14   is apropos to this case is, "Brevity is the soul of wit."

15             MR. EHRLICH:  And that was Shakespeare, not me, that

16   quote.

17             THE COURT:  Go ahead.

18             MR. BELLAMY:  Thank you, Your Honor.  This is a case

19   about priority of rights, as you know, and whether and--more

20   importantly--when the parties' respective marks became

21   distinctive and recognized by consumers as a trademark, not as

22   a descriptor.  This is not a summary judgment case.  And the

23   recitation of background facts in the summary judgment decision

24   were not the findings; they were construed in favor of the

25   nonmoving party and are not evidence in this case.

1              The timing of events is very important here, and so as

2        Plaintiff outlined, a timeline is a good way to look at it.

3        And the evidence will fall into three general categories.  The

4        first one is that that relates to SOCOM's program, the SOF

5        Combat Assault Rifle Program, that they abbreviated as SCAR.

6        It seems to have started somewhere in 2000-2003, but the idea

7        was to have multiple vendors submit proposals for this weapon

8        system that SOCOM had designed.  Whoever won that would then

9        build SOCOM's SCAR rifle for them.

10             In a solicitation synopsis it spelled out what SOF

11       Combat Assault Rifle was.  It created the -- it used the

12       abbreviation SCAR, the SCAR-Light, SCAR-L, SCAR-Heavy, SCAR-H

13       and so forth.  The solicitation was released, and there will be

14       evidence that media reports on the solicitation, before any

15       entries had been made, were referring to the Special Operations

16       Forces Combat Assault Rifle saying, "The SCAR," as it already

17       has become known -- already became known before any of the

18       competitors had -- had won a contract.

19            FN submitted three prototype weapons as did other

20       manufacturers.  Colt had a SCAR rifle and others did as well.

21       And in November of '04, FN was awarded a purchase order.  That

22       was not delivery of a product.  It was a -- it was a purchase

23       order.  It totaled $634,000.  Of that, about $281,000 related

24       to SCAR rifles.  There were 20 rifles total in that order.

25       There were -- there were 19 SCAR-L rifles at $13,500 each.

1    There was one SCAR-H advanced concept demonstrator at $25,000.

2    There were 6 tool kits at 800-and-some dollars each.  There

3    were 12 grenade launchers, some of those were at $6,000 each,

4    some at $20,000 each.  There were stand-alone butt stocks for

5    those grenade launchers that were $3,000 each.

6            So that contract was not for SCAR branded products; it

7    was for SOCOM's SCAR rifle program, and it was a development

8    contract.  Those are not retail prices, those are development

9    prices.

10           There will be some evidence that soon after it got the

11   award, that FN ordered a couple hundred hats and shirts with

12   "SCAR" on them, and that that same piece of evidence will show

13   that it came out of their military budget.

14           As things moved along, there was media coverage of how

15   the program was progressing.  We saw then in 2006 that FN

16   displayed two prototype rifles, and they said in their press

17   release that the prototypes on display are the military

18   prototypes, prior to even the most current updates, based on

19   the testing that was going on.  In the military catalogue there

20   was a message from the director of military operations that

21   said:  We're proud to announce that SOCOM awarded the contract

22   for the Special Combat Assault Rifle, and then pointed out the

23   abbreviation SCAR.  There were no SCAR products shown in that

24   catalogue.

25           The law enforcement/commercial catalogue for 2006 had

1    no mention of SCAR whatsoever.  There was a press release

2    immediately following -- well, about a month following SHOT

3    Show 2006 entitled, "The Making of the 21st Century Assault

4    Rifle," and it told the readers that SCAR was an abbreviation

5    for SOF Combat Assault Rifle.  The descriptive term had an

6    abbreviation that was used in conjunction with it, together.

7            What they said about future availability to law

8    enforcement and civilian market was not that it would be

9    available in two years, but that it potentially may be

10   available in the next two years.

11           They had a brochure, and each of their brochures and

12   each of their advertisements to the military market at that

13   time reinforced that SCAR was an abbreviation for a descriptive

14   term that was consistently used to get SCAR SOF Combat Assault

15   Rifle.  In September of '06 there was an article in *Small Arms*

16   *Review* about the Colt SCAR weapons.  There was interest in the

17   other entries.  In October there was a second article about the

18   Colt -- yeah, the Colt SCAR rifles.

19           The 2007 military catalogue still was simply saying

20   that they expected to begin to fulfill the low rate initial

21   production portion of the SCAR/SOF Combat Assault Rifle, again

22   using it in a descriptive way.

23           The program continued and -- to develop over the years

24   for the military until eventually it was scaled back somewhat

25   from what the initial expectations were.  But such as it was,

1    they had sold this product to the military, SOCOM's SOF Combat

2    Assault Rifle Program.

3            The second group of evidence relates to Clyde Armory's

4    use.  And it's really not in dispute when they started using

5    this.  Their first sales were in September of 2006, and they

6    sold product that had the mark marked on it, and there were

7    activities leading up to that.  There were meetings between

8    Clyde Armory and Sage, there were prototypes provided, all

9    within a matter of a few months.  There were ads placed.  There

10   were other components for this product that were ordered.

11           Clyde Armory had committed to buy a thousand of these

12   units.  And to back up that commitment, he started advertising

13   even before they had them ready, a couple of months before they

14   were ready, but expecting they would be available on time.  He

15   ordered adjustable length butt stocks which were a second

16   component to this unit from what came from Sage.  And on that

17   butt stock, it was specially engraved, "SCAR-CQB."  He ordered

18   a thousand of those and received them right away.

19           He ordered a thousand hand grips, that was the third

20   component, that goes together and be assembled by Clyde Armory

21   to make this whole product.  Even those -- though some of those

22   things may be considered a shipment of marked goods in

23   commerce, even though they may be analogous use because there

24   was discussion among potential customers, we're standing on the

25   September, 2006, as a first actual use in commerce date,

 1    priority date.

 2            For SHOT Show 2000 -- so sales continued steadily,

 3    right away.  The shipments were received in September and

 4    shipped out to customers.  The first sale was for 10 units.

 5    Other sales followed along that same day and thereafter.

 6    Promotional materials were printed and distributed.  At SHOT

 7    Show 2007, it was exhibited in two different booths, the Sage

 8    booth and the Ruger booth, because this was a product used with

 9    Ruger rifles.  And brochures were distributed at that show, as

10    well.

11            The third category of evidence is that where FN begins

12    to act like this is a trademark and they begin using it in a

13    commercial way.  Their first actual sale was in very late 2008.

14    But they had sold -- or they had filed a registration

15    application in Europe in November of '07, so according to

16    international law, they get the benefit of that priority date.

17    But that's still not early enough to get behind the September,

18    2006, so they have to rely on use analogous to use.

19            And we look, then, at what were they doing ramping up

20    to that sale or that priority date.  But there's a gap between

21    when the SOCOM program, their use if you will, of the mark --

22    of the term that was not a mark, but was a descriptive term

23    with SOCOM, when did that become used as a trademark.  And so

24    that gap in between is where FN carries the burden of proving

25    when did the descriptive term gain distinctiveness and can they

1    prove that it was before the September, 2006.  That's their

2    burden by clear and convincing evidence.

3            The evidence will fall into those categories, and we

4    will be pointing out certain things as being before September,

5    2006 and other evidence that was after September, 2006.  For

6    example, that "battle scar" ad that was just mentioned was

7    after September of 2006.  So whatever distinctiveness it was

8    creating in the minds of the public, it was too late, it was

9    already after Clyde Armory's first actual use in commerce.

10            Of course the government's not claiming trademark

11   rights.  It's a descriptive term to SOCOM.  And when they order

12   a product by its descriptive term, that's what they expect to

13   get.

14            So in the end, the question is, priority of rights,

15   can FN carry its burden by clear and convincing evidence to

16   show that this use analogous to use in a commercial sense, when

17   did they start acting like it was a trademark as opposed to a

18   descriptive term, where they were -- kept telling everyone

19   every time they used it that this is an abbreviation for the

20   descriptive term?  When did they stop doing that and start

21   treating it like a trademark?  And the evidence is going to

22   show that it was not until after September, 2006.

23            THE COURT:  All right.  Very good.

24            MR. BELLAMY:  Thank you.

25            THE COURT:  I would like to have you identify

```
 1    yourselves for the court reporter, so we'll start over here
 2    with Mr. Ehrlich.
 3              MR. EHRLICH:  I'm Burt Ehrlich.
 4              MR. HOOKER:  Charles Hooker, Your Honor.
 5              MS. ANDES:  Phyllis Andes.
 6              MR. EHRLICH:  She's counsel for the corporation, Your
 7    Honor.  In-house counsel.
 8              MR. HOOKER:  We have with us Nita Gray here.
 9              MS. DEAL:  Jennifer Deal.
10              MR. UMANSKY:  Boris Umansky.
11              MR. EHRLICH:  Do you want the witnesses to introduce
12    themselves?
13              THE COURT:  When we finish, that's what we're going to
14    find out, to see if we need to sequester the witnesses.
15              MR. BELLAMY:  My name is Glenn Bellamy for the
16    Defendant, Clyde Armory.
17              MR. LINDEN:  Your Honor, I'm Paul Linden for the
18    Defendant.
19              MR. DANIEL:  Michael Daniel, Your Honor, for the
20    Defendant.
21              MR. CLYDE:  I'm Andrew Clyde, Your Honor, the
22    Defendant.
23              THE COURT:  Do we need to sequester the witnesses?
24    Makes no difference to me.  They may stay in here.
25              MR. BELLAMY:  I see no reason to.
```

1          THE COURT:  Okay.

2          MR. EHRLICH:  We -- we concur, Your Honor.

3          THE COURT:  Okay.  So they can just stay in here,

4     that's fine.  All right.  Are we ready to proceed?

5          MR. EHRLICH:  Your Honor, a procedural point, is

6     the -- we have exhibits where there's no objection to those

7     exhibits, and maybe we should at this point just read out the

8     numbers and then can we move to admit them since there's no

9     objection to them, Your Honor.

10          MR. BELLAMY:  Your Honor, there are a considerable

11     number of exhibits to which we have no substantive objection,

12     but they are subject to some sort of foundation.  Because we

13     don't even know what they are.  We're not saying that they are

14     not authentic, it's just they don't speak for themselves as to

15     what they are.  So it seems inappropriate to do this without

16     having a witness first say what this is and what this has to do

17     with the case, to simply admit all of these exhibits *en masse*.

18          MR. EHRLICH:  Your Honor, if I may respond, these are

19     not any of the -- not any of the exhibits where he made a

20     foundation objection.  These are exhibits where there is no

21     foundation objection.  Some of them are, like, certified copies

22     of a federal registration.  I mean, you know, they are just --

23     they're just -- it would take an unduly amount of time to just

24     talk about -- you know, and then start moving all the time.

25          Everybody has had the chance, both sides, for an

```
 1   extended period now to make any objections.  We've identified,

 2   and he has identified, too, Your Honor, where there's no

 3   objection to the exhibit at all.  Not even a foundation

 4   objection.  And we'd simply -- to expedite things and move it

 5   along, we'd simply want to admit those exhibits right now so,

 6   you know, we can spend as little or as much time on witnesses

 7   and you can cross witnesses with whatever you want.  But it

 8   will just take a far less time; otherwise, we're talking about

 9   every single exhibit, and, you know, with laying foundations

10   and that sort of thing.

11        THE COURT:  Well, there should be some way to simplify

12   this.  I don't know -- how many exhibits are you talking about?

13        MR. EHRLICH:  We're talking about, Your Honor,

14   maybe -- it looks like on the first page maybe -- it looks like

15   the joint exhibits, there's 20 of them that we think pretty

16   much -- well, we both have agreed to the joint exhibits, and on

17   the others maybe 22 exhibits, so maybe 30 exhibits.

18        THE COURT:  Well, joint exhibits are joint.  I mean,

19   that means that they are admitted.  You are not complaining

20   about those; are you?

21        MR. BELLAMY:  Well, Your Honor, some of those are

22   deposition transcripts that were for the purpose of impeachment

23   only.

24        THE COURT:  Right.

25        MR. BELLAMY:  So with that caveat, those should not be
```

```
 1   admitted other than for impeachment purposes.
 2           THE COURT:  Well, what else?  I mean -- and in this
 3   court a joint exhibit means it comes in.
 4           MR. BELLAMY:  That's fine.
 5           THE COURT:  It may have some restriction on purpose,
 6   but it comes in.  So I don't understand.
 7           MR. BELLAMY:  That's fine, Your Honor.  And as to the
 8   things where there was no objection at all, that's fine as
 9   well.  It seems odd to do it at the front end, but we certainly
10   can, if he wants to read through.
11           MR. EHRLICH:  I could read the list, I have it right
12   here.
13           THE COURT:  Read it.
14           MR. EHRLICH:  Okay.  P-006, P-7, P-9, P-18, P-116,
15   P-117, P-118, P-123, 124, 151, 154, 168, 169, 170, 197, 198,
16   204 through 207, 212, 217, 219, 220, 221, 224, 225, 226, 233,
17   234, 235.
18           THE COURT:  Slow down.
19           MR. EHRLICH:  And then that's it, Your Honor.
20           THE COURT:  Slow down so she can get the numbers.
21           COURTROOM DEPUTY:  33?  34?
22           MR. EHRLICH:  Oh, I'm sorry, there's one?  Oh, on the
23   next page there's some where he had no chance to object yet.
24   Oh, there's one more at the top of the page, P-238.  Oh, I'm
25   sorry.
```

```
1              COURTROOM DEPUTY:  25?  26?

2              THE COURT:  Start over with 25.

3              COURTROOM DEPUTY:  Start with 25.

4              MR. EHRLICH:  226, 233, 234, 235 and 238.

5              MR. BELLAMY:  Your Honor, with respect to those last

6     four, I think these are videos to which we had expressed an

7     objection to three of those four.  It seemed like one of those

8     was an appropriate one and the others were not.  On the list, I

9     can't tell which is which.  Here.  So perhaps that's something

10    that we need to look at.  I don't know whether -- when they

11    intended to present those or just submit them electronically.

12             THE COURT:  No, this is a nonjury trial and that makes

13    this case much more flexible in terms of how we deal with the

14    evidence.  Quite a bit more informality, as far as I'm

15    concerned anyway, about that, and we're just trying to move

16    this along.  And, I mean, I'm in the dark here about whether

17    these are joint exhibits or not.  If they are joint exhibits,

18    they need to come in without any further discussion.

19             MR. BELLAMY:  Those are not joint exhibits, Your

20    Honor.  Those were Plaintiff's exhibits.

21             THE COURT:  All right.  Well, let's just move forward

22    and we'll bring those up at the appropriate time.  And I'll

23    deal with them.  Do you want to call your first witness?

24             MR. HOOKER:  Yes, Your Honor, Frank Spaniel.

25             COURTROOM DEPUTY:  Raise your right hand, please.  Do
```

1    you solemnly swear that your testimony in this case will be the

2    truth, the whole truth, and nothing but the truth, so help you,

3    God?

4                THE WITNESS:  I do.

5                COURTROOM DEPUTY:  State your full name, please.

6                THE WITNESS:  Frank Spaniel.

7                COURTROOM DEPUTY:  Spell your last name.

8                THE WITNESS:  S-p-a-n-i-e-l.

9                COURTROOM DEPUTY:  Thank you.

10               THE COURT:  Let me caution the lawyers to stay close

11   to the microphones.  If you want to be seated, that's fine.  If

12   you're standing over there, the acoustics in this room are not

13   the greatest, and we just need to be careful so the Court can

14   always hear you.

15               FRANK SPANIEL, CALLED BY PLAINTIFF, WAS SWORN:

16                         DIRECT EXAMINATION

17   BY MR. HOOKER:

18   Q.  Good morning, Mr. Spaniel.  Will you please introduce

19   yourself to the Court.

20   A.  As I said, my name is Frank Spaniel.  I am the assistant

21   vice president of -- for research and development at FN

22   America, formerly known up to about a year ago as FN

23   Manufacturing.  We're a wholly-owned subsidiary of FN Herstal

24   located in Herstal, Belgium.  We're all part of what's called

25   the Herstal Group, which includes the entities I mentioned,

1    plus Browning and Winchester brands, development, manufacture,

2    sales, marketing, both in the U.S. and internationally.

3    Q.  And where do you work at FN America?

4    A.  Oh, Columbia, South Carolina, is our plant.

5    Q.  And what's your current position there?

6    A.  As I said, assistant vice president of research and

7    development.

8    Q.  And how long have you been in that role?

9    A.  Three years.  First as director and then as assistant vice

10   president.  They are essentially the same duties.  That has

11   been the last three years.

12   Q.  And how long have you been at FN America or what was

13   formerly FN Manufacturing?

14   A.  Seventeen and a half years in total.

15   Q.  And before you were assistant vice president of research

16   and development, what roles did you have at the company?

17   A.  I came in as an engineer, project engineer, doing

18   development, testing.  And then became an engineering manager

19   around 2005 time frame.  And then 2009 became chief engineer,

20   which then I was responsible for the day-to-day operations of

21   the department, reporting to the vice president of operations

22   at the time.  And then on to director and assistant vice

23   president.

24   Q.  And if you could, just briefly for the Court describe what

25   your responsibilities were in each of those roles.

1    A.  Okay.  As an engineer, I was responsible for new product

2    development, for supporting products in production.  You know,

3    those things that come up from time to time that need the

4    engineer's help as we're manufacturing weapons.

5       When I became the engineering manager, my main role was

6    really the SCAR program.  I -- I came in to the SCAR program in

7    the spring of 2005 and worked pretty much exclusively on that

8    program through 2009.  When I became the chief engineer, then

9    my role changed of course, because I had responsibilities

10   throughout the department and it's continued in that way since.

11   Q.  Okay.  Just to round out your background, where were you

12   employed before you were at FN America?

13   A.  I worked for AEA Technology, an engineering consulting firm

14   in Pittsburgh, Pennsylvania.  I was there for 18 years before I

15   came to FN Manufacturing at the time.

16   Q.  And before that, just briefly, what were your degrees in?

17   A.  I have a bachelor of science in mechanical engineering from

18   Carnegie Mellon University in Pittsburgh and a master's in

19   mechanical engineering also from Carnegie Mellon.

20   Q.  Okay.  So turning back to your work at FN America, what

21   involvement have you had with the development of the SCAR

22   rifle?

23   A.  As I said, starting in the spring of 2005, the research and

24   development group at Herstal, Belgium, tapped us or asked us

25   for assistance to develop the SCAR rifle.  Each caliber variant

1    of it has three barrel lengths, and the first two had been

2    developed.  The third one, the longest barrel, had not yet been

3    developed.  So we were asked as -- our primary focus initially

4    was on that long barrel development.

5              We were also tasked with sourcing accessories for the

6    SCAR rifle in the US.  Items that, you know, the end user would

7    be familiar with, used to using, you know, that would be

8    compatible with this new assault rifle.

9    Q.  And when did FN first begin working on the SCAR rifle?

10   A.  Well, FN back -- at least when the sources sought came out

11   in January, 2003.  Typically with the sources sought, you've

12   got some industry intel, even before then, that they probably

13   knew a bit about what was coming and likely were working on it.

14   But for sure once the sources sought hit the street on through

15   the formal solicitation, they would have been working on that

16   development.

17   Q.  And in your role at FN America, did you work closely with

18   folks at FN Herstal in Belgium and with folks at FN USA?

19   A.  Yes, very closely.  With FN USA, we had call weeks where we

20   worked together on the development of the long barrel that I

21   mentioned on the accessory procurement.  Also extremely close

22   with the R & D department in Herstal, Belgium, as they were the

23   leaders of the program and they more or less directed our

24   activities.

25   Q.  So just to back up for a minute, can you explain briefly

1    for the Court exactly what the SCAR weapon is.

2    A.   Okay.  It was a concept that, you know, those combat

3    developers, program personnel, operators got together and

4    decided on what capabilities they wanted.  This weapon system

5    was to be modular, versatile, in two different calibers, a 5.56

6    millimeter and a 7.62 millimeter.

7         And it was intended to replace five different weapon

8    systems, actually six, that they were currently using:  The M4

9    carbine, which was their main assault rifle; the Mark 18, which

10   was a short barrel, close quarter combat rifle; the Mark 12,

11   which was more of a longer range rifle in 5.56; the Mark 11,

12   which was a sniper rifle; and the M14 rifle, that's been around

13   for a number of years; and the sixth that I mentioned was also

14   a 40-millimeter grenade launcher that attaches to some or all

15   of these weapons.  They were replacing that, also.

16         So -- and the concept was the SCAR-Light, the

17   SCAR-Heavy, the 5.56, 7.62, ergonomically, all the controls,

18   the feel of the weapon, the recoil of the weapon when you fire

19   it is very similar.  That was deemed as an advantage, replacing

20   these dissimilar weapons, that they are all a little bit

21   different how you charge them, where the safety was, how the

22   safety operated, how you selected to put it on fire or

23   full-auto if it had that capability.

24         So that was the concept of the SCAR program, was

25   commonality.  They were also looking for improved barrel life,

```
 1   weapon life, improved reliability.  And, again, you know, an
 2   upgrade to ergonomics of the system and the commonality of the
 3   ergonomics.  Those are the main points that come to mind.
 4   Q.  Okay.  Thank you.  You mentioned earlier the sources sought
 5   notice.  I'd like to show you what's previously been marked as
 6   Defendant's Exhibit 180.  You have it there in your binder.
 7   A.  Hang on a sec.
 8   Q.  It's on the screen for you now.
 9   A.  Oh, okay.
10   Q.  Do you recognize that document?
11   A.  Yes.  Yeah, FedBizOpps is an internet site where the
12   government does post these opportunities and sources sought for
13   the SCAR rifle.
14   Q.  And do you review this website and this document in
15   particular as part of your job?
16   A.  Yes, I do.
17   Q.  I would like to direct you to the top left corner, have you
18   just tell me what the date is there.  Under "Original
19   Synopsis."
20   A.  October 15, 2003, 12:00 a.m.
21   Q.  And is this a true and accurate copy of this document?
22   A.  As far as I can tell, this is exactly what sources sought
23   notices look like.
24            MR. HOOKER:  Your Honor, I would like to move to admit
25   this exhibit.
```

1              MR. LINDEN:  No objection.

2              THE COURT:  Admitted.

3         (Defendant's Exhibit 180 was admitted into evidence at

4    10:10 a.m.)

5    BY MR. HOOKER:

6    Q.  Now, you testified earlier that there was a date as early

7    as January, 2003, for the sources sought notice.  Is that

8    right?

9    A.  Yes, I did.  Well -- yes.

10   Q.  Briefly for the Court, what is USSOCOM?

11   A.  That's United States Special Operations Command.  It is the

12   Special Forces, as we know them typically.  The elite groups of

13   the Army, Navy, Air Force and Marines.  So that would be Navy

14   SEALs, Army Special Forces, Air Force AFSOC, and Marines

15   MARSOC.  Those are the main commands of the USSOCOM.

16   Q.  I would like to show you what's been previously marked and

17   as I understand it admitted now as Joint Exhibit 19.

18   A.  Okay.

19   Q.  What is this document?

20   A.  That's a solicitation that outlines the requirements of the

21   program.  This is dated date of issue, 23 January of 2004.  So

22   this would have been a document that actually kicked off the

23   formal competition for the SCAR rifle.

24   Q.  And pursuant to this document, did FN deliver machine guns

25   to USSOCOM?

1   A.  "Pursuant," you mean because of this?

2   Q.  Right.

3   A.  Yes.

4   Q.  Right.  As part of the competition?

5   A.  Yes.  This document would have outlined what you have to do

6   to be part of the competition, which typically includes written

7   proposals and hardware, weapons, for -- to demonstrate that you

8   can meet the requirements set forth.

9   Q.  And were those guns marked with S-C-A-R, SCAR?

10  A.  Yes, they were marked SCAR dash L, SCAR dash H.

11  Q.  Now, did other firearms manufacturers participate in this

12  competition?

13  A.  Yes, there were six others:  Colt Manufacturing, Diemaco,

14  Cobb, Robinson Arms, Lewis Machine & Tool, and Knights

15  Armament, I believe were the other six competitors.

16  Q.  Do you recall media coverage, the press at this

17  competition?

18  A.  Yes, for sure there was an extreme amount of press covering

19  the different entries.

20  Q.  And can you give some examples of some of the publications

21  that were covering it.

22  A.  Sure.  *Small Arms Review* was a publication that I actually

23  read monthly.  There were others like *National Defense*,

24  *Guns & Ammo*, *Special Weapons for Military and Police*.  There

25  was many.  Those I'm familiar with.  *Shot Business*, *Shooting*

1    *Industry* are a couple others.

2    Q.  Can you describe the readership or who -- who all reads

3    those publications?

4    A.  Oh, they are widely read.  Definitely with those in the

5    industry.  We typically have a large array of these magazines,

6    you know, available in our department for the engineers to

7    read.  The general public, firearm enthusiasts all read these

8    magazines.  They are all available at your regular newsstands

9    and book stores.

10   Q.  Would you often find them for sale in gun shops?

11   A.  I would expect so, yes.

12   Q.  Now, how did the competition that was started by Joint

13   Exhibit 19, how did that competition end?

14   A.  It ended with award to FN Herstal for the SCAR rifle in the

15   end of 2004.

16   Q.  And when that award issued at the end of 2004, do you

17   remember seeing media coverage of that?

18   A.  Oh, yes.  That was big news.  Everybody was anticipating

19   who would win that award.  It was -- you know, there hadn't

20   been an assault rifle program with an award for 40 years or so,

21   from the -- you know, when the M16 was first adopted.

22   Q.  I would like to show you what's been previously marked as

23   Defendant's Exhibit 188.

24   A.  Okay.

25   Q.  And what is that document?

1    A.  This is an *ArmyTimes* article dated November 12, 2004.

2    "Army Special Operations Troops to Get New Rifle."  That's the

3    title of it.  And it talks about special operators will soon

4    take a new rifle to battle.  So this was announcing that FN had

5    been selected.

6    Q.  Who was Paul Evancoe?

7    A.  Paul Evancoe was our director of military operations at the

8    time, kind of our elite guy in this program at this time.

9    Q.  Now, do you remember when this article came out?

10   A.  Oh, yes, yes, definitely.

11   Q.  You read it when it came out?

12   A.  Yes.

13   Q.  If you will, look down in the fifth paragraph, there's a

14   reference to indefinite delivery/indefinite quantity.  What is

15   that?

16   A.  That's the way the government -- or the military runs our

17   contracts now.  We call them ID/IQ.  That means you have a

18   contract that has a certain value amount, and they will give

19   you an upper limit of how many weapons they may order under

20   that contract.  But you don't immediately fill those orders.

21   They will do delivery orders against that contract as the years

22   go by.

23      And typically ID/IQs today are about 5-year programs, so

24   anywhere within that 5 years -- they could wait until the last

25   day of that 5-year period and order the entire quantity that

1    that contract would cover or they could split it up and order

2    smaller amounts, you know, throughout that 5-year period.  And

3    I believe the SCAR contract ended up being an 8-year ID/IQ.

4          MR. HOOKER:  Your Honor, I would like to move to admit

5    Defendant's Exhibit 188.

6          MR. LINDEN:  No objection.

7          THE COURT:  Admitted.

8       (Defendant's Exhibit 188 was admitted into evidence at

9    10:17 a.m.)

10   BY MR. HOOKER:

11   Q.  Mr. Spaniel, I would like to show you what's previously

12   been marked as Plaintiff's Exhibit 180.

13   A.  Okay.

14   Q.  Do you recognize that document?

15   A.  Yes.  That's the cover of *Small Arms Review*.  That's the

16   magazine in particular that I mentioned that I read monthly

17   over quite a few years.  And on there it's talking about FN

18   SCAR-Light and the first detailed look.  That's a major -- a

19   major point they want to make, that they are going to be the

20   first to tell us the details about what a SCAR-Light really is.

21   Q.  And what's the date of this article?

22   A.  This issue is July, 2005.

23   Q.  Do you remember reading this when it came out?

24   A.  Definitely.  Yes.

25          MR. HOOKER:  Your Honor, I would like to move to admit

1   Plaintiff's Exhibit 180.

2           MR. LINDEN:  No objection.

3           THE COURT:  Admitted.

4      (Plaintiff's Exhibit 180 was admitted into evidence at

5   10:18 a.m.)

6           THE COURT:  I don't have this on my screen.

7           MR. HOOKER:  Yes, we're having some difficulty.

8   Ms. Gray is working on it.  I believe you have it in your

9   binder there if you would like to look at it.

10          THE COURT:  Thank you.

11          MR. HOOKER:  Sorry about that.

12          THE COURT:  What was the number again, please?

13          MR. HOOKER:  That was Plaintiff's Exhibit 180.

14          THE COURT:  I see it.

15  BY MR. HOOKER:

16  Q.  Mr. Spaniel, I would like to show you what's been

17  previously marked as Plaintiff's Exhibit 214.  And what is

18  that?

19  A.  That's the cover of a magazine called *Guns & Ammo Combat*

20  *Arms*.  It's a -- under the name *Combat Arms, Military - Law*

21  *Enforcement - Home Defense*.  So it's a magazine geared to folks

22  with those interests.

23  Q.  And does this article talk about the FN SCAR weapon?

24  A.  I don't see it under cover, but I guess flipping in, yes.

25  The SCAR weapon is featured in an article.  "Replacing the

1    M16," is the title of the article.  This appears to be going

2    through some of the popular weapons other than the FN SCAR

3    rifle at the time.  And I believe they were speculating -- you

4    know, the SCAR rifle was SOCOM, and I believe this article is

5    discussing a potential similar move by the Army overall to

6    replace the M16 with one of these newer rifle systems.

7            THE COURT:  Excuse me, just let me ask a question.

8    P-180, first page we're talking about, is that the SCAR rifle

9    that's shown on the first page?  Or is that --

10            THE WITNESS:  Difficult to tell in this picture.

11            THE COURT:  Okay.  That's fine.  All right.

12            THE WITNESS:  It may be, you know, the Yugoslav AKM

13    that's also listed on the cover.  But, yes, everything is just

14    black and melted together, so it's difficult to say.

15    BY MR. HOOKER:

16    Q.  And what's the date of this publication?

17    A.  Of the *Guns & Ammo Combat Arms* is dated July 4, 2006.

18    Q.  And do you remember seeing this article when it came out?

19    A.  Yes, I do.

20            MR. HOOKER:  Your Honor, I would like to move to admit

21    Plaintiff's Exhibit 214.

22            MR. LINDEN:  No objection.

23            THE COURT:  Admitted.

24        (Plaintiff's Exhibit 214 was admitted into evidence at

25    10:20 a.m.)

 1   BY MR. HOOKER:

 2   Q.  Mr. Spaniel, I would like to show you what's previously

 3   been marked as Defendant's Exhibit 190.  Can you identify that

 4   for the Court, please.

 5   A.  That's another *ArmyTimes* article, dated July 21, 2006, and

 6   titled, "Congressmen Shoot New Special Operations Weapon."  I

 7   do remember the buzz within the company when -- when that event

 8   was being planned and executed.  That was a big deal.

 9   Q.  And the date on this article?

10   A.  It was July 21, 2006.

11   Q.  If you will, go down to the fourth paragraph beginning, "FN

12   Manufacturing...," if you could just read that for the Court,

13   please.

14   A.       "FN Manufacturing, located in South Carolina,

15             will produce the SCAR system, and is

16             scheduled to begin delivering the first of

17             1,800 SCAR systems to USSOCOM in January."

18   Q.  Is that a true statement?

19   A.  Not 100 percent, because the SCAR weapon was produced in

20   Belgium at FN Herstal.

21   Q.  Okay.

22   A.  But other than that, as FN, that's a true statement.

23   Q.  Otherwise, it's a true statement?

24   A.  Yes.

25             MR. HOOKER:  Your Honor, I would like to move to admit

1    Defendant's Exhibit 190.

2              MR. LINDEN:  No objection.

3              THE COURT:  Admitted.

4        (Defendant's Exhibit 190 was admitted into evidence at

5    10:22 a.m.)

6    BY MR. HOOKER:

7    Q.  Mr. Spaniel, I would like to show you what's previously

8    been marked as Plaintiff's Exhibit 42.  And if you could

9    identify that for the Court, please.

10   A.  This is a *DefenseNews* article, and it's, "Extra Funds To

11   Refine U.S. SpecOps' Future Rifle," the title -- subtitle,

12   "Weapon Offers Modular, Adjustable Features."  Again, this is

13   an article talking about the features of the SCAR rifle.

14        And it starts out as Congress earmarking $2 million to help

15   refine the rifle in the future.  This is in October 9, 2006.

16   And that's -- you know, that's kind of typical in these

17   programs.

18        You know, I've worked in another program earlier in my

19   career taking one of our machine guns and tailoring it to the

20   needs of the Special Operations, in particular Navy SEALs, and,

21   you know, you work together with them to refine the weapon over

22   the program.  You know, you submit an initial weapon that meets

23   their specification and requirements.  Once the operators

24   actually get it in their hand, you know, one thing is thinking

25   about what it is you want, the other is holding it and shooting

1    it, running through drills with it, and then they ask for

2    refinements.  And I believe that's part of what this article is

3    talking about, when it says, "extra funds to refine."

4    Q.  And over on the right-hand column there's a header that

5    reads, "Emphasis on Commonality."  What is that referring to?

6    A.  That's what I talked about early on, that you have a 7.62

7    and a 5.56 caliber version of the rifle that, you know, it's

8    very difficult to tell one from another unless you're really

9    astute on firearms.

10       And that gives the operator the ability to have both of

11   those capabilities.  You know, the 7.62 will reach out to a

12   longer range and be effective at that range.  5.56 gives you

13   the advantage of a little lighter, the ammunition is lighter.

14   So depending on what mission set they have as to which type of

15   rifle and ammunition they want to deploy, and this gives them

16   the ability to have familiarity with a common platform for all

17   their different mission sets.

18   Q.  You mentioned the 7.62 and the 5.56.  Are there trademarks

19   that FN uses in conjunction with those different rifles?

20            MR. LINDEN:  Objection.  Legal conclusion.

21   BY MR. HOOKER:

22   Q.  Are there --

23            THE COURT:  Overruled.

24   BY MR. HOOKER:

25   Q.  You may answer.

1    A.  The 5.56 version, we use SCAR 16/SCAR 16S names; and the

2    7.62, SCAR 17 and SCAR 17S.

3           MR. HOOKER:  Your Honor, I would like to move to admit

4    Plaintiff's Exhibit 42.

5           MR. LINDEN:  No objection.

6           THE COURT:  Admitted.

7      (Plaintiff's Exhibit 42 was admitted into evidence at

8    10:25 a.m.)

9           THE COURT:  Why don't we take a break now.  We'll take

10   about a 15-minute break and come back.

11     (Court in recess from 10:25 to 10:38 a.m.)

12          MR. HOOKER:  I believe we left off, Your Honor, having

13   just moved to admit Plaintiff's Exhibit 42, and Ms. Purvis is

14   asking me to slow down a little bit for her so we make sure we

15   are getting an accurate record of everything.

16          THE COURT:  Okay.

17   BY MR. HOOKER:

18   Q.  Mr. Spaniel, I would like to show you what's previously

19   been marked as Plaintiff's Exhibit 195.

20   A.  Okay.

21   Q.  And do you recognize this document?

22   A.  Yes, I do.  I recall seeing this *Guns & Ammo Combat Arms*

23   titled, "SCAR Power, FN USA, A Gun for Every Mission."  And it

24   shows two variants of the SCAR rifle on there.  One is an FN

25   SCAR-Heavy, .308.  That's the -- what I -- 7.62 is the military

1    cartridge for that.  And the FN SCAR-Light CQC, close quarter

2    combat, short-barreled 5.56 bearing.

3    Q.  Now, are you looking at the --

4    A.  I'm sorry, I'm looking at 113.

5    Q.  That's all right.

6    A.  It flipped right by, the tabs are on top of each other.

7    Q.  That's okay.  We are on Plaintiff's 195, and it should be

8    on your screen as well.

9    A.  Yes, yes.

10   Q.  Do you recognize this article?

11   A.  Yes.  This is a *National Defense* article, about the --

12   about the SCAR rifle.

13   Q.  What's the date on that?

14   A.  The date here is July, 2005.

15   Q.  And do you remember seeing this when it came out?

16   A.  Yes, I do.

17   Q.  Now, who reads *National Defense*?

18   A.  Industry folks.  *National Defense*, when you attend an

19   industry and government forum, NDIA, small arms forum, this

20   magazine is tied to the NDIA.  I believe they publish it.

21   Q.  Do people outside of government and defense read it?

22   A.  I really am not sure.  I am not sure of their distribution.

23   Q.  Okay.  If you will, look with me on Page 2, P195.002, three

24   or four lines down, there's a line that begins, "Known as the

25   special operations combat assault rifle, or SCAR..."

 1   A.   Okay.

 2   Q.   Is that right?

 3   A.   Yes.

 4   Q.   Now, is that one of the acronyms that you've seen for SCAR?

 5   A.   Yes.

 6   Q.   Have you seen others?

 7   A.   I've seen it abbreviated, you know, with periods between

 8   the letters.  And I've seen that acronym referred to as Special

 9   Operation Forces Combat Assault Rifle, Special Forces Combat

10   Assault Rifle.

11   Q.   Okay.

12         MR. HOOKER:  Your Honor, I would like to move to admit

13   Plaintiff's Exhibit 195.

14         MR. LINDEN:  No objection, Your Honor.

15         THE COURT:  Admitted.

16     (Plaintiff's Exhibit 195 was admitted into evidence at

17   10:42 a.m.)

18   BY MR. HOOKER:

19   Q.   Okay.  So now we'll get to Plaintiff's Exhibit 113.  What

20   is Plaintiff's Exhibit 113?

21   A.   As I said previously, *Guns & Ammo Combat Arms* magazine with

22   SCAR rifles on the cover, and the tag line, if you will, "SCAR

23   Power, FNH USA, A Gun for Every Mission."

24   Q.   What is the date on that article?

25   A.   This date is July 1st, 2008.

1    Q.  And do you remember seeing that magazine when it came out?

2    A.  Yes, I do.

3        MR. HOOKER:  I'd like to move to admit Plaintiff's

4    Exhibit 113.

5        MR. LINDEN:  No objection.

6        THE COURT:  Admitted.

7    (Plaintiff's Exhibit 113 was admitted into evidence at

8    10:42 a.m.)

9    BY MR. HOOKER:

10   Q.  Now, of all these exhibits we've looked at in the last

11   little while, from Defendant's Exhibit 188 through 113 -- you

12   know what, I apologize, there's one more I just wanted to show

13   you briefly and then we will be done with these.  Plaintiff's

14   Exhibit 57.  Do you recognize that?

15   A.  Yes.  A cover of a *Shotgun News* magazine, and it says, "A

16   SCAR You Can Own!"  I see at the selector lever safe and

17   semi-auto only markings, so this is the civilian-legal,

18   semi-auto only version, and a SCAR 16S brand name on the --

19   engraved on the rifle.

20   Q.  What is the date of this article?

21   A.  This article date is August 3rd, 2009.

22   Q.  Okay.  Who reads *Shotgun News*?

23   A.  Oh, many people in the industry or folks, you know, that

24   are gun enthusiasts, interested -- as I said before, many of

25   these publications are widely distributed, available at

1    newsstands or folks actually subscribe to them.

2              MR. HOOKER:  Your Honor, I would like to move to admit

3    Plaintiff's Exhibit 57.

4              MR. LINDEN:  No objection.

5              THE COURT:  Admitted.

6         (Plaintiff's Exhibit 57 was admitted into evidence at

7    10:44 a.m.)

8    BY MR. HOOKER:

9    Q.  Mr. Spaniel, now these articles you've looked at ranging

10   from Defendant's Exhibit 188 on down through the one we just

11   looked at, Plaintiff's Exhibit 57, are these representative

12   examples of the kind of media coverage you saw starting in 2004

13   about the SCAR rifle?

14   A.  Yes, but a very, very small sampling of media coverage.

15   Q.  And how many such articles did you see?

16   A.  Oh, gosh.  It's hard to say.  In the early period, there

17   had to be one every month in some publication.  At a minimum.

18   Q.  Okay.  Let's turn back to the particular SCAR weapon

19   itself.  What specific aspects of the weapon did you, yourself,

20   help engineer?

21   A.  We worked on, as I said, the -- the long barrel variant, so

22   that was developing what is the appropriate barrel length to

23   meet the spec requirements without making it too long or too

24   heavy, because those are always -- you know, the operator is

25   looking for the shortest, lightest they can get that will do

1    the job.

2         We also had to work on muzzle device and sound suppressor

3    for -- across all barrel lengths.  What's called a blank firing

4    adaptor for training.  You know, we also helped with other

5    small, you know, technical challenges as the weapon evolved.

6    And we had to make -- make changes per either test event

7    results or operator feedback that, yeah, I don't quite like it

8    like this, let's make it a little bit different.  So, you know,

9    we would be involved in that R & D, along with supporting the

10   R & D department at FN Herstal.

11   Q.  I'd like to show you what's previously been marked as

12   Defendant's Exhibit 182.  And before we get into this, how did

13   you go about developing those aspects?  If you could, just

14   describe for the Court briefly the kind of testing and process

15   that you went through.

16   A.  Oh, sure.  Right.  So for the long barrel was, again, the

17   beginning of our really heavier involvement in the program.  So

18   we knew just from prior weapons, prior experience, we knew

19   approximately what barrel length we needed, what kind of barrel

20   profile we needed.  So we made three different barrel lengths

21   around what we felt was optimal.  And then you do extensive

22   testing to demonstrate which one really fits the need the best,

23   meets the spec requirements the best.

24        So, you know, there's -- there's a fair amount of

25   development work and prototyping to get this hardware and then

1    maybe actually go out to the range and put some rounds

2    down-range, measuring accuracy and other aspects.  As you

3    change barrel length on these weapons, you can change their

4    functionality, just because of the way the system operates.  So

5    you have to ensure that, you know, you haven't done anything

6    negative to reliability, and also especially when you put a

7    sound suppressor on it, which I mentioned.

8        And the sound suppressor aspect of it was fairly extensive,

9    also.  We went to four major players in the sound suppressor

10   market and got them to give us samples and down-selected via,

11   again, extensive testing to prove out whether or not they could

12   meet the specifications set forth for a sound suppressor on

13   this weapon and also to make sure we could maintain weapon

14   reliability, functionality if you will, because when you put a

15   suppressor on a weapon it changes how it operates.

16   Q.  Backing up and kind of getting a big picture of the

17   development of the weapon overall.  So starting in -- whenever

18   the initial engineering began taking place, and you can tell me

19   when that was, in 2003 or 2004, on through the point at which

20   the weapon, you know, was in full production, can you describe

21   that span of time and the various phases for the Court.

22   A.  Sure.  It definitely would have begun in 2003 when the

23   sources sought was out as a chance.  It began before that with

24   market intelligence, as I said before.  I really couldn't tell

25   you the exact date as I was only aware of the program at the

1    time and not personally, you know, involved in the engineering

2    and development.

3        So once -- once we won the competition and we submitted the

4    three samples, that then we were down-selected for the -- for

5    the award.

6    Q.  What does "down-selected" mean?

7    A.  I mentioned there were six other competitors, so seven

8    competitors total.  And we were selected as the single awardee

9    for the program to move forward.

10        So then we were required to submit additional samples, the

11    quantities listed in the solicitation as to what you need to

12    supply.  The government then goes through what they call

13    developmental testing, which is indoor range mostly; a lot of

14    simulated environments, like hot, cold, humidity, rain, just

15    general durability, accuracy.  They will do that again in -- I

16    guess, in general you would almost call it a laboratory

17    environment or an indoor range environment.

18        In conjunction with that, they start user assessments.  So

19    that's where you actually go out to a government facility and

20    they will bring in users from each of the components of the

21    special forces, and they will have a preplanned test protocol,

22    test program to run the weapon through its paces, get their

23    feedback.  That's where I talked about, you know, you went

24    through these events.  They are called EUAs or early user

25    assessments.  The first one I participated in was in late 2005,

1    and it was actually conducted at four different venues in the

2    California area.

3    Q.  Do you remember which ones?

4    A.  Sure.  It was Camp Pendleton, La Posta, San Clemente, and

5    Camp Billy Machen, which is out in the desert, east of San

6    Diego a couple hours.  So it was a 3-week -- a 3-week program

7    at those four facilities.  Running it through its paces.

8        For example, they will go into a shoot house with a close

9    quarter combat variant and run through drills.  They will go on

10   a known distance range and shoot at various ranges to see can

11   this weapon do what we've asked it to do.  They will also do

12   different kinds of drills; egress from a vehicle with a stock

13   folded, and come out of the vehicle, throw open the stock and

14   engage targets and things like that.

15       So they are trying to simulate operational type of

16   scenarios.  Once they go through that -- you know, those

17   typically don't go without comment, don't go without issue --

18   you have what's called an IPT following that, a number of

19   months later.

20   Q.  What's an IPT?

21   A.  That's an integrated product team meeting.  That's users or

22   operators, program personnel, combat developers that support

23   different commands, of course FN, folks from the contract

24   office in Tampa.  And they talk about what these test results

25   were.  What did this early user assessment tell us.  What did

1    we learn.  And they will give the manufacturer feedback to say,

2    you know, we don't like this, we want this changed, let's look

3    at this different accessory, we think it might be better.

4        And we'll move off into another iteration of development.

5    Come back and do another early user assessment with either the

6    same or different group of operators.  And that then actually

7    was a little bit of a problem in the program that drug it out,

8    is you had very little continuity.  As these operators go from

9    their assignment to assignment, it's difficult for the program

10   to get the same guys back.  So this guy wanted it one way or a

11   group wanted it one way, two groups later might have taken it

12   full circle back to where it started.

13       So it was a long, involved, 4-year process, iterating

14   between a user assessment and then back to an IPT to discuss

15   results, request changes, and, you know, that whole process

16   just took a number of years to finally -- them to say as a

17   collective group that had input in the decision that, yes, this

18   is good to go and let's go forward with low rate production.

19   Q.  You used the term "operator."  Just briefly for the Court,

20   what is the operator?

21   A.  That's the soldier that's the end user.  We tend to call

22   them operators.  That's the terminology they use.  So, yeah,

23   it's the guy actually carrying the rifle, pulling the trigger.

24   Q.  Now, over the course of this and your involvement with it,

25   did you maintain a log of these various phases?

1    A.  Yes, I did.  I started what I call the timeline, a SCAR

2    timeline.  The reason I did that was as the years went by, you

3    know, I'd be asked a question or we'd be trying to research

4    something we did in the past.  And it was always difficult to

5    pinpoint, you know, where it was stored or when you got an

6    e-mail.

7         So I -- I usually could remember, gee, that was associated

8    with EUA-3, but when was EUA-3?  And I would have to go digging

9    to find that date.  So I ultimately just set up a -- just a

10   very high-level timeline of when the events happened, and that

11   just helped me find information I needed quicker.  And then

12   once I made it, I just maintained it over the -- over the

13   years.  So memory tool.

14             MR. HOOKER:  Your Honor, I would like to show

15   Mr. Spaniel this log that he kept really for demonstrative

16   purposes just to walk through some of these dates in this

17   process and move it along if that's okay with opposing counsel.

18             MR. BELLAMY:  Is this something we've seen?

19             MR. HOOKER:  I believe we sent it to you the other day

20   with our -- with the exhibits we've seen.  But we can publish

21   it for you here on the monitor.  (Displaying.)

22             MR. BELLAMY:  No objection.

23             THE COURT:  It was not admitted.

24             MR. HOOKER:  We are not moving to admit it into

25   evidence.  It is just purely for demonstrative purposes.

1    BY MR. HOOKER:

2    Q.  Now, Mr. Spaniel, you mentioned early user assessments or

3    EUA.  So I am hoping this document will help you refresh your

4    recollection as to specific dates.  When did those begin?

5    A.  Well, EUA-2 was the first that I participated in, and that

6    was November, 2005.  There would have been an EUA before that

7    that I was not a participant.

8    Q.  Okay.  So following then, for example, the one in November

9    of 2005, just below that in January of 2006, there's an IPT.

10   And what is that again?

11   A.  That's the integrated product team meeting.  Essentially

12   that's to review the EUA results, is a succinct way to put it.

13   Q.  And so then out of that meeting, what would happen?

14   A.  Well, then we would go back and take the feedback that we

15   received and make changes to the weapon system.

16   Q.  And then where would we see those changes reflected here?

17   Or would we?

18   A.  Well, you see in April, 2006, there was another IPT.  That

19   one was actually held in Columbia.  And that's where we -- we

20   actually showed them with PowerPoints, with maybe preliminary

21   prototype hardware that here's what we did with your request,

22   and kind of get their agreement that, yes, you're on the right

23   track, this is what we asked for, prior to going to another

24   EUA.

25          Because, you know, that's a fairly major event to pull

1    together that group of testers and test -- the folks that run

2    the test and record the test for EUA-3.  So then April, 2006,

3    we held the IPT, deemed that we were ready to go to EUA-3 in

4    July, 2006.

5         THE COURT:  Let me stop you, because immediately above

6    that it says, "Gen 2 SCAR."  I assume that's Generation 2.

7         THE WITNESS:  Yes, that's correct.

8         THE COURT:  What does that indicate?

9         THE WITNESS:  Well, that was out of EUA-2.  Those

10   were -- well, actually, Gen 2 would have been what was tested

11   at EUA-2.  That was the first delivery of the SCAR.  So the

12   original SCAR, the first three weapons that were submitted

13   weren't configured the same as those weapons that were tested

14   in EUA-2 and on display in SHOT Show 2006.  It was -- already

15   we had feedback and made changes.  For example, the first three

16   weapons were black in color.  The Gen 2 SCAR was flat dark

17   earth in color, which was one of the specification

18   requirements.

19   BY MR. HOOKER:

20   Q.  Okay.  So now if we move on down to the entry that you have

21   here as "OT" for July through December, 2007.  What is that?

22   A.  That's operational test and evaluation.  OT&E.  And what

23   that's supposed to be is the culmination event to deem that the

24   rifle was ready to go into service.  They will take each of the

25   main components of SOCOM and test it at their different

1   facilities.  For example, the Marines test it at Camp Lejeune

2   in a very hot, humid environment.  That -- at the right time of

3   the year for that.  The --

4   Q.  And by, "right time of the year," what do you mean?

5   A.  When it's very hot and humid.

6   Q.  Right.

7   A.  Sorry.  And the Army Special Forces test it at high

8   altitude, somewhere in the western part of the country.  You

9   know, we don't -- as industry, we don't attend or participate

10  in the operational testing.  That's government-only events.

11  And they really seriously put it through its paces and, again,

12  you know, trying to put it in the most extreme environments

13  they can.

14      Another environment they were in was Stennis, Mississippi.

15  It was swampy, wet, probably also hot and humid.  And out of

16  that, they learned some things.  You know, we had some polymer

17  issues with water absorption.  We had to -- we still had to

18  work on some things beyond that.

19      You'll notice later in the list there was an acronym FOT;

20  stands for follow-on -- FOT, that means we had to do some

21  aspects of OT over again because during OT the weapon wasn't

22  deemed ready.  In an ideal -- ideal world, you would go to an

23  early user assessment, everything is on thumbs-up.  You go to

24  operational testing, everything is thumbs-up.  And you go into

25  production.  But it rarely works out that way as they start

1    really -- really taking what they envisioned and putting it
2    through its paces as a system piece of hardware.
3    Q.   Now, you mentioned Stennis, Mississippi, and Camp Lejeune.
4    Were there also some cold or arid or different environments?
5    A.   Yeah, the cold one was the mountains that the Army Special
6    Forces -- and, again, I can't remember exactly which state they
7    were in.  Could have been Colorado.  I am almost thinking the
8    state of Washington even.  But some -- one of their bases in an
9    area where it's high altitude and very cold, late in the year.
10   Q.   Okay.  You mentioned this term earlier, LRIP, and we see
11   that on your log, July through November, 2008.  What is LRIP?
12   A.   That's low rate initial production.  And what that is, is
13   once they do deem that the weapon system is ready to go, they
14   don't just jump in with both feet and order to completely
15   outfit their units.  They -- they judiciously choose specific
16   units and quantities that they want.  And then they will
17   actually field them, and they will take them into
18   operational -- true operational scenarios and make sure.
19       It's kind of the final -- the final piece to say this --
20   this is the weapon system we want.  So it's easing into
21   production.  It also helps manufacturing because you don't have
22   to hit higher quantities per month right from the -- from day
23   one.  It allows you to ramp up your production and your
24   assembly line and things like that.
25   Q.   So part of it -- does part of it have to do with the

1    tooling of the factory --

2    A.  Sure, yes, definitely.

3    Q.  -- ensuring --

4    A.  Because you can't really fully tool until you know what the

5    end product is coming out of all these different events that

6    we've talked through.

7    Q.  And then is part of the process making sure that you can

8    replicate this final prototype or final model and mass produce

9    it?

10   A.  Definitely.  And there are things like first article that

11   your first production has to be very thoroughly inspected and

12   tested to demonstrate that, you know, those smaller quantities

13   of units that you've delivered up till then, that, yeah, your

14   production process gives that same -- same result, that same

15   weapon system with the same characteristics.

16   Q.  Now, if we move on down, November through January, 2008 --

17   I assume that means November of 2008 to January, 2009; is that

18   right?

19   A.  Yes.  Yes.

20   Q.  -- low rate initial production deliveries.  What does that

21   refer to?

22   A.  Well, that was when it actually happened.  If you look at

23   July to November, 2008, it was originally scheduled for that,

24   anticipating the successful approval for LRIP.  And you notice,

25   I wrote, "Scheduled delivery delayed due to OT issues," so

1    there was yet more work to do between, you know, that July,

2    2008, start of LRIP until it actually happened in November of

3    2008.  And, again, that was the customer delay -- delay in the

4    customer approval to begin LRIP.

5    Q.  And do you recall or know what the -- generally or

6    approximately what the quantities are that are generated

7    through LRIP?

8    A.  I believe it's in the -- in the neighborhood of 1500, but

9    I -- it's been a while.  I haven't actually researched that.

10   But it's some kind of -- some quantity like that.

11   Q.  Now, November, 2008, there's an entry that says, "BATF

12   approves 16S for commercial sale."  What does that refer to?

13   A.  So to take this assault rifle that has select fire,

14   semi-auto and full-auto capability, that's not civilian-legal.

15   So you have to modify the weapon to make it very difficult for

16   someone to convert from semi-auto only--that is, civilian-

17   legal--to a full-auto weapon, using the same base platform.

18       And you have to demonstrate by a written summary and by

19   hardware for evaluation to the BATF--Bureau of Alcohol, Tobacco

20   and Firearms--that you've achieved that.  So they will actually

21   study your proposal for a semi-auto weapon, and then they will

22   take it and they'll shoot it, they will try to convert it to

23   prove to themselves that, yes, this isn't an easily convertible

24   weapon system from a semi-auto to a full-auto Class III.

25   Q.  Is it fair to say the purpose of that process is to ensure

1    that civilians cannot get a semi-automatic weapon and easily

2    convert it into a fully automatic machine gun?

3    A.  That is correct.

4    Q.  And how long does that process take?

5    A.  It takes a number of months.  You know, it probably depends

6    on the weapon system.  Their workload.  I don't recall exactly

7    how long, but I would venture easy six months from developing

8    and submitting and then approving.

9    Q.  So part of that is your engineering?

10   A.  Correct.

11   Q.  And then part of that is the Bureau of Alcohol, Tobacco and

12   Firearms doing their tests and approving it?

13   A.  Yes.

14   Q.  Move on down to July, 2010.  "SCAR FULL RATE PRODUCTION."

15   What does that refer to?

16   A.  That takes you beyond the LRIP quantities.  So now the

17   government is then free to -- when the need is there, when the

18   funding is there, that they can order up to that full quantity

19   on the ID/IQ contract.  So we'll release to fill the contract

20   in full at their discretion.

21   Q.  But prior to July of 2010, going all the way back to the

22   time that FN was awarded this contract, FN would have been

23   delivering firearms to the military marked, "SCAR"?

24   A.  Yes.

25   Q.  In your opinion as an engineer, is the amount that -- of

```
 1   time that it took to go from the award of the contract to

 2   low-rate initial production a reasonable amount of time?

 3   A.  Yeah.  I mean, it's typically a number of years.  You know,

 4   four years may seem long, but if you think about what this

 5   weapon system does, quite a bit of commonality over two

 6   calibers, three barrel lengths, with and without sound

 7   suppressors, it's a challenging -- a challenging developmental

 8   task, and it took us time to get it right.

 9       Plus the ergonomics.  You know, the ergonomics was what a

10   lot of the user feedback was about.  In addition to

11   functionality.  So, yes, it -- it took a lot of iterations to

12   get it right.

13   Q.  Is there still today research and development going on?

14   A.  Oh, yes, definitely.

15   Q.  All right.  You mentioned the SHOT Show.  I believe you

16   said the 2006 SHOT Show earlier --

17   A.  Yes.

18   Q.  -- when we were going through your timeline.  Were you at

19   the 2006 SHOT Show?

20   A.  Yes, I was.

21   Q.  I'd like to show you what's been previously marked as

22   Defendant's Exhibit 182.  And what is this document?

23   A.  That's a press release by FNH USA, "The Making of the 21st

24   Century Assault Rifle:  SCAR SOF Combat Assault Rifle."

25   Q.  What is the date of this document?
```

1    A.   This was released March 2nd, 2006.

2    Q.   And do you regularly review these press releases?

3    A.   Yes.  They distribute those, you know, within the -- within

4    the company.

5    Q.   If you will, turn with me to Page 5, DX 182.005, there's a

6    header halfway or so down the page, it says, "February 2006."

7    Can you just read that sentence for me, please.

8    A.       "FN Herstal unveiled the new battle rifle systems

9            SCAR-Light and SCAR-Heavy to the commercial

10           and law enforcement (LE) markets at the 2006

11           SHOT Show in Las Vegas, Nevada, held

12           February 8 to 11, 2006."

13   Q.   And that was the SHOT Show you were at?

14   A.   That's correct.

15           MR. HOOKER:  Your Honor, I would like to move to admit

16   Defendant's Exhibit 182.

17           MR. LINDEN:  I believe it's already admitted, Your

18   Honor.

19           THE COURT:  Admitted.

20      (Defendant's Exhibit 182 was admitted into evidence at

21   11:10 a.m.)

22           MR. HOOKER:  All right.

23   BY MR. HOOKER:

24   Q.   Let's shift gears -- before we do that, how many people

25   attend the SHOT Show?

1   A.  Tens of thousands.  It's a very largely populated show, a

2   very well known show.  Everybody wants to go to the SHOT Show.

3   It's anything and everything in the shooting industry that you

4   could think of is on display at that show.  It's extremely

5   large.

6       There's always a lot of buzz around it.  You know, they do

7   daily reports of, hey, what's new at the SHOT Show.  Of course

8   in 2006, you know, the SCAR was a big buzz at the SHOT Show.

9   Being on display.  I didn't work the booth, but I recall being

10  there and many, many people coming by.  And, of course, the

11  question always was, When can I get one?  When are you going to

12  have the civilian one?  You know, those kinds of things.

13  Q.  What's your understanding of the kinds of people that

14  attend the SHOT Show in terms of whether they're military?

15  Nonmilitary?

16  A.  You'll have some military.  It's not a military show, but

17  I'll have military that attends.  Law enforcement, you know,

18  federal agency types.  Industry folks.  You know, people that

19  own, sell, manufacture firearms.  You have clothing and

20  ancillary equipment.  And, again, about anything you could

21  think of.  And then, you know, firearm enthusiasts if they can,

22  you know, get into the show.  You know, they would like to be

23  at the show.

24      But it's -- you know, it's an LE/commercial type of show.

25  Shotguns and rifles for hunting, for sporting clothes, things

1    like that.  It's just anything in the shooting industry, well

2    rounded, with the military really being a small part of that.

3    Q.  You mentioned LE.  What does that stand for?

4    A.  Law enforcement.

5    Q.  And where are all the people who attend the SHOT Show from

6    generally?

7    A.  All over the world.  They will typically publish how many

8    countries, you know, are in attendance.  You will have a large

9    segment from the U.S. obviously, but they will come from around

10    the world.

11    Q.  And around the United States, as well?

12    A.  Yes.

13    Q.  And are the press and media at the SHOT Show?

14    A.  Yes, they are.

15    Q.  Do you recall the 2006 SHOT Show being covered by the press

16    and the media?

17    A.  Yes.  Definitely.

18    Q.  Okay.  I would like to shift gears now, and the Court has

19    allowed us to bring in two of the SCAR rifles and have you show

20    those.  And I believe the marshal is going to hand those to

21    you.

22         THE WITNESS:  Would it be okay if I stand up to do

23    this?

24         THE COURT:  As long as we can hear you.

25         THE WITNESS:  Okay.  I can speak loud.  Do it up here

1    or down here?

2            THE COURT:  Doesn't matter as long as we can hear you.

3            THE WITNESS:  I guess the first thing I would say

4    before I even pick them up is the firing pins in these weapons

5    have been cut so they are unable to fire.  There is also a

6    cable lock, and that would prevent the operating system from

7    closing and loading a round.  I would also like to check that

8    the chamber is empty and also like the marshal to check if he

9    hasn't done it already.

10           BAILIFF:  It's done.

11           THE WITNESS:  What we have here is the 5.56 version

12   SCAR 15S.  This is a civilian-legal variant of the SCAR rifle.

13   And it fires semi-auto only.  So you have a selector switch

14   here that will be on safe, meaning when you pull the trigger

15   nothing happens.  And then the Number 1 indicates semi-auto.

16   And it will fire one round at a time with a pull of the

17   trigger.  And that's it.  So that's the semi-auto version.

18       You know, here is one of the barrel lengths.  This happens

19   to be a 16-inch barrel.  Because for a civilian-legal it has to

20   be 16.  The barrel length we worked on for this rifle, back in

21   2005, is 18 inches.  That will reach out to a further distance.

22       One of the things I failed to mention that I think of while

23   I'm holding this is, one of the big features of this rifle also

24   was ambidextrous, meaning a left-handed or right-handed

25   operator had most of the controls at their disposal easily,

1    whether they shot left-handed or right-handed.  That's a big

2    thing in military procurement these days, and it's made its way

3    into the commercial market, too, to have ambidextrous controls.

4        If you hand me the other and confirm that the chamber is

5    empty.  Thank you.  So this rifle is actually a SCAR 17.  It

6    has -- it's a 7.62 variant, and --

7            (Addressing Mr. Mills) Is this a full-auto version,

8    Bucky?

9            MR. MILLS:  Yes

10           THE WITNESS:  Oh, I couldn't see the A.  It's covered

11   up by the paddle of the selector lever.

12           But this weapon here is actually capable of firing

13   full-auto.  Meaning one pull of the trigger will fire multiple

14   rounds until you let go of the trigger.

15           You can see that these two rifles are very similar.

16   That was, as I spoke to earlier, between 5.56 and 7.62, one of

17   the goals of the program is a lot of commonality.  That helps

18   with logistics support.  Spare parts, there are a lot of parts

19   that are exactly the same in both of these rifles.

20           And to further that, when you go from a full-auto

21   Class III weapon that only the military, federal agencies, law

22   enforcement could own, to a semi-auto only civilian version --

23   and law enforcement will actually want a semi-auto version,

24   also, it depends on their need -- there are only a few parts in

25   here that have some changes to them.

1          So there's still a lot of commonality between a

2     full-auto rifle and a semi-auto rifle.  You know, we made the

3     appropriate changes so that it can't be easily converted.  But,

4     you know, these rifles are all very similar and very modular

5     and, again, a lot of parts commonality.

6     BY MR. HOOKER:

7     Q.  Which parts did you help engineer?

8     A.  So we worked on the barrel.  We worked on the muzzle device

9     which is different than this one, which the sound suppressor

10    is -- is -- can be adapted to.

11         Example of a small thing we worked on, the screw retention

12    system.  I failed to mention also that one of the requirements

13    of the program was the operator can change the barrel between

14    these different barrel lengths I talked about in under five

15    minutes, I believe it was.

16         So there's a system here with four screws that you can

17    unscrew it, take a barrel out, put a different barrel in.  The

18    retention system for how we did that -- because once you take

19    these screws out, you can't be holding them in your hand,

20    you'll lose them.  And then they wouldn't be able to attach to

21    other barrels.  So the screws have to be retained.  So we

22    worked and helped with the design of that screw retention

23    system.

24         I mentioned the Camp Lejeune, very hot, humid.  This

25    polymer butt stock had some issue with moisture absorption.

1    The polymer got kind of weak, and, you know, this -- there's a

2    button here that you can depress and fold the stock, and that

3    interface of that button to that polymer needed some work after

4    we -- you know, after we got the results from the Camp Lejeune

5    tests, and we did a lot of work in how to redesign that

6    interface.

7        Just a number -- a number of other things.  But mostly,

8    like, these rail panels, this vertical grip, we don't design

9    those, but we found the manufacturers that do, and made sure

10   they are compatible, made sure they were durable, made sure

11   during the user assessments that the operators were comfortable

12   with them, it's what they wanted.  So it was those kinds of

13   things that was our contribution to the R & D.

14   Q.  You mentioned I think the different versions.  Was there

15   also a sniper variant?

16   A.  Yes.  A SCAR SSR, sniper variant.  The 7.62 version with

17   its longest barrel was intended to fulfill the role of a

18   Mark 11 that they already had.  And what the different barrel

19   lengths do, there's a certain accuracy requirement which means

20   in a certain number of rounds you put on target, how far away

21   from each other the rounds have to be.

22       So, in other words, you want repeatability of the rounds

23   down-range to -- into a group, a small group.  And the way the

24   program was laid out, the different barrel lengths kept that

25   same accuracy requirement and just gave you that at a further

1    distance away.  I'm talking distances from 300 meters out to

2    eight, nine, a thousand meters.

3         As it got further into the program, the operators decided,

4    well, we want better than that for the longest barrel variant

5    of the SCAR 17.  We want to be able to have better accuracy at

6    that longer distance.  Oh, by the way, we want more rail space

7    to put not only an optic, but a night vision, one in front of

8    the other.  You can see with the optic on this weapon, you

9    know, there's not that much space left here to put another

10    device on.  So we extended the receiver.

11         And they also wanted what they -- what you call is more of

12    a match grade trigger versus an assault rifle trigger.  When

13    you pull a trigger, there's what's called a trigger pull, and

14    it's the force you need, how hard it is to pull the trigger.

15    And, you know, for precise shooting, you want a trigger pull as

16    low as they will legally allow you to have.  If you go too low,

17    you could bump the weapon and it will fire.  So there's limits

18    how low they will allow it to go.  So that's what the

19    variant -- and we did that development in Columbia for the SCAR

20    SSR variant to achieve those new program requirements.

21    Q.  Now, are those weapons marked with the mark "SCAR"?

22    A.  Yes.  That one is a SCAR 17.  This one is a SCAR 16S.

23    Q.  And how long has FN marked its weapons, those weapons with

24    "SCAR"?

25    A.  Always.

1    Q.  You mentioned, I believe, that -- I just want to make sure

2    we cover this for the record -- law enforcement, that law

3    enforcement can use a full-auto version; is that right?

4    A.  That's correct.

5    Q.  I think we're done with those for now, and I believe

6    Ms. Purvis asked if we could take some photographs for the

7    Court, which we will do.

8         THE COURT:  You have the replacement stock?  Your

9    replacement stock?

10        MR. BELLAMY:  We do, Your Honor.  It's in the custody

11   of the marshal at the moment.

12        THE COURT:  Okay.  What I want to do is to take all

13   three back into chambers and just take a look at them very

14   briefly.  Anybody have any problem with that?

15        MR. BELLAMY:  No, Your Honor.  Would you like to have

16   maybe five or ten minutes of testimony from Mr. Clyde, just

17   describing the replacement stock?

18        THE COURT:  I think that would be good.  Let's do it

19   that way.  So we'll interrupt your case.

20        MR. HOOKER:  That's fine.

21        THE COURT:  I don't want to keep these here.  I

22   want -- we don't have guns in the courthouse, and so we had to

23   go around some circles to get that taken care of, but we did.

24   It's not a big deal.  But I would like these to be gone today.

25   But at the same time, I want to see the stock and those at the

1    same time back in my library.  So let's let this witness out of

2    the seat.  You can call him (indicating Mr. Clyde).  He can

3    give some brief testimony about that.  And then I'll go back

4    and take a look at them.

5         (Mr. Spaniel leaving stand at 11:23 a.m.;

6         (Mr. Clyde assuming stand at 11:23 a.m.)

7              MR. CLYDE:  Good morning, Your Honor.

8              MR. HOOKER:  Your Honor, we have one other witness,

9    Mr. Mills, whose job it is to show the weapon around the

10   country.  He would also like to talk about some of the aspects

11   of the weapon before you take it back into chambers.

12             THE COURT:  That's fine.

13             MR. HOOKER:  We can go ahead with Mr. Clyde.

14             THE COURT:  Y'all understand what I want to do.  But I

15   want to do it consistently, what y'all think is the best way to

16   do it.

17             MR. HOOKER:  That's fine.

18             THE COURT:  He's there, go ahead.

19             MR. BELLAMY:  Does he have the specimen?  I believe

20   the marshal went to get it.

21             COURTROOM DEPUTY:  He's gone to get it.

22        Do you solemnly swear that the testimony you will give

23   in this case will be the truth, the whole truth, and nothing

24   but the truth, so help you, God?

25             THE WITNESS:  I do.

```
 1          COURTROOM DEPUTY:  State your name for the record.
 2          THE WITNESS:  Andrew Scott Clyde.
 3       ANDREW S. CLYDE, CALLED BY DEFENDANT, WAS SWORN:
 4                     DIRECT EXAMINATION
 5  BY MR. BELLAMY:
 6  Q.  All right.  Okay.  Mr. Clyde, we are not going to ask you
 7  to give your background and so forth.  This testimony is
 8  focusing specifically on this product, so I'm going to ask you
 9  some questions about how it's made, what it does, and what's
10  done with it.  That sort of thing.  Perhaps if you can stand up
11  and take it --
12          THE COURT:  Be better if you have a seat, but if it's
13  too tight you can stand up.
14          THE WITNESS:  Okay.  I will like this.
15          THE COURT:  All right.
16  BY MR. BELLAMY:
17  Q.  Can you describe for us first the three main components
18  that go into that Clyde Armory SCAR-CQB stock that you have in
19  your hand.
20  A.  Yes, sir.  The first component is the chassis.  It's an
21  aluminum chassis.  And that is actually manufactured by Sage
22  for us.  Sage International.
23      The second component of it is the pistol grip at the
24  bottom.  And then the third component is the sliding M4 butt
25  stock, which we assemble to the product as well as the pistol
```

1  grip.

2  Q.  When you say, "M4," what do you mean by that?

3  A.  "M4" is the industry designation for this particular type

4  of stock.  I believe Colt came up with it.

5  Q.  And can you tell me, are there any markings on the chassis

6  portion of the device?

7  A.  Yes, there are.  The markings are -- it says, "SCAR-CQB

8  Stock TM," and then, "Clyde Armory Incorporated, Athens,

9  Georgia 30606."

10  Q.  Are there any markings on the M4 butt stock?

11  A.  There are.  On the M4 butt stock itself it actually says

12  "SCAR-CQB" on the stock engraved in the plastic.

13  Q.  And on the hand grip, are there any special markings on it?

14  A.  Yes, sir.  And it's a lot smaller but it says, "Clyde

15  Armory," and it says, "Ps 91:1-16."

16  Q.  And can you describe for us -- what you have in your hand

17  is actually not a firearm; correct?

18  A.  That is correct.  It is just a stock.

19  Q.  Can you describe for us, then, it is assembled with a

20  firearm?

21  A.  Certainly.  This particular stock goes with the Ruger

22  Mini-14 or the AC-556, "AC" being automatic, meaning machine

23  gun, and "556" being the caliber, 5.56-millimeter.  But the way

24  that you would assemble this is you've got the top cover here,

25  which has five Allen head screws.  You would remove the five

1    Allen head screws, and the top cover would come off.

2         And you would remove the wooden butt stock from the Ruger

3    Mini-14.  The way you would do that is the trigger guard swings

4    down -- there's a little latch on it, it swings down, and the

5    entire trigger mechanism pulls out of the Ruger rifle.  And at

6    that point, then the upper receiver and the wooden stock can

7    come apart and it slides up.  And then you would discard the

8    wooden stock.

9         And then you would take that upper receiver, with the

10   barrel assembly, and you would slide it down over the front of

11   this -- of the stock.  The gas block of the Mini-14/AC-556

12   would sit over this horseshoe-shaped portion, the front of the

13   stock, and it would rock down into place, and it would lay

14   flush on the top of this receiver.

15        At that point, with the receiver flush against the stock,

16   then you would put the trigger guard or the trigger group back

17   in, it would fit into the upper receiver, and then you would

18   rotate the trigger guard back into place, and it would latch

19   into place.  So that would be the reassembly of the receiver

20   and the trigger guard -- trigger group, rather, into the stock.

21   And then you would take the upper part of the hand guard and

22   simply put the five bolts back in and bolt it back into the

23   stock.

24             THE COURT:  Is that typically done by the purchaser or

25   do you need a gunsmith to do that?

1          THE WITNESS:  No, sir, it's done by the purchaser.

2     It's just simple hand tools is all that is required.

3     BY MR. BELLAMY:

4     Q.  One other aspect of that, that there's a plastic portion or

5     polymer portion that's on the chassis.  Can you tell us what

6     that is.

7     A.  This is the front hand guard system.  And this allows a

8     person to get a good grip on it.

9          There's four rails, four quad rails on the stock itself.

10    And this is one of the neat features of this particular stock

11    that allows it to improve the Ruger rifle itself.

12         Ruger, way back, you know, when this first came out, did

13    not have a -- the ability to mount either a bi-pod or a light

14    system for better visibility or a good way of mounting an

15    optics, like a scope or a red-dot optic on top of the Ruger

16    rifle.  And so -- or a laser designator system.  Some people

17    like the little red dot for their rifle.  So that allowed the

18    Ruger rifle these capabilities.

19         Also being a metal chassis, a very rigid metal chassis, it

20    was a way of aluminum bedding the receiver of the Ruger rifle.

21    And in doing that, the rigidity increased the accuracy of the

22    rifle.  So it was a way of increasing the accuracy of the Ruger

23    rifle as well.  So those features.

24         And then with the stock being adjustable to multiple,

25    different lengths, you can have people with different length

1    arms and different length hands that would be able to have a

2    different -- what's called a length of pull.  So, you know,

3    smaller and shorter people can have a closer butt stock, and

4    the much taller people can have a much longer one and have

5    longer arms.  So it allowed that capability that the Ruger

6    rifle did not previously have.

7    Q.  The chassis part there you said is metal.  What metal is

8    that made of?

9    A.  It's made of aircraft-grade aluminum.

10   Q.  And this one is black.  How -- what sort of finish is on

11   that?

12   A.  This would be an anodized.  I -- I can't remember the

13   hardness -- the Rockwell hardness of it, but it would be an

14   anodized finish.  And when you anodize aluminum, it gives it a

15   very, very durable, very strong finish to it.  So it -- it will

16   take abuse.

17   Q.  Okay.  We'll have you talk more about this using

18   photographs and things later.  Is there anything else about the

19   construction, the assembly, that you need to say?

20       Let me ask this first.  Those three components -- the

21   chassis, the butt stock and the hand grip -- how do they get

22   together?

23   A.  Sage creates for us -- they machine for us the chassis

24   system in and of itself.  Including this aluminum adapter block

25   back here.  And they send this to us.  The fore end is attached

1    already.  This front plastic or Kydex fore end is attached to

2    it.

3        And when we receive it, then we install the buffer tube

4    back here, the castle nuts on it, and we install the pistol

5    grip as well.  Make sure that they are all appropriately

6    adjusted.  And then inspect it to make sure that it's -- you

7    know, there aren't any manufacturing defects on it.  And then

8    we put it in its box, ready for sale.

9            MR. BELLAMY:  Do you have any questions, Your Honor?

10            THE COURT:  No, no, I think that's very helpful.

11            THE WITNESS:  Thank you.  I'm finished?

12            THE COURT:  You're finished.

13            THE WITNESS:  Thank you, Your Honor.

14            MR. BELLAMY:  Wait, Mr. Clyde.

15            MR. HOOKER:  I don't have any questions of Mr. Clyde,

16    Your Honor.  Thank you.

17            MR. EHRLICH:  Oh, wait, I have a question as long as

18    we're going to do this.

19                        CROSS EXAMINATION

20    BY MR. EHRLICH:

21    Q.  Mr. Clyde, you described the markings on the product.

22    Hasn't there been other markings on the product as well?

23    A.  Yes.  We moved from Bogart, Georgia, to Athens, Georgia,

24    when they changed our ZIP Code.  And so we changed -- it

25    originally said, "Bogart, Georgia 30622," and now it says,

1    "Athens, Georgia 30606."  And it originally said,

2    "Clyde Armory.com," I think.  I believe that's correct.

3    Q.  I'm sorry, what did you say?

4    A.  I believe it said, "Clyde Armory.com," originally instead

5    of Clyde Armory, Incorporated.  We became incorporated in 2009,

6    and it would not have said that back in 2006.  So that would

7    have been a change on it.  And then we had -- oh, let's see.

8    And then the -- we added the "TM" as well to it.

9    Q.  And it had other markings; did it not?

10   A.  What are you referring to?

11       THE COURT:  Do you have photographs of what you're

12   talking about?

13       MR. EHRLICH:  Yes.

14   BY MR. EHRLICH:

15   Q.  It had a patent number; did it not?

16   A.  Oh --

17       MR. BELLAMY:  Your Honor, we object to this being

18   irrelevant.

19       THE COURT:  Well, I think it's beyond the scope of the

20   direct examination because all I want to know is just enough to

21   orient me so when I go back there and I look at all three of

22   these items, I just had a little orientation.  We can get down

23   to -- what you're talking about, it seems to me that might be

24   appropriate later, but I don't know that I need it right now.

25       MR. EHRLICH:  I'm just going into the markings.  So I

1   was trying to stay within the scope of direct.

2   BY MR. EHRLICH:

3   Q.  When did it show "TM" on -- the "TM"?

4   A.  Probably within the last -- well, the first time it showed

5   TM, it was a little larger TM than this one.  And then we --

6   and Sage was able to shrink it for us, so probably -- it was

7   after we registered for the trademark.

8   Q.  So sometime in 2009?

9   A.  I don't know exactly.  I don't remember.  I would have to

10  go back and look.  There may be one of our purchase orders that

11  might have said it on it.

12  Q.  But you said it changed, you added TM?

13  A.  It did.  It did.  That's correct.

14  Q.  Thank you.

15          MR. EHRLICH:  No further questions.

16          THE COURT:  You have someone you want to put up?

17          MR. HOOKER:  Very briefly, yes, Your Honor.

18  Mr. Mills.  And we will be calling Mr. Mills later today.

19          THE COURT:  Okay.

20      (Mr. Clyde leaving stand at 11:36 a.m.)

21      (Mr. Mills assuming the stand at 11:36 a.m.)

22          COURTROOM DEPUTY:  Would you raise your right hand,

23  please.  Do you solemnly swear that your testimony in this case

24  shall be the truth, the whole truth, and nothing but the truth,

25  so help you, God?

1          THE WITNESS:  Yes, ma'am, I do.

2          COURTROOM DEPUTY:  State your name for the record.

3          THE WITNESS:  Charles Newton Mills the Third.  I go by

4    Bucky, though.

5          THE COURT:  You say you go by what?

6          THE WITNESS:  "Bucky," sir.

7          MR. HOOKER:  Your Honor, we'll go more into his

8    background later.

9          THE COURT:  Right, we don't need that.  I just want to

10   hear what he was to say about the --

11         MR. HOOKER:  Do we have one of the --

12         THE COURT:  Yes, the marshal is bringing it out.

13      CHARLES (BUCKY) MILLS, CALLED BY PLAINTIFF, WAS SWORN:

14                        DIRECT EXAMINATION

15   BY MR. HOOKER:

16   Q.  Mr. Mills, will you just describe the butt stock of the

17   SCAR rifle.

18   A.  Okay.  First of all, just for safety-wise, just to

19   re-verify, the action is open, no round in the chamber, no

20   magazine, Your Honor.  (Displaying.)  Okay.

21       The butt stock, it has certain features.  First of all,

22   it's very specific to a SCAR platform.  It cannot be put on an

23   M4 or an M4 SCAR rifle nor can an M4 butt stock be put on a

24   SCAR.

25       You have 6-position length of pull.  Each position is a

1    half an inch.  The reason that is, different body armor,

2    different body style, depending on the mission that they need,

3    you would adjust it to the individual operator.  If you're

4    running just arm sights, you would keep your cheek piece down.

5    If you're running optics like this, you raise your cheek piece

6    again one-half inch, brings the cheek up higher.  Modifications

7    that U.S. Special Forces wanted in their butt stock.

8        That was the big thing about the butt stock, is that the

9    way this attaches to the receiver cannot be modified easily.

10   And currently there are no M4-style butt stocks that would fit

11   on this system, sir.

12       Everything else -- I don't know how far you want to go to

13   look at it.  But you have a one-piece receiver, monolithic

14   rail.  You have pop-up arm sights.  You have a 2-position gas

15   port, regulator right there.

16       This system here is a 90,000 round receiver, 35,000 round

17   barrel, expected life.  If you're running it suppressed, you

18   would put it in one position; non-suppressed a separate

19   position.

20           Charging handle is reversible for a leftie or rightie,

21   like Mr. Spaniel indicated.  Magazine release, the magazine

22   release to release the bolt.  And if you wish, we could -- I

23   don't know how far you want to take it apart.

24           THE COURT:  We don't need to take it apart.

25           THE WITNESS:  Okay, sir.  That was pretty much it.

1          THE COURT:  What about the optics on it?  Is that

2     standard?

3          THE WITNESS:  I put the optics on this one, sir.  This

4     is one of my samples, sir.  This is just a Leupold Mark IV CQT.

5     It is an adjustable 1 to 4 power, depending on -- we have some

6     that run EOTech, some that run ACOGs, depending on -- we show a

7     variety because we have a variety of customers in what they're

8     looking for.  But a 1913 rail, continuous rail, any of these

9     types of optics easily bolt on.

10          THE COURT:  All right.  Very good.  We will take a

11     break now and I'll go back here.

12          BAILIFF:  All rise.

13       (Court in recess from 11:39 to 11:54 a.m.)

14          BAILIFF:  All rise.  Be seated and come to order.

15          THE COURT:  I want to just tell you what I observed

16     back there in terms of these trademarks that are on here.  And

17     I have a few questions.  It appears to me that the word SCAR,

18     S-C-A-R, on both companies' products looks basically to me like

19     it's out of the same font.  The size, length and height is

20     fairly much the same.

21          Can you, both sides, tell me how it is that these --

22     this mark got on here?  Is it painted on here?  Is it lasered

23     on here?  Do you know?

24          MR. CLYDE:  Your Honor, that is laser engraved

25          THE COURT:  Okay.  And what about -- what about on

 1  the --

 2          MR. MILLS:  Same, it is laser engraved.

 3          THE COURT:  Okay.  Now, I don't know if we have

 4  photographs of these or not.  It would be nice if we could get

 5  photographs.

 6          MR. HOOKER:  Your Honor, for our side, Ms. Gray has a

 7  camera that we could get and take some photographs, either here

 8  or back at our hotel, and e-mail those to the Court.

 9          THE COURT:  Okay.  I mean, I would -- like I say, I

10  took some with my phone, that won't amount to much, but I think

11  it would be good so that I would know that there's a photograph

12  showing specifically what I saw because I would like to send

13  these back.  Does anybody think we need these any longer?

14          MR. HOOKER:  No.  We don't.

15          THE COURT:  Okay.

16          MR. BELLAMY:  No.

17          THE COURT:  It was important for me to do an *in camera*

18  inspection.  I've done that.  So I don't know what else we need

19  to do other than y'all get together and take the photographs,

20  okay?  All right.  Thank you.

21          Now, let's go to lunch.  We'll be back around 1:00

22  o'clock.  How much longer do you think you'll have with this

23  witness?

24          MR. HOOKER:  Not much longer, Your Honor.  I would

25  guess 15, 20 minutes, perhaps.

1          THE COURT:  Okay.  And how long do you think your
2     cross will be?
3          MR. LINDEN:  Half hour, 45 minutes, Your Honor.
4          THE COURT:  Okay.  All right.  Very good.  Okay.
5     Thank you very much.  We will be back around 1:00 o'clock and
6     we'll get started again.
7          BAILIFF:  All rise.
8        (Court in recess from 11:57 a.m. to 1:07 p.m.)
9          BAILIFF:  This Honorable Court is once again in
10    session.  Be seated and come to order.
11         THE COURT:  Is everybody ready to proceed?
12         MR. HOOKER:  Yes, Your Honor.
13                    FRANK SPANIEL
14               DIRECT EXAMINATION CONTINUED
15    BY MR. HOOKER:
16    Q.  Mr. Spaniel, you will recall we looked at Joint Exhibit 19,
17    that January 23rd, 2004, USSOCOM solicitation.  You're familiar
18    with that, you testified earlier about it?
19    A.  Yes.
20    Q.  Now, did that contain specifications for the weapon system?
21    A.  No.  The specification is a separate document.
22    Q.  Okay.  And what kind of document would that have been?
23    A.  Well, I mean, it's just a typical Word document that lists
24    in paragraph form all the requirements of the weapon system,
25    things like the weight, the length, its reliability, color,

1    what types of accessories.

2          THE COURT:  Excuse me, which exhibit are you on now?

3          MR. HOOKER:  Your Honor, I was referring to Joint

4    Exhibit 19.  It's one of the very first ones.

5          THE COURT:  Okay.

6    BY MR. HOOKER:

7    Q.  Have you reviewed all the specifications that the

8    government has issued for the weapons at issue here?

9    A.  Yes, I have.  That's what we work to.

10   Q.  And are you -- was there anywhere in those specifications

11   that the government or the military required FN to place "SCAR"

12   on the rifle?

13   A.  No.  That's not a requirement.

14   Q.  So is it true that that was something that FN decided on

15   its own to do?

16   A.  That's correct.

17   Q.  When did FN decide to begin -- or decide to sell SCAR

18   rifles to law enforcement and civilians?

19   A.  It would have been very early on.  With a program like

20   this, when you are selected as the new military assault rifle

21   in some segment of the military, the expectation is to

22   leverage, you know, law enforcement and commercial sales off of

23   that notoriety, if you will.

24      We do that with -- and have done that with other in our

25   product line.  We have a P90 submachine gun that we have a

1    commercial -- or civilian PS90.  Same with an F2000 Bullpup,

2    there's an FS2000.

3        We're currently in development, just recently had hit news

4    at a show, our M249 long-standing 5.56-millimeter machine gun,

5    we're in development of a semi-auto version of that called the

6    M249S due out late this year/early next year.  So it's a very

7    common process that we go through.

8    Q.  Do other gun manufacturers do the same thing?

9    A.  Yes, I believe so.

10   Q.  Do people in the marketplace expect that when a company

11   develops a weapon for the military that there will be civilian

12   and law enforcement?

13   A.  Yeah, without a doubt.  As I -- I mentioned earlier, at

14   SHOT Show 2006 many questions of:  Hey, will these be available

15   that I can purchase?  When do you think that will be?

16       You know, we had -- one of the times during development, we

17   were doing a test in Fredericksburg, Virginia, we had a group

18   that was working on a video game, I couldn't tell you what

19   game, but they came to record the sound of the weapon firing so

20   they could put, you know, the authentic sound in the video

21   game.

22       You know, it's a very -- very big event, a lot of publicity

23   around it.  There's a lot of buzz and expectation to be able to

24   have a SCAR weapon.

25   Q.  And when did FN begin actually marketing the SCAR rifle to

1  law enforcement and civilians?

2  A.  I believe -- I believe we discussed an initial announcement

3  in 2006, I believe, early.

4  Q.  Were you at the 2005 SHOT Show?

5  A.  No, I did not attend the 2005.

6  Q.  Were you at the 2006 SHOT Show?

7  A.  Yes.

8  Q.  Was the SCAR rifle on display at the 2006 SHOT Show?

9  A.  Yes, it was.

10  Q.  What -- can you describe how else the weapon was being

11  marketed at the 2006 SHOT Show?

12  A.  Well, they typically have literature, some type of brochure

13  or flier to explain the features of the weapon.  You know, a

14  little bit about it.  Its weight, its length, its caliber, some

15  of the other modular features.

16      They would typically have some sort of video running that

17  show all of our weapons that would include the SCAR.  And of

18  course, you know, anyone that came by from the media that

19  wanted to do a story or cover, they have designated people that

20  can talk to those folks and answer their questions, and

21  obviously they are looking to do a story on you and your

22  products.

23  Q.  And approximately how many people attend the SHOT Show?

24  A.  It's tens of thousands.  I'm sure that records of

25  attendance are on some website somewhere.  I don't have a

1   figure in my head.  But it's very well attended.

2   Q.  What other SHOT Show -- or sorry, what other trade shows

3   have you attended where the SCAR rifle has been displayed or

4   marketed?

5   A.  I would typically attend SHOT Show; NDIA, which is a small

6   arms forum which I mentioned earlier; and there's a U.S. Army

7   show called AUSA in the fall.  So those are the three mainly

8   that I would have attended.

9   Q.  Did you attend the AUSA show in 2006?

10  A.  Yes.

11  Q.  And was the SCAR rifle on display then?

12  A.  Yes.

13  Q.  Are firearms trade shows reported in the media or the

14  press?

15  A.  Yes, definitely.

16  Q.  Can you give us some examples of the kinds of publications

17  that cover those shows?

18  A.  Sure.  I mean *Small Arms Review* always does a big story on

19  it.  *Shot Business*, *Shooting Industry*, *National Defense*,

20  probably others we've looked at.  You know, *Guns & Ammo*, those

21  types.  There's quite an extensive coverage of a show like

22  that.

23  Q.  And in the 2004 to 2006 time frame, do you recall seeing

24  those publications and others cover the SCAR weapon being shown

25  at trade shows?

1    A.   Yes.

2    Q.   And in other ways, as well?

3    A.   Yeah.  Some type of internet posting that some may be aware

4    of.  But, yeah, many magazine print ads, as we've looked

5    through some of the examples earlier.

6    Q.   If you had to characterize the coverage or the attention

7    that was given to the SCAR weapon in the 2004 to 2006 time

8    frame, how would you describe that or characterize it?

9    A.   I mean, it was -- it was big news, you know.  Everyone

10   wanted to know more about it, how the program was progressing.

11   And, you know, I'm sure many people ultimately, you know, went,

12   as I said before:  When can I get one?  When will they be

13   available?

14   Q.   I would like to show you what's previously been marked as

15   Plaintiff's Exhibit 218.  Will you describe for the Court what

16   the documents in Plaintiff's Exhibit 218 are.

17   A.   Sure.  These are photographs.  The first few are of a PDW

18   variant of the SCAR weapon.  Well, the first one is a SCAR 16S,

19   so that's a different color, a black version of what we had

20   here in the courtroom earlier.

21       The next few are the shorter personal defense

22   weapon--that's what PDW stands for--and they are marked, "SCAR

23   PDW," with caliber and manufacturer.

24       And then we get to flat dark earth colored SCAR 17, which

25   is the fully automatic select fire version that's sold to law

1    enforcement.

2        And at the end there's another bit-blurry picture of a SCAR

3    16S.

4            MR. HOOKER:  Your Honor, I would like to move to admit

5    Plaintiff's Exhibit 218.

6            MR. LINDEN:  No objection.

7            THE COURT:  Is this all one exhibit?

8            MR. HOOKER:  We did, we put it into one composite

9    exhibit.

10            THE COURT:  Okay.  What is the number again?

11            MR. HOOKER:  It is 218.

12        (Plaintiff's Exhibit 218 was admitted into evidence at

13    1:17 p.m.)

14            MR. HOOKER:  And with that I have no further questions

15    for Mr. Spaniel.

16            THE COURT:  I have one question.  You're talking about

17    the civilian versus military market, and the 5.56 and the 7.62.

18    They are comparable to civilian ammo .223 and .308?

19            THE WITNESS:  Yes.

20            THE COURT:  Do your guns, your rifles fire that

21    civilian-type ammunition?  Or if you're a civilian do you have

22    to go out and buy the 7.62 as opposed to the .308?

23            THE WITNESS:  It will fire the .223 and the .308.

24            THE COURT:  And both the civilian and the military

25    will do that?

```
1              THE WITNESS:  Correct.

2              THE COURT:  Okay.  All right.

3                      CROSS EXAMINATION

4  BY MR. LINDEN:

5  Q.  Good afternoon, Mr. Spaniel.

6  A.  Good afternoon.

7  Q.  We haven't met.  My name is Paul Linden.  I am an attorney

8  for Mr. Clyde and Clyde Armory.  You testified on direct that

9  FN sold a Mark 12 weapon.  Is that weapon referred to as the

10 SPR?

11 A.  I did not -- I don't believe I testified that FN sold a

12 Mark 12.

13 Q.  Does FN sell a Mark 12 weapon?

14 A.  Not to my knowledge.

15 Q.  Does FN sell a weapon known as the SPR?

16 A.  Yes.

17 Q.  Does SPR stand for special police gun -- or I'm sorry,

18 special police rifle?

19 A.  That's my understanding, yes.

20 Q.  Mr. Spaniel, FN didn't come up with the term "SCAR"; did

21 it?

22 A.  No.

23 Q.  In fact, it was the U.S. military, specifically SOCOM, that

24 came up to the term "SCAR"; is that correct?

25 A.  That was the name of their program for this assault rifle.
```

```
1    Q.  I would like to direct your attention to what's already
2    been admitted as Defendant's Exhibit 180.  Do you have that
3    document in front of you?
4    A.  Yes.
5    Q.  So there's a section there about the middle of the page
6    that says, "Synopsis."  Do you see that?
7    A.  Yes.
8    Q.  It begins -- the paragraph begins,
9            "The United States Special Operations Command
10           is issuing a solicitation for the procurement
11           of SOF Combat Assault Rifles (SCAR)."
12   Did I read that correctly?
13   A.  Yes.
14   Q.  It continues,
15           "The program will use full and open
16           competition to fulfill the joint USSOCOM SCAR
17           requirement."
18   Did I read that correctly?
19   A.  Yes.
20   Q.  SOCOM came up with "SCAR" as a term for the type of weapon
21   it was seeking; correct?
22   A.  It was in the name of the program that they were running
23   for a new weapons system.
24   Q.  I realize it was the name of the program.  But USSOCOM came
25   up with the term "SCAR" for the type of weapon it was seeking;
```

1    correct?

2    A.   That's my understanding.

3    Q.   Later on in that paragraph it continues with certain

4    requirements of the SCAR rifle that USSOCOM is seeking.

5    A.   Yes.

6    Q.   For instance, if you follow me down a little bit further in

7    this paragraph there's a sentence that begins, "The SCAR-L

8    shall be optimized..."  Do you see where that sentence is?

9    A.   Yes.

10    Q.   "The SCAR-L shall be optimized for 5.56 by 45 millimeters

11    and thus shall use an enhanced 5.56-millimeter magazine";

12    correct?

13    A.   Correct.

14    Q.   Did I read that correctly?

15    A.   Um-hum.

16    Q.   Now, when you led FN's efforts within the SCAR program, is

17    this a document that you would refer to as requirements that we

18    need to meet in order to participate in the program?

19    A.   Yes, early on.

20    Q.   "Early on."  So looking at documents like this, you are

21    sure, as someone in your position at FN, you follow everything

22    that is said in these documents so that you are in compliance

23    with the program; isn't that correct?

24            MR. HOOKER:  Objection, Your Honor.  I am not sure if

25    he's referring to DX 180, which is a magazine article?

1          THE COURT:  Well, 180 is a FedBizOpps.  Is that what

2    you're looking at?

3          MR. LINDEN:  Yes, sir, that's what I'm looking at.

4          MR. HOOKER:  Okay.  I just wanted to clarify.

5          THE COURT:  It has all the specifications.

6          MR. HOOKER:  Okay.

7          THE COURT:  You may proceed.

8    BY MR. LINDEN:

9    Q.  I'm sorry, I believe the question is that you look at

10   documents like that in your position with FN to make sure that

11   you meet and follow all the requirements of the program in

12   order to compete in the program; isn't that correct?

13   A.  Yes, this is in anticipation of what the program will

14   require.  They do not use a FedBizOpps pre-solicitation to

15   define the specification of the rifle.  It's to give industry a

16   sense of what they are going to be looking for.

17   Q.  Okay.  Thank you.  If you could turn to the next page of

18   this same exhibit.  The second paragraph down reads,

19          "The SCAR barrels/caliber will be readily

20          exchanged at operator level, without head

21          space/timing adjustments, within 20 minutes,

22          threshold (T), 5 minutes objective (O)."

23   To you, as someone in your position at FN, do you read that as

24   a requirement that you need to meet with your weapon?

25   A.  Yes.

1  Q.  Further on down, you skip a paragraph and go to the next

2  one it reads,

3           "The SCAR-L and H, in threshold caliber

4           configuration/ball ammunition (T), spirally

5           developed/alternate caliber configurations

6           (O), shall have a Mean Round Between Failure

7           (MRBF) of 15,000 rounds (T), 30,000 rounds

8           (O)."

9  Did I read that correctly?

10  A.  Yes.

11  Q.  Do you read that as a requirement of what your submissions

12  to the SCAR program need to have?

13  A.  Yes.

14  Q.  The paragraph I read to you previously and the one I just

15  read they begin, "The SCAR...," right?

16  A.  The later one begins, "The SCAR-L..."

17  Q.  "The SCAR-L and H...," in fact; correct?

18  A.  Correct.

19  Q.  And the one previously refers to, "The SCAR

20  barrels/caliber..."; correct?

21  A.  Yes.

22  Q.  So in saying, "The SCAR," this document in fact is

23  referring to the type of weapon that will be submitted within

24  this SOCOM program; isn't that correct?

25  A.  Yes.

1    Q.  I would like to draw your attention now to Joint Exhibit 19

2    which has been previously admitted.  Mr. Spaniel, this document

3    is, in fact, a solicitation from USSOCOM; isn't it?

4    A.  Yes.

5    Q.  And in Box Number 5 at the top of the document it's issued

6    23 January 2004; correct?

7    A.  Correct.

8    Q.  So if I could turn you -- if I could draw your attention to

9    the second page of this document.  Under Section B, "Supplies

10   or Services and Prices."  Do you see where I'm at?

11   A.  Yes.

12   Q.  Tell me if I've read this correctly.  The first line says,

13          "Pricing is hereby requested on an eight (8)

14          year Indefinite Delivery/Indefinite Quantity

15          of Special Operations Forces Combat Assault

16          Rifle (SCAR) in light 5.56 and heavy 7.62

17          variants."

18   Did I read that correctly?

19   A.  Yes.

20   Q.  In fact, in the very summary of the solicitation, SOCOM is

21   referring to the type of weapon that they want you to submit as

22   a SCAR; are they not?

23   A.  Yes.

24   Q.  Later on in the same page under a box entitled, "Minimum

25   Quantities" -- do you see where I am?

1    A.  Yes.

2    Q.  -- there is a line that says, "SOF Combat Assault Rifle

3    Light."  Correct?  Do you see where I am?

4    A.  Yes, I see it.

5    Q.  And below that it lists one, two, three -- four different

6    lines of SCAR-L, Standard Configuration, followed by a SCAR-L

7    CQC Configuration; SCAR-L SV Configuration with suppressors,

8    and SCAR-L Tool/Gage Kit.  Do you see where I am?

9    A.  Yes.

10   Q.  Did I read those correctly?

11   A.  Yes.

12   Q.  Does the solicitation here, in fact, call for -- in fact

13   define the weapons that SOCOM is seeking as SCAR-Ls?

14   A.  Yes.

15   Q.  Mr. Spaniel, I would like to draw your attention to what's

16   already been entered into evidence as Defendant's Exhibit 188.

17          THE COURT:  Did you say 180?

18          MR. LINDEN:  I'm sorry, 1-8-8.

19   BY MR. LINDEN:

20   Q.  Sir, do you have that exhibit in front of you?

21   A.  Yes, I do.

22   Q.  This is an *ArmyTimes* article from November 12th, 2004;

23   correct?

24   A.  Correct.

25   Q.  It reads at the very top,

1                    "Special operators will soon take a new rifle

2                    into battle.  The U.S. Special Operations

3                    Command has awarded FN Herstal USA,

4                    Incorporated a contract to produce SOF Combat

5                    Assault Rifles, or SCAR, for its elite

6                    forces."

7      Did I read that correctly?

8      A.   Yes.

9      Q.   This passage here is referring to SOF Combat Assault Rifles

10     or SCAR interchangeably; is it not?

11     A.   Yeah, it appears so.

12     Q.   SCAR, in fact, does stand for SOF Combat Assault Rifle;

13     does it not?

14     A.   Yeah, in their program.

15     Q.   And so this article, as of November 12, 2004, is referring

16     to SOCOM's SCAR rifle; correct?

17     A.   Correct.

18     Q.   I would like to move next to what's Exhibit 190,

19     Defendant's DX 190, which is already entered into evidence.  Do

20     you have that exhibit in front of you?

21     A.   Yes.

22     Q.   This is an *ArmyTimes* article dated July 21st, 2006;

23     correct?

24     A.   Correct.

25     Q.   The second paragraph down reads,

1              "Fourteen members of the House and Senate

2              attended the July 13 event to familiarize

3              themselves with the Special Operations Forces

4              Combat Assault rifle or SCAR."

5    Correct?

6    A.  Correct.

7    Q.  This article is referring to the type of weapon that these

8    members of Congress familiarized themselves with; correct?

9    A.  Correct.

10   Q.  And that type of weapon is referred to in this article as a

11   SCAR; correct?

12        MR. EHRLICH:  Objection, Your Honor, the document

13   speaks for itself.  It says, "Special Operations Forces Combat

14   Assault Rifle," and then it goes on to read something further.

15   I think the document speaks for itself.

16        MR. LINDEN:  Your Honor, I'm asking -- Mr. Spaniel

17   testified about this article.  He testified that this is the

18   type of thing that people were reading that was creating a

19   buzz.  This is specifically referring to the type of weapon,

20   that Special -- that SOCOM was looking for.  It was a SCAR.

21        THE COURT:  All right.  Well, I'll overrule the

22   objection.  Go ahead.

23        MR. LINDEN:  I believe the witness in fact answered

24   the question before the objection.  Is that the case?

25        THE COURT:  Do you remember the question?

1              THE WITNESS:  No, could you repeat.

2              THE COURT:  Ask the question again, please.

3              MR. HOOKER:  Can I ask the question be read.

4         (Reporter read back the previous question at 1:31 p.m.)

5    BY MR. LINDEN:

6    Q.  Would you please answer the question.

7    A.  Yes.

8    Q.  I would like to move on to what's previously been admitted

9    as Plaintiff's Exhibit 180.  Mr. Spaniel, do you have that

10   document in front of you?

11   A.  Not yet.  Yes.

12   Q.  Bear with me one second, please.  Actually, I would like to

13   draw your attention now to Defendant's Exhibit 214.  Do you

14   have that document in front of you?

15   A.  Yes.

16   Q.  So if you flip to the page that's marked in the lower

17   right-hand corner as CA 03693, it's Page 27 of the article.

18   Would you look at that for me, please.

19   A.  Yes, I'm there.

20   Q.  So under the section entitled, "SCAR Light and Heavy," it

21   reads,

22              "In 2002 a requirement was established for a

23              new combat rifle to replace the M4A1 Carbine

24              for SOCOM's Special Forces.  Called the

25              Special Operations Forces Combat Assault

1          Rifle (SCAR, or SofCAR)..."

2    Do you see that?

3    A.  I see that.

4    Q.  This article is referring to what was issued by SOCOM as a

5    requirement and that SOCOM is referring to what they wanted as

6    a SCAR rifle; is that right?

7    A.  I'm not sure that this article is detailing what they

8    wanted, and it -- and it also, you know, illustrates, you know,

9    SCAR and SofCAR as abbreviations that they used for the program

10   named Special Operations Forces Combat Assault Rifle.

11   Q.  Okay.  Well, the article does reference the year 2002;

12   correct?  Right where I read.  The beginning of that paragraph.

13   A.  Well, yeah, yeah.

14   Q.  "In 2002...," which in 2002 is when SOCOM was beginning the

15   SCAR program; correct?

16   A.  Yeah, I believe so.

17   Q.  And by a requirement, they are referring to what SOCOM

18   issues as requirements for what they're looking for in weapons

19   they want submitted; correct?

20          MR. EHRLICH:  Objection, Your Honor.  There's no

21   foundation for him being familiar with this so-called

22   requirement from 2002.  And unless there is a document that

23   opposing counsel has where -- you know, or something that

24   establishes his familiarity with this aspect.  This is just a

25   news report from a magazine.  And unless this witness -- it's

1   just hearsay on a magazine, they may or may not have it right.

2   But I don't see how there is a foundation established for him

3   having familiarity with that 2002 SOCOM requirement.

4         THE COURT:  Well, I thought that the key document on

5   that was Defendant's 180.  Am I wrong about that?  That that's

6   where you started, and that seems to have the synopsis or the

7   specifications there?  I am not finding a date on this.

8         MR. LINDEN:  Right now, Your Honor, I'm questioning

9   the witness about Defendant's Exhibit 214.

10        THE COURT:  Okay.  Right.

11        MR. LINDEN:  I had called out --

12        THE COURT:  The question is can he testify -- is he

13  competent to testify about that?  Is he qualified to testify

14  about that?  I don't know.

15        Do you know about the 2002 date?  2002 date?

16        MR. LINDEN:  Yes, sir.  The article reads, "In

17  2002..."

18        THE COURT:  All right.

19        THE WITNESS:  I have no specific knowledge of when,

20  you know, SOCOM would have -- what they would have done in

21  2002.

22  BY MR. LINDEN:

23  Q.  Okay.  You do have knowledge what SOCOM was doing in 2003?

24  A.  Yes.

25  Q.  And isn't it correct that when SOCOM discussed their

1    solicitation -- this is referred to commonly as when a

2    requirement is issued; correct?  SOCOM issues a requirement?

3    A.  Ultimately, yes.

4    Q.  So the -- the article here is referring to a requirement

5    that SOCOM has issued.  And whether you're familiar with it or

6    not, this is 2002, a requirement was issued.  "Was

7    established," is what the article reads.  Isn't that correct?

8    A.  That's what it says.

9    Q.  And do you -- strike that.

10          THE COURT:  May I ask a question while you're looking?

11    If you will turn back a page -- I'm sorry, to the first page of

12    P-214.  And this is a question that I just was curious about,

13    if they ever started this.  FN built an FAL; right?

14          THE WITNESS:  Yes.

15          THE COURT:  Was that ever -- was FAL ever trademarked?

16          THE WITNESS:  I don't know that answer.

17          THE COURT:  Okay.  Go ahead.

18    BY MR. LINDEN:

19    Q.  I want to draw your attention now to Plaintiff's

20    Exhibit 42, which has already been admitted into evidence.  Do

21    you have that document in front of you?

22    A.  Yes.

23    Q.  In the top left-hand corner of this document, do you see it

24    says, "60 DefenseNews"?

25    A.  Yes.

 1   Q.  And can you read that date for me, please.

 2   A.  "October 9, 2006."

 3   Q.  That's after September, 2006; correct?

 4        MR. EHRLICH:  Objection, Your Honor.  I mean, that's

 5   public knowledge, you know.

 6        THE COURT:  Okay.  We all know the answer to that one.

 7   Go ahead.

 8   BY MR. LINDEN:

 9   Q.  Let's move on to Plaintiff's Exhibit 195.  Do you have that

10   exhibit in front of you, sir?

11   A.  I do.

12   Q.  The beginning of the article reads,

13           "U.S. special operations forces this summer

14           will begin testing a new assault rifle, which

15           is expected to be more accurate and less

16           cumbersome than current weapons."

17   Did I read that correctly?

18   A.  Yes, you did.

19   Q.  It continues,

20           "Known as the special operations combat

21           assault rifle, or SCAR, the weapon comes in

22           5.56 light and 7.62 heavy versions that are

23           designated the Mk 16 SCAR-L and Mk 17

24           SCAR-H."

25   Did I read that correctly?

1  A.  Yes.

2  Q.  Those designations were given by USSOCOM; correct?

3       MR. EHRLICH:  Objection, Your Honor.  This is -- it

4  says designation Mk.  I'm not sure what designations he's

5  referring to, whether it's the whole thing.  And the article

6  doesn't read who -- who designates necessarily.  If all he's

7  being asked is whether he can read this article and doesn't

8  have a separate foundation, then I think the -- the question is

9  highly objectionable based on foundation.

10       THE COURT:  You put him on the stand because he was

11  familiar with the design and development and testing of all

12  this.  He may or may not know the answer to that question.  I

13  don't know.  You put him on the stand for that purpose, and if

14  he can answer the question, I think he ought to.  If he can't,

15  he can't.

16       Can you answer the question?

17  A.  I'd like to hear the exact question again.

18  BY MR. LINDEN:

19  Q.  My question is whether SOCOM came up with the designations

20  that are stated in the part of the article that I just read,

21  sir.

22  A.  I can't speak to the -- that they did.  What I do know is

23  Mk is the common designation for a SOCOM weapon.  Earlier when

24  I talked about what weapons this system replaced, it was a

25  Mark 11, a Mark 18, you know, which is -- when I say Mark it is

1    the Mk abbreviation.  They did designate that the numerical

2    number for these weapons would be 16 and 17.  I recall that

3    specifically.  But I don't recall ever saying, "We're going to

4    designate Mk 16 SCAR-L," I can't say I recall that.

5    Q.   Okay.  Later on in that article, one, two, three, four --

6    the fifth paragraph down begins, "The manufacturer..."  Do you

7    see that?

8    A.   I'm not with you yet.

9    Q.   It's a 2-line paragraph.

10   A.   Is it in the first column or the second column?

11   Q.   The left-hand column.

12   A.   Oh, I see it, yes.

13   Q.        "The manufacturer of the rifle, FN Herstal,

14              is testing different interchangeable barrels,

15              he said in an interview."

16   Did I read that correctly?

17   A.   Yes, you did.

18   Q.   This article is referring to "the rifle" being the SCAR

19   rifle; correct?

20   A.   Yes.  I mean, that seems rather obvious.

21   Q.   And that is -- in fact, the rifle is designated as the SCAR

22   rifle; isn't that right?

23   A.   As I have said, I mean, in my mind, the program was the

24   SCAR program to produce a new assault rifle.  So naturally, it

25   was referred to as the SCAR rifle.

1  Q.  I would like to draw your attention now to Plaintiff's

2  Exhibit 113, which is already admitted into evidence.  Are you

3  with me there?

4  A.  Yes.

5  Q.  If you look at the front of this exhibit, can you tell me,

6  in the lower right-hand corner, what date this -- this magazine

7  was published?

8  A.  July 1st, 2008.  Oh, I'm sorry, that's, "Display Until."  I

9  guess that would be your date.  That's the only date.

10 Q.  Let me draw your attention now to Plaintiff's Exhibit 57.

11 Are you with me there?

12 A.  Yes.

13 Q.  Can you tell me the date on the front of this magazine

14 cover?

15 A.  August 3rd, 2009.

16 Q.  And now I would like to draw your attention to Defendant's

17 Exhibit 182.

18 A.  Okay.

19 Q.  This is a press release issued by FN Herstal; correct?

20 A.  By FNH USA, the U.S. Sales and Marketing for FN Herstal.

21 Q.  And the issue date is March 2nd, 2006; correct?

22 A.  That's correct.

23 Q.  It begins by saying,

24              "FN Herstal is now entering the final phase

25              of the development of the SCAR SOF Combat

1              Assault Rifle..."

2  Do you see where I am?

3  A.  Yes.

4  Q.       "...the first assault rifle procured through

5           an open competition since the M4/M16."

6  Do you see where I am there?

7  A.  Yes.

8  Q.  Now, in the section that is entitled, "2002-2003:  The

9  search begins for a new SOF assault rifle," it reads,

10          "In an effort to acquire a 'Weapon Designed

11          for SOF by SOF...'"

12  Do you see where I am?

13  A.  Yes.

14  Q.       "...USSOCOM initiated the SCAR program with

15          an approved Joint Operational Requirements

16          Document,"

17  otherwise known as the JORD.  Do you see that?

18  A.  Yes.

19  Q.  So in FN's press release here, it's saying that it's

20  entered the SCAR program and submitted and worked with SOCOM to

21  produce SCAR rifles; correct?

22  A.  I don't agree that that's what that says.  Unless I

23  misunderstood you.

24  Q.  Well, it says that, "USSOCOM initiated the SCAR program";

25  correct?  Do you see where I am?

1    A.  Yes, that's correct.

2    Q.  And that FN Herstal was entering the final phase of the

3    SCAR program up at the top.  Correct?

4    A.  Oh, okay.

5    Q.  So essentially USSOCOM has started a SCAR program, and FN

6    Herstal is entering the final phase of it; is that correct?

7    A.  Okay.  Yes.

8    Q.  I would like to draw your attention to -- it's a page later

9    on in this same document.  The section entitled February, 2006.

10   And in the lower right-hand corner of that page you will see a

11   designation CA00137.

12   A.  Okay.

13   Q.  So the first paragraph of that section reads,

14              "FN Herstal unveiled the new battle rifle

15              systems SCAR-Light and SCAR-Heavy to the

16              commercial and law enforcement (LE) markets

17              at the 2006 SHOT Show in Las Vegas, Nevada,

18              held February 8 through 11, 2006."

19   Do you see where I am?

20   A.  Yes.

21   Q.  Did I read that correctly?

22   A.  Yes.

23   Q.  Now, the -- the prototypes that were at the SHOT Show,

24   those were fully automatic; correct?

25   A.  Yes.

1   Q.  There were no semi-automatic prototypes available at SHOT

2   Show?

3   A.  No.  Not to my knowledge.

4   Q.  And civilians cannot use fully automatic weapons; isn't

5   that correct?

6   A.  That's correct.

7   Q.  Fully automatic weapons are solely preserved for the

8   military or law enforcement; correct?

9   A.  And federal agencies, yes.

10  Q.  2006 SHOT Show, you testified earlier that you were at, the

11  SHOT Show is really a trade show; isn't it?  It's for industry

12  insiders; correct?

13  A.  Yeah, for the most part.

14  Q.  I mean, gun distributors can attend; correct?

15  A.  Correct.

16  Q.  Gun manufacturers can attend; correct?

17  A.  Correct.

18  Q.  Owners of gun stores can attend; correct?

19  A.  Yes.

20  Q.  But a customer that walks into Clyde Armory in the morning,

21  cannot then just proceed to go on to SHOT Show; isn't that

22  right?

23          MR. EHRLICH:  Objection.  Argumentative.  It

24  mischaracterizes his earlier testimony where he did mention

25  that some gun enthusiasts are able to attend.  You're making an

1   argument that they can just walk in.  You know, that's --

2   that -- I don't think that's a proper argument, but --

3           THE COURT:  I am not clear what the question is here.

4   I mean, the SHOT Show is a public show.  Anybody can go.  You

5   don't have to be a distributor; isn't that correct?  Isn't it

6   open to the public?

7           THE WITNESS:  No, it's not the general public.  You --

8   but many people have a connection that aren't a distributor

9   that are able to attend.

10  BY MR. LINDEN:

11  Q.  So, in other words, for your average Joe Customer off the

12  street to attend, he would have to have a connection with

13  somebody related to the show; correct?

14          MR. EHRLICH:  Objection.  Speculation.  Conjecture.  I

15  don't know what an average Joe is.

16          THE COURT:  I think he's already answered the

17  question.  But I'm overruling that objection.  Go ahead and ask

18  the question again.

19  BY MR. LINDEN:

20  Q.  My question, sir, is just to clarify your previous response

21  about average customers attending the show.  You said if they

22  have a connection that they can get in.  I'm saying, if an

23  average customer does not have a connection, they really can't

24  just walk off the street and enter the SHOT Show 2006; am I

25  right?

1    A.   That's been my understanding.

2    Q.   Referring back now to Exhibit 182.  In that same section

3    entitled, "February 2006," it's the fourth paragraph down, it

4    reads,

5             "Production of a semi-automatic only version

6             of the innovative modular rifle system with a

7             target launch to LE and commercial markets

8             will potentially be available in the next two

9             years";

10   correct?

11   A.   Yes.

12   Q.   Have I read that --

13   A.   That's what it says.

14   Q.   In fact, when did FN produce a semi-automatic version

15   available for commercial purposes?

16   A.   I believe it was late 2008.

17   Q.   AUSA is a military-only trade show; isn't that correct?

18   A.   Yes.

19   Q.   Mr. Spaniel, I believe you testified on direct that you

20   started putting "SCAR" on the assault rifles you produced for

21   SOCOM from the beginning; isn't that right?

22   A.   Yes.  I -- I don't recall if I testified exactly to that.

23   But, yeah, we put the SCAR name on the rifle that we submitted.

24   Q.   And by, "submitted," you mean the one that you submitted to

25   the SOCOM competition?

```
1    A.  That's my understanding.

2    Q.  And you put "SCAR" on that weapon because you were

3    participating in the SCAR program; isn't that correct?

4    A.  Yes.

5              MR. EHRLICH:  Objection.  Foundation.

6              THE COURT:  Overruled.

7              MR. LINDEN:  Your Honor, if I could just have a minute

8    to confer with my co-counsel.

9              THE COURT:  Certainly.

10      (Aside.)

11             MR. LINDEN:  Your Honor, I don't have any further

12   questions for Mr. Spaniel, but I do want to clarify that

13   earlier I was referring to Plaintiff's Exhibit 214, and I

14   misspoke and called it Defendant's Exhibit 214.

15             THE COURT:  Okay.

16             MR. LINDEN:  Otherwise, I don't have any further

17   questions for Mr. Spaniel.

18             THE COURT:  Any redirect?

19             MR. LINDEN:  Thank you.

20             MR. HOOKER:  Yes, Your Honor, very briefly.

21                        REDIRECT EXAMINATION

22   BY MR. HOOKER:

23   Q.  Mr. Spaniel, did FN decide to adopt SCAR as a trademark?

24   A.  I believe, you know, yes, that we were going to call the

25   rifle the SCAR rifle.
```

1  Q.  And are you aware of anywhere where the military or the

2  U.S. government has claimed trademark rights in SCAR?

3  A.  No.  I have never heard that.

4  Q.  Now, you were asked some questions about various acronyms

5  or things that SCAR could stand for.  Are you aware of

6  different things that SCAR has stood for?

7  A.  Yes.  We actually -- one of the exhibits we went through, I

8  couldn't tell you which one, it had two different acronyms,

9  SofCAR and SCAR, for the same phrase.

10 Q.  Right.  So it could stand for Special Operations Forces

11 Combat Assault Rifle?

12 A.  Yes.

13 Q.  It could stand for Special Operations Combat Assault Rifle?

14 A.  Yes.

15 Q.  It could stand for Special Forces Combat Assault Rifle?

16 A.  Yes, I've heard all those.

17 Q.  If you will, turn with me in Exhibit 214, Plaintiff's

18 Exhibit 214, Page P214.0005 in the bottom left.  Do you see,

19 "SofCAR"?  I'll let you catch up with me.  It's Page 5 in the

20 top right corner there.  I'm looking at the --

21 A.  Oh, okay, yeah.

22 Q.  In the bottom left-hand corner under a heading that says,

23 "SCAR Light and Heavy," three lines up from the bottom, all the

24 way to the left, do you see where it says, "SofCAR"?

25 A.  Yes.

1    Q.  Do you understand that to be an acronym for the same

2    program counsel was referring to?

3    A.  Yes.

4    Q.  Now, USSOCOM never produced a SCAR rifle on its own;

5    correct?

6    A.  That's correct.

7    Q.  If an individual had a license from ATF, could they

8    purchase a fully automatic machine gun?

9    A.  Not today, no.

10   Q.  At any point in time, could they?

11   A.  Well, there was a ban on being able to purchase it, so it

12   would have to have been something produced pre that ban.

13   Q.  Do you know what the date of that ban was?

14   A.  It was in the 1980s, I believe.

15   Q.  Now, the 2000 -- there was some testimony about the 2006

16   SHOT Show.  And whether civilians could or couldn't attend.

17   Generally speaking, was the gun market expecting there to be a

18   SCAR rifle offered to the civilian and law enforcement market?

19   A.  Yes.  There was definitely an expectation.

20   Q.  And as early as when?

21   A.  Probably as early as when someone won the competition which

22   was FN that --

23   Q.  And what year was that?

24   A.  That was -- the award was in 2004.

25   Q.  And I believe you testified earlier -- I just want to

1    confirm -- that it's typical for a gun manufacturer, when they

2    manufacture a weapon for the military, that they will then

3    carry that weapon into the civilian and law enforcement market?

4    A.  Yes.

5    Q.  And can the -- can law enforcement purchase fully automatic

6    weapons?

7    A.  Yes.

8    Q.  Last question:  Who are FN's customers?  Who does FN sell

9    directly to?

10    A.  Oh, FN sells directly to the military, to law enforcement,

11    federal agencies, also to distributors, large distributors that

12    then sell to local dealers.

13    Q.  And can all of those people attend the SHOT Show?

14    A.  Yes.

15             MR. HOOKER:  No further questions.

16             THE COURT:  Can he come down now?

17             MR. LINDEN:  No recross, Your Honor.

18        (Witness was excused at 1:57 p.m.)

19             THE COURT:  You want to excuse this witness or do you

20    want him to stay here?

21             MR. EHRLICH:  I'm sorry?

22             THE COURT:  Do you want to excuse him or do you want

23    him to stay there?

24             MR. EHRLICH:  It's up to you.  If you don't need him,

25    we can send him off.

```
 1            MR. BELLAMY:  We do not intend to call him as a
 2     witness.
 3            THE COURT:  Okay.  I always ask that after every
 4     witness.
 5            MR. BELLAMY:  I appreciate that.
 6            MR. EHRLICH:  We appreciate that, too.
 7            THE COURT:  Let them go if they can go back to
 8     wherever they need to go.  So you're excused, sir, or you can
 9     stay, whatever you want to do.
10            THE WITNESS:  Thank you.
11            THE COURT:  Call your next witness.
12            MR. HOOKER:  Mr. Mills, Your Honor.
13        (Mr. Mills assumed the stand at 1:58 p.m.)
14            MR. HOOKER:  If I may approach, Your Honor.  I have a
15     binder for you and for the witness.
16                     CHARLES "BUCKY" MILLS
17                   DIRECT EXAMINATION CONTINUED
18     BY MR. HOOKER:
19     Q.  Mr. Mills, would you please introduce yourself to the
20     Court.
21     A.  Good afternoon.  My name is Charles Newton Mills the Third.
22     I go by "Bucky," as I stated earlier.  I am senior director for
23     FN America, which up till a year ago was FNH USA, for law
24     enforcement sales and training.
25     Q.  And as senior director, what are your job responsibilities
```

1    for FN?

2    A.  I'm in charge of selling law enforcement product and

3    provide training to that product to U.S. law enforcement

4    agencies, state, local and federal agencies.

5    Q.  And how long have you been in that position?

6    A.  As senior director/director two years.  As a manager and

7    deputy director, then a director.  I've been with FN since

8    2001.

9    Q.  Can you walk us through the various roles you've had with

10   FN since you started in -- I believe, late 2001 is what you

11   said?

12   A.  Yes, sir.  My very first job with FN was 2001 SHOT Show.  I

13   was hired as an adjunct employee to provide training to law

14   enforcement agencies that were attending the SHOT Show on our

15   Less Lethal 303 Launcher.

16   Q.  And after that --

17   A.  I -- after that, I was asked to develop a comprehensive

18   training program on all FN products for law enforcement.  And

19   then FN hired me January of 2002 full-time as a manager of law

20   enforcement sales and training.

21   Q.  So as manager of law enforcement sales and training, what

22   were your responsibilities in that role?

23   A.  Pretty much the same as they are today, just a little more

24   expanded.  Responsible for selling and providing FN product to

25   U.S. law enforcement at the state, local and federal level.

1    Q.  And at that time, were you also providing sales support to

2    distributors?

3    A.  That's part of -- we have a 2-stage system.  We would sell

4    directly to federal agencies and then we sell directly to

5    certain distributors who then subsell to dealers and then would

6    go to the end user.

7    Q.  So is it fair to say that the whole -- the entire time

8    you've been with FN, you have been in the sales capacity?

9    A.  Sales and training, yes, sir.

10   Q.  And have you had any role in interacting with the Bureau of

11   Alcohol, Tobacco and Firearms?

12   A.  Quite often, sir.

13   Q.  And can you just explain briefly what that role has been?

14   A.  A couple different roles.  Actually one role would be in

15   providing them items to look at and evaluate for sale to that

16   agency.  And then a second role, 2004 through 2006, I handled

17   all the ATF and state department paperwork, imports, exports,

18   Form 3, Form 2.  Any machine gun that needed to be titled and

19   transferred, I handled that paperwork with ATF.

20       I also handled -- when we would bring in a P90 and want to

21   sell it commercially, we would have to go to ATF -- I'm sorry,

22   Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms

23   Technology Branch, FTB.  We would present a semi-automatic

24   version for them to evaluate on the PS90, the FS2000, and I

25   also did the SCAR 16S and SCAR 17S.

1   Q.  Now, before you joined FN, what did you do?

2   A.  Prince George County, Maryland, law enforcement officer for

3   27 years.  It's right outside of Washington, D.C.

4   Q.  Can you describe your duties in that job.

5   A.  I was on the street for 6 years.  I was in special

6   operations for 11 years.  Then I went to the firearms range for

7   6 years, and then up to the training academy.  And then I

8   retired, came back the next day, and was civilian director for

9   all use of force for Prince George's Police Department for 3

10   years, where I would train officers on the proper use of force

11   and then I would also testify for the County in police use of

12   force, police use of deadly force cases.

13   Q.  Are you familiar with FN SCAR brand?

14   A.  Yes, sir, I am familiar with FN SCAR brand.

15   Q.  What is that?

16   A.  When I hear FN SCAR brand, that is the FN SCAR 16 or SCAR

17   16S, the FN SCAR 17 or SCAR 17S.  If it's coming from the

18   military person, now I hear it as an FN MK 16, FN MK 17.

19   Q.  Who are the target consumers for FN SCAR products?

20   A.  A complete list?

21   Q.  Categories.

22   A.  Okay.  Military personnel; meaning units, not individual

23   military officers.  Law enforcement departments, individual

24   officers.  And then the general citizens that could buy a SCAR

25   16S or a SCAR 17S.  And the S stands for a semi-automatic

1    version of that product.

2    Q.   And how did FN come to begin making SCAR brand rifles?

3    A.   They decided to submit to the solicitation for U.S. Special

4    Forces and that's how it started.

5    Q.   And that was in 2004?

6    A.   2003-2004, sir.

7    Q.   As -- and then as Mr. Spaniel testified earlier, FN, you're

8    aware that FN won that solicitation?

9    A.   I was aware that we were the only ones that passed Phase I.

10   We were down-selected for Phase II and -- which meant we won

11   that and it proceeded, yes, sir.

12   Q.   Now, in the prototype rifles that were -- that were shipped

13   in 2004 to USSOCOM, were those marked with SCAR?

14   A.   Yes, sir.

15   Q.   And how do you know that?

16   A.   I personally saw some of them.

17   Q.   And where were they marked with SCAR?

18   A.   On the side of the receiver.  Currently, the same place

19   that was on the side of the receivers that were shown earlier

20   in court.

21   Q.   Okay.  I want to show you what's been marked previously as

22   Plaintiff's Exhibit 76.  And what is that document?

23           THE COURT:  What's the number on that again, please?

24           MR. HOOKER:  Plaintiff's 76.

25   A.   It is a Bureau of Alcohol, Tobacco and Firearms ATF Form 2.

1    What it does, it registers -- when you have an approved

2    importation license, as soon as the firearm is brought into the

3    country, you fill out this form, submit it to BATF, and they

4    register that machine gun.  And that's what this form is, sir.

5    BY MR. HOOKER:

6    Q.  At the bottom of the form, what's the -- what's the date?

7    A.  February 22nd, 2005.  And it is also my signature.

8    Q.  And on the right-hand side, is there a serial number there?

9    A.  The serial number is up just below the column on the

10   right-hand side, 00103.

11   Q.  And do you recall importing this weapon?

12   A.  Yes, sir, I handled the paperwork for this firearm.

13        MR. HOOKER:  Your Honor, I would move to admit

14   Plaintiff's Exhibit 76.

15        MR. BELLAMY:  No objection.

16        THE COURT:  Admitted.

17   (Plaintiff's Exhibit 76 was admitted into evidence at

18   2:06 p.m.)

19   BY MR. HOOKER:

20   Q.  If you would turn with me to Plaintiff's Exhibit 77 and

21   describe for the Court what that shows.

22   A.  This is a picture taken of an FN brand SCAR-Light 5.56, and

23   it's a machine gun.  It doesn't say so, but it's a machine gun,

24   it's a select fire.

25   Q.  What's the serial number of that?

1    A.  The serial number on that is 00103.

2    Q.  Is that the same firearm that's referenced in Plaintiff's

3    Exhibit 76?

4    A.  Yes, sir, it is.

5         MR. HOOKER:  Your Honor, I would like to move to admit

6    Plaintiff's Exhibit 77.

7         MR. BELLAMY:  No objection.

8         THE COURT:  Admitted.

9      (Plaintiff's Exhibit 77 was admitted into evidence at

10   2:07 p.m.)

11   BY MR. HOOKER:

12   Q.  Mr. Mills, do you recall why you imported this weapon and

13   what you used it for?

14   A.  That was one of the first black SCARs that we received that

15   we could actually use to demonstrate to law enforcement

16   agencies and show distributors to start generating interest in

17   sales orders for our product.

18   Q.  Do you recall specific shows or events you took that rifle

19   to?

20   A.  Hundreds of shows and events, sir.  I handled -- I would do

21   a list every year of all the shows my folks would attend and

22   that I would attend.

23   Q.  Can you list some of them that might jump to mind.

24   A.  SHOT Show; NRA; International Chiefs of Police; National

25   Sheriff Show; Police and Security Expo, Atlantic City; local

1   and state law enforcement association shows.  Each state has a

2   chiefs of police and a national -- I'm sorry, a sheriff's show,

3   majority of the states have those.  That's just a few of the

4   shows that we attended.

5   Q.  And would those shows have been in 2005?  2006?  Or when

6   would those have been?

7   A.  We've been doing those shows since I started in 2001, sir.

8   Q.  Just to be clear, so this rifle that you imported in 2005,

9   did you take it to shows in 2005?

10  A.  Yes, sir, I did.  Not all of them, but different shows,

11  yes, sir.

12  Q.  And what about shows in 2006?

13  A.  Yes, sir.  I don't -- I did not take that specific one in

14  '06.

15  Q.  A different one?

16  A.  Two different ones.

17  Q.  That were marked with "SCAR"?

18  A.  Yes, sir, they were marked with "SCAR."  Just different

19  serial numbers.

20  Q.  And at the shows, how would you use the weapon at the show?

21  A.  It depends on the show.  2006, I hand carried a SCAR-Light

22  and a SCAR-Heavy brand machine gun to the SHOT Show, just like

23  I did today in a hard case.  I flew with them to Las Vegas.  We

24  put them in our safe box.  We would put it out every morning on

25  a -- we call it a kiosk.  It was on a pedestal, and I --

1  because in 2006, we had so much interest, I had three people

2  assigned just to that one area to answer questions, because we

3  were bombarded with questions nonstop from the time we opened

4  up.

5  Q.  So is it fair to say it was displayed at your kiosk or at

6  your booth at these trade shows?

7  A.  Yes, sir.  And then also used during live fire events when

8  I would go to agencies and conduct live fire events.  And if I

9  went to a distributor to show them the features and benefit of

10 it, yes, sir.

11 Q.  At the trade shows, was it a central feature of your booth?

12 A.  Starting 2005, everybody asked where the SCAR was.  And

13 honestly, we had it locked up in the back room.  We did not

14 want to put it out yet because it was just the first generation

15 of SCAR.  And we explained what "generation" was earlier.  And

16 we knew that there would be several more generations.  And

17 because the SHOT Show is a commercial show, we didn't want to

18 mislead the dealers and distributors that we would have it that

19 year.  We knew it would take a couple years to go through

20 qualifications with the military.

21 Q.  In 2005, were people at the commercial shows, like SHOT

22 Show, asking for or asking when the SCAR rifles would be

23 available?

24 A.  Yes, they were.  And we would tell them sometime in the

25 next couple years.  And certain law enforcement agencies, state

1    and federal, and certain writers, we would actually take them

2    to the back room and show them the one that we had brought.

3    Q.  Now, in 2006, was the SCAR rifle a central feature of your

4    booths or kiosks at trade shows?

5    A.  It was the number one talked-about firearm at the whole

6    SHOT Show in 2006.  And it was prominently displayed in our

7    booth, and you had to wait in line to get to see it.

8    Q.  And you mentioned that FN allowed writers, journalists as

9    early as 2005 to begin seeing the weapon?

10   A.  Yes, sir.

11   Q.  Was there anything -- was there a high demand among

12   journalists to see it?

13   A.  There was a waiting list for a year, sir.  We'd only had a

14   limited number of them, and we could only get them out to so

15   many at a time.

16   Q.  Now, in the 2004 to 2006 to '7 time frame, how did FN or

17   how else did FN advertise SCAR brand rifles?

18   A.  2004 through 2006, 2007, it was multiple stage.  The demand

19   was so high that FN did not need to spend very much money to

20   promote it.  Everybody talked about it.  All the magazines, all

21   the reporters, all -- everybody, all the gun writers, wanted to

22   be the first ones, wanted to write about the SCAR.

23       So, as a business plan, it was very smart to let them do

24   the work, and it didn't cost us anything except for them to

25   evaluate it for a week or two.  That was the majority of it.

1          Then we also, through trade shows, through a lot of visits

2     to agencies, major agencies, we would do a shoot in a major

3     area.  We might have 15 to 20 to 30 agencies, separate agencies

4     at that shoot, just to shoot our product, the SCARs, the P90s,

5     things like that.

6          Through distributors, we would show it to distributors.  We

7     would show it to their sales force, their inside and outside

8     sales force, to get them to start talking about it, talking to

9     agencies.  Because for a law enforcement agency to buy a brand

10    new platform, a new firearm, first they will go to a show, they

11    will go to a training class, evaluate it there.  Then they will

12    ask for a T and E, a test and evaluation of it.  Then they will

13    receive a test and evaluation.  If they decide to go to it,

14    then it's going to have to go through budget, then it's going

15    to have to go through purchasing, before they finally give us a

16    PO.

17         Anywhere -- from the first time they called you or you

18    visited them, it could take anywhere from six months to a year

19    to a year and a half, two years before you actually were able

20    to ship them that firearm.  The bigger the agency, the longer

21    it takes.

22    Q.  Staying in that 2004 to 2006 time frame, in your role with

23    FN, did you take SCAR weapons around to law enforcement

24    agencies?

25    A.  Yes, sir, I did.

1    Q.   And did you take the SCAR weapons around to distributors?

2    A.   Yes, sir, I did.

3    Q.   What about dealers?

4    A.   We didn't -- very few dealers.  It would be -- it would

5    have to be a huge dealer.  We dealt mostly with distributors.

6    And of course the agencies.

7    Q.   In a typical year in that time frame, how many different

8    law enforcement agencies would you or would someone on your

9    team take the SCAR weapons to?

10   A.   Hundreds.

11   Q.   And how many different distributors?

12   A.   We averaged about 23 to 28 distributors each year.

13   Q.   Now, turning back just for a second to the trade shows in

14   2004 to 2006, what else did FN use to market the SCAR brand?

15   A.   We used key chains.  We had SCAR key chains, which every

16   time we would come to a show we would pass out two or three

17   thousand, and they would be gone the first day.  Hats, tee

18   shirts.  The SCAR tee shirt was a -- in very high demand.

19   Q.   Can you even guess how many of those different items of

20   schwag you would pass out?

21        MR. BELLAMY:  Objection.  Calls for speculation.

22   Asking him if he had to guess.

23        MR. HOOKER:  Let me rephrase.

24   BY MR. HOOKER:

25   Q.   How many of those items would you -- had you passed out?

1    A.   Tee shirts, I passed out hundreds.  Key chains, thousands.

2    To law enforcement, end users, civilians.  I'd pass them out at

3    all of our shows.

4    Q.   Did FN use brochures and fliers?

5    A.   Yes, sir, we do.

6    Q.   I would like to show you what's been marked as Plaintiff's

7    Exhibit 75.  If we can turn to the second page of that exhibit.

8    A.   Yes, sir.

9    Q.   Is that P075.002.  Do you recognize that document?

10   A.   It was a one-page flier that was developed by our marketing

11   team.

12   Q.   And if you look down at the bottom right corner, what's the

13   date there?

14   A.   It says, "2006."

15   Q.   And do you recall handing out this flier?

16   A.   I -- I have handed out those fliers, yes, sir.

17   Q.   And when would you have handed out this flier?

18   A.   In 2006.

19   Q.   If you will turn with me over to Page 4, P075.0004.  Do you

20   recognize that document?

21   A.   Yes, sir, I do.

22   Q.   And did you -- is that a SCAR flier?

23   A.   Yes, sir, it is.  It's a one-page flier that we handed out.

24   Q.   You handed out that flier?

25   A.   I have personally, yes, sir.

1   Q.  And the next one, P075.0005, do you recognize that?

2   A.  Again, it's a one-page flier that I have handed out in the

3   past, yes, sir.

4   Q.  And in the bottom right, what's the date?

5   A.  That again is 2006.

6   Q.  And did you hand out that flier?

7   A.  Yes, sir, I did.

8   Q.  How many of each of these did you hand out?

9   A.  At least 500 of each.  We would go through thousands at a

10  show.  Just like a SHOT Show, you would go through several

11  thousand, we would have.

12  Q.  So FN would have handed out -- or did hand out thousands?

13  A.  Yes, sir.

14  Q.  If you will turn with me to the next page, P075.0006.  Do

15  you recognize that document?

16  A.  Again, it's a one-page SCAR brand flier.

17  Q.  What's the date?

18  A.  2006, sir.

19  Q.  And did FN distribute this flier?

20  A.  FN did and I did as part of FN, yes, sir.

21  Q.  And for all of these, where again were these distributed?

22  A.  To law enforcement agencies, law enforcement shows.  And

23  even like the NRA show, commercial shows, we would start

24  handing out fliers like this.

25  Q.  The next page, P075.0007, what is that document?

1  A.  Again, it's a SCAR brand flier, has a SCAR-Light,

2  SCAR-Heavy on it, and a date of 2007.

3  Q.  And did you and did FN hand out --

4  A.  I personally did and so did the employees of FN.  The other

5  employees.

6  Q.  And finally, the next page, P075.0008, what is that

7  document?

8  A.  Again, that's a one-page flier, and I believe the date --

9  it's pretty bad, but I believe it says 2007.

10  Q.  And did FN distribute this flier?

11  A.  Yes, sir.

12       MR. HOOKER:  Your Honor, I would like to move to admit

13  this exhibit, P-075.  We can exclude the first page and the

14  third page, but the fliers I'd like to be submitted.

15       MR. BELLAMY:  With those exclusions, I have no

16  objection.

17       THE COURT:  Admitted.

18    (Plaintiff's Exhibit 75 was admitted into evidence at

19  2:19 p.m.)

20  BY MR. HOOKER:

21  Q.  When did FN decide to sell SCAR rifles to law enforcement

22  agencies and commercial customers?

23  A.  To the best of my memory, as soon as they decided that they

24  were to go forth with this project, it was determined that we

25  would sell the select fires also to law enforcement.  And then

1    if we were able to obtain BATF approval, we would develop,

2    build and sell a semi-automatic version of it to the general

3    public.

4    Q.   And did FN make that intention known to law enforcement and

5    to dealers and distributors?

6    A.   Yes, sir, I personally did myself.

7    Q.   Was there an expectation already there?

8    A.   Yes, sir.  Starting in 2005 SHOT Show, the -- the majority

9    of the questions were from an agency:  When can we get one?

10   And then from individuals, citizens:  When can I start selling

11   them?  Or, When can I actually have one?

12   Q.   Why would there have been the expectation there?

13   A.   The majority of --

14         MR. BELLAMY:  Objection.  Calls for -- asking the

15   state of mind of the person making the inquiry.

16         THE COURT:  Ask the question again, please.

17         MR. HOOKER:  I just asked him why there was an

18   expectation already there among civilian and law enforcement.

19         THE COURT:  Did you have any discussions with any of

20   these people about that?

21         THE WITNESS:  Oh, yes, sir.

22         THE COURT:  Well, I will overrule the objection.  This

23   is a -- this is a nonjury trial.  I understand the value of

24   various kinds of testimony, so go ahead.

25         THE WITNESS:  If I apologize, I can answer it?

1          THE COURT:  You can answer it.

2          THE WITNESS:  Thank you, sir.

3     A.  Yes, it's a general practice in the firearms industry.

4     When you have a manufacturer that makes machine guns, law

5     enforcement -- and especially if the U.S. military has adopted

6     it and wants to use it, law enforcement figures if it's good

7     for them, it's going to be great for law enforcement.  It's

8     already been tested.

9          And the civilians that can buy -- legally buy a firearm

10    want also to have that -- as close to that version of machine

11    gun as they can get.  Which we did that with our PS90 and

12    FS2000.  And our customers knew that we'd already come up with

13    civilian versions of those machine guns, semi-automatic, and

14    they expected us to come out with a civilian version of the

15    SCAR.

16    BY MR. HOOKER:

17    Q.  I would like to show you what's previously been marked as

18    Plaintiff's Exhibit 139.

19    A.  Yes, sir.

20    Q.  What is that document?

21    A.  That's an equipment custody receipt.  That's an FNH USA

22    internal document from the time I came on in 2002, full-time,

23    to 2008, when we went to a different computer system, for the

24    full-time FN employees if you had a firearm, this tracked your

25    firearm as to what employee had it.  And when it was assigned

1    to them, when they returned it.

2    Q.  And am I reading the date correctly on the bottom,

3    January 31st, 2006?

4    A.  Yes, sir.

5    Q.  And so was this your signature that you were checking out

6    this firearm?

7    A.  I checked out those two products.  That is my signature,

8    plus my initials next to Column 1 and 2.  I checked out a SCAR

9    brand Light and a SCAR brand Heavy.

10   Q.  And what did you use those SCAR brand rifles for?

11   A.  I -- I -- I live in the State of Maryland, so I drove to

12   our facility that stored all those units in Virginia,

13   Fredericksburg.  Had those assigned to me, picked them up,

14   drove back, then flew out to SHOT Show to have those displayed

15   at SHOT Show.  Those are the two firearms I personally took to

16   SHOT Show.

17   Q.  And that would be the 2006 SHOT Show?

18   A.  Yes, sir, it was.

19   Q.  And where were those displayed in the 2006 SHOT Show?

20   A.  In the middle of our booth.

21   Q.  I would like to direct --

22        MR. HOOKER:  Well, I would like to move to admit

23   Plaintiff's Exhibit 139.

24        MR. BELLAMY:  Is this just a one-page document?

25        THE WITNESS:  Yes, sir.  It -- well, the form is only

1    a one-page form.

2              MR. HOOKER:  Well, there are additional pages.  I can

3    go and lay a foundation for all of them if you want.

4              THE COURT:  Let's figure out what we're admitting now

5    because he just asked if it was one page.  It's obviously more

6    than one page, so what are we -- what you just elicited from

7    him really dealt only with this one page.

8              MR. HOOKER:  Is there just one page in your binder?

9              THE COURT:  I understand, it looks to me like there

10   are 8 pages.  Is that what you have?

11             MR. BELLAMY:  Yes, I have 8 pages in what I was

12   looking at.

13             MR. HOOKER:  I'm happy to go through all 8 pages.  I

14   was trying to save the Court some time.

15             THE COURT:  Well, I am just trying to decide whether

16   it's admissible or not, so you tell me.  Is there an objection

17   to this or not?

18             MR. BELLAMY:  Well, I'm -- I'm taking a look at the

19   others here.  I don't have any objection to the first page that

20   the witness testified about.

21             MR. HOOKER:  I can ask the witness if those are his

22   signatures on all the pages.

23             THE COURT:  It looks to me like there are other dates

24   when these were checked out.  Is that what -- is that what --

25             THE WITNESS:  Different firearms, sir, on different

1  dates for different events, yes.

2          THE COURT:  They are all the same kinds of forms, just

3  different dates?

4          THE WITNESS:  Different dates, different serial

5  numbers, different firearms.

6          THE COURT:  Right.  So --

7          MR. BELLAMY:  That's fine.  No objection, then.

8          THE COURT:  Okay.  They are admitted.

9      (Plaintiff's Exhibit 139 was admitted into evidence at

10  2:26 p.m.)

11          MR. HOOKER:  Okay.  Great.

12  BY MR. HOOKER:

13  Q.  I would like to direct your attention to Plaintiff's

14  Exhibit 134.

15  A.  Yes, sir.

16  Q.  Can you identify that document.

17  A.  It was a brochure that was developed by FNH USA sales and

18  marketing team.  It's a tri-fold SCAR brochure.

19  Q.  And there is a front and a back, or two pages here; right?

20  These are the two pages of the same tri-fold?

21  A.  Same brochure, yes, sir.  It's just the front and back of

22  it.

23  Q.  And did you pass this brochure out?

24  A.  Yes, sir, I have.

25          THE COURT:  Is there a date on this?  I don't see a

```
 1   date on it.
 2   BY MR. HOOKER:
 3   Q.  Do you recall when you distributed this?
 4   A.  I want to say 2005, during the year of late 2005, but --
 5   that's what I would go with.  That or early 2006, sir.
 6   Q.  And how many of these would you have distributed?  You or
 7   FN.
 8   A.  I personally probably did over a hundred.  FN -- I know
 9   there was several hundred printed and distributed.
10        MR. HOOKER:  Your Honor, I would like to move to admit
11   Plaintiff's Exhibit 134.
12        MR. BELLAMY:  No objection.
13        THE COURT:  Admitted.
14     (Plaintiff's Exhibit 134 was admitted into evidence at
15   2:27 p.m.)
16        MR. BELLAMY:  For the record, we objected to this on
17   the basis of the unlawful use of the SOCOM emblem, and just to
18   preserve that objection, I'd like to renew it at this point.
19        THE COURT:  That's fine.
20   BY MR. HOOKER:
21   Q.  I would like to show you what's been marked as Plaintiff's
22   Exhibit 222.
23   A.  I'm sorry, "222"?
24   Q.  "222."  Can you identify that document for me.
25   A.  Again, that is a tri-fold SCAR brand brochure that we
```

1    passed out.

2    Q.   And do you recall distributing this brochure?

3    A.   Yes, sir, I do.

4    Q.   Do you recall when you distributed this brochure?

5    A.   Again, the same time frame, the end of 2005-2006.

6    Q.   And approximately how many of these did FN distribute?

7    A.   Hundreds.

8    Q.   And where were these distributed?

9    A.   Different shows, at law enforcement agencies, law

10   enforcement shoots and military shoots.

11          MR. HOOKER:  I would like to move to admit Plaintiff's

12   Exhibit 222.

13          MR. BELLAMY:  Your Honor, this was the document that

14   was produced late in the game, and it was represented to us

15   that this was apparently not printed until August of 2006, was

16   the representation that Plaintiffs made to us.  That's contrary

17   to what this witness just testified about.  And --

18          THE COURT:  Where did the August, 2006, date come

19   from?

20          MR. HOOKER:  Your Honor, I actually have a document I

21   can use to refresh the witness' recollection, and it's the same

22   document we've given Mr. Bellamy a copy of.

23          If you'd like, I may approach the witness.

24          THE COURT:  What does it say?

25          MR. HOOKER:  This is the invoice showing when this

1    brochure was printed.  And it says that it was shipped on

2    August 22nd, 2006.  And I believe his testimony was 2005 to

3    2006 time frame, so it may have been a bit early.

4              MR. EHRLICH:  It was --

5              THE COURT:  We have P-222 as August of 2006 that they

6    gave them out.  Would that be correct?

7              MR. HOOKER:  That would be correct, Your Honor.

8              MR. BELLAMY:  With that understanding, then I don't

9    object.

10              THE COURT:  All right.

11              MR. HOOKER:  So then just for the record I was moving

12    to admit P-222.

13              THE COURT:  So that's admitted.

14       (Plaintiff's Exhibit 222 was admitted into evidence at

15    2:30 p.m.)

16    BY MR. HOOKER:

17    Q.  Mr. Mills, I would like to show you what's been previously

18    marked as Plaintiff's Exhibit 142.

19    A.  I have it, sir.

20    Q.  Can you identify that document for the Court?

21    A.  Yes, sir.  It's a 2006 Law Enforcement Trade Show Schedule

22    of the events and who's assigned to attend the events.

23    Q.  Now, if you'll turn with me, it's a multi-page document,

24    and on the second page and on subsequent pages it has a year

25    and then, "Law Enforcement/Commercial Trade Shows."

1    A.  Yes, sir.

2    Q.  Should the -- should the first page -- or would it be more

3    accurate to title the first page, "Law Enforcement/Commercial

4    Trade Shows"?

5    A.  It has both trade shows, yes, sir.

6    Q.  Okay.  Now, did you attend all these trade shows?

7    A.  This is my document, sir.  I created this document.

8    Q.  You did create this document?

9    A.  I created this document, yes, sir.

10   Q.  Did you personally attend all of these trade shows?

11   A.  No, sir.  Where you would see -- under, "Attendees," where

12   it says, "BM," that would show you the shows that I attended.

13   Q.  Did you have input on who attended these trade shows?

14   A.  Yes, sir.  I assigned different employees to the different

15   shows.

16   Q.  And did you have input on what was shown at the various

17   trade shows?

18   A.  Yes, sir, I did.

19          MR. HOOKER:  I'd like to move to admit Plaintiff's

20   Exhibit 142.

21          MR. BELLAMY:  Is this all the pages?

22          MR. HOOKER:  This is all the pages, yeah.  You go

23   through 2010.

24          MR. BELLAMY:  Okay.  No objection.

25          THE COURT:  Admitted.

1        (Plaintiff's Exhibit 142 was admitted into evidence at

2    2:32 p.m.)

3    BY MR. HOOKER:

4    Q.  Just briefly, if you would, describe for me some of these.

5    I will just point some of them out.  Like for example the

6    AcuSport East Trade Show in 2006, was there a -- was there a

7    SCAR weapon that was displayed and marketed at that show?

8    A.  Not at that show.

9    Q.  Can you identify shows where there were SCAR weapons.

10   A.  Yes, sir.  SHOT Show.  Trexpo West.  BORTAC.  ILEETA.  Mock

11   Prison Riot.  Southeast SWAT Conference.  SPOTC.  2006

12   FN/Leupold Long Range Position Comp.  IALEFI.  Police &

13   Security Expo.  Trexpo East.  Jerry's Sport Center/Range Day.

14   NTOA Nationals.  IACP which stands for International Chiefs of

15   Police.  SWAT Round Up.  I would have been at those shows, sir.

16   Q.  I won't make you do this for each and every one of those

17   shows, but as a whole, how many different people saw the SCAR

18   rifle and SCAR marketing at those shows?

19   A.  Sir, it depends on the show.  SHOT Show is the biggest

20   firearms show in the U.S.  There are 53,000 plus FFL holders

21   that can attend those show, plus their families, along with

22   their employees.  And then you have the law enforcement; state,

23   local and federal agencies can attend.  And then your

24   department -- U.S. Department folks, Department of Defense,

25   Department of State, Department of Homeland Security, ICE,

1    Secret Service, Border Control.  All those people can attend

2    that show.

3    Q.  So give us an order of magnitude how many people saw SCAR

4    marketing at all those shows.

5    A.  Hundreds of thousands of people, sir.

6    Q.  Did you ever visit Clyde Armory in your role at FN?

7    A.  Yes, sir, I did.

8    Q.  And did you display or present the SCAR rifle to Clyde

9    Armory?

10   A.  Those were two of the items I did bring him and show him, a

11   SCAR 16 and a SCAR 17 brand.

12   Q.  And who all did you display the rifle to?

13   A.  Mr. Clyde, some of his law enforcement sales staff.

14   Q.  If you will, turn with me to Plaintiff's Exhibit 155.  And

15   in your binder and in Your Honor's binder we have pulled out a

16   subset of these just to have the witness go through, and I can

17   identify those page numbers for us.  But can you first identify

18   what Plaintiff's Exhibit 155 is.

19   A.  Yes, sir.  This is an FNH USA internal document.  It's an

20   invoice that would have been sent to Clyde Armory for two

21   Five-SeveNs black and two Five-SeveNs flat dark earth.  And

22   those were pistols, I'm sorry.

23   Q.  If you'll look through that document, are there any sales

24   of SCAR weapons reflected on -- in these pages?

25   A.  Yes, sir.  The second page of that first document has -- it

1    looks like without counting, about ten SCAR 16Ss.

2    Q.  And how do you know that?

3    A.  By the serial number.  And the part number, a 98501.

4    Q.  And if you will, turn with me to Page P155.0050.

5    A.  Those are SCAR 16Ss, too, sir.  The same thing on 68, those

6    are SCAR 16Ss.  69 the same.  70, 71, 72.  Then on Page -- I'm

7    sorry, .0076, Page 155, has SCAR 17Ss.

8    Q.  So Clyde Armory purchased SCAR weapons from FN?

9    A.  SCAR brand firearms, yes, sir.

10   Q.  Right.

11   A.  Yes, sir.

12        MR. HOOKER:  I'd like to move to admit Plaintiff's

13   Exhibit 155.

14        MR. BELLAMY:  Is this the entirety of it?  That's

15   fine.  I don't object.  I was just asking.

16        MR. HOOKER:  Yes.

17        MR. BELLAMY:  No objection.

18        THE COURT:  Admitted.

19     (Plaintiff's Exhibit 155 was admitted into evidence at

20   2:38 p.m.)

21   BY MR. HOOKER:

22   Q.  Now, is Clyde Armory still a distributor of FN's?

23   A.  No, sir.

24   Q.  And do you recall when it stopped being a distributor?

25   A.  I want to say 2011 or -- well, 2012-2011 time frame.

1    Q.  Now, turning back to the trade shows in 2005 to 2006 time

2    frame --

3    A.  Yes, sir.

4    Q.  -- do you recall those as being covered by the media?

5    A.  Very heavily, yes, sir.

6    Q.  And can you describe that for the Court.

7    A.  We'll start out with SHOT Show.  SHOT Show is not just for

8    the U.S. customers; there's international military agencies

9    that come there, there's international press, international law

10   enforcement agencies attend that.

11       It is about a 90-percent commercial show, about 5 percent

12   law enforcement.  What I mean by that is federal, state and

13   local law enforcement, if you have a badge, you can get into

14   the show.  They will give you an ID to get into the show.  Any

15   government employee, it doesn't have to be Department of

16   Defense, any government agency employee.

17       And then media probably makes up about 4 percent.  It's a

18   huge media event.

19   Q.  How many different articles do you recall seeing covering

20   that show?

21   A.  The 2005 show?

22   Q.  In 2005.

23   A.  I probably read 8 to 10 articles, different articles

24   myself.

25   Q.  And what about the same show in 2006?

1    A.   A few more, probably 15.

2    Q.   I would like to show you what's been marked as Plaintiff's

3    Exhibit 71.

4    A.   Yes, sir.

5    Q.   Can you identify that document.

6    A.   It looks like a copy -- a photocopy of *Small Arms Review*

7    dated July, 2005.  On the front page of it.  The back page

8    discusses the FN SCAR.

9    Q.   Do you recall seeing this magazine come out?

10   A.   Yes, sir.  I did read it.

11   Q.   And you may have said this.  Did you say the date?  What's

12   the date of it?

13   A.   July, 2005.

14           MR. HOOKER:  I would like to move to admit Plaintiff's

15   Exhibit 71.

16           MR. BELLAMY:  No objection.

17           THE COURT:  Admitted.

18       (Plaintiff's Exhibit 71 was admitted into evidence at

19   2:40 p.m.)

20   BY MR. HOOKER:

21   Q.   Now, who all reads *Small Arms Review*?

22   A.   Anybody that's interested in firearms for the most part.

23   Commercial, law enforcement, military.

24   Q.   Now, this isn't in your binder, but I would like to show

25   you -- Ms. Gray can put it up on the screen -- Defendant's

1  Exhibit 113.

2  A.  Yes, sir.

3  Q.  What is that document?

4  A.  Again, it's a *Small Arms Review* dated November of 2007.

5  Q.  And if you will turn to the last page of that DX113.0004,

6  what do you see on that page?

7  A.  It's a -- it looks like a flier or a news article/ad for

8  SCAR-Stock from Clyde Armory.

9  Q.  Now, I would like to show you what's been marked as

10  Plaintiff's Exhibit 244.

11  A.  Yes, sir.

12  Q.  What is this document?

13  A.  That is internal media document for FNH USA for 2006 media

14  plan.  What that means is -- on the left-hand column going

15  down, it has different magazines.  And then going across, by

16  the month, it has what article we're going to run, featuring

17  which product of ours in that month's article.

18          THE COURT:  So you pay for this advertising?

19          THE WITNESS:  Yes, sir, that's the stuff that FNH has

20  paid for.

21  BY MR. HOOKER:

22  Q.  Now, which of these advertisements, if you recall, featured

23  the SCAR rifle?

24  A.  On the page you have in front of you, sir, I don't see

25  that.

```
 1            THE COURT:  Hold on, let me understand it.  Are you
 2   saying that --
 3            THE WITNESS:  I'm sorry, I was looking at the screen.
 4   I'm sorry.
 5            THE COURT:  My question is, on this Exhibit P-244,
 6   which is where I understand you are, this is the 2006 media
 7   plan, and if I understand what you just said, none of this has
 8   to do with SCAR?
 9            THE WITNESS:  Page 1 -- no, sir, I didn't realize -- I
10   was looking at the screen.  I didn't flip to the book.  I
11   apologize.
12            Page 2 of that same item has the SCAR in *Guns & Ammo*
13   for January/February, and then down in *Rifle Shooter* for the
14   same thing, January/February.  *Guns Magazine*, February.
15   February in *Shooting Times*.  At a quick glance those are the
16   ones I see, sir.
17   BY MR. HOOKER:
18   Q.  Okay.  Now, more generally, how much money does FN spend
19   each year marketing the SCAR brand in the United States?
20   A.  Probably less than a hundred thousand, maybe 150,000 for
21   FNH USA.  On print ads.
22       We have the luxury that the gun is still very highly sought
23   after.  We still have back orders on them.  We cannot produce
24   enough of the SCAR 17S brand firearms to meet the demands
25   still, after all these years.  And it moves itself.  We're
```

1  lucky in that aspect.  So what we spend our money on would be

2  key chains, other things like that.

3  Q.  Okay.  So that figure that you gave, that was for print

4  advertising?

5  A.  To my knowledge, yes, sir.

6  Q.  And then you might spend some additional money on brochures

7  that --

8  A.  Brochures.  Give-a-ways, things like that, yes, sir.

9  Q.  And then you were saying the reason why you don't spend

10  more than the hundred or hundred fifty thousand dollars is

11  because there's already so much market demand for the product?

12  A.  Yes, sir.

13  Q.  What does the term "fully allocated" mean?

14  A.  An allocated product means we don't have enough of that

15  product come in country or we don't build enough of it to meet

16  the demand.  So unfortunately I have to allocate it.  Law

17  enforcement, my side, comes first; and then individual officers

18  and commercial come after that.

19  Q.  And is the SCAR rifle fully allocated?

20  A.  Yes, sir, it's still an allocated item.  Every -- every day

21  I do allocations, and I allocate it to different distributors

22  and/or agencies.

23  Q.  And so is it fair to say, then, that FN can't build the

24  rifles fast enough, there's so much demand for them?

25  A.  Still, yes, sir.

1   Q.  And when did that level of demand begin?

2   A.  That demand started in 2005 and we couldn't even take

3   orders.

4   Q.  Okay.  I'd like to show you what's previously been marked

5   as Plaintiff's Exhibit 146.

6   A.  Yes, sir.

7   Q.  Identify that document, please.

8   A.  That is a document that I generated to Mr. Vasquez at BATF

9   Firearms Technology Branch.  They wanted to evaluate some

10  SCARs, which were all fully automatic SCAR 16s and SCAR 17s,

11  for purchase by the Bureau of Alcohol, Tobacco and Firearms.

12  And we have a policy that we will not send a prototype firearm

13  to be evaluated by a law enforcement agency.  Just in case

14  there's changes, we don't want to have them test something that

15  we might have modified or made enhancements to when the final

16  production goes out.

17  Q.  And what is the date of this document?

18  A.  October 19th, 2006, sir.

19  Q.  And did you send this letter?

20  A.  Yes, sir, I did.

21  Q.  Now, is it fair to say that you were responding to a desire

22  of the Bureau of Alcohol, Tobacco and Firearms to purchase SCAR

23  weapons?

24  A.  Yes, sir, they -- Mr. Vasquez called me and asked me if I

25  could send him some, and I responded to him in writing that

1    unfortunately at this time, until I have a final production

2    version, no, I can't.

3            MR. HOOKER:  I would like to move to admit Plaintiff's

4    Exhibit 146.

5            MR. BELLAMY:  146?  No objection.

6            THE COURT:  Admitted.

7        (Plaintiff's Exhibit 146 was admitted into evidence at

8    2:48 p.m.)

9    BY MR. HOOKER:

10   Q.  Now, after 2006, did FN continue to market and advertise

11   SCAR brand rifles?

12   A.  To this day, sir, yes.

13   Q.  And how did it go about doing that?

14   A.  The same way we've always done it.  Through trade shows,

15   through direct agency contacts, agency demos, distributor

16   contacts, outside distributor sales staff.  Commercial shows.

17   That we've been --

18   Q.  All of the same things --

19   A.  All the same that we've been doing since we first received

20   them in 2005-2006.

21   Q.  And is that true to this day?

22   A.  Yes, sir.

23   Q.  I'd like to show you what's been marked previously as

24   Plaintiff's Exhibit 243.

25   A.  Yes, sir.

1    Q.  And this is a series of photographs.  Can you identify them

2    collectively for us.

3    A.  Yes, sir.  This is a photo shoot that I assisted our

4    marketing team with for the 2007 catalogue.  This particular

5    shoot was on July 24th, 2006.  It was in Calvert County,

6    Maryland, at one of their training facilities.  That's Calvert

7    County Emergency Services Team.

8    Q.  What were those photographs used for?

9    A.  Several of these photographs were used in our 2007 product

10   catalogue.

11          MR. HOOKER:  I would like to move to admit Plaintiff's

12   Exhibit 243.

13          MR. BELLAMY:  Your Honor, this is something that was

14   apparently recently produced, because it's not on my list or

15   recently added to the list.  Mine goes up to 235.  And I am

16   trying to see the rest of these.  So I would like to reserve

17   that and have an opportunity to look at the rest of these

18   before waiving an objection.

19          THE COURT:  He certainly identified them sufficiently

20   as far as I'm concerned to have them admitted.  The question is

21   how many of them.  And I don't know the answer to that.  But

22   you're welcome to do that.

23          MR. BELLAMY:  I would just -- I'd like to have a

24   chance to see them.  We've seen the first one here, but I've

25   not seen the others.

```
 1              THE COURT:  All right.  That's fine, not a problem.
 2              MR. HOOKER:  That's fine.
 3    BY MR. HOOKER:
 4    Q.  Mr. Mills, I would like to show you what's been marked
 5    previously as Plaintiff's Exhibit 144.
 6    A.  Yes, sir.
 7    Q.  Can you identify that document?
 8    A.  Yes, sir.
 9    Q.  It is a PowerPoint presentation that my boss at the time,
10    Rick DeMilt, gave at the 2007 AcuSport Dealer Show.
11    Q.  Did you see this presentation given?
12    A.  Yeah.  Yes, sir, I'm sorry.  I saw it prior to it being
13    given, and I was there when it was given.
14    Q.  If you will turn with me to Page 27 -- P144.0027.  There
15    are a series of statements on that page about the SCAR weapon.
16    Is that correct?
17    A.  Yes, sir.
18    Q.  That it is the, "Most Heavily Tested Combat Rifle In
19    History," and so on and so forth.  I won't go through every
20    one.  But are those all true statements?
21    A.  Yes, sir.
22              MR. HOOKER:  Your Honor, I would like to move to admit
23    Plaintiff's Exhibit 144.
24              MR. BELLAMY:  No objection.
25              THE COURT:  Admitted.
```

1          (Plaintiff's Exhibit 144 was admitted into evidence at

2     2:52 p.m.)

3     BY MR. HOOKER:

4     Q.   Can you describe for me what the AcuSport dealer show is.

5     A.   The AcuSport Dealer Show is a show where AcuSport flies in

6     some of their dealers to the -- they have direct contact with,

7     to attend and buy product for that year.  Most of AcuSport's

8     manufacturers that they deal with are at that show and they

9     sell their product.  We call them stock and dealer packages.

10    They sell their product at that show.

11    Q.   And how many people are at that show each year?

12    A.   Anywhere from -- depending on if it's an east or west show,

13    three to seven hundred different dealers.

14    Q.   Okay.  I'd like to show you what's previously been marked

15    as Plaintiff's Exhibit 161.

16    A.   Yes, sir.

17    Q.   Do you recognize that document?

18    A.   It's another FNH flier.  And it references FN's history and

19    the SCAR.

20    Q.   Now, do you recall this flier being distributed by FN?

21    A.   Yes, sir, I handed out this flier also.

22          MR. HOOKER:  I would like to move to admit Plaintiff's

23    Exhibit 161.

24          MR. BELLAMY:  No objection.

25          THE COURT:  Admitted.

1      (Plaintiff's Exhibit 161 was admitted into evidence at
2    2:53 p.m.)
3    BY MR. HOOKER:
4    Q.  I would like to show you what's previously been marked as
5    Plaintiff's Exhibit 93.
6    A.  Yes, sir.
7    Q.  Do you recognize that document?
8    A.  I have seen this, yes, sir.
9    Q.  And what is it?
10   A.  Again, it's a flier, a one-page, that highlights a SCAR 16
11   with an EGLM grenade launcher underneath it.
12   Q.  And did FN distribute this flier?
13   A.  Yes, sir, we did.
14   Q.  Are these --
15          MR. HOOKER:  I would like to move to admit Plaintiff's
16   Exhibit 93, Your Honor.
17          MR. BELLAMY:  No objection.
18          THE COURT:  Admitted.
19      (Plaintiff's Exhibit 93 was admitted into evidence at
20   2:54 p.m.)
21   BY MR. HOOKER:
22   Q.  Are these fliers representative examples of fliers FN has
23   used over the years to advertise the SCAR brand rifle?
24   A.  Yes sir.
25   Q.  Now, has FN advertised the SCAR brand rifle through

1    catalogues?

2    A.   Yes, sir.

3    Q.   I would like to show you what's previously been marked as

4    Plaintiff's Exhibit 108.

5    A.   Yes, sir.

6    Q.   What is that document?

7    A.   It's the 2008 -- well, it's an FNH USA 2008 military

8    catalogue.

9    Q.   And is the SCAR rifle featured in this catalogue?

10   A.   Yes, sir, it is.

11   Q.   Who all receives this Military Products catalogue?

12   A.   It's distributed at all the military shows, military

13   shooting events.  I've also distributed some of them to law

14   enforcement events.

15            MR. HOOKER:  I believe that this exhibit is one that's

16   already been preadmitted and Mr. Ehrlich read out at the

17   beginning of our session today.

18            COURTROOM DEPUTY:  No.

19            MR. EHRLICH:  Yes.  Wait, yes.

20            MR. HOOKER:  Plaintiff's Exhibit 108.

21            MR. BELLAMY:  I have no objection in any event.

22            THE COURT:  Admitted.

23       (Plaintiff's Exhibit 108 was admitted into evidence at

24   2:56 p.m.)

25

1  BY MR. HOOKER:

2  Q.  I would like to turn your attention to Plaintiff's

3  Exhibit 110.

4  A.  Yes, sir.

5  Q.  And what is that document?

6  A.  It's a 2011 FNH USA Military/Law Enforcement Product

7  Catalogue.

8  Q.  Is the SCAR rifle featured in -- or are SCAR rifles

9  featured in that catalogue?

10  A.  Yes, sir, they are.

11  Q.  And who all receives the FNH USA Product Catalogue?

12  A.  It would be military and law enforcement agencies, military

13  and law enforcement personnel.

14        MR. HOOKER:  Again, I believe this was already

15  admitted but just -- I'd like to move to admit Plaintiff's

16  Exhibit 110.

17        MR. BELLAMY:  No objection.

18        THE COURT:  Admitted.

19     (Plaintiff's Exhibit 110 was admitted into evidence at

20  2:57 p.m.)

21  BY MR. HOOKER:

22  Q.  Plaintiff's Exhibit 123.

23  A.  Yes, sir.

24  Q.  Do you recognize that document?

25  A.  Again, FNH USA 2012 Commercial Product Catalogue.

1    Q.  And is -- are SCAR rifles shown in that catalogue?

2    A.  Yes, sir, they are.

3    Q.  And who all receives the FNH 2012 -- or any FNH product

4    catalogues that are designated "commercial"?

5    A.  Commercial customers.  And if there's any law enforcement

6    or government attendees at the events that they are handed out

7    at.

8    Q.  How many of these different catalogues does FN send out

9    each year?

10   A.  We print, I believe, 20- or 30,000 a year.

11   Q.  And all of those are sent out and distributed?

12   A.  Yes, sir.

13          MR. HOOKER:  I would like to move to admit Plaintiff's

14   Exhibit 123.

15          MR. BELLAMY:  No objection.

16          THE COURT:  Admitted.

17      (Plaintiff's Exhibit 123 was admitted into evidence at

18   2:58 p.m.)

19   BY MR. HOOKER:

20   Q.  If you will, turn with me to Plaintiff's Exhibit 124.  And

21   identify that document.

22   A.  2012 Military/Law Enforcement Product Catalogue, sir.

23   Q.  And who all receives Military and Law Enforcement Product

24   Catalogues?

25   A.  Mainly the military and law enforcement personnel.

1    Q.  And would this -- these would have been included in your

2    estimation or your count a minute ago of the catalogues that

3    are sent out each year?

4    A.  Yes, sir.

5    Q.  And is the SCAR -- are SCAR rifles featured in this product

6    catalogue?

7    A.  Yes, sir, they are.

8         MR. HOOKER:  Move to admit Plaintiff's Exhibit 124.

9         MR. BELLAMY:  No objection.

10         THE COURT:  Admitted.

11    (Plaintiff's Exhibit 124 was admitted into evidence at

12    2:58 p.m.)

13    BY MR. HOOKER:

14    Q.  Now, again, after 2006, has media coverage continued on the

15    SCAR rifle?

16    A.  Yes, sir.

17    Q.  And can you describe the nature and extent of that coverage

18    for the Court.

19    A.  It's still being covered.  They highlight now more on the

20    SCAR PDW, personal defense weapon, that we're working on and a

21    select fire version.  And they ask about, are we going to come

22    out with that as a semi-automatic version only.  Also the SCAR

23    long range rifles for precision shooting, the MK 20 or the

24    CSR -- SCAR CSR.  We've had articles on those.  And we still

25    have articles come out.  Especially on the SCAR 17, SCAR 17S.

1  Q.  How many articles per year come out about SCAR?

2  A.  It's slowed down some now, but we still have a handful come

3  out every year.

4  Q.  I'd like to show you what's previously been marked as

5  Plaintiff's Exhibit 23.  Do you recognize that document?

6  A.  Yes, sir.

7  Q.  What is that?

8  A.  It's a Xerox copy of an article in *Police* magazine, May of

9  2008 it looks like.

10 Q.  And does it feature the SCAR rifle?

11 A.  Yes, sir, it features the SCAR brand 5.56 and 7.62, which

12 would be the SCAR 16 or SCAR 17.

13 Q.  And who all reads *Police* magazine?

14 A.  Police officers, police administrators, purchasing

15 officers, general public can buy it.

16 Q.  And do you remember seeing this article when it came out?

17 A.  I did read it, yes, sir.

18         MR. HOOKER:  Move to admit Plaintiff's Exhibit 23.

19         MR. BELLAMY:  No objection.

20         THE COURT:  Admitted.

21    (Plaintiff's Exhibit 23 was admitted into evidence at

22 3:00 p.m.)

23 BY MR. HOOKER:

24 Q.  If you will, turn with me to Plaintiff's Exhibit 44.

25 A.  Yes, sir.

1  Q.  What is that document?

2  A.  The *Firearms Update*.  It's a magazine article on the

3  Baltimore County SWAT Team when they won the 2009 FNH USA

4  Leupold Long Range Precision Rifle Competition.  They were

5  awarded a SCAR 16S each.

6  Q.  Is this long range shooting competition an event that FNH

7  USA sponsored?

8  A.  Yes, sir, we did.  And I attended it.

9  Q.  You attended it?

10  A.  Yes, sir, I did.

11  Q.  And was the -- and it was -- am I correct in understanding

12  that the SCAR rifle was awarded to the winners of this

13  competition?

14  A.  It's a 2-man team, and there was one that was awarded to

15  each.

16  Q.  One each?

17  A.  Yes, sir.

18  Q.  Has FN done other similar kinds of events over the years to

19  market that SCAR rifle?

20  A.  That is one of the type of events we do, yes, sir.

21  Q.  And you do those events regularly?

22  A.  Yes, sir.

23        MR. HOOKER:  Move to admit Plaintiff's Exhibit 44.

24        MR. BELLAMY:  No objection.

25        THE COURT:  Admitted.

1          (Plaintiff's Exhibit 44 was admitted into evidence at

2     3:02 p.m.)

3     BY MR. HOOKER:

4     Q.  Mr. Mills, I would like to turn your attention to

5     Plaintiff's Exhibit 24.

6               MR. BELLAMY:  I'm sorry?

7               MR. HOOKER:  24.  Plaintiff's 24.

8     A.  Yes, sir.

9     BY MR. HOOKER:

10    Q.  And what is that document?

11    A.  It is a Xerox copy of *Police & Security News*, March/April,

12    2010, and it looks like it has a small article on the FN SCAR

13    16S black.

14    Q.  Now, is this an advertisement for a SCAR rifle?

15    A.  *Police & Security News* does a little blurb on all the new

16    products coming out in law enforcement, and this page just

17    showed several different of the new products to include our FN

18    SCAR 16S.

19    Q.  Did FN provide the copy for this segment?

20    A.  I would say our marketing department did, yes, sir, but I

21    personally didn't.

22    Q.  And do you recall seeing this in *Police & Security News*?

23    A.  Yes, sir.  That's handed out at the Police & Security Expo

24    every year.  So they -- they push that very hard.

25              MR. HOOKER:  I move to admit Plaintiff's Exhibit 24.

1          MR. BELLAMY:  No objection.

2          THE COURT:  Admitted.

3      (Plaintiff's Exhibit 24 was admitted into evidence at

4  3:03 p.m.)

5  BY MR. HOOKER:

6  Q.  Now, has this same copy that's been -- that's shown here in

7  Plaintiff's Exhibit 24 been used as an advertisement elsewhere

8  by FN?

9  A.  The exact same --

10  Q.  Or one like it?

11  A.  One like it, yes, sir.  Not exactly the same one.

12  Q.  Okay.  I would like to turn your attention to Plaintiff's

13  Exhibit 56.

14  A.  I'm sorry, five six?

15  Q.  Five six.

16  A.  Yes, sir.

17  Q.  And what is that?

18  A.  *Shooting Illustrated*.  It is an NRA publication.  National

19  Rifle Association.  Dated August, 2009.  On the front page it

20  shows a SCAR -- looks like a 16S, sir.

21  Q.  And do you remember seeing this when it came out?

22  A.  I read the article, yes, sir.

23  Q.  Can you describe the readership of this publication?

24  A.  This is handed out to all the NRA members.  And then it's

25  also sold on newsstands.

1          MR. HOOKER:  Move to admit Plaintiff's Exhibit 56.

2          MR. BELLAMY:  No objection.

3          THE COURT:  Admitted.

4      (Plaintiff's Exhibit 56 was admitted into evidence at

5  3:04 p.m.)

6  BY MR. HOOKER:

7  Q.  Now, all these articles we've just looked at, are these

8  representative examples of the kinds of articles you've seen

9  since 2006 about SCAR rifles?

10  A.  Yes, sir, it is.

11  Q.  And how many of these would you say you've seen since 2006?

12  A.  Per year or just overall?

13  Q.  Overall.

14  A.  75 to a hundred overall, all those years.

15  Q.  Okay.  Let's turn to sales of SCAR weapons.  When did FN

16  first begin taking orders for SCAR brand weapons from law

17  enforcement and commercial distributors?

18          THE COURT:  Let's take a break now.  We'll take about

19  a 15-minute break.

20          BAILIFF:  All rise.

21      (Court in recess from 3:05 to 3:20 p.m.)

22          THE COURT:  Let me ask a question.  This is a matter

23  that came up.  Mr. Ehrlich, I think you said something about

24  this in your opening statement about sales, and I am a little

25  bit confused about sales of military weapons versus civilian

1    and law enforcement maybe.  Does this man know that or who can

2    tell me what that is?

3         MR. EHRLICH:  We were going to go into sales next,

4    Your Honor.

5         THE COURT:  Well, that's --

6         MR. EHRLICH:  And the problem is that the specific --

7    while we agreed that when the summary judgment order was

8    written that we would not need to redact anything, it just was

9    a total sales figure.  There was some discussion here that the

10   specific numbers and specific products, that that would be

11   something that we'd like to keep, you know, highly

12   confidential, attorneys eyes only.

13        And so we'd ask the Court that the next testimony on

14   sales, when we get to the actual sales by product by number by

15   year and military versus nonmilitary -- we have said what the

16   total number was, but we don't -- we really want to keep the

17   specifics confidential if that's okay.  And we'd ask that, you

18   know, that that portion of the record be designated as highly

19   confidential.  It's just that --

20        THE COURT:  So you're going to tell me what the total

21   sales are on these rifles, but you are not going to break it

22   out between military?

23        MR. EHRLICH:  Well, we were going to break it out

24   today, Your Honor, and this witness would do that, but we feel

25   that's confidential.  And the other thing is we're not saying

1    worldwide sales.  We're only saying U.S. sales, Your Honor.

2              THE COURT:  Oh, okay.  Let's proceed, then.  That's

3    fine.

4              MR. HOOKER:  To clarify, Your Honor, I believe between

5    this witness and our next witness we can provide a breakdown.

6              MR. EHRLICH:  Except if it's highly confidential.

7    Then we have the issue of the Defendant, although we -- we

8    permitted the total number, we'd prefer that the Defendant not

9    hear the actual sales when broken down, Your Honor.  And we

10   would also want that portion of the record marked highly

11   confidential.  It's competitive information.

12             THE COURT:  You want to respond to that?

13             MR. BELLAMY:  I think he's -- when he says,

14   "Defendant," he's referring to Andrew Clyde.

15             THE COURT:  Right.

16             MR. BELLAMY:  As opposed to Clyde Armory,

17   Incorporated.  Andrew Clyde is the corporate representative for

18   us at counsel table.  I infer from this that he's asking for

19   Mr. Clyde to be excluded during this testimony.

20             THE COURT:  Well, I think they are making the argument

21   this is proprietary information and that it might put them at a

22   competitive disadvantage if it was revealed to the public.

23             Is that what you're saying?

24             MR. EHRLICH:  That's exactly what I'm saying, Your

25   Honor.

1          THE COURT:  And so --

2          MR. BELLAMY:  I think there are two different things

3    between it being marked as such on the record so that it

4    doesn't become public record versus Mr. Clyde having an

5    understanding that this is confidential information that he

6    can't share with anyone else.  Even though it was -- you know,

7    excluded from the public record.

8          THE COURT:  All right.  Well, I haven't had this

9    question come up in a long time, so I don't know exactly what

10   the law is on this.  I guess we'll have to look at that.

11         MR. EHRLICH:  It's in the protective order.  We had,

12   of course, the two-tier protective order, Your Honor.  And this

13   was always designated -- the specific numbers were designated

14   as highly confidential.  And, of course, people sign protective

15   orders and attorneys are bound by them and, you know, we'd only

16   ask -- we've been going through sales, and we even had the

17   media numbers on some things and we didn't ask any

18   confidentiality either on the record or for the Defendant, you

19   know, himself to have to leave during that, although there was

20   some feeling that that was -- you know, media buys and stuff

21   like that is confidential.  But it's just these figures we feel

22   are highly confidential.  We just feel he could come back in

23   after the numbers are admitted.

24         THE COURT:  When we get to that point, we'll take it

25   up.  I mean certainly -- I don't have any problem of redacting

1    that out of the record.  Because I can't imagine that has

2    anything whatsoever to do with anything related to any appeal.

3    You may have a different opinion about that.  But I don't see

4    how that makes any difference at all.  So really all you're

5    asking is to let the lawyers stay in the room and the Defendant

6    step out.

7              MR. EHRLICH:  That's exactly right, Your Honor.

8              THE COURT:  Okay.  All right.  Well, let's just move

9    along.  We're making good progress, let's move along.  And

10   we'll see about that.

11   BY MR. HOOKER:

12   Q.  Mr. Mills, just to step back for a moment, there's been

13   some discussion today about the SCAR rifle generally and the

14   use of "SCAR" on weapons.  Are you aware of any other company,

15   firearms manufacturer, who manufactures a firearm with SCAR on

16   it?

17   A.  No, sir, I'm not.

18   Q.  Or that uses "SCAR" as a brand or as a trademark in any

19   way?

20   A.  As a firearm, no, sir.

21   Q.  And are you aware of any regulation or requirement by the

22   United States military that FN place "SCAR" on any of its

23   weapons?

24   A.  No, sir, I'm not.  And when I took the product to Bureau of

25   Alcohol, Tobacco and Firearms, we made that mark on our

1    firearm, and we're the ones that asked for that, not the U.S.

2    military, to be placed on our firearms.

3    Q.   And when people at trade shows and at law enforcement

4    agencies and dealers and others who you speak with refer to

5    SCAR weapons, what do you understand them to refer to?

6    A.   They are asking to see an FN brand SCAR firearm.

7    Q.   Just another general point before we jump back in to where

8    we were.  At the SHOT Show, so 2004 to -- you know, to present,

9    can you describe for me who all attends that show.

10   A.   The show as a percentage breakdown:  About 90 percent FFL,

11   Federal Firearms License holders, their employees, their

12   families--except minors, minors cannot attend, but the adults

13   in the family can; 5 percent law enforcement, federal, state,

14   local, to include international; about 2 percent to 4 percent

15   of international and U.S. press.  And that takes up about all

16   of it.

17   Q.   And who all can purchase firearms at those shows?

18   A.   Some of the distributors actually take orders and sell

19   them.  Some do not.  They would be taking orders, the

20   distributors would, FFL holders would.

21   Q.   Okay.  And then Mr. Spaniel in his testimony, I believe,

22   testified that civilians could not purchase fully automatic

23   rifles.  Do you recall that?

24   A.   I do recall that.  That's not exactly correct, sir.

25   Q.   Okay.  And how do you know that that's not correct?

A.   I sell them all the time.  And I know what proper ATF

paperwork is needed to purchase a select fire Class II, Title 2

machine gun.

Q.   And what is required?

A.   You need several things.  You need an FFL license.  You

need an SOT, a special stamp from the federal government.  And

you need a law letter from an agency head, either a sheriff or

a chief, signed by the sheriff or chief, requesting the demo of

that specific product.

     Take an FN SCAR 16 brand rifle.  So if you were an FFL

holder, a gun collector, you are a civilian, you are not

affiliated with any agency or federal government, if you have

the proper paperwork and submit the proper paperwork, and then

we would submit it to Bureau of Alcohol, Tobacco, Firearms.  If

they approve it, then we would ship the firearm.  And then it's

up to that FFL holder to do the demo, and then that firearm is

theirs.

Q.   Now, the question you were asked just before we took a

break is when did FN first take orders for SCAR brand weapons

from law enforcement agencies and commercial distributors?

A.   We started showing the product in 2005, 2006 and '7 to

generate the orders.  As I stated earlier this afternoon, it

takes months up to years when you show an agency a product for

that product to actually receive a purchase order for it and

then ship it.

1          THE COURT:  When was the purchase?

2          THE WITNESS:  I would say the first ones were late

3    2007/early 2008, sir.  People tried to give us orders before

4    that, but I would not accept them because I told them I had to

5    wait for a final product.

6          THE COURT:  Okay.

7    BY MR. HOOKER:

8    Q.  Mr. Mills, if I could turn your attention to Plaintiff's

9    Exhibit 118 and ask you to identify that document for the

10   Court.  Plaintiff's Exhibit 118.

11   A.  Yes, sir.  It's an internal FNH USA request for immediate

12   press release.

13   Q.  And do you recall seeing this document?

14   A.  Yes, sir, I do.

15   Q.  And the first sentence reads,

16          "FNH USA announces the exciting FN SCAR 16S

17          for the civilian enthusiast was delivered to

18          its dealer base at year end 2008."

19   Is that a true statement?

20   A.  I'm sorry, where do you see that?  I see it, okay.  Yes.

21   That is a true statement, sir.

22          MR. HOOKER:  I'd like to move to admit Plaintiff's

23   Exhibit 118.

24          MR. BELLAMY:  No objection.

25          THE COURT:  It's admitted.

1          (Plaintiff's Exhibit 118 was admitted into evidence at

2     3:30 p.m.)

3          THE COURT:  I have a question about that.  What is the

4     significance of 16S?

5          THE WITNESS:  The SCAR 16 is the 5.56 variant, the S

6     means it's a semi-automatic only.  If it's just a SCAR 16,

7     that's a select fire machine gun.  So if it has an S behind it,

8     it's a civil version semi-automatic weapon.

9          THE COURT:  All right.  Go ahead.

10    BY MR. HOOKER:

11    Q.  Mr. Mills, if I could turn your attention to Defendant's

12    Exhibit 203.

13    A.  Yes, sir.

14    Q.  And on Page 2 of that document, under 2004 to 2008, there

15    is a -- an entry for 2007 to 2008,

16              "FN introduces the large caliber FNP-45

17              polymer-framed autoloading pistol and the

18              selective-fire FN SCAR 16 and SCAR 17 to the

19              U.S. law enforcement market."

20    Is that a correct statement?

21    A.  Yes, sir, it is.

22          MR. HOOKER:  I would like to move to admit Defendant's

23    Exhibit 203.

24          MR. BELLAMY:  No objection.

25          THE COURT:  Admitted.

1     (Defendant's Exhibit 203 was admitted into evidence at

2     3:32 p.m.)

3     BY MR. HOOKER:

4     Q.  Now, why didn't FN begin selling SCAR brand rifles to law

5     enforcement or the general public until late 2007?  Why did it

6     take from 2004, when the initial contract was given from the

7     government, all the way to 2007 for that to occur?

8          THE WITNESS:  The reason, Judge, is in 2004, they had

9     a prototype beginning stage of what product they wanted.  It

10    had to go through four or five generations.  Had to be field

11    tested, which took several years, as you heard testimony.

12         FN is not going to release it to law enforcement,

13    release it to the commercial market until we have a final

14    product that we feel comfortable that won't change.  And then

15    it has to be manufactured, put in the manufacturing queue,

16    built after the USSOCOM rifles are built.  Then law enforcement

17    receives theirs.

18         And then I submitted those to the Bureau of Alcohol,

19    Tobacco & Firearms, Firearms Technology Branch, to get a

20    civilian semi-automatic SCAR 16S/SCAR 17S approval.  So that's

21    what took the time.

22         THE COURT:  Okay.

23    BY MR. HOOKER:

24    Q.  And some of that is what Mr. Spaniel was testifying about

25    earlier this morning, low rate initial production phase?

1    A.   Correct.  All that played a factor into that.  We were

2    constantly being bombarded by agencies, by individuals:  What's

3    taking so long?  Why can't we get them yet?

4        And we would always say the same thing:  As soon as we have

5    a final configuration for the U.S. military version, then we

6    will have a configuration for the law enforcement.

7        Then we would submit a semi-automatic version for a BATF

8    approval.  Then we would produce that gun.  Then we would start

9    selling that gun.

10   Q.   Now, does FN -- is FN obligated to fulfill military orders

11   first?

12   A.   Contractually, yes.  In our general everyday practices, we

13   always do our military orders first, and then law enforcement

14   agencies, and then individual officers, and then the general

15   public.

16   Q.   Just while we're on that point, is there a program that FN

17   has for sales to individual officers?

18   A.   Yes, sir, we do.  We have our commercial firearms--our

19   semi-automatic pistols, shotguns, rifles, bolt rifles,

20   carbines.  We offer a discounted price to active/retired law

21   enforcement, active/retired military.

22            THE WITNESS:  (Addressing the Court) I am not bribing

23   you, but federal judges.  TSA employees.  I just wanted to put

24   this all in the list, sir.

25   A.   Honorably discharged veterans, emergency medical personnel

1    are some of the people on the list.

2    BY MR. HOOKER:

3    Q.  And do those include SCAR weapons?

4    A.  Yes, the semi-automatic versions, yes, sir.

5              MR. BELLAMY:  Your Honor, I object that that list did

6    not include opposing counsel.

7              THE WITNESS:  Are you active or retired?  Anything,

8    sir?

9              MR. BELLAMY:  No.

10             THE WITNESS:  Be glad to put you on there.

11             THE COURT:  I am not a bit surprised about that

12   because Glock does something very similar.

13             THE WITNESS:  Most of the manufacturers do, sir.

14             THE COURT:  Right.  (Addressing Mr. Bellamy) Sorry you

15   were left out, just get the President to appoint you to a

16   federal judgeship.

17             MR. BELLAMY:  We'll see what we can do.

18             MR. HOOKER:  Your Honor, we are at that point where I

19   have two documents to show Mr. Mills that contain sales

20   information.

21             THE COURT:  Okay.  All right.  Well, you -- if I

22   understand correctly, you have the total for the military and

23   civilian sales?

24             MR. EHRLICH:  That's correct, Your Honor.

25             THE COURT:  And you don't have a problem giving up

1    that number?

2              MR. EHRLICH:  We've given out the total -- the

3    aggregate of the two numbers that's in your order as of that

4    point in time, Your Honor.  For U.S.  For the U.S. only.

5              THE COURT:  Refresh my memory how much it was.

6              MR. EHRLICH:  $111 million.

7              THE COURT:  I thought that was military sales.  This

8    is why I'm confused.  There are different numbers floating

9    around here, at least I thought there were.  Maybe I didn't

10   understand what you said in your opening statement.

11             MR. EHRLICH:  It was a $640,000 order that I was

12   referring to at that time.

13             THE COURT:  Right.

14             MR. EHRLICH:  Which is a sizable sum of money, but

15   that's -- you know, that number is not 111 million between law

16   enforcement, civilian and government.  And the government sales

17   are -- you know, I mean, they were saying early in this case

18   that that was -- you know, we can't even say that.  But the

19   government published at least some of their sales on the

20   internet.

21             So -- but on this, Your Honor, what we're saying is

22   the breakdown of the individual products, and civilian versus

23   law enforcement, we have those numbers here.  We've given those

24   to attorneys eyes only, and that's what we consider to be

25   confidential.

1            THE COURT:  Okay.  Well, you want to respond to that?

2            MR. BELLAMY:  Your Honor, I'd like to have my

3     corporate representative with me.

4            THE COURT:  I understand.

5            MR. BELLAMY:  But obviously we will abide by your

6     order.

7            MR. EHRLICH:  Obviously.

8            THE COURT:  Well, I mean, I will be honest with you, I

9     don't know what the law is on this.  You obviously have an

10    interest in that.  That interest ought to be protected.  I am

11    not sure what difference it really makes ultimately to the

12    Defendant whether half of that or three-quarters of it or

13    one-third of it amounts to the civilian, nonmilitary sales.

14           I just don't really know what the difference is.  And

15    my law clerk is supposedly over here working on this question.

16    I don't know whether she's come up with an answer yet or not.

17    We can take it up tomorrow.  I don't know.

18           I mean, I can -- I can always threaten to put this

19    gentleman in jail if he breaches the confidentiality.  And I

20    have put people in jail before on civil matters.  Not just

21    criminal matters, but civil matters.  Discovery matters.  For

22    months.  So I don't know where you're going here.  If we can

23    decide tomorrow -- you going to be back tomorrow or do you have

24    to leave?

25           THE WITNESS:  I'm here as long as you need me, sir.

```
 1            THE COURT:  Let me decide where we go.
 2        (Aside.)
 3            THE COURT:  Let me ask you this question.  You say you
 4    want your corporate representative with you.  What is the harm
 5    going to be if he's not?  What prejudice is it to you?  I mean,
 6    the problem here is, again, he doesn't sell guns.  I mean, he
 7    sells replacement stocks.  We have a gun manufacturer versus a
 8    retailer of -- maybe he's even an assembler of stocks.  So
 9    if -- I am not exactly clear what difference it really makes to
10    him, whether he's in here and he hears these numbers or not.
11            MR. BELLAMY:  Well, Your Honor, I mean, I don't think
12    that he's a competitor on these products.  Granted, we
13    understand the importance of the information not being shared
14    outside.  But that's a separate question from Mr. Clyde being
15    able to be present to hear the information.
16            THE COURT:  Well, I mean, I am not exactly clear why
17    that's separate.  But --
18        (Aside.)
19            THE COURT:  Well, what is the -- what is the
20    Plaintiff's concern -- specific concern about this?
21            MR. EHRLICH:  Well, the Plaintiff -- Your Honor, first
22    of all, there's other gun dealers.  I mean, there's
23    competitors.  He's not claiming to be a competitor right now
24    and he's -- you know.  But the issue is, this isn't public
25    information.  Colt, you know, we had a deposition taken in this
```

1    case.  We don't want really -- and how would we ever prove --

2    you know, if we're selling something very strongly to the

3    private sector, law enforcement or, you know, civilian, you

4    know, we don't want those numbers ever being floated.  We face

5    serious worldwide competition every day.

6            And we keep these numbers where normally many of the

7    people -- you know, many of the people working for the company

8    wouldn't even know these numbers, not even have access to these

9    numbers.  We see no harm.  He's got the total number of both.

10   But the configuration of those numbers I think is very

11   confidential.

12           THE COURT:  Are these guns being sold to any military

13   other than the American?

14           MR. EHRLICH:  Yes, they are.  We've sold over -- the

15   last I saw, Your Honor, was something like 60-some militaries

16   in the world have --

17           THE COURT:  Does this 110 figure include that or is

18   that separate?

19           MR. EHRLICH:  No, this figure, Your Honor, is only

20   sales to the United States.

21           THE COURT:   Just the American.

22           MR. EHRLICH:  Sales to the U.S. military and sales to

23   the civilian and law enforcement market in the United States.

24   We've never disclosed our worldwide sales to the Defendant in

25   this case, nor is it -- you know, it might be arguable it's

1    somewhat relevant, but I don't know that -- it's not U.S.

2    trademark-wise.

3             THE COURT:  Probably not relevant.

4             MR. BELLAMY:  Your Honor, perhaps we could handle it

5    this way.  We could ask Mr. Clyde to step out and proffer what

6    the testimony would be, and then you can rule.

7             THE COURT:  Okay.  Let's do that.

8         (Mr. Clyde leaving courtroom at 3:42 p.m.)

9             MR. BELLAMY:  Could we have a break when it's time to

10   go retrieve him?

11            THE COURT:  Sure.  My guess is that Mr. Clyde doesn't

12   really care.  Is my guess about that.  But I know that other

13   gun dealers are interested in this case, so -- I know that.

14            MR. EHRLICH:  And the decision doesn't need to be made

15   right away.  If you want, you know, during the course of

16   your -- just --

17            THE COURT:  I think that's the way to do it.  What

18   we'll do is we'll put the evidence on the record, and then I'll

19   figure out and then -- I mean, all it will be will just be to

20   tell him.  But he wasn't here to hear the testimony, he's not

21   going to hear the numbers.  Because I think all I'm going to

22   get is the numbers probably in a percentage.

23            MR. BELLAMY:  But I will need to know, Your Honor,

24   because I don't want to be in contempt of this court by not

25   knowing whether I can share information with my client or not.

1           THE COURT:  I understand that part.  I understand that

2    part.

3           MR. BELLAMY:  Ultimately.

4           THE COURT:  So we're just going to proceed in this

5    way, which I think is a smart way to do it.  And then I'll --

6    we may look at it a little bit more, and I'll decide tomorrow.

7    But my point is that I don't think we have to redo the

8    testimony.

9           MR. BELLAMY:  Exactly.

10          THE COURT:  Yeah, right.  Go ahead.  Ask the

11   questions.

12          MR. HOOKER:  Well, Your Honor, my client is just

13   reminding me that this information was provided by FN, you

14   know, to us and to Ms. Andes, you know, on the express

15   condition that it be held attorneys eyes only and not be made

16   public in any way.

17          THE COURT:  And that includes these boys over here?

18          MR. EHRLICH:  No, no, Your Honor, it was marked highly

19   confidential.  It's produced to them in advance.  They have

20   received it.  It's marked highly confidential.  They could

21   receive it attorneys eyes only.  They are bound by the rules of

22   the Court.  And they've signed the protective order and I know

23   that they know what's in the protective order.

24          THE COURT:  I understand all that.  I'm trying to

25   understand what it has to do with the next question that's

1   going to be asked.

2           MR. EHRLICH:  We're just saying that the information

3   was disclosed.

4           MR. HOOKER:  We're just concerned that if there's a --

5   if there's a contingency in place, or if there's a chance that

6   this will -- that you will rule that -- that this is not going

7   to be held attorneys eyes only or that Mr. Clyde can see it,

8   that -- that -- that's not something our client --

9           THE COURT:  So you don't want him knowing the numbers,

10  that's what you're saying.

11          MR. EHRLICH:  Your Honor --

12          THE COURT:  He's (referring to Mr. Mills) coming back

13  tomorrow.  He'll come back tomorrow.  Let's proceed.  We will

14  move on to the next topic.  There you go.  Bring him (referring

15  to Mr. Clyde) back in.

16          MR. HOOKER:  That's my last topic to cover with him.

17          THE COURT:  You're finished with him, then?  So it's

18  time to start cross examination.

19      (Aside.)

20      (Mr. Clyde returned to the courtroom at 3:47 p.m.)

21          THE COURT:  There is one question I would like to

22  clarify.  And this is probably maybe incrementally in the

23  evidence.  But when were the first sales -- when were the first

24  military sales and then when were the first civilian/law

25  enforcement sales?

1            THE WITNESS:  Delivered or requested and received POs?
2    Which aspect are you looking at first, sir?
3            THE COURT:  When did you first make a delivery to the
4    military for sales?
5            THE WITNESS:  I believe that was in 2004.
6            THE COURT:  "2004"?
7            THE WITNESS:  Yes, sir.
8            THE COURT:  And when was the first delivery of the
9    civilian/law enforcement arms?
10           THE WITNESS:  2008, sir.  The end of 2008.
11           THE COURT:  All right.
12           Okay.  Do you have another question?
13           MR. HOOKER:  Your Honor, I was reminded during one of
14    the breaks that I did not move to admit Defendant's Exhibit 113
15    and Plaintiff's Exhibit 244.
16           THE COURT:  Do you have any objections to either one
17    of those?
18           MR. BELLAMY:  No objection to Defendant's 113.
19       (Defendant's Exhibit 113 was admitted into evidence at
20    3:48 p.m.)
21           MR. BELLAMY:  Plaintiff's 244, I would really like to
22    voir dire the witness about first on the foundation for that.
23    We would reserve that.
24           MR. HOOKER:  That was the media plan document.
25           THE COURT:  Tell me the number again.

```
1              COURTROOM DEPUTY:  244.

2              MR. HOOKER:  Plaintiff's Exhibit 244.

3              THE COURT:  Oh, I see it, okay.  All right.  That has

4    to do with the advertising?  The advertising budget?  The media

5    plan?

6              MR. BELLAMY:  Yes.

7              THE COURT:  Okay.  That's fine, you can examine him

8    about that.  So then we'll -- I will withhold my ruling on

9    that.  And if you will begin with that, please, and then we

10   will decide -- when you decide you have enough information

11   whether you want to object or not object, let me know.  If you

12   don't object, it will be admitted.

13             MR. BELLAMY:  Very well.  Give me just a moment,

14   please, to get some documents.

15             Could I ask the media person to bring Exhibit 244 up

16   on the display.  That is one of the late ones that I didn't

17   have the copy of.

18                         CROSS EXAMINATION

19   BY MR. BELLAMY:

20   Q.  Hi, Mr. Mills.  My name is Glenn Bellamy.  We met before in

21   a deposition.

22   A.  Good afternoon.

23   Q.  Plaintiff's Exhibit 244, is this --

24             THE COURT:  Hold the microphone a little closer to

25   you, please.
```

```
 1              MR. BELLAMY:  Of course.
 2   BY MR. BELLAMY:
 3   Q.  Mr. Mills, is this a document that you created?
 4   A.  No, sir, I did not.
 5   Q.  Do you know who created it?
 6   A.  Yes, sir.
 7   Q.  Who is that?
 8   A.  Sarah Perry.
 9   Q.  And what is her role?
10   A.  In 2006, she was our marketing director.  Or marketing
11   manager, I believe, actually.
12   Q.  And was this created in 2006?
13   A.  Yes, sir.
14              MR. BELLAMY:  Based on that, I have no objection.
15              THE COURT:  Okay.  It's admitted.
16       (Plaintiff's Exhibit 244 was admitted into evidence at
17   3:52 p.m.)
18   BY MR. BELLAMY:
19   Q.  Mr. Mills, if I could have you turn to Plaintiff's
20   Exhibit 76.
21   A.  Yes, sir.
22   Q.  This was the Form 2 that you spoke of?
23   A.  Yes, sir.
24   Q.  And under Model there, how is this firearm identified by
25   model?
```

1   A.  The form says, "Scar-L."

2   Q.  And under Description, how is this firearm described?

3   A.  I just stated that, sir.

4   Q.  No, I was asking you under Model.  The column that says,

5   "Model."

6   A.  "Scar-L."  Same thing.

7   Q.  And then there's a column, Column B?

8   A.  Correct.

9   Q.  That says, "Additional Description."

10  A.  Yes, sir.

11  Q.  And that one says, "Scar-L," also?

12  A.  Correct, sir.

13  Q.  On the left-hand side, there is some sort of stamp and/or

14  signature that's June 16 of 2008.

15  A.  Correct.

16  Q.  What is that?

17  A.  That is from the NFA Branch of the Bureau of Alcohol,

18  Tobacco and Firearms.

19  Q.  And this was submitted, you said, on February 22nd of '05?

20  A.  Correct, sir.

21  Q.  Did NFA Branch take more than three years to return a

22  Form 2?

23  A.  Actually, this was part of the audit that we had, and there

24  were several firearms that the former NFA examiner failed to

25  send back to us.  And when I provided documentation that we

1    faxed over copies on that date that I signed it, they then

2    stamped it and proceeded to release that person.

3    Q.  Very well.  Thank you.  Could you turn your attention to

4    Exhibit 77, Plaintiff's Exhibit 77.

5    A.  Yes, sir.

6    Q.  These photographs showing "SCAR-L" on the firearm.

7    A.  Correct, sir.

8    Q.  Is that something that is engraved?

9    A.  It's laser engraved, yes, sir.

10   Q.  That's not the same type of engraving as the weapons that

11   we had in court earlier today; is it?

12   A.  I am not really sure about your question.

13   Q.  Let me clarify.  By "type" I mean this doesn't look the

14   same as those do.  As it did on those weapons we had today;

15   does it?

16   A.  I still don't follow your question, sir.

17   Q.  Well, the appearance of this SCAR-L engraving in this

18   photograph, it doesn't have the same appearance as the

19   engravings on the firearms that we had in court this morning;

20   does it?

21   A.  On the semi-automatic SCAR, the SCAR 16S, it's the same

22   type of engraving, yes, sir.  And it's on a different location

23   on the semi-automatic version that you saw on the receiver.

24   This is one of the original SCAR brand Ls, Lights.  And we were

25   allowed to engrave that one, for lack of a better word, Your

1  Honor, on the lower part of the firearm.  But then the Bureau

2  of Alcohol, Tobacco and Firearms decided that they wanted to

3  now start putting the serial number and the engraving on the

4  upper receiver part.  So that's why it changed to that.  That

5  was a BATF request, sir.

6  Q.  My point is it doesn't look the same.  The judge mentioned

7  the font of the letters and so forth.  It doesn't look the same

8  as the models that we saw today?

9  A.  I believe I just answered your question, sir.

10  Q.  What was your answer to my question, then?  You mentioned

11  it was in a different place.

12          MR. EHRLICH:  Objection.  Asked and answered.  I mean,

13  there's been quite a bit of testimony about this already.

14          MR. BELLAMY:  I am just trying to get an answer.

15          THE COURT:  All right.  Do you have anything further

16  to say on that?

17          THE WITNESS:  No, sir, I don't.  This is where they

18  told us to put it originally, and then they changed their mind

19  and wrote us a letter, and we complied with the federal

20  government and put it up on the top receiver, sir.

21          THE COURT:  Other than the difference in the

22  placement, does it look any different to you?

23          THE WITNESS:  No, sir, not to me.

24          THE COURT:  There's your answer.  Go ahead.

25          MR. BELLAMY:  Thank you.

1    BY MR. BELLAMY:

2    Q.  You mentioned earlier that one of the promotional items

3    that was made and given away were key chains.  Do you recall

4    that?

5    A.  Yes, sir, I do.

6    Q.  Do you know when the key chains were made that related to

7    the SCAR product?

8    A.  I would say in 2005.  When we first brought out the PS90,

9    P90, we had P90 key chains, we had FN 45 key chains.  And as

10   soon as we won the SCAR contract and started receiving all the

11   inquiries and we started promoting the SCAR for sales and

12   marketing, we had key chains made.  2005 to 2006 time frame,

13   sir.

14   Q.  And what about the hats and tee shirts that you mentioned?

15   When were those?

16   A.  Those would have been the same time, sir.  '05-06, I

17   believe.

18   Q.  Do you know how many in '05?

19   A.  Without trying to go back through records that are

20   archived, no, sir.

21   Q.  Do you know how many in '06?

22   A.  The same thing, no, sir.  I know hundreds -- I personally

23   passed out hundreds.

24   Q.  Do you know whether all of those came out of the military

25   marketing budget?

1    A.  No, sir, some of them came out of my budget.  My law

2    enforcement budget.

3    Q.  I would like you to look at Exhibit -- Plaintiff's

4    Exhibit 75, please.

5    A.  Yes, sir.

6    Q.  If you would turn in that several pages in, the -- the

7    one-page document that is sort of greenish has the word

8    "Operator" large in the middle.  The one that has the Special

9    Forces emblem in the lower right hand.

10   A.  Yes, sir.

11   Q.  Is there anything on here that indicates to you when this

12   was printed?

13          MR. EHRLICH:  Objection.  It's confusing.  When you

14   say, "anything on here," if he's asking for a date, that's one

15   thing.  If there's something about the document, let's say the

16   model or the description, then that's something else that could

17   date a document.  I am not sure what he's asking.  Whether look

18   for a date or whether to identify that there's a date that he

19   could know this document would have been around from.

20          THE COURT:  I think the question was clear enough.  I

21   want to know which page number we're talking about.

22          MR. BELLAMY:  It's the one that's marked FN100412.

23          THE COURT:  412?

24          THE WITNESS:  Page 4, sir.

25          THE COURT:  All right.  Do you know the date on that

1    one, sir?

2        THE WITNESS:  Well, it would have to be sometime in

3    2005 since that's part of the news article on Special

4    Operations Technology.

5    BY MR. BELLAMY:

6    Q.  How do you know that that's part of the news article?

7    A.  It looks like it's a continuation of that copy, sir.  Do I

8    know personally?  I didn't make this copy, so I do not know

9    100 percent.

10   Q.  You don't have any personal knowledge whether this document

11   that's identified as FN 412 was in any particular magazine?

12   A.  No, sir, I don't personally know that.  I did hand this

13   flier -- a copy of this flier out to people in 2005, yes, sir.

14   Q.  You testified before that as soon as the SCAR program at FN

15   was begun, that the decision was made to eventually sell to law

16   enforcement and semi-auto to civilians.  Is that what you said?

17   A.  Without going back and reviewing my testimony, that's

18   probably what I said.

19   Q.  FN has had a contract to manufacture the M16 for the U.S.

20   military for quite some time; has it not?

21   A.  FN does have a contract to manufacture the M16 for the U.S.

22   DOD, yes, sir.

23   Q.  But it's had that for a couple of decades?

24   A.  Correct.

25   Q.  How recently did FN come out with a semi-auto version of

1    that firearm platform to sell?

2    A.  First of all, sir, the military contract for the M16

3    belongs to the U.S. military.  That's a technical data package

4    that we were awarded to build M16s for the U.S. military.  We

5    do not -- FN owns the technical data package for the SCAR.  So

6    FN can decide when to bring out that SCAR into a civilian

7    market, when they decide they want to brand it to a civilian

8    market.

9        The M16, we wanted to honor the federal government, the

10   U.S. Department of Defense, and we decided to hold off on

11   making a civilian version of that until just a year and a half,

12   two years ago we started.

13   Q.  And that's the FN 15?

14   A.  And variants of it, yes, sir.

15   Q.  And so when FN began this contract to make the M16 for the

16   military, was there anticipation that it would soon be making

17   them in a civilian version?

18   A.  Sir, I tried to get them to make them in a civilian version

19   in 2002.  And the powers to be at FN Herstal, and it was

20   decided way above my pay grade, that we would hold off until a

21   later time and reevaluate it.

22   Q.  So, then, it's not always the case that when a firearms

23   manufacturer as well known as FN starts making a firearm for

24   the government that it's anticipated that very soon they will

25   be making a civilian version; right?

1          MR. EHRLICH:  Objection, Your Honor.  Anticipated by

2    whom?  It calls for speculation.

3          THE COURT:  Let me point out you need to lean forward

4    if you want to make an objection.  You don't have to stand up,

5    but you do need to lean forward.  Because when you stand back,

6    we can't hear you.  I didn't hear that objection, so go ahead.

7          MR. EHRLICH:  I'm sorry, Your Honor.  He's asking for

8    anticipation, and it's a hypothetical.  He asks, "anticipated."

9    Anticipated by who?  And I don't understand the hypothetical.

10   It's confusing.

11         THE COURT:  Can you ask a question that's more

12   specific than that.

13   BY MR. BELLAMY:

14   Q.  You testified earlier this morning that there was great

15   anticipation in the marketplace when FN received the initial

16   SCAR contract as to when they would come out with any law

17   enforcement and civilian version.  Do you remember that

18   testimony?

19   A.  Yes, I do.

20   Q.  And that is not always the case every time a firearms

21   manufacturer as large as FN gets a military contract; correct?

22         MR. EHRLICH:  Objection.  Again, it's hypothetical and

23   how can he know from all the military manufacturers.

24         THE COURT:  Wait just a minute.  I think he can answer

25   the question.  I mean, it's a question that can be answered.  I

1    don't know whether he can answer it or not.

2          Did you understand the question?

3    A.  Would you repeat it again, sir, I'm sorry.

4    BY MR. BELLAMY:

5    Q.  Well, you said this morning that it is commonly highly

6    anticipated that when a firearms manufacturer, such as FN, gets

7    a government contract to make a firearm, that the consumer and

8    law enforcement market is anxious to receive a version they can

9    have.  Do you remember talking about that and saying that it

10   was commonplace?

11   A.  I just answered that a minute ago.  Yes, I do, sir.

12   Q.  And what was your answer a minute ago?

13   A.  I told you yes, it is commonplace.

14   Q.  But it's not always the case?

15   A.  I never said it was always the case 100 percent, sir.

16   Q.  I would like you to turn to Exhibit -- Plaintiff's

17   Exhibit 134, please.

18   A.  Yes, sir.

19   Q.  On the first page of that -- when this was folded up as a

20   tri-fold, which of these panels would be the front?

21   A.  If I remember correctly, sir, it would be the very top of

22   Page 0001, which has the SCAR brand Light, SCAR brand Heavy,

23   with the EOTech sights on them, sir.

24   Q.  I'm sorry, this is Exhibit 134?

25   A.  134.001.

1          MR. EHRLICH:  If you want, we have the original so we

2     could give it to you, Glenn, and you could inspect it.

3          MR. BELLAMY:  Well, that might be helpful.  Because we

4     seem to -- I am not following what you're talking about.

5       (Mr. Ehrlich provided document to counsel.)

6          MR. BELLAMY:  So -- perhaps if I hand this to the

7     witness it would be easier.

8     BY MR. BELLAMY:

9     Q.  I have just handed you an original specimen of Plaintiff's

10    Exhibit 134.  And my question is, when it was distributed,

11    which panel would be the front panel?

12    A.  As I stated earlier, sir, the one showing the two SCARs and

13    saying the "SCAR" in front, when it's folded properly, and

14    that's how it was handed out and displayed.

15          THE COURT:  May I see it, please.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  All right.

18    BY MR. BELLAMY:

19    Q.  And at the top of that panel, it has the term "SCAR"

20    prominently; is that correct?

21    A.  Yes, sir, it does.

22    Q.  And under that, it tells the reader what that means,

23    "S.O.F. Combat Assault Rifle"; is that correct?

24    A.  That's what's written on the top of it, yes, sir.

25    Q.  If I could have you turn to Exhibit -- Plaintiff's

1  Exhibit 222.

2  A.  Yes, sir.

3  Q.  This is a similar tri-fold.  Could you identify for us on

4  that one which panel would be the front panel when it's folded

5  and handed out.

6  A.  To the best of my memory, sir, it would have been the back

7  page of that, which was Page 222.0002.  And it would show the

8  picture of the single SCAR on the front with a grenade launcher

9  underneath of it.

10  Q.  And at the top of that also it has the word, "SCAR"?

11  A.  Yes, sir, it does.

12  Q.  And below that it tells the reader what SCAR stands for,

13  "S.O.F. Combat Assault Rifle"?

14  A.  Below that -- what it reads is, "SCAR," below and then,

15  "S.O.F. Combat Assault Rifle," in parentheses.

16  Q.  You said that you had visited Clyde Armory in the past?

17  A.  Yes, sir, I have.

18  Q.  Do you know when that visit was?

19  A.  No, sir, I don't.

20  Q.  Do you recall what the store looked like?

21  A.  Yes, sir.

22  Q.  Was it in a -- let me ask you this.  Are you familiar with

23  Clyde Armory's current facility and where it's located?

24  A.  I think I drove past it coming in here Sunday.

25  Q.  Is that the one that you visited?

1    A.  Yes, sir.

2    Q.  When you visited there, did you see a Clyde Armory SCAR-CQB

3    stock?

4    A.  I don't recall that, sir.

5    Q.  I would like you to turn to Plaintiff's Exhibit 155.

6    A.  Yes, sir.

7    Q.  You testified before that these were invoices all selling

8    products to Clyde Armory?

9    A.  They are copies of invoices, yes, sir.

10   Q.  Are any of these invoices for a sale prior to September of

11   2006?

12   A.  If you give me a second, I'll take a look, sir.

13   Q.  Let me ask you a more specific question to save you a

14   little bit more time.

15   A.  Yes, sir.

16   Q.  Are any of the invoices that are dated prior to September,

17   2006, do any of those include a SCAR -- FN SCAR rifle?

18   A.  To Clyde Armory?

19   Q.  Correct.

20   A.  That's what I'm checking for, sir.  You just asked me to

21   check.

22   Q.  Well, I -- I had asked you just were any of them dated

23   before September of '06.  And I'm asking more specifically of

24   any before '06, do any of them include an FN SCAR rifle?

25   A.  Sir, I am not going to incriminate myself without looking

1   at what you presented me.

2   Q.  I understand.  I am just trying to give you a more narrow

3   question to look at in the first instance.

4   A.  On Page 1?  You're asking?

5   Q.  Well, I was asking about in the whole group.

6   A.  I'm almost done with it, sir.  Then I will be able to

7   answer your question very shortly.

8   Q.  Let me ask you this.  Is it possible that Clyde Armory

9   would have brought -- would have bought an FN SCAR rifle

10  directly from FN prior to September of 2006?

11  A.  Not at all.

12  Q.  I would like you to turn to Plaintiff's Exhibit 146.

13  A.  Yes, sir.

14  Q.  In this letter to Mr. Vasquez, I believe you said this was

15  in response to an inquiry, was it that ATF wanted to purchase a

16  SCAR rifle from FN?  Is that correct?

17  A.  They wanted to test and evaluate first for possible

18  purchase, yes.

19  Q.  But you were telling them that all of the SCARs to date

20  that have been imported were prototype models; is that correct?

21  A.  There were no final production models at that date, no,

22  sir.

23  Q.  And that you would probably not have production models

24  until May of 2007; is that what you told him?

25  A.  Yes, sir.  At that time that I wrote this letter to ATF, we

1    were under the impression and belief that SOCOM would have a

2    final version selected and we would be in production by then.

3    Q.  So SOCOM had not even selected a final version by October

4    of 2006?

5    A.  They were still going through different generations,

6    different modifications that they requested as Mr. Spaniel

7    testified to earlier this morning, sir.

8    Q.  I would like you to turn to Plaintiff's Exhibit 144.

9    A.  Yes, sir.

10   Q.  I believe you said that this was a presentation that was

11   given by Rick DeMilt?

12   A.  Yes, sir.

13   Q.  And that presentation was not given prior to September,

14   2006; was it?

15   A.  This presentation?  No, sir.

16   Q.  I would like you to turn to Plaintiff's Exhibit 161.

17   A.  Yes, sir.

18   Q.  And this includes two pages.  Looking at the front one

19   first, I don't believe -- I don't have in my notes as to a date

20   that this was published.  Do you know when this was published?

21   A.  2010, sir.

22   Q.  And the second page, the same question.

23   A.  It's not stated on here, sir, but it looks like it's the

24   back -- it's a 2-sided flier.

25   Q.  So it would have been either the same time or about the

1  same time?

2  A.  I would have to guess.

3  Q.  Do you have any reason to believe that the second page was

4  published prior to September, 2006?

5  A.  No, sir.

6  Q.  In fact, you can be pretty certain that it was not?

7  A.  Yeah.  I wouldn't understand why they would put "2010" on

8  it then, sir.

9  Q.  Please turn to Plaintiff's Exhibit 93.

10  A.  Yes, sir.

11  Q.  I believe -- I also didn't get this written down, so if you

12  testified, I didn't catch it, but what date would this have

13  been published?

14  A.  Sometime in 2011, sir.

15  Q.  Pardon me for just a moment.

16  A.  Yes, sir.

17  Q.  To locate the next document.  Please turn to, if you have

18  it there, Defendant's Exhibit 205.  If you do not, we will get

19  a copy for you.

20  A.  I don't think I have it, sir.

21        MR. BELLAMY:  I will be asking for Defendant's 205 and

22  232.

23        MR. EHRLICH:  I believe it's in the binder, Your

24  Honor.

25        THE COURT:  I don't see any Ds in this book.

1          MR. HOOKER:  I don't think they were in that book,

2    Your Honor.

3          THE COURT:  Probably the first book we had?

4          THE WITNESS:  I don't have it, sir.

5          THE COURT:  You don't have it?

6          MR. BELLAMY:  I have a book.

7          THE COURT:  Do you have one for me?

8          MR. BELLAMY:  I do.

9          THE COURT:  What was the exhibit number again, please?

10         MR. BELLAMY:  Defendant's 205.

11   A.  I have it now, sir.

12   BY MR. BELLAMY:

13   Q.  Okay.  This is a copy of FNH USA's product catalogue from

14   2006.  Does that appear to be correct?

15   A.  It could be, sir, but I'm not 100 percent sure because it

16   also says, "FN Herstal."  So I'm not sure if it's a -- it's an

17   FNH USA catalogue, yes, sir.  If everything in 205 is part of

18   that catalogue, yes, sir.

19   Q.  If you would, turn to the fourth page of that Exhibit 1

20   that says, "A message from FNH USA," at the top.

21   A.  Sir, my Page 4 says -- it's got a Five-SeveN pistol on it.

22   Page 2 has a message.

23         MR. EHRLICH:  You might want to refer to the Bates

24   number or the --

25         MR. BELLAMY:  Okay.

1    BY MR. BELLAMY:

2    Q.  The Bates number at the bottom would be FN102642.

3    A.  Yes, sir, that's Page 2.  Thank you.

4    Q.  And this is a message that's addressed, "Dear Clients,

5    Customers and Operators."  Is that correct?

6    A.  That's what it states, yes, sir.

7    Q.  And it's in the form of essentially a letter, if you will,

8    signed by Mr. Evancoe?

9    A.  That's what it states, yes, sir.

10   Q.  And he was the director of military operations in 2006; is

11   that right?

12   A.  Yes, sir.

13   Q.  In the middle of that message, there are two bullet-pointed

14   paragraphs.

15   A.  Correct.

16   Q.  The first one reads,

17              "We are proud to announce that the United

18              States Special Operations Command (USSOCOM)

19              awarded the contract for the Special Combat

20              Assault Rifle (SCAR) to FN Herstal."

21   Did I read that correctly?

22   A.  That's what it reads, yes, sir.

23   Q.  When it says, "the Special Combat Assault Rifle," that's

24   referring to the rifle that resulted from the SOCOM SCAR

25   program that you talked about; is that correct?

1    A.  He's referring to the FN Herstal SCAR brand rifle that was

2    submitted and was awarded the contract, yes, sir.

3    Q.  So the Special Combat Assault Rifle, that phrase, that's a

4    brand of Herstal; is that what you're saying?

5    A.  I'm saying we have that on all of our product and we

6    decided before we were awarded the contract that we would go

7    with that brand, yes, sir.

8    Q.  The brand, "Special Combat Assault Rifle"?

9    A.  No, the brand of "SCAR."

10   Q.  And so when it says, "Special Combat Assault rifle," is

11   that referring to a brand?

12   A.  I don't know.  I didn't write it, sir.

13   Q.  Does it appear to be to you?

14        MR. EHRLICH:  Objection --

15   A.  That's speculation.

16        MR. EHRLICH:  -- Your Honor.

17   BY MR. BELLAMY:

18   Q.  So is it your testimony that --

19        THE COURT:  You are not really speaking quite loud

20   enough for me to hear you.  I want you to move in a little bit

21   closer.  Most of the time I hear you, but I don't hear you

22   every time.  What was the last question?

23        MR. BELLAMY:  I apologize, Your Honor.

24   BY MR. BELLAMY:

25   Q.  My last question was, when it says, "Special Combat Assault

1    Rifle," was that referring to a brand of FN Herstal?

2              MR. EHRLICH:  That was asked and answered.  Objection.

3              THE COURT:  Well, I am going to overrule the

4    objection.

5    A.  SCAR was the brand, sir.  The Special Combat Assault Rifle

6    was the name of the program.

7              THE COURT:  Let me ask a question.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  You might not be able to answer this, but

10   maybe someone out there can answer this question.  Did the

11   contract, the specifications, so forth and so on, that FN tried

12   to comply with, did it require that "SCAR" be on the side of

13   the gun, the receiver, or anywhere else for that matter?

14             THE WITNESS:  No, sir, did not require writing at all

15   anywhere.

16             THE COURT:  All right.  Go ahead.

17   BY MR. BELLAMY:

18   Q.  But within the SOCOM's SOF Combat Assault Rifle Program,

19   "SCAR" was an abbreviation for SOF Combat Assault Rifle, was it

20   not?

21   A.  It was one of them, yes, sir.

22   Q.  Did SCAR stand for something else in that program?

23   A.  I don't know.  I didn't -- I didn't run that program, sir.

24   Q.  But you said it was one of the abbreviations?

25   A.  Correct.

1    Q.   In this catalogue, are there any SCAR products being

2    offered?

3    A.   Give me a second, let me look through the catalogue, sir.

4    Q.   Let me ask you a broader question as you do that.  Is SCAR

5    mentioned anywhere else in this catalogue?

6    A.   I'll answer your first question first, and then I'll get to

7    your second one, sir. (Witness reviewing document.) No, sir, I

8    don't see it anywhere else.

9    Q.   Is this a catalogue that would have been given out at SHOT

10   Show 2006?

11   A.   This is the -- looks like the military version catalogue.

12   I truly believe there was also a commercial version, but I

13   won't swear to it, sir.  And if it's the military version,

14   then, no, it wouldn't have been given out.  It would have --

15   the commercial/LE version would have been given out.

16   Q.   And not the military version?

17   A.   Correct.  It is not a military show, sir.

18   Q.   One more question on this.  Could I have you turn to a page

19   somewhere in the middle, it's marked at the bottom FN102658.

20   A.   Give me one second, sir.  Yes, sir.

21   Q.   That is for a product line called Special Police Rifles.

22   A.   Yes, sir, bolt guns.

23   Q.   Is SPR a brand of FN's?

24   A.   SPR is a model of FN.

25   Q.   It's marked there with a TM.  Is that -- does that indicate

1   to you that it's a trademark?

2   A.  I am not a lawyer.  I am a layman.  But to me it is, yes.

3   Q.  I would like you to now look at Defendant's Exhibit 232.

4   It should be in that same book.

5   A.  I have it, sir.

6   Q.  Is this the 2006 commercial version of the catalogue?

7   A.  Correct, sir.  Commercial/law enforcement version, yes.

8   Q.  I'd like to ask you is there any mention of SCAR in this

9   catalogue?

10  A.  You are going to have to give me a couple minutes to go

11  through every page again. (Witness reviewing document.)  No, I

12  don't see anything, sir.

13          MR. BELLAMY:  I would like to move Defendant's

14  Exhibit 205 and 232.

15          MR. EHRLICH:  Wait, it's not their case in chief here.

16          THE COURT:  We are not that technical.  If he wants to

17  admit it, that's fine.  Do you have an objection to it over

18  this?

19          MR. EHRLICH:  205 and 206?

20          MR. BELLAMY:  205 and 232.

21          MR. EHRLICH:  No, we have no objection.

22          THE COURT:  It's your product.

23          MR. EHRLICH:  And I'm sorry, I should have looked

24  first.

25          THE COURT:  No problem.  No problem.  They are both

1  admitted.

2      (Defendant's Exhibits 205 and 232 were admitted into

3  evidence at 4:35 p.m.)

4  BY MR. BELLAMY:

5  Q.  I have a question that I forgot to ask you earlier.  If you

6  could turn back to Plaintiff's Exhibit 134.

7  A.  Give me one second, sir, I am trying to get this book back

8  together.

9  Q.  That would be in your main notebook there.

10 A.  Yes, sir.

11 Q.  Do you recall us looking at this tri-fold during your

12 deposition?

13 A.  Without going back to my deposition, I don't remember, sir.

14 Q.  Do you recall being asked whether this had been distributed

15 at SHOT Show 2006, and you answered that you really weren't

16 sure?

17 A.  Again, without going back and looking at my deposition, I

18 wouldn't be able to tell you exactly what I said, sir.  That

19 was a couple years ago.  And I believe it was 196 pages or

20 something like that.

21 Q.  All right.  Well, if we could have you then look at Exhibit

22 -- Defendant's Exhibit 200.

23          THE COURT:  What page?

24          MR. BELLAMY:  I will -- it will be Page 115.

25          THE WITNESS:  Yes, sir.

```
 1              MR. BELLAMY:  About the bottom third of that page.
 2              THE COURT:  Hold on.  What number?
 3              MR. BELLAMY:  Oh, at Line 17, Page 115.
 4   BY MR. BELLAMY:
 5   Q.  I asked you,
 6        "Q.  Do you know whether you handed out this trifold that
 7        is shown in Exhibit 29 at SHOT Show in 2006?"
 8   You answered,
 9        "A.  I do not know, sir."
10   A.  Correct.  That's what this says here, yes.
11   Q.  Is that still your testimony, that you don't know whether
12   that was handed out at SHOT Show 2006?
13              MR. EHRLICH:  Objection, Your Honor.  I am not sure
14   what we're talking about right now.  He's referring to this
15   document, but he doesn't -- he hasn't given him Exhibit 29 to
16   the deposition.  Unless he's referring to -- it's not referred
17   to that way here.  And I am not sure that the witness has --
18              THE COURT:  Just a minute.  Which exhibit are you
19   referring to?
20              MR. BELLAMY:  I'm referring to Exhibit 29, which is
21   the same as Plaintiff's Exhibit 134.
22              THE COURT:  So what you want to do is look at Exhibit
23   Plaintiff 134.
24              THE WITNESS:  Sir, I don't see any exhibit here.
25              THE COURT:  I don't find it, either.
```

1              MR. BELLAMY:  "Exhibit 134" is the Trial Exhibit 134.

2              THE WITNESS:  Again, sir, I don't see any exhibits in

3    here.

4              MR. BELLAMY:  It's in the other binder.  It's in

5    the --

6              THE COURT:  It's out of order in the notebook.

7    BY MR. BELLAMY:

8    Q.  So is it your testimony now, do you know or not know

9    whether that was distributed at SHOT Show 2006?

10   A.  Yes, it was distributed at SHOT Show 2006.  Since my

11   deposition, looking at what we're talking about now, I did go

12   back and do some research.  Yes.

13             MR. EHRLICH:  And just on clarification, he did say

14   that it was a strong possibility that it was distributed in his

15   answers.  So I am not sure there was impeachment there.

16             THE COURT:  Do you have any further questions?

17             MR. BELLAMY:  Just a moment, Your Honor.  I'm -- I may

18   not.  But I'd like to just confirm that.

19             THE COURT:  All right.

20   BY MR. BELLAMY:

21   Q.  I would like for the witness to be handed Defendant's

22   Exhibit 175 through 178.  I will see if I can get the binder.

23   Q.  If you would turn first to Defendant's Exhibit 175, please.

24   A.  Yes, sir.

25   Q.  Does this show an after-market product for an FN SCAR

1    rifle?

2    A.   I'm sorry, I have no clue.  It shows a Xerox copy of a

3    stripped trigger module that looks like -- it says "SCAR" on

4    it.  "SCAR25 Lower."  I have never personally seen this.

5    Q.   Okay.  Never heard of the Handl Defense SCAR25 Lower?

6    A.   No, sir.

7    Q.   Have you heard of the Handl Defense SCAR25m Lower?

8    A.   Again, no, sir.

9    Q.   Have you heard of the Handl Defense SCAR47 Lower?

10   A.   No, sir.

11   Q.   All right.

12           MR. BELLAMY:  Give me one moment, because I believe --

13   yes, Your Honor, that's all the questions I have on cross

14   examination.

15           THE COURT:  Any redirect?

16           MR. HOOKER:  Your Honor, may we take a short break?

17           THE COURT:  Well, if it's too short, I'm going home

18   so --

19           MR. HOOKER:  Very short and a very short redirect.

20           THE COURT:  Because it's a quarter to 5:00.  We don't

21   need to go much longer today, but we can take a short break.

22   Is five minutes enough?  Just have the court security officer

23   knock on the door when you're ready to come back in.

24           MR. EHRLICH:  Thank you, Your Honor.

25           BAILIFF:  All rise.

1      (Court in recess from 4:44 to 4:50 p.m.)

2          BAILIFF:  Be seated and come to order.

3          MR. HOOKER:  Just a very few questions on redirect,

4    Your Honor.

5                        REDIRECT EXAMINATION

6    BY MR. HOOKER:

7    Q.  Mr. Mills, you were asked about FN's decision to begin

8    making a civilian version of the M16.  Do you recall that?

9    A.  Yes, sir, I do.

10   Q.  How was that decision to make a civilian version of the M16

11   different from the decision to make a civilian version of the

12   SCAR rifle?

13   A.  Several factors played into that, sir.  There are well over

14   200 manufacturers that make civilian versions of the M16 and

15   M4.  We didn't want to be just another of those 200-plus

16   manufacturers.  We wanted something special.  We wanted to be

17   able to present the FN brand, known for high quality,

18   top-of-the-line product.

19       The bigger decision was -- that was not an FN product.  It

20   was first designed and developed by Colt.  TDP belongs to the

21   federal government, Department of Defense.  And under contract

22   that, when making our M16s, we were not allowed to make a

23   civilian version of that.  We had to go totally outside of the

24   box and come up with something totally different and not use

25   anything from the TDP.  We couldn't cross contaminate our

1    production lines or anything, sir.

2    Q.   You used the term, "TDP," what does that stand for?

3    A.   Technical data package, sir.

4    Q.   And who owned the technical data package for the M16?

5    A.   The federal government does, I believe.  The Department of

6    Defense.

7    Q.   And who owns the TDP for the SCAR rifle?

8    A.   FN Herstal, sir.

9    Q.   Now, you were asked some questions about the 2006 military

10   catalogue and the 2006 commercial catalogue.  Do you recall

11   that?

12   A.   Yes, sir, I do.

13   Q.   Now, why did the FN SCAR brand rifle not appear for sale in

14   those catalogues?

15   A.   Two reasons.  Number one, we didn't have a final production

16   version of it.  We were probably in Gen 2, Gen 3 at that time.

17   Generation 2, Generation 3.  So, we did not want to put that in

18   the catalogue, but we wanted to keep the attention, draw the

19   interest, say that the product's coming out, expand on our

20   brand of FN SCAR.  So we put out the fliers, the one-page

21   sheets here, the one-page sheets there, throughout the year.

22   We would still show the firearms, the machine gun versions of

23   them at the trade shows.  We would show them when we did law

24   enforcement demos or law enforcement shows, also.

25   Q.   So then the fact that they did not appear in those

1    catalogues does not mean that FN was not marketing the SCAR

2    rifle at that time?

3    A.  We marketed since the day we were awarded the contract.

4    We've never stopped.

5    Q.  And was FN selling the 2000 -- selling the SCAR rifles in

6    2006?

7    A.  To the Department of Defense, yes, sir.

8    Q.  And going back to when?

9    A.  2004 was the first one, I believe, sir.

10   Q.  Was the first sales to the --

11   A.  To the Department of the Defense, yes, sir.

12   Q.  -- of the SCAR rifles.  Now, you were shown Defendant's

13   Exhibit 175.  I don't believe you need to look at it.  Those

14   were the Handl Defense web pages.

15   A.  Correct, sir.

16   Q.  Now, did anything on those website pages indicate anything

17   about any sales of those items?

18   A.  No, sir, not that I --

19   Q.  And were you aware of any of those items ever being sold to

20   anyone?

21   A.  No, sir.

22   Q.  Do you have any -- do you know one way or the other whether

23   they have a license from someone to use any of the terms on

24   that web page?

25   A.  To my knowledge, no, sir.

1          MR. HOOKER:  No further questions.

2          THE COURT:  Would you like to do some recross?

3          MR. BELLAMY:  Nothing else, Your Honor.

4          THE COURT:  Okay.  All right.  We're good.  Thank you

5    very much.  You may step down.

6          THE WITNESS:  Yes, sir.  And you will need me

7    tomorrow, correct?

8          THE COURT:  We're going to talk about that.

9          THE WITNESS:  Okay.  Thank you.

10          THE COURT:  How far are we along?  Are we where you

11   thought we'd be at the end of the day?  Behind, or ahead or

12   where?

13          MR. EHRLICH:  Your Honor, we're probably ahead of

14   where we thought we'd be.  Yeah.  At this point.  So, we think

15   we moved very quickly on a lot of exhibits and a lot of

16   testimony, and I think we're ahead of where we thought we'd be.

17          THE COURT:  Okay.  Who are you going to start with

18   tomorrow?

19          MR. EHRLICH:  We're going to start with -- if we want,

20   we could start with finishing this witness with the financial

21   information that he's going to introduce, and then we thought

22   we'd start with Mr. Bosschaerts, he's in the courtroom right

23   here, after that.

24          THE COURT:  And do you have a witness after that or is

25   he the last witness?

1          MR. EHRLICH:  No, Your Honor, we were -- we were

2    planning on calling an adverse witness or two, depending on the

3    situation.  And we have a subpoenaed witness as well.  Your

4    Honor.  The former employee of -- of --

5          THE COURT:  That will be a short witness; won't it?

6          MR. EHRLICH:  What's that?

7          THE COURT:  That will be a short witness; won't it?

8          MR. EHRLICH:  It should be, Your Honor.

9          THE COURT:  I'm a little bit confused.  Are you going

10   to call four witnesses tomorrow?

11         MR. EHRLICH:  Yeah.  But they'd just be very -- these

12   other -- three of them are relatively very short, and the

13   fourth might -- you know, we're not thinking -- we were

14   thinking it might be an hour, hour and a half max.  I mean,

15   it -- it can vary.

16         But we -- we -- when we were initially looking at how

17   far along we were, Your Honor, we thought it would take two

18   days to reach the point that we could be reaching in way less

19   than the two-day span.  We were hoping optimistically on the

20   two days.

21         THE COURT:  It sounds to me like it's going to be less

22   than two days.

23         MR. EHRLICH:  It is.

24         THE COURT:  (Addressing Mr. Bellamy) Which means you

25   need to have some witnesses here tomorrow.  How many witnesses

 1    do you think you're going to call all together?

 2              MR. BELLAMY:  Two or three.

 3              THE COURT:  Okay.

 4              MR. EHRLICH:  One issue that we do have to resolve is

 5    the designations on the depositions, Your Honor.

 6              THE COURT:  Right.

 7              MR. EHRLICH:  We've never really resolved the

 8    objections or the designations, and that could cut down on some

 9    time.  We've gone back and forth, but, you know -- maybe we'll

10    just give you the entire transcripts, Your Honor, and we mark

11    which sections in yellow highlighting that we want you to look

12    at.  And then you can, you know -- obviously you'd have the

13    whole transcript and, you know, you could -- if there's

14    something else you see that you'd look at, you look at.

15              THE COURT:  Okay.  Well, I told you all to do this

16    before trial.  I guess we're not having a jury trial, so it

17    makes some difference here.  All right.  Have you -- are there

18    other exhibits you want to get in or have you gotten all your

19    exhibits in?

20              MR. EHRLICH:  No, we have not gotten all our exhibits

21    in.  Unfortunately, because of the foundation objections to

22    90 percent of our exhibits, we've -- we've had to fly

23    Mr. Bosschaerts from Belgium to testify, and he'll be

24    testifying as to certain exhibits to lay the foundation and for

25    some other reasons.  But we -- we felt we had to get in these

1    other exhibits.

2              THE COURT:  Sorry you had to come here from Belgium to

3    come here in July.  I'm sure you'd much rather be over there

4    than here.  I would.

5              Let me tell you about this financial -- this financial

6    information.  I understand that there are roughly $110 million

7    worth of sales related to these rifles.  I understand that this

8    is, unlike the AR-15, a very unique weapon.  And I'm not sure

9    that it really makes a lot of difference to me that I know the

10   percentage of the breakdown of that $110 million civilian

11   versus the military market.  I don't know that that's really

12   going to have much effect on my opinion about the case.

13             I think you have a legitimate concern about your

14   proprietary interest in these numbers.  I can certainly

15   understand why your client would not want those divulged.  I

16   certainly understand that the military arms market and the

17   civilian market is very, very competitive.  And so I can

18   understand why they wouldn't want that information divulged.

19             I am not completely convinced that it would be wrong

20   for me to ask Mr. Clyde to step outside, but I am just not sure

21   it makes much difference to me one way or another.  I mean,

22   certainly there had to be a substantial number of civilian

23   sales based on what I've heard.  And there were sales to Clyde

24   Armory that have been reflected in one of the exhibits already.

25   So we know -- I mean, I know they're out there and they're

1    being sold.

2           And I don't doubt the testimony that there is a lot of

3    interest in the civilian market and law enforcement market in a

4    rifle like this.  Everybody wants something new, it doesn't

5    matter whether it's a car or a dress or whatever, you know.

6    That's the way it is in our consumer society.  So, I don't -- I

7    don't care much one way or the other whether I have that

8    information about the breakdown.

9           MR. EHRLICH:  Well, for the record, we'd like to put

10   it in.  I think it would be interesting.  It's -- it's -- you

11   know, I think it's useful.

12          THE COURT:  Well, you think about it and we'll talk

13   about it again in the morning.

14          MR. EHRLICH:  Thank you, Your Honor.

15          THE COURT:  All right.  Anything further we need to

16   talk about?

17          MR. BELLAMY:  There was an issue of a -- a --

18   impeachment witness that we had raised with Plaintiff, and it

19   was depending upon whether Mr. Smith was going to testify.  So

20   we understand he is now under subpoena so we're expecting him

21   to be here.

22          THE COURT:  Is this the witness who said Mr. Clyde

23   went to the SHOT Show and said we're going to use the SCAR?

24          MR. BELLAMY:  No, this would be a witness for

25   impeachment of Mr. Smith's --

```
1                THE COURT:  That's what I'm saying.

2                MR. BELLAMY:  -- testimony.

3                THE COURT:  The witness you want to impeach is the one

4     I just described?

5                MR. EHRLICH:  That's right, he --

6                MR. BELLAMY:  I guess so.

7                MR. EHRLICH:  -- he's saying Josh Smith, who we

8     subpoenaed to appear, is the witness you want to impeach.

9                MR. BELLAMY:  Right.

10               MR. EHRLICH:  And, Your Honor, we may be able to

11    shortcut this.  We may be able -- I could -- I could probably

12    agree that if we use his deposition instead of live testimony,

13    we could probably -- then he won't need the impeachment witness

14    if he would agree to that.

15               MR. BELLAMY:  Absolutely not.

16               MR. EHRLICH:  No deal there, Your Honor.

17               THE COURT:  You are not right on that one.

18               MR. BELLAMY:  Mr. Smith's credibility is very much at

19    issue here, and having him here live would be important.

20               THE COURT:  All right.  Okay.

21               MR. EHRLICH:  Your Honor, the impeachment witness that

22    they are using was never identified to us, wasn't listed in the

23    pretrial order, and we first learned of this new witness --

24    what was it, Glenn? -- about a week ago?  When you identified

25    him?
```

1          MR. BELLAMY:  It was about three weeks ago, I believe.

2          MR. EHRLICH:  I don't think so.  I think it was

3  more -- it may have been two weeks.  Time goes by, Your Honor.

4  But it was -- it was -- it was long after discovery closed and

5  after the pretrial order was entered with the names in the

6  pretrial order, and the order specifically says you can't add

7  names.  If they're going to use an impeachment witness to

8  impeach my impeachment witness, we would like to take his

9  deposition, Your Honor.  We could do that outside of court.

10          MR. BELLAMY:  Your Honor --

11          THE COURT:  Wait a minute.  Wait a minute.  When was

12  Mr. Smith deposed?  How long ago?

13          MR. EHRLICH:  Mr. Smith was deposed over two years

14  ago, as I recall, Your Honor.  I think it was more like -- I

15  could look up the exact date, and I'm sure we have it here, but

16  it was -- you know, it was ages ago.  We never heard of this

17  witness.  I don't believe he was in the -- in the initial

18  disclosure statements or anything like that.

19          THE COURT:  What is the --

20          MR. EHRLICH:  Okay.  Mr. Smith was deposed February 5,

21  2014.  So that was -- it wasn't two years ago.  It's, what,

22  about a year and six months ago or five months ago.  This is

23  the first we -- I mean, you know, we didn't get a chance to

24  depose his impeachment witness who has come out of the blue,

25  Your Honor.

1          THE COURT:  What's this man's name?

2          MR. BELLAMY:  His name is Jay Johnson.  Your Honor, he

3    was disclosed, I believe it was about three weeks ago.  And an

4    offer was made more than once to take a discovery deposition.

5    He's here in Athens, that he would be available, and we got no

6    reply at all.  I know at least twice --

7          MR. EHRLICH:  Your Honor --

8          MR. BELLAMY:  -- we offered --

9          THE COURT:  Don't interrupt.  Please don't interrupt.

10   Where does this man work?

11         MR. BELLAMY:  The probation office for the county.

12   The county probation office.

13         THE COURT:  Okay.

14         MR. EHRLICH:  If you want, we'll take his deposition

15   tomorrow morning.  We'll start the trial a little later.

16         THE COURT:  We're not going to start the trial late.

17         MR. EHRLICH:  Well, we will have a long breakfast.

18   Just kidding.

19         MR. BELLAMY:  There were -- at least the past two

20   weeks I know of time when I was waiting to hear when they

21   wanted to take his deposition.

22         MR. EHRLICH:  Your Honor, I think we were kind of busy

23   with, like, motions back and forth and -- I didn't really want

24   to take another trip down here for that, quite frankly.  But

25   I -- I -- what we were offered was a deal that they wouldn't do

```
1    something if we didn't do something, and that didn't sound real
2    appealing.  But you're saying it was three weeks ago.  I
3    thought it was a little less.  We could bring in the letter if
4    we want.  But all we're asking for is that we get to take his
5    deposition.
6          THE COURT:  Well, I think it's too late for that.  Had
7    you asked me about that at the pretrial conference, I would
8    have told you that --
9          MR. EHRLICH:  But it wasn't disclosed to us, Your
10   Honor.  They only disclosed his name after the pretrial
11   conference.
12         THE COURT:  When was the pretrial conference?
13         MR. BELLAMY:  June 29th.
14         MR. EHRLICH:  And this witness was disclosed to us
15   after the pretrial conference.
16         THE COURT:  It was after the pretrial conference?
17         MR. EHRLICH:  Yes.  For sure.
18         MR. BELLAMY:  I believe that that's correct.  It was
19   before the pretrial order was entered and Mr. --
20         MR. EHRLICH:  No, technically, the pre- -- the
21   pretrial -- the pretrial conference was --
22         MR. BELLAMY:  Excuse me, could I finish?
23         THE COURT:  Pull the microphone down.
24         MR. BELLAMY:  I'm sorry, it was disclosed before the
25   pretrial order was entered.  And it was -- it was raised by
```

1    Mr. Ehrlich at the end of the last telephone conference that we

2    had with Your Honor when other issues were being addressed.

3    But there wasn't discussion about it then.

4            MR. EHRLICH:  I don't know what he -- you know,

5    honestly, I remember receiving the letter where he raised the

6    new witness, where he identified that new witness.  The

7    pretrial -- the pretrial conference had long since been held as

8    of that point.

9            And while he's saying the pretrial order hadn't been

10   entered, the pretrial order that has been entered by this Court

11   never listed his name.  And no drafts of the pretrial order

12   ever listed his name.  I think after the pretrial order is

13   entered -- the pretrial order was done with the names and the

14   pretrial order never showed this guy's name.  And, the pretrial

15   hearing was held and this guy wasn't raised.  That's why we

16   didn't take his deposition.

17           THE COURT:  All right.  Well, we'll take this up

18   tomorrow.  We'll go from there.  Anything else?

19           MR. BELLAMY:  No, Your Honor.

20           MR. EHRLICH:  No, that's enough.

21           THE COURT:  Is Mr. Smith coming?  Do you know that

22   he's coming?

23           MR. EHRLICH:  We subpoenaed him and he said he's

24   coming.

25           THE COURT:  Okay.  All right.  All right.  Very good.

1    Thank you all, have a nice evening.

2              BAILIFF:  All rise.

3        (Court was adjourned at 5:07 p.m.)

4                         END OF RECORD

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, Darlene D Fuller, Federal Official Realtime Court

6       Reporter, in and for the United States District Court for the

7       Middle District of Georgia, do hereby certify that pursuant to

8       Section 753, Title 28, United States Code, that the foregoing

9       is a true and correct transcript of the stenographically

10      reported proceedings held in the above-entitled matter and that

11      the transcript page format is in conformance with the

12      regulations of the Judicial Conference of the United States

13

14                            Dated this 28th day of July, 2015

15

16

17                            _____
                              s/Darlene D. Fuller
18                            Darlene D Fuller, CSR No. 5803
                              RPR, CRR, RMR
19                            Federal Official Court Reporter

20

21

22

23

24

25