1            IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
2                      ATHENS DIVISION

3                   _____

4    FN HERSTAL, S.A., PLAINTIFF,          )
                                           ) Case No. 3:12-CV-102-CAR
5         vs.                              ) November 1, 2016
                                           ) Macon, Georgia
6    CLYDE ARMORY, INC., DEFENDANT.        )
     _____)
7

8                      STATUS CONFERENCE

9

10            BEFORE THE HONORABLE C. ASHLEY ROYAL
             UNITED STATES DISTRICT JUDGE, PRESIDING
11

12   APPEARANCES:

13   FOR THE PLAINTIFF:        BURTON S. EHRLICH
                               LADAS & PARRY
14                             224 SOUTH MICHIGAN AVENUE, STE 1600
                               CHICAGO, IL  60604
15
                               CHARLES H. HOOKER, III
16                             KILPATRICK & TOWNSEND
                               1100 PEACHTREE STREET, N.W.;
17                             STE 2800
                               ATLANTA, GA  30309
18

19   FOR THE DEFENDANT:        GLENN D. BELLAMY
                               WOOD HERRON & EVANS
20                             2700 CAREW TOWER
                               441 VINE STREET
21                             CINCINNATI, OH  45202-2917
     _____
22
                      *DARLENE D. FULLER, USCR*
23                     POST OFFICE BOX 1873
                       MACON, GA  31202-1873
24                       (478) 752-3497

25

1    Macon, Georgia

2    Tuesday, November 1, 2016

3    10:03 a.m.

4                    P R O C E E D I N G S

5              MARSHAL:  All rise.  United States District Court for

6    the District of Georgia, Macon Division, is now in session.

7              THE COURT:  Good morning, how are y'all today?

8              COUNSEL COLLECTIVELY:  Good morning, Your Honor.

9              THE COURT:  So, Mr. Ehrlich, you decided to come

10   visit us?

11             MR. EHRLICH:  Yes, I sure did.  Thank you, Your

12   Honor.

13             THE COURT:  Now, I know that Herstal filed a motion

14   in this case, and then very recently a report was filed from

15   Clyde Armory.  And there's a declaration from Mr. Clyde.  And

16   then there are also some exhibits attached here.

17             And so I've reviewed this, and I have to say I was

18   under the impression that Mr. Clyde was violating certain

19   portions of the rule that I had invoked after rendering a

20   decision in this case.  And I think that was really the essence

21   of why the motion was filed.  There were certain things that he

22   was doing that were inconsistent with my order, and also seemed

23   to be continuing his commerce under the name SCAR.  So maybe

24   all that is not correct.

25             But anyway, where we stand today is that there is a

1    report, and I want to find out where y'all stand with this.

2    Are you satisfied with what's stated in here?  Is there other

3    relief that you feel like you need?  And if so, what is that

4    relief and how would it be carried out?  So -- so, in other

5    words, I think the status -- I think the status has changed

6    since you filed your motion.  Maybe it hasn't.  So that's why

7    we're here.  We're here to find out what you think the posture

8    of the case is and what you think needs to be done, and then

9    obviously we will hear from defense counsel.

10          So, let me just tell you, please do not stand up in

11   my courtroom.  We're casual here.  I do insist that you have

12   the microphone close to you.  So, just keep your seat and I'll

13   be glad to hear from you about what you think we need to do.

14          MR. HOOKER:  Your Honor, one question that we have,

15   it is not clear from the report what -- how many units were

16   sold after the injunction was entered, when those were sold,

17   and how many are left and, you know, what the disposition of

18   those are.

19          Our understanding, I think, of the posture of the

20   case is that Your Honor granted our motion for contempt, at

21   least in part; that Mr. Clyde was, in fact, in contempt; that

22   attorneys fees were awarded; and that now we need to address

23   the briefing schedule for the attorneys fees -- the

24   determination of the actual fees that should be ultimately

25   awarded.

1          THE COURT:  Right.  We're going to talk about that.

2     But the first is this issue about the report and what needs to

3     be done there.  So you have a question about how many units are

4     sold and how many were destroyed?

5          MR. HOOKER:  That's right.  I mean, otherwise, I

6     think -- I think our view of it if you -- I'm looking at Page 1

7     of Docket 176, which was the report.  And in essence -- the

8     report and the declaration of Mr. Clyde in essence admit that

9     Clyde Armory failed to do each of the items enumerated in Your

10    Honor's injunction, starting with (A) and going through at

11    least (E), if not (F) on Page 2.  I mean, there just seems to

12    be no question that he continued to sell these infringing --

13         THE COURT:  Well, that was my impression.  I mean,

14    you know, I didn't have any evidence of that.  I mean, that was

15    obviously what --

16         MR. HOOKER:  Well, we put in -- we put in a notice of

17    filing, which Clyde Armory filed a response to.  But we had a

18    declaration -- I believe Mr. Copland from the Kilpatrick firm,

19    my firm, put in a declaration.  And then we had another

20    declaration from Mr. Stanislo, who actually went to Clyde

21    Armory's store in Athens and put in evidence that they were

22    still selling and --

23         THE COURT:  Okay.

24         MR. HOOKER:  -- advertising the items.  Mr. Copland's

25    declaration related to the website.  But it was very clear --

1           THE COURT:  Right.

2           MR. HOOKER:  -- that they were selling the items well

3    beyond -- I think that was in the -- you know, months after

4    Your Honor's order was entered.  So --

5           THE COURT:  Well, I certainly came away with the

6    conclusion from what I read that that had happened.  I didn't

7    know what Mr. Clyde's position on that was.

8           Do you want to tell me about that?

9           MR. BELLAMY:  Well, Your Honor, after the original

10   decision was entered, Clyde Armory filed a motion asking for a

11   modification pending appeal.  And I believe the Defendant was

12   very clear as to what he said he was going to be doing.  And

13   that the Plaintiff would be very aware of that.

14          THE COURT:  Was that to continue to sell these

15   products?

16          MR. BELLAMY:  At his store, without any advertising.

17          MR. HOOKER:  Your Honor, if I could just -- well --

18          MR. BELLAMY:  If I could finish.

19          THE COURT:  Go right ahead, you can finish.

20          MR. BELLAMY:  And then -- and then with all due

21   respect, we heard nothing for about a year.  At which time

22   there was a finding of contempt, and --

23          In any event, you know, all sales, all promotion, all

24   advertising has completely ceased.  So, it was pending that

25   motion in asking for the modification, and we believed it

1    was -- everyone understood what the requested modification was.

2    And then that was all in the briefing involving that motion,

3    the cross-motion for contempt, and so forth.  And immediately,

4    when that was decided, Clyde Armory got into compliance ASAP.

5          MR. EHRLICH:  Your Honor, we think it's -- it's

6    really the situation that we immediately -- when we heard what

7    they were planning to do, we tracked what they were doing on

8    the internet and we hired the investigator.  To say nothing

9    happened for a year, we filed our motion for contempt.

10   Immediately they knew that we did not agree to the

11   modifications that they were requesting in the injunction.

12         With one small exception.  We did agree that we would

13   hold the matters basically in abeyance on the trademark

14   opposition matters, which is proper, and we told them we'll

15   modify the injunction.  So the only modification that ever

16   occurred to the injunction that was something we agreed to, and

17   had nothing to do with our motion for contempt.

18         We filed our motion for contempt timely.  We gave a

19   warning.  Essentially, they asked us would we agree to these

20   modifications; we said no.  And we warned them, and then they

21   went ahead and continued doing it.  And the only excuse they've

22   given is that -- the excuse being that they asked for a

23   modification of the injunction.

24         THE COURT:  I don't remember ever giving a

25   modification --

```
 1              MR. EHRLICH:  No, you did not.

 2              THE COURT:  -- for the purposes of them being able to

 3    sell and market this material, these products.  Did I ever do

 4    that?

 5              MR. BELLAMY:  Well, Your Honor, the motion was not

 6    decided until just a few weeks ago.

 7              THE COURT:  Okay.

 8              MR. BELLAMY:  The motion for modification.

 9              MR. HOOKER:  Your Honor, if I may just add one thing.

10    I mean, to be clear, what Mr. Ehrlich just made very clear is

11    we never consented to this modification --

12              THE COURT:  I understand that.

13              MR. HOOKER:  -- anyway.  And that they -- to ask the

14    Court for that after an injunction has been entered is an end

15    around the injunction in a way.

16              Another thing, I am not aware of any law, you know,

17    authorizing a party to continue selling product that's clearly

18    been enjoined --

19              THE COURT:  I agree.

20              MR. HOOKER:  -- only under the authority that they've

21    moved to modify the injunction.

22              THE COURT:  Well, to me, and my assessment of this

23    before I walked in, and that's basically been confirmed, is

24    that Mr. Clyde has just been very arrogant in dealing with the

25    Court.  And that he thinks he doesn't have to comply with an
```

1    order of injunction from the United States District Court Judge

2    is flagrant and abusive.

3            I mean, the fact that you may have wanted to continue

4    to sell those things and you did it until I was going to rule

5    on it one way or the other, and my having already enjoined

6    that, I --

7            So, anyway, what do we need to do today to put

8    this -- I'm -- I know we've had problems in the past, but today

9    is today and we're trying to move forward with this.  That's

10   what I want to do is get this --

11           You know, I've found that y'all are entitled to your

12   attorneys fees.  We will talk about that in a minute.  But I

13   just want to get by this report and the status of all that.

14   Because I think there are a couple of other -- at least one

15   other issue that you haven't mentioned yet, and so I'd like to

16   hear from you further.

17           MR. EHRLICH:  Your Honor, we have -- the court order

18   for today's hearing stated that the parties are to be in court.

19   We're a little surprised Andrew -- more than a little surprised

20   Andrew Clyde isn't here today.  And we have a concern, Your

21   Honor.

22           Shortly after this Court ruled on the contempt,

23   finding them in contempt, and, you know, not amending the

24   injunction, you know, what we saw happen was they filed a

25   report saying they are now being in compliance.

1          And when you read the report, it's a little

2    ambiguous.  And we have a concern that how could they have made

3    the change to the actual product.  Because while we looked at

4    their website, they are selling apparently this gun stock now

5    under another mark on the website.  The product, as you will

6    recall, was laser marked.  And laser marked at times in more

7    than one spot.  We have photographs of that.

8          And all of a sudden -- I mean, they had this

9    left-over inventory that they admitted they have, that they

10   continued to sell, and it wasn't being used up.  And all of a

11   sudden they change the website -- like, within 48 hours or 72

12   hours -- after this Court ruled that they are in contempt.  But

13   now the actual product that was sold, when people order it, is

14   it still bearing "SCAR-Stock"?

15         And if it is, there is still continuing contempt

16   right now.  The Defendant isn't here today, and we'd like to

17   know, what -- what did he do?  Because to order this -- I was

18   the one who deposed John Klein of Sage, and he would have had

19   to order the product, the guy would have had to basically

20   manufacture it and ship it, or he had to obliterate the laser

21   marking.  What happened there?  We would like an explanation.

22         THE COURT:  Well, of course, you pointed out

23   something that occurred to me, too, and that is how to ensure

24   compliance.  How to ensure that what is stated here is, in

25   fact, what's going to happen.

1              You know, there's a -- it talks about Clyde Armory

2    immediately commence complete compliance with the Court's

3    September 27...,  I mean, how do we know that?  I don't

4    understand how the Court knows whether that's happened or not.

5              And -- my recollection is -- and, of course, it's

6    been a while -- but I mean, he ordered quite a number of

7    stocks.  He had a significant inventory of these stocks.  And

8    that he really hadn't sold all that many at the time of the

9    trial.  And that he really hadn't produced that much revenue

10   from the sale of these stocks.  So, I was left with the

11   impression at the trial that he still had a significant

12   inventory of these stocks.

13             MR. BELLAMY:  No, Your Honor, that is not correct.

14   At the time of trial he had sold somewhere around 800, I

15   believe.  The -- it was -- remaining after the decision -- I

16   don't remember exactly, it seems like about 70-something of

17   them existed.  What remains today are simply an example of each

18   one, which is not for sale.  They are simply being preserved

19   for evidentiary purposes.  Should there need to be one

20   produced, there is one available.  They are not for sale.

21             The product on the -- is not on the website.  I

22   believe that Plaintiff's counsel is confusing the SCAR-Stock

23   product with the EBR stock, which is something that's made by

24   Sage.  It fits a different firearm.  They look very similar, as

25   we said at trial.  The SCAR-Stock was modeled after the EBR,

1    and that's what's being sold now.  And it's a Sage product.

2              There are none offered for sale.  There are none on

3    the website.  There are none in the store other than, like I

4    say, an example of each, which are stored away and are not in

5    commerce.  And the way that you know that, Your Honor, is that

6    we filed a report with a declaration signed by my client's CEO.

7              THE COURT:  Go ahead.

8              MR. BELLAMY:  I am not sure what else we can do to

9    provide assurance that what we said is true.

10             MR. HOOKER:  I think -- I think we could probably

11   clear this up in a pretty simple fashion.  He's correct in that

12   there are certain representations made in the report.  But in

13   Paragraph 6 and 9 there's no specificity given as to how many,

14   again, were sold after Your Honor entered the injunction and

15   how many remained at that time, and then specifically how many

16   are left now.

17             Instead, we're left with fairly vague terms of "there

18   are a few examples still left," "there were some sold."  If

19   Mr. Clyde would submit another declaration certifying to the

20   Court the number, the specific number that were sold and the

21   specific number that were left, I think we could clear this

22   issue up.

23             THE COURT:  Well, I think what we need is him to

24   submit another declaration of how many were sold, how many were

25   left over in the inventory and how many were destroyed.

1              MR. HOOKER:  If I may, Your Honor, just add onto

2       that:  Specifically when they were sold.  I take it your order

3       would be for the number that were sold after the injunction was

4       entered.

5              THE COURT:  Yes.  Right, right, exactly.  Right.

6              MR. EHRLICH:  It also raises the question, Your

7       Honor, you know, the order itself did not say compensatory

8       damages were awarded for the contempt at this point in time,

9       but it might be helpful if we had some idea of what the sales

10      prices were, when the sales were made, that sort of

11      documentation, to see what was really going on.

12             And it seems a stretch of coincidence that all of a

13      sudden, when this Court ordered the contempt, that now he was

14      only left with two units.  He never said in any declaration he

15      destroyed anything.  He says, "Oh, I only have a couple units.

16      You know, that I'm saving."  So what did he do with the rest of

17      it?  Did he destroy it?  Where is it?  What's happening to it?

18      And this Court did not order that it be warehoused or anything

19      like that.  But I think we should get specificity and maybe

20      even the invoices.

21             THE COURT:  Well, I think we can do that.  I wonder

22      if one way might just to go take his deposition.  Find out what

23      he had to say.

24             MR. BELLAMY:  Your Honor, if I may.

25             THE COURT:  If he can produce the documents.  So --

1              MR. BELLAMY:  Your Honor -- where do I start?  None

2      were destroyed.  There's no reason to destroy any of these.

3      If -- if there was a -- if there was remaining inventory to be

4      sold in commerce, the trademark could be obliterated, and that

5      would make them non-infringing at that point.

6              Although, that did not happen.  The sales were very,

7      very small because there was no advertising or promotion

8      outside of the store.  And so, there weren't many remaining.

9      Obviously no more had been ordered.  And there were very few

10     remaining.

11             No one ever said, "two."  I believe it's maybe more

12     like five, being an example of each of the models and colors

13     and so forth.  But, you know -- but to destroy these, which

14     could be evidence later, makes no sense when they are

15     quarantined, if you will.  They are not in commerce.  And

16     that's what the declaration says.

17             THE COURT:  Well, it sounds to me like he stopped

18     selling these things because he ran out of them.  Is that what

19     you're telling me?

20             MR. BELLAMY:  Well, he was certainly not going to

21     order any more of them.  And so supply was very low at the end.

22             THE COURT:  Well, I think you need to provide them

23     with the information.  And I think that if there are any

24     replicas, if you want to call it that, left over, they need to

25     be kept in your office.  So you can have them transmitted to

1    your office.

2             MR. BELLAMY:  Okay.

3             MR. EHRLICH:  Then if there are any questions we

4    might want to depose --

5             THE COURT:  That's fine, that's fine.  I mean, it

6    seems to me your client was in contempt.  It's very hard for me

7    to -- very hard for me to just accept what's stated here.  You

8    know, I'm just skeptical, quite frankly, of what he has to say

9    in light of his conduct.  So --

10            MR. BELLAMY:  Your Honor, within hours of when your

11   contempt finding came out, these things were removed.  And as

12   soon as possible, the domain name was offered up and has been

13   transferred.  It's in the Plaintiff's control.  Has been for

14   weeks now.

15            THE COURT:  Well, I am not concerned about what

16   happened after the contempt order was entered.  I'm concerned

17   about what happened after the trial and I took actions.  That's

18   mainly my concern.  Anyway, what else do we need to deal with?

19            MR. EHRLICH:  We also have the question of the

20   attorneys fees and how to proceed with that.  And we have a

21   recommendation, Your Honor.

22            THE COURT:  Okay.  I am not ready to get to that yet.

23   Do you have anything else?

24            MR. EHRLICH:  Well, you have something.

25            THE COURT:  Okay.  Well, I have something and what I

1  have is on Page 2, although not -- at the bottom of the page,

2  last sentence,

3          "Although not specifically identified in the

4          Court's order, Clyde Armory continued pursuit

5          of relief at the appellate level will also

6          result in the continued suspension, rather

7          than abandonment, of its combined opposition/

8          cancellation proceedings at the USPTO."

9  Is it okay with y'all if that just be suspended?

10         MR. EHRLICH:  Your Honor, we don't have a problem

11  with the suspension of the proceedings in the USPTO pending the

12  resolution of the matter.

13         THE COURT:  Okay.

14         MR. EHRLICH:  That's -- that's in compliance with the

15  Trademark Office rules that they will accept that.

16         THE COURT:  Okay.

17         MR. EHRLICH:  As long as there hasn't been a final

18  determination.  We do have to say that while that reference

19  that he was going to file for a rehearing or a rehearing *en*

20  *banc* in the Eleventh Circuit, his time is up for doing that.

21         THE COURT:  That was another thing.

22         MR. EHRLICH:  And he didn't do it.

23         THE COURT:  It looks -- have you filed anything in

24  the Eleventh Circuit?  Because it looks like the time has run.

25         MR. BELLAMY:  We did not.  We considered that.  We

1    investigated that carefully.  And we chose not to file anything

2    else in the Eleventh Circuit.  We are pursuing a petition for

3    certiorari.

4              THE COURT:  Okay.

5              MR. BELLAMY:  That is due on December 26th.

6              THE COURT:  All right.  So when that gets denied,

7    that will be the end of the case.  And at that point, that will

8    be the abandonment.  You will abandon that claim in the Patent

9    and Trademark --

10             MR. BELLAMY:  I understand that.

11             THE COURT:  Okay.  All right.  So that's the other

12   issue that I was concerned about.  Before we talk about

13   attorneys fees, is there anything else we need to cover related

14   to any of this contempt and order and report or anything else

15   that we need to deal with related to that?

16             MR. EHRLICH:  No.  I think we're fine.

17             THE COURT:  Okay --

18             MR. EHRLICH:  On the issue of attorneys fees, Your

19   Honor.

20             THE COURT:  Wait a minute, Defendant may have a

21   comment.

22             MR. BELLAMY:  I don't believe that there's anything

23   else that is -- that's pending right now as an issue.

24             THE COURT:  Okay.  All right.  Attorneys fees?

25             MR. EHRLICH:  Yes.  On the issue of attorneys fees,

1    Your Honor, we thought about a procedure where basically,

2    hopefully, we could narrow the issues on the hourly rates and

3    the time spent by seeking to reach an agreement with opposing

4    counsel. And, you know, that maybe we'd exchange records, make

5    them available to each other, see if we can narrow the issues

6    and agree on hourly rates and agree on the time spent.

7            And then to the extent there's any remaining issues,

8    then we'd have to brief those and provide it in a brief to the

9    Court. And we thought maybe something on the order of 30 days

10   for maybe exchanging and seeing what we could agree to in the

11   way of hourly rates and attorneys fees.

12           And then maybe 15 days thereafter, we would file our

13   opening brief to the extent that we haven't reached an

14   agreement. We're hoping we might be able to reach an

15   agreement. And, you know -- but we'll have to see about that.

16           We were also thinking that in some courts there is a

17   procedure where you have to make records available in terms

18   of -- like, we'd make our billing records available, redacted,

19   so he could see the hours and the rates and what we charged the

20   client.

21           And we're hoping reciprocally that if he relies on

22   information rather than it coming in after the -- on a brief,

23   and we see it for the first time, that if he's disputing

24   something, that he could show us what hours he's spent and his

25   hourly rates and that sort of thing. And then we'd, you know,

1    come in with whatever issues we have for the Court on anything

2    disputed.

3           MR. HOOKER:  Well, I'd just like to clarify, Your

4    Honor, what we're asking for is a 30-day period of negotiation

5    with the other side to see if we can stipulate on a

6    reasonableness of the rates or the hours or the total value of

7    the services rendered for our attorneys fees.  And if at the

8    end of that we can't agree on anything, then we would go ahead

9    and submit our brief on December 15th.

10          THE COURT:  Do you agree with that?  It sounds like a

11   good plan to me.

12          MR. BELLAMY:  I don't disagree with the plan.  I

13   would ask, though, that we defer it until there's a ruling on

14   the petition for certiorari.

15          MR. EHRLICH:  Your Honor, that's very concerning to

16   us because that is a substantial delay.  I mean, the chances of

17   a writ of certiorari being granted, as we all know, it's like

18   about one percent of the cases.  Will this be one of them?

19   Well, no one knows with any certainty, but I don't see issues

20   that raise themselves to a level to assert themselves as

21   constitutional issues, so it's a very low chance and a very

22   lengthy process for the writ to be denied.

23          We would -- and with the bad faith -- the Court

24   finding repeatedly in the Court's decision bad faith, then the

25   contempt which is more bad faith, we're -- we're -- we're very

1    apprehensive about, you know, even what's going to happen in

2    the end.  We'd ask that the Defendant, you know -- potentially

3    that this Court consider that the Defendant, you know, be

4    required to post a bond and -- and basically give a personal

5    guaranty on what's ever owed in the end.  And we might agree to

6    a specific amount for the bond, you know, based upon what we

7    think the Court might grant in the way of attorneys fees.

8         MR. BELLAMY:  I -- I don't see any justification for

9    that or any necessity for -- for anything like that.

10        THE COURT:  Well, I am not inclined to have him

11   provide a bond in this case.  I think the chances of you

12   getting to the Supreme Court, much less prevailing in the

13   Supreme Court, are slim to none based on the issues that were

14   raised and cited, based on the opinions from the Eleventh

15   Circuit.

16        I mean, so much of it is really just my factual

17   findings.  And then it's some procedural things that I don't

18   think really have any broad concern or interest in the Supreme

19   Court.  And for that matter, even in the Eleventh Circuit.

20        So, I think we need to proceed with that.  We're

21   going to go with the plan that you proposed.  And so y'all have

22   30 days, if that's enough time.  And it may not be enough time.

23   Maybe you need a little bit more than that.  I don't know.  I

24   don't have any idea how extensive the --

25        MR. HOOKER:  I really don't think we need any more

1    time.  I think it's probably in our interest to move it along.

2              THE COURT:  Okay.  30 days is fine.

3              MR. EHRLICH:  And then 15 thereafter for the brief.

4              THE COURT:  Okay.  That will be good.

5              MR. EHRLICH:  We could always -- if we're making some

6    progress, we could always come to the Court, you know, and just

7    say we're narrowing the issues.  You know, So if it looks like

8    we're not making progress, then, you know, we are filing our

9    brief.  And if we're, you know, almost there, maybe we can

10   narrow the issues.

11             Hopefully there won't be that much that, you know,

12   we'll be having the Court decide.  But we don't know.  We just

13   think in good faith both parties ought to negotiate this and

14   get it resolved if we can.

15             THE COURT:  All right.

16             MR. EHRLICH:  There is one other thing.  We do have

17   the -- the bill of costs were granted, you know, to the tune of

18   about 14,000, I think, in the district court and another

19   400-some-odd in the appellate court.  And, is that something

20   that maybe the Court -- maybe the Defendant -- at least so the

21   total sum isn't being owed, maybe the Defendant should be

22   required to pay that in the interim?

23             THE COURT:  Well, I am trying to think if we normally

24   get that as a part of the attorneys fees or if that's separate.

25   I don't -- I just don't remember how we've handled that.

```
 1              MR. BELLAMY:  It's under the same rule, the costs.

 2              THE COURT:  Say that again.  Sorry.

 3              MR. BELLAMY:  It's under the same rule, award of

 4    costs, and then attorneys fees is a subset.

 5              MR. EHRLICH:  What is taxable costs versus, you know,

 6    the attorneys fees, which is by a special statute or the

 7    exceptional case doctrine.

 8              THE COURT:  Well, there's not going to be any dispute

 9    about that amount; right?

10              MR. EHRLICH:  It's been resolved.

11              MR. BELLAMY:  Right.  We contested some, and the

12    Clerk adjust-  -- made an adjustment in -- in -- along with

13    what we had contested.

14              THE COURT:  Right.  Okay.  Well, let's go ahead and

15    get the attorneys fees wrapped up.

16              Now let's talk a minute about how you're going to

17    present that to me, because sometimes lawyers don't send me

18    what I need.  And -- and typically what we get -- and we

19    only -- I mean, it's only several times a year that we even do

20    this.  It's just not that common.  Because so many of these

21    cases settle.  But, you know, are you going to send me a bill,

22    essentially a complete bill, that will give me the total of

23    what the attorneys fees are and how the rates are charged?

24    And --

25              MR. HOOKER:  Your Honor, we just filed with the
```

1    Eleventh Circuit a motion for our attorneys fees there.

2                  THE COURT:  Okay.

3                  MR. HOOKER:  We asked the Eleventh Circuit under the

4    local rule to transfer the determination of that to you so that

5    it all can be wrapped up together.

6                  THE COURT:  Okay.

7                  MR. HOOKER:  And in that motion for our fees on

8    appeal, we simply provided redacted versions of the invoices

9    that we sent to our client and that the client paid.  We had an

10   attorney declaration sponsoring that, authenticating that, and

11   providing any explanation that was necessary for anything that

12   was deducted from the total amount shown on the bill.

13                  But it was done in a very methodical way that was

14   intended to make it very clear for Your Honor to follow exactly

15   what was in each invoice.  Each was attached as a separate

16   exhibit to the declaration.  And then we laid it out in a very

17   lock-step way.

18                  You know, following the lodestar method that the

19   Eleventh Circuit assigns for this process, we went through the

20   reasonableness of the rate, the reasons that we think the rate

21   is reasonable, putting in evidence for that.  And then a

22   discussion of each phase of the case -- or in this case each

23   phase of the appeal -- and what was done, what the work was.

24   And matching up the invoice that, you know, that time was

25   billed under.  And then giving the Court a road map for that.

1          So that's how we would propose to do it if that's

2     acceptable to Your Honor.

3          THE COURT:  Well, one thing that's not clear to me is

4     am I going to be able to see what work was done at any given

5     time and how many hours it took to do that work, and then how

6     much that cost?  Is that what you're sending me or not?  It

7     doesn't sound like it.

8          MR. EHRLICH:  We broke down our billing, both

9     Charles' office and our office broke down our billing by

10    attorney per day, with a description each day of what they did.

11    So you will be able to see what the work -- what the total

12    amount of work that was spent, you know, by us and the hourly

13    time for each attorney and what their billing rate was.

14         We did give discounts at times, and you will be able

15    to see that on the bills, too.  We were just going to only

16    redact what would normally be, you know, very attorney-client

17    privileged, like telephone -- you know, there might be some

18    things where, you know -- and normally that's redacted --

19    communications or certain things with -- you know, whatever.

20         But we were thinking that hopefully we could reach

21    some agreement with opposing counsel on billing rates and --

22    and also maybe on time spent.  So at least we can identify for

23    the Court, through this process, where there is a dispute.  For

24    instance, if they say we spent too much time on summary

25    judgment; we could say, yeah, we spent X number of hours and

1    you spent X number of hours, too, on your side.  And, you know,

2    the Court could then determine, you know, based on the

3    descriptions in our -- in our pleading what is reasonable.

4         But we think this is a far better procedure than just

5    piling everything into the Court and then not knowing what

6    position they are taking.  We at least in good faith need to

7    identify where we've got an agreement --

8         THE COURT:  Okay.

9         MR. EHRLICH:  -- on reasonableness and costs.

10        THE COURT:  I think the thing to do is just proceed

11   as you've described.  And then if I don't have what I think I

12   need, you will have to put it in a different format.

13        I mean, I will just give you an example.  One of the

14   things that I look for when I go over these attorneys fees is

15   the duplication of work.  I mean, Lawyer A reviews the

16   complaint, Lawyer B reviews the complaint, Lawyer C reviews the

17   complaint, paralegal reviews the complaint.  That kind of thing

18   is what I'm talking about.  So I need to -- need to know

19   where -- that's where the duplication of work is.

20        And I understand this is a complicated case, no

21   question about that.  But I'm just -- just need to make sure I

22   know how many people really did the work and what is the work

23   they did.

24        MR. HOOKER:  You will have that information.

25        THE COURT:  Okay.

```
 1          MR. HOOKER:  And in the case -- and I have a copy
 2   here.  We filed it under seal.  If Your Honor would like a copy
 3   of what we filed with the Eleventh Circuit, I have a copy to
 4   hand up to you.
 5          THE COURT:  Well, you can give it to my deputy.
 6          MR. HOOKER:  In this instance, we redacted out
 7   time -- in fact, there wasn't any attorney-client privilege
 8   information, so what we redacted out was time that we weren't
 9   seeking reimbursement for because it didn't relate to the
10   appeal.  But in every instance there is detailed time entries
11   for each timekeeper.
12          THE COURT:  Okay.
13          MR. HOOKER:  But I would just like to understand,
14   what is -- would you like, and what I understand the lodestar
15   method requires, is a description by phase of the case.  And
16   that so far in this instance, initial phase of the case and
17   discovery, and you would have for that total number of hours
18   expended, times the hourly rates for each of the attorneys that
19   worked on that phase.  That would summarize what's in the
20   underlying invoices.  Is that what you're looking for?
21          THE COURT:  Well, I mean, it sounds to me like -- is
22   this an example?  Let me take a look at that.
23          MR. HOOKER:  Yes.
24      (Law clerk passing document to Court for review.)
25          THE COURT:  Well, it looks to me like this is the
```

1    format that I want.  Just to give you an example, here's,

2              "10/2/15, LWC, various communications with

3              PACER regarding Eleventh Circuit ECF log-in

4              and credentials for Mr. Hooker, .4 hours,

5              $110."

6    And if it's going to come in that format --

7              MR. HOOKER:  Yes.

8              THE COURT:  -- then I think it will be all right.

9              MR. EHRLICH:  Both our billings are in that format,

10   Your Honor.

11             THE COURT:  Okay.

12             MR. EHRLICH:  They have been in that format

13   throughout the case.

14             THE COURT:  Okay.

15             MR. EHRLICH:  And like Charles said, there were

16   occasioning communications that we will strike out because they

17   may be relating to another proceeding or not really directly to

18   the case.  But we're hoping that some of this doesn't need to

19   be resolved by you, Your Honor, in terms of that we could reach

20   an agreement on rates, billing rates, wherever possible.  And

21   we're hoping that we could also reach an agreement on maybe

22   phases in the case.  Maybe the summary judgment portion --

23             THE COURT:  Okay.

24             MR. EHRLICH:  -- we can agree that the time was

25   reasonable.  No doubt, we won't reach -- the way the case has

1    gone -- and I do have respect for Glenn, opposing counsel --

2    that, you know, he -- you know, he -- we've seen where when

3    he's calling some shots, he -- he can be very reasonable.  But,

4    you know, I don't know how -- beyond that, he has the client,

5    too, that he has to serve.

6           THE COURT:  I understand.

7           MR. EHRLICH:  So we're hoping we can resolve much of

8    this.  And one question we do have -- you know, one of the

9    rationales for attorneys fees was his conduct even after the

10   order was entered in the contempt, and we're thinking that we

11   should probably be submitting attorneys fees right up through

12   the fee petition so that way this Court can award the attorneys

13   fees for the contempt and for the fee petition right up -- and

14   then if the Court decides for some reason not to award

15   something, you know, the Court has the information.

16          THE COURT:  That's a good way to do that, all right.

17   Anything else?

18          MR. BELLAMY:  No, Your Honor.

19          MR. HOOKER:  No.

20          THE COURT:  Very good.  Thank you very much.

21          MR. EHRLICH:  Thank you, Your Honor.

22          MARSHAL:  All rise.  Court is dismissed.

23      (Proceedings concluded at 10:39 a.m.)

24                          END OF RECORD

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, Darlene D Fuller, Federal Official Realtime Court

6    Reporter, in and for the United States District Court for the

7    Middle District of Georgia, do hereby certify that pursuant to

8    Section 753, Title 28, United States Code, that the foregoing

9    is a true and correct transcript of the stenographically

10   reported proceedings held in the above-entitled matter and that

11   the transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States

13

14                       Dated this 6th day of November, 2016

15

16

17   _____
                                      *Darlene D. Fuller*
18   Darlene D. Fuller, RPR, CRR, RMR
     NCRA No. 5803
19   Federal Official Court Reporter
     Georgia CCR 5641-3440-5157-6832
20   Michigan Certification CSR-0929

21

22

23

24

25